**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOCELYN TROELL, et. al., | Docket No.  1:24-cv-07136 (JSR) |
| Plaintiffs, | |
| vs. | **ORAL ARGUMENT** |
| | **NOVEMBER 27, 2024 AT 2 PM** |
| BINANCE HOLDINGS LIMITED, et. al., | |
| Defendants. | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**BINANCE HOLDINGS LIMITED'S MOTION TO DISMISS**</u>

**CAHILL GORDON & REINDEL** LLP
Samson A. Enzer
Anirudh Bansal
Sesi Garimella
32 Old Slip
New York, New York 10005
(212) 701-3125

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

THE COMPLAINT'S ALLEGATIONS .................................................................. 4

ARGUMENT ............................................................................................................. 9

I.     The Complaint Fails to State a Claim for Aiding-and-Abetting Liability (Count 1). 10

  A.    The Complaint Fails to Sufficiently Allege BHL Knowingly and Substantially Assisted the Attacks. .................................................................................. 10

    i.    The Complaint Fails Plausibly to Allege that BHL Engaged in "Conscious, Voluntary, and Culpable" Conduct. ....................................... 10

    ii.    Plaintiffs Do Not Allege a Sufficient Nexus Between BHL's Alleged Conduct and the Attacks. .......................................................... 12

    iii.    The Halberstam Factors All Support Dismissal. ....................... 14

  B.    The Complaint Does Not Adequately Allege BHL Was Generally Aware of Its Role in the Relevant Terrorist Activity. ............................................ 14

II.     The Complaint Fails to Plead a Conspiracy Claim (Counts 2 and 3)....................... 16

  A.    The Alleged Axis Conspiracy (Count 2). ................................................. 17

    i.    Count 2 Does Not Allege Any Illicit Agreement. ....................... 17

    ii.    Count 2 Does Not Allege that BHL Conspired to Commit an Act of International Terrorism. .............................................................. 19

    iii.    Count 2 Does Not Plausibly Allege an Overt Act in Furtherance of an Agreement to Commit International Terrorism. .............................. 20

  B.    The Alleged ISIS Conspiracy (Count 3). ................................................. 22

    i.    Count 3 Does Not Allege an Illicit Agreement. ....................... 22

    ii.    Count 3 Does Not Allege that BHL Conspired to Commit an Act of International Terrorism. .............................................................. 23

    iii.    Count 3 Does Not Plausibly Allege an Overt Act in Furtherance of an Agreement to Commit International Terrorism. .............................. 23

III.     The Complaint Fails to Establish Personal Jurisdiction Over BHL. ........................ 24

CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorosa* v. *Gen. Elec. Co.*,
    2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)............................................................5

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)............................................................4

*Bernhardt* v. *Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022)............................................*passim*

*Byfield* v. *New York City Dep't of Educ.*,
    2023 WL 3293644 (S.D.N.Y. May 5, 2023) . (See Enzer Decl. Exs. 1-8)............................5

*Cain* v. *Twitter Inc.*,
    2018 WL 4657275 (N.D. Cal. Sept. 24, 2018) ............................................*passim*

*Freeman* v. *HSBC Holdings PLC*,
    57 F. 4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023)............................*passim*

*Halberstam* v. *Welch*,
    705 F.2d 472 (D.C. Cir. 1983)............................................9, 14, 17

*Honickman for Est. of Goldstein* v. *BLOM Bank SAL*,
    432 F. Supp. 3d 253 (E.D.N.Y. 2020), *aff'd sub nom. Honickman* v. *BLOM
    Bank SAL*, 6 F.4th 487 (2d Cir. 2021)............................15, 16

*Kemper* v. *Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ............................................17, 18, 19, 22

*Knight* v. *Standard Chartered Bank*,
    531 F. Supp. 3d 755 (S.D.N.Y. 2021)............................................25

*Lau* v. *ZTE Corp.*,
    2023 WL 9066883 (E.D.N.Y. Sept. 28, 2023) ............................16, 20, 23

*Linde* v. *Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)............................................15

*In re Nat'l Instruments Corp. Sec. Litig.*,
    2024 WL 4108011 (S.D.N.Y. Sept. 6, 2024)............................................4

*O'Sullivan* v. *Deutsche Bank AG*,
2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) (Swain, J.) ............................................... *passim*

*Ofisi* v. *BNP Paribas, S.A.*,
77 F.4th 667 (D.C. Cir. 2023) ....................................................................................... 19

*Strauss* v. *Crédit Lyonnais, S.A.*,
379 F. Supp. 3d 148 (E.D.N.Y. 2019), *aff'd in relevant part, appeal dismissed in part*, 842 F. App'x 701 (2d Cir. 2021) ................................................................... 16

*Waldman* v. *Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016) .................................................................................. 24, 25

*Zobay* v. *MTN Grp. Ltd.*,
695 F. Supp. 3d 301 (E.D.N.Y. 2023) ............................................................................ 24

**Statutes**

18 U.S.C. § 2333(d)(2) ......................................................................................................... 9, 16

18 U.S.C. § 2333(d)(2): (1) ....................................................................................................... 4

Defendant Binance Holdings Limited ("BHL") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Complaint (ECF No. 1 ("Compl.")) under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2).[1]

## PRELIMINARY STATEMENT

BHL unequivocally condemns all acts of terrorism, including the reprehensible attacks referenced in the Complaint (the "Attacks"). The perpetrators of the Attacks should be brought to justice and made to compensate the victims. But BHL is not among those responsible. BHL did not perpetrate the Attacks, nor participate in them in any way, and there are no allegations connecting BHL to the Attacks. The Complaint does not and cannot plausibly allege otherwise.

Plaintiffs are victims (or their representatives) of 17 terrorist attacks, who seek damages based on speculative and conclusory assertions that BHL (a foreign company that is part of a wider group of entities operating the Binance.com offshore digital-asset exchange ("Binance")) somehow facilitated the Attacks. Yet what the Complaint actually alleges—and all it plausibly could allege—is speculation based on: (1) BHL having provided routine transaction services to users worldwide, and (2) BHL's government agency settlements, that those generally-available services had deficient anti-money laundering ("AML") and sanctions controls. Critically, the Complaint does not connect those services, nor the control deficiencies, to the Attacks.

Rather, on the basis of conjecture as to what *must* have occurred because of BHL's control issues, and without the necessary supporting factual allegations, the Complaint asserts causes of action against BHL under the Anti-Terrorism Act ("ATA"), accusing BHL of aiding-and-abetting acts of terrorism (Count 1) and conspiring with the terrorists (Counts 2 and 3). As discussed in Sections I and II below, however, these allegations fail to state a plausible claim.

