**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOCELYN TROELL, et. al., | |
| Plaintiffs, | Docket No. 24 Civ. 07136 (JAV) |
| vs. | **ORAL ARGUMENT REQUESTED** |
| BINANCE HOLDINGS LIMITED, et. al., | |
| Defendants. | |

**DEFENDANT BINANCE HOLDINGS LIMITED'S MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED  COMPLAINT**

CAHILL GORDON & REINDEL LLP
Samson A. Enzer
Anirudh Bansal
Sesi Garimella
32 Old Slip
New York, New York 10005
(212) 701-3125

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

THE AMENDED COMPLAINT'S ALLEGATIONS......................................................................4

ARGUMENT ...............................................................................................................................10

I.      THE AMENDED COMPLAINT FAILS TO MEET THE BASIC NOTICE
        REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 8....................................10

II.     THE AMENDED COMPLAINT FAILS TO PLEAD A PRIMARY LIABILITY
        CLAIM (COUNT 5)...............................................................................................................12

        A.      The Amended Complaint Fails to Adequately Allege that BHL Committed an Act of
                International Terrorism. ...........................................................................................13

        B.      The Amended Complaint Fails to Adequately Allege that Defendants Proximately
                Caused Plaintiffs' Alleged Injuries. ........................................................................16

III.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR AIDING-
        AND-ABETTING LIABILITY (COUNT 1). ...........................................................................17

        A.      The Amended Complaint Fails to Sufficiently Allege BHL Knowingly and
                Substantially Assisted the Attacks. ..........................................................................18

                i.      The Amended Complaint Fails Plausibly to Allege that BHL Engaged in
                        "Conscious, Voluntary, and Culpable" Conduct. ...........................................18

                ii.     Plaintiffs Do Not Allege a Sufficient Nexus Between BHL's Alleged Conduct and
                        the Attacks. ............................................................................................19

                iii.    The Halberstam Factors All Support Dismissal. ............................................21

        B.      The Amended Complaint Does Not Adequately Allege BHL Was Generally Aware
                of Its Role in the Relevant Terrorist Activity. ............................................................22

IV.     THE AMENDED COMPLAINT FAILS TO PLEAD A CONSPIRACY CLAIM
        (COUNTS 2, 3, AND 4). ......................................................................................................23

CONCLUSION............................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorosa* v. *Gen. Elec. Co.*,
  2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)...........................................................3n

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) .....................................................................................................2n

*Averbach* v. *Cairo Amman Bank*,
  2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022) ...........................................................16

*Bernhardt* v. *Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022), *cert. denied sub nom. Bernhardt* v. *HSBC
  Holdings PLC*, 144 S. Ct. 280 (2023) .......................................................... 26, 28, 29

*Byfield* v. *New York City Dep't of Educ.*,
  2023 WL 3293644 (S.D.N.Y. May 5, 2023)  .............................................................3n

*Cain* v. *Twitter Inc.*,
  2018 WL 4657275 (N.D. Cal. Sept. 24, 2018).....................................................26, 27

*Freeman* v. *HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019), *aff'd on other grounds*, 57 F.4th 66 (2d
  Cir. 2023) .....................................................................................................................25

*Freeman* v. *HSBC Holdings PLC*,
  57 F.4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023).......................... *passim*

*Grimes* v. *Fremont Gen. Corp.*,
  933 F. Supp. 2d 584 (S.D.N.Y. 2013) .......................................................................10

*Halberstam* v. *Welch*,
  705 F.2d 472 (D.C. Cir. 1983).............................................................................21, 22

*Honickman for Est. of Goldstein* v. *BLOM Bank SAL*,
  432 F. Supp. 3d 253 (E.D.N.Y. 2020), *aff'd sub nom. Honickman* v. *BLOM
  Bank SAL*, 6 F.4th 487 (2d Cir. 2021).......................................................................23

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
  405 F. Supp. 3d 525 (S.D.N.Y. 2019), *vacated in part on other grounds*, 999
  F.3d 842 (2d Cir. 2021)..............................................................................................17

*Kemper* v. *Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ........................................................................ 24, 25, 27

*King* v. *Habib Bank Ltd.*,
    2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ........................................................... 13

*Lau* v. *ZTE Corp.*,
    2023 WL 9066883 (E.D.N.Y. Sept. 28, 2023) ......................................................24, 28

*Linde* v. *Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ..................................................... 12, 15, 7n, 22

*O'Sullivan* v. *Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ................................................ *passim*

*Ofisi* v. *BNP Paribas, S.A.*,
    77 F.4th 667 (D.C. Cir. 2023) ............................................................................. 27

*Rothstein* v. *UBS AG*,
    708 F.3d 82 (2d Cir. 2013) .................................................................................. 16

*Salahuddin* v. *Cuomo*,
    861 F.2d 40 (2d Cir. 1988) .................................................................................. 10

*Strauss* v. *Crédit Lyonnais, S.A.*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019), *aff'd in relevant part, appeal dismissed in part*, 842 F. App'x 701 (2d Cir. 2021) .................................................................. 23

*Stutts* v. *De Dietrich Group*,
    2006 WL 1867060 (E.D.N.Y. June 30, 2006) ......................................................... 14

*Twitter, Inc.* v. *Taamneh*,
    598 U.S. 471 (2023) .......................................................................................... *passim*

*Taamneh* v. *Twitter, Inc.*,
    343 F. Supp. 3d 904 (N.D. Cal. 2018) ................................................................... 27

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ............................................................................... 16

*Weiss* v. *Nat'l Westminster Bank, PLC*,
    993 F.3d 144 (2d Cir. 2021) ............................................................................... 14

*Zapata* v. *HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019).................................................................... 17

**Statutes**

18 U.S.C. § 2331.................................................................................................13, 15

18 U.S.C. § 2333.................................................................................... 4, 17, 23, 24

18 U.S.C. § 2339A...............................................................................................14

**Other Authorities**

Federal Rule of Civil Procedure 8 .......................................................................10

Federal Rule of Civil Procedure 12 .......................................................................1

Defendant Binance Holdings Limited ("BHL") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' Amended Complaint (Dkt. No. 27 ("AC")) under Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

BHL unequivocally condemns all acts of terrorism, including the reprehensible attacks referenced in the Amended Complaint (the "Attacks"). The perpetrators should be brought to justice and compelled to compensate the victims. But BHL is not among those responsible. Plaintiffs are alleged victims of the Attacks (or their representatives) who are suing BHL for money damages under the Anti-Terrorism Act (the "ATA") based on speculative and conclusory claims that BHL (a foreign company which owns an offshore digital asset trading exchange) somehow facilitated those Attacks.[2] Those claims fail as a matter of law and should be dismissed.

BHL initially moved on November 1, 2024 to dismiss Plaintiffs' original complaint. BHL's memorandum in support of that dismissal motion described at length the complaint's fundamental flaws, including its inability to plausibly link BHL to any of the Plaintiffs' injuries, let alone allege that BHL acted with some type of terroristic intent. (*See* Dkt. No. 22). Instead of responding to BHL's motion, Plaintiffs amended their complaint, adding over 600 pages (2,000 paragraphs) with the promise that their amendment would remedy at least some of the deficiencies identified in BHL's motion to dismiss. (*See* Dec. 20, 2024 Declaration of Samson A. Enzer ("Enzer Decl"). Ex. 1 (Oct. 16, 2024 Hr'g Tr. at 6:2-6)). It has not. As discussed in Section I

---

[1] Unless otherwise noted, capitalized terms have the same definitions as in the AC, emphasis is added, and internal citations and quotations are omitted. In addition, Judge Rakoff set a 30 page limit for this brief. (*See* Nov. 27, 2024 Minute Entry).

