# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x

JOCELYN TROELL, individually, and for the
estate of STEPHEN TROELL, et al.,

                    Plaintiffs,

        v.

BINANCE HOLDINGS LIMITED, et al.,

                    Defendants.

: 
: 
: 
:    No. 1:24-cv-07136 (JAV)
: 
: 
: 
: 
: 
: 
: 

---------------------------------------------x

## DEFENDANT BAM TRADING SERVICES INC.'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 5

I.    This Court Lacks Personal Jurisdiction Over Bam Because Plaintiffs Fail To Plausibly Allege That BAM's Contacts With The Forum Are Substantially Related To The 64 Terror Attacks. ........................................................................................................... 5

II.    Counts I-IV: Plaintiffs' Claims For Secondary Liability Fail To Satisfy *Taamneh's* Mandate. ................................................................................................................. 9

    A.    Plaintiffs Fail To State A Claim For Aiding And Abetting Against BAM or Any Other Defendant.................................................................................... 10

        1.    There is no connection between the alleged transactions and the 64 attacks................................................................................................ 10

        2.    Plaintiffs fail to plausibly allege BAM's "general awareness" that BAM had assumed a role in terrorist activity....................................... 11

        3.    Plaintiffs do not plausibly allege that BAM provided knowing, substantial assistance to the FTOs that attacked Plaintiffs. ......................................... 14

    B.    Plaintiffs Fail to Demonstrate BAM Entered Any Agreement with Terrorists with a "Common Scheme" To Commit the 64 Terror Attacks....................................... 20

        1.    Count II: Plaintiffs' Conspiracy Claim Is Missing Plausible Allegations of an Agreement. ............................................................................ 21

        2.    Counts III and IV: Plaintiffs' Conspiracy Claim Is Missing Plausible Allegations of a Common Scheme.............................................. 24

III.    Plaintiff's Primary Liability Claim Fails Because A Domestic Ransomware Attack Is Not an act of "International Terrorism," and Plaintiffs' Do Not Allege the Actual Knowledge Required by 18 U.S.C. § 2339A................................................................ 24

IV.  CONCLUSION .................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Rushaid v. Pictet & Cie*,
    68 N.E.3d 1 (N.Y. 2016) ............................................................................................................. 7

*In re All Year Holdings Ltd.*,
    648 B.R. 434 (S.D.N.Y. 2022) ................................................................................................. 10

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ................................................................................................... 23

*Averbach v. Cairo Amman Bank*,
    2020 U.S. Dist. LEXIS 10902 (S.D.N.Y. Jan. 21, 2020), *report and
    recommendation adopted by* 2020 U.S. Dist. LEXIS 40430 (S.D.N.Y. Mar. 9,
    2020) .................................................................................................................................. 14, 15

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir.1999) ..................................................................................................... 5, 6

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................ 23

*Bernhardt v. Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022) ................................................................................................. 23

*Bonacasa v. Std. Chtd. PLC*,
    2023 U.S. Dist. LEXIS 38147 (S.D.N.Y. 2023) ...................................................................... 14

*Brill v. Chevron Corp.*,
    2018 U.S. Dist. LEXIS 137579 (N.D. Cal. Aug. 14, 2018) ...................................................... 16

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ................................................................................................... 6, 7

*Freeman v. HSBC Holdings PLC*,
    465 F. Supp. 3d 220 (E.D.N.Y. 2020) ........................................................................... 12, 16, 19

*Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir.), *cert. denied*, 144 S. Ct. 83, 217 L. Ed. 2d 17 (2023) ..................... *passim*

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .......................................................................................... *passim*

*Henderson v. I.N.S.*,
    157 F.3d 106 (2d Cir. 1998) ...................................................................................................... 7

*Honickman v. BLOM Bank SAL.*,
    6 F.4th 487 (2d Cir. 2021) ................................................................................12, 18

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
    326 U.S. 310 (1945) ...........................................................................................8

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ..............................................................................23

*King v. Habib Bank Ltd.*,
    No. 20 CIV. 4322 (LGS), 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022)..........................8, 9

*Lelchook v. Lebanese Canadian Bank*,
    2024 WL 967078 (S.D.N.Y. Mar. 6, 2024) ............................................................15

*Licci v. Lebanese Canadian Bank*,
    32 F.3d 161 (2d Cir. 2013)...................................................................................8

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir.), *certified question accepted sub nom. Licci v. Lebanese*
    *Canadian Bank*, 18 N.Y.3d 952 (2012), and *certified question answered sub*
    *nom. Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327 (2012).........................................6, 7, 8

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ...............................................................................12

*Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
    2025 U.S. App. LEXIS 641 (2d Cir. Jan. 13, 2025) ..................................................13

*O'Sullivan v. Deutsche Bank AG*,
    2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar. 28, 2019) ......................................12, 22, 23

*Ofisi v. BNP Paribas, S.A.*,
    77 F.4th 667 (D.C. Cir. 2023)..............................................................................19

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007), *aff'd* 349 F. App'x 637 (2d Cir. 2009) .......................16

*Siegel v. HSBC Bank USA, N.A.*,
    2018 U.S. Dist. LEXIS 126152 (S.D.N.Y. July 27, 2018) .........................................15, 16

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) ...........................................................................12, 15, 19

*Spetner v. Palestine Inv. Bank*,
    70 F.4th 632 (2d Cir. 2023) .................................................................................9

*Stadtmauer v. Tulis,*
   115 F.4th 90 (2d Cir. 2024) ................................................................ 10

*Strauss v. Credit Lyonnais, S.A.,*
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ............................................... 6, 9, 15

*Twitter v. Taamneh,*
   598 U.S. 471 (2023) ................................................................. *passim*

*Waldman v. Palestine Liberation Org.,*
   835 F.3d 317 (2d Cir. 2016) .......................................................... 3, 5, 6

*Weiss v. Nat'l Westminster Bank PLC,*
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ...................................................... 6

*Weiss v. Nat'l Westminster Bank PLC,*
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) .................................................... 15

*Weiss v. Nat'l Westminster Bank PLC,*
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) .................................................... 15

*Weiss v. Nat'l Westminster Bank, PLC.,*
   993 F.3d 144 (2d Cir. 2021) ............................................................. 25

*Wultz v. Republic of Iran,*
   762 F.Supp.2d 18 (D.D.C. 2011) ........................................................... 6

*Zobay v. MTN Grp.,*
   695 F. Supp. 3d 301 (E.D.N.Y. 2023) ........................................... 15, 22, 23

## Statutes

18 U.S.C. § 2333(d)(2) ....................................................................... 21

18 U.S.C. § 2333 *et seq., as amended by* Pub. L. No. 114-222, 130 Stat. 852
   (Sept. 28, 2016). ................................................................. *passim*

18 U.S.C. § 2334(a) ............................................................................ 6

18 U.S.C. § 2339A ........................................................................ 24, 25

## Other Authorities

CPLR § 302(a)(1) ........................................................................... 6, 8

