Exhibit A

1

P4M4RAAC

1 | UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
2 | ------------------------------x

3 | JUDITH RAANAN, *et al.*,

4 |              Plaintiffs,

5 |         v.                        24 Civ. 697 (JGK)

6 | BINANCE HOLDINGS LIMITED, *et al.*,

7 |                                   Oral Argument

8 |              Defendants.

9 | ------------------------------x
                                    New York, N.Y.
10 |                                 April 22, 2025
                                    11:10 a.m.
11 |
Before:
12 |
                     HON. JOHN G. KOELTL,
13 |
                                    District Judge
14 |
                        APPEARANCES
15 |
SEIDEN LAW LLP
16 |      Attorneys for Plaintiffs
BY:  AMIAD M. KUSHNER
17 |      JENNIFER BLECHER
         JACOB NACHMANI
18 |
PERLES LAW FIRM, PC
19 |      Attorneys for Plaintiffs
BY:  EDWARD MACALLISTER
20 |
CAHILL GORDON & REINDEL LLP
21 |      Attorneys for Defendant BINANCE HOLDINGS LTD.
BY:  ANIRUDH BANSAL
22 |      SESI V. GARIMELLA

23 | BAKER & HOSTETLER LLP
         Attorneys for Defendant CHANGPENG ZHAO
24 | BY:  JOANNA WASICK
         MARCO MOLINA

25 |

P4M4RAAC

1           (Case called)

2           MR. KUSHNER:  Good morning, your Honor, my name is

3    Amiad Kushner from Seiden Law for the plaintiffs.  I'm here

4    with my partners, Jake Nachmani and Jen Bleacher and our

5    co-counsel Ed MacAllister from the Perles Law Firm.

6           THE COURT:  Good morning.

7           MR. BANSAL:  Good morning, your Honor.  Anirudh

8    Bansal, Cahill Gordon & Reindel for the defendant Binance

9    Holdings Ltd.  I'm joined at counsel table by my partner Sesi

10   Garimella, who is also here on behalf of Binance.

11          MR. MOLINA:  Good morning, your Honor.  Marco Molina

12   from Baker Hostetler.  We represent Changpeng Zhao in this

13   litigation.  And I'm joined here by my partner Joanna Wasick

14   from the same law firm.  Thank you.

15          THE COURT:  All right.  So there is a motion for

16   reconsideration and to certify to the Second Circuit for

17   interlocutory appeal.  I'm familiar with the papers.  I'll

18   listen to argument.  But, as I say, I'm familiar with the

19   papers.

20          Mr. Bansal.

21          MR. BANSAL:  Thank you, your Honor.

22          Judge, I know that you don't often grant oral

23   arguments on motions like this, so I do appreciate you giving

24   us time.  I don't want to repeat any of our briefing.  I really

25   would like to focus on questions that you might have.  But I

P4M4RAAC

1    have --

2              THE COURT:  Well, the main question is with respect to

3    both the motion for reconsideration and the motion to certify,

4    you're not suggesting that I missed *Twitter*.  So it's not a

5    case for reconsideration because the Court overlooked an

6    opinion that was brought to the Court's attention.  I had a lot

7    to say about *Twitter* and how I thought it did not preclude the

8    plaintiff's case in this case.  So it would appear that this is

9    simply a case where you disagree with my reading of *Twitter* as

10   it applies to this case.  But that is not traditionally a basis

11   for reconsideration.  Other courts, at least two other judges

12   in this district, have denied reconsideration after *Twitter*.

13   And the response is they erred.  So that's not a strong case

14   going in.  As a matter of courtesy, really, I granted argument

15   on the motions because you plainly put a lot of effort into

16   both motions.  So here you are, and, as they say, here I am.

17             MR. BANSAL:  Kind of you to say that, Judge, and I do

18   hope to persuade you that the Court, in its February 25th

19   order, did overlook aspects of what *Twitter* requires and what

20   JASTA, as interpreted by *Twitter*, requires.  And, at a minimum,

21   I hope to persuade you, Judge, that there is such a substantial

22   basis for a difference of opinion and that so much could be

23   gained from an appeal right now, that a certification, under

24   1292, is appropriate.

25             THE COURT:  I mean, we all know what the effect of

P4M4RAAC

1    certification will be.  It would be if the Court of Appeals

2    decided to take the case, unlike its traditional reluctance to

3    take a case on interlocutory appeal, it could be a year while

4    the case is stalled.  That's not a way to expedite the final

5    resolution of the case.  But go ahead.

6         MR. BANSAL:  Judge, I do think that judicial

7    efficiency could be served, would be served, by not having the

8    parties go through an entire discovery process, summary

9    judgment, and trial before a ruling on, what I believe is a

10   discrete and controlling legal issue, is rendered.

11        THE COURT:  But, of course, you would have the

12   opportunity for a motion for summary judgment at the conclusion

13   of discovery with the enlightenment of any cases, including the

14   other case that the parties point to that's pending before the

15   Second Circuit.  But we wouldn't have lost the time where the

16   case was otherwise stalled.

17        MR. BANSAL:  I'm sorry, Judge.  I didn't mean to

18   interrupt you.

19        THE COURT:  No, you're very polite.  You weren't

20   interrupting me.

21        MR. BANSAL:  We wouldn't spend the resources and time,

22   both parties, of going through discovery and the Court wouldn't

23   have expended the resources and time in ruling on a motion for

24   summary judgment.  So I think that there is something to

25   counterbalance the delay that is inevitable in the Second

P4M4RAAC

1    Circuit appeal, it happens in every appeal, and letting

2    discovery go forward.

3         I would say, Judge, with respect to the cases where

4    interlocutory appeal and motions for reconsideration have been

5    denied, I don't think that two characteristics are so clearly

6    apparent.  And the first characteristic, Judge, is that the

7    Court did not find, and the plaintiffs do not even try to

8    allege, that there was any scienter with respect to the

9    attacks.  I think that is clear.  It is undisputed.

10         The second thing, Judge, and this is in dispute, that

11   the plaintiffs have not alleged a definable nexus between

12   Binance's conduct and the attacks that injured their clients.

13   Now, the plaintiffs dispute how we would characterize the

14   Court's findings on that.  When the Court said there was not a

15   close nexus or a close nexus was lacking, that doesn't mean

16   that the nexus was attenuated.  But I think it's important,

17   Judge, that the plaintiffs did not tie a single dollar

18   transacted on the exchange, a single transaction on Binance's

19   exchange, a single user that was a customer of Binance to the

20   attack, not that they funded the attacks, not that they

21   participated, not that they paid a martyr payment to anybody,

22   nothing, Judge.  And this Court actually in another part of the

23   order in discussing the proximate cause element of primary

24   liability held that the causal link of Binance's provision of

25   financial services and the plaintiffs' injuries is too

P4M4RAAC

1   attenuated, and too attenuated to support the inference, now

2   these are my words, that Binance's conduct was "a substantial

3   factor in causing the October 7th attacks and that the attacks

4   were a reasonable foreseeable natural consequence of the

5   defendants' actions."  The Court said that the allegations here

6   are too attenuated from the attacks to meet those requirements.

7   The Court noted that the amended complaint is devoid of any

8   factual, non-conclusory allegations that the defendant provided

9   money directly to Hamas and PIJ to carry out the attacks.

