**VIA ECF**                                                                                                  July 7, 2025

Hon. Jeannette A. Vargas, U.S.D.J.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 703
New York, NY 10007

                RE:     *Troell et al.* v. *Binance Holdings Ltd., et al.*, No. 1:24-cv-07136 (S.D.N.Y.)

Dear Judge Vargas:

      Pursuant to the Court's Order of May 21, 2025 (ECF No. 100, the "May Order"), the Parties respectfully submit this joint letter to update the Court on the status of their meet and confers regarding (i) the Government Productions[1] and (ii) how this case should proceed, including the potential use of a bellwether process.  The Parties' respective positions are set forth below.

### *Plaintiffs' Position*

**Plaintiffs' Position on the Government Productions**

      The information Defendants recently provided about their productions to government agencies in the Enforcement Actions reads like a roadmap to Plaintiffs' case, ranging from Binance's evasion of AML laws, Zhao's control over Binance.US, Binance's and Binance.US's compliance procedures, Binance and Binance.US's reporting of suspicious activity, Binance's services to users in sanctioned jurisdictions, Binance's interactions with US users which exposed it to AML liability, and Binance and Zhao's efforts to create and use Binance.US as a shield to evade AML laws and regulatory scrutiny.  *See* Ex. A (Binance and Zhao Letter), Ex. B (Binance.US Letter).  However, despite the obvious relevance of these productions, Defendants have inexplicably refused to produce *any* documents from these productions.  Defendants' position defies the Federal Rules, precedent, and common sense.  This Court should immediately order Defendants to produce these plainly relevant documents, so discovery can proceed.

      Critically, the meet and confers revealed that Defendants *still* cannot substantiate their relevance objections.  Defendants admitted that as of today, they have not actually reviewed a *single document* from any production.  All they have done since this Court's May 21 Order was contact Defendants' *prior counsel* to invite secondhand, belated recollections of the productions' contents.  This is the sole basis for Defendants' understanding of what was produced to the government agencies.  Moreover, as of today, Defendants have *still not reviewed the government's requests or the search terms used*.  Binance's counsel blamed this failure on the holiday weekend, but as detailed in Plaintiffs' prior letter (ECF No. 110), Binance had a duty to substantiate its objections since at least January 24, and has therefore waived its objections.

      Defendants argued in the meet and confers that Plaintiffs have the burden of providing a proposal.  Plaintiffs have a proposal—full reproductions—and provided two others to attempt to clarify Defendants' position.  First, Plaintiffs requested that Defendants propose search terms for any limited categories they argue are irrelevant.  Second, Plaintiffs requested that Defendants

---

[1] As defined in the May Order.

comply with their obligation under Rule 34 to state with specificity which categories of documents they will not produce. Defendants categorically rejected each request.

Precedent supports full reproductions. Surveying the caselaw and rejecting the defendant's declaration (at ECF No. 390 in that case) that the "full productions" contained "tens of thousands of documents unrelated to Plaintiffs' Complaint," a court held that "[i]n similar situations, other courts have ordered the production of *all documents previously produced* to the SEC or the DOJ, even lifting the PSLRA stay to allow plaintiffs early access to such documents," and noting that "[a] request for discovery should be allowed *unless it is clear* that the information sought can have *no possible bearing* on the claim or defense of a party." *In re New Century,* No. 07-CV-931, 2009 WL 9568860, at *1, 6 (C.D. Cal. July 8, 2009) (internal quotation marks omitted) (emphasis added). The court also concluded that "a responding party must explain and/or establish the basis for his objection *at the time* he asserts his objection" and found critical that the defendant failed to "establish[] the basis for its . . . objection at the time defendant asserted its objection" because "plaintiffs were denied the opportunity to challenge defendant's objection" before the defendant belatedly attempted to substantiate its objection in opposing relief from the court. *Id.* at *6 (emphasis added). Just so here.

The entire productions are relevant. Binance and Zhao's guilty pleas will play a critical role at trial. Binance and Zhao have already previewed their trial strategy: arguing that the guilty pleas were not primarily motivated by their laundering of money for terrorists. Plaintiffs must be able to meaningfully engage with (and dispute) this defense, and therefore Defendants cannot maintain that the full productions have "no possible bearing" on their defense.

Moreover, Defendants cannot hide the relevance of these productions by describing the categories in ambiguous language. For example, the relevance of Binance and Zhao's category of "a 2018 reported theft of Bitcoin from a Japanese virtual asset exchange" is not necessarily clear at first glance. However, that theft is detailed in a Reuters report regarding Binance's money laundering (*see* https://www.reuters.com/investigates/special-report/finance-crypto-currency-binance/) because hackers used Binance to launder the funds, and Binance was even sued for "aiding and abetting" money laundering of the stolen funds (*see* https://www.coindesk.com/policy/2020/09/15/japanese-crypto-exchange-accuses-binance-of-helping-launder-9m-from-2018-hack). These documents are in fact *highly* relevant.

