**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JOCELYN TROELL, individually, and for the estate of STEPHEN TROELL, *et al.*,<br><br>       Plaintiffs,<br><br>   -v-<br><br>BINANCE HOLDINGS LIMITED, *et al.*,<br><br>       Defendants. | **Case No.: 1:24-cv-07136 (JAV)** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANT CHANGPENG ZHAO'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

PLAINTIFFS' ALLEGATIONS AGAINST ZHAO .......................................................... 2

ARGUMENT .................................................................................................................. 6

   I.   Zhao's Rule 8 Argument Is Meritless ............................................................... 6

   II.  Service on Zhao Was Proper .......................................................................... 6

   III. This Court Has Personal Jurisdiction Over Zhao ........................................... 6

      A.  The Court Has Statutory Personal Jurisdiction ........................................... 6

      B.  The Court Has Personal Jurisdiction Under the Supreme Court's Recent Decision in *Fuld v. Palestine Liberation Organization* ................................... 8

      C.  Even Under a Minimum Contacts Analysis, the Court Has Jurisdiction Over Zhao.... 13

   IV. Plaintiffs State an Aiding and Abetting Claim ............................................... 15

      A.  Plaintiffs Allege Knowing and Substantial Assistance ................................ 15

      B.  Plaintiffs Allege a Sufficient Nexus Between Zhao's Misconduct and the Attacks...... 23

      C.  Zhao's Argument About Regulatory Failings Falls Flat ................................ 25

   V.  Plaintiffs State Conspiracy Claims ............................................................... 27

   VI. Plaintiffs State a Primary Liability Claim....................................................... 28

CONCLUSION............................................................................................................ 28

# TABLE OF AUTHORITIES

## Cases

*Ashley v. Deutsche Bank Aktiengesellschaft*,
--- F.4th ----, 2025 WL 2025448 (2d Cir. July 21, 2025) ............................................ 22, 23, 24

*Bartlett v. Société Générale de Banque au Liban SAL*,
2024 WL 5497906 (E.D.N.Y. Sept. 18, 2024) ......................................................................... 26

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022) .................................................................................................... 18

*Calista Enters. Ltd. v. Tenza Trading Ltd.*,
40 F. Supp. 3d 1371 (D. Or. 2014) ............................................................................................ 8

*Camp v. Dema*,
948 F.2d 455 (8th Cir. 1991) ..................................................................................................... 17

*Caplan v. Dollinger*,
2025 WL 1808530 (S.D.N.Y. June 30, 2025) ......................................................................... 11

*CFTC v. Zhao*,
2023 WL 10449084 (N.D. Ill. Dec. 14, 2023) ......................................................................... 15

*Chiquita Fresh N. Am., LLC v. Long Island Banana Corp.*,
27 F. Supp. 3d 340 (E.D.N.Y. 2014) ......................................................................................... 15

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) .......................................................................................................... 13

*Fuld v. Palestine Liberation Org.*,
101 F.4th 190 (2d Cir. 2024) ...................................................................................................... 13

*Fuld v. Palestine Liberation Org.*,
145 S. Ct. 2090 (2025) .................................................................................................. 8, 9, 10, 12

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .................................................................................................... 16

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) .......................................................................................................... 24

*In re Magnetic Audiotape Antitrust Litig.*,
334 F.3d 204 (2d Cir. 2003) .......................................................................................................... 6

*In re Paraquat Prods. Liab. Litig.*,
2021 WL 4775284 (S.D. Ill. Oct. 13, 2021) .............................................................................. 8

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ................................................................................................. 22, 26

*King v. Habib Bank Ltd.*,
2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) ........................................................................ 26

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ........................................................................................................ 18

*Monsen v. Consol. Dressed Beef Co.*,
  579 F.2d 793 (3d Cir. 1978) ............................................................................... 17

*NLRB v. Newark Elec. Corp.*,
  14 F.4th 152 (2d Cir. 2021) ............................................................................... 15

*Porina v. Marward Shipping Co.*,
  521 F.3d 122 (2d Cir. 2008) ............................................................................... 7

*Raanan v. Binance Holdings Ltd.*,
  2025 WL 605594 (S.D.N.Y. Feb. 25, 2025) ...................................... 2, 15, 16, 21, 24

*RSM Prod. Corp. v. Fridman*,
  2007 WL 2295907 (S.D.N.Y. Aug. 10, 2007) ..................................................... 8

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ............................................................................... 14

*Santos v. State Farm Fire & Cas. Co.*,
  902 F.2d 1092 (2d Cir. 1990) ............................................................................. 8

*Schrier v. Qatar Islamic Bank*,
  632 F. Supp. 3d 1335 (S.D. Fla. 2022) ............................................................... 8

*SEC v. Terraform Labs Pte. Ltd.*,
  2022 WL 2066414 (2d Cir. June 8, 2022) ....................................................... 13, 14

*SEC v. Terraform Labs Pte. Ltd.*,
  684 F. Supp. 3d 170 (S.D.N.Y. 2023) ................................................................. 13

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  145 S. Ct. 1556 (2025) ....................................................................................... 18

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ............................................................... 2, 15, 16, 17, 18, 23

*Unclaimed Prop. Recovery Serv., Inc. v. Credit Suisse AG*,
  2013 WL 1777761 (S.D.N.Y. Apr. 25, 2013) ..................................................... 15

*United States v. Peters*,
  732 F.3d 93 (2d Cir. 2013) ................................................................................. 14

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014) ............................................................................... 21

*Woodward v. Metro Bank of Dallas*,
  522 F.2d 84 (5th Cir. 1975) ............................................................................... 17

*Zobay v. MTN Grp. Ltd.*,
  695 F. Supp. 3d 301 (E.D.N.Y. 2023) ................................................................. 26

**Statutes**

18 U.S.C. § 2333 ................................................................................................... 1

18 U.S.C. § 2334(a) ...................................................................................... 7, 8, 12

18 U.S.C. § 2334(e) ............................................................................................. 10

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................................................ 10
    § 2(a)(3) ........................................................................................................................ 24
    § 2(a)(6) ........................................................................................................................ 10
    § 2(b) ....................................................................................................................... 10, 24
Sudan Claims Resolution Act,
    Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020) ........... 9

**Rules**

Fed. R. Civ. P. 4(e)(1) ...................................................................................................... 6
Fed. R. Civ. P. 4(f)(3) ................................................................................................... 6, 7
Fed. R. Civ. P. 4(h)(2) ...................................................................................................... 7
Fed. R. Civ. P. 4(k)(1)(C) ............................................................................................ 6, 7
Fed. R. Civ. P. 4(k)(2) ............................................................................................ 6, 7, 12

**Other Authorities**

S. Rep. No. 102-342 (1992) ...................................................................................... 12, 24

## INTRODUCTION

Plaintiffs' opposition to the Binance entities' motions to dismiss advanced most of the salient facts and legal arguments. *See* ECF 69 (Opp.). As explained therein, Plaintiffs allege that since its founding in 2017, Binance actively provided terrorists access to cryptocurrency markets—thus enabling terrorist finance, sanctions violations, and money laundering that fueled terrorist violence, including the attacks that injured Plaintiffs and their loved ones. These violations support civil liability under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333.