---

[1] Unless otherwise noted, capitalized terms have the same definitions as in the Complaint, emphasis is added, and internal citations and quotations are omitted.

To state a claim under any of these counts, Plaintiffs would, at minimum, have to plead with sufficiency that BHL actively, intentionally, and knowingly assisted terrorists in carrying out the Attacks.  But all the Complaint alleges—and only in the most generalized, conclusory terms—is that terrorist organizations need money to carry out their heinous acts; that some of the money the terrorists acquired involved digital assets; and that BHL (one of numerous companies offering a digital asset trading exchange) failed to implement sufficient controls to prevent terrorist-affiliated individuals and entities and other wrongdoers from using its services.  What it does not do is: (1) plausibly allege that any Binance user was a member of a terrorist group, let alone that BHL knew at the time that terrorist groups were using Binance; (2) plausibly allege a connection between a single transaction on Binance and the Attack, or (3) explain how BHL's generally-available transaction services had anything to do with Plaintiffs' injuries.  The best Plaintiffs can muster is the speculative and conclusory allegation that some transactional activity on Binance (in many cases only with the benefit of hindsight) has some purported association (which the Complaint fails to specify) with some terrorist groups.  And although Plaintiffs rely on government agency findings concerning BHL's controls deficiencies, those findings do not suggest any *intent* to support terrorism, let alone the specific Attacks that caused Plaintiffs' injuries.  These deficiencies require dismissal of the Complaint's ATA claims.

The U.S. Supreme Court recently made clear just how deficient the Complaint's allegations are.  In *Twitter, Inc.* v. *Taamneh*, the Court held that to plead aiding-and-abetting liability under the ATA, a plaintiff must allege facts showing that the defendant engaged in "truly culpable conduct" by "consciously, voluntarily, and culpably" participating in the terrorist attack that injured the plaintiff.  598 U.S. 471, 489, 505 (2023).  Otherwise, the Court cautioned, "mostly passive actors like banks [would] become liable for all of their customers' crimes by virtue of

carrying out routine transactions." *Id.* at 491.  The Complaint's aiding-and-abetting count suffers the same infirmities as the claims dismissed in *Twitter*, and must be dismissed for the same reasons.

The Complaint's conspiracy claims fare even worse, since to sustain them Plaintiffs would have to plausibly allege and prove an *agreement* between BHL and the perpetrators of the Attacks *to carry out the Attacks*.  *See Twitter*, 598 U.S. at 490.  In *Twitter* the Supreme Court characterized this as a "significant limiting principle," even when compared to aiding-and-abetting liability, which the Court curtailed in that case.  *Id*.  And recent Second Circuit ATA precedent—decided a few months prior to *Twitter*—makes clear that the conspiracies alleged in the Complaint are not actionable as a means to compensate the Plaintiffs for their injuries sustained in the Attacks.  *See Freeman* v. *HSBC Holdings PLC*, 57 F. 4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023).

Under the Second Circuit's holding in *Freeman*, Plaintiffs cannot state a conspiracy claim unless they allege that BHL entered into a conspiracy with a terrorist group to commit the Attacks, or other acts of terrorism.  But here, the Complaint alleges only that BHL conspired to provide material support to terrorists, supposedly by enabling them to access the financial system.  And the Second Circuit made clear in *Freeman* that pleading this type of conspiracy—to allow terrorists to access the financial system, after which the terrorists allegedly used that access to fund terrorism—is insufficient to hold BHL accountable for the *Attacks* and Plaintiffs' injuries sustained from them.  *See Freeman*, 57 F. 4th at 79-83 (dismissing ATA conspiracy claim alleging that bank enabled terrorists to evade economic sanctions, leading to the funding of terrorism).

Finally, as discussed in Section III *infra*, the Complaint fails to adequately plead personal jurisdiction over BHL, which independently requires dismissal.

## THE COMPLAINT'S ALLEGATIONS[2]

Plaintiffs are 270 individuals who allege they are victims, or represent victims, of the Attacks.  (Compl. ¶ 2).  Their Complaint seeks to hold BHL liable for the physical and emotional harm they suffered from the Attacks, based on three causes of action under 18 U.S.C. § 2333(d)(2): (1) aiding-and-abetting designated foreign terrorist organizations ("FTOs") in carrying out acts of international terrorism; (2) conspiring with Iran-affiliated FTOs to maintain their ability to access payments used in connection with acts of international terrorism; and (3) conspiring with ISIS to provide material support for its acts of international terrorism.  (*Id.* ¶¶ 1-2, 1132-1184).

The Complaint contains no allegations tying BHL to the Attacks.  It alleges that BHL provided arm's-length services to users, and that BHL's failure to implement sufficient AML and sanctions controls allowed certain users, with unspecified ties to FTOs, to use Binance.  But the Complaint does not allege that BHL: (1) planned or participated in the Attacks, (2) intended to support the Attacks, (3) had advance knowledge of the Attacks, nor (4) had any connection with the Attacks' perpetrators.  Nor does the Complaint allege with factual support that a single act by BHL, nor even a single transaction by a Binance user, directly funded or caused the Attacks.

Ultimately, the best the Complaint can do across its nearly 1200 paragraphs is string together a disjointed assortment of allegations that, according to Plaintiffs, suggest that: (1) BHL somehow disregarded that individuals associated with designated FTOs were among the 180 million users transacting on Binance, and (2) Plaintiffs have identified so many transactions with unspecified links to designated FTOs that, in hindsight, some *must* have been connected to the Attacks in some way.  These sorts of allegations are plainly insufficient to sustain an ATA claim.

---

[2] The facts alleged by Plaintiffs are taken as true for purposes of this motion only.  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *In re Nat'l Instruments Corp. Sec. Litig.*, 2024 WL 4108011, at *1 (S.D.N.Y. Sept. 6, 2024).

*Allegations That BHL Must Have Known Terrorists Used Binance*

In an attempt to support their speculative assertion that BHL must have known FTO-linked users were accessing Binance, Plaintiffs rely on four sources of information, which, even taken together, are insufficient to support an ATA claim.