[2] The facts alleged by Plaintiffs are taken as true for purposes of this motion only. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

below, the result is a hopelessly prolix complaint, which still cannot satisfy the basic requirements for pleading a viable ATA claim. Among other things, the Amended Complaint does not allege sufficient facts to plausibly allege that BHL actively, intentionally, and knowingly assisted terrorists in carrying out any of the Attacks. Instead, it doubles-down on its fatally flawed theory of liability. At bottom, all the Amended Complaint alleges—and only in the most generalized, conclusory terms—is that terrorist organizations need money to carry out their heinous acts; that some of the money the terrorists acquired involved digital assets; and that BHL (one of many companies offering digital asset trading exchange services) failed to implement sufficient anti-money laundering controls to prevent terrorist-affiliated individuals and entities and other wrongdoers from using its services. Under any theory of ATA liability, that is not sufficient.

The Amended Complaint asserts five causes of action, each more flawed than the last:

Plaintiffs' primary liability claim (discussed in Section II below) alleges that BHL committed an act of international terrorism by having processed payments "associated with" cyberterrorist group "Wizard Spider," resulting in a 2019 ransomware attack on an Alabama hospital. Setting aside the well-settled law that providing routine transaction services does not constitute an act of international terrorism, the Amended Complaint makes no attempt to connect a single transaction on the BHL exchange with the 2019 Attack. Nor do Plaintiffs sufficiently plead that BHL acted with the requisite intent because the Amended Complaint does not—and cannot—allege that BHL was contemporaneously aware that Wizard Spider transacted on its platform.

Plaintiffs' aiding-and-abetting claim (Section III below), which is premised on 64 separate terrorist attacks listed in their Amended Complaint, suffers from many of the same flaws. To state an ATA aiding-and-abetting claim, Plaintiffs would, at minimum, have to plead with sufficiency

that BHL actively, intentionally, and knowingly assisted terrorists in carrying out the Attacks. Much like Plaintiffs' failed primary liability claim, the aiding-and-abetting claim does not: (1) plausibly allege that any BHL exchange user was a member of a terrorist group, let alone that BHL knew at the time that terrorist groups were using BHL; (2) plausibly allege a connection between a single transaction on the BHL exchange and the Attacks, or (3) explain how BHL's generally-available transaction services had anything to do with Plaintiffs' injuries.

The U.S. Supreme Court recently made clear just how deficient the Amended Complaint's allegations are.  In *Twitter, Inc.* v. *Taamneh*, the Court held that to plead aiding-and-abetting liability under the ATA, a plaintiff must allege facts showing that the defendant engaged in "truly culpable conduct" by "consciously, voluntarily, and culpably" participating in the terrorist attack that injured the plaintiff.  598 U.S. 471, 489, 505 (2023).  Otherwise, the Court cautioned, "mostly passive actors like banks [would] become liable for all of their customers' crimes by virtue of carrying out routine transactions."  *Id.* at 491.  The Amended Complaint's aiding-and-abetting count suffers the same infirmities as the claims dismissed in *Twitter*, and must be dismissed for the same reasons.

The Amended Complaint's three conspiracy claims (Section IV below) fare even worse. Plaintiffs allege that BHL conspired with: (1) Iran-affiliated foreign terrorist organizations ("FTOs") to reduce economic pressure on Iran and to profit from ending U.S. sanctions there; (2) Iran-affiliated FTOs to maintain their ability to access payments used in connection with acts of international terrorism; and (3) the Islamic State of Iraq and Syria ("ISIS") to provide material support for its acts of international terrorism.  All three claims fail because in order to withstand dismissal under *Twitter*, Plaintiffs would have to plausibly allege and prove the existence of an *agreement* between BHL and the perpetrators of the Attacks *to carry out the Attacks*.  *See Twitter*,

598 U.S. at 490. Plaintiffs do not and cannot meet *Twitter*'s requirements.

Moreover, recent Second Circuit ATA precedent makes clear that the conspiracies alleged in the Amended Complaint are not actionable as a means to compensate the Plaintiffs for injuries sustained in the Attacks. *See Freeman* v. *HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023). Under *Freeman*, Plaintiffs cannot state an ATA conspiracy claim unless they allege that BHL entered into a conspiracy with a terrorist group to commit the Attacks, or other acts of terrorism. Here, the Amended Complaint alleges only that BHL conspired to provide material support to terrorists and evade sanctions, supposedly by enabling them to access the financial system. The Second Circuit explained in *Freeman* that pleading this type of conspiracy—the alleged goal of which is to allow terrorists to access the financial system, after which the terrorists allegedly used that access to fund terrorism—is insufficient to hold BHL accountable for the Attacks and any resulting injuries sustained by Plaintiffs. *See Freeman*, 57 F.4th at 79-83 (dismissing ATA conspiracy claim alleging that bank enabled terrorists to evade economic sanctions, leading to the funding of terrorism).

## THE AMENDED COMPLAINT'S ALLEGATIONS

Plaintiffs are 535 individuals who allege they are victims, or represent victims, of the Attacks. (AC ¶ 2). Their Amended Complaint seeks to hold BHL liable for the physical and emotional harm they suffered from the Attacks, based on five causes of action under 18 U.S.C. §§ 2333(a) and 2333(d)(2): (1) providing material support to cyber-terrorism group, "Wizard Spider"; (2) aiding-and-abetting designated FTOs in carrying out acts of international terrorism; (3) conspiring with Iran-affiliated FTOs to reduce economic pressure on Iran and to profit from ending U.S. sanctions there; (4) conspiring with Iran-affiliated FTOs to maintain their ability to access payments used in connection with acts of international terrorism; and (5) conspiring with ISIS to provide material support for its acts of international terrorism. (*Id.* ¶¶ 1-2, 3041-187).

Despite its excessive length, the Amended Complaint contains no allegations directly tying BHL to any Attack.  At best, it alleges that BHL provided arm's-length services to users, and that BHL's failure to implement sufficient anti-money laundering and sanctions controls allowed certain users, with unspecified ties to FTOs, to use the BHL exchange.  But the Amended Complaint does not allege that BHL: (1) planned or participated in the Attacks; (2) intended to support the Attacks; (3) had advance knowledge of the Attacks; or (4) had any connection with the Attacks' perpetrators.  Nor does the Amended Complaint plausibly allege that a single act by BHL, nor even a single transaction by a BHL exchange user, directly funded or caused the Attacks.

Ultimately, the best the Amended Complaint can do across its nearly 3,200 paragraphs is string together a disjointed assortment of allegations that, according to Plaintiffs, suggest that: (1) BHL somehow disregarded that individuals associated with designated FTOs were among the 180 million users transacting on Binance; and (2) Plaintiffs have identified so many transactions with unspecified links to designated FTOs that, in hindsight, some *must* have been connected to the Attacks in some way.  These sorts of allegations are plainly insufficient to sustain an ATA claim.

### Allegations That BHL Must Have Known Terrorists Used Binance

In an attempt to support their speculative assertion that BHL must have known FTO-linked users were accessing the BHL exchange, Plaintiffs rely on four sources of information, which, even taken together, are insufficient to support an ATA claim.

<u>***U.S. Regulatory Actions***</u>:  The Amended Complaint relies heavily on U.S. government agency filings from 2023, including a Consent Order between BHL and the Financial Crimes Enforcement Network ("FinCEN"), a complaint by the Commodity Futures Trading Commission, and a plea agreement with the Department of Justice.  But—as the actual documents, rather than Plaintiffs' cherry-picked excerpts, make clear—the central issue in those matters was that BHL did not have sufficient anti-money laundering and sanctions controls, and failed to register with

FinCEN as a money service business. None of these agencies alleged that BHL intentionally supported terrorists, let alone the Attacks.[3] Indeed, the FinCEN Consent Order acknowledges that although BHL may not have filed suspicious activity reports, BHL "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing." (Enzer Decl. Ex. 2 at 46).