Fed. R. Civ. P. 4(k)(1) ........................................................................ 6

Fed. R. Civ. P. 4(k)(1)(a) ..................................................................... 6

Fed. R. Civ. P. 4(k)(1)(c) ................................................................................... 6

Fed. R. Civ. P. 4(k)(2) ...................................................................................... 6

Fed. R. Civ. P. 8(a) ........................................................................................... 9

Fed. R. Civ. P. 12(b)(2) ..................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ............................................................................ 1, 3, 4, 9

U.S. Const. Due Process Clause .................................................................... 3, 7

BAM Trading Services Inc. d/b/a/ Binance.US ("BAM") unequivocally condemns terrorism in all forms and deeply sympathizes with the victims of the devastating events described in the Amended Complaint. BAM moves this Court to dismiss all claims against it, however, because Plaintiffs have not carried their burden of proof to demonstrate the Court's jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or to satisfy their Rule 12(b)(6) burden of proof in accord with *Twitter v. Taamneh*, 598 U.S. 471 (2023).

## INTRODUCTION

Plaintiffs' core theory is simple, if fundamentally illogical and legally incompatible with this Court's exercise of jurisdiction over BAM and Plaintiffs' Anti-Terrorism Act ("ATA") claims.[1] The Amended Complaint alleges that BAM (along with all Defendants) "fueled" terrorist activity generally by indirectly contributing to Iranian economic growth, in that "Iran's cyber-related fronts flowed value through to [Iran] for use in terrorist attacks."[2] Plaintiffs' language immediately informs this Court that they do not connect BAM (or other Defendants) to the 64 terror attacks in this case but instead focus only on connecting BAM <u>generally to the attempted commission of terror attacks</u>. This is precisely what the Supreme Court rejected in *Taamneh*, because the "plaintiffs' allegations are insufficient to establish that these defendants aided and abetted ISIS in <u>carrying out the relevant attack</u>."[3]

Buried among hundreds of pages extensively detailing the historical inner workings of Iran's geopolitical, religious, and cultural regime, Plaintiffs also attempt to establish a connection between BAM (along with the other Defendants) and Irancell, a telecommunications company

---

[1] Anti-Terrorism Act ("ATA"), *as amended by* JASTA (Justice Against Sponsors of Terrorism Act), 18 U.S.C. § 2333 *et seq.*, *as amended by* Pub. L. No. 114-222, 130 Stat. 852 (Sept. 28, 2016).

[2] Am. Compl. ¶¶ 816, 1045, 1103.

[3] *Id.*, 598 U.S. at 478 (emphasis added); *see* Am. Compl. ¶¶ 816, 1045, 1103.

allegedly operating as a front for Iranian terrorists.[4] Rather than alleging any specific contact, transaction, or direct interaction between BAM and the terrorists alleged to have committed the attacks, as they must, Plaintiffs instead allege that "Defendants" collectively—not BAM—enabled Iran to make money, because "Defendants" failed to prevent cryptocurrency transactions between customers of Binance.com—a cryptocurrency exchange that BAM is entirely unconnected with and cannot access—and customers of Iranian cryptocurrency exchanges.[5] The mere occurrence of these transactions, they allege, increased Iranian demand for telecommunications services, and thereby increased the wealth of Iran.[6] In other words, Plaintiffs allege that because the Binance.com crypto exchange platform—not BAM or its exchange platform, Binance.US—indirectly contributed to economic conditions in Iran, causing Iran to potentially earn more profits for alleged terrorist-linked Iranian companies, BAM is liable for the terrorist attacks that harmed these Plaintiffs. Plaintiffs point to transactions with cryptocurrency wallets without plausibly alleging any connection between those transactions and any attack.

Accordingly, BAM seeks dismissal of the claims against it for two reasons: <u>first</u>, because Plaintiffs' allegations of BAM's connections to the claims in this case are too weak and attenuated to support an exercise of jurisdiction over BAM, and, <u>second</u>, because those same suit-related conduct allegations do not satisfy the ATA's threshold requirements to permit Plaintiffs' claims to proceed.

Plaintiffs assert personal jurisdiction over BAM under the New York and Federal long-arm statutes and the ATA. The Amended Complaint must lay a well-lit path here and methodically

---

[4] *E.g.*, *id.* ¶ 1031 (alleging Defendants funded missiles used in attacks against Plaintiffs by "flowing profits" to terrorist sponsors through Irancell); ¶ 1078 (same for small arms attacks); ¶ 1045 (same for rocket attacks).

[5] *See id.* ¶¶ 799–807.

[6] *Id.*

demonstrate how it satisfies each of the jurisdictional requirements and ultimately the Due Process Clause. The jurisdictional benchmark for ATA claims in this Circuit, *Waldman v. Palestine Liberation Org.*, requires Plaintiffs to allege sufficient facts to show that BAM's "suit-related conduct" (its alleged role in the 64 terror attacks) "creates a substantial connection with the forum State pursuant to the ATA."[7] Plaintiffs never walk through the 64 terror attacks, however, matching BAM's alleged conduct to the commission of each attack. Instead, Plaintiffs rely on BAM's paper-thin contacts with New York and the United States that are unrelated to their ATA claims.

This same weakness in the Amended Complaint also founders Plaintiffs' ATA claims under Rule 12(b)(6). To proceed beyond a Rule 12(b)(6) challenge, a plaintiff must allege specific connections between the defendant and each alleged terror attack.  BAM is mentioned just 27 times in the Amended Complaint's 3,189 paragraphs. In none of those 27 do Plaintiffs allege BAM's connection to any terrorist attack, any terrorist group, or even any specific transaction. Despite the Supreme Court's recent clarification in *Taamneh* of Plaintiffs' burden of proof on their ATA claims, Plaintiffs added BAM to this action based on allegations that barely construct an incomplete scaffolding of an ATA claim, much less a well-laid foundation.

Plaintiffs do make a faint attempt to impute allegations about other Defendants to BAM, asserting that BAM <u>could possibly be</u> the "alter ego" of Defendants Changpeng Zhao ("CZ") and Binance Holdings Ltd. ("BHL").[8] That tack is equally unavailing because Plaintiffs state only the legal conclusion ("alter ego") and omit any facts to demonstrate that BAM is a mere extension of

---

[7] 835 F.3d 317, 335 (2d Cir. 2016).

[8] "As part of a common enterprise with Zhao and Binance—<u>if not an alter-ego of both</u>—Binance US had, at a minimum, the same purposeful contacts with New York and the United States more broadly that are alleged as to Zhao and Binance above." Am. Compl. ¶ 1578 (emphasis added). Plaintiffs' legal conclusion of a "common enterprise" fails for the same reason, and for those articulated in the discussion of Counts II-IV, *infra*.