10       Judge, it seems clear to me from my reading of *Twitter*

11  that in that situation*, Twitter*'s sliding scale, which I don't

12  think anyone disputes, would require and required that

13  plaintiffs meet a "drastically increased," those are the

14  Supreme Court's words, a drastically increased burden to show

15  that the defendants somehow consciously and culpably assisted

16  in the attack.  That they culpably associated themselves with

17  the attack and participated in it as something they wished to

18  bring about.  Judge, our contention is that that drastically

19  increased burden that the Supreme Court says is required by

20  JASTA, as a matter of statutory requirements, is what the

21  February 25th order did not apply.

22       Respectfully, Judge, what the 25th order did was find

23  it sufficient that the plaintiffs had alleged assistance to

24  Hamas and PIJ associate accounts independent of the attacks,

25  hovering above the attacks themselves.  If you look at page 70

P4M4RAAC

1    of the opinion, what the Court says is that the financial

2    assistance allegedly provided was substantial, even if not

3    directly targeted at the October 7th attacks.  And it goes on

4    to talk about assistance to Hamas and PIJ, in general.  And I

5    will say, Judge, that the plaintiffs haven't even alleged

6    anything more.  The plaintiffs say that their theory of

7    recovery, their theory of liability and aiding and abetting is,

8    and I'm quoting, "when you are knowingly providing financial

9    services to terrorists, you can be held liable for aiding and

10    abetting."  That is the plaintiffs' theory of liability.  They

11    don't even pretend that it's anything else.

12              Judge, that's exactly what the Ninth Circuit did in

13    *Twitter*.  That's exactly what the Supreme Court rejected in

14    *Twitter*.  The notion that the Ninth Circuit and the plaintiffs

15    here have framed the issue of substantial assistance as turning

16    on the defendant's assistance in *Twitter* to ISIS's activities

17    in general, and that's exactly what the Supreme Court said was

18    not sufficient.  The question the Supreme Court said is whether

19    defendants gave substantial assistance to ISIS with respect to

20    the Reina attack there.  So they framed substantial assistance

21    as substantially assisting the organization, and I think that,

22    unfortunately, that carried through the order -- sorry, Judge.

23              THE COURT:  *Twitter* goes back to the classic

24    definition of aiding and abetting, and the DC Circuit case

25    about how a person could be found guilty of aiding and abetting

P4M4RAAC

1     without even knowing about the specific crime that was at issue

2     because of the personal involvement over time with the criminal

3     wrongdoer.  And *Twitter* left open the sliding scale and viewed

4     *Twitter* as a case where there was just insufficient contact and

5     didn't set out the precise boundaries but left it to further

6     development.  *Twitter* was at an extreme end because a contrary

7     decision in *Twitter* would have made *Twitter* responsible for

8     vast crimes, and the Court was not prepared to go that far.

9     But made it clear that the boundaries would have to be

10    developed in subsequent cases under a standard of aiding and

11    abetting liability.

12          MR. BANSAL:  Judge, I think there's two doors that

13    *Twitter* left open that might relax the sliding scale.  One is

14    the situation, and I think you alluded to this now, Judge, the

15    assistance or conduct that ended up assisting the tortfeasor

16    was so systemic and pervasive that it was almost like a

17    conspiracy.  And in a conspiracy one can, as you know, Judge,

18    be held accountable for the reasonably foreseeable acts of

19    one's coconspirators.  That's not what the plaintiffs have

20    alleged here.  What they've alleged and what the order is based

21    on is the notion that the services, which would otherwise be

22    routine, were provided in an unusual or dangerous way.  And I'd

23    actually like to talk about that.  Because I think probably

24    were it not for that finding, I believe that the Court would

25    have to have applied the drastically increased standard of

P4M4RAAC

1    *Twitter* and found that the failure to even try to allege that

2    Binance or the defendants had specific scienter with respect to

3    the attacks, would have precluded the claim.

4         But let's talk about the dangerous and unusual, sort

5    of, exception.  The order, at page 66, says that the reason

6    that the services were unusual was that they were designed to

7    evade government detection and regulation.  So it was the

8    intentional circumvention of the Bank Secrecy Act and IEEPA.  I

9    will say, Judge, that the allegation that Binance intentionally

10   circumvented terrorist financing regulations, the Bank Secrecy

11   Act and IEEPA is present, is a feature in just about every Bank

12   Secrecy Act and IEEPA violation.  Because criminal violations

13   of those statutes, as you know, Judge, require willfulness.

14   Willfulness is intent plus.  So intentional circumvention of

15   money laundering and sanctions regulations is built into the

16   violation.

17        For that reason, Judge in *Siegel*, in *O'Sullivan*, in

18   *Wildman*, there were the same violations of those intentional

19   circumvention of those duties.  And I will say, Judge, in those

20   cases which were stopped at the motion to dismiss, they did not

21   survive motions to dismiss -- *Siegel* was a Second Circuit

22   case -- the conduct was much more intentional, the evasion of

23   sanctions was much more intentional than we have here.  There

24   was, in *Siegel*, wire stripping or specialized services that

25   were directed at the terrorist group.  In *Wildman* the bank has

P4M4RAAC

1    a client, a fertilizer company, that was making something that

2    the U.S. Army walked into the offices of the bank and said,

3    "you are banking somebody that is creating something that is

4    killing American soldiers."  The bank then went ahead and gave

5    another loan to that fertilizer company that enabled it to

6    reduce the bottlenecks in the production of this fertilizer.

7    And in that situation, that was a much more intentional

8    circumvention of AML regulations under IEEPA.  And that in

9    itself didn't make the goods or the services unusual.

10            If you look at the cases that you cited, Judge,

11   *Kaplan*, *King*, *Bonacasa* that the order cites, the thread that

12   runs through all of those cases is preferential treatment of

13   the terrorist group, something special that is given to them.

14   In *Bonacasa* it's the fertilizer company.  They gave them

15   specialized loans.  In *Kaplan*, the bank had accounts in the

16   name of Hezbollah leaders, and that was reported by the UN.

17   But that's not the kind of thing that is evident here.

18            THE COURT:  Well, in this case there was at least one

19   example of Binance knowing that the account was a terrorist

20   account.  And they notified the depositor and told the

21   depositor that they would return the money.

22            MR. BANSAL:  I want to talk about that, Judge.  But I

23   just want to finish the point that things that run through

24   these cases, and the Court cited it correctly in the order, a

25   main feature of them is special treatment, and that's important

P4M4RAAC

1    under *Twitter*.  That's important.  The Supreme Court found it

2    important that *Twitter* was treating ISIS and ISIS's content

3    just like everybody else.  Judge, I think the same is

4    absolutely true of Binance.  The allegation is not that Binance

5    filed a lot of SARs but then when it came to an account that it

6    had noticed was linked to Hamas or with PIJ, they said, "no,

7    no, don't file SAR on that account."  The incident that you're

8    talking about in Paragraph 216 of the complaint, what happens

9    is that a Binance employee says if that person is a VIP, then

10   let them take their money and leave.  Okay.  But close the

11   account.  How does that substantially assist?  How does that

12   help Hamas?  All it does is it closes the account.  And also,

13   Judge --

14           THE COURT:  It returns the money.

15           MR. BANSAL:  Well, all that is, Judge, is not meeting

16   your AML obligation.  If the money was -- if Binance had met

17   its AML obligations, arguably, it would block and report.  And

18   it would freeze the money so that OFAC could come and get it.