The Court has broad discretion regarding discovery, and courts often order full reproductions in light of the judicial efficiency and economy interests embodied by FRCP 1. In another case where defendants vigorously objected to the production of 680,000 pages already produced to the government, including on relevance grounds, the court nonetheless ordered defendants to produce all the documents *within seven days* of the order in the interest of "efficiency and economy." *In re Diisocyanates Antitrust Litig.*, 2019 WL 1069660, at *1 (W.D. Pa. Jan. 15, 2019). Defendants have demonstrated that additional time will only enable further delays and prevent an efficient discovery process. Binance's failure to, as of today, review a single document from the government productions, or even review the government's requests—in the face of Plaintiffs' numerous requests for substantive details since January 24, 2025, a motion to compel, and a court order—makes that clear. Full and prompt reproductions is the only practical way to keep discovery moving in earnest and avoid further substantial delay.

**Plaintiffs' Position on a Bellwether Approach**

Both the Federal Rules and precedent in this District authorize the Court to order a bellwether trial, which is appropriate for "mass tort actions", which are comparable in size and scope to this case. *In re Methyl Tertiary Butyl Ether (MTBE) Prods.*, 2007 WL 1791258, at *1-2 (S.D.N.Y. June 15, 2007) (detailing virtues of bellwether approach). Bellwether trials prevent "the sheer volume of the proceeding [from] overwhelm[ing] a court's ability to provide *any* plaintiff with relief in a timely and efficient manner." *Id.* at *2. Accordingly, bellwethers are the norm in large Anti-Terrorism Act cases. *See, e.g., King v. Habib Bank Ltd.*, No. 20-cv-4322 (S.D.N.Y.), ECF Nos. 68, 70, 80.

Yet, without offering any practical alternative, Defendants have refused to agree that a bellwether approach is appropriate here—where over 533 Plaintiffs were harmed in 64 distinct attacks by several terrorist organizations operating in various geographies. Instead of acknowledging that only a bellwether approach is efficient, Defendants have blamed Plaintiffs for pursuing a broad case—even though the breadth of the case is merely the corollary to Defendants' breathtaking criminality.

Plaintiffs have outlined a practical bellwether approach. *See* Ex. C (MJF Email). The parties would first agree upon 12-14 *bellwether attacks* that would serve as the basis for selecting 1-2 bellwether plaintiffs per bellwether attack. This would allow discovery and trial to focus on Defendants' alleged liability across representative types of attacks—*i.e.*, attacks by different terrorist groups, using different modalities (e.g., suicide bombing attacks, complex attacks, rocket attacks, hostage-taking, etc.), in different geographies, at different times—while also providing instructive information through the jury's damages awards in the bellwether trial to resolve the case more broadly.

Instead of discussing the merits of this proposal, Defendants have used it as a pretext to excuse their delay in producing unquestionably relevant documents requested *last year* and to attempt to overwhelm Plaintiffs' counsel and the individual Plaintiffs by insisting that *each of the 533 Plaintiffs* submit a detailed "Plaintiff Fact Sheet" that includes over 50 intrusive, premature, burdensome requests for information and 18 separate document requests. *See* Ex. D (Ivan Email & Attachment). Plaintiffs rejected that unserious proposal out of hand, as nothing justifies undergoing an *everything-but-the-deposition* amount of discovery before deciding on a bellwether process. *See* Ex. E (AJG Email); *see Morgan v. Ford Motor Co.*, 2007 WL 1456154, at *9 (D.N.J. May 17, 2007) (denying defendant's request for detailed information to inform bellwether selection as "unnecessarily costly" and premature; instead requiring only "simple statement" about injuries). Doing so would defeat the efficiency gains that a bellwether approach provides. Nonetheless, Plaintiffs *have* provided additional information and have repeatedly invited Defendants to make specific, tailored requests for other information that may bear on the bellwether discussion. To date, Defendants have yet to say what, if any, additional information they need. Plaintiffs are willing to continue conferring about this issue, but remain concerned that Defendants will continue to treat these discussions—which have been ongoing since before this case was reassigned—as an opportunity to stall all discovery and force this case to resolve through a war of attrition rather than a trial on the merits of Plaintiffs' serious and important claims.