The companies' violations are attributable to Changpeng Zhao—Binance's founder and then-chief executive, who was convicted of willfully causing Binance not to adopt an effective anti-money-laundering (AML) program. As the government explained during Zhao's sentencing:

> Zhao's willful violation of U.S. law was no accident or oversight. He made a business decision that violating U.S. law was the best way to attract users, build his company, and line his pockets. Despite knowing Binance was required to comply with U.S. law, Zhao chose not to register the company with U.S. regulators; he chose not to comply with fundamental U.S. anti-money-laundering (AML) requirements; he chose not to implement and maintain an effective know-your-customer (KYC) system, which prevented effective transaction monitoring and allowed suspicious and criminal users to transact through Binance; and even when Binance employees detected suspicious transactions, Zhao's choices meant those transactions were not reported to U.S. authorities. And when it became clear that Binance had a critical mass of lucrative U.S. customers, Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base. Critically, Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between U.S. users and users in Iran and other sanctioned countries and regions in violation of U.S. law.

¶641. Furthermore, the Department of Justice confirmed that "Binance's and Zhao's willful violations of anti-money laundering and sanctions law threatened … our national security," and the Treasury Secretary explained that Defendants' misconduct "allowed money to flow to terrorists." ¶6.

1

Having evaded service of process for months, Zhao has now been served and filed his own motion to dismiss. The court in *Raanan v. Binance Holdings Limited*, 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025), denied an indistinguishable motion, holding that the plaintiffs there plausibly alleged "that Binance and Zhao 'consciously and culpably participated' in" terrorists' wrongdoing. *Id*. at *23 (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023)). For the reasons set forth in *Raanan* and Plaintiffs' prior opposition—incorporated by reference herein—as well as *infra*, Zhao's motion should be denied.

## PLAINTIFFS' ALLEGATIONS AGAINST ZHAO

Zhao directed the corporate Defendants' misconduct. Zhao "directly or indirectly owned and controlled a "maze of corporate entities … designed to obscure ownership, control, and location of the Binance platform." ¶689 (cleaned up). Thus, Zhao "had ultimate control over all of Binance's business activities," including making "strategic decisions for Binance and supervis[ing] and exercis[ing] day-to-day control over its operations and finances," which included "directing and overseeing the creation and operation of Binance's trade matching engines, website, application programming interface ('API') functionalities, and order entry system," and "evaluating the legal and regulatory risks associated with Binance's business activities." ¶¶28-29. "Because of Zhao's domination of Binance, and Zhao and Binance's domination of the other entities within the corporate 'maze' of the Binance enterprise, including Binance US, actions purportedly performed by those entities are legally attributable to Zhao and Binance and vice versa." ¶34. Indeed, "Zhao has publicly claimed that he and the broader Binance enterprise are alter egos of one another: 'Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office.'" ¶688.

As Binance's leader, Zhao orchestrated Binance's wrongful acts. *First*, Zhao admittedly caused Binance to forgo an effective AML program. ¶¶5, 506-09. This was "because Zhao

personally believed that implementing strong KYC requirements would deter users from joining the exchange." ¶16.

*Second*, Zhao knowingly facilitated transactions for sanctioned users from Iran. ¶524. Zhao "knew that Binance.com was blatantly violating U.S. law, including anti-terrorism sanctions." ¶522. Critically, Zhao knew (in his own words) that "[t]he United States has a bunch of laws to prevent you and Americans from any transaction with any terrorist," which apply if you "serve Americans or service U.S. sanctioned country," and yet served U.S. and Iranian users (including in transactions with each other) in violation of U.S. law. *Id*.; *see also* ¶640 (recounting government's findings that Zhao knew that Binance was facilitating sanctions violations). Zhao did this actively: At his direction, Binance's employees and website advised users to use Virtual Private Networks to circumvent Binance's geographic restrictions. ¶520; *see also* ¶757 (Zhao tweeting in 2019 that VPNs were "a necessity, not optional"). Internally, "Zhao and other senior executives confirmed that covertly advising customers to use VPNs to circumvent Binance's own IP address blocks was a high-level business decision." ¶520. Other conversations confirmed that Zhao knowingly declined to enforce sanctions restrictions on Iran, contradicting Binance's public stance. ¶752. Zhao thus "'prioritized Binance's growth and profits over compliance with U.S. law, telling Binance employees that it was 'better to ask for forgiveness than permission.'" ¶29.

Relatedly, Zhao caused Binance to give terrorist customers special treatment. For example, Binance allowed an individual "designated by OFAC for support of a terrorist group" to maintain an account "for several years." ¶1259. In 2020, "after a third-party service provider flagged accounts associated with ISIS and Hamas," the decision was made to let the user "take his funds and leave," and also "[t]ell him that third party compliance tools flagged him." *Id*.; *see also* ¶1259. The same user was likely given another account: Binance would "check a user's VIP level before

3

offboarding them, and then Binance could 'give them a new account (if they are important/VIP)' with the instructions 'not to go through XXX channel again.'" ¶635. When law enforcement requested freezing of accounts, Binance's VIP team would "contact the user 'through all available means (text, phone) to inform him/her that his account has been frozen or unfrozen. Do not directly tell the user to run, just tell them their account has been unfrozen and it was investigated by XXX. If the user is a big trader, or a smart one, he/she will get the hint.'" ¶638. This flowed from "Zhao's top-down edicts that Binance avoid removing criminals and terrorists from the Binance exchange." ¶708. As the former Chief Compliance Officer told colleagues, "Offboarding = bad in [Zhao's] eyes." *Id*. Little wonder that terrorist groups like Hamas openly solicited donations through Binance. ¶¶1261-62.

*Third*, after Binance purportedly shunted U.S. users from Binance.com onto the Binance US exchange, "Zhao directed Binance to assist high-value U.S. customers, referred to internally as 'VIP' users, in circumventing those controls and to do so surreptitiously" so that Binance would not, in Zhao's words, "be held accountable." ¶511. "Zhao's stated 'goal' was 'to reduce the losses to ourselves, and at the same time make the U.S. regulatory authorities not trouble us.'" *Id*. Zhao "authorized and directed" Binance employees to direct U.S. users to provide non-U.S. KYC information so that Binance could reclassify them. ¶512. This was described internally as "international circumvention of KYC." ¶513. Binance illegally migrated high-value users from the U.S. exchange to the global one, with employees explaining that Zhao "'will definitely agree to this' because 'we always have a way for whales'" to access the global platform. ¶514.

To further his scheme, Zhao controlled Binance US, abusing Binance US's corporate form to facilitate illicit transactions and deceive U.S. regulators. ¶¶690-97. Binance US's first CEO complained that she had been "duped into being a puppet," and the second CEO explained that

"'[Zhao] was the CEO of [Binance US], not me … I'm not actually the one running this company[.]'" ¶697.

*Fourth*, Zhao used "social media and public relations campaigns to gaslight law enforcement officials, regulators, and the public," concealing that "noncompliance with U.S. counterterrorism laws (among many other laws) and disregard for basic AML/CFT practices was foundational to [Binance's] business model." ¶646. For example, Zhao falsely posted that "Binance follows international sanction rules strictly," "ensures all its users are properly screened to minimize sanctions risk," and uses "sophisticated tracking systems to track [customer] money … to ensure illicit funds with possible sanctions backgrounds are identified and restricted accordingly." ¶647; *see also* ¶657 (Zhao declaring that Binance does "very careful, very strict KYC/AML," and uses "very intelligent geofencing"). These statements were false when made, ¶¶648-49, alongside other false statements posted, dictated, or approved by Zhao, ¶¶650-60.