<u>**U.S. Regulatory Actions**</u>:    The Complaint relies heavily on U.S. government agency filings, including a 2023 Consent Order between BHL and the Financial Crimes Enforcement Network ("FinCEN"), a 2023 complaint by the Commodity Futures Trading Commission ("CFTC"), and a 2023 plea agreement with the Department of Justice ("DOJ").    But—as the actual documents, rather than Plaintiffs' curated excerpts, make clear—the central issue in those matters was that BHL did not have sufficient AML and sanctions controls, and failed to register with FinCEN as a money service business.    None of these agencies alleged that BHL intentionally supported any terrorist group, let alone the Attacks.[3]    Most of Plaintiffs' out-of-context quotes are from the agencies' backward-looking reviews, which say nothing about whether BHL knew any transactions on Binance were linked to terrorists *at the time they occurred*.    (*See, e.g.*, Compl. ¶ 304 ("Binance user addresses were found" at unspecified times "to interact with bitcoin wallets associated with [terrorist groups]"); *id.* ¶ 164.c (alleging FinCEN's investigation discovered

---

[3] While the Court is required to accept the allegations as true on this motion, courts "generally do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not conducted independent investigation." *Amorosa* v. *Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022). Those principles also apply to consent orders, including the consent orders referenced in the Complaint, which expressly limit their admissions to the content of BHL's plea agreements. (*See* Enzer Decl. Exs. 5, 7); *Amorosa*, 2022 WL 3577838, at *1 ("[A] consent judgment between a federal agency and a private corporation" is "not the result of an actual adjudication of any of the issues" and reflects nothing more than "the result of private bargaining[.]"). Nevertheless, should the Court wish to consider these materials in their proper context, BHL has submitted them. *Byfield* v. *New York City Dep't of Educ.*, 2023 WL 3293644, at *1 (S.D.N.Y. May 5, 2023) ("[T]he Court may consider . . . documents that are integral to the Complaint even if they are not incorporated by reference."). (See Enzer Decl. Exs. 1-8).

"direct transactions between Binance and ISIS-associated wallets"); *id.* ¶ 164.e (FinCEN's investigation identified "tens of millions of dollars in transactions with a network identified with the terrorist organization [Palestinian Islamic Jihad].")).

Even when the Complaint attempts to allege BHL's contemporaneous knowledge—rather than rely on hindsight—it fails. The Complaint quotes from the FinCEN Consent Order to allege that in April 2019, BHL "received reports from its third-party service provider," identifying "Hamas-associated transactions." (*Id.* ¶ 428). This allegation says nothing about whether BHL was aware of the alleged "Hamas associat[ion]" at the time the transactions were processed. Similarly, the allegation that BHL allowed "accounts associated with ISIS and Hamas" to be offboarded, and the user allowed to withdraw the funds (*id.* ¶ 429), says nothing about what BHL knew about the accounts when they were transacting on the exchange. If anything, this allegation shows that once BHL understood the account to be "associated" with the FTOs, [BHL's] former Chief Compliance Officer described it as '[e]xtremely dangerous for our company' and instructed compliance personnel to '[c]heck if he is a VIP account, if yes, to . . . *[o]ffboard the user* but let him take his funds and leave.'" (*Id.* ¶ 429). That is the antithesis of allowing the exchange to be used to advance terrorism (which is true regardless of whether BHL was required to report the user to FinCEN). Nor does the Complaint state—other than in an entirely conclusory way—the supposed FTO "associations" on which these allegations rest.

Unable to plead facts showing contemporaneous knowledge, Plaintiffs pivot to alleging that BHL failed to block and report suspicious transactions. (*Id.* ¶¶ 6, 167). Not only is this conclusory allegation contradicted by the Complaint itself (as the discussion immediately above makes clear), even if it were accepted as true, it does not demonstrate that BHL intentionally and substantially aided terrorists, nor that it shared a common intent with them.

"***Warnings*" from International Organizations**:  The Complaint cites multiple "warnings" from members of the international community about the "possibility—and reality—of terrorist use of cryptocurrency," which Plaintiffs claim "gave Defendants general awareness of the terrorist-financing risks posed by cryptocurrency."  (*Id.* ¶ 215).  Specifically, the Complaint cites U.N. resolutions describing terrorists' use of emerging financial technologies (*id.* ¶ 216), and U.N. reports describing terrorists' use of cryptocurrency wallets.  (*See, e.g.*, *id.* ¶¶ 217, 269).  Plaintiffs also cite reports by the Financial Action Task Force warning of the risk of terrorists' use of cryptocurrencies.  (*Id.* ¶¶ 218-219).  But none of this implicates BHL in the Attacks, much less shows that BHL aided or abetted or conspired to commit them.

**"*Warnings*" from Blockchain Analysis Firms, Scholars, and NGOs**:  The Complaint alleges that various "blockchain analysis firms, cryptocurrency and terrorist-finance scholars, and NGOs similarly sounded the alarm that terrorist groups were actively looking to use—and did in fact use—cryptocurrency to fund their operations and commit attacks."  (*Id.* ¶ 200; *see also, e.g.*, ¶¶ 223-25).  It also alleges that "Binance was also told directly about these warnings by the blockchain analysis firms whose AML/CFT/KYC monitoring services Binance contracted for and used."  (*Id.* ¶ 201).  But again, allegations that blockchain analysis firms, NGOs, and scholars warned of a general risk that FTOs may use cryptocurrencies does nothing to advance the Complaint's assertion that *BHL* aided-and-abetted and conspired in the Attacks.

Plaintiffs also allege that BHL "had contractual relationships with several blockchain analysis firms . . . [which] provided Defendants a constant stream of warnings regarding wallets that were likely connected to terrorist groups—but Defendants willfully disregarded those warnings and permitted wallets labeled as connected to the IRGC to transact on the Binance exchange."  (*Id.* ¶ 391).  Here again, the Complaint does not allege that any of these wallets were

connected to any Attack, nor even what the supposed connections to the IRGC were.

***Israeli Government Actions***:  The Complaint also cites instances in which the Israeli government took action against digital assets:  for example, news reports, that "Israel ha[d] seized digital wallets linked to Iran's Islamic Revolutionary Guard Corps' Quds Force and the Iran-backed Hezbollah terror group."  (*Id.* ¶ 418).  Plaintiffs misleadingly paraphrase from the news reports to suggest Binance-hosted accounts were implicated in this seizure, but in truth the reports do not even mention Binance.  Even if the Israeli-seized accounts were hosted on Binance, the FinCEN Consent Order confirms that BHL "cooperated with Israeli law enforcement in numerous seizures related to the al Qassam Brigades," which flatly contradicts the notion that BHL intentionally supported terrorists.  In fact, the Complaint fails to identify a *single* wallet that transacted on Binance after having been blacklisted, nor does it connect any blacklisted wallet to the Attacks.