Most of Plaintiffs' out-of-context quotes are from the agencies' backward-looking reviews, which say nothing about whether BHL knew any transactions on Binance were linked to terrorists *at the time they occurred*. (*See, e.g.*, AC ¶ 631 ("Binance user addresses were found" at unspecified times "to interact with bitcoin wallets associated with [terrorist groups]"); *id.* ¶ 502.c (alleging FinCEN's investigation discovered "direct transactions between Binance and ISIS-associated wallets"); *id.* ¶ 502.e (FinCEN's investigation identified "[t]ens of millions of dollars in transactions with a network identified with" a terrorist organization).

Even when the Amended Complaint attempts to allege BHL's contemporaneous knowledge—rather than rely on hindsight—it fails. The Amended Complaint quotes from the FinCEN Consent Order to allege that in April 2019, BHL "received reports from its third-party service provider," identifying "Hamas-associated transactions" (*id.* ¶ 1258) and that in May 2022,

---

[3] While the Court is required to accept the allegations as true on this motion, courts "generally do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not conducted independent investigation." *Amorosa* v. *Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022). Those principles also apply to consent orders, including the consent orders referenced in the Amended Complaint, which expressly limit their admissions to the content of BHL's plea agreements. (*See* Enzer Decl. Exs. 6, 8); *Amorosa*, 2022 WL 3577838, at *1 ("[A] consent judgment between a federal agency and a private corporation" that is "not the result of an actual adjudication of any of the issues" reflects nothing more than "the result of private bargaining[.]"). Nevertheless, should the Court wish to consider these materials in their proper context, BHL has submitted them. *Byfield* v. *New York City Dep't of Educ.*, 2023 WL 3293644, at *1 (S.D.N.Y. May 5, 2023) ("[T]he Court may consider . . . documents that are integral to the Complaint even if they are not incorporated by reference."). (*See* Enzer Decl. Exs. 2-9).

BHL "received a report detailing how [cybercrime group Wizard Spider] was moving illicit proceeds through accounts on its platform" (*id.* ¶ 1529). These allegations say nothing about whether BHL was aware of the alleged "Hamas associat[ion]" or cybercrime group at the time the transactions were processed. (*Id.* ¶ 1258). Similarly, the allegation that BHL allowed "accounts associated with ISIS and Hamas" to be offboarded, and the user allowed to withdraw the funds (*id.* ¶ 1259), says nothing about what BHL knew about the accounts when they were transacting on the exchange or whether those funds were intended for violent ends. If anything, this allegation shows that once BHL understood the account to be "associated" with the FTOs, BHL's former Chief Compliance Officer instructed compliance personnel to "'[c]heck if he is a VIP account, if yes," to "*[o]ffboard the user* but let him take his funds and leave.'" (*Id.*). The same goes for the cybercrime group: once BHL became aware of the issue, it "took internal action to address" it. (*Id.* ¶ 1529). That is the antithesis of allowing the BHL exchange to be used to advance terrorism (which is true regardless of whether BHL was required to report the user to FinCEN).

Unable to plead facts showing contemporaneous knowledge, Plaintiffs pivot to alleging that BHL failed to block and report suspicious transactions. (*Id.* ¶¶ 6, 506-07). Not only is this conclusory allegation contradicted by the Amended Complaint itself (as the discussion immediately above makes clear), even if it were accepted as true, it does not demonstrate that BHL intentionally and substantially aided terrorists, nor that it shared a common intent with them.

**_"Warnings" from International Organizations_**: The Amended Complaint cites multiple "warnings" from members of the international community about the "possibility—and reality—of terrorist use of cryptocurrency," which Plaintiffs claim "gave Defendants general awareness of the terrorist-financing risks posed by cryptocurrency." (*Id.* ¶ 552). Specifically, the Amended Complaint cites U.N. Resolutions describing terrorists' use of emerging financial technologies (*id.*

¶ 553) and U.N. reports describing terrorists' use of cryptocurrency wallets. (*See, e.g.*, *id.* ¶¶ 554, 602). Plaintiffs also cite reports by the Financial Action Task Force warning of the risk of terrorists' use of cryptocurrencies. (*Id.* ¶¶ 556-57). But none of this implicates BHL in the Attacks, much less shows that BHL aided or abetted or conspired to commit them.

> **_"Warnings" from Blockchain Analysis Firms, Scholars, and NGOs_**: The Amended Complaint alleges that various "blockchain analysis firms, cryptocurrency and terrorist-finance scholars, and NGOs similarly sounded the alarm that terrorist groups were actively looking to use—and did in fact use—cryptocurrency to fund their operations and commit attacks." (*Id.* ¶ 537; *see also, e.g.*, ¶¶ 560-62). It also alleges that "Binance was also told directly about these warnings by the blockchain analysis firms whose AML/CFT/KYC monitoring services Binance contracted for and used." (*Id.* ¶ 538). But again, allegations that blockchain analysis firms, scholars, and NGOs warned of a general risk that FTOs may use cryptocurrencies does nothing to advance the Amended Complaint's assertion that *BHL* participated in the Attacks, let alone that BHL did so actively, intentionally, and knowingly.

Plaintiffs also allege that several blockchain analysis firms "provided Defendants a constant stream of warnings regarding wallets that were likely connected to terrorist groups—but Defendants willfully disregarded those warnings and permitted wallets labeled as connected to [Iran's Islamic Revolutionary Guard Corps. ("IRGC")] to transact on the Binance exchange." (*Id.* ¶ 770). Here again, the Amended Complaint does not allege that any of these wallets were connected to any Attack, nor even what the supposed connections to the IRGC were.

> **_Israeli Government Actions_**: The Amended Complaint also cites instances in which the Israeli government took action against digital assets. For example, it quotes uncited reports, that "the Israeli government seized cryptocurrency wallets linked to the IRGC-QF and its primary

8

terrorist proxy, Hezbollah[.]" (*Id.* ¶ 831). Even if the Israeli-seized accounts were hosted on Binance, the FinCEN Consent Order confirms that BHL "cooperated with Israeli law enforcement in numerous seizures related to the al Qassam Brigades" (Enzer Decl. Ex. 2 at 46), which flatly contradicts the notion that BHL intentionally supported terrorists. In fact, the Amended Complaint fails to identify a *single* wallet that transacted on the BHL exchange after having been blacklisted, nor does it connect any blacklisted wallet to the Attacks.

Plaintiffs also allege that the BHL exchange hosted at least one wallet held by Tawfik Muhammad Sa'id al-Law, who "conducted cryptocurrency transfers for sanctioned Hizballah officials" and whose other cryptocurrency the Israeli government later seized. (*Id.* ¶¶ 1154, 1156). But the Amended Complaint does not (1) allege that this wallet was used to conduct sanctioned transactions for Hezbollah, let alone fund the Attacks, nor does it (2) address whether that link would have been apparent to BHL prior to the transfers.