BHL and CZ.  BAM has submitted in support of its Motion a declaration that details that BAM is an independent corporation apart from BHL, which maintains its own, separate operations and employees; maintains separate accounts for its unique body of customers; offers different services to a different customer base and has created and maintains its own policies and procedures related to its customer relationships and regulatory obligations.[9] Plaintiffs cannot state a single legal conclusion and expect to collapse BAM's independent corporate identity.

Even if the Plaintiffs had well-pled an alter ego theory, they would not be absolved of their Rule 12(b)(6) burden to plausibly allege the required elements of the ATA's primary and secondary liability provisions. Plaintiffs' ATA claims suffer from many incurable deficiencies, in fact. In Count I, Plaintiffs make several conclusory statements that BAM is liable for aiding and abetting the terror attacks because BAM "knowingly provided substantial assistance" to terrorist organizations.  *Taamneh* discards any approach that relies on conclusory statements like this one, instructing that this Court must "cabin aiding-and-abetting liability to cases of truly culpable conduct."[10] Thus, Plaintiffs are not permitted to speculate that because ISIS leadership retained a percentage of "the spoils," ISIS "likely" kept some of the profits from Iranian crypto exchange transactions, some of those Iranian crypto exchanges might have processed Binance.com customer transactions, and so some of the profits that ISIS kept may have come from Binance.com customers.[11] *Taamneh* requires Plaintiffs to allege credible facts to show that Defendants were

---

[9] *See generally* Ex. A (Blodgett Decl.).

[10] 598 U.S. at 489 (holding unanimously that the ATA does not require an internet platform to aggressively police and prevent terrorists from using the platform).

[11] Am. Compl. ¶¶ 1512–13.

"generally aware" that they were participating in terrorist activity <u>and</u> that they "knowingly and substantially assist[ed]" each of the 64 attacks that harmed Plaintiffs.[12]

The ATA conspiracy claims in Counts II, III, and IV are equally flawed. Plaintiffs allege, in conclusory fashion, that BAM "conspired" with terrorist organizations,[13] but the ATA's requirements for conspiracy claims are far more demanding and do not permit legal conclusions to stand for allegations. Plaintiffs must allege instead that the Defendants knowingly entered into an <u>agreement</u> with terrorist entities to engage in terrorist activities, and pair those allegations with plausible facts. The Amended Complaint omits any credible factual allegations that such an agreement existed, or that BAM participated in or even knew of such an agreement.

In Count V, Plaintiffs' primary liability claim relating to a ransomware attack in July 2019 fails against BAM, including because a ransomware attack in Alabama does not constitute of act of "international terrorism" that is cognizable under the ATA.

For these reasons, BAM respectfully requests that the Court dismiss, with prejudice, the claims against it for lack of jurisdiction and failure to state a claim.

## <u>ARGUMENT</u>

**I.     This Court Lacks Personal Jurisdiction Over BAM Because Plaintiffs Fail to Plausibly Allege that BAM's Contacts with the Forum Are Substantially Related to the 64 Terror Attacks.**

For this Court to exercise personal jurisdiction over BAM, Plaintiffs bear the burden of establish three foundational prerequisites. *See Waldman*, 835 F.3d at 327.[14] "First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be

---

[12] *Id*. at 486.

[13] Am. Compl. ¶ 3108.

[14] *See also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) (holding that "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant").

a statutory basis for personal jurisdiction that renders such service of process effective. . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Id.* (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 75 (2d Cir. 2012) ("*Licci II*")).

Plaintiffs fail to demonstrate satisfaction of any of the three steps. Even if Plaintiffs show this Court that service was procedurally proper,[15] their jurisdictional case falls apart at the second and third steps. With respect to the second step (the "statutory basis"), Plaintiffs rely on the New York and Federal long-arm statutes to assert jurisdiction over "Defendants"[16] collectively, based on Defendants' alleged "substantial suit-related contacts with New York" and the United States.[17] *See* Am. Compl. ¶¶ 36–37 (citing Fed. R. Civ. P. 4(k)(1)(a), (c)).

Plaintiffs rely on C.P.L.R. Section 302(a)(1)—the "transacting business" provision of New York's long-arm statute—which "calls for a showing that the defendant purposefully avail[ed] itself of the privilege of conducting activities within New York . . . thereby invoking the benefits and protections of its laws." *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 18 (E.D.N.Y. 2016). Plaintiffs consequently must demonstrate that BAM "conducted sufficient activities to have transacted business in the state" (the "purposeful availment prong") and, further, "the claims must

---

[15] Unless Plaintiffs demonstrate that venue is proper in this district, Plaintiffs cannot invoke the nationwide jurisdiction provision of the ATA for purposes of the minimum contacts analysis. *See Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 284 (E.D.N.Y. 2016) (citing *Wultz v. Republic of Iran*, 762 F. Supp. 2d 18, 25–29 (D.D.C. 2011)). Plaintiffs have not established that venue is proper in this district, because the Amended Complaint does not allege facts to show which Plaintiff(s) live within the Southern District of New York, and no proof of service has been filed on the docket. *See* 18 U.S.C. § 2334(a).

[16] Throughout the Amended Complaint, "Defendants" is defined by Plaintiffs as BHL, CZ, and after 2019, BAM.

[17] Am. Compl. ¶¶ 36–37 (citing Fed. R. Civ. P. 4(k)(1); N.Y. C.P.L.R. § 302(a)(1)). Plaintiffs also plead grounds for jurisdiction over Defendants Binance and CZ under Fed. R. Civ. P. 4(k)(2), which applies only to foreign defendants who are not residents of the U.S. *See* Am. Compl. ¶¶ 38–39.

arise from the transactions" (the nexus prong). *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 7 (N.Y. 2016). Plaintiffs are irreparably weak on both fronts. They do not allege meaningful contacts with the forum, and not one of Plaintiffs' claims bears the necessary "substantial relationship" with any of those contacts. *Henderson v. I.N.S.*, 157 F.3d 106, 123 (2d Cir. 1998).

The third step of this Court's jurisdictional analysis provides that if Plaintiffs establish that the long-arm statute permits an exercise of personal jurisdiction based on the facts and circumstances of this case, the Court must then determine "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Licci II*, 673 F.3d at 75. This question comes with its own two-part test: (1) does BAM have sufficient "minimum contacts" with the forum based on the facts of the case, (2) in view of those contacts, would exercising personal jurisdiction "comport[] with 'traditional notions of fair play and substantial justice.'" *Id.* at 59–60 (collecting cases). The analysis for the second (long-arm) and third (constitutional) steps is similar, because the Court must examine to what extent BAM purposefully transacted business in New York and the United States, and then determine whether those transactions are sufficiently connected to the claims asserted to comport with constitutional due process.

Plaintiffs focus only on BAM's contacts with New York for purposes of establishing the Court's jurisdictional basis. There are no jurisdictional allegations in the Amended Complaint related to BAM's contacts with other states or the United States as a whole.