19   But the complaint and the thing that Binance pled guilty to was

20   not doing that for anyone.  It wasn't that Binance had

21   effective controls, but when it came to Hamas and PIJ it gave

22   them special treatment.  Just like Twitter and unlike the cases

23   that the Court cited King, *Bonacasa*, and *Kaplan*, there was

24   nothing special about the way that Binance reacted to

25   notifications that there were Hamas-associated accounts.  And,

P4M4RAAC

1    please, Judge, I'm not trying to say that's okay.

2          THE COURT:  Just consider what you're saying.  They

3    were required to freeze the account and report it.  They didn't

4    do that.  They gave the money back to a known terrorist group.

5    And the argument is, but that's not special treatment for this

6    terrorist group.  They did it for everyone who was on the list

7    of people that they had to block accounts for.  There's nothing

8    different about this particular terrorist group.

9          MR. BANSAL:  Judge, it's not that they did anything

10   for everyone.  It's that they didn't file SARs.  That is the

11   allegation.  It's not that they provided a service to people

12   that were on SDN lists.  It's that they treated them just like

13   everybody else.  That's not right, Judge.  That's what Binance

14   paid $4 billion for.  It's what Mr. Zhao served prison time, a

15   willful violation of the Bank Secrecy Act.

16          I do want to say, Judge, I'm going off of, when I say

17   they had an obligation to freeze, I'm going off knowledge that

18   it is probably 15, 20 years old, I don't know that.  I'm

19   assuming that.  But what I'm assuming, even assuming that, it's

20   nothing different than what Binance provided to anyone else.

21   *Halberstam*, it's also a situation where there was one client.

22   This is not a CPA who had -- Ms. -- I think her name was

23   Hamilton -- she wasn't a CPA that had many clients, not

24   hundreds of clients, one of which was Mr. Walsh.  It was that

25   she only worked for Mr. Walsh, and that's not what's being

P4M4RAAC

1   alleged here.

2         THE COURT:  But, you know, *Halberstam* is a case that

3   really stretches aiding and abetting liability which has now

4   been blessed as the standard for aiding and abetting liability.

5         MR. BANSAL:  It does stretch it, Judge, but this --

6         THE COURT:  That's what the Supreme Court told us is

7   the law.

8         MR. BANSAL:  The Supreme Court said that *Halberstam*

9   remains.  And the Supreme Court did say you can't

10  mathematically apply *Halberstam*.  It's a set of factors that

11  guide the ultimate question, which is did the person or the

12  defendant render substantial assistance in the tort?  And so

13  *Twitter* continually tried to bring, *Halberstam*,

14  notwithstanding, *Twitter* is a case from the Supreme Court and

15  it's actually interpreted in the statute that is at issue.

16  *Halberstam* is a common law case.  So *Twitter* clearly controls

17  if there's any inconsistency between it and *Halberstam*.  I'm

18  not saying that there is.  But *Twitter* continually brought the

19  analysis back to the specific tort that injured the plaintiff

20  and whether the defendant substantially assisted in that tort.

21  What I'm saying, Judge, is that the only reason, it seems to

22  me, that the February 25th order did not apply that, was this

23  finding that there was something unusual about the services

24  that were applied to Hamas.  And I guess what I'm saying,

25  Judge, is that there was nothing unusual.  Like in *Twitter*, the

P4M4RAAC

1    Supreme Court said your problem, the plaintiffs, your problem

2    is not what Binance did -- sorry, not what *Twitter* did for

3    ISIS, it's what *Twitter* did for everyone.  It's what *Twitter*

4    failed to do for everyone.  And that's exactly the case here.

5    Judge, it's the systemic non-filing of SARs.  It's not the

6    systemic anything with respect to Hamas and PIJ.  The

7    allegations in the complaint that relate to Hamas and PIJ, they

8    end in 2020 -- I think it's around 2020 they end.

9         And then there is blockchain analysis that I'm sure my

10   colleague is going to talk about.  The blockchain analysis,

11   Judge, it doesn't say anything about Binance's state of mind.

12   It doesn't say anything -- they haven't even tried to allege

13   that Binance knew of any Hamas connections, which they haven't

14   spelled out at all.  They haven't even tried to allege that

15   Binance knew of any of that at the time the transactions were

16   occurring or any time before the attack.

17        And that's another reason, Judge, just while I'm on

18   it, Footnote 22 of the opinion distinguished *Siegel* on the

19   basis that it was crucial in *Siegel* that the bank's assistance

20   or alleged assistance ended ten months before the attacks, and

21   that made a finding of knowing substantial assistance

22   implausible.  Here, Judge, the blockchain analysis says nothing

23   about knowing financial assistance.  I looked back at the

24   complaint and the allegation that is closest in time to the

25   attack comes from or purports to discuss a February 20, 2022,

P4M4RAAC

1    Times of Israel article that says that, according to the

2    complaint, that Binance wallets were seized in connection with

3    an operation against Hamas.  But Judge, two things:  First of

4    all that's February 2022.  It's longer back than was the case

5    in *Siegel*.  I also went back and I looked at the article,

6    Judge, there is actually no mention of Hamas in the article.

7    They just misstated what's in the article.  So you have to go

8    back beyond 2022 to find anything that is directed in the

9    plaintiffs' telling at Hamas.  So, again, the attenuation is

10   actually much more than in the cases where it was found that

11   there wasn't a liability.

12           Judge, I think at a minimum, and I'm sure there is

13   going to be vehement disagreement when my colleague gets up,

14   and I can't tell if maybe the Court still disagrees, but I have

15   to say that it seems -- it seems like a fairly easy question

16   whether this is a substantial, there are substantial grounds

17   for disagreement.  You got *Wildman* in the Eastern District

18   saying that walking into a bank's office and saying you're

19   manufacturing this fertilizer is not sufficient -- saying you

20   are banking a fertilizer company that is creating a dangerous

21   explosive, that's not sufficient.  You got *Bonacasa* in this

22   district that says exactly the opposite.  There are statements

23   in *Kaplan*, in *Honickman*, about intent that *Twitter* is

24   completely inconsistent with.  I'm not going to repeat our

25   briefs on that, but *Twitter* is completely inconsistent with

P4M4RAAC

1       those.  There is definitely substantial grounds for

2       disagreement about the meaning of JASTA, as interpreted by

3       *Twitter*.  This case is much more similar to Judge Failla's

4       decision in *SEC v. Coinbase* than in any of the cases the

5       plaintiffs cite.

6              And I know, Judge, that the plaintiffs have said,

7       and --

8              THE COURT:  I don't agree with that.  I thought that

9       Judge Failla's decision really turned on an issue of law that

10      applied to lots of cases.  And I'm not sure -- I guess there

11      was disagreement, wasn't there, as to whether it should be

12      certified.  But it appeared to me to be a question of law

13      rather than one that depended very much on the factual

14      allegations in the complaint.

15             MR. BANSAL:  Judge, it was no more a question of law

16      as it is here.  Judge Failla said in her decision that she had

17      to determine whether, under the Securities Act, the

18      cryptocurrency was an investment contract.  She had to consider

19      not only the pleadings but the economic realities and totality

20      of circumstances surrounding the offer of an investment

21      contract, including the intentions -- that's always very fact

22      deep -- including the intentions and expectations of the

23      parties.  Here, we are not actually asking the circuit to do

24      any of that.  We are assuming every allegation in the complaint

25      for these purposes, we dispute all of them, many of them, but

P4M4RAAC

1    assuming every allegation in the complaint to be true, and

2    saying that even taking all that as true, JASTA, the

3    controlling statute is being misinterpreted.