*Defendants' Position*

**Government Productions.** The May Order instructed Defendants to "provide Plaintiffs with additional information regarding the contents of the Government Productions, including the volume of these productions, the types of documents contained in the productions (including the internal sources of such records, such as the relevant custodians, shared drives, or internal databases), and a description of the general subject matter of these productions." May Order at 1. In order to respond to the Court's detailed order, Defendants worked to gain a fuller understanding of the circumstances, scope, and content of the Government Productions, as none of Defendants' current counsel was involved with the regulatory investigations and productions.

On June 27, Defendants served Plaintiffs with two letters (the "Government Production Letters"),[2] setting out detailed information about the Government Productions, including document and page counts, lists of custodians, sources of records, and descriptions of the documents' contents broken out across thirty-four categories (inclusive of both letters). The Government Production Letters have been filed as sealed attachments hereto. As the Court will note, they provide detailed information, in compliance with every requirement in the May Order.

On July 2, 2025, the Parties met and conferred about the Government Productions. Plaintiffs claimed that *every* category of documents listed in the Government Production Letters is relevant to their claims, and proposed that Defendants immediately produce the *entirety* of the Government Productions to them. According to Plaintiffs, defense counsel in this action—none of whom represented the Defendants in the relevant government investigations—need not even review the Government Productions before producing them to Plaintiffs wholesale.

Defendants rejected this proposal, reminding Plaintiffs that the Court had already expressed concerns about forcing Defendants to re-produce the Government Productions *en masse*. *See* May 21 Tr. at 20:10-21:4 ("I do not see that it's necessarily the case that simply because the government requested it, it is relevant to [Plaintiffs'] claims…). Defendants also pointed out that, as the Government Production Letters demonstrated, many (if not most) of the categories of materials in the Government Productions are irrelevant to Plaintiffs' claims. Moreover, as Defendants explained to Plaintiffs, *all* documents in a single given category of materials would not be relevant and discoverable in this action. Accordingly, Defendants would have to identify, segregate, and review any potentially relevant and discoverable materials before production in this case, a process which would be manual in significant respects.

When Defendants invited Plaintiffs to propose a procedure for identifying and segregating relevant and discoverable documents in the Government Productions, Plaintiffs proposed that Defendants ***create a list of "exclusionary" search terms that could be run across the Government Productions to identify potentially irrelevant documents***. Plaintiffs stated that these potentially *irrelevant* documents should be reviewed, and any mis-hits (*i.e.*, those that Plaintiffs would deem discoverable) should be produced to Plaintiffs along with the remainder of the Government Production, which, again, Plaintiffs told Defendants need ***not*** be reviewed prior to production.

Defendants pointed out that a list of *irrelevant* terms would be virtually unlimited, and suggested that Plaintiffs propose a list of search terms designed to identify *relevant* documents, as is the case in every term-guided search in defense counsel's collective memory. Plaintiffs

---

[2] Binance Holdings Limited ("BHL")'s letter covered materials produced on behalf of BHL and Mr. Zhao, and BAM Trading Services, Inc.'s letter covered materials it produced. Exs. A & B.

responded that their Amended Complaint is so "broad" that Plaintiffs doubt they could prepare a list of search terms that would meaningfully shrink the pool of potentially relevant documents. As Defendants pointed out, it would be completely impracticable, if it were even possible, to come up with a list of search terms that *exclude irrelevant materials* in the Government Productions. Moreover, Plaintiffs' reason for declining to follow normal procedure and propose *inclusionary* (rather than exclusionary) search terms only highlights the unwieldiness of their claims (as Defendants pointed out in our motions to dismiss, *see* ECF No. 35 at 10-12), and is not a valid justification for Plaintiffs' novel position.

Separately, Plaintiffs stated that, even if they receive relevant materials from the Government Productions, they would still seek the *same materials* from Defendants' documents generally. In other words, even if Defendants shoulder the burden of identifying, reviewing, and producing discoverable materials from the Government Productions, we will have do it all over again when responding to the 37 other discovery requests from the Plaintiffs.

Plaintiffs also asked several follow up questions concerning the Government Productions, which counsel for Defendants are discussing internally and with counsel in the regulatory matters. We provided some information on Plaintiffs' follow-up questions during a meet-and-confer today.

Defendants remain willing to negotiate in good faith to arrive at a productive path forward with respect to the Government Productions. But we respectfully submit that such discussions will require Plaintiffs to take a more practical approach to the employment of search terms, and agree that if Defendants do undertake the lengthy and burdensome exercise of producing discoverable documents from the Government Productions, we will not have to review materials from the same time periods and concerning the same issues again when responding to the Plaintiffs' many other requests. We intend to continue discussing these issues between now and the July 14 conference, and will be prepared to report on those discussions at the conference.