Zhao had a culpable mental state. As the government explained—and Zhao admitted—his violations were willful. ¶641. Zhao also knew the nature of Binance's illicit customers. *See* Opp. 11-13. "As the CEO of a global cryptocurrency exchange and a highly active member of the cryptocurrency community, Zhao regularly monitored (but willfully disregarded) warnings from the U.S. government, international community, and blockchain analysis firms about the risks of illicit use of cryptocurrency by FTOs." ¶539. Those robust warnings made Zhao aware that by eschewing AML controls, Binance would facilitate terrorist attacks. ¶551.

In summary, Zhao consciously and culpably aided terrorist fundraising by the violent actors that injured Plaintiffs, enabling the attacks in this case. Plaintiffs seek to hold Zhao and his corporations liable for aiding and abetting the attacks, conspiring with the groups that committed them, and participating in a ransomware attack on an American hospital.

## ARGUMENT

### I. Zhao's Rule 8 Argument Is Meritless

Zhao advances a perfunctory Rule 8 argument. MTD 3. Plaintiffs addressed an indistinguishable argument previously. Opp. 27-31. As explained, the standard for dismissal on this ground is demanding—and dismissal with prejudice is essentially forbidden by controlling precedent. Moreover, the complaint satisfies the Second Circuit's Rule 8 standard by providing adequate notice to Defendants of the basis of the claims against them, including specific allegations explaining Zhao's role. *See supra* pp.2-5.

### II. Service on Zhao Was Proper

On May 16, 2025, this Court authorized Plaintiffs to serve Zhao, who resides abroad, by serving the summons and complaint on his U.S. counsel. *See* ECF 94, at 11. Plaintiffs did so on May 20. ECF 99. Zhao reiterates his opposition to alternative service. His arguments are no more persuasive today than when the Court rejected them.

Zhao principally argues that Rule 4(f)(3) only permits service outside the United States, and therefore not on U.S. counsel. MTD 4. But "service on defendant's domestic counsel is commonly authorized under Rule 4(f)(3)," ECF 94, at 10, and the Court correctly followed that consensus. For a belt-and-suspenders approach, the Court should also deny Zhao's motion to dismiss on the alternative ground that Plaintiffs' service on Zhao's U.S. counsel satisfied Rule 4(e)(1) under New York law. *See* ECF 45, at 10-11 (collecting cases).

### III. This Court Has Personal Jurisdiction Over Zhao

#### A. The Court Has Statutory Personal Jurisdiction

The Court has statutory jurisdiction over Zhao under both Rule 4(k)(2) and Rule 4(k)(1)(C). Rule 4(k)(2), the "federal long-arm statute," has three requirements. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207 (2d Cir. 2003). *First*, the case must arise under federal

6

law. *Second*, the plaintiff must certify that the defendant is not subject to the jurisdiction of any state court of general jurisdiction. *Third*, jurisdiction must be consistent with the Constitution and federal law. *See Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008).

Each requirement is satisfied here: Plaintiffs' claims arise under the federal ATA; to the best of Plaintiffs' knowledge, Zhao is not subject to suit in any state court of general jurisdiction, *see* Ex. A (Singh Declaration); and jurisdiction is consistent with federal law and the Fifth Amendment, as explained *infra*. Tellingly, Zhao does not discuss Rule 4(k)(2), despite it being flagged in the complaint (¶39).

Rule 4(k)(1)(C) provides that service of a summons establishes personal jurisdiction "when authorized by a federal statute." Here, 18 U.S.C. § 2334(a) provides that process in an ATA action "may be served in any district where the defendant resides, is found, or has an agent." Plaintiffs served Zhao's agent, his U.S. counsel, in this district, on May 20.

Zhao responds that he was served abroad, not here. For purposes of Rule 4(f)(3), service was *completed* abroad. But it was commenced by serving Zhao's counsel here. To read the ATA's service provision as Zhao does would render it all-but ineffective in cases against foreign defendants—which makes no sense because foreign defendants are the ATA's principal targets. That is because foreign defendants must be served pursuant to the procedures of Rule 4(f) (or Rule 4(h)(2), which circles back to Rule 4(f)). If such service is deemed to occur *solely* abroad, then the ATA's jurisdictional provision will never apply to such suits. The better reading is that although service was completed abroad, the fact that the defendant's agent is located in this district satisfies 18 U.S.C. § 2334(a).

Zhao argues that because the Court—not Zhao—authorized his New York counsel to accept service, his attorneys are not agents under 18 U.S.C. § 2334(a). This reads the word "agent" too

narrowly. The Court effectively appointed counsel as Zhao's agent for receiving service. *See RSM Prod. Corp. v. Fridman*, 2007 WL 2295907, at *6 (S.D.N.Y. Aug. 10, 2007) ("Court-ordered service on counsel made under Rule 4(f)(3) serves as effective authorization 'by law' for counsel to receive service."). Contrary to Zhao's belief, "courts routinely authorize" service "on domestic counsel as involuntary agents for their clients abroad." *Calista Enters. Ltd. v. Tenza Trading Ltd.*, 40 F. Supp. 3d 1371, 1376 (D. Or. 2014); *see also In re Paraquat Prods. Liab. Litig.*, 2021 WL 4775284, at *3 (S.D. Ill. Oct. 13, 2021) (similar). The cases Zhao cites are unpersuasive because in both *Santos v. State Farm Fire & Casualty Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990), and *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1346 (S.D. Fla. 2022), the court did not issue an order permitting service on a domestic agent.

Finally, to the extent the Court finds any of Zhao's arguments against the applicability of 18 U.S.C. § 2334(a) even potentially persuasive, it can resolve the issue by holding that service satisfied Rule 4(e)—establishing that Zhao's agent was served in this district.

### B. The Court Has Personal Jurisdiction Under the Supreme Court's Recent Decision in *Fuld v. Palestine Liberation Organization*

In federal question cases, the Fifth Amendment governs the constitutional personal jurisdiction inquiry. Until recently, courts in the Second Circuit held that the Fifth Amendment's standards mirrored the Fourteenth Amendment's "minimum contacts" analysis. But the Supreme Court recently rejected that approach, holding that "[b]ecause the State and Federal Governments occupy categorically different sovereign spheres, we decline to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment. Rather, the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld v. Palestine Liberation Org.*, 145 S. Ct. 2090, 2105 (2025). The Court did not "purport to delineate the outer bounds of the Federal

Government's power, consistent with due process, to hale foreign defendants into U.S. courts," but held that it was sufficient to tie "federal jurisdiction to conduct closely related to the United States that implicates important foreign policy concerns." *Id*. at 2106. Applying that standard, the Court upheld the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA), which conferred personal jurisdiction over the Palestine Liberation Organization (PLO) and Palestinian Authority (PA) for ATA claims provided those entities "make any payment, directly or indirectly" to families of deceased terrorists. *Id*. at 2100 (cleaned up).