Plaintiffs also allege that Binance hosted at least one wallet held by Tawfik Muhammad Sa'id al-Law, who "conducted cryptocurrency transfers for sanctioned Hizballah officials" and whose other cryptocurrency the Israeli government later seized.  (*Id.* ¶ 423).  But the Complaint does not (1) allege that this wallet was used to conduct sanctioned transactions for Hizballah, let alone fund the Attacks, nor (2) address whether that link would have been apparent to BHL prior to the transfers.

### Allegations Attempting to Link Binance Users' Transactions to the Attacks

Unable to plead facts showing a link between the Attacks and BHL, Plaintiffs fall back on an undisclosed "preliminary analysis of open-source intelligence and publicly available information," to allege that unspecified sums (supposedly in excess of tens of millions of dollars), involving addresses with purported but unidentified links to FTOs, "flowed through" Binance. (*See* Compl. ¶¶ 387-389, 433, 437, 452, 460).  Even assuming the truth of this opaque, conclusory

summary of Plaintiffs' private analysis, it does not establish a link to the Attacks. Trying to hold BHL accountable for an FTO's violent attacks because the group or its associates used digital assets that may have flowed through Binance-hosted accounts at some point is like trying to hold an international bank accountable because terrorists used money.

## ARGUMENT

Plaintiffs attempt to hold BHL liable for the Attacks under the aiding-and-abetting (Count 1) and conspiracy (Counts 2 and 3) provisions of the Anti-Terrorism Act (ATA). Congress passed the ATA in 1992 to hold terrorists accountable for their actions against Americans. In 2016, Congress amended the ATA by enacting the Justice Against Sponsors of Terrorism Act ("JASTA"), which created aiding-and-abetting and conspiracy liability for non-terrorists under certain narrow circumstances. Specifically, a person injured by an act of international terrorism "committed, planned, or authorized" by a designated FTO may assert liability against "any person who [1] aids and abets, by knowingly providing substantial assistance, or [2] who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).[4]

Plaintiffs' Complaint fails to state a cause of action under either theory, because they have failed to sufficiently allege that BHL knowingly provided "substantial assistance" to any Attack (*see* Section I *infra*), nor does it sufficiently alleged that BHL was part of any conspiratorial agreement to carry out any Attack (*see* Section II *infra*).

---

[4] As explained further below, in enacting JASTA, Congress specifically pointed to the D.C. Circuit's 1983 *Halberstam* decision as providing "the proper legal framework" for assessing aiding-and-abetting and conspiracy liability under Section 2333(d). Pub. L. No. 144-222, § 2(a)(5), 130 Stat. at 852.

I.    **The Complaint Fails to State a Claim for Aiding-and-Abetting Liability (Count 1).**

The Complaint fails to state an ATA aiding-and-abetting claim because it does not sufficiently allege that BHL (1) "knowingly and substantially assist[ed] the principal violation"; or (2) "[was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance." *Twitter*, 598 U.S. at 486.

A.    **The Complaint Fails to Sufficiently Allege BHL Knowingly and Substantially Assisted the Attacks.**

The Complaint does not come close to meeting the exacting standard for the knowing and substantial assistance element that the Supreme Court recently set forth in *Twitter*. *Id.* at 489, 505. In *Twitter*, the plaintiffs were victims of a terrorist attack committed by ISIS at a nightclub in Istanbul. *Id.* at 478-79. They alleged that various social media companies aided and abetted ISIS by knowingly permitting ISIS to use the companies' platforms and algorithms to target and recruit new members, and fundraise. *Id.* at 480-81. In explaining why the plaintiffs had failed to state a claim, the Court distilled the "conceptual core" of the knowing and substantial assistance element to two requirements:  (1) "conscious, voluntary, and culpable participation" in the principal's wrongdoing (here, the Attacks); and (2) a nexus between that participation and the plaintiffs' injuries. *Id.* at 493-95, 506. The Complaint fails to satisfy either requirement.

i.    ***The Complaint Fails Plausibly to Allege that BHL Engaged in "Conscious, Voluntary, and Culpable" Conduct.***

The *Twitter* Court explained that "conscious, voluntary, and culpable participation in another's wrongdoing" requires plausible allegations that the defendants actively participated in the relevant attack "as something that they wished to bring about, or sought by their action to make . . . succeed." *Id.* at 493, 498. Accordingly, the Court found it insufficient for the plaintiffs to allege that the social media company defendants *knew* that ISIS was using their platforms to further

terrorism.  *Id.* at 478.  It was likewise insufficient to allege "omissions, inactions or nonfeasance." *Id.* at 489; *compare id.* at 490 (aiding-and-abetting liability requires affirmative misconduct such as "inducing, encouraging, soliciting, or advising the commission of the offense"), *with id.* at 499, 500 ("passive assistance" or a defendant's "failure to stop" terrorists from using its services is not enough).  That is why the *Twitter* plaintiffs' theory of liability—that the social media companies *failed to stop* ISIS from using their platforms—was insufficient.  *Id.* at 499-501.  The Court stressed that *affirmative* misconduct is necessary because otherwise, "mostly passive actors like banks" would be "liable for all of their customers' crimes by virtue of carrying out routine transactions."  *Id.* at 491.

Plaintiffs' allegations here have all the failings of the claims dismissed in *Twitter*.  The Complaint alleges that BHL offered the general public routine transaction services and, *at most* (even stretching beyond the limits of reasonable inferences that can be drawn from its allegations), that: (1) BHL knew or must have known FTO-associated accounts were using Binance, and (2) BHL—because of its deficient controls—failed to stop this use.  (Compl. ¶¶ 302-312, 313-318, 319, 321, 330-31, 337-38).  That is simply not enough under *Twitter*.  598 U.S. at 500 ("To show that defendants' failure to stop ISIS from using these platforms is somehow culpable with respect to the Reina attack, a strong showing of assistance and scienter would thus be required.").  The *Twitter* Court explained that "defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis.  Yet, there are no allegations that defendants treated ISIS any differently from anyone else."  *Id.*  The same is true here:  Plaintiffs allege that BHL offered its products and services to "over 100 million customers throughout the world."  (*Id.* ¶ 11).  Yet, notwithstanding the Complaint's vague and generalized allegations regarding accounts "associated" with FTOs (Compl. ¶¶ 428, 429, 433),

there are no allegations to suggest BHL gave special treatment to any FTO compared to any of Binance's other users, or that BHL did anything to advance any of the Attacks.

ii. ***Plaintiffs Do Not Allege a Sufficient Nexus Between BHL's Alleged Conduct and the Attacks.***

Plaintiffs do not come close to pleading the other sub-prong of knowing and substantial assistance, the "definable nexus between the defendants' assistance and the attack." *See Twitter*, 598 U.S. at 498, 503 ("plaintiffs never allege[d] that ISIS used defendants' platforms to plan or coordinate" the specific nightclub attack at issue). Instead, the Complaint contains only vague and conclusory assertions that BHL somehow enabled and participated in the Attacks by facilitating the FTOs' access to funds or the U.S. market. (*See* Compl. ¶¶ 29, 162, 337, 339, 348, 412, 418, 456). But alleging that a defendant gave "assistance to [the principal wrongdoer's] activities in general" is not enough. *Twitter*, 598 U.S. at 503.