### *Allegations Attempting to Link Binance Users' Transactions to the Attacks*

Unable to plead facts showing any link between the Attacks and BHL, Plaintiffs fall back on an undisclosed "preliminary analysis of open-source intelligence and publicly available information," to allege that unspecified sums (supposedly in excess of tens of millions of dollars), involving addresses with purported but unidentified links to FTOs, "flowed through" Binance. (*See id.* ¶¶ 765, 767-68, 1263, 1266-67, 1393, 1489). Even assuming the truth of this opaque, conclusory summary of Plaintiffs' private analysis, it does not establish a link to the Attacks nor does it say anything about what BHL knew at the time those transactions were processed. Trying to hold BHL accountable for terrorists' violent attacks because the group or its associates used digital assets that may have flowed through Binance-hosted accounts at some point is like trying to hold an international bank accountable because terrorists used fiat money.

## ARGUMENT

I. **THE AMENDED COMPLAINT FAILS TO MEET THE BASIC NOTICE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 8.**

The prolix Amended Complaint fails by any yardstick to set forth "a short and plain statement of the claim," as Federal Rule of Civil Procedure Rule 8(a) requires. *Grimes* v. *Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 595 (S.D.N.Y. 2013) (dismissing complaint that "is over 300 pages long and contains over 1000 specifically numbered paragraphs"). The purpose of Rule 8 is to "give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin* v. *Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("[U]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."). The Court may dismiss a complaint that violates Rule 8 without leave to amend, particularly where, as here, "leave to amend has previously been given and the successive pleadings remain prolix and unintelligible." *Id.*

Here, Plaintiffs' initial complaint was already over 200 pages and chock full of irrelevant material. Following their amendment, the operative complaint has ballooned to nearly 3,200 paragraphs spread across almost 900 pages. A portion of the increased length owes to the inclusion of additional Attacks and Plaintiffs: whereas the initial complaint covered 17 attacks on behalf of 270 Plaintiffs, the Amended Complaint covers 64 attacks on behalf of 535 Plaintiffs. However, a staggering proportion of the new allegations are highly repetitive, and have no discernible relationship to the claims asserted against Defendants or the relief sought. For example, Plaintiffs dedicate hundreds of pages to discussions on the history of Iran and its sponsorship of terrorism, along with detailed backgrounds on various FTOs and descriptions of their heinous acts—despite the fact that many of those FTOs are not named as defendants and that the vast majority of

allegations concerning them pre-date the creation of BHL, often by decades. (*See, e.g.*, AC ¶¶ 62-161 (describing terrorist attacks committed by Iranian proxies for the period between 1970 and 2024)).

Although the Amended Complaint seeks to recover for 64 different terrorist attacks, it cannot connect BHL to *any* of them. Instead, the Amended Complaint uses its excessive length to distract from its generic or conclusory allegations. For example, 41 individual Plaintiffs allege that they were injured by Al-Qaeda's December 6, 2019 Small Arms Attack on the Naval Air Station in Pensacola, Florida. (*Id.* ¶¶ 2759-847). Even construing the allegations favorably to Plaintiffs, the Amended Complaint devotes only a single paragraph attempting to tie BHL to the Pensacola Attack: more than 1,300 paragraphs before describing the Pensacola Attack, the Amended Complaint alleges that Al-Qaeda "required high-end, military grade communications technologies," and that by routing "vast profits to" various Iranian groups, BHL somehow "financed the entire constellation of tactical communications technologies" upon which al-Qaeda "relied." (*Id.* ¶ 1438). But the allegation that BHL routed "vast profits" to these organizations is supported only by Plaintiffs' unproduced "blockchain analysis" (*see id.* ¶ 1393) and says nothing about what the "profits" were used for. More to the point, Plaintiffs do not explain how a backward-looking analysis of transaction data can speak to what BHL knew at the time of the transactions and the December 6, 2019 Pensacola Attack.

As another example, 197 of the Plaintiffs claim to have been injured in Attacks taking place at Al Asad Air Base, Erbil Air Base and Camp Taji in Iraq. (*Id.* ¶ 157; *see, e.g.*, *id.* ¶ 1681). Here too, the allegations cannot connect BHL to any of those Attacks. Instead, Plaintiffs appear to claim, without support, that "Defendants directly financed the specific missile types" used in certain attacks (*id.* ¶ 1031) but they make no attempt to explain how the funds flowed through

BHL to the purchase or manufacture of those missiles, or whether BHL was contemporaneously aware of any such link. The best Plaintiffs can muster are a series of news reports connecting certain illicit actors to the Attacks and allegations describing BHL's transaction monitoring systems, which Plaintiffs claim "necessarily alerted" BHL to the presence of those illicit actors on the exchange. (*Id.* ¶¶ 666-71). That is plainly not enough—no matter how many paragraphs Plaintiffs take to allege it.

These examples represent only two of the 64 Attacks that make up the Amended Complaint, but they are representative of how Plaintiffs have pled each Attack. In place of any substantive allegations linking BHL to the Attacks, Plaintiffs have loaded up the Amended Complaint with a treatise on the evolution of terrorist activity in certain parts of the world along with lengthy descriptions of terrorist cells and their weapons systems. Plaintiffs' decision to include these irrelevant and oftentimes repetitive allegations is a transparent attempt to obscure the weaknesses of their pleading. Neither BHL nor the Court should be forced to sift through such an enormous and rambling morass in an attempt to discern the few allegations that are actually relevant to the claims. The Court should dismiss the Amended Complaint on this basis alone.

## II.    THE AMENDED COMPLAINT FAILS TO PLEAD A PRIMARY LIABILITY CLAIM (COUNT 5).

Plaintiffs attempt to hold BHL liable as a primary violator under the ATA (Count 5) by alleging that BHL provided material support to cyber-terrorism organization, "Wizard Spider," which in turn committed a July 2019 ransomware attack on an Alabama hospital. (*See* AC ¶¶ 3023-24).

In 1992, Congress enacted the ATA to hold terrorists accountable for their actions. In 2016, Congress amended that statute by enacting the Justice Against Sponsors of Terrorism Act ("JASTA") to create aiding-and-abetting and conspiracy liability for non-terrorists under certain

narrow circumstances.  *See Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 318 (2d Cir. 2018).  Since JASTA was passed, courts have routinely rejected attempts to bring primary ATA liability claims against non-terrorist organizations.  *See King* v. *Habib Bank Ltd.*, 2022 WL 4537849, at *5 (S.D.N.Y. Sept. 28, 2022) (post-JASTA cases generally "recognize that liability for banking services provided to support a terrorist group's mission more generally are properly analyzed under JASTA's aiding-and-abetting provision").  Asserting primary liability against non-terrorists is precisely what Plaintiffs are trying to do here.  Thus, it is not surprising that the Amended Complaint fails to plead a viable ATA claim.

## A.  The Amended Complaint Fails to Adequately Allege that BHL Committed an Act of International Terrorism.

Plaintiffs cannot state a primary ATA liability claim because the Amended Complaint fails to plausibly allege that BHL committed an act of international terrorism.  The ATA creates a private right of action for any U.S. national (or certain of his or her representatives) who is injured by "an act of international terrorism."  18 U.S.C. § 2331.  Section 2331(1) of the statute defines acts of international terrorism as activities that:

> (A) involve violent acts or acts dangerous to human life [i] that are a violation of the criminal laws of the United States or of any State, or [ii] that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries[.]

13

Plaintiffs do not and cannot plausibly allege that BHL's provision of routine transaction services qualifies under Subsections (A) or (B) of Section 2331(1).