Plaintiffs' three allegations about BAM's New York transactions are extremely thin and pertain to a PAC formed by BAM in 2022. Am. Compl. ¶¶ 1579, 1582–84. The allegations here concern the formation a PAC, that PAC's New York bank relationship, and the PAC's political contributions, and are not "continuous and systematic contacts" sufficient for jurisdiction. Nor can Plaintiffs reasonably argue that their handful of allegations regarding the PAC have anything to do

with the Terrorist Attacks that form the heart of Plaintiffs' ATA claims. Plaintiffs tell us this themselves by never mentioning the PAC again in the Amended Complaint.

Rather, Plaintiffs' jurisdictional allegations against BAM resemble "the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf", which "are not enough to subject it to suit on causes of action unconnected with the activities there." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 317 (1945); *Licci II*, 673 F.3d at 62 (reasoning that "[n]ot all purposeful activity . . . constitutes a transaction of business within the meaning of CPLR § 302(a)(1) (cleaned up).

With respect to Plaintiffs' allegations regarding the use of a New York bank for the PAC, for each one of the 64 Attacks, Plaintiffs must allege "sufficient facts from which to infer that Defendant used . . . New York's banking system 'as an instrument to achieve the very wrong alleged,' that is, 'to further [al-Qaeda's] terrorist goals.'"[18] Plaintiffs improperly lump their 64 attacks together into five categories, which requires this Court to guess BAM's purported substantial connection to each of the terror attacks. *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 23 (E.D.N.Y. 2016) ("disagree[ing]" that plaintiffs' 19 terror attacks can "be aggregated into a single, unitary claim under the ATA for purposes of establishing specific jurisdiction").

*King* is instructive. There, the district court concluded it could exercise jurisdiction over the defendant bank, because the plaintiffs alleged "that a large volume of the transactions through [its] New York branch were for ARB, a known financier of al-Qaeda, during the period of time that the attacks at issue took place, years after ARB's ties to terrorists became publicly known."

---

[18] *King v. Habib Bank Ltd.*, 2022 WL 4537849, at *3 (S.D.N.Y. Sept. 28, 2022) (quoting *Licci v. Lebanese Canadian Bank*, 32 F.3d 161, 171 (2d Cir. 2013)).

2022 WL 4537849, at *3. In *King*, the defendant bank established a branch office in New York, solicited and maintained a customer base in New York, and was regulated by New York financial services regulator. *Id.*; *see also Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 645 (2d Cir. 2023) (holding jurisdiction satisfied constitutional due process inquiry because bank defendant "had repeated contact with New York through [third party]'s correspondent accounts").

## II.    Counts I–IV: Plaintiffs' Claims for Secondary Liability Fail to Satisfy *Taamneh*'s Mandate.[19]

As noted above, BAM barely features in the 891-page Amended Complaint.[20] Plaintiffs mention BAM in only 27 paragraphs (out of 3,189 total). As importantly, none of those 27 paragraphs puts forward facts linking BAM to any terrorist or Iranian entity, and none concerns any transaction on the Binance.US exchange. Every specific cryptocurrency transaction identified in the Amended Complaint, even those with no alleged connection to the attacks on Plaintiffs did not take place on BAM's crypto trading platform, Binance.US but rather on Binance.com. In its supporting declaration, BAM establishes that Binance.com and Binance.US are entirely separate trading platforms owned and maintained by independent companies. *See* Blodgett Decl., ¶¶ 15–24.

While Plaintiffs allude briefly to alter-ego liability in a single clause of a single sentence, they do not plead any plausible fact allegations about BAM that would permit this Court to pierce the corporate veil and disregard the independent corporate forms of the two companies. Instead, Plaintiffs merely use the word "domination"—a legal conclusion—to demand that Defendant CZ's

---

[19] BAM joins Defendant BHL's pending Rule 12(b)(6) Motion with regard to Counts I–IV, which allege secondary liability claims against BAM and other Defendants, and Count V's primary liability ATA claim.

[20] BAM joins BHL's argument in its Motion to Dismiss the Amended Complaint that the Amended Complaint plainly fails to satisfy Federal Rule of Civil Procedure 8(a)'s requirement of a "short and plain statement of the claim." BHL Mot. at 10–12, Dkt. 35.

and BHL's actions on or regarding the Binance.com platform be "legally attribute[d]" to BAM. Am. Compl. ¶ 34. BAM and BHL are separate entities that maintain separate operations and platforms, with separate Boards of Directors, and no overlapping employees or offices. Even if Plaintiffs could show some prior "control" by CZ or BHL, Plaintiffs still must demonstrate that CZ and BHL used their alleged "control" of BAM to violate the ATA by harming Plaintiffs in the 64 terror attacks, as alleged. *See Stadtmauer v. Tulis*, 115 F.4th 90, 107 (2d Cir. 2024); *In re All Year Holdings Ltd.*, 648 B.R. 434, 444–45 (S.D.N.Y. 2022) (dismissing claims).

A.   Plaintiffs Fail To State A Claim For Aiding And Abetting Against BAM or Any Other Defendant.

Plaintiffs fail to plead a *prima facie* case for secondary liability under the ATA. This is because Plaintiffs allege no plausible facts that BAM (or indeed any of the Defendants) failed to prevent Iranian- or terrorist-linked transactions on the Binance.com platform, and therefore that BAM was "generally aware" that it was participating in terrorist activity and/or that it "knowingly and substantially assist[ed]" the attacks that harmed Plaintiffs. *Taamneh*, 598 U.S. at 486.

1.   *There is no connection between the alleged transactions and the 64 attacks.*

Plaintiffs allege that "Binance" aided the attacks against Plaintiffs in four ways—all either rely on BHL's alleged provision of the type of neutral, arms' length services held to be too remote for ATA liability in *Taamneh*, or the even more circuitous and attenuated theory that Defendants "indirectly" contributed to economic growth in Iran.

First, Plaintiffs allege BHL enriched the Iranian terrorist sponsors involved in the attacks by permitting transactions between Iranian users and the Binance.com exchange. *See, e.g.*, *id.* ¶¶ 18, 991. They allege these transactions contributed to the growth of the Iranian cryptocurrency industry, which increased Iranian demand for network and data services. This increased demand increased profits for the state-controlled telecommunications company Irancell. Terrorist sponsors

10

involved in the ownership and management of Irancell then allegedly siphoned off a portion of Irancell's profits and used them to fund the types of weapons used by the terrorists who attacked Plaintiffs. *See, e.g.*, Am. Compl. ¶¶ 447, 803–805, 1078, 1084, 1214.

Second, Plaintiffs allege Iranian terrorist sponsors controlled Iranian cryptocurrency exchanges, and therefore directly profited from transactions between those exchanges' users and Binance.com through transaction fees and the appreciation of cryptocurrency assets. *Id.* ¶¶ 481, 786.

Third, they allege that cryptocurrency wallets linked to Iranian-affiliated terrorist groups made transfers through Binance.com. *See, e.g.*, *id.* ¶¶ 767 (wallets linked to the IRGC), ¶¶ 1153–1158 (Hezbollah-linked money exchanger). Plaintiffs fail to allege a specific connection between these transactions and the attacks harming any Plaintiff.