4            THE COURT:  You don't see any distinction between, are

5    the facts of this case sufficient to allege aiding and abetting

6    liability, compared to whether this investment vehicle is an

7    investment contract?

8            MR. BANSAL:  Judge, I think that if the outcome is the

9    same, the import is the same.  Because if it were not an

10   investment contract, the SEC has no case.  So in the end,

11   right, it is whether, in her case, a narrower question, in the

12   *Coinbase* case a narrower question of whether the facts alleged

13   meet the statutory definition of an investment contract, just

14   because there were other elements.  But here it is in some ways

15   also a narrow question, Judge, about what is the meaning of

16   this particular element of JASTA, the substantial assistance,

17   the knowing and substantial assistance to the tortfeasor in the

18   commission of the tort.  So to me, Judge, I'm having trouble

19   distinguishing them.  I can't see -- I'm not trying to dismiss

20   the point, Judge, but it is very similar to a case where, yes,

21   we're taking facts and applying the law to them, but if the

22   plaintiffs were right then every time you take facts and apply

23   the law to them, it's not -- you can't -- it's not certifiable.

24   Every case involves taking facts and applying the law to them.

25   We are talking about the meaning, the interpretation of a

P4M4RAAC

1    controlling statute based on controlling Supreme Court

2    precedent.  That's what the pure issue of law is about which I

3    think there is no doubt that there is a substantial ground for

4    disagreement.

5           And there are a lot of cases.  I know that you said,

6    Judge, that Judge Failla's case would have helped a lot of

7    cases.  I think that's true.  There is over 20 cases pending in

8    this circuit where similar issues have been raised that would

9    be aided by this.

10           THE COURT:  The parties point out that there is

11   another case pending in the Second Circuit now, is it involving

12   Deutsche Bank where this is also at issue before the Court of

13   Appeals.

14           MR. BANSAL:  That's true.  It's *Wildman*.  *Wildman* also

15   involves --

16           THE COURT:  How long has that one been pending?

17           MR. BANSAL:  I could find it.

18           THE COURT:  I'm sure someone will tell me.

19           MR. BANSAL:  Judge, it was argued in March of last

20   year.

21           THE COURT:  It's been pending for over a year.

22           MR. BANSAL:  It has been, Judge.  Again, I don't think

23   that means because the circuit takes an average of 13 months,

24   at the time I last looked, between briefing and decision, it

25   doesn't mean that the judicial -- the efficiencies of stopping

19

P4M4RAAC

1    discovery at this point, not having the parties -- you know,

2    plaintiffs are going to have to go through depositions too,

3    Judge, not just us and produce discovery and also going to have

4    to respond and make summary judgment motions, all of that.

5            THE COURT:  They are not seeking interlocutory appeal.

6            MR. BANSAL:  No.  But I'm saying their efficiency is

7    not just about the defendants, the efficiencies that would,

8    sort of, benefit the defendants.

9            THE COURT:  The only reason, actually, that I brought

10   up the pending Second Circuit case is that you'll get guidance

11   from the Second Circuit, presumably when that case comes out.

12           MR. BANSAL:  Maybe.

13           THE COURT:  Well, if not, that means that this is a

14   very fact-based decision.

15           MR. BANSAL:  No, Judge.  I said "maybe" because the

16   *Wildman* decision is also being appealed on the grounds of

17   general awareness.  So it is possible that that district

18   court's decision will be sustained on the grounds of general

19   awareness, and we won't have any guidance on knowing and

20   substantial assistance.

21           Again, the fact that an issue is already pending

22   before the circuit, maybe that means we stay this until that

23   happens.  But, again, there is no guarantee that the circuit's

24   decision in *Wildman* is actually going to help dispose of this

25   case.

P4M4RAAC

1          THE COURT:  Okay.

2          MR. BANSAL:  I'll yield to my colleague unless there

3    are any other questions.

4          THE COURT:  Thank you.

5          MR. BANSAL:  Judge, do you want to hear, my colleague

6    Mr. Molina is going to be arguing the personal jurisdiction

7    aspect for the motion of reconsideration.  I apologize for not

8    having raised that before we started.  But would you like to

9    hear that first, or would you like to let plaintiffs --

10          THE COURT:  No, I'd like to hear all of the motions

11    first, before a response.

12          MR. BANSAL:  Okay.  Thank you.

13          MR. MOLINA:  Good morning, your Honor.  Your Honor

14    mentioned earlier, you're familiar with the briefs.  I'm not

15    going to go into them in large detail.  But I do want to focus

16    on this jurisdictional discovery ruling, which unlike the

17    arguments you just heard were not briefed during the motion to

18    dismiss phase.  I'm going to just briefly hit on three points

19    if that's okay, your Honor.

20          The first point is that jurisdictional discovery is

21    inappropriate where the plaintiff has not established or

22    alleged a viable personal jurisdiction theory.  We believe in

23    this case -- and I'll get to it in a second -- we believe in

24    this case, this is one of the cases where that's the case.

25          Secondly, I'm going to get to the point that because

P4M4RAAC

1    they haven't alleged a viable personal jurisdiction theory,

2    what's come out now post order, these meet and confers that we

3    had, that your Honor has ordered us to have with plaintiffs'

4    counsel is we've noticed that they are expanding their

5    discovery theories beyond what was alleged in the complaint.

6    Again, we think this underscores the non-viability of the

7    personal jurisdiction theory that's alleged in the complaint.

8            And the third point I'm going to make is that now,

9    because we have shifting theories, we are in a state where

10   essentially this is one huge fishing expedition.  And we heard

11   a lot of from your Honor and my colleague about judicial

12   efficiency.  We think this is headed towards a path of needless

13   litigation over what's the scope of jurisdictional discovery

14   and so forth.

15           THE COURT:  Those are the kinds of discovery disputes

16   that are dealt with all the time.  They're not terribly

17   difficult.  Sure, you have to have a meet and confer and then

18   there'll be a decision.

19           MR. MOLINA:  Yes, your Honor.  But with respect to

20   jurisdictional discovery in particular, the case law is clear.

21   It's not your typical discovery practice.  It's meant to be

22   limited, and it's meant to be keyed to the allegations of

23   personal jurisdiction in the complaint.  And what I'm trying to

24   communicate, your Honor, is that what plaintiffs are doing is

25   they are straying from what is alleged in the complaint.

P4M4RAAC

1                    Let me go back to my first point for a second so I can

2       go through that.  This is the *Reed International* case that we

3       cited to in our motion papers.  The *Reed International* case is

4       a decision from this district in 2023.  And it collects all the

5       case law that stands for the proposition that jurisdictional

6       discovery is inappropriate where the facts that will be

7       discovered will not sustain personal jurisdiction.

8                    Then the question is, what's the theory here that they

9       are supposed to discover facts to try to sustain?  Well, as

10      your Honor correctly noted in the order, the jurisdictional

11      theory that's alleged is, what I'm going to call for the sake

12      of this argument, a market maker theory.  Essentially, they're

13      saying Binance was able to get to the point where Binance got

14      because they had these VIP customers based in New York, who

15      were market makers and provided sufficient liquidity.  And

16      their allegation is that because of that significant business

17      relationship, Binance should be haled into court in New York

18      for any tort that could arise from that exchange, from

19      customers using the exchange, including, in this case, the

20      alleged use of Binance by Hamas and PIJ to fund their terrorist

21      attacks in Israel.