**The Bellwether and Further Proceedings in this Case.** The complaint Plaintiffs chose to file involves over 550 Plaintiffs, allegedly injured by 64 distinct terrorist attacks, carried out by various terrorist groups, involving multiple attack types and geographies, and spread out over nearly eight years. Recognizing this complexity, this Court's May Order instructed the Parties to meet and confer to discuss "how this case should proceed, including whether discovery in this matter should be staged; whether the selection of [bellwether] plaintiffs would be appropriate, and if so a protocol for the selection of such plaintiffs; and if [bellwether] plaintiffs are selected, how that would affect discovery deadlines in this matter." May Order at 1. As explained below, the Parties' discussions concerning the use of a bellwether process are progressing, but we have not yet reached an agreement on whether a bellwether is appropriate, how any such bellwether should be structured, and how the case should proceed.

As discussed in Defendants' June 25 letter to the Court, Plaintiffs had, until just days earlier, consistently taken the position that this case should proceed with a cross-section of twelve to fourteen "representative" *plaintiffs*. (ECF No. 116 at 2). Defendants were (and remain) skeptical that this claimant-centered approach would be fair or efficient, since Plaintiffs were proposing that the cross-section of claimants would encompass every attack and the entire time period covered by their unusually-lengthy complaint. Accordingly, while Plaintiffs would benefit from vastly reduced discovery burdens, Defendants' discovery and the trial itself would remain just as complex and unwieldy as before. Discovery and trial would continue to involve multiple attacks by multiple foreign terrorist organizations over multiple years in multiple locations.

5

      Nevertheless, to give the Plaintiffs' proposal adequate consideration, on June 11, 2025, Defendants sent Plaintiffs a proposed questionnaire seeking information on several criteria relevant to the selection of bellwether claimants. Plaintiffs rejected the questionnaire outright, claiming that "no one has ever asked us (or to our knowledge any other [Anti-Terrorism Act ("ATA")] plaintiffs) to do this as a condition precedent to any bellwether proceeding" and that "[i]t is not a serious approach." Ex. F (6/12/2025 email from R. Sparacino). Plaintiffs stated that they would only provide some "demographic information" so that Defendants could do their own diligence by searching for publicly-available information about each of the 550 individual plaintiffs. In response, Defendants pointed out that in one of the very few ATA cases that has actually proceeded to trial—*Linde et al.* v. *Arab Bank, PLC*, No. 04 Civ. 2799 (E.D.N.Y)—Magistrate Judge Pohorelsky and Judge Gershon ordered the use of a similar questionnaire. Defendants also suggested that Plaintiffs provide a redline of the questionnaire so that the Parties could discuss what information Plaintiffs thought was irrelevant.

      Instead, on June 23, 2025, Plaintiffs proposed that instead of a representative sample of individual plaintiffs, the Parties should select a list of representative ***attacks***. Specifically, Plaintiffs suggested a bellwether proceeding that would cover at least four attacks, spanning nearly five years, involving six different terrorist organizations, and occurring in four different countries.

      During the July 2 meet-and confer, Defendants explained to Plaintiffs that their new attack-based proposal, which covered such a wide cross-section of attacks and time periods, would not meaningfully streamline discovery or trial. Nor was it reasonable to expect Defendants to commit to any bellwether procedure, attack-based or otherwise, without more information related to, for example, each Plaintiff's standing or potential damages. Plaintiffs restated their position that the only information Defendants needed was already in the complaint, and if Defendants thought more was needed, they should conduct their own investigation without additional information from Plaintiffs themselves. Defendants are still considering Plaintiffs' most recent proposal, but presently believe that if Plaintiffs do not want to prove their case as to each Plaintiff individually (as would typically be required), they must provide Defendants with the detailed information they need to effectively consider and/or participate in a bellwether selection process.

      We will continue to meet and confer with Plaintiffs, and hope to come to an agreement, or at least positions we can report to the Court, before the July 14 conference.

      Respectfully submitted,

| | |
|---|---|
| /s/ *Ian Miller* | /s/ *Anirudh Bansal* |
| Holwell Shuster & Goldberg LLP | Cahill Gordon & Reindel LLP |
| *Counsel for Plaintiffs* | *Counsel for Defendant Binance Holdings Limited* |
| | |
| /s/ *Adam J. Goldstein* | /s/ *Thania Charmani* |
| Sparacino PLLC | Winston & Strawn LLP |
| *Counsel for Plaintiffs* | *Counsel for Defendant BAM Trading Services Inc.* |
| | |
| | /s/ *Katherine L. McKnight* |
| | BakerHostetler LLP |
| cc: All attorneys via ECF | *Counsel to Defendant Changpeng Zhao* |

6