The same analysis compels the same result here. Plaintiffs assert claims under the same ATA cause of action as the plaintiffs in *Fuld*. And as in *Fuld*, Defendants engaged in "conduct closely related to the United States that implicates important foreign policy concerns." 145 S. Ct. at 2106. They knowingly provided support to and conspired with U.S.-designated terrorist groups, helping those terrorists obtain resources to injure U.S. citizens, including servicemembers pursuing U.S. policy objectives. No less than in *Fuld*, holding Defendants accountable for that conduct in U.S. courts is "vital" in "furthering the safety of Americans abroad, facilitating compensation for injuries or death, and deterring international terrorism." *Id*. at 2107 (cleaned up).

Consistent with the findings that drove the result in *Fuld*, Congress reiterated the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism[.]" Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). And when it enacted the Justice Against Sponsors of Terrorism Act (JASTA) in 2016, Congress expressly found that "[p]ersons … that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism

9

that threaten the security of nationals of the United States … necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities." Pub. L. No. 114-222 § 2(a)(6), 130 Stat. 852. Congress sought "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief" against such persons, "wherever acting and wherever they may be found." *Id*. § 2(b).

After *Fuld*, those legislative findings sustain jurisdiction here. That is because the ATA, like the PSJVTA, "ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States." *Fuld*, 145 S. Ct. at 2109. By providing critical financial services to terrorists in defiance of federal law, Defendants "direct[ed] their conduct at the United States," subjecting themselves to jurisdiction. JASTA § 2(a)(6).

Indeed, Zhao's U.S.-directed conduct was far more robust than the conduct that supported jurisdiction in *Fuld*. There, the PSJVTA authorized jurisdiction over specific defendants that either: (1) engaged in activities on U.S. soil unconnected to their U.N. mission; or (2) paid terrorists or the families of terrorists who had harmed Americans. *See* 18 U.S.C. § 2334(e). The plaintiffs only proved the second predicate, yet those extraterritorial payments supported jurisdiction. Here, Plaintiffs allege that Zhao's conduct also resulted in payments to terrorists—alongside myriad other U.S.-facing aspects.

As recounted *supra* pp.2-5, Zhao's U.S.-facing misconduct was prolific. *First*, Zhao owned and controlled Binance and Binance US, a U.S.-facing business. *Second*, Zhao willfully violated U.S. law by causing Binance not to implement an effective AML program. *Third*, when Binance's employees and consultants discovered suspicious transactions (including terrorism-related transactions), Zhao instructed his company to disregard mandatory U.S. reporting obligations and

instead help wrongdoers evade detection. *Fourth*, Zhao's violations caused Binance to facilitate a massive number of transactions violating U.S. anti-terrorism sanctions and prohibitions, breaking U.S. law on a wholesale basis. *Fifth*, Zhao's violations put money in the hands of America's worst enemies—and did so in a manner that allowed terrorists to circumvent U.S.-created controls on the international financial system. *Sixth*, Zhao deceived U.S. regulators into believing that Binance was complying with its U.S. legal obligations, while secretly directing a scheme to violate those same obligations.

Zhao perpetrated this multifaceted scheme to benefit from the U.S. cryptocurrency market without adhering to U.S. laws designed to prevent money from reaching terrorists and dangerous criminals. ¶¶1575-77. The Treasury Secretary herself explained that "[a]ny institution, wherever located, that wants to reap the benefits of the U.S. financial system must also play by the rules that keep us all safe from terrorists, foreign adversaries, and crime or face the consequences," and noted that Defendants' "willful failures allowed money to flow to terrorists." ¶6. The Department of Justice likewise stated that "Binance's and Zhao's willful violations of anti-money laundering and sanctions laws threatened the U.S. financial system and our national security." *Id*. FinCEN confirmed that Defendants' misconduct led to "terrorist financing" and "expos[ed] the U.S. financial system to a significant volume of illicit activity." ¶532. Under *Fuld*, that is more than enough to support jurisdiction over Zhao in an ATA case. *Cf. Caplan v. Dollinger*, 2025 WL 1808530, at *6 (S.D.N.Y. June 30, 2025) (acknowledging that *Fuld* overruled the Second Circuit's prior precedents and holding that the defendants were subject to personal jurisdiction when they were allegedly "involved in a scheme directed toward the United States" (quotation marks omitted)).

Zhao argues that *Fuld*'s analysis only applies when jurisdiction is authorized by federal statute. MTD 5-6. Section 2334(a) satisfies that requirement. But the result is the same even under Rule 4(k)(2). *Fuld* elucidated the meaning of the Fifth Amendment—not any particular statute. Accordingly, *Fuld*'s rule applies whenever the Fifth Amendment governs. To the extent any additional legislative imprimatur is required to satisfy *Fuld*'s rule, the ATA's extraterritorial reach and Congress's findings in JASTA provide it.

Zhao also argues (in a footnote) that *Fuld* emphasized that the PSJVTA targeted only two specific entities. MTD 6 n.5. Although the Court identified the statute's narrowness as a virtue, it never suggested that the ATA is too broad to satisfy the Fifth Amendment. The ATA falls within *Fuld*'s holding that jurisdiction is appropriate when tied to extraterritorial conduct "closely related to the United States that implicates important foreign policy concerns." 145 S. Ct. at 2106. Moreover, like the PSJVTA, the ATA "does not put [defendants] at broad risk of being haled into U.S. courts for myriad civil liability actions." *Id*. at 2107. Rather, "ATA cases" entail "a narrow category of claims that provide civil remedies only for Americans injured by acts of international terrorism," *id.*, as part of a "comprehensive legal response to international terrorism," *id.* at 2099. Indeed, *Fuld* recognized that even before the PSJVTA, the ATA was designed to "'ope[n] the courthouse door to victims of international terrorism' by 'extend[ing] the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines." *Id*. at 2105 (quoting S. Rep. No. 102-342, at 45 (1992)). This action thus rests on the same constitutional footing as the successful criminal cases against Zhao and Binance.

Finally, *Fuld* did "not purport to delineate the outer bounds" of the Fifth Amendment, nor reject the "maximalist" theory that the Fifth Amendment imposes no limits on the federal government's power to hale foreign defendants into court, 145 S. Ct. at 2106—and two concurring

Justices persuasively advocated that rule, *see id*. at 2110 (Thomas, J.). Three Second Circuit judges made a similar argument dissenting from denial of rehearing. *See Fuld v. Palestine Liberation Org.*, 101 F.4th 190, 216-23 (2d Cir. 2024) (Menashi, J.). The Court should reject Zhao's attempts to cabin *Fuld* to its facts—but if the Court instead decides instead to identify the outer bounds of the Fifth Amendment, it should adopt these well-considered opinions.

### C.   Even Under a Minimum Contacts Analysis, the Court Has Jurisdiction Over Zhao

Zhao denies that he has contacts with the United States; disputes that Binance and Binance US's contacts can be attributed to him; and argues that conspiracy jurisdiction does not apply. MTD 6-14. These arguments are only relevant under the minimum-contacts standard the Supreme Court rejected in *Fuld*—and so they are irrelevant here. They are also meritless, so even if the Court applied a minimum-contacts rule, it should rule in Plaintiffs' favor.