Without allegations connecting a defendant's alleged assistance to the specific terrorist act, plaintiffs face a "drastically increase[d] . . . burden" of establishing that the defendant "so systemically and pervasively assisted" the terrorist group, that it "could be said to aid and abet every single . . . attack" the group committed. *Id.* at 501, 503. The Complaint does not even approach this high bar. At most (and again, stretching the Complaints' allegations to the limits of logical inferences), they allege several transactions with FTO-linked accounts. That does not mean BHL provided such extensive assistance to the FTOs that it can be held responsible for any attack these terrorist organizations committed world-wide.

The law is equally clear that providing routine business services to persons or entities "with connections" to terrorist organizations—as opposed to the organizations themselves—is insufficient to state a claim for aiding-and-abetting (or conspiracy) liability. *See, e.g.*, *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446, at *8 (S.D.N.Y. Mar. 28, 2019) (Swain, J.) (no aiding-

and-abetting liability where complaint alleged defendants provided financial services to Iranian banks and businesses "with connections to terrorist organizations"). Yet that is the entire extent of the (wholly conclusory) allegations here. For example, the Complaint alleges BHL received reports that identified "Hamas-*associated* transactions" on Binance (*see, e.g.*, Compl. ¶¶ 309, 428), and that FinCEN's investigation identified "Binance user addresses" that "were *found to interact* [at unspecified times] with bitcoin wallets associated with" FTOs (*id.* ¶¶ 304, 450). This is not the same as alleging that BHL provided services directly to the FTOs and is, thus, insufficient to meet the nexus requirement. *See O'Sullivan*, 2019 WL 1409446, at *7-8.

Nor would it be sufficient if, as the Complaint alleges, Binance hosted a single wallet owned by an individual who allegedly sent cryptocurrency transfers to Hezbollah, or that Binance hosted 19 other wallets belonging to this individual's "intermediaries." (Compl. ¶¶ 423-424). The Complaint fails entirely to draw any connection between any of these wallets and any Attack. *See Twitter*, 598 U.S. at 506 (2023) ("The focus must remain on assistance to the tort for which plaintiffs seek to impose liability. . . . [T]he more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort."). And the Complaint's reliance on the vaguely-pled connection between these wallets and Hezbollah in general is plainly insufficient. *See O'Sullivan*, 2019 WL 1409446 at *7-8. Nor is there any allegation that BHL knew of any connection between the wallets and Hezbollah—let alone to any Attack—when the wallets were transacting on Binance (which means the allegations also fail to establish "conscious, voluntary, and culpable participation in" any attack). *Twitter*, 598 U.S. at 498.

iii. **The** Halberstam *Factors All Support Dismissal.*

When it enacted JASTA, Congress pointed to the D.C. Circuit's decision in *Halberstam* v. *Welch*—which lists six factors that "determine whether a defendant's assistance was substantial"—as the proper framework for analyzing aiding-and-abetting liability. *Twitter*, 598 U.S. at 486; *Halberstam* v. *Welch*, 705 F.2d 472, 483-84 (D.C. Cir. 1983). *Twitter* confirmed that these factors remain relevant because their point "is to help courts capture the essence of aiding and abetting." 598 U.S. at 504. All of these factors weigh in favor of dismissal in this case.

- **<u>Nature of the Act</u>**: The Complaint does not plead any facts to suggest that the routine services BHL are alleged to have provided were "indisputably important" to any FTO. *Halberstam*, 705 F.2d at 488.

- **<u>Amount of Assistance</u>**: Plaintiffs do not allege that BHL processed any transactions that are directly tied to the Attacks, let alone "an essential part of the pattern" giving rise to the Attacks. *Id.*

- **<u>BHL's Presence</u>**: Plaintiffs have not and cannot plead any facts to show that any BHL employee was present during the Attacks. *Id.*

- **<u>BHL's Relationship to the FTOs</u>**: Plaintiffs allege that BHL processed transactions by users with unspecified links to various FTOs, but they do not tie those transactions to the Attacks, nor allege any relationship between BHL and the FTOs. Providing routine services to the general public is insufficient. *Id.*

- **<u>BHL's State of Mind</u>**: The Complaint alleges no act that BHL undertook with the "intention" of facilitating the Attacks. *Id.* at 488.

- **<u>Duration of the Assistance</u>**: Although the Complaint alleges that BHL provided services to the FTOs for years leading up to the Attacks, this says nothing about the "quality and extent" of the alleged relationship between BHL and FTOs (compared to BHL's user base generally), nor does the Complaint suggest that the duration of the relationship resulted in an increased "amount of aid" provided. *Id.* at 484.

**B.  The Complaint Does Not Adequately Allege BHL Was Generally Aware of Its Role in the Relevant Terrorist Activity.**

Because Plaintiffs have failed to allege knowing and substantial assistance, their aiding-and-abetting claim fails, and the Court need not consider the issue of general awareness. Regardless, the Complaint also fails adequately to plead general awareness.

To meet the general awareness requirement, a plaintiff must plead that the defendant was "generally aware that it was . . . playing a role in [a designated FTO's] violent or life-endangering activities." *Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018). Plaintiffs seek to establish general awareness here by pointing to various warnings issued by the U.S. government, the U.N., NGOs, blockchain analysis firms, and scholars, which according to the Complaint, "conveyed to Defendants that terrorist organizations may seek to transact using cryptocurrency on its exchange and that that these terrorist organizations used cryptocurrency to fund their operations and commit terrorist attacks." (Compl. ¶ 214; *see also id.* ¶¶ 221, 225, 228, 229, 239, 244, 250). This is not enough. The Complaint does not allege that BHL was warned that specific Binance customers were engaged in terrorism, nor that certain of the generalized warnings—such as those by NGOs and terrorism scholars—were even known to BHL. *See Honickman for Est. of Goldstein* v. *BLOM Bank SAL*, 432 F. Supp. 3d 253, 265 (E.D.N.Y. 2020) (plaintiffs' cites to press articles, government actions, and alleged public knowledge describing a connection between defendant's customers and Hamas were not enough to plead general awareness where plaintiffs failed to allege that defendants or their employees actually knew of plaintiffs' cited sources), *aff'd sub nom. Honickman* v. *BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021).