*No Violent or Dangerous Acts*.  The Amended Complaint does not allege that BHL committed any violent or dangerous acts.[4]  Rather, Plaintiffs' claim turns on allegations that BHL "process[ed] payments to Wizard Spider."  (AC ¶¶ 3181, 3184).  But Second Circuit law is clear that providing ordinary business services to a terrorist organization is not sufficient to plead a violent act.  *Weiss* v. *Nat'l Westminster Bank, PLC*, 993 F.3d 144, 162-63 (2d Cir. 2021) ("[P]roof of the provision of banking services, in and of itself, is insufficient . . . to show that the services involved an act of violence or threat to human life[.]"); *see also Stutts* v. *De Dietrich Group*, 2006 WL 1867060, at *2 (E.D.N.Y. June 30, 2006) ("The plain language of the ATA compels the conclusion that, by engaging in commercial banking activity, the Bank Defendants were not involved in violent acts or acts dangerous to human life.").

*No Criminal Law Violations*.  Nor does the Amended Complaint adequately allege a criminal act by BHL.  Plaintiffs assert in conclusory fashion that BHL violated 18 U.S.C. § 2339A (making it a crime to provide material support or resources "*knowing or intending* that they are to be used in preparation for, or in carrying out a violation of" specified criminal statutes).  The Amended Complaint comes nowhere close to pleading the requisite guilty state of mind.  Plaintiffs allege that between 2019 and 2022, BHL processed potentially suspicious transactions with Garantex, a foreign digital asset exchange, and that roughly $6 billion of those transactions are somehow linked to Conti ransomware.[5]  (AC ¶¶ 701-03).  Elsewhere, Plaintiffs quote from the

---

[4]  Although the statute does not expressly provide that the defendant must be the one to commit the act of terrorism, that is the only logical reading and, as shown from the cases below, the reading that courts routinely have adopted.  *See* Section II.A, *infra*.

[5] Plaintiffs also allege, without support that Conti is the same organization as Wizard Spider.  (AC

FinCEN Consent Order to allege that in May 2022, nearly three years *after* the ransomware attack from which they claim their injuries, "Binance received a report detailing how [Wizard Spider] was moving illicit proceeds through accounts on its platform" and that the report "associated . . . over $12 million of [virtual currency] that traced specifically from [Wizard Spider] attackers to accounts at Binance."[6]  (*Id.* ¶ 1529).  Finally, Plaintiffs refer to their unproduced blockchain analysis to allege that BHL enabled Wizard Spider to conduct over $16 million in transactions on the Binance exchange, without alleging when the transactions occurred or when BHL became aware of them.  (*Id.* ¶ 1530).  At best, these allegations suggest that individuals or entities associated with either Wizard Spider, Conti, or another third-party actor, transacted on the exchange and that BHL *at some point* became aware of those transactions.  Those allegations do not plausibly suggest that BHL knew—at the time it provided those services—that any particular transaction was connected to Wizard Spider, or their 2019 ransomware attack.  In any event, even if those allegations were sufficient to plead a criminal violation, Plaintiffs' failure to plead a violent act by BHL would still be fatal to their claims.  *See Linde*, 882 F.3d at 326 ("The provision of material support to a designated terrorist organization in violation of § 2339B can certainly satisfy that *part* of the statutory definition.  Still, to qualify as international terrorism, a defendant's act must *also* involve violence or endanger human life.") (emphasis in original).

**No Objective Terroristic Intent**.  The Amended Complaint similarly does not satisfy Subsection (B) of 18 U.S.C. § 2331 because Plaintiffs fail to allege that BHL acted with an

---

¶¶ 703 n.26, 1518.)

[6] The FinCEN Consent Order never uses the term "Wizard Spider."  (*See* Enzer Decl. Ex. 2). Instead, Plaintiffs have quoted from the Consent Order, replacing the term "Conti" with "Wizard Spider," based on nothing more than their own self-serving statement that the two organizations are the same.

objective terroristic intent (*i.e.,* an intent to intimidate or coerce a civilian population or influence a government). To establish objective terroristic intent, Plaintiffs must show that BHL processed transactions explicitly identified as payments for terroristic efforts. *See Averbach* v. *Cairo Amman Bank*, 2022 WL 2530797, at \*19 (S.D.N.Y. Apr. 11, 2022) (granting defendant bank's motion to dismiss primary liability claim where plaintiffs failed to allege that defendant bank processed payments explicitly identified as terrorist-related).[7] Nowhere does the Amended Complaint allege that BHL processed transactions it knew were going to be used to facilitate Wizard Spider's efforts. In fact, Plaintiffs' most factually robust allegation, albeit taken from a regulatory agency report, concedes that BHL "took internal action" once becoming aware that Wizard Spider had used the platform. (AC ¶ 1529). That sort of allegation does not establish BHL's terroristic intent; if anything, it rebuts it.

### B. The Amended Complaint Fails to Adequately Allege that Defendants Proximately Caused Plaintiffs' Alleged Injuries.

The Amended Complaint's failure to plausibly allege proximate cause is an independent basis for dismissal. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013). ("[T]he [ATA] restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants['] actions proximately caused their injuries[.]"). To establish proximate cause, Plaintiffs must make plausible allegations that they were injured "by reason of" an act that BHL itself committed. *See Rothstein* v. *UBS AG*, 708 F.3d 82, 91, 93, 95 (2d Cir. 2013) ("proximate cause" requires showing that defendant's "acts were a substantial factor in the sequence of responsible causation" and that the alleged "injury was reasonably foreseeable or

---

[7] *Cf. Linde*, 882 F.3d at 321 (holding that defendant bank processing transfers that "were explicitly identified as payments for suicide bombings" was sufficient to create triable issue of fact as to whether the bank acted with the requisite intent).

anticipated as a natural consequence"). Plaintiffs make no attempt to link any transaction on the Binance exchange to the 2019 Ransomware Attack on an Alabama hospital. Instead, Plaintiffs argue that Wizard Spider adopted a "custom and practice" of demanding that ransom payments be sent to a wallet hosted on the Binance exchange (AC ¶ 1531) and therefore BHL somehow *caused* the 2019 Ransomware Attack. Notably, Plaintiffs do not plausibly allege that the ransom associated with the 2019 Ransomware Attack was sent to a BHL hosted wallet, but even if it did, that allegation would still not suffice to establish that BHL proximately *caused* either the attack or Plaintiffs' injuries. (*Id.*); *see Kaplan* v. *Lebanese Canadian Bank, SAL,* 405 F. Supp. 3d 525, 532-33 (S.D.N.Y. 2019) (plaintiff's "conclusory allegations" that actions of a bank, in "intentionally and/or recklessly provid[ing] extensive banking services to Hizbollah, which caused. . . the terrorist rocket attacks," failed to plausibly allege proximate cause), *vacated in part on other grounds*, 999 F.3d 842 (2d Cir. 2021); *Zapata* v. *HSBC Holdings PLC*, 414 F. Supp. 3d 342, 355-59 (E.D.N.Y. 2019) (no proximate cause where plaintiffs failed to allege "any relationship between [defendant] HSBC's money laundering and the acts of violence perpetrated against them").

## III.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR AIDING-AND-ABETTING LIABILITY (COUNT 1).

Plaintiffs fail to adequately plead a secondary ATA liability claim. JASTA imposes secondary civil ATA liability on "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed" an "act of international terrorism." 18 U.S.C. § 2333(d)(2). As the U.S. Supreme Court has held, to adequately plead an aiding-and-abetting violation under JASTA, a plaintiff must (among other things) allege that the defendant (1) "[was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance"; and (2) "knowingly and substantially assist[ed] the principal violation." *Twitter*, 598 U.S. at 486. The Amended Complaint falls far short on both.