Finally, for the subset of attacks allegedly carried out by ISIS, Plaintiffs allege that ISIS-linked transactions on the Binance.com exchange "directly financed" the attacks, because the leadership cell responsible typically captured a percentage of ISIS's "criminal racket income." *See id.* ¶¶ 1489, 1492, 1513, 1514b. Plaintiffs assert, without explanation, that the identified transactions constituted such "criminal racket income."

2. *Plaintiffs fail to plausibly allege BAM's "general awareness" that BAM had assumed a role in terrorist activity.*

Plaintiffs consistently fail to show that these transactions were "so closely intertwined with [the] violent terrorist activities" of the FTOs that attacked Plaintiffs, *Honickman v. BLOM Bank SAL.*, 6 F.4th 487, 499 (2d Cir. 2021), to permit the reasonable inference that Defendants were "generally aware" that they were "[themselves] assuming a role in terrorist activities" when the transactions occurred. *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018).

Plaintiffs allege that Defendants aided terrorists or their intermediaries in two ways. *First*, they allege Defendants enriched Iranian terrorist sponsors by permitting transactions with users of Iranian cryptocurrency exchanges because (1) those transactions increased Iranian network and data demand, indirectly increasing profits for regime-owned firms providing telecommunications services, and (2) the terrorist sponsors controlled the exchanges themselves, and profited from transactions fees. *Second*, Plaintiffs allege they have used their own experts to identify transactions linked to terrorist wallets that "flowed through Binance." Am. Compl. ¶ 767.

The first category—transactions with Iranian users of Iranian cryptocurrency exchanges—cannot establish general awareness. Not even Plaintiffs suggest that all or even a sizable percentage of Iran's 85 million citizens were terrorist collaborators. *See* Am. Compl. ¶ 774. Plaintiffs' point to Nobitex's alleged ties to the Iranian government and certain Iranian terrorist sponsors, based on frequently non-specific and undated "[o]pen-source intelligence and public reporting." Am. Compl ¶ 486. The law is settled that a company's knowledge of "Iran's status as a state sponsor of terrorism," or of a foreign financial institution that is "believed by some to have links to terrorist organizations," cannot establish "general awareness" under the ATA. *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019); *O'Sullivan*, 2019 WL 1409446, at *10; *see Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 230 (E.D.N.Y. 2020) (even provision of "non-routine or illegal" services including sanctions-evading transactions with Iranian entities with terrorist links does not establish "general awareness" of participation in terrorism).

The second category—transactions with specific terrorist wallets—are likewise disqualified from this Court's consideration. As BHL explains in its Motion, Plaintiffs largely offer evidence that the terrorist links to these transactions were identified *after the fact*. *See* Dkt. 35

(BHL Motion), at 5–6. Observations in hindsight cannot demonstrate Defendants' general awareness at the time of the transaction.

Where Plaintiffs do allege that Defendants had contemporaneous knowledge of their alleged role in the attacks, their allegations are directly contradictory. On one hand, Plaintiffs allege repeatedly that BHL employed "deliberately anemic" AML controls that were "ineffective against terrorist finance" and "Know Your Customer" procedures, which left BHL "willfully blind to its prohibited users' characteristics." Am. Compl. ¶¶ 505, 508. Once Plaintiffs try to demonstrate that Defendants were "generally aware" of their alleged role in committing the 64 terror attacks, however, BHL is alleged to have used sophisticated blockchain analysis firms to conduct AML monitoring, which gave Defendants "granular, real-time information on a transaction-by-transaction basis" relating to the terrorist-linked transactions. *Id.* ¶¶ 664, 672, 1488.

The Court is not required to credit the conflicting assertions Plaintiffs offer, depending on the element they are attempting to establish. *See Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 126 F.4th 125, 143 (2d Cir. 2025) (Menashi, J., dissenting) ("When the pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss.").

Even if the Court were to give credence to conflicting allegations, "neutral transactions," including those that involve "charities linked to terrorist groups" or "prominent members of terrorist groups," have repeatedly been held insufficient to establish general awareness. *Averbach v. Cairo Amman Bank,* 2020 WL 486860, at *2, 14, 15 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted by* 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).

3. *Plaintiffs do not plausibly allege that BAM provided knowing, substantial assistance to the FTOs that attacked Plaintiffs.*

Likewise, these transactions fail to establish that Defendants "knowingly and substantially assist[ed]" in terrorism. Plaintiffs neither establish Defendants' "conscious, voluntary, and culpable" assistance, nor the required nexus to the attacks on Plaintiffs.

i.     Plaintiffs never allege that Defendants' actions were "conscious, voluntary, and culpable."

In *Taamneh*, the Supreme Court made clear that courts must "cabin" aiding-and-abetting liability to truly "conscious, voluntary, and culpable" conduct. 598 U.S. at 489, 493. In other words, plaintiffs must show what is missing here: an "affirmative act" by the defendant "with the intent of facilitating the offense's commission." *Id.* at 490.  Under *Halberstam*, aiding and abetting claims require the "encouragement" of another to commit a tortious act. *Freeman*, 57 F.4th at 81. Plaintiffs must prove "*knowing action* that substantially aids tortious conduct." *Id.* (emphasis added).

Plaintiffs offer no evidence that Defendants gave any terrorist-linked accounts "special treatment or words of encouragement," "treated [the FTOs] any differently from anyone else," or operated in anything more than an "arm's length, passive, and largely indifferent" posture. *Taamneh*, 598 U.S. at 498, 500. Instead, they allege that Defendants failed to prevent terrorists or their intermediaries from accessing a publicly available platform, on the same terms offered to other users. Plaintiffs have not alleged that any of Defendants provided Iranian or terrorist-linked entities any non-routine services, such as providing a terrorist-intermediary company with millions of dollars in "specially structured" loans (*Bonacasa v. Std. Chtd. PLC*, 2023 WL 2390718, at *3 (S.D.N.Y. Mar. 7, 2023), "enter[ing] into a joint venture with a known terrorist front" (*Zobay v. MTN Grp.*, 695 F. Supp. 3d 301, 347 (E.D.N.Y. 2023), or "direct[ing]," as opposed to passively permitting, processing of the transactions (*Lelchook v. Lebanese Canadian Bank*, 2024 WL

14

967078, at *8–9 (S.D.N.Y. Mar. 6, 2024)).  *Halberstam* requires "encouragement", none of which is alleged here. *Freeman*, 57 F.4th at 81.