22                   Your Honor, the problem with that theory is, first of

23      all, it sounds more like a general jurisdiction than is

24      personal jurisdiction because it doesn't actually directly link

25      the contacts in the forum with the attacks on Israel.  That's

P4M4RAAC

1    fatal under the CPLR because, as your Honor knows, there has to

2    be a substantial relationship between the contacts in the

3    forum, in this case the market makers in New York and the

4    conduct at issue or the scheme at issue which is the attacks on

5    Israel in 2023.  On the face of the complaint, your Honor,

6    there absolutely no linkage whatsoever.  And your order

7    actually said as much.  They allege -- they make these

8    conclusory, vague allegations on information and belief.  But

9    they don't actually tie it.

10            What we disagree with, your Honor, is when your Honor

11    said maybe if they have discovery, maybe they would be able to

12    come up with facts.  Because as I'm trying to get to, your

13    Honor, any fact that -- let's just play it out.  Let's assume

14    for the sake of argument that they are going to get discovery

15    and they are going to prove their theory, prove that Binance

16    got to the size it got and had the sufficient liquidity that it

17    was able to have because of market makers in New York.  That

18    says nothing about any relationship.  That does not meet the

19    articulable nexus standard under CPLR 302.

20            And I know your Honor cited in the order the *Licci*

21    case.  I think it's *Licci* 2 from the Second Circuit to

22    essentially support the idea they might be on the right path to

23    establishing personal jurisdiction.  As your Honor knows, in

24    the *Licci* case, the issue is very similar in some ways to

25    what's happening here, plaintiffs were victims of a terrorist

P4M4RAAC

1    attack in Israel.  In that case it was Hezbollah that committed

2    the attacks, and they sued a foreign bank in New York because,

3    under their theory, they said this bank had sufficient business

4    contacts in New York.  Now, where the case is different, your

5    Honor, in that case the personal jurisdiction theory was that

6    the contact, which in that case was a corresponding bank in New

7    York, was used to clear transactions that directly funded the

8    terrorist attacks in Israel.  That's that linkage that we don't

9    see here at all.  They don't make the allegation on the face of

10   the complaint that these VIP customers were clearing

11   transactions on the Binance exchange that directly funded

12   whatever attacks occurred, the attacks of October 2023 from

13   Hamas and PIJ.  That's not their allegation.

14          This is more akin to the case we cited to in our

15   papers, your Honor, the *Bristol Myers Squibb* decision from the

16   Supreme Court in 2017.  As your Honor probably knows, in that

17   case -- and I'm from California, and I know too much about this

18   case.  The California state courts have this practice where

19   when it came to personal jurisdiction, specifically specific

20   jurisdiction, the Court said, well, we'll do a sliding scale.

21   If your context of the forums are so strong, we will relax the

22   whole linkage from the contact to the underlying conduct.  And

23   essentially when you read the complaint, that's essentially

24   what they are trying to say.  They're saying that Binance had

25   such strong contacts in New York that we should just forgive

P4M4RAAC

1    the fact that the plaintiffs don't actually link those contacts

2    to the attacks in Israel.  Your Honor, the Supreme Court

3    rejected that argument as a loose and spurious form of general

4    jurisdiction, and we think that's the case here.

5            Now, if I may go to my second point, because there's

6    no viable jurisdictional theory here, we are starting to see

7    what really should be improper here.  Which is that we are

8    seeing the plaintiffs use this jurisdictional discovery that

9    your Honor issued to go on a fishing expedition and try to come

10   up with fact new facts for a new theory that's beyond what they

11   actually allege in the complaint.  This is on page 18 of their

12   opposition papers, your Honor.  And it's also referenced in the

13   joint letter that the parties submitted to your Honor on

14   March 11 after a meet and confer to discuss the scope of

15   jurisdiction in this case.

16           THE COURT:  Have I assigned the jurisdictional

17   discovery dispute to the magistrate judge yet?

18           MR. MOLINA:  Yes.  There was a letter.  And I'm sorry,

19   I'm looking at my counsel.  Yes, my understanding is that this

20   has been designated.

21           THE COURT:  Okay.  I'm sure that the magistrate judge

22   will appropriately rule on any issues with respect to the scope

23   of appropriate jurisdictional discovery, making sure that it's

24   proper and proportional to the relevant issues.

25           MR. MOLINA:  That's fine, your Honor, but the

P4M4RAAC

1    fundamental argument that we are trying to present here is,

2    again, even if the magistrate judge corrals the plaintiffs and

3    says let's stick to the market-maker theory that's alleged in

4    the complaint.  There is no amount of facts -- again, we are

5    not here disputing the facts related to that theory.  But for

6    the sake of this argument we are just going to assume they are

7    true, that they will be able to prove that.  What is the

8    relationship between those contacts in New York to a terrorist

9    attack in Israel with foreign actors based in the Middle East?

10   They don't have anything on the face of the complaint.  And

11   again, your Honor, the case law is clear in these situations.

12   Even though your Honor enjoys broad discretion generally to

13   issue jurisdictional discovery, there is a precondition, the

14   theory has to be viable, as a matter of law, otherwise everyone

15   is spinning their wheels.

16          And if I may just go to the third and final point.

17   "Fishing expedition" is a phrase that maybe is overused and --

18          THE COURT:  No, it's a perfectly fine phrase.  It's

19   been around for a long time.

20          MR. MOLINA:  I think in this case the case law is

21   clear, again, that yes, jurisdictional discovery is a tool that

22   the Courts may, at times, employ.  But jurisdictional discovery

23   need to be limited.  So a fishing expedition in a

24   jurisdictional discovery setting is even more concerning

25   because, again, they have not met their *prima facie* burden yet

P4M4RAAC

1    of establishing personal jurisdiction.  We have foreign

2    defendants not based here, not typically haled into court here

3    in this district, and are not subject, typically, to U.S.-style

4    discovery.  We've cited to *the Reed* case which says when it's a

5    foreign defendant, in particular, the Courts are typically

6    reluctant to issue jurisdictional discovery at all.  And when

7    you add on top of it here that there is a moving target,

8    plaintiffs don't know quite what their jurisdictional theory

9    is.  Again, just making reference to page 18 of their

10   opposition papers, they tee up what I'm going to call a

11   counter-party theory.  Which is essentially that maybe they

12   weren't just market makers, maybe they were counterparties to

13   these transactions that we believe Hamas and PIJ conducted on

14   the exchange.  That's not in the complaint.  They are literally

15   moving the goal posts and using this discovery ruling to go

16   fishing.

17          Again, we cited the case in our papers.  I'm happy to

18   answer any questions.  I don't want to just go on and on about

19   those cases, but we think it's clear in that context your Honor

20   should reconsider the ruling on jurisdictional discovery and

21   instead just dismiss the complaint.  And if they want to

22   continue with this case in New York, they would have to come up

23   with a viable theory for personal jurisdiction under the

24   long-arm statute.

25          THE COURT:  Thank you.

P4M4RAAC

1          MR. BANSAL:  Judge, I apologize.  Just so the record

2     is clear, it was pointed out to me in describing the Times of

3     Israel article from February 2022 I said it was "Hamas" that

4     isn't mentioned in the article.  It's "Binance" that is not

5     mentioned in the article.  I apologize for misspeaking.