The federal minimum contacts analysis asked whether the defendant has sufficient suit-related contacts with the United States as a whole. *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 185-86 (S.D.N.Y. 2023). When a defendant undertakes "actions that suggest a manifest intent to benefit from the forum's markets or laws, such as an offer to sell goods to residents of that forum," jurisdiction is proper. *Id*. at 186. A company's contacts are imputed onto a CEO who "exercised extensive control" over the company. *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, 2022 WL 2066414, at *3 n.2 (2d Cir. June 8, 2022) (citing *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016)). Thus, the court in *Terraform Labs* exercised jurisdiction over a foreign cryptocurrency company and its CEO based on U.S.-facing marketing of allegedly fraudulent assets.

Binance and Zhao's contacts are even more robust. As explained *supra*, Zhao made the key decisions to offer Binance's services in the United States without following applicable U.S. laws,

which led directly to millions of transactions between U.S. users and users in Iran, as well as additional illicit transactions with foreign terrorist users. Zhao decided not to report suspicious transactions, as required by U.S. law. Zhao approved the strategy of coaching users, including U.S. users, to use VPNs to evade Binance's geofencing. He approved using Binance US as a fig leaf to obscure Binance's ongoing service to U.S. customers in violation of U.S. law. And he either made or dictated false statements about Binance's operations and compliance efforts to deceive U.S. regulators. Zhao did all of this to benefit financially from the U.S. cryptocurrency market and from the liquidity that U.S. users provided—which is textbook purposeful availment. Plaintiffs' claims arise out of that misconduct, which enabled terrorists to access cryptocurrency assets to finance attacks on Americans.

Zhao resists the conclusion that Binance and Binance US's contacts should be imputed to him. He frames this as a challenge to an "alter ego" theory. While an alter-ego finding would be *sufficient* to support jurisdiction over Zhao, it is not necessary. It is enough that Zhao exercised control over Binance and Binance US. *See, e.g.*, *Terraform Labs*, 2022 WL 2066414, at *3 n.2. Plaintiffs allege such control, with supporting facts. *See* ¶¶28-30, 32-34, 641, 679, 688-97.

In any event, alter-ego jurisdiction is appropriate here. In cases arising under federal statutes implicating significant federal interests, courts apply federal common law to the alter ego analysis. *See, e.g.*, *United States v. Peters*, 732 F.3d 93, 103 n.4 (2d Cir. 2013). The federal test merely requires plaintiffs to "demonstrate that it would be unfair under the circumstances not to disregard the corporate form." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 139 (2d Cir. 2010). That test is met because Plaintiffs allege that Zhao and his companies operated as a single, integrated enterprise pursuing a common, unlawful agenda—and that Zhao abused the corporate form to facilitate the scheme. ¶¶688-92. Indeed, a federal district court has already found

14

as a factual matter that Binance's "maze" of companies operated as a "common enterprise." *See CFTC v. Zhao*, 2023 WL 10449084, at *2 (N.D. Ill. Dec. 14, 2023). Given how "fact-intensive" the alter-ego inquiry is, Plaintiffs' allegations suffice at the pleading stage. *See Chiquita Fresh N. Am., LLC v. Long Island Banana Corp.*, 27 F. Supp. 3d 340, 346 (E.D.N.Y. 2014).[1]

## IV.    Plaintiffs State an Aiding and Abetting Claim

The opposition explained in detail why Plaintiffs plausibly allege the elements of JASTA aiding and abetting. Opp. 31-46. Zhao does not offer any persuasive new argument for dismissal.

### A.    Plaintiffs Allege Knowing and Substantial Assistance

1. Plaintiffs allege that Zhao consciously structured and operated Binance's business in a way that broke U.S. anti-terrorism laws and helped terrorists raise and move money—causing millions of dollars to flow to terrorist attacks. Such conscious, culpable assistance constitutes aiding and abetting under JASTA.

Like the corporate defendants, Zhao has no answer to *Raanan*, which sustained materially indistinguishable allegations. Specifically, *Raanan* determined that "construed in the light most favorable to the plaintiffs," the plaintiffs alleged "more than mere 'passive nonfeasance' in the provision of 'routine services.'" 2025 WL 605594, at *21 (quoting *Twitter*, 598 U.S. at 500, 502). "Rather, the plaintiffs claim the defendants took affirmative actions to enable terrorist groups to transact on the Binance platform," including "intentionally engag[ing] in a scheme to evade anti-terror financing regulations in order to retain illicit actors on the platform," and the company going "out of its way to *protect* a user associated with Hamas" by letting the identified Hamas user "take

---

[1] Zhao argues that the complaint's use of the phrase "and vice versa" makes the alter-ego allegations "incomprehensible." MTD 10. But the complaint is clear that Zhao dominated the corporate entities. ¶¶33-34. And it is common to say that the components of a single enterprise are alter egos of each other without specifying a hierarchy. *See, e.g.*, *NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 165 (2d Cir. 2021); *Unclaimed Prop. Recovery Serv., Inc. v. Credit Suisse AG*, 2013 WL 1777761, at *2 (S.D.N.Y. Apr. 25, 2013).

his funds and leave" and informing him that "third party compliance tools flagged him." *Id*. The court also explained that "insofar as the defendants' alleged wrongdoing can be characterized principally as a failure to act, the defendants in this case allegedly had an independent duty to act," embodied in "United States law and regulations" designed "to prevent terrorists from accessing the United States financial system through the Binance exchange." *Id*. Thus, the plaintiffs "alleged that the defendants provided services that might otherwise be considered routine—cryptocurrency transaction services—in an 'unusual way'—designed to evade government detection and regulation," in a manner the Supreme Court deemed "'could constitute aiding and abetting a foreseeable terrorist attack.'" *Id*. at *22 (quoting *Twitter*, 598 U.S. at 502). Plaintiffs' complaint has all of these allegations and more—making *Raanan* highly persuasive.

Zhao never attempts to distinguish *Raanan*. He offers only a footnote arguing that *Raanan* wrongly treated Binance's duties to act as relevant because those obligations do not run to private plaintiffs. MTD 22 n.8. A duty to act matters only if the defendant was passive; Zhao's argument ignores *Raanan*'s conclusion that Binance's activities are not properly characterized as passive. The argument is also wrong. Nobody argues that the Bank Secrecy Act (BSA) or U.S. sanctions create implied private rights of action or duties of care that can be enforced in negligence claims. But it does not follow that willful violations of those legal requirements are irrelevant to the JASTA analysis—which asks holistically whether the defendant "consciously and culpably" assisted terrorism. *Twitter*, 598 U.S. at 493. Thus, as *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), explained, acts that are "neutral standing alone … must be evaluated in the context of the enterprise they aided." *Id*. at 488. That is why Hamilton, a "passive but compliant partner" to the crimes in *Halberstam*, was easily held liable for those crimes and their foreseeable consequences. *Id*. at 474. Under this rubric, a defendant that knowingly breaks the law—and knows or is willfully blind to

16

the fact that those violations will aid terrorists in perpetrating anti-American violence—is consciously and culpably assisting terrorist acts.