Plaintiffs also fail to allege that BHL intended to further any FTO's terrorist activities or were generally aware that it was playing a role in those activities. Indeed, the Complaint lacks *any* allegation connecting a transaction executed on Binance with terrorist activity. Rather, the Complaint merely asserts that BHL knew or must have known that its generally-available financial services were being used by individuals or entities associated with FTOs. (*See* Compl. ¶¶ 323, 330 (alleging, without factual support, that blockchain analysis firms "informed Binance of terrorists operating on its exchange" and that BHL "knew [through blockchain analysis tools] when

terrorists accessed and transacted on the Binance exchange.")).  That is not enough.  *See Honickman*, 432 F. Supp. 3d at 266 (failure to plead general awareness where plaintiffs alleged defendants knew that that by providing financial services to certain customers, they were playing a role in Hamas' activities); *Strauss* v. *Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 164 (E.D.N.Y. 2019) ("Evidence that [d]efendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement."), *aff'd in relevant part, appeal dismissed in part*, 842 F. App'x 701 (2d Cir. 2021).

## II.    The Complaint Fails to Plead a Conspiracy Claim (Counts 2 and 3).

Under JASTA, a defendant is civilly liable if it "conspire[d] with the person who committed [] an act of international terrorism."  18 U.S.C. § 2333(d)(2).  To state a conspiracy claim, a plaintiff must plead and prove that (1) the defendant affirmatively agreed to join a conspiracy; (2) the goal of the conspiracy was to commit "an act of international terrorism"; and (3) there was an overt act in furtherance of the goal of the conspiracy. 18 U.S.C. § 2333(d)(2); *Lau* v. *ZTE Corp.*, 2023 WL 9066883, at *7 (E.D.N.Y. Sept. 28, 2023); *O'Sullivan*, 2019 WL 1409446, at *9.  Here, Plaintiffs allege two conspiracies:  Count 2 alleges BHL conspired with Iran's "Axis of Resistance" to maintain the terror organizations' "ability to access the payments they received in connection with their [alleged terroristic acts, such as] hostage-taking, human trafficking, ransomware, and protection payment schemes[.]"  (Compl. ¶¶ 1144, 1153).  And Count 3 contends that BHL conspired to "provid[e] material support" to ISIS.  (Compl. ¶ 1174).  Neither Count adequately states a conspiracy claim under JASTA.

### A. The Alleged Axis Conspiracy (Count 2).

As noted, Plaintiffs first allege that BHL and the Axis-affiliated terrorist organizations[5] conspired to "maintain" the terrorist organizations' access to the funds they raised through trafficking and other illicit conduct.  (Compl. ¶¶ 1144, 1153).  Plaintiffs allege in conclusory terms that, to accomplish this goal, BHL agreed with Iran's Islamic Revolutionary Guard Corps to "collaborate to break the law together" by allowing transactions between Binance and Nobitex (a digital asset exchange alleged to be an IRGC front).  (*Id.* ¶¶ 1146, 1148).  The Complaint further alleges, without explanation, that acts of international terrorism—including the Attacks that killed and injured Plaintiffs—furthered the overall object of the conspiracy and were a foreseeable consequence of it.  (*Id.* ¶ 1159).

#### i. *Count 2 Does Not Allege <u>Any</u> Illicit Agreement.*

The conspiracy claim fails at the very first step, by not plausibly alleging the most fundamental requirement: an agreement.  This element is the "crux" of any conspiracy claim, *Kemper* v. *Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018), and what distinguishes conspiracy from aiding-and-abetting.  *Halberstam*, 705 F.2d at 477-78.  The illicit agreement requirement is "especially important in business dealings" to ensure that routine financial services do not "carry with them the excess baggage of conspiracy." *Kemper*, 911 F.3d at 395.

As the Second Circuit explained in *Freeman*, a plaintiff asserting a JASTA conspiracy claim must allege an illicit agreement between the defendant and terrorists that perpetrated the attack in question.  57 F.4th at 79.  That requires plausible allegations that the defendant and the terrorist attackers "were pursuing the same object" and had a "common intent." *Id.* at 79-80.

---

[5] Plaintiffs allege that IRGC was the "leader" and "direct beneficiary" of the conspiracy, but that it also included Hezbollah, Kataib Hezbollah, Hamas, PIJ, al-Qaeda, and the Taliban as "members" and "indirect beneficiaries."  (*See* Compl. ¶¶ 1144, 1146).

Indeed, it is a basic principle of conspiracy law that "one cannot join a conspiracy through apathy." *Kemper*, 911 F.3d at 395. To hold otherwise would impose conspiracy liability on any business that transacted with bad actors. *See id.* Thus, "although a conspirator [need] not agree to commit or facilitate each and every part of the offense, she must reach an agreement with the specific intent that the conspiratorial goal be completed." *Id.*

In *Freeman*, the Second Circuit affirmed the dismissal of JASTA conspiracy claims, in part because the plaintiffs had failed to allege a common intent among the bank defendants and the terrorists who perpetrated the attacks. The court explained that "[n]owhere in the Complaint . . . do Plaintiffs plead that the Banks intended to kill or injure U.S. service members in Iraq," and "[i]n the absence of any allegation that the Banks and the terrorist groups engaged in a common pursuit, we cannot identify any agreement that could form the basis of a JASTA conspiracy between the Banks and the terrorist groups, whether they conspired directly or indirectly with one another." *Id.* at 80.

Plaintiffs' conspiracy claim here suffers from the same flaw. The Complaint does not plausibly allege that BHL had any contact with Axis-affiliated terrorists, let alone that BHL reached some type of "agreement" with them, either express or implied. At most, the Complaint alleges that Binance lacked sufficient AML controls such that terrorist organizations may have exploited that. But BHL's failure to implement adequate AML controls is a far cry from an agreement with terrorist organizations for any purposes—including the alleged agreement to "collaborate to break the law" with the Nobitex exchange (*see* Compl. ¶¶ 1144, 1148). There simply was no meeting of the minds. *See Bernhardt* v. *Islamic Republic of Iran,* 47 F.4th 856, 873 (D.C. Cir. 2022) (dismissing conspiracy claim where "[t]he complaint states that HSBC was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S.

into retreating from the world stage"), *cert. denied sub nom. Bernhardt* v. *HSBC Holdings PLC*, 144 S. Ct. 280 (2023).