### A. The Amended Complaint Fails to Sufficiently Allege BHL Knowingly and Substantially Assisted the Attacks.

The Amended Complaint does not come close to meeting the exacting standard for the knowing and substantial assistance element that the Supreme Court recently set forth in *Twitter*. *Id.* at 489-93, 505. In *Twitter*, the plaintiffs were victims of a terrorist attack committed by ISIS at a nightclub in Istanbul. *Id.* at 478-79. They alleged that various social media companies aided and abetted ISIS by knowingly permitting ISIS to use the companies' platforms and algorithms to target and recruit new members, and fundraise. *Id.* at 480-82. In explaining why the plaintiffs had failed to state a claim, the Court distilled the "conceptual core" of the knowing and substantial assistance element to two requirements: (1) "conscious, voluntary, and culpable participation" in the principal's wrongdoing (here, the Attacks); and (2) a nexus between that participation and the plaintiffs' injuries. *Id.* at 493-95, 506. The Amended Complaint fails to satisfy either requirement.

### i. *The Amended Complaint Fails Plausibly to Allege that BHL Engaged in "Conscious, Voluntary, and Culpable" Conduct.*

The *Twitter* Court explained that "conscious, voluntary, and culpable participation in another's wrongdoing" requires plausible allegations that the defendants actively participated in the relevant attack "as something that they wished to bring about, or sought by their action" to make "succeed." *Id.* at 493, 498. Accordingly, the Court found it insufficient for the plaintiffs to allege that the social media company defendants *knew* that ISIS was using their platforms to further terrorism. *Id.* at 478. It was likewise insufficient to allege "omissions, inactions or nonfeasance." *Id.* at 489; *compare id.* at 490 (aiding-and-abetting liability requires affirmative misconduct such as "inducing, encouraging, soliciting, or advising the commission of the offense"), *with id.* at 499, 500 ("passive assistance" or a defendant's "failure to stop" terrorists from using its services is not enough). That is why the *Twitter* plaintiffs' theory of liability—that the social media companies *failed to stop* ISIS from using their platforms—was insufficient. *Id.* The Court stressed that

*affirmative* misconduct is necessary; otherwise, "mostly passive actors like banks" would be "liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491.

Plaintiffs' allegations here have all the failings of the claims dismissed in *Twitter*. The Amended Complaint alleges that BHL offered the general public routine transaction services and, *at most* (even stretching beyond the limits of reasonable inferences that can be drawn from its allegations), that: (1) BHL knew or must have known FTO-associated accounts were using Binance, and (2) BHL—because of its deficient controls—failed to stop this use. (AC ¶¶ 629-40, 661, 663, 672, 679-80). That is simply not enough under *Twitter*. 598 U.S. at 500 ("To show that defendants' failure to stop ISIS from using these platforms is somehow culpable with respect to the Reina attack, a strong showing of assistance and scienter would thus be required."). The *Twitter* Court explained that "defendants' platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information on a daily basis. Yet, there are no allegations that defendants treated ISIS any differently from anyone else." *Id.* The same is true here: Plaintiffs allege that BHL offered its products and services to "over 100 million customers throughout the world." (AC ¶ 26). Yet, notwithstanding the Amended Complaint's vague and generalized allegations regarding accounts "associated" with FTOs (AC ¶¶ 1258-59, 1263), there are no allegations to suggest BHL gave special treatment to any FTO compared to any of Binance's other users, or that BHL did anything to advance any of the Attacks.

>           ii.   ***Plaintiffs Do Not Allege a Sufficient Nexus Between BHL's Alleged Conduct and the Attacks.***

Plaintiffs do not come close to pleading the other sub-prong of knowing and substantial assistance, the "definable nexus between the defendants' assistance and [the] attack." *See Twitter*, 598 U.S. at 498, 503 ("plaintiffs never allege[d] that ISIS used defendants' platforms to plan or coordinate" the specific nightclub attack at issue). Instead, the Amended Complaint contains only

vague and conclusory assertions that BHL somehow enabled and participated in the Attacks by facilitating the FTOs' access to funds or the U.S. market.  (*See* AC ¶¶ 500, 679, 716, 722, 727, 785).  But alleging that a defendant gave "assistance to [the principal wrongdoer's] activities in general" is not enough.  *Twitter*, 598 U.S. at 503.

Without allegations connecting a defendant's alleged assistance to the specific terrorist act, plaintiffs face a "drastically increase[d]" burden of establishing that the defendant "so systemically and pervasively assisted" the terrorist group, that it "could be said to aid and abet every single" attack the group committed.  *Id.* at 501, 503.  The Amended Complaint does not even approach this high bar.  At most (and again, stretching the allegations to the limits of logical inferences), Plaintiffs allege several transactions with FTO-linked accounts.  That does not mean BHL provided such extensive assistance to the FTOs that it can be held responsible for any attack these terrorist organizations committed world-wide.

The law is equally clear that providing routine business services to persons or entities "with connections" to terrorist organizations—as opposed to the organizations themselves—is insufficient to state a claim for aiding-and-abetting (or conspiracy) liability.  *See, e.g.*, *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446, at *8 (S.D.N.Y. Mar. 28, 2019) (no aiding-and-abetting liability where complaint alleged defendants provided financial services to Iranian banks and businesses "with connections to terrorist organizations").  Yet that is the entire extent of the (wholly conclusory) allegations here.  For example, the Amended Complaint alleges BHL received reports that identified "Hamas-*associated* transactions" on Binance (*see, e.g.*, AC ¶¶ 636, 1258), and that FinCEN's investigation identified "Binance user addresses" that "were *found to interact* [at unspecified times] with bitcoin wallets associated with" FTOs (*id.* ¶¶ 631, 1391).  This is not

the same as alleging that BHL provided services directly to the FTOs and is, thus, insufficient to meet the nexus requirement. *See O'Sullivan*, 2019 WL 1409446, at \*7-8.

Nor would it be sufficient if, as the Amended Complaint alleges, Binance hosted a single wallet owned by an individual who allegedly sent cryptocurrency transfers to Hezbollah, or that Binance hosted 19 other wallets belonging to this individual's "intermediaries." (AC ¶¶ 1153-58). The Amended Complaint fails entirely to draw any connection between any of these wallets and any Attack. *See Twitter*, 598 U.S. at 506 (2023) ("The focus must remain on assistance to the tort for which plaintiffs seek to impose liability"; "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort."). The Amended Complaint's reliance on the vaguely-pled connection between these wallets and Hezbollah in general is plainly insufficient. *See O'Sullivan*, 2019 WL 1409446 at \*7-8. Nor is there any allegation that BHL knew of any connection between the wallets and Hezbollah—let alone to any Attack—when the wallets were transacting on Binance (which means the allegations also fail to establish "conscious, voluntary, and culpable participation in" any attack). *Twitter*, 598 U.S. at 493.

### iii.  *The <u>Halberstam</u> Factors All Support Dismissal.*

When it enacted JASTA, Congress pointed to the D.C. Circuit's decision in *Halberstam* v. *Welch*—which lists six factors that "determine whether a defendant's assistance was substantial"—as the proper framework for analyzing aiding-and-abetting liability. *Twitter*, 598 U.S. at 486; *Halberstam* v. *Welch*, 705 F.2d 472, 483-84 (D.C. Cir. 1983). *Twitter* confirmed that these factors remain relevant because their point "is to help courts capture the essence of aiding and abetting." 598 U.S. at 504. All of these factors weigh in favor of dismissal in this case:

- **<u>Nature of the Act</u>**: The Amended Complaint does not adequately plead any facts to suggest that the routine services BHL are alleged to have provided were "indisputably important" to any FTO. *Halberstam*, 705 F.2d at 488.