*Taamneh* reminds the courts that secondary liability aiding and abetting law under "JASTA and *Halberstam*'s elements and factors rest[s] on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed." *Taamneh*, 598 U.S. at 493 (cleaned up). Even before *Taamneh* directed courts to sharpen their focus on truly "conscious, culpable conduct", allegations of "neutral transactions" or "common commercial" services were repeatedly held to be inadequate to state a claim for aiding and abetting. *Averbach*, 2020 WL 486860, at *15; *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *5 (S.D.N.Y. July 27, 2018). Such routine services are directly analogous to the ones alleged here: "maintaining accounts and processing wire transfers" (*Averbach*, 2020 WL 486860, at *2, 16) and "the receipt or transfer of funds" (*Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 621 (E.D.N.Y. 2006)). *See also Strauss*, 379 F. Supp. 3d at 164 ("[K]nowingly provid[ing] banking services" to a terrorist front insufficient to establish ATA liability); *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 232, 239 (E.D.N.Y. 2019) (same).

Allegations that Defendants employed weak AML or KYC controls do not qualify as "conscious and culpable" and do not "transform defendants' distant inaction into knowing and substantial assistance." *Taamneh*, 598 U.S. at 501. As this Court held in *Siegel*, allegations of "slipshod banking practices and operating with inadequate anti-money laundering controls" fail to even establish "general awareness" in terrorist activity and therefore cannot establish knowing substantial assistance to specific terrorist attacks. *Siegel*, 2018 WL 3611967, at *4. It equates instead to "an allegation of recklessness". In essence, Plaintiffs here allege that Defendants should

have known better but "chose to ignore the possible consequences." "JASTA requires more" than that. *Freeman*, 465 F. Supp. 3d at 233 (quoting *Brill v. Chevron Corp.*, 2018 WL 3861659, at *3 (N.D. Cal. Aug. 14, 2018)) (alterations omitted). This is consistent with *Taamneh*'s observation that the type of "failure to act" allegations at the core of this case "might have more purchase" if linked to "some independent duty in tort" to remove certain actors from Defendants' generally available service. *Taamneh*, 598 U.S. at 501. Inadequate AML and KYC policies do not create such duties, as they have been found insufficient to support aiding-and-abetting common law fraud. *See Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007), *aff'd* 349 F. App'x 637 (2d Cir. 2009).

Congress specified that *Halberstam v. Welch* "provides the proper legal framework" for analyzing JASTA aiding and abetting claims. *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir.), *cert. denied*, 144 S. Ct. 83 (2023) (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Halberstam* underscores that Defendants' alleged failure to prevent such transactions is the precise sort of passive, non-culpable conduct that *Taamneh* made clear cannot constitute substantial assistance.[21] At most, Plaintiffs allege that Defendants permitted terrorists or their intermediaries access to routine financial services. The provision of these services cannot be said to have "encouraged" terrorist attacks; nor can Plaintiffs clearly quantify the "amount of assistance" provided, given that they allege much of this assistance was indirect; and BHL and its employees were necessarily "absen[t]" during the attacks. Plaintiffs' allegations further establish

---

[21] The six *Halberstam* factors are: "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the principal actor, (5) the defendant's state of mind, and (6) the duration of the assistance given." *Taamneh*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 488). *See also* BHL Mot. at 21–22, Dkt. 35.

no more than an arms-length commercial relationship, and Defendants' passive interactions cannot establish that they assumed any knowing or intentional role in the attacks.

      ii.    <u>Plaintiffs do not identify a "nexus" between Defendants' alleged assistance and the specific attacks on Plaintiffs.</u>

Plaintiffs' allegations further fail to identify the necessary nexus between the transactions and the specific attacks required to sustain an aiding-and-abetting claim. *See Taamneh*, 598 U.S. at 495 ("[I]t is not enough . . . that a defendant has given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it."); *id.* at 503 ("[T]he question is whether defendants gave substantial assistance to ISIS with respect to the Reina attack."). Plaintiffs concede that they "do not allege that Defendants' resources aided such attacks enabled by" the terrorist groups at issue "anywhere in the world." Am. Compl. ¶ 1151 (IRGC or Iranian-enabled attacks); ¶ 1498 (ISIS attacks).

That concession aside, Plaintiffs' allegations do not support a finding that Defendants' alleged "assistance" to terrorist groups was "so systematic[] and pervasive[]" that they could be said "to aid and abet" every one of those groups' attacks. Plaintiffs do not allege, for example, "that defendants intentionally associated themselves with [terrorist] operations or affirmatively gave aid," or that Defendants "formed a near-common enterprise" with Defendants. *Taamneh*, 598 U.S. at 501; *see* Section II.B. It is therefore not enough to allege that the transactions involved terrorist funds generally. Plaintiffs must establish that those funds were used in the specific attacks that harmed Plaintiffs.

As noted above, Plaintiffs attempt to connect Defendants' conduct to the 64 attacks in two ways—through a nebulous link between "Binance" transactions and Iranian state-controlled corporations, and through transactions involving cryptocurrency wallets linked to terrorist groups. The first theory provides the alleged nexus for 40 out of the 64 attacks.

In November 2022, Hezbollah and Jaysh al-Mahdi ("JAM") terrorists allegedly used small arms to kidnap and kill Plaintiff Stephen Troell in Iraq in a horrific attack. *See* Am. Compl. ¶¶ 1585, 1591. Hezbollah and JAM obtained the types of small arms used in hostage-taking attacks with funding from Iranian terrorist sponsors such as the Foundation for the Oppressed; the weapons themselves were manufactured by Iran Electronics Industries ("IEI"), a regime-controlled arms manufacturer. *Id.* ¶¶ 1002, 1014. IEI and the Foundation obtained the funds necessary to manufacture and facilitate the transfer of these weapons to Hezbollah and JAM by siphoning profits from other regime-controlled companies. One such company was the telecommunications firm Irancell, in which the Foundation and IEI were majority owners that "linearly profited" from Irancell's business. *Id.* ¶¶ 446, 1241. Irancell's profits increased as demand for telecommunications services in Iran grew. The growth of Iran's cryptocurrency industry—specifically, "cryptomining, exchange-hosting, and trading"—increased "network and data demand" in Iran. *Id.* ¶¶ 801–802, 806. Finally, at the end of this chain, Defendants, by failing to completely wall off the Binance.com exchange from Iranian-origin transactions, contributed to the growth of Iran's cryptocurrency industry. *Id.* ¶ 786.

This winding, multi-step chain cannot establish the nexus between Defendants' alleged assistance and the actual attacks. Plaintiffs allege the barest connections between BAM In cases in which the plaintiffs alleged more direct connections between ATA defendants and alleged terror groups and their leaders, , not to mention Defendants and specific attacks, have been found far too "attenuated" to support aiding-and-abetting liability. *See Honickman*, 6. F.4th at 500–01 (allegation defendant-bank "allegedly had a commercial relationship with <u>another bank</u> that was linked to <u>various terrorist organizations</u> including the FTO that caused the plaintiffs' injuries" too attenuated) (citing *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019)); *cf. Ofisi v.*

*BNP Paribas, S.A.*, 77 F.4th 667, 675 (D.C. Cir. 2023) ("Through a series of attenuated links, Appellants connect [Defendant] through its financial support of Sudan to al-Qaeda, which banked in Sudan, and thus to al-Qaeda's bombings. This 'causal' chain is simply too remote."). Here, none of the Defendants have any "relationship to the principal" – *i.e.*, the FTC.  *Freeman*, 465 F. Supp. 3d at 234 (finding the fourth *Halberstam* factor was not adequately pled).