6          THE COURT:  Thank you.

7          MR. KUSHNER:  Your Honor, with respect to your ruling

8     on whether plaintiffs have stated the claim for aiding and

9     abetting, as your Honor I think pointed out correctly, they

10    haven't shown anything that was overlooked.  Counsel went

11    through defendant's interpretation of *Twitter*, defendant's

12    interpretation of some of the case applying *Twitter* and

13    although they may disagree with your Honor's painstaking and

14    careful and well-reasoned analysis, that's not a basis for

15    reconsideration.  They have to show facts or law that was

16    overlooked, and they haven't done that.  They haven't pointed

17    to anything that was overlooked, not a single thing.  They're

18    just debating what you looked at and the way that you came out

19    on the law and the facts.

20          I'll just say a couple more things on that and maybe

21    I'll move on the jurisdiction point.  Your Honor, they said

22    that our entire aiding and abetting theory comes down to the

23    allegation that Binance knowingly provided financial services

24    to terrorists, and that is not sufficient under *Twitter*.  But,

25    your Honor, it's more than that.  As you recognized in the

P4M4RAAC

1    February 25th order, the facts pled in this case have two very

2    different components, which make this decision different from

3    *Twitter* where the Supreme Court rejected the Ninth Circuit's

4    analysis.  And your Honor correctly pointed out, and this is at

5    page 63 of the order, defendants in this case allegedly had an

6    independent duty to act that was not present in *Twitter*.  So

7    you have regulated entities and they have duties, and that was

8    not an issue in *Twitter* because you have the social media

9    companies, YouTube Google, Facebook, they don't have those very

10   comprehensive regulatory duties.

11        And the second significant difference between this

12   case and the facts in *Twitter*, as your Honor correctly pointed

13   out in the order, and this is at page 64 and 66 of the order,

14   your Honor wrote that the defendants allegedly, "took

15   affirmative actions to enable terrorist groups to transact on

16   the Binance platform and thus provided service that might

17   otherwise be considered routine cryptocurrency transaction

18   services in an unusual way designed to evade government

19   detection and regulation."  Again, it's not just knowingly

20   providing financial services to terrorists, and it's that

21   intentional circumvention of regulation, it's doing it in a

22   very unusual way.

23        And, your Honor, with respect to my colleague's

24   comment that somehow there is a whole universe of cases

25   involving willful violations of the Bank Secrecy Act or the

P4M4RAAC

1    International Emergency Economic Powers Act, and the attempt to

2    minimize the allegations in this case with respect to the

3    evasion of government regulations.  I think that there is not a

4    single case in which you have this enterprise-wide intentional

5    circumvention of regulation and directed from the very top,

6    from Mr. Zhao all the way on down to the chief compliance

7    officer and the entire senior leadership of the company,

8    implementing deliberate policy to frustrate, to evade, to

9    circumvent regulation.  There is not a single case like that.

10   So this case is very different in that respect as well.

11        My colleague mentioned that the complaint doesn't

12   plead scienter with respect to the October 7th attack.  This

13   is, yet again, they're repeating the argument that somehow we

14   need to allege that there was a specific intent to bring about

15   the October 7th attacks or to bring about an act of terrorism,

16   and that's not the law.  That's not what *Twitter* says.  You

17   don't need to plead -- in order have aiding and abetting

18   liability, you don't need to plead an intent to further the

19   ultimate terror attack.  You don't need to plead that the aider

20   and abettor intended to further the primary violator's plan.

21   That's black-letter law.  Your Honor pointed out in the order,

22   correctly, and there is just absolutely nothing to support what

23   they keep trying to argue again and again.  There is not a

24   shred of authority in their favor on that.

25        They also -- my colleague said that we haven't tied a

P4M4RAAC

1    single dollar of money that was moved on the Binance exchanges

2    to the October 7th attacks.  Again, that's not required.

3    *Twitter* expressly stated that a strict nexus is not required,

4    even remote assistance qualifies.  And again, this point was

5    extensively discussed in the briefing that preceded the motion

6    to dismiss.  It was discussed at argument.  It was extensively

7    discussed in your order, and it's not a basis for

8    reconsideration.

9           And I think the same confusion about what *Twitter*

10   required and what the intent requirements are was in my

11   colleagues' discussion of some of the cases.  So for example,

12   my colleague was talking about the fertilizer case.  And in

13   that case the United States military approached Standard

14   Chartered Bank, and said the company that you're funding in

15   Pakistan is manufacturing fertilizer, and that fertilizer is

16   the main killer -- it's the main ingredient of bombs that are

17   killing American troops in Afghanistan.  And even though the

18   Court upheld aiding and abetting liability for Standard

19   Chartered on those facts by continuing to provide financial

20   services for this fertilizer company, there is no allegation in

21   that case that Standard Chartered intended to bring about a

22   terror attack against United States troops in Afghanistan.

23   There is no allegation that Standard Chartered knew about any

24   plan to commit a terror attack.  So the idea that somehow in

25   this case the plaintiffs have to allege that Binance and

P4M4RAAC

1    Mr. Zhao intended to bring about the October 7 attacks is just

2    not the law.

3              Your Honor, unless you have any questions about the

4    aiding and abetting portion of this, I want to move on to

5    jurisdictional discovery.

6              On jurisdictional discovery just preliminarily, your

7    Honor, we did, in accordance with the schedule that was agreed

8    and presented to the Court, we did serve an initial set of

9    jurisdictional discovery demands.  But the defendants have not

10   yet responded to them.  The parties have not yet met and

11   conferred.  And any issues with regard to that -- any potential

12   issues have not been raised with us yet and certainly are not

13   part of the briefing that's currently before the Court.  So

14   it's premature to be, at least today, debating hypothetical

15   issues that haven't been raised yet.

16             Setting that aside, I will say, your Honor, there is

17   no fishing expedition.  Our requests were targeted to New York

18   VIP users, to New York bank accounts, and we also believe that

19   the discovery we are seeking is actually duplicative of

20   discovery that was previously sought by the government.

21             With respect to --

22             THE COURT:  I'm sorry.  Duplicative of discovery that

23   the government previously sought from the defendant?

24             MR. KUSHNER:  That's our belief, yes.

25             THE COURT:  So the argument is it's not burdensome?

P4M4RAAC

1          MR. KUSHNER:  That's exactly what I'm trying to say,

2     your Honor.  We don't think it's particularly burdensome.  But

3     again, we haven't been presented with any objections, so we

4     just don't know what issue they may have.

5          With respect to jurisdictional discovery, we believe

6     your Honor was absolutely correct that there is a potentially

7     viable jurisdictional theory that could come out of

8     jurisdictional discovery.  And our theory was mischaracterized

9     just now, and I want to just frame it correctly for your Honor.

10    But before I talk about what our theory is, I just want to talk

11    a little bit about what we are not required to show.  Because

12    what my colleague said is that we are required to show a

13    connection between something that the defendants did in New

14    York and the October 7th attacks, but that's not the case.  The

15    relevant scheme here is the provision of cryptocurrency

16    services to Hamas and PIJ.  That's the aiding and abetting

17    theory.  It's the substantial assistance.  We're not required

18    to connect what Binance and Zhao were doing to the October 7th

19    attacks.  That's black-letter law.  It's in the *Licci* Case.