*Twitter*'s discussion of liability for inaction shows that *Raanan* was correct. As the Court explained, the law hesitates to impose liability for inaction to avoid punishing ordinary business transactions absent "'[c]ulpability of some sort.'" *Twitter*, 598 U.S. at 491 (quoting *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978)). But the required culpability is not high—nor does the law require an independent duty to the plaintiff. In the case *Twitter* cited (*Monsen*), the court concluded that even though the defendant bank had "no direct duty" to the victims of a fraud, liability was appropriate because the bank "was not merely an innocent third party. Rather, it enhanced its position at the expense of the [victims] with knowledge of [the fraudster's] deception." 579 F.2d at 803 n.17. So too here: Zhao made *at least* millions by knowingly facilitating illicit transactions on Binance. ¶¶23, 641, 687.

*Twitter* also cited *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975), for the proposition that inaction can sometimes support liability. *See* 598 U.S. at 501. *Woodward* held that "[i]n a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If … the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability." 522 F.2d at 97 (footnote omitted); *see also Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) (cited repeatedly in *Twitter*) ("A party who engages in atypical business transactions … may be found liable as an aider and abettor with a minimal showing of knowledge."). Here, repeated violations of core legal requirements show that Defendants' conduct was not routine. ¶630. Defendants also repeatedly violated their own policies and representations (*e.g.*, by outwardly claiming to block users from sanctioned countries while

17

covertly serving them, ¶752; by coaching users to use VPNs to evade Binance's geofencing, ¶757; by claiming to have robust KYC and AML programs while having none, ¶¶647-48; by allowing high-value U.S. users to transact covertly on Binance.com, ¶514; and in myriad other ways). Accordingly, the Court should readily infer conscious and culpable assistance—just as in *Raanan*.

2. Zhao relies on *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556 (2025). But as Plaintiffs explained in a letter (ECF 107), that decision—which interpreted a different statute, addressed criminal (not civil) aiding and abetting, and involved distinguishable facts—changed nothing about the legal standards governing this case, which come from JASTA precedents. Despite the letter being filed well before Zhao's motion, Zhao responds to none of the contentions. But because *Smith & Wesson* applies an inapposite legal standard to distinguishable facts, Zhao's repeated reliance on it only undermines his argument for dismissal. For example, the complaint need not plead Zhao's intentional participation in terrorist acts (*contra* MTD 15) because specific intent is a requirement in *criminal* cases, not civil ones. ECF 107, at 2-3; *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 868 n.12 (D.C. Cir. 2022) (citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)). In civil cases, it is enough to knowingly provide substantial assistance—and knowledge and assistance work on a sliding scale, with a greater showing of one requiring a lesser showing of the other. *See Twitter*, 598 U.S. at 491-92; MTD 18. That sliding-scale approach forecloses any rigid intent requirement.

To make *Smith & Wesson* appear more relevant, Zhao strains to cast Plaintiffs' allegations as mere failure to prevent abuse of the Binance platform (which itself did nothing wrong) by bad actors. In *Smith & Wesson*, the gun manufacturers were not alleged to have violated any law whatsoever; instead, they lawfully sold their guns to distributors, who sold those guns to dealers, a small minority of whom sold guns to bad actors in unlawful sales. 145 S. Ct. at 1568. This case

is different. Binance and Zhao were convicted of federal felonies. They, themselves—not just downstream parties—facilitated illicit transactions that benefited terrorists. They did this by advising users to submit misleading KYC information, by coaching users to use VPNs to avoid geographical blocks, ¶¶520, 643, 754, by knowingly processing transactions between U.S. persons and persons in sanctioned countries, by informing terrorist users when their accounts had been flagged by third parties so that those users could take their money and create new accounts, ¶¶635-38, by refusing to report suspicious transactions as required by U.S. law, ¶527, and by acting as the direct counterparty in hundreds of ransomware transactions, ¶19. That is on top of Binance's systemic refusal—at Zhao's direction—to implement an effective AML and KYC program, its repeated lies to U.S. regulators and third parties, and its affirmative decision to court business from "whales" such as the Iranian cryptocurrency exchange Nobitex, ¶¶479-95, 763-65, 814, cryptocurrency mixers, ¶¶530-32, and other customers that processed tremendous volumes of illicit transactions that benefited Hamas, Palestinian Islamic Jihad (PIJ), and other terrorist groups including Iran's Terrorist Sponsors, ¶¶17-18. Zhao pursued these objectives aware that terrorist financiers needed cryptocurrency to circumvent sanctions and raise and move money around the world to fund attacks. *E.g.*, ¶¶607-28.

3. Like the corporate Defendants, Zhao disputes that the complaint alleges knowledge, and frames his acts as mere passivity. Regarding knowledge, Zhao contends that he did not know that specific terrorists used the exchange. MTD 15. Plaintiffs allege otherwise. *See, e.g.*, ¶631 (explaining that Defendants knowingly "failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist organizations … as well as high-risk exchanges associated with terrorist financing activity," including "wallets associated with ISIS, Hamas' Al-Qassam Brigades, Al Qaeda, and the [PIJ]"); ¶633 (recounting an internal

conversation where Binance employees described likely terrorist transactions); ¶¶636-37, 640-41, 643, 661-73 (additional allegations that Defendants contemporaneously knew they were facilitating terrorist finance); ¶752 (Zhao knew that many Iranian users were on the platform and instructed employees to covertly serve them); ¶¶772-76 (Zhao knew, based on industry-standard diligence, that Binance was serving potentially hundreds of thousands of IRGC members); ¶1526 (Zhao knew that Binance was serving ransomware gangs); *see also* Opp. 11 (citing additional allegations). Even if Zhao may not have known the specific identity of each terrorist user, he knew enough to know that his actions were facilitating terrorist finance on a global scale by these specific groups—and to know that attacks on Americans were a foreseeable result.

Moreover, to the extent Zhao was unaware of any fact, that lack of awareness is the product of willful blindness, tantamount to actual knowledge. ¶639 (Zhao deliberately ensured that Binance's controls were weak to court suspicious users, including terrorists); ¶¶674-80 (additional willful blindness allegations). Had Zhao wished to, he could have learned the identities of suspicious customers (*e.g.*, by requiring effective KYC, or investigating suspicious transactions). His contrary decision was deliberate. ¶641. These allegations were featured in the opposition. Opp. 39. Like the corporate Defendants, Zhao says nothing about them.

Zhao also tries to reframe his willful violations as mere passivity. According to him, all he did was "permit[] customer privacy," and he argues that "[d]eclining to actively identify users and file reports" does not suggest intent to facilitate terrorism. MTD 16. As detailed *supra* pp.2-5 and in his guilty plea, Zhao did much more than merely permit privacy: he provided (or ordered others to provide) multifaceted assistance in the face of evidence that customers were engaged in terrorist finance, supporting an inference that he intended to aid those customers. Zhao's self-serving reframing might be more persuasive if the rule at the pleading stage was that plaintiffs' allegations

can be selectively ignored and that all inferences should be drawn in the defendant's favor. But since the rule is the opposite, the argument only exposes the degree to which Zhao's motion is premised on the wrong legal standard.