Nor are allegations that BHL provided routine transaction services to individuals or entities alleged to have unidentified affiliations with Iran's Axis sufficient to plead an agreement. *See, e.g.*, *Kemper*, 911 F.3d at 395 ("The facts here suggest only that Deutsche Bank may have engaged in business dealings that incidentally assisted a separate terrorism-related conspiracy involving Iran; they do not suggest that Deutsche Bank ever agreed to join that conspiracy."); *O'Sullivan*, 2019 WL 1409446, at *9 ("The Complaint pleads no facts from which the Court can infer that [d]efendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs like Hezbollah . . . for the purpose of committing violent or life-endangering acts."); *Cain* v. *Twitter Inc.*, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018) ("Plaintiffs point to Twitter's terms of service that every user is subject to, but while that clearly is an 'agreement,' it is hardly relevant to a terrorist conspiracy.").

### ii. *Count 2 Does Not Allege that BHL Conspired to Commit an Act of International Terrorism.*

Even if the Complaint adequately alleged an agreement (which it does not), it does not allege an agreement *to commit acts of international terrorism*—the only type of conspiracy actionable under JASTA. *See Freeman*, 57 F.4th at 79-80; *O'Sullivan*, 2019 WL 1409446, at *9; *Cain*, 2018 WL 4657275, at *3 (dismissing JASTA conspiracy claim because "[n]othing in the [complaint] establishes an agreement, express or otherwise, between Twitter and ISIS to commit terrorist attacks"); *Ofisi* v. *BNP Paribas, S.A.*, 77 F.4th 667, 671 (D.C. Cir. 2023) (affirming dismissal of conspiracy count where the defendant bank and FTO shared no common goal to commit terrorist attacks); *accord Twitter*, 343 F. Supp. 3d at 916 (JASTA "indicates that the injury at issue must have arisen from '*an act* of international terrorism' and that the secondary tortfeasor

19

assisted the principal tortfeasor in committing '*such an act* of international terrorism.' JASTA does not refer to assisting a foreign terrorist organization generally or such an organization's general course of conduct.") (citation omitted) (emphasis in original).

Even accepting as true the Complaint's conclusory allegations that BHL knowingly facilitated terrorist financing or willfully turned a blind eye toward it, the conspiracy claim still fails because the Complaint does not—and cannot—allege that BHL ever agreed to commit a terrorist attack. Simply put, the Complaint does not—and cannot—allege that BHL and the terrorist organizations "were pursuing the same object" or shared a "common intent" to commit an *act of terrorism*, because the Complaint does not and cannot allege that BHL "intended to kill or injure" anyone. *Freeman*, 57 F.4th at 79-80; *see Bernhardt*, 47 F.4th at 873 ("In the absence of any alleged concordance between HSBC's and al-Qaeda's objectives, [plaintiffs'] conspiracy claim is inadequate."); *Lau* v. *ZTE Corp.*, 2023 WL 9066883, at *7 (E.D.N.Y. Sept. 28, 2023) ("Plaintiffs' allegations are insufficient to plausibly suggest that either set of [d]efendants reached an agreement with either intermediary—the Iranian shareholders or the IRGC—to carry out a common scheme to commit an act of international terrorism."); *O'Sullivan*, 2019 WL 1409446, at *9 (no conspiracy liability under the ATA where allegations did not demonstrate that "the connection between [d]efendants' activities and those of various . . . FTOs was so coordinated or monolithic that [d]efendants shared a common purpose or plan with FTOs" to "commit an act of international terrorism").

### iii. *Count 2 Does Not Plausibly Allege an Overt Act in Furtherance of an Agreement to Commit International Terrorism.*

As the Second Circuit has made clear, "a plaintiff asserting a civil conspiracy claim must adequately plead that their injuries were caused by an unlawful overt act done in furtherance of the [co-conspirators'] common scheme." *Freeman*, 57 F.4th at 80. And as noted, the common

scheme under JASTA must be one to commit acts of international terrorism. (*See supra* Section II.A.ii.). Here, the overt acts pled by Plaintiffs in support of the alleged "Axis of Resistance" conspiracy are acts in furtherance of the objective of allowing the Axis to maintain access to payments. But the Complaint does *not* allege that the object of the conspiracy was to commit the Attacks. Accordingly, the overt acts alleged in furtherance of the Axis conspiracy are insufficient to state a JASTA conspiracy claim since they were not the Attacks that caused the Plaintiffs' injuries.

Again, the Circuit's decision in *Freeman* forecloses the Axis conspiracy claim. In *Freeman*, the plaintiffs alleged that the defendant banks conspired to violate OFAC sanctions by providing banking services to entities associated with Iran, which supported the groups that perpetrated terrorist attacks. 57 F. 4th at 72-74. The *Freeman* plaintiffs asserted that this conspiracy was "a significant factor in the chain of events leading to Plaintiffs' deaths and injuries," and argued that conspiracy liability reaches any conduct that might "foreseeably result" from the conspiracy. *Id.* at 80. The Second Circuit rejected the plaintiffs' theory, holding that their allegation that attacks are the "natural and foreseeable consequence" of the conspiracy does not meet the requirements of JASTA liability, in part because the attacks that injured the plaintiffs were not overt acts in furtherance of the conspiracy plaintiffs pled. *Id.* at 82. The Second Circuit reasoned that "[t]o hold a defendant liable for a coconspirator's actions [the attacks] merely because they are foreseeable – even though wholly detached from the shared conspiratorial plan – would stretch the concept of civil conspiracy too far beyond its origin." *Id.* The same is true here. The Attacks that injured the Plaintiffs were not overt acts in furtherance of the Axis conspiracy pled in Count 2, nor did any overt act in furtherance of the Axis conspiracy—an alleged conspiracy to allow the Axis to access funds—cause injury to Plaintiffs. *Id.* ("Plaintiffs simply have not

explained how the . . . terrorist attacks furthered [b]anks' conspiracy with Iranian entities to circumvent U.S. sanctions."); *see also Bernhardt*, 47 F.4th at 873 ("[I]t [is not] plausible to infer that an attack on a secret CIA base in Afghanistan would further HSBC's alleged objective of maximizing profits through the evasion of U.S. sanctions.").  This deficiency also requires dismissal of Count 2.