- **Amount of Assistance**:  Plaintiffs do not allege that BHL processed any transactions that are directly tied to the Attacks, let alone "an essential part of the pattern" giving rise to the Attacks.  *Id.*

- **BHL's Presence**:  Plaintiffs have not and cannot plead any facts to show that any BHL employee was present during the Attacks.  *Id.*

- **BHL's Relationship to the FTOs**:  Plaintiffs allege that BHL processed transactions by users with unspecified links to various FTOs, but they do not tie those transactions to the Attacks, nor allege any relationship between BHL and the FTOs.  Providing routine services to the general public is insufficient.  *Id.*

- **BHL's State of Mind**:  The Amended Complaint alleges no act that BHL undertook with the "intention" of facilitating the Attacks.  *Id.* at 488.

- **Duration of the Assistance**:  Although the Amended Complaint alleges that BHL provided services to the FTOs for years leading up to the Attacks, this says nothing about the "quality and extent" of the alleged relationship between BHL and the FTOs (compared to BHL's user base generally), nor does the Amended Complaint suggest that the duration of the relationship resulted in an increased "amount of aid" provided.  *Id.* at 484.

### B. The Amended Complaint Does Not Adequately Allege BHL Was Generally Aware of Its Role in the Relevant Terrorist Activity.

Because Plaintiffs have failed to allege knowing and substantial assistance, their aiding-and-abetting claim fails, and the Court need not consider the issue of general awareness. Regardless, the Amended Complaint also fails to adequately plead general awareness.

To meet the general awareness requirement, a plaintiff must plead that the defendant was "generally aware" that it was "playing a role in [a designated FTO's] violent or life-endangering activities." *Linde*, 882 F.3d at 329-30.  Plaintiffs seek to establish general awareness here by pointing to various warnings issued by the U.S. government, the U.N., NGOs, blockchain analysis firms, and scholars, which according to Plaintiffs, "conveyed to Defendants that terrorist organizations may seek to transact using cryptocurrency on its exchange and that these terrorist organizations used cryptocurrency to fund their operations and commit terrorist attacks." (AC ¶ 551; *see also id.* ¶¶ 540, 552, 562, 568, 572, 578).  This is not enough.  The Amended Complaint does not allege that BHL was warned that specific Binance customers were engaged in terrorism, nor that certain of the generalized warnings—such as those by NGOs and terrorism scholars—

were even known to BHL.  *See Honickman for Est. of Goldstein* v. *BLOM Bank SAL*, 432 F. Supp. 3d 253, 265 (E.D.N.Y. 2020) (plaintiffs' cites to press articles, government actions, and alleged public knowledge describing a connection between defendant's customers and Hamas were not enough to plead general awareness where plaintiffs failed to allege that defendants or their employees actually knew of plaintiffs' cited sources), *aff'd sub nom. Honickman* v. *BLOM Bank SAL*, 6 F.4th 487 (2d Cir. 2021).

Plaintiffs also fail to allege that BHL intended to further any FTO's terrorist activities or was generally aware that it was playing a role in those activities.  Indeed, the Amended Complaint lacks *any* allegation connecting a transaction executed on Binance with terrorist activity.  Rather, the Amended Complaint merely asserts that BHL knew or must have known that its generally available financial services were being used by individuals or entities associated with FTOs.  (*See* AC ¶¶ 665, 672 (alleging, without factual support, that blockchain analysis firms "informed Binance of terrorists operating on its exchange" and that BHL "knew [through blockchain analysis tools] when terrorists accessed and transacted on the Binance exchange.")).  That is not sufficient. *See Honickman*, 432 F. Supp. 3d at 266 (failure to plead general awareness where plaintiffs alleged defendants knew that by providing financial services to certain customers, they were playing a role in Hamas' activities); *Strauss* v. *Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 164 (E.D.N.Y. 2019) ("Evidence that [d]efendant knowingly provided banking services to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement."), *aff'd in relevant part, appeal dismissed in part*, 842 F. App'x 701 (2d Cir. 2021).

## IV. THE AMENDED COMPLAINT FAILS TO PLEAD A CONSPIRACY CLAIM (COUNTS 2, 3, AND 4).

Under JASTA, a defendant is civilly liable if it "conspire[d] with the person who committed [] an act of international terrorism."  18 U.S.C. § 2333(d)(2).  To state a conspiracy

claim, a plaintiff must plead and prove that (1) the defendant affirmatively agreed to join a conspiracy; (2) the goal of the conspiracy was to commit "an act of international terrorism"; and (3) there was an overt act in furtherance of the goal of the conspiracy.  18 U.S.C. § 2333(d)(2); *Lau* v. *ZTE Corp.*, 2023 WL 9066883, at *7 (E.D.N.Y. Sept. 28, 2023); *O'Sullivan*, 2019 WL 1409446, at *9.   Here, Plaintiffs allege three conspiracies.   Count 2 alleges a so-called "Counterpressure Conspiracy" through which BHL allegedly conspired with Iran and its "Axis of Resistance" allies to "degrade, deter, and destroy Iran-facing economic pressure supported by persons in the United States," and to "secure windfall profits" for each co-conspirator by destroying the U.S. sanctions regime against Iran.  (AC ¶¶ 3053-55).  Count 3 alleges an "Axis Conspiracy" through which BHL allegedly conspired with Iran's "Axis of Resistance" to maintain the terror organizations' "ability to access the payments they received in connection with their [alleged terroristic acts, such as] hostage-taking, human trafficking, ransomware, and protection payment schemes."  (AC ¶¶ 3133-66).  Lastly, Count 4 contends that BHL conspired to "provid[e] material support" to ISIS.  (AC ¶¶ 3167-78).  None of these counts adequately states a conspiracy claim under JASTA.

**Lack of Agreement.**   As the Second Circuit explained in *Freeman*, a plaintiff asserting a JASTA conspiracy claim must allege an illicit agreement between the defendant and terrorists that perpetrated the attack in question.  57 F.4th at 79.  That requires plausible allegations that the defendant and the terrorist attackers "were pursuing the same object" and had a "common intent." *Id*. at 79-80.  Indeed, it is a basic principle of conspiracy law that "one cannot join a conspiracy through apathy."  *Kemper* v. *Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018).  To hold otherwise would impose conspiracy liability on any business that transacted with bad actors.  *See id.*  Thus, "although a conspirator [need] not agree to commit or facilitate each and every part of

the offense, she must reach an agreement with the specific intent that the conspiratorial goal be completed." *Id.*  In *Freeman*, the Second Circuit affirmed the dismissal of JASTA conspiracy claims, in part because the plaintiffs had failed to allege a common intent among the bank defendants and the terrorists who perpetrated the attacks.  The Circuit explained that "[n]owhere in the Complaint" do "Plaintiffs plead that the Banks intended to kill or injure U.S. service members in Iraq," and "[i]n the absence of any allegation that the Banks and the terrorist groups engaged in a common pursuit, we cannot identify any agreement that could form the basis of a JASTA conspiracy between the Banks and the terrorist groups, whether they conspired directly or indirectly with one another." *Freeman*, 57 F.4th at 80.