Plaintiffs allege that they have identified wallets on Binance.com, which allegedly are connected to certain terrorist groups. Plaintiffs omit any details connecting transactions involving those wallets and any specific attack. *See, e.g.*, Am. Compl. ¶ 767 (IRGC wallets), ¶ 1153 (Hezbollah-linked money exchanger), ¶ 17 (Hamas wallets), ¶ 1267 (PIJ wallets). Plaintiffs' burden is to plausibly plead the connections between those alleged transactions, Defendants' alleged role, and the specific terror attacks. As *Taamneh* dictates, "The focus thus must remain on the . . . attack; plaintiffs' <u>failure to allege any definable nexus</u> between the defendants' assistance and that attack therefore—at minimum—<u>drastically increases their burden</u> to show that defendants somehow consciously and culpably assisted the attack." *Taamneh*, 598 U.S. at 503 (emphasis added). Plaintiffs do not allege, in any of the nearly 3,200 paragraphs of the Amended Complaint, any facts that plausibly establish a nexus between BAM and the 64 attacks.

For just one subset of the attacks, Plaintiffs do attempt to connect transactions that "flowed through" Binance.com to the specific attacks. Am. Compl. ¶ 1489 (ISIS Attacks). Here too, Plaintiffs rely on speculative leaps to bridge the gap between Defendants' conduct and Plaintiffs' attacks. Regarding the ISIS attacks, Plaintiffs allege that certain transactions on Binance.com were made by wallets later identified to have ISIS links. They also allege that ISIS's "Leadership Cell" played a direct role in planning and carrying out the four attacks that injured Plaintiffs. *Id.* ¶ 1514b. Plaintiffs speculate a connection between Defendants' conduct and the terror attacks:

1. Because the Leadership Cell's typical practice was to "capture[] a percentage of the [ISIS]'s criminal racket income" (*Id*. ¶ 1513); and,

2. Because the alleged transactions on Binance.com included such income; and,

3. Because that income allegedly was paid to the head of the ISIS Leadership Cell, Abu Bakr al-Baghdadi;

4. A portion of that income was redirected by ISIS to finance some number of the terror attacks against Plaintiffs. Id. ¶ 1513.

Plaintiffs ask the Court to credit these assumptions, but in the same breath, Plaintiffs also tell us that ISIS "would control 'a fifth part of the spoils'"—where ISIS defined "spoils" to include human captives. Am. Compl. ¶ 1512 (quoting 2020 observations of "ISIS scholars"). Plaintiffs fail to demonstrate plausible connections between the attacks that harmed them and BAM's conduct, and their own cited sources muddy those connections further.

      B.    <u>Plaintiffs Fail to Demonstrate BAM Entered Any Agreement with Terrorists with a "Common Scheme" To Commit the 64 Terror Attacks.</u>

Plaintiffs allege that "upon its creation in 2019," BAM entered three conspiracies in violation of the ATA: (1) to "destroy" the U.S. sanctions regime against Iran through sanctions evasion and terrorist violence (Count II); (2) to facilitate hostage-taking and ransomware attacks (Count III); and, (3) to provide material support to ISIS (Count IV). Each count includes only a *single allegation* specific to BAM—the bare recitation that "Binance US joined [each] conspiracy upon its creation in 2019." Am. Compl. ¶¶ 3053, 3100, 3168. Those are conclusory statements of the type that is consistently rejected by courts in this Circuit.[22]

ATA conspiracy liability requires Plaintiffs to allege, plausibly, that there was: (1) "an agreement between two or more persons"; (2) "to participate in an unlawful act"; (3) "an injury

---

[22] BHL argues in its Motion to Dismiss that Plaintiffs fail to state a conspiracy claim against any Defendants, including BAM. *See* Dkt. 35 (BHL Motion), at 23-29.

caused by an unlawful overt act performed by one of the parties to the agreement"; (4) "which . . . was done pursuant to an in furtherance of the common scheme." *Freeman*, 57 F.4th at 79 (quoting *Halberstam*, 705 F.2d at 477, 480); 18 U.S.C. § 2333(d)(2) (providing secondary liability for "any person . . . who conspires with the person who committed . . . an act of international terrorism"). Plaintiffs' claims break down because the Amended Complaint does not plausibly allege at least two of those critical elements: <u>first</u>, Plaintiffs fail to allege plausibly that BAM entered "an agreement" with any Iranian entity, terrorist, or their intermediaries, and, <u>second</u>, Plaintiffs never demonstrate that BAM joined a "common scheme" to commit acts of terrorism.

1.   <u>*Count II: Plaintiffs' Conspiracy Claim Is Missing Plausible Allegations of an Agreement.*</u>

In Count II, Plaintiffs allege that because Defendants failed to prevent transactions between Binance.com users and users of an Iranian cryptocurrency exchange, BAM conspired to topple the U.S. sanctions regime through terrorist violence with the intent of "monopolizing" Iran's cryptocurrency market when sanctions fell. But Plaintiffs' allegations are "devoid of any fact suggesting that the [Defendants] conspired—either directly or indirectly—with the terrorist perpetrators." *Freeman*, 57 F.4th at 79.

Plaintiffs' allegations with respect to BAM are wholly deficient—the single conclusory allegation that Binance.US joined the conspiracy immediately upon its incorporation fails to show that BAM made an agreement of any sort, much less an agreement to participate in sanctions-evasion and terrorism. Nor are Plaintiffs' allegations concerning CZ and BHL sufficient to fill the gap. Instead of alleging, as they must, an agreement between BHL and the terrorist sponsors, they offer a chain of speculation. First, Plaintiffs claim the volume of transactions between Binance.com and Nobitex suggests that BHL considered Nobitex a "VIP or important customer". Plaintiffs' conspiracy claim rests on transactions between Binance.com and Nobitex <u>users</u>, however, not

allegations that <u>the corporate entities</u> running the exchanges interacted. *See* Am. Compl. ¶¶ 483, 3058. From there, Plaintiffs invite this Court to speculate that BHL personnel may therefore have "regularly communicated with Nobitex personnel," and when doing so "made common cause over their respective disdain for U.S. sanctions and their desire to render them impotent." *Id.* ¶ 3058. This is not simply speculation; it is pure imagination.