20    And your Honor correctly recognizes this.  Your Honor said at

21    page 10 of the order, CPLR 302(a)(1), "does not require a

22    causal link between the defendants' New York business activity

23    and the plaintiffs' injury.  But rather, it requires a

24    relatedness between the transaction and the legal claim."  And

25    your Honor was quoting the Court of Appeals decision in *Licci*.

P4M4RAAC

1          And *Licci* also said that CPLR 302(a)(1), "does not

2     require that every element of the cause of action pleaded must

3     be related to the New York contacts, rather where at least one

4     element arises from the New York contacts, the relationship

5     between the business transaction and the claim asserted

6     supports specific jurisdiction under the statute."  So here,

7     one element of the JASTA claim is the substantial assistance to

8     Hamas and PIJ.  So if jurisdictional discovery can tie the

9     substantial assistance to New York, then there is a basis for

10    jurisdiction in New York.  That's all that's required.

11         Your Honor, I'll move on to our jurisdictional theory

12    because I think that, again, I think my colleague

13    mischaracterized it.  And there are several elements to it.

14    It's not simply the existence of market makers in New York.  So

15    our complaint interweaves a couple of points that are related

16    to the market makers, and I'll try to kind of tease it out for

17    your Honor.

18         First of all, we allege that there were these high

19    volume U.S. customers, including market makers in New York,

20    trading firms in New York that provided liquidity that was

21    critical for the operations of Binance.com, which is the

22    international exchanges, Binance.com.  And we explain that in

23    Paragraphs 11, 68, 155, and 157 of our complaint.

24         Moving on to a different part of the story, what we

25    allege is that at some point in time, Binance decides to create

P4M4RAAC

1    a U.S. platform which they call Binance.us  So you have

2    Binance.com which is the international platform and then

3    Binance.us which is the platform that was ostensibly intended

4    for U.S. users.  And what we allege in the complaint and this

5    is Paragraphs 176 to 180 of the complaint, is that when Binance

6    created Binance.us, Binance and its CEO, Mr. Zhao engaged in a

7    scheme to obtain high volume U.S. users on Binance.com, the

8    international exchange, by having them delete their U.S. Nexus

9    in KYC information.  So they approached these high-volume

10   users, including many trading firms in New York, and they asked

11   them to update their KYC information to delete a U.S. Nexus.

12   So you have this intentional isolation of a group of trading

13   firms, high-volume users, many of whom are in New York.  And

14   this is a critical point your Honor, this group is secretly

15   retained on Binance.com, and it's in New York.  It's largely in

16   New York.  And defendants deliberately did this.  They wanted

17   these VIPs on Binance.com.  They wanted to retain them.  And,

18   your Honor, we don't know -- we don't know why Binance went out

19   of its way to retain those users on Binance.com.  But what we

20   do allege is that whatever services Binance did provide to

21   Hamas and PIJ, the market makers were critical.  The market

22   makers on Binance.com were critical to Binance's ability to

23   provide those services.  And jurisdictional discovery can help

24   uncover why Binance secretly isolated this group of high-volume

25   market makers in New York in order to retain them on

P4M4RAAC

1    Binance.com.

2            And your Honor, respectfully this jurisdictional

3    theory, in other words, the notion that you are wrongfully

4    isolating a group of users in New York in order to retain them

5    on a platform, right?  This is what makes this, it fits it

6    within *Licci*.  Because *Licci* talks about the use of an account

7    in New York as "an instrument to achieve the very wrong

8    alleged."  And *Licci* says it was deliberate and recuring.  Now,

9    in *Licci* the instrument was a corresponding bank account in New

10   York.  But here the instrument is a secretly retained group of

11   high-volume users in New York.  So that is very much connected

12   to the allegation in this case.  It's not simply about

13   Binance's business, generally, no, the intentional

14   circumvention of KYC and the fact that these retained users,

15   secretly retained users are critical to the Binance's ability

16   to provide the very services to Hamas and PIJ that are at issue

17   in this action, that's a pretty significant link, your Honor.

18           Your Honor, do you have any questions about what I

19   just said?  I know it was a lot.

20           THE COURT:  Nope.

21           MR. KUSHNER:  My colleague also mentioned an

22   alternative theory of jurisdiction in New York which kind of

23   very simply, it involves the possibility that users in New York

24   actually acted as counterparties to transactions of Hamas and

25   PIJ, that argument is something that I mentioned at the oral

P4M4RAAC

1    argument on motion to dismiss, before your Honor issued the

2    order.  It's not a brand-new argument.  It was not something

3    explicitly mentioned in the complaint but is another

4    possibility which could be revealed by jurisdictional

5    discovery.  But again, your Honor, the market maker theory gets

6    us there.

7            Unless, your Honor, has any questions, I'll rest.

8            THE COURT:  No.  Okay.

9            MR. BANSAL:  I'll be brief, your Honor.  You've given

10   us a lot of time, and I do thank you for your indulgence.

11           Just very quickly, my colleague said he tried to

12   distinguish what he called the Stand Chart case on the basis

13   that there was no allegation that the bank intended the attack,

14   and that there was no allegation that the bank had

15   foreknowledge of the attack.  I was very surprised that he

16   tried to distinguish this case from this one because he said

17   the last time we were here that this complaint, his complaint,

18   does not allege that the defendants intended to bring about the

19   October attacks.  It does not allege that the defendants

20   intended to bring about any act of terrorism.  So I'm not sure

21   what he means.  Is he making my point or his, with respect to

22   the Stand Chart case because it seems to prove mine.

23           Similarly, Judge, my colleague mentioned it's not his

24   entire theory that knowingly providing terrorists with

25   assistance without any reference to the attacks is their whole

P4M4RAAC

1    theory.  Judge, I just refer you back to their brief.  Their

2    brief at page on the motion for reconsideration says, the

3    allegation is, as your Honor correctly pointed out, when you

4    are knowingly providing financial services to terrorists, you

5    can be held liable for aiding and abetting.  Again our view,

6    and I'm not going to belabor it, is that's what the Ninth

7    Circuit did in *Twitter*, and that's what is improper and that is

8    what is error.

9              THE COURT:  Okay.

10             MR. BANSAL:  And Judge, lastly, I would just point out

11   that the duties and the affirmative actions and the enterprise

12   violations, all you have to do is look at the *Siegel* case, all

13   you have to do is look at the other cases I cited.  The same

14   things happened there.  There is nothing about the duty or the

15   affirmative actions or the enterprise-wide violations that

16   distinguishes those cases from this one.  Thank you, Judge.

17             THE COURT:  All right.

18             MR. MOLINA:  Just briefly, your Honor, on the

19   jurisdictional discovery, I just want to point out that my

20   colleague basically just admitted that under the market maker

21   theory that they are proposing there's no direct link to Hamas

22   or PIJ or the terrorists attacks.  What I think I heard my

23   colleague say is that they are interested that this theory will

24   focus on how Binance did not disclose or failed to disclose

25   these market makers that were based in New York when they were

P4M4RAAC

1    migrating.  They were using them with the international

2    exchange when they should have used them in the U.S. exchange.

3    Your Honor, the SEC and CFTC and other regulatory bodies

4    already looked into that, already prosecuted that.  That's not

5    what this case is.  This is an Anti-Terrorism Act case.  It's a

6    case about terrorists attacks in Israel.  What my colleague

7    just said here never tied these New York market makers to that

8    attack whatsoever.

9            And then he mentioned *Licci*.  Again, I will not go

10   into detail, but I will say that *Licci* itself was a close call.