Zhao argues that the allegations of active participation are vague and violate Rule 8. MTD 17. This is perplexing. As described *supra* (and in Opp. 4-9), the active steps Binance undertook (at Zhao's direction) included: (1) retaining identified terrorist customers—including warning them about law enforcement investigations, allowing them to keep their money, and issuing them new accounts after they were discovered; (2) courting risky customers including cryptocurrency mixers, anonymity-enhanced cryptocurrencies, nested sub-accounts, and darknet users; (3) coaching users to use VPNs to circumvent sanctions controls; (4) doing tremendous volumes of business with Iranian users, including known fronts for the IRGC; and (5) lying to U.S. regulators and the public about the state of Binance's compliance program and the composition of its user base. Moreover, as the court explained in *Raanan*, to the extent any of Defendants' misconduct can be described as passive, it violated duties to act. *See* 2025 WL 605594, at *21.

4. Zhao argues that his provision of assistance helpful to terrorists cannot be used to infer his intent to assist terrorists. MTD 18. First, the civil standard is knowledge, not intent. Second, providing substantial assistance can absolutely support an inference of scienter. Indeed, that is the entire point of the *Twitter / Halberstam* sliding-scale approach. Moreover, as the Second Circuit has explained, the court is "lenient in allowing scienter issues to withstand [even] summary judgment based on fairly tenuous inferences, because such issues are appropriate for resolution by the trier of fact." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) (quotation omitted). The pleading standard is at least as generous, because prior to discovery "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan v. Lebanese*

*Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (quotation marks omitted). Here, the inference is not even tenuous: Defendants provided millions of dollars to terrorist groups for years, willfully violated anti-terrorism laws, sabotaged their own internal controls, and ignored copious authoritative warnings that their conduct would lead to terrorist violence. That is plainly enough to allege knowledge or willful blindness.

5. The Second Circuit recently decided *Ashley v. Deutsche Bank Aktiengesellschaft*, ---F.4th ----, 2025 WL 2025448 (2d Cir. July 21, 2025), affirming dismissal of JASTA claims against certain banks. The court explained that the "assessment of a defendant's knowing and substantial assistance under the JASTA framework is highly fact intensive; the analysis differs on a case-by-case-basis." *Id.* at *14 (cleaned up). It contrasted the plaintiffs' insufficient allegations with the ones that succeeded in *Kaplan*. Thus, *Ashley* dismissed allegations against a bank that provided "basic commercial banking services" to lawful fertilizer companies "after learning that the Companies' product would be exploited by" terrorists downstream. *Id.* at *11. The Second Circuit found critical that the complaint did not allege that the bank's "customers were themselves terrorists" and "conspicuously stop[ped] short of alleging that [the defendant] knowingly violated U.S. sanctions or terrorist finance laws." *Id.* at *13 & n.15. Moreover, the court explained, "[s]imilar banking services in a different context may lead to a different result." *Id.* at *14. For example, the court reiterated that liability was appropriate in *Kaplan*, where the bank "gave its customers 'special treatment,' including allowing its customers to 'deposit large sums in various accounts at different [bank] branches … without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity.'" *Id.* at *12 (quoting *Kaplan*, 999 F.3d at 866). Here, Defendants' conduct—including pleading guilty to willful sanctions violations, dealing directly with terrorist customers, providing special treatment for terrorists in evading compliance,

and facilitating covert transactions—is the very conduct that *Ashley* distinguished as supporting liability in *Kaplan*.

Similarly, the court dismissed allegations of assisting money laundering that had only an attenuated nexus with attacks. *Ashley*, 2025 WL 2025448, at \*15-16. But, the court explained, this was "not to say money laundering can never form the basis of a JASTA claim." *Id*. at \*16. Again, the court pointed to *Kaplan*, where the customers had identifiable links to Hezbollah and "the bank violated sanctions laws." *Id*. Here, the same features are present (and more, given the guilty pleas). Moreover, the nexus between the violations and the attacks is much clearer than it was in *Ashley*. *See infra* pp.23-25.

Finally, *Ashley* affirmed the dismissal of allegations based on tax fraud, holding that the defendants lacked awareness that their customers were associated with terrorist groups. The same knowledge gap is not present here. *See supra* pp.19-20.

### B.    Plaintiffs Allege a Sufficient Nexus Between Zhao's Misconduct and the Attacks.

Zhao contends that the complaint does not show a nexus between his actions and any specific terrorist attack. MTD 18-19. As the opposition explained, Plaintiffs' nexus allegations are granular, linking Defendants' misconduct to specific terrorists, geographies, and timeframes. Opp. 14-18, 22, 40, 43-44. That is more than enough, as Plaintiffs need not trace dollars to specific attacks, nor allege "a strict nexus between the alleged assistance and the terrorist act." Opp. 23 (quoting *Twitter*, 598 U.S. at 497); *see also* Opp. 39. Instead, a person who substantially helps another commit a crime is liable for the "foreseeable result[s] of such crimes." *Twitter*, 598 U.S. at 487. Or, "where the provider of routine services does so in an unusual way," that "could constitute aiding and abetting a foreseeable terror attack." *Id*. at 502; *see also* Opp. 41. *Raanan*

held that this was exactly what Binance and Zhao did—and Plaintiffs' allegations are indistinguishable. *See* 2025 WL 605594, at *22.

Zhao argues that Plaintiffs cannot rely on foreseeability without showing that Zhao directly aided at least one tort. MTD 19. That is incorrect. The foreseeability rule is that substantially assisting an unlawful act (even a non-tortious one) renders the defendant liable for foreseeable consequences. *See Ashley*, 2025 WL 2025448, at *10 (explaining that the defendant "must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable"); *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021) (holding that the tort "must be foreseeable from the illegal activity that the defendant assisted," but that "substantial assistance to the actual injury-causing act … is unnecessary"). A contrary rule would fatally undermine JASTA in terrorist finance cases because assisting terrorist finance is not itself tortious. Yet the ATA expressly seeks to "interrupt, or at least imperil, the flow of money" to terrorists by imposing "liability at any point along the causal chain of terrorism." S. Rep. No. 102-342, at 22. And JASTA recognizes that terrorists "raise significant funds outside of the United States for conduct directed and targeted at the United States," and seeks to curb that fundraising by empowering "civil litigants with the broadest possible basis … to seek relief against" anybody who "provided material support, directly or indirectly," to terrorists. JASTA § 2(a)(3), (b). Applying the correct foreseeability rule to Zhao's misconduct, Plaintiffs amply plead that the attacks here were a foreseeable consequence of Zhao's illegal terrorist finance activities. *See, e.g.*, ¶23; Opp. 14-18 (collecting complaint citations).

Contrary to Zhao's assertion (MTD 18-19), Plaintiffs' foreseeability argument is not based only on the fungibility of money. Plaintiffs' allegation is *not* merely that Defendants gave terrorist organizations money that could have freed up resources to commit attacks; it is that the specific

resources Defendants gave to the terrorists were used to finance the attacks committed here. Thus, the terrorist fundraisers involved here were financing violent activities, and they used cryptocurrency for attacks (and not any benign purposes). *E.g.*, ¶¶588-94 (Hamas's military wing and PIJ); ¶¶598-606 (al-Qaeda); ¶¶621-28, 817-29 (IRGC); ¶¶1481-85, 1492-99 (ISIS). Defendants' misconduct allowed these terrorists to raise money worldwide, move it instantly across the world, and spend it in conflict zones to buy weapons, pay fighters, and offer bounties for attacks, all covertly. ¶¶720-46. These allegations are supported by public sources, meaning Defendants knew all of this at the time they assisted their terrorist customers.