### B.  The Alleged ISIS Conspiracy (Count 3).

Plaintiffs' second conspiracy claim is deficient for many of the same reasons.  In Count 3, Plaintiffs allege that BHL "entered a conspiracy with ISIS with the overall goal of providing material support for ISIS."  (Compl. ¶ 1174).  The Complaint alleges that the ISIS Attacks benefited BHL, furthered the alleged conspiracy, and that the Attacks were a foreseeable consequence of the conspiracy.  (*Id.* ¶¶ 1180-1182).  This claim is also foreclosed by *Freeman*.

#### i.  *Count 3 Does Not Allege an Illicit Agreement.*

Just as the Complaint fails to allege an agreement between BHL and Iran's Axis of Resistance (*see supra* Section II.A.i), it does not and cannot allege an agreement between BHL and ISIS.  As with the Axis conspiracy claim, the Complaint's ISIS conspiracy claim relies on BHL's routine transaction services to individuals or entities that Plaintiffs later connected to ISIS. This does not adequately plead an agreement.  *Kemper*, 911 F.3d at 395; *see supra,* Section II.A.i. And as with all of the Complaint's allegations concerning FTOs' claimed use of Binance, Count 3 does not allege that BHL knew of any ISIS-"associated" accounts using Binance when the alleged use was occurring, nor that there was any connection between any such usage and any Attack.  Count 3's allegations are plainly insufficient to plead an agreement to provide material support to ISIS.

ii. ***Count 3 Does Not Allege that BHL Conspired to Commit an Act of International Terrorism.***

Nor does Count 3 allege—as it must—that BHL agreed with ISIS to commit an act of terrorism. The closest the Complaint comes—and it is not particularly close—is to allege that BHL received generalized "warnings" that some terrorist organizations, including ISIS, utilized cryptocurrencies (Compl. ¶¶ 223, 260, 261-280), and that some accounts associated with ISIS may have operated on Binance. (Compl. ¶ 164.c (stating that, in hindsight, FinCEN observed "[m]ultiple direct transactions between Binance and ISIS-associated wallets")). This is insufficient to allege an agreement to commit an act of terrorism, and therefore plainly insufficient to plead a JASTA conspiracy claim. *See O'Sullivan*, 2019 WL 1409446, at *9 (dismissing conspiracy claim where "[d]efendants' alleged provision of material support to Iranian entities [through sanctions evasion] is so far removed from the acts of terrorism that injured [p]laintiffs that the Court cannot infer that [d]efendants shared the common goal of committing an act of international terrorism"); *see also Bernhardt*, 47 F.4th at 873 (dismissing conspiracy claim where plaintiff failed to allege "common objective between HSBC and al-Qaeda"); *Lau*, 2023 WL 9066883, at *7 (dismissing conspiracy claim where allegations did not plausibly suggest an agreement "to carry out a common scheme to commit an act of international terrorism.").

iii. ***Count 3 Does Not Plausibly Allege an Overt Act in Furtherance of an Agreement to Commit International Terrorism.***

Plaintiffs must allege they were injured by an overt act in furtherance of the ISIS conspiracy alleged in Count 3. (*See supra* Section II.A.iii). But as with the Count 2, the most Plaintiffs can plausibly allege is that BHL's controls deficiencies allowed actors connected with ISIS to transact on Binance. (Compl. ¶¶ 171, 491). Even if these acts somehow assisted ISIS—something the Complaint asserts in only the most conclusory way—this is insufficient to plead, as required, that

Plaintiffs were injured by these acts, or that the Attacks were acts in furtherance of the conspiracy pled in Count 3. *See Freeman*, 57 F. 4th at 82; *see also Bernhardt*, 47 F.4th at 873 (sanctions evasion not an overt act in furtherance of conspiracy to commit an act of terrorism).

## III.    The Complaint Fails to Establish Personal Jurisdiction Over BHL.

The Complaint must also be dismissed because it fails to plead personal jurisdiction over BHL.    Plaintiffs' burden of establishing personal jurisdiction over BHL requires that they demonstrate that "the exercise of personal jurisdiction . . . comport[s] with constitutional due process principles." *Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016). But the Complaint fails to allege sufficient "*suit-related*" contacts with New York or the United States as a whole, such that the exercise of jurisdiction in this case would comply with due process requirements. *See Zobay* v. *MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 323 (E.D.N.Y. 2023).

Plaintiffs allege no contacts with the United States (or New York) that "gave rise to the episode-in-suit" as required by Second Circuit law. *See Waldman*, 835 F.3d at 331 ("The exercise of specific jurisdiction depends on in-state activity that '*gave rise to the episode-in-suit*.'") (emphasis in original).    The crux of the Complaint's jurisdictional allegations is that BHL's provision of financial services to FTOs somehow depended on BHL's ties to New York and the United States.[6] (*See* Compl. ¶¶ 472-96).  Plaintiffs assert that BHL had business relationships with U.S.-based service providers and suggest that "liquidity" provided by U.S.-based customers (including New York) enabled the FTOs to trade on Binance. (*See id.*).  But these allegations are

---

[6] As Plaintiffs do not even attempt to allege that BHL is incorporated in the United States or otherwise maintains its principal place of business within the United States, BHL only addresses whether Plaintiffs have satisfied the minimum contacts test for specific personal jurisdiction. For the avoidance of any doubt, however, the Complaint also fails to allege general personal jurisdiction. *See Waldman*, 835 F.3d at 332 ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.").

too attenuated from the Attacks and Plaintiffs' injuries to support liability under the ATA, and accordingly they cannot support the exercise of personal jurisdiction over BHL. *Waldman*, 835 F.3d at 335 ("The relevant 'suit-related conduct' by [a] defendant . . . [i]s the conduct that could . . . subject . . . them to liability under the ATA.").

Simply put, BHL's U.S.-based customers and business relationships have no plausible connection to the Attacks or Plaintiffs' injuries. Plaintiffs' conclusory and unsupported allegation that Binance's U.S.-connections that somehow enabled FTOs to operate on Binance (*see* Compl. ¶ 474) does not bridge this gap. *See Knight* v. *Standard Chartered Bank*, 531 F. Supp. 3d 755, 770 (S.D.N.Y. 2021) ("[A]llegations or evidence of activity constituting the basis of jurisdiction must be non-conclusory and fact-specific. Conclusory statements—without any supporting facts are not enough."). Because the Complaint's jurisdictional allegations are simply not "suit-related," the Complaint fails to establish personal jurisdiction over BHL.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint.

Date: November 1, 2024

Respectfully submitted,

*Samson A. Enzer*
**CAHILL GORDON & REINDEL LLP**
Samson A. Enzer
Anirudh Bansal
Sesi Garimella
32 Old Slip
New York, NY 10005
(212) 701-3125

*Attorneys for Binance Holdings Limited*