Here, each of Plaintiffs' conspiracy claims suffers from the same fatal flaw.  With respect to the Counterpressure Conspiracy (Count 2), Plaintiffs' allege that BHL's "knowledge" of Iran's effort to counter and end U.S.-origin sanctions is proof that it sought to and did enter an agreement to end those sanctions.  (AC ¶¶ 3057, 3083-84, 3090-98, 3101-03, 3107-08).  But mere knowledge of unlawful behavior does not create a "tacit" agreement to do anything, much less enter into a conspiracy.  *Freeman* v. *HSBC Holdings PLC*, 413 F. Supp. 3d 67, 88 (E.D.N.Y. 2019) (even assuming defendants knew of Iran's ties to and support of terrorist organizations, that fact could not create an inference that defendants agreed to provide Iran with material support in ATA conspiracy claim), *aff'd on other grounds*, 57 F.4th 66 (2d Cir. 2023).  Nor does an agreement to evade sanctions plausibly equate to an agreement to facilitate terrorist attacks.  While Plaintiffs allege that "a company's intentional violation of U.S. sanctions with Iran [is] tantamount to a tacit agreement with the Iranian regime to endorse its ongoing attacks seeking to counter [U.S. sanctions]" (AC ¶ 3103), this allegation fails to state a conspiracy claim on its face.  *See, e.g.*, *Kemper*, 911 F.3d at 395 ("The facts here suggest only that Deutsche Bank may have engaged in

business dealings that incidentally assisted a separate terrorism-related conspiracy involving Iran; they do not suggest that Deutsche Bank ever agreed to join that conspiracy."); *O'Sullivan*, 2019 WL 1409446, at *9 ("The Complaint pleads no facts from which the Court can infer that [d]efendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs like Hezbollah" for "the purpose of committing violent or life-endangering acts."); *Cain* v. *Twitter Inc.*, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018) ("Plaintiffs point to Twitter's terms of service that every user is subject to, but while that clearly is an 'agreement,' it is hardly relevant to a terrorist conspiracy.").

The Axis Conspiracy (Count 3) similarly fails to allege a conspiratorial agreement.  The Amended Complaint does not plausibly allege that BHL had any contact with Axis-affiliated terrorists, let alone that BHL reached some type of "agreement" with them, either express or implied.  At most, the Amended Complaint alleges that Binance lacked sufficient AML controls such that terrorist organizations may have exploited that.  But BHL's failure to implement adequate AML controls is a far cry from an agreement with terrorist organizations for any purposes— including the alleged agreement to "jointly profit by participating" in "illicit transactions" with the Nobitex exchange (*see* AC ¶ 3139).  There simply was no meeting of the minds.  *See Bernhardt* v. *Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022) (dismissing conspiracy claim where "[t]he complaint states that HSBC was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world stage"), *cert. denied sub nom. Bernhardt* v. *HSBC Holdings PLC*, 144 S. Ct. 280 (2023).

Just as the Amended Complaint fails to allege an agreement between BHL and Iran's Axis of Resistance, it does not and cannot allege an agreement between BHL and ISIS (Count 4).  As with the other defective conspiracy claims, the Amended Complaint's ISIS conspiracy claim relies

on BHL's routine transaction services to individuals or entities that Plaintiffs later connected to ISIS. This does not adequately plead an agreement. *Kemper*, 911 F.3d at 395. And as with all of the Amended Complaint's allegations concerning FTOs' claimed use of Binance, Count 4 does not allege that BHL knew of any ISIS-"associated" accounts using Binance when the alleged use was occurring, nor that there was any connection between any such usage and any Attack. Count 4's allegations are plainly insufficient to plead an agreement to provide material support to ISIS.

***No Conspiracy to Commit an Act of Terrorism.*** Even if the Amended Complaint adequately alleged an agreement (which it does not), it does not allege an agreement *to commit acts of international terrorism*—the only type of conspiracy actionable under JASTA. *See Freeman*, 57 F.4th at 79-80; *O'Sullivan*, 2019 WL 1409446, at *9; *Cain*, 2018 WL 4657275, at *3 (dismissing JASTA conspiracy claim because "[n]othing in the [complaint] establishes an agreement, express or otherwise, between Twitter and ISIS to commit terrorist attacks"); *Ofisi* v. *BNP Paribas, S.A.*, 77 F.4th 667, 671-72 (D.C. Cir. 2023) (affirming dismissal of conspiracy count where the defendant bank and FTO shared no common goal to commit terrorist attacks); *accord Taamneh* v. *Twitter, Inc.*, 343 F. Supp. 3d 904, 916 (N.D. Cal. 2018) (JASTA "indicates that the injury at issue must have arisen from *an act* of international terrorism and that the secondary tortfeasor assisted the principal tortfeasor in committing *such an act* of international terrorism. JASTA does not refer to assisting a foreign terrorist organization generally or such an organization's general course of conduct." (emphasis in original)).

Even accepting as true the Amended Complaint's conclusory allegations that BHL knowingly facilitated terrorist financing or willfully turned a blind eye toward it, the conspiracy claim still fails because the Amended Complaint does not—and cannot—allege that BHL ever agreed to commit a terrorist attack. Indeed, Plaintiffs acknowledge the opposite, when they allege

27

that "Defendants did not pull the trigger on any of the regime's attacks[.]" ( AC ¶ 3101). Simply put, the Amended Complaint fails to allege that BHL and the terrorist organizations "were pursuing the same object" or shared a "common intent" to commit an *act of terrorism*, because the Amended Complaint does not and cannot allege that BHL "intended to kill or injure" anyone, under any of the three claimed conspiracies. *Freeman*, 57 F.4th at 79-80; *see Bernhardt*, 47 F.4th at 873 ("In the absence of any alleged concordance between HSBC's and al-Qaeda's objectives, [plaintiffs'] conspiracy claim is inadequate."); *Lau*, 2023 WL 9066883, at *7 ("Plaintiffs' allegations are insufficient to plausibly suggest that either set of [d]efendants reached an agreement with either intermediary—the Iranian shareholders or the IRGC—to carry out a common scheme to commit an act of international terrorism."); *O'Sullivan*, 2019 WL 1409446, at *9 (no conspiracy liability under the ATA where allegations did not demonstrate that "the connection between [d]efendants' activities and those of various" FTOs "was so coordinated or monolithic that [d]efendants shared a common purpose or plan with FTOs" to "commit an act of international terrorism").

***No Overt Act.*** Lastly, Plaintiffs fail to allege an overt act in furtherance of a goal of the alleged conspiracies. As the Second Circuit has made clear, "a plaintiff asserting a civil conspiracy claim must adequately plead that their injuries were caused by an unlawful overt act done in furtherance of the [co-conspirators'] common scheme." *Freeman*, 57 F.4th at 80. And as noted, the common scheme under JASTA must be one to commit acts of international terrorism. Here, the overt acts pled by Plaintiffs in support of the Counterpressure Conspiracy are acts in furtherance of creating and using "alternative financial systems that facilitated access to the U.S. economy without reliance upon the formal U.S. financial system, including using cryptocurrency transactions to evade and undermine U.S.-Origin Sanctions" and through terrorist attacks targeting the U.S. and its allies. (AC ¶¶ 3056). In support of the Axis Conspiracy, Plaintiffs plead overt

acts in furtherance of the objective of allowing the Axis to maintain access to payments, and in support of the ISIS Conspiracy, Plaintiffs plead that BHL's controls deficiencies allowed actors connected with ISIS to transact on Binance. Even if any of these acts somehow assisted the designated FTOs—something the Amended Complaint asserts in only the most conclusory way—these allegations are insufficient to plead, as required, that Plaintiffs were injured by the acts, or that the Attacks were in furtherance of any conspiracy. *See Freeman*, 57 F.4th at 82; *see also Bernhardt*, 47 F.4th at 873 (sanctions evasion not an overt act in furtherance of conspiracy to commit an act of terrorism).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should dismiss the Amended Complaint with prejudice.

Date: December 20, 2024

Respectfully submitted,

*/s/ Samson A. Enzer*
**CAHILL GORDON & REINDEL LLP**
Samson A. Enzer
Anirudh Bansal
Sesi Garimella
32 Old Slip
New York, NY 10005
(212) 701-3125

*Attorneys for Binance Holdings Limited*