Alternatively, Plaintiffs also fail to allege that BHL or CZ had an indirect agreement with terrorist sponsors because they rely on a theory that courts have repeatedly rejected. They allege that Defendants "tacitly agreed" to undermine U.S. sanctions through terrorist violence by establishing a "market presence in Iran" while knowing that the terrorist sponsors "effectively controlled" Iranian cryptocurrency exchanges. *Id.* ¶ 3058. To establish the agreement element through indirect evidence, Plaintiffs must, at a minimum, plausibly "allege that the coconspirators were pursuing the same object." *Freeman*, 57 F.4th at 79 (quoting *Halberstam*, 705 F.2d at 487) (internal quotations omitted); *see Zobay*, 695 F. Supp. 3d at 354 (holding that the plaintiffs failed "to plausibly suggest Defendants reached an agreement with [a terrorist intermediary] to carry out a common scheme to commit an act of international terrorism"); *O'Sullivan*, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019) (same).  They have not done so, and they could not do so.

Alleged transactions with a terrorist group or its intermediary, even in violation of economic sanctions, do not amount to a shared "common intent" with violent anti-American terrorists. *Freeman*, 57 F.4th at 80. Plaintiffs also do not plausibly allege that BHL permitted Nobitex transactions with the overall goal of weakening U.S. economic sanctions or of positioning itself to capitalize on a post-sanction "windfall." Instead, they speculate that an end to U.S. sanctions might benefit companies already operating in Iran, such that "Binance" "had the same intent as . . . the IRGC, Supreme Leader's Office, Foundation for the Oppressed, Hezbollah,

Hamas, PIJ, the Houthis, al-Qaeda, and the Taliban" to bring an end to U.S. sanctions. *Id.* ¶ 3098. Plaintiffs cannot ascribe a speculative theory of intent "'merely consistent' with an agreement" to defendants, they must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 557 (2007)). While Plaintiffs allege that BHL and CZ's actions were "in pursuit of profit" (Am. Compl. ¶ 6), they also spell out in exhaustive detail that the Iranian terrorist sponsors and their affiliated terrorist groups, in contrast, "relied upon terrorist violence around the world . . . to weaken support for sanctions in the West." Am. Compl. ¶ 3074. *Freeman*, 57 F.4th at 80 (conspiracy claim "inadequate" where plaintiffs stated defendant bank "was trying to make substantial profits by evading sanctions, whereas [FTO] sought to terrorize the U.S. into retreating from the world stage" (quoting *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 873 (D.C. Cir. 2022)).

It is dispositive of Plaintiffs' conspiracy claim that the Amended Complaint is missing allegations of even "an inference of a common scheme," *Zobay*, 695 F. Supp. 3d at 355, between Defendants and the terrorists. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 395 (7th Cir. 2018) (allegations failing to establish that defendant "cared how its Iranian customers obtained or spent the funds that [defendant] processed for them" insufficient). This is particularly true here, where "Defendants' alleged support to Iranian entities is [] far removed from the acts of terrorism that injured Plaintiffs." *O'Sullivan*, 2019 WL 1409446, at *9; *see Kemper*, 911 F.3d at 395–96 ("[T]he further down the causal chain a defendant sits, the more diligent a plaintiff must be to plead facts that plausibly suggest that the defendant entered into an agreement to support terrorism.").

2.    *Counts III and IV: Plaintiffs' Conspiracy Claim Is Missing Plausible Allegations of a Common Scheme.*

Plaintiffs' Count III conspiracy claim—alleging that an unknown subset of the Binance-Nobitex transactions may have included terrorist ransom proceeds, and therefore BAM conspired with FTOs to kidnap and attack Americans—suffers from the same deficiencies.  Plaintiffs do not allege any conduct by BAM other than that it was incorporated in 2019, and do not identify any conduct by BHL or CZ plausibly alleging they entered an agreement with an FTO or intermediary to commit the Terrorist Attacks that harmed Plaintiffs. Instead, they rely on allegations that Defendants generally knew that terrorist sponsors controlled Nobitex, and further, knew that global instability increase the value of cryptocurrency. *See* Am. Compl. ¶¶ 3145–46. Even if this were true, it does not amount to an agreement or common scheme by Defendants to commit the 64 terror attacks that harmed Plaintiffs.

Count IV is equally deficient. Plaintiffs allege that the Defendants entered into a conspiracy with ISIS because ISIS-linked wallets transacted on the Binance.com exchange. Plaintiffs allege no plausible facts to support that because ISIS-linked transactions may have "flowed through Binance," *id.* ¶ 1489, the Defendants entered into a conspiracy with this terrorist organization. *Taamneh* precludes Plaintiffs from relying on the Defendants' alleged passive inaction to prevent alleged transactions like those here.

**III.    Plaintiff's Primary Liability Claim Fails Because A Domestic Ransomware Attack Is Not an Act of "International Terrorism," and Plaintiffs Do Not Allege the Actual Knowledge Required by 18 U.S.C. § 2339A.**

That leaves only Plaintiffs' ATA primary liability claim, which centers on the Wizard Spider ransomware attack. But the claim is irreparably flawed, especially as against BAM, and must be

dismissed.[23]  As an initial matter, Plaintiffs never mention BAM in the allegations pertaining to this claim.

Additionally, Plaintiffs allege the wrong *scienter*, namely that Defendants "recklessly disregarded" that Wizard Spider would use Defendants' alleged material support to carry out the killing or harm of another person. Am. Compl. ¶ 3183.  Plaintiffs must plausibly allege that BAM (and the other Defendants) had "actual knowledge" of the purpose for which the alleged material support was being provided. *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009). Understandably, there are no allegations that state how Wizard Spider connected with BAM in July 2019, before BAM opened its doors for the first time in September 2019.

Moreover, a ransomware attack, initiated outside the United States and without plausible allegations of terroristic intent, is simply not "an act of international terrorism" cognizable under the ATA. *See Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 162 (2d Cir. 2021) (noting "an element is not proven unless the evidence comports with the ATA's definition of the element"). To date, no court has recognized ransomware cyber-attack as a viable basis for an ATA claim. Before Plaintiffs can convince this Court to make new law under the ATA related to cyber-attacks, Plaintiffs must substantiate how ransomware attacks themselves constitute "violence" or "endangering life."

## IV.    CONCLUSION

Plaintiffs' claims against BAM should be dismissed for the reasons described in its Motion.

---

[23] BAM joins BHL's motion to dismiss as to Plaintiffs' § 2339A primary liability claim. BHL Mot. at 12–17. BAM asserts that the same pleading deficiencies apply equally to BAM as they do to BHL.

Dated: February 18, 2025                    Respectfully submitted,

                                           **WINSTON & STRAWN LLP**

                                           /s/ Alexandra E. Chopin
                                           Alexandra E. Chopin
                                           AChopin@winston.com
                                           Daniel T. Stabile, Esq.
                                           DStabile@winston.com

                                           MetLife Building
                                           200 Park Avenue
                                           New York, NY 10166
                                           (T) 212.294.6700


                                           *Attorneys for Defendant BAM Trading Services Inc.*
                                           *d/b/a Binance.US*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February [18], 2025, a true and correct copy of the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users in this action.

/s/ *Alexandra E. Chopin*
Alexandra E. Chopin