11   If your Honor remembers, the Second Circuit certified that

12   issue to the New York Court of Appeals because it wasn't sure

13   whether the statute reached the facts in that case.  And what

14   the New York Court of Appeals said after certification is that

15   it's a close cause, but the only reason they said it did reach

16   is because they felt the new corresponding bank practice was

17   done pervasively and on purpose and to further the activities

18   of Hezbollah.  That's not what's being alleged here.  These New

19   York contacts, these market makers, there's no allegation they

20   were, in any way, involved whatsoever with Hamas or PIJ.  Or

21   that they had any interest in furthering the activities of

22   those organizations.  The two cases could not be more different

23   in that regard.

24           And as your Honor knows, we represent Defendant Zhao

25   in this litigation.  These contacts, whatever import they have

40

P4M4RAAC

1    in this litigation, those are Binance's contacts.  They are not

2    Mr. Zhao's personal contacts.  So this loose and spurious

3    connection with it is even more attenuated with respect to him.

4    Thank you, unless, your Honor has any questions.

5          THE COURT:  No.  Thank you.

6          All right.  I'm prepared to decide.

7          Although plaintiffs brought this action against

8    Binance Holdings Ltd and Changpeng Zhao pursuant to the

9    Anti-Terrorism Act and the Justice Against Sponsors of

10   Terrorism Act, JASTA.  On February 25, 2025, the Court granted

11   in part and denied in part the defendant's motion to dismiss

12   the amended complaint, ECF No. 53.  The defendants have now

13   filed a motion for reconsideration, ECF No. 57.

14         The motion to grant or deny a reconsideration rests

15   within the sound discretion of the district court, *U.S. Bank*

16   *National Ass'n v. Nesbitt Bellevue Property LLC*, 859 F. Supp.2d

17   602 (S.D.N.Y. 2012).  The Court's reconsideration of a prior

18   order is an extraordinary remedy to be employed sparingly.

19   *Anwar v. Fairfield Greenwich Ltd*., 800 F.Supp.2d 571, 572

20   (S.D.N.Y. 2011).  Reconsideration will generally be denied

21   unless the moving party can point to controlling decisions or

22   data that the Court overlooked.  *Schrader v. CSX Transp. Inc.*,

23   70 F.3d 255, 257, (2d Cir. 1995).  This standard is strict, "in

24   order to discourage litigants from making repetitive arguments

25   on issues that have been thoroughly considered by the Court."

P4M4RAAC

1    *Range Road Music, Inc. v. Music Sales Corp.*, 90 F.Supp 2d 390,

2    391-392 (S.D.N.Y. 2000).

3              In this case there is no basis for reconsideration.

4    The defendants argue primarily that in denying the defendants'

5    motion to dismiss the plaintiffs' claims under JASTA, the Court

6    misinterpreted the Supreme Court's decision in *Twitter v.*

7    *Taamneh*, 598, U.S. 471 (2023), but the Court carefully

8    considered the *Twitter* decision and the arguments raised by the

9    defendants, and the defendants simply disagree with the Court's

10   conclusions.  "Reiterating the same arguments is not a basis

11   for reconsideration.  The fact that the defendants disagree

12   with the Court's decision is also not a basis for

13   reconsideration."  *Beaner v. City of New York,* No. 19 CIV 9646

14   2021 WL 5827536 at *3 (S.D.N.Y. Dec. 7, 2021).

15             Similarly, the defendants disagree with the Court's

16   decision to permit jurisdictional discovery.  However, the

17   defendants have failed to show this discretionary decision was

18   incorrect and have not pointed to any information that "might

19   reasonably be expected to alter the conclusion reached by the

20   Court."  *Schrader* 70 F.3d at 257.

21             The motion for reconsideration is therefore denied.

22   The clerk is respectfully requested to close ECF Nos. 57 and

23   59, so ordered.

24             The defendants also move for the Court to certify for

25   interlocutory appeal, the portion of the order ECF No. 53 that

P4M4RAAC

1   denied the defendants' motion to dismiss the plaintiffs' aiding

2   and abetting claims under JASTA, ECF No. 61.  The Court may

3   certify an issue for interlocutory appeal if, one, such order

4   involves a controlling question of law, two, there is

5   substantial ground for difference of opinion, and, three, an

6   immediate appeal from the order may materially advance the

7   ultimate termination of the litigation.  28 U.S.C. Section

8   1292(b).  Certification "should be strictly limited because

9   only exceptional circumstances will justify a departure from

10  the basic policy of postponing appellate review until after the

11  entry of a final judgment."  In re, 4 79 F.3d 281, 284, (2d

12  Cir. 1996).  "The decision whether to grant an interlocutory

13  appeal from a district court order lies within the district

14  court's discretion." *King County v. IKB Deutsche Industriebank*

15  *AG*, 863 F.Supp.2d, 37-20 (S.D.N.Y. 2012).

16          In this case, there is no controlling issue of law as

17  to which there is a substantial difference of opinion.  Rather,

18  the defendants disagree with the Court's conclusion that the

19  amended complaint contained sufficient allegations to plead

20  aiding and abetting liability under JASTA and the Supreme

21  Court's decision in *Twitter Inc. v. Taamneh*, 598 U.S. 471

22  (2023).  There is no substantial difference of opinion with

23  respect to the legal standards articulated by the Supreme Court

24  in *Twitter*.  The dispute is over whether the factual

25  allegations in the amended complaint are sufficient under

P4M4RAAC

1    *Twitter*, which "turns on the assessment of the pleading" and

2    "is not a pure question of law suited for interlocutory

3    appeal." *McGraw Hill Global Education Holdings LLC v.*

4    *Mathrani*, 293 F.Supp 3d, 394, 399, (S.D.N.Y. 2018).

5            Moreover, an immediate appeal would not materially

6    advance the ultimate termination of the litigation.  Whether

7    the defendants are ultimately liable for aiding and abetting

8    under JASTA will depend on the facts of this case as developed

9    through discovery.  Thus, an interlocutory appeal will not

10   materially advance the ultimate termination of this litigation

11   but will actually hinder it.  A lengthy interlocutory appeal

12   will simply delay discovery, dispositive motions, and perhaps

13   trial.  And even if the Court of Appeals were to resolve an

14   interlocutory appeal in the defendants' favor, the plaintiffs

15   would likely be granted leave to replead.  For this reason,

16   "interlocutory appeals in the preliminary stages of litigation

17   are regularly denied because reversal at most could lead only

18   to a remand for repleading with possibilities of further

19   interlocutory appeals thereafter." *King v. Habib Bank Ltd.,*

20   No. 20 CIV. 4322, 2024 WL 3761821, at *1 (S.D.N.Y. Jan. 2,

21   2024).

22           The motion for an interlocutory appeal is therefore

23   denied.  The clerk is respectfully requested to close ECF No.

24   61.

25           Okay.  I thank you all for the thorough briefing and

44

P4M4RAAC

1  for the argument.  By the way, I appreciate that whether to

2  grant argument is within the discretion of the Court, but in

3  this case, the defendants sought oral argument with respect to

4  both motions.  Yes, it's somewhat unusual to have oral argument

5  on these sorts of motions, but it was also somewhat unusual to

6  me to have specific request for oral argument on these motions.

7  So in response to the request, I granted argument.  I tried to

8  cooperate with the parties' request when I can.  Thank you all.

9          (Adjourned)