Independently, Defendants provided pervasive, systemic, and culpable aid to terrorists— an alternative way to satisfy the nexus requirement. Opp. 39, 41-42. Zhao halfheartedly argues otherwise (MTD 19), essentially asking this Court to disregard Plaintiffs' well-pleaded allegations that Zhao's actions caused hundreds of millions of dollars to flow to violent terrorists for years. Such arguments have no place at the pleading stage.

### C.    Zhao's Argument About Regulatory Failings Falls Flat

Zhao argues that the complaint seeks to transform mere regulatory failings into JASTA liability. MTD 20-23. The euphemism "regulatory failing"—which conjures the image of a business trying its best to follow the law—is inappropriate here. Zhao and his companies admittedly broke laws aimed squarely at preventing the financing of terrorism—and did so willfully, actively, and persistently for years as part of Zhao's business strategy. That strategy allowed Zhao to accumulate billions of dollars at the expense of the safety of U.S. nationals. This was not a regulatory failing; it was a criminal success.

Zhao also mistakenly points to the government's charges and his guilty plea as if they are somehow exculpatory. Thus, Zhao emphasizes that the government did not charge him with providing material support to terrorists, and wants the Court to infer that any such allegation is

therefore implausible. MTD 20-21. This is a bit like Al Capone insisting that because the government only convicted him of tax evasion, he must have otherwise been an upstanding citizen. Anybody familiar with criminal justice knows that the government does not necessarily charge every offense that a civil plaintiff could prove, and that admissions in a plea agreement do not necessarily include every culpable fact a civil jury might find at trial. Consequently, the criminal charges against Zhao and his admissions do not establish the ceiling of his liability; instead, they create a floor. The floor is sufficient to support civil liability: by willfully violating laws designed to prevent terrorism, Zhao consciously and culpably ran afoul of JASTA. But Plaintiffs have investigated additional facts and built upon that floor to bring additional plausible allegations against Zhao and Binance. *See supra* pp.2-5; Opp. 4-18.

Zhao is also wrong to argue that Plaintiffs are attempting to privately enforce the BSA or OFAC sanctions. JASTA's elements are not coterminous with those statutes—and so not every BSA or sanctions violation will support a JASTA claim. But when conduct that violates the BSA or sanctions also results in substantial assistance to terrorists, the underlying violations are aggravating—and not mitigating—factors in the culpability analysis. Indeed, courts in this Circuit have deemed misconduct allowing terrorists to "circumvent[] sanctions imposed in order to hinder terrorist activity" as assistance that is "qualitatively and quantitatively substantial." *Kaplan*, 999 F.3d at 866; *see also Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 346 (E.D.N.Y. 2023); *Bartlett v. Société Générale de Banque au Liban SAL*, 2024 WL 5497906, at *5 (E.D.N.Y. Sept. 18, 2024); *King v. Habib Bank Ltd.*, 2022 WL 4537849, at *10 (S.D.N.Y. Sept. 28, 2022).

Zhao speculates that if his admissions are used to support civil liability, others will be deterred from settling with the government. MTD 22-23. The more likely outcome is that holding Zhao accountable will deter others from willfully violating federal law in ways that result in

hundreds of millions of dollars flowing to America's worst enemies to finance the murder of American citizens. That is why Congress enacted JASTA.

## V.    Plaintiffs State Conspiracy Claims

The prior opposition explained that Binance and Zhao joined three separate conspiracies: the Counterpressure Conspiracy, the Ransom Conspiracy, and the ISIS Conspiracy, and answered the arguments Zhao now makes about the lack of an agreement (false), and whether the object of the conspiracy must be terrorism (no). *Compare* MTD 23-24 *with* Opp. 46-51. Zhao's few additional arguments fail.

Zhao argues that financial services provided to ISIS were not inherently dangerous to human life. MTD 24-25. But Plaintiffs allege that money, and especially access to virtual currency, was critical to ISIS's violent capabilities, including the attacks in this case. ¶¶1493-1514. Similar allegations were not present in the case Zhao cites. And whether Plaintiffs' allegations are true is a question of fact.

Zhao argues that the complaint does not allege that he shared all of the terrorists' goals. MTD 25. But Zhao and the terrorist co-conspirators shared at least some goals—and the acts of terrorism that injured Plaintiffs were undertaken in furtherance of those goals. *See, e.g.*, ¶¶3053-56 (Binance and Zhao shared the objective of their counterpressure co-conspirators to degrade U.S. sanctions on Iran by showing their ineffectiveness and to profit from the end of the sanctions regime); ¶¶3136-40 (Binance and Zhao shared the ransom co-conspirators' goal of profiting from hostage-taking, trafficking, and ransomware activities); ¶3168 (Binance shared ISIS's goal of providing material support for ISIS). There is no further shared-intent requirement. As long as the attacks were in furtherance of the agreements, liability attaches.

## VI.    Plaintiffs State a Primary Liability Claim

The primary liability claim alleges that Binance played a key role in Wizard Spider's ransomware attacks by allowing the terrorists to claim the ransom payment for their hack on a U.S. hospital. The prior opposition addressed most of Zhao's responses. Opp. 52-55. The only new argument Zhao raises is that he, personally, played no role. This does not matter because Binance's misconduct here is legally attributable to Zhao for the reasons explained *supra*. Put simply, at Zhao's direction, Binance chose not to prevent or report suspicious ransomware transactions, ¶¶19, 700-08, 1526-31. Moreover, Plaintiffs allege that Wizard Spider was treated as a VIP customer, ¶3182, a class of customers that Zhao instructed his subordinates to cater to, ¶¶511, 517, 635-38. The primary liability claim against him should accordingly proceed.

### CONCLUSION

The Court should deny Zhao's motion.

Respectfully submitted,

/s/Tejinder Singh

| | |
|---|---|
| Vincent Levy | Ryan R. Sparacino (pro hac vice) |
| Ian Miller | Geoffrey P. Eaton (pro hac vice) |
| HOLWELL SHUSTER & GOLDBERG LLP | Matthew J. Fisher (pro hac vice) |
| 425 Lexington Ave., 14th Floor | Adam J. Goldstein |
| New York, N.Y. 10017 | Tejinder Singh |
| Tel: (646) 837-5151 | SPARACINO PLLC |
| vlevy@hsgllp.com | 1920 L Street, NW, Suite 835 |
| imiller@hsgllp.com | Washington, D.C. 20036 |
| | Tel: (202) 629-3530 |
| | ryan.sparacino@sparacinopllc.com |
| | geoff.eaton@sparacinopllc.com |
| | matt.fisher@sparacinopllc.com |
| | adam.goldstein@sparacinopllc.com |
| | tejinder.singh@sparacinopllc.com |

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1 and Section 5(a) of the Court's Individual Rules and Practices in Civil Cases, I hereby certify that the foregoing memorandum of law complies with the word count limitation as set forth therein. As measured by the word processing system used to prepare it, the foregoing memorandum of law contains 8,730 words.


July 22, 2025                                    /s/Tejinder Singh