P7entroc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    JOCELYN TROELL, *et al.*,
3
                    Plaintiffs,
4
                v.                              24 Civ. 7136 (JAV)
5
    BINANCE HOLDINGS LIMITED,
6   *et al.*
7                   Defendants.
                                                Conference
8   ------------------------------x
                                                New York, N.Y.
9                                               July 14, 2025
                                                11:00 a.m.
10
    Before:
11                      HON. JEANNETTE A. VARGAS,
12                                              District Judge
13                              APPEARANCES
14  HOLWELL SHUSTER & GOLDBERG LLP
          Attorneys for Plaintiffs
15  BY:  IAN MILLER
          ARIELLA KAHAN
16
    CAHILL GORDON & REINDEL LLP
17        Attorneys for Defendant Binance Holdings
    BY:  ANIRUDH BANSAL
18        SESI GARIMELLA
19  BAKER & HOSTETLER LLP
          Attorneys for Defendant Zhao
20  BY:  KATHERINE L. McKNIGHT
21  WINSTON & STRAWN LLP
          Attorneys for Defendant BAM Trading
22  BY:  ATHANASIA CHARMANI
23
24
25

P7entroc

1          (Case called; appearances noted)

2          THE DEPUTY CLERK:  Will the parties please make their

3   appearances, beginning with the plaintiff.

4          MR. MILLER:  Ian Miller, Holwell Shuster & Goldberg

5   here for the plaintiffs, along with my colleague Ariella Kahan.

6          THE COURT:  Good morning.

7          MR. BANSAL:  Good morning, your Honor.  Anirudh

8   Bansal, Cahill Gordon & Reindel, for defendant Binance Holdings

9   Limited, and with me at counsel table is my colleague Sesi

10  Garimella.

11         MS. CHARMANI:  Good morning, your Honor.  Athanasia

12  Charmani from Winston & Strawn, on behalf of BAM Trading

13  Services.

14         THE COURT:  Good morning.

15         MS. McKNIGHT:  Good morning, your Honor.  Katherine

16  McKnight, Baker Hostetler on behalf of Changpeng Zhao.

17         THE COURT:  Good morning, Ms. McKnight.

18         We are here for a followup status conference on two

19  issues that came up at the last status conference, the initial

20  pretrial conference, for which I deferred entering a case

21  management plan while the parties first considered the impact

22  of the bellwether proposals on proposed discovery.

23         Secondly, there was also the motion practice with

24  respect to the government productions.

25         I do want to just start at the outset by saying I have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7entroc

1  reviewed the parties' joint letter and the attachments thereto

2  as well as the other letters that have been submitted in the

3  interim.

4        I am somewhat disappointed that the spirit in which we

5  left the last conference seems not to have been abided by by

6  either side honestly.  I had hoped that there would be some

7  reasonable discussions on both ends as to how to proceed

8  efficiently and expeditiously in moving this case forward.  The

9  proposals on both sides seem to compound inefficiencies as

10  opposed to seriously contemplating how this case can move

11  forward.

12        So I start from that.  I had wanted to leave the

13  parties with the freedom to negotiate a reasonable resolution

14  of these issues, because you are closest to the case and you

15  know the issues, and you know on behalf of your clients what's

16  needed.

17        I certainly don't want to be micromanaging your case

18  for you, but if the parties cannot agree to reasonable

19  procedures, then I will impose them.  And you may not like what

20  I wind up imposing.

21        So I am hopeful that at the end of this the parties

22  will perhaps be willing to meet and confer with more open minds

23  on all of these issues and reach compromises, because the

24  alternative is that I will be deciding them and we will be

25  moving fairly quickly.  I don't necessarily know that either

P7entroc

1    side is going to appreciate how I would manage discovery in the

2    absence of party agreement.

3         So let me start with that, and let's move to the

4    issues.

5         Number one is the government productions.

6         At the last conference I had asked the defendants to

7    provide information to the plaintiffs regarding the volume of

8    productions, the custodians, the subject matter to the extent

9    known, etc., information that I thought would be beneficial to

10   negotiating among the parties what among the government

11   productions was relevant, what categories of information could

12   be quickly turned over, what would be of less relevance.

13        It seems as if defendants did provide the information

14   and plaintiffs' response is that they want all of it.

15        That is an unhelpful position.  It's 2 million pages

16   of documents at a minimum, just counting up from what I saw in

17   the papers.  I don't understand how from where we were last

18   time, with being provided additional information to make

19   targeted requests for discovery that could be quickly turned

20   over, we are at "we want everything."  I don't see how that is

21   either helpful or in the spirit of how we left the last

22   conference.

23        Mr. Miller, let me hear from you.

24        MR. MILLER:  I'm happy to address that, your Honor,

25   because I think the critical issue here is that precedent says

P7entroc

1    that wholesale productions are the efficient approach.  I want

2    to start with precedent because I think it makes it clear.

3            So there is a question I think in the Court's mind,

4    which is should we pursue what I'll call the *Anthem* approach,

5    which is this kind of category by category, the parties agree

6    on different categories, and we slice and dice the productions.

7            I will just note that is not the more efficient

8    approach, because in all the cases we've cited the parties,

9    when there's wholesale productions get them within 7, 14, 30

10   days, and the cases move forward very quickly.

11           In *Anthem* --

12           THE COURT:  In a lot of those cases that was the

13   discovery.  If you are telling me right now that is all the

14   discovery you want, you are going to take discovery production

15   and we are going to be done, that would be efficient.

16           Are you telling me that?

17           MR. MILLER:  I am not telling you that.

18           THE COURT:  I didn't think you were telling me that.

19   So that's my concern.  You want these 2 million pages of

20   documents, but then I assume you want them to go and start

21   searches and do full discovery perhaps at the same custodians,

22   perhaps using the same search terms or different search terms.

23           That to me seems wholly inefficient, because you are

24   not saving any work.  You are just duplicating the work.  You

25   are going to get all these documents up front, but we are still

P7entroc

1    going to search the same custodians?

2                MR. MILLER:  Your Honor, I think the cases make clear

3    what seems on its face to be perhaps less efficient is more

4    efficient if done, what we're asking for here, including in the

5    cases Binance cited.

6                So, for example, in the case, the antitrust case we

7    cited in our recent status letter, the Court said within seven

8    days of the order on the motion to compel that defendants

9    should produce 680,000 documents within seven days.

10               And I looked later at all the docket entries, and

11   there were an additional 1.8 million documents produced,

12   including from the same custodians.  The Court's reasoning was

13   that it was more efficient and economical.

14               In the cases Binance cited, if you look at *Alaska* and

15   *WorldCom*, in those cases, you had huge wholesale productions,

16   including, critically, whole swaths of irrelevant information

17   that the Court said in the interest of efficiency hand it all

18   over, and that will move the rest of discovery forward, because

19   it lets you generate better custodian lists, better search

20   terms.

21               So defendants' approach to this omnibus we do it all

22   at once is actually rejected by precedent.  I Want to go

23   through precedent because it makes clear -- because I think we

24   are under a little bit of a -- the defendants went into last

25   conference with a string cite saying the majority approach is

P7entroc

1    to reject wholesale productions.

2           I think what I will be able to show your Honor is that

3    the majority approach, the overwhelming majority approach is

4    wholesale productions, even with the same concerns noted in

5    this case, and even in higher standards of antitrust contexts

6    where you have *Twombly* lurking, especially in the cases after

7    *Twombly* in the PSLRA context, where there is a higher standard

8    We are in that world where it's more efficient.

9           So starting with *WorldCom*, this is the case that

10   Binance cited in its opposition to the motion to compel.

11   WorldCom, as your Honor knows, was a wide-ranging investigation

12   into everything WorldCom did, because it also led to, for

13   example, insider trading agreements and settlements by some of

14   the individual executives that the company.

15          So it was really the government saying, "What went

16   wrong here?  We want the company's files."

17          So the civil case was much more narrow.  That is what

18   he defense argued in that case.  Judge Cote said, turn it all

19   over, because this will be the basis for coming up with

20   custodians.  Because you can look in the files and you can see,

21   well, these are the people actually speaking on these issues.

22   We need broader discovery from those plaintiffs, from those

23   custodians.

24          That was one of the cases Binance cited in its

25   three-case string cite for courts routinely reject that

P7entroc

1   approach.

2           The second case --

3           THE COURT:  Let me just stop you.

4           MR. MILLER:  Yes.

5           THE COURT:  I don't think this is particularly helpful

6   for me.

7           MR. MILLER:  Okay.

8           THE COURT:  I don't want to waste time on precedent.

9           MR. MILLER:  Understood.

10          THE COURT:  Because at the event of the day, unless it

11  is a Second Circuit precedent, all of these issues are within a

12  district court's discretion.  So what one judge does in one

13  case doesn't bind another court in another case.

14          These are all discretionary decisions within the

15  district court's jurisdiction to control its docket and to

16  control discovery under Rule 16 or Rule 26.  So what one Judge

17  does in one case can be very fact specific and may not apply

18  here.

19          I want you to tell me why in this case, not why in

20  WorldCom Judge Cote did what she did.

21          MR. MILLER:  Sure.

22          THE COURT:  Why in this case is this the most

23  efficient because, frankly, I am not seeing it.  It does not

24  strike me as being an efficient way to go.  If we are then

25  going to use the same custodians and ruin these same searches

P7entroc

 1    and have them search the same documents again, then I don't see

 2    why we just don't do that from the outset, other than getting

 3    you documents on a fast track.

 4         Obviously, I understand why from your point of view

 5    that would be desirable, but in terms of the overall

 6    efficiencies of discovery I want you to explain to me why this

 7    is a better approach.

 8         MR. MILLER:  Understood, your Honor.

 9         So in our proposed world, we get all the documents on

10    an expedited basis.  We go through them, and we use that to

11    come up with a custodian list, to come up with targeted search

12    terms, because we can look in the documents.

13         For example, we don't know the midlevel people who are

14    really making the calls on these compliance issues.  The

15    interrogatory responses we've received have only been the

16    high-level folks.  We don't know the midlevel people.  But we

17    can look in the productions and we can figure out who the key

18    people are, and we can use that for custodians.

19         We can also look and think, okay, when they talk about

20    these issues, are there certain terms specific to the company

21    that they use for KYC or to refer to terrorists?  Are there

22    code names for CZ?  Are there search words that are able to

23    helpfully generate searches?

24         I think that will be an iterative approach, which will

25    be faster, because the problem we will get is, let's say we

P7entroc

1    adopt the omnibus, negotiate this whole search term thing at

2    once?

3         What's going to happen as is we go through the

4    documents we're going to notice there's missing gaps.  It is

5    inevitable in case this big and with a production this big.

6         And we're going to have to go before the Court and

7    say, we didn't realize this was a search term we should have

8    included, because we didn't realize that this was, you know, a

9    code word used in this context.  We didn't realize that this

10   person was a relevant custodian, and we need to search the

11   document for this person's name that keeps coming up in the

12   productions.

13        So we are going to have to do an iterative approach

14   either way.  Ours expedites it.  It makes it faster.

15        The other thing from an efficiency standpoint -- and

16   this wasn't in the letter, because we just got it a hundred

17   percent confirmed on Friday -- is that all these documents

18   exist in a central repository.

19        So in the antitrust case I cited, one of the reasons

20   the judge said give it over within seven days even though it

21   was 680,000 documents was because everything was able to be

22   turned over.  And it takes longer to generate those search

23   terms; it takes longer to then do the quality checks.

24        So I looked at the docket, for example, in *Anthem*.  I

25   understand your Honor's point about precedent, but the reason I

P7entroc

do think it's instructive is that in every case cited by the

parties on both sides, the judges ordered wholesale

productions.

Or there's *Anthem*.  There's no other case supporting

the proposition that the affirmative-search-term approach

should be used.  *Anthem* is the one case where they do it.

As your Honor knows, it's distinguishable because

there you have a competitor's sensitive information and you're

worried about the government being forced to give a

competitor's sensitive information.

And there are clear categories.  The government, as

your Honor knows, had done search terms to say there are 1.1

million irrelevant documents.  And then the opposition to the

motion to compel substantiated that with hit counts and search

terms and said here's 1.1 million document, and here is the

other side saying we agree those are irrelevant.

That is simply not the case here.  So we are not in

*Anthem* land.  We are in *WorldCom* land.  We are in *Enron* land.

I looked up *Enron* to round out other early 2000s wild

fraud cases*.  Enron* in both the securities case and in the

ERISA case ordered full productions, even when you know, if you

think an ERISA case, that's a lot smaller than the whole

investigation into *Enron*, because there's just a zillion issues

that the government was looking at in *Enron*, including

individual insider trading.  The judge there said just turn it

P7entroc

1    all over, because it's just a matter of keeping these from the

2    parties, and this will move production and discovery forward

3    efficiently.

4          So I do think it is important to see, are we in *Anthem*

5    land or are in we *WorldCom* land*, Enron* land*, Alaska* land, which

6    is the Judge Furman case we went over at the last conference,

7    where 1.6 million documents to the CFT were turned over even

8    before RFPs were issued.  He said go ahead and do it, because

9    he said this is going to be more efficient.

10          In all those cases you have quick productions.  So I

11    think -- after this I'll go through the categories and explain

12    why it doesn't work to slice and dice them.

13          So the categories themselves don't give us a basis for

14    excluding any of them for two reasons:

15          First is that they're all highly relevant.  So some of

16    them are described in ambiguous language.  That doesn't make it

17    necessarily clear, if your Honor read the attachments and

18    thought okay, what are these, maybe some of these aren't

19    relevant.

20          And what it does is that ambiguous language makes it

21    hard to know.  I've looked into every category, and they all

22    relate to the complaint.  In fact, they are not only kind of

23    minimally relevant, which is the standard for relevance, they

24    are highly relevant.  These are like the lists on your outline

25    for a deposition, because these are the topics.

P7entroc

1          So, to start with, I just want to clear up the fact

2     that the U.S. traders, like the fact that they had U.S.

3     customers, and the registration requirements are the core of

4     the case, there is a quote from CZ in our complaint, and cited

5     by the government, where he says the problem with U.S. users is

6     that if you trade with U.S. users you become subject to the

7     laws regulating financing for terrorism, not just general AML.

8     He links it to the financing for terrorism.  That's just true.

9     The problem with being an MSB is that then FinCEN is on you

10    about making sure that you don't provide money to terrorists.

11         So step one, Exhibit 1 in our opening to the jury will

12    be they knew from the start that they were creating an MSB.

13    They knew that their profit would be crushed if they did strict

14    AML, and they put profit above the requirement to register and

15    be subject to U.S. regulation.

16         And here's CZ saying that.  That is actually in a

17    recording that is in the government productions, or in a

18    document.  It is not a hundred percent clear.  There's

19    references to both, the recording, it might be a document as

20    well.

21         So that's step one.  And that encompasses the fact

22    that they were U.S. users.  And then Binance U.S. was created

23    as a way to hide the fact that they had U.S. users.  So there

24    is extensive evidence in the government productions that shows

25    how Binance U.S. was affirmatively created to hide the fact

P7entroc

1    that they were then routing the highest valued users to Binance

2    while using Binance.U.S. as a fake regulated entity.

3            If you look through and you think, okay, all this

4    stuff about U.S. users, registration requirements, all of that

5    is foundational, is trial evidence, not just the liberal

6    relevance standard.  So we need that evidence, and that's the

7    evidence that is core to our complaint.

8            Now, there are a couple of other categories that, at

9    least in my mind when I read them, I thought, uh-oh, is this

10   not relevant?  Because then I thought we might have a problem,

11   where we would have to go category by category.

12           We couldn't fit all this in our letter, so I will

13   explain why I think those are relevant.

14           So, for example, there's the reference to the Japan

15   hack --

16           MR. BANSAL:  Your Honor, I apologize.  We did file

17   these letters under seal for a reason.  They're subject to a

18   protective order.

19           I had asked Mr. Miller before this conference if he

20   was going to reference any parts of the letter in public, and

21   you said, I believe that your response was that you would let

22   me know.

23           So this is the first I'm hearing it.  I am happy to

24   take this into the robing room.  I am not trying to sort of cut

25   off the discussion, but these are documents that are under seal

P7entroc

1    and subject to the protective order.

2         MR. MILLER:  My understanding is we are talking about

3    a specific category there that was especially sensitive, but I

4    am happy to take this into the robing room or whatever your

5    Honor would prefer.

6         THE COURT:  Why don't we continue the discussion to

7    the extent you can without the specific reference to the sealed

8    material.  If I feel at the end that we need to adjourn to get

9    more details at an *in camera* session, we can do that.

10         MR. MILLER:  Understood.  I think, Anirudh, this

11    example is in our -- this example is in our letter, which you

12    did not file under seal.  But I will move forward.  I will

13    ambiguize it.

14         THE COURT:  I do think that one example is referenced

15    in the body of the letter.  If I'm recalling, the theft of the

16    Bitcoin example was in the body of the joint letter.  I also

17    read it in the body of the joint letter, if that's the same

18    reference that you are making.

19         MR. MILLER:  Yes, it is, your Honor.

20         There are a bunch of code names that refer to specific

21    things, and those things are ways that Binance hid the fact

22    that it had U.S. users.  So it all goes to the same underlying

23    scheme to hide the fact that it had to comply with

24    antiterrorism money laundering rules.

25         So if you look at a bunch of the different

P7entroc

categories -- and they have odd names -- if you look them up,

they'll be described in the public consent orders that are

talking about the scheme to hide U.S. users.

There are a couple other categories that are also

clearly relevant because they go to the culture of

noncompliance and affirmative violation of U.S. laws and

affirmative hiding of the fact that Binance was failing to

comply with antimoney laundering laws and U.S. requirements, so

from all these requirements.

There is one other one which is in BAM's, which

relates to the topic we discussed on Friday.

You mentioned there were about 20 documents for that

category.  Do you mind in I list the name of the category?

MS. CHARMANI:  No, you can list that name.

MR. MILLER:  There is one other category, which to me

I thought is this irrelevant or not.  It was performance

reviews.  My concern was, is if there is some sort of wide

ranging employ discrimination investigation or something else

that would be a problem for us, and we would want to exclude

it.

I got more information on that on Friday.  There's 20

documents in that category.  And they go to the roles,

responsibility, and structure of Binance U.S. in its reporting,

which makes sense to me, because those are the materials that

would get pulled in when the government asks for, okay, let's

P7entroc

1   get everything that we can about how Binance was structured,

2   because we want to know whether there was an alter ego

3   controlled by CZ.

4           We detailed how the former CEOs quit because they said

5   the real power is Binance, that we had no power.  We thought we

6   had power, but we were overruled in every major decision.  And

7   it will show, as the government requested, that those 20

8   documents -- and the 20 is a tiny number as well, your Honor.

9   And so if you look through each category, one of -- there's two

10  reasons why I think wholesale makes sense.  The first is that

11  in those other cases and in general the trend is there's a

12  protective order in place.

13          All the documents are Bates stamped and ready to be

14  sent over.  So from a huge efficient, F.R.C.D. 1. standpoint,

15  that's why judges in similar contexts, even in the PSLRA

16  context, a case we cited, *In Re New Century*, surveyed the

17  field, cited a whole bunch of more cases, said that judges

18  routinely do this and said all documents.

19          The reason why that is the overwhelming majority trend

20  is because it's more efficient.  To your Honor's concern, this

21  is not a case where there is categories of irrelevant material.

22          Finally I want to touch on --

23          THE COURT:  I think in addition to my concern about

24  there being irrelevant categories, I have two other concerns,

25  one of which I expressed at the last conference, which is to

P7entroc

what extent are we given that this is a criminal investigation
and that this was turned over pursuant to grand jury subpoenas,
to what extent are we intruding about the 6(e) issues that I
highlighted last time?

        Not all of the cases that you referred to in all 6(e)
materials, sometimes there are productions to the SEC, to other
regulators.  They are not always criminal.  So that does add a
gloss here that is not always present in these cases.

        But my second concern -- and this is what I expressed
at the outset of this discussion -- is that to what extent are
we essentially going to be duplicating efforts?

        To what extent is this going to get us further
advanced in discovery?  Okay, now you have two million pages of
material regarding Binance's history and its operating
structure and who occupies what role and what regulatory issues
they have, all of those categories I'm trying to refer to them
very broadly in light of the fact that they're under seal, but
I have read them.  I'm familiar with the categories.

        To what extent are you then going to be seeking these
again from the same custodians and then just basically
duplicating that work?

        If you were to tell me that this is going to seriously
cut off on the back end a lot of the work that defendants would
have to do because you would not be seeking duplicative
discovery once you got this, that this is going to take you a

P7entroc

1    decent amount of the way or maybe you will have to fill in some

2    gaps, maybe you will have to do some supplementary discovery,

3    but this was going to be the core set of documents, that's one

4    thing.

5            But my concern is that that's not going to be the

6    case, that you are going to get this 2 million, and this is

7    just going to be a drop in the barrel, and really you are going

8    to continue to seek all discovery from all of these custodians

9    all over again.

10           That is concerning to me.  That seems very

11   disproportionate and not a time saver and not a money saver.

12   So I have those concerns in my mind.

13           But I do want to hear from defense counsel on this

14   issue before we proceed any further.

15           MR. BANSAL:  Thank you, your Honor.

16           Judge, I heard my colleague say that he thought that

17   one of the benefits, maybe a main benefit of receiving the

18   entire government production would be to be able to formulate

19   additional discovery requests.

20           I would submit, Judge, that is not an appropriate use

21   of discovery.  He has asked questions of us, interrogatories

22   about who the appropriate custodians would be.  We have

23   responded.

24           I am not hearing until today that he felt that that

25   was inadequate, that our response was inadequate.  We've

P7entroc

1    offered to meet and confer on that, and my colleague has not

2    taken us up on that.

3            I will say it is not actually accurate that the

4    individuals that we identified in our interrogatory response

5    were all high-level individuals.  They were many midlevel and

6    low-level individuals as well.

7            I also would point out, Judge, that my colleague said

8    that it is going to have to be an iterative approach either

9    way.  I think what the plaintiffs are contemplating is that

10   they would receive the government discovery, they would then

11   make requests of us with search terms, additional search terms,

12   and then they would add to those search terms anyway.

13           I am also having a hard time seeing any efficiencies

14   that would be created from the plaintiffs' proposal.  It would

15   be one thing if they were going to propose inclusive search

16   terms.  I've never encountered this notion of exclusive search

17   terms, search terms designed to exclude materials.  I don't

18   know how we would begin to formulate them.

19           THE COURT:  I am not inclined to consider exclusive

20   search terms either.

21           My question to you, Mr. Bansal, is what is the burden

22   on your client of turning this material over?

23           If it's in a central repository, it's already been

24   gathered, it's already been reviewed.  It is a collection that

25   is sitting there.

P7entroc

1          What is the burden for the defendants to turn the

2    material over?

3          MR. BANSAL:  Judge, we would have to review it again.

4          THE COURT:  Is there privileged material in there?

5          MR. BANSAL:  There could be --

6          THE COURT:  And would the privilege have been waived

7    because it's been turned over already to the government?

8          MR. BANSAL:  Judge, there could be material, and I

9    don't know for sure, but there could be material that is

10   covered by foreign data protection principles, which the rules

11   are different in giving materials over to a law enforcement

12   agency versus giving them to a private plaintiff.

13          I just want to point out, Judge I don't want you to

14   leave with the misimpression that the material is covered by

15   6(e) necessarily, because I am informed that the government was

16   using formal requests rather than grand jury subpoenas.

17          So while 6(e) would not necessarily be a concern,

18   there are other concerns, including -- and I realize these are

19   not my privileges to assert, but law enforcement interests.

20   And I think the Court did recognize during the last conference

21   that to the extent that the government's interest in a

22   particular topic or that they asked for something was going to

23   be revealed by the discovery that that would be something that

24   the Court called delicate, and I would agree with that.

25          THE COURT:  It would be, but if there's no 6(e)

P7entroc

```
 1    concerns, that was my primary concern at the last conference,

 2    which is that although the case law and the Second Circuit

 3    hasn't definitively ruled on this particular issue, other

 4    circuits have.

 5           When subpoenas go out to a company seeking material

 6    that's been turned over to the government, 6(e) doesn't protect

 7    the documents in the possession of the company.  However, the

 8    knowledge that those documents were turned over to the

 9    government can still be protected by the 6(e) privilege.

10           So that is the delicate issue that I was referring to,

11    which is if they just asked you for all documents pertaining to

12    Binance's history, structure, etc. and some of those documents

13    happened to have been turned over to the government, Binance

14    doesn't certainly have a 6(e) privilege they can assert.

15           But it is a different request to what did the grand

16    jury subpoena request of you?

17           Even though you are not turning over the grand jury

18    subpoena, by implication you are revealing what the nature of

19    the grand jury subpoena is, which is 6(e) material.

20           So that was my concern, because the circuit certainly

21    has indicated that that is a potential government interest.  It

22    seemed as if based on the way plaintiffs have phrased their

23    document requests that we were treading on that line.

24           If these were informal responses and not grand jury

25    subpoenas, then I don't necessarily know that the 6(e)
```

P7entroc

1    distinction that has been raised by various circuit decisions

2    is implicated hire.

3         MR. BANSAL:  Judge, I think that the law enforcement

4    confidentiality interest is the same whether Rule 6(e) is

5    involved or not.

6         Specifically, Judge, Rule 6(e) imposes restrictions on

7    what government attorneys and court staff can say about the --

8    I'm probably telling the Court something it already knows, but

9    just for the record it is to prohibit government attorneys and

10   court staff from revealing information that is put before the

11   grand jury.

12        But the interest of law enforcement in keeping its

13   investigations and what it is interested in in its

14   investigations confidential from the public, especially where

15   there are ongoing investigations, which the CFTC in their

16   response to the plaintiff's *Tuohy* request did say that.  They

17   said that it could compromise investigations to give this

18   information over.

19        Those interests are equally implicated whether rule

20   6(e), which again binds only the government, is implicated or

21   not.

22        THE COURT:  Well, I would hesitate to think that the

23   law enforcement privilege is implicated here, given that the

24   prosecution is over.

25        Is there some pending investigation criminal

1    investigation that I am unaware of?

2          You don't have to tell me on the record obviously if

3    there is.  But certainly the law enforcement privilege that

4    protects ongoing proceedings would not pertain to this if we

5    are talking about the concluded criminal prosecutions and law

6    enforcement techniques or confidential sources or the types of

7    things that are normally protected by law enforcement privilege

8    are very unlikely to be contained in Binance's documents.

9          So I struggle to see how simply turning over documents

10   that have been informally requested by a now closed criminal

11   investigation would implicate the law enforcement privilege in

12   any serious way.

13         MR. BANSAL:  Judge, I would not know necessarily with

14   certainty if there were ongoing investigations.  But the CFTC I

15   am reminded did say in their response to the plaintiffs *Tuohy*

16   requests that providing the information could compromise

17   ongoing investigations.

18         And the plaintiffs can correct me.  I don't have the

19   response in my hand, but the plaintiffs can correct me if I am

20   wrong.  I don't see Mr. Miller rising to do that.

21         MR. MILLER:  I'm rising to do that if that's the

22   invitation.

23         Because what the CFTC's response said -- and, look,

24   maybe our request to the CFTC was overbroad, because the first

25   one asked for their investigative notes, and that's probably a

P7entroc

1    real privilege concern to them.

2              And they say there's whistleblowers here.  They said

3    the whistleblower privilege.  So I get that.  But they don't

4    have those witness interview notes.

5              That's the same thing that was said in *WorldCom*, where

6    as long it's limited to the documents it's fine.  That was the

7    DOJ.

8              THE COURT:  What does the CFTC response say with

9    respect to ongoing investigations?

10             MR. MILLER:  So --

11             THE COURT:  When was this *Tuohy* request submitted?

12             MR. MILLER:  Late last year.

13             It did not say that there were ongoing investigations.

14   It said -- right after the -- it says, "The subpoena's request

15   for all documents related to the CFTC's civil action against

16   Binance appears to be an attempt to gain access to the

17   Commission's entire investigative and litigation files."

18             And then continued a couple of sentencing later and

19   says, "Therefore, you may wish to consider first requesting

20   documents from the parties to the case, especially as, based on

21   our initial review of the subpoena, a substantial portion of

22   the requested materials are likely in Binance's possession."

23             So in my view the CFTC says we have got these

24   interview notes and this other stuff you are asking for.  We

25   are going to stand on privilege.  And then there's these

P7entroc

```
1    documents.  Go get them from Binance.  They did not say there
2    is a privilege that attaches to that or we're concerned about
3    that.
4              THE COURT:  Did they say anything about an
5    investigation that is still pending or danger to ongoing
6    investigative efforts?
7              MR. MILLER:  I did not see that.
8              We can look at it again, but there is nothing -- it
9    talked about the witness interview notes and the whistleblower
10   privilege and the law enforcement privilege, but did not refer
11   to ongoing investigations, but we can confirm that.
12             THE COURT:  All right.
13             Let me go back to Mr. Bansal.
14             I really do want to focus on what is the burden.  You
15   are saying that you would actually have to go through and do a
16   review.
17             MR. BANSAL:  Absolutely, Judge.  I don't think we
18   could responsibly or even ethically just turn over documents
19   that our law firm has not even looked at, especially
20   considering that there is going to be material -- I think one
21   thing that the letters of both BHL and BAM make clear is there
22   is going to be a great deal of irrelevant and nondiscoverable
23   material in the government's production, meaning not
24   discoverable in this action.  I didn't really follow my
25   colleague's linkage --
```

P7entroc

1          THE COURT:  What do you mean by "nondiscoverable"?

2          MR. BANSAL:  Just that they're not relevant, Judge.

3          THE COURT:  Leaving aside relevance, though, turning

4    over irrelevant documents happens all the time.

5          Are there legal impediments, privilege impediments

6    with respect to these documents, and, if so, which sets of

7    document and to what extent are they found in these documents?

8          MR. BANSAL:  Judge, there could well be customer

9    information that is protected by foreign law that we would have

10    to make sure is excised even if it were produced to U.S.

11    authorities, because there are different rules that apply as I

12    understand it.

13          I am not a foreign data privacy lawyer, but as I have

14    been told there are different rules that apply to turning over

15    materials to government agencies versus turning them over in

16    civil cases.

17          THE COURT:  Is there anything else in there that you

18    would need to review before these could be turned over?

19          MR. BANSAL:  If I could have just a moment, Judge.

20          Judge, we would have to review for relevance and

21    responsiveness, but as I stand here I can't think of another

22    sort of -- I think that is a big one, right?  The relevance and

23    responsiveness.

24          THE COURT:  But I could just order the disclosure of

25    the documents, and then you don't have to review for relevance

1    or responsiveness because I've ordered them to be produced.

2              I am concerned about whether or not there is a foreign

3    law issue that would protect the documents for which review

4    needs to be done or a privilege issue for which a review needs

5    to be done.

6              MR. BANSAL:  Judge, I would have to get foreign law

7    advice specifically on that and get back to the court.  I have

8    to say that as I came to court I did not see the Court's -- I

9    guess the Court didn't rule last time that the Court --

10             THE COURT:  The Court did not rule, so it's still an

11   open issue.  The motion to compel is still live.  They have

12   asked for the documents.  I asked you to provide information

13   from which a discussion could be had about ways in which the

14   production could be leveraged for quick productions.  Quick

15   productions, that's my thought.

16             This is not we have two million documents and we are

17   going to approach it from the outset and review them for

18   responsiveness and -- no.  That is not what we are doing.

19             The idea is to leverage these to get them into the

20   hands of the plaintiffs quickly.  It doesn't need to be all 2

21   million.  That is what I said at the outset.  Reasonable

22   discussions can be had as to which categories of documents

23   could be turned over quickly.

24             Are there categories of documents that are probably

25   not going to raise these foreign data concerns that you have

P7entroc

1    just raised with the Court?

2            Are there particular custodians whose information is

3    of particular relevance?

4            Those are the types of discussions that I was hoping

5    the parties would reasonably have.  Perhaps I was naive in that

6    respect, since both parties seem to have dug their heels in on

7    this, but that is what I wanted the parties to discuss.

8            The whole purpose of exchanging information is not

9    simply so you can say, okay, this is the volume, these are the

10    custodians, but we are going to start all over with discovery

11    as if these collections have not been made and review them from

12    the outset as if we just started discovery.

13            That doesn't advance the ball at all.  The point is to

14    have discussions for what does the plaintiff need from the

15    subset that can be turned over quickly, not that your firm is

16    going to review starting from scratch.

17            MR. BANSAL:  Judge, we during meet-and-confers have

18    proposed to the plaintiffs that they provide search terms, you

19    know, just regular search terms that we do in any other --

20            THE COURT:  How is that any different than discovery?

21            MR. BANSAL:  It does lead me to question what use

22    really there is in using the government productions as an

23    efficiency matter.

24            THE COURT:  The efficiency is that they're there.

25    They've already been gathered.  They're already there.  Most of

P7entroc

```
1    the documents or a large swath of them are likely to be

2    relevant, and they could be turned over quickly.  That is the

3    efficiency.

4            MR. BANSAL:  Judge, especially in light of the data

5    protection concern that I have mentioned, I could not

6    responsibly turn over materials without having my law firm

7    review the materials to make sure that they are in fact

8    discoverable.

9            If I could have a moment, Judge.

10            THE COURT:  I find it hard to believe that the data

11    problems pertain to the large majority of these documents.  It

12    seems to me as if it would be fairly easy to isolate the

13    documents that need to be reviewed for the foreign data issues

14    from documents that don't need to be reviewed for them.

15            Just my experience with E-discovery tells me that

16    there's going to be certain classes of documents where this

17    issue might arise, but certainly classes of documents where it

18    is very unlikely to come up.

19            The whole point of this is to leverage these

20    productions to get them in the hands the plaintiff quickly.  If

21    you are not prepared to come up with proposals on how to do

22    that, then as I said at the outset, I will just issue an order.

23    You may not like the order that I issue, but I am giving you an

24    opportunity to have reasonable discussions.

25            The same message to the plaintiff:  I am unlikely to
```

P7entroc

 1    order the wholesale production of the entire collection, but I

 2    am giving you an opportunity to say what do you need what it

 3    would be most efficient for you to have at the outset.

 4         I am not going to issue an order today.  I want the

 5    parties to meet and confer.  In an ideal world you will have a

 6    reasonable conversation as reasonable people as professionals

 7    and work this out yourselves.  Otherwise at the next conference

 8    I will issue the order and that will be what happens.  So

 9    that's the message I am delivering to both of you.

10         I am unlikely to order the entire collection, so

11    approach it from that point of view, Mr. Miller.

12         But I am also not going to allow you, Mr. Bansal, to

13    start as if this collection didn't exist and you are going to

14    start reviewing it from scratch.

15         We are looking to turn over large chunks of documents

16    in short order from this collection which already exists.

17         How do you accomplish that?

18         What will be most efficient?

19         What will be most useful to the plaintiffs?

20         Those I am leaving to the parties because you are more

21    familiar with your case, you are more familiar with the

22    documents, but that is the project.  That's the marching

23    orders.

24         MR. BANSAL:  And we hear you loud and clear, Judge.

25    We will go back and do some work with the plaintiffs.

P7entroc

1          THE COURT:  Okay.

2          MS. CHARMANI:  Your Honor, excuse me.  There are a

3   couple of issues specific as to BAM that I wanted to bring to

4   the Court attention.

5          THE COURT:  Please do.

6          MS. CHARMANI:  BAM, as the Court is aware, was not a

7   party to any of the enforcement actions.  BAM was only a party

8   to the SEC action that is not included in the plaintiffs'

9   definition of the enforcement actions.

10         We spoke to counsel for BAM during the investigations,

11  and they have very recently informed us that the way that

12  process happened with BAM was that the SEC was the primary

13  regulator that took the lead on production negotiations.

14         In fact, as I have informed plaintiffs, there were not

15  even agreed-upon search terms with the DOJ because BAM made

16  productions to the SEC and then parallel productions to the

17  DOJ.  There were very specific categories of documents that

18  were produced solely to the DOJ having to do, for example, with

19  policy and procedures that plaintiffs could also require here.

20         So, from BAM's perspective, segregating documents that

21  were produced to the DOJ solely because they were responsive to

22  the DOJ issues is a very burdensome and perhaps impossible

23  exercise.

24         Plaintiffs cannot credibly dispute that the issues

25  present in the SEC action are just not relevant here.  The SEC

P7entroc

1  brought an action claiming violations of the securities laws,

2  registration violations, and it focused on issues that are not

3  even referenced in plaintiffs' complaint, for example, staking

4  activities or certain application protocols, categories of

5  specific assets and whether they constitute a security under

6  the *Howey* test.

7          These issues are not present here.  They are not

8  relevant here.  It would be very hard for BAM to go back and

9  look at productions that were made in parallel to both

10  regulators when the SEC took the lead and figured out what's

11  responsive without agreed-upon search terms with the DOJ.

12          I wanted to also note on the efficiency point,

13  opposing counsel keeps pointing to precedent, such as the

14  antitrust litigation they cited in their letter.  But they are

15  omitted that there the investigation, the DOJ investigation was

16  pending when the complaint was filed, which means that these

17  documents were being reviewed at the same time, and the issues

18  are inextricably intertwined.

19          This is not the case here where the productions were

20  made years ago from different counsel, and they would involve a

21  burden.  I completely hear your Honor, that if you order that

22  that we produce them, we will produce them.  But even if we

23  don't review for relevance in order to withhold documents that

24  are not responsive, counsel still needs to be aware in order to

25  advocate for our client what is in this production.  So we

P7entroc

1   would have to review.

2          And we are frankly at a loss why opposing counsel

3   won't just identify specific search terms that we can run on

4   these productions.  Even if that is not the case, why they

5   won't say, if we are going to use this universe of documents,

6   the government productions, then this is how this is going to

7   benefit us down the road.

8          For example, let's exclude a time period that is

9   covered by that.  Let's exclude custodians that will be covered

10  by that.  They refuse to exclude anything down the road.

11         So what's going to happen is we are going to go

12  through a very burdensome exercise and a very expensive

13  exercise, and we are going to have do exactly the same thing

14  three months down the road.

15         And any kind of -- and I have talked to our

16  E-discovery specialist, saying give me an efficient way to do

17  it.  They have told me there isn't one, because even the

18  duplication only identifies documents or files with the exact

19  digital footprint, which means that the materials produced to

20  the government won't necessarily be identified as duplicates of

21  the overall documents we have in our collection.

22         So I struggle to see how this is efficient.  Just to

23  bring an example of what Mr. Miller said about the performance

24  reviews, this is a perfect example.  If plaintiffs are

25  interested in that, they can say to BAM:  We think performance

P7entroc

1    reviews are very relevant.  Run a search term for performance

2    reviews.  And we can do this within ten days.

3           With all due respect, this exercise, that we will go

4    through all these documents and then they refuse to even

5    articulate how this will benefit down the road makes it very

6    hard to see how this is an efficient way to proceed.

7           We have all gone through discovery.  If we engage in a

8    productive conversation on relevant custodians and they ask us

9    for midlevel, for example, personnel, we will provide that.

10          If they review documents and they say there is a code

11   name -- I don't know, "Paper" -- and they come back to us and

12   say this has been excluded please run a review for "Paper," we

13   will produce them.

14          Mr. Miller already said this will necessarily have to

15   be an iterative process.  We just struggle to see how this is

16   going to be efficient or fast or in any way move discovery

17   faster.

18          THE COURT:  I share some of those concerns in the

19   duplicativeness of later discovery.  And I will keep in mind if

20   I do order or the parties agree that there will be productions

21   to the plaintiffs in discovery of the government collection,

22   then that is going to inform what the scope of later discovery

23   is in this case.

24          We are not going to do this process five, six times

25   where the same custodians are searched over and over again.  If

P7entroc

1   they're getting a bulk of documents from X custodian as part of

2   this process, this is not five bites at the apple, Mr. Miller.

3        That is my concern, and that's not going to be

4   permitted.  They are not looking for the same documents over

5   and over again.

6        That's just not efficient.  It is very expensive for

7   them, it is not proportional to the needs of the case, and that

8   is not an exercise we are going to do.  But there are

9   efficiencies with a given collection that could be turned over

10  in short order.

11       To what extent BAM's issues are unique as you have

12  just set forth, in that a lot of the documents relate to

13  securities issues with the SEC investigation and don't go to

14  the same issues that were raised by the DOJ, the separate

15  criminal DOJ investigation, that will be very pertinent I think

16  to any discussions you have with plaintiff as to relevance.

17       Perhaps with BAM there needs to be a different

18  approach taken.  I am not enough in the weeds on these issues

19  to know.  But I do want to give the parties one last

20  opportunity to have these discussions and to be reasonable and

21  to be thoughtful and to think about ways in which documents can

22  be turned over quickly.

23       That is the exercise.  I am going to, again, not issue

24  an order today.  I want to give the parties an opportunity to

25  work this out amongst themselves, but these are the guiding

P7entroc

```
1    principles that you should be looking at, how to get focused

2    discovery turned over quickly that would expedite the concerns,

3    Mr. Miller, that you said that animate this request.

4           You are looking for other custodians.  You are looking

5    for search terms that could potentially be used to inform later

6    discussions regarding the scope of discovery.

7           You are also, I assume, looking for documents, as you

8    set forth earlier, that are relevant to the actual claims in

9    case, so this is not just discovery on discovery, this is also

10   substantively relevant, or at least some categories of

11   documents will be substantive, relevant to the issues that you

12   are litigating.

13          Keeping all of those goals in mind, what do you

14   absolutely need and what can be turned over quickly?

15          MR. MILLER:  Your Honor, I understand the Court's

16   direction, and that is what we will attempt to do.

17          To do that effectively, we would like the requests

18   that the government issued, which we have requested and

19   defendants told us they would not provide us.  So on Friday --

20   we had requested it in our prior meet-and-confer.

21          On Friday I read the court's statement from the last

22   conference to the defendants:  You know what these documents

23   concern, and what requests they were responsive to.  Without

24   that information, it is very hard for us to move this issue

25   forward.  It seems like that needs to be the priority.  That
```

P7entroc

information is to be shared with plaintiffs.  They need to know

what is the volume, what are the general categories of

information and, without sharing 6(e) material and the like,

what categories of responses, what kind of information were you

being requested to provide, and into what buckets do these

documents fall.

Later the Court said:  But again I don't know what the

documents were.  That's part of the issue I have and I'm

struggling with.  I don't know what the government requested,

and I don't know what you produced.

And we have requested the search terms that the

government and the parties agreed upon, which were produced

within 45 days of the initial conference in *Alaska*.  We have

asked for the government's requests so that we can match them

to the categories, because Binance's footnote, footnote 2 I

believe, says these categories don't match up to the government

requests, that they're their former counsel's secondhand

recollections of what they remember the documents being.  They

are not tied to the government requests.

And we've asked for search terms so that we could

understand how much the search terms would need to be different

later on.  And we would also like the time period for the

search terms, so we can know, for example, how to delimit it.

Because I think, to your Honor's point, you could say,

well, these search terms are sufficient for this period of time

P7entroc

1    for this custodian, so you don't need to research that period

2    of time.  Or you could say we'll add five words to that period

3    of time and, you know, it's Hezbollah, a couple of other

4    examples.

5        So you can make it nonduplicative if you have the

6    requests, if you have the search terms, if you know the date

7    ranges of the custodians that were searched.

8        And we asked for that to try to be able to do that, to

9    understand and to narrow it down.  We need that information,

10   and we were told that they would not provide it.

11       MR. BANSAL:  Judge, can I respond please.

12       First of all, I just would like to point out that in a

13   letter from the CFTC to Mr. Miller's law firm dated January 10,

14   2025, the CFTC said that the subpoena, which is the *Tuohy*

15   subpoena, which seeks the same documents plaintiffs are seeking

16   from us, "improperly demands documents that could reveal law

17   enforcement sources or methods and may interfere with ongoing

18   investigations."

19       So that is the language that I was referring to.  It

20   turns out I did recall it correctly.  I am not sure why

21   Mr. Miller did not bring to the Court's attention earlier when

22   he was describing the letter.

23       I will say, Judge, that what I have just heard from

24   Mr. Miller is that he wants search terms that the government

25   formulated so that he can formulate search terms.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P7entroc

1          All this time he's been resistant to the notion of

2    using search terms to mine the government productions.  We have

3    asked several times, as my colleague for BAM pointed out, that

4    they use search terms and the plaintiffs have refused.

5          THE COURT:  But this is a separate issue.  He's trying

6    to figure out what the universe is that is this collection.

7          Without knowing what the search terms are and the date

8    range, when we go forward into document discovery, how is it

9    possible that we're not going to run into the very duplication

10   issues that I have expressed concerns about, and that

11   Ms. Charmani just expressed concern about.

12         Why would we run the same search terms against the

13   same custodians?

14         We don't want to do that.  That is exactly what we

15   want to avoid doing.  We want to know what the search terms

16   were, what comprised the universe.

17         MR. BANSAL:  The efficient way to do that would be for

18   Mr. Miller to propose search terms.  We would run --

19         THE COURT:  No.  That's not the efficient way to

20   proceed.  We have a two-million-document collection.  We have

21   the collection.  It's been collected.  We just need to know

22   what it is.

23         MR. BANSAL:  Judge --

24         THE COURT:  We don't know what the collection is

25   because we don't know what search terms were used to gather

P7entroc

1    those documents.

2          Then we use that collection, turn over a large subset

3    of it, because probably a large part of it is relevant, and

4    then we fill in the gaps as needed.

5          That's the efficient way to go about doing this.  The

6    more you talk, Mr. Bansal, the more I'm becoming inclined that

7    maybe we should just turn over this entire collection.

8          MR. BANSAL:  Well, Judge, maybe I ought to confer with

9    the plaintiffs before I say anything more on this subject.

10          THE COURT:  I would suggest so.

11          Let's turn to bellwether.  Let's turn to the

12    bellwether issue.

13          The point again of bellwether was to maximize

14    efficiency, and I do not see the proposals that are before me

15    on either side as maximizing efficiency.

16          On the one hand, we have a proposal for six to twelve

17    attack-based bellwethers.  This is, again, just for discovery

18    as I understand it.

19          That seems excessive to me.  It seems with one to two

20    plaintiffs for each -- I'm guessing you will want two -- so now

21    we are talking 24 bellwether plaintiffs across a large scale of

22    time and different types of attacks.

23          I could see four, five, maybe six, but it does strike

24    me that is an excessive number.  Having plaintiffs from the

25    same attack does strike me as not being in the spirit of the

P7entroc

1   bellwether principles, which do seek normally as I understand

2   the process -- again, not having done one of these myself --

3   but understanding that they're supposed to be representative.

4          They're supposed to allow the parties to have some

5   indication as to the strength and weaknesses of various types

6   of claims.  So the idea would be to have a victim of an attack

7   versus a family member of an attack versus a couple of

8   different types of attacks, and perhaps different terrorist

9   groups so that we have some sampling representative of the

10  wider claims that we don't have to bog down in discovery on

11  500-plus plaintiffs.

12         So I do understand that there needs to be -- having a

13  few plaintiffs from one particular terrorist attack does not

14  seem like it would be representative, but six to twelve strikes

15  me then as so excessive that what are the efficiencies that we

16  are goes to be gaining from that exercise.

17         What discovery is going to be streamlined, Mr. Miller?

18         MR. MILLER:  So we have 64 attacks in the complaint.

19  So our proposal would slice that down considerably.  That means

20  that instead of 530 depositions and 530 witness examinations at

21  a trial, we would have a smaller number.

22         Instead of testimony about 64 different attacks, we

23  would have testimony about a much smaller number.

24         But I hear your Honor's concerns about the number of

25  attacks.  So we will go back and take a close look what we

P7entroc

1    think could be an efficient trial presentation and come up with

2    a better understanding of what attacks would make sense and how

3    that would be representative.

4         To your Honor's point about plaintiffs, I think a

5    couple of plaintiffs from each attack does make sense for the

6    points your Honor raised about representativeness, so a family

7    member versus an individual, a traumatic brain injury versus a

8    death.

9         I think that there's some value also in alternate

10    plaintiffs in terms of if you have a higher number it means if

11    someone dies before trial that we don't have a severe problem

12    or if there is an individual settlement before trial.

13         So I think there is value to making sure we have a

14    sufficient number, but we will give further thought to what

15    that number should be and how to make it so it's a

16    representativeness question and make sure that's complying with

17    the spirit of bellwether.

18         THE COURT:  I think that would be a much more

19    efficient way to go about it.  It just strikes me that the

20    number is excessive.

21         The point of this process is to streamline, to make

22    this efficient, and make this something workable.  Dealing with

23    24 plaintiffs and 12 terrorist attacks across a wide range of

24    geographies, terrorist groups and time frame, at that point I

25    don't know that we have really streamlined it.

P7entroc

1          I hear the 64 attacks versus 12, sure, you are coming

2    down on the number, but across the range of times, the range of

3    groups, what discovery is being saved?

4          Ordinarily, this is an issue that comes up more when

5    you are talking about narrowing and representativeness at the

6    trial phase.  We are at the discovery phase.  We are at the

7    outset.

8          Obviously, as you say, you save the cost and expense

9    of depositions of 500-plus plaintiffs.  But on liability I

10   would assume that discovery is going to be largely the same.

11   It's really the damages issues that are receiving a lot of the

12   time and efficiency.

13         At some point the efficiencies become so minimal that

14   really all we are doing is bifurcating liability and damages

15   and not really addressing the streamlining of the liability

16   discovery, which is what I thought was part of the intent of

17   doing this at the outset as opposed to later in the process.

18         Mr. Bansal, with respect to the questionnaire issue, a

19   25-page plaintiff questionnaire is wholly excessive for simply

20   getting a representative sample.  You don't need someone's

21   social media account to figure out if they're representative of

22   the group.

23         Why would you possibly need that information at the

24   outset?

25         This is not a trial questionnaire.

P7entroc

1           MR. BANSAL:  Judge, we did invite the plaintiffs to

2    mark up our questionnaire.  I think we invited them twice to

3    mark it up and let us know what they are willing to and not

4    willing to answer.

5           We will talk to them again and see if they're willing

6    to do that, but they didn't.  They haven't done that up to this

7    point.  They just provided us with a spreadsheet that really

8    repackaged the allegations in the complaint.

9           THE COURT:  Certainly more information needs to be

10   provided to the defendants so that a true discussion about

11   representativeness on the bellwether issue can be had.

12          Simply referring them to the complaint is not

13   sufficient, Mr. Miller.

14          But on the other hand, a 25-page spreadsheet is not

15   either.

16          The citation, I forget which case you cited to from

17   Eastern District of New York, but that was a trial

18   questionnaire.  It wasn't a discovery questionnaire.  So we are

19   just not in similar situations at this point.  We are not in

20   similar situations.

21          So at the outset, where we are trying to streamline

22   discovery and trying to come up with appropriate bellwethers,

23   yes, you are entitled to some additional information certainly

24   to inform you in that process.

25          I would think that the most relevant information would

P7entroc

1    pertain to the damages that each of these individuals suffered.

2    We are trying to get representative individuals.  That would be

3    very pertinent.

4        Anything that is pertinent to the representative

5    issues, pertinent to any specific defenses that the defendants

6    have in mind, I certainly would let you inquire into that as

7    part of the bellwether process, but this is not going to

8    replace depositions.  It is not going to replace discovery.

9    This is simply to choose the appropriate plaintiffs.

10        So it is not going to be a 25-page questionnaire and

11    15 document requests seeking all of these people's medical

12    information at the outset.

13        No, that's not the process.

14        I've never heard of that being done at the outset of a

15    bellwether in order to choose the appropriate scope of

16    discovery.  So to do discovery in order to streamline discovery

17    is just backwards.

18        So exchange information.

19        Mr. Miller, you do have to provide them with more

20    information than you have.  What you have provided so far is

21    not sufficient.  I saw your response that the information is in

22    complaint, not with any degree of specificity that informs this

23    discussion.

24        MR. MILLER:  We did also -- and my apologies if wasn't

25    in the letter.  My colleague, Matt Fisher from Sparacino, did

P7entroc

```
 1    provide a spreadsheet with some plaintiff information that went
 2    plaintiff by plaintiff.
 3          We'll confer about what additional information
 4    defendants need to make that work.  But after defendants said
 5    we need more than just refer us to the complaint, give us some
 6    sort of spreadsheet, we did provide a spreadsheet.
 7          The other points I just want to get back to, I think
 8    your Honor made clear on the search terms, but I want to make
 9    clear what I am asking for because we requested this
10    information and were told it was not within the scope of the
11    Court's written order.
12          So specifically to make sure that we're matching up
13    and trying to think about the categories, I'm requesting the
14    search terms actually used and run on the collected documents
15    by defendants, the time period for each of those, not just the
16    whole thing, but you know this search term on this time period,
17    and then I was informed that the government both issued initial
18    requests and then after negotiation narrowed requests.
19          So I would like to look at the actual initial requests
20    and the narrowed requests to try to figure out how they match
21    up to the categories and how they match up to the search terms
22    so that we can try to do what your Honor suggested on
23    government productions.
24          THE COURT:  Certainly I am ordering the disclosure to
25    the plaintiffs of the search terms and the date range.
```

P7entroc

1          That absolutely needs to be provided.

2          Whether the initial requests are as relevant, it seems

3    to me what you need is the narrow requests, because that is

4    what was actually produced.

5          The point of this exercise, Mr. Bansal, is to find

6    ways to limit what is otherwise going to be a wholesale

7    production.  So it really is to your benefit to provide this

8    information to the plaintiff, because if there is no limiting

9    principle on the large-scale government production, then they

10   are going to get the government production.

11         So I'm trying to assist you here.  I don't know why

12   you're fighting this process, but I would like to find a way to

13   narrow in on the most relevant materials in the government

14   production, and more information about the government

15   production would be helpful that exercise.

16         So I would encourage to approach it in that spirit.

17         MR. BANSAL:  I am not going to fight you, Judge.

18   Naturally we will comply with that order.

19         I did want to point out that it could take some doing

20   to find out what the ultimate parameters of the requests that

21   were complied with are, because those tend to be informal

22   conversations.

23         THE COURT:  I'm sympathetic to that.  I understand

24   that.  It was not your law firm that did it.  I'm guessing

25   there may not be like a list that exists with here's the final

P7entroc

1    list of search terms here's the final list.

2            To the extent you can obtain that information in short

3    order and what you can learn about it, both from the prior law

4    firm and also from your client, who presumably ran the search

5    terms and gave instructions to whoever the vendor was or the

6    internal IT folks who ran the searches, somewhere you can back

7    engineer what was done, even if it's not a comprehensive

8    agreement between the client and the government as to here's

9    the final list of search terms.  But somewhere there's a way to

10   figure out what is this universe of documents.

11           MR. BANSAL:  Sure, Judge.

12           Just two other things for the record only.

13           I just wanted to make clear that Ms. Charmani raised

14   that there were aspects of the investigation of BAM that were

15   completely afield from what might be relevant to the

16   plaintiffs' claims.

17           THE COURT:  Yes.

18           MR. BANSAL:  That is in some senses equally true of

19   the investigation with respect to BHL.  There were aspects of

20   the CFTC's investigation that went to compliance with the

21   Commodities Exchange Act.

22           So I am just trying to say, Judge, I don't want

23   Mr. Miller to be surprised by me saying that I think I did

24   mention that to him in previous conversations.

25           THE COURT:  I think that is a very fair point.  That

P7entroc

1    is exactly the kind of exercise I want us to be engaging in.

2    What are categories that be carved out because they are

3    involving separate investigations into separate issues?

4            Those chunks of documents can be peeled away hopefully

5    fairly easily.  If we know, for example, what the search terms

6    were that were used to generate those documents, what

7    custodians were pertinent to those particular sets of

8    documents?

9            There probably are ways in which to, again, reverse

10   engineer what documents were searched for in connection with

11   those separate investigative prongs and that can be segregated

12   bout from the main production.

13           MR. BANSAL:  Yes, Judge.

14           THE COURT:  I am very open to that approach.

15           MR. BANSAL:  Thank you, Judge.  We will work on that.

16           Lastly I just wanted to note that the spreadsheet that

17   Mr. Miller mentioned is what I was referring to when I said

18   they just repackaged the allegations in the complaint, but we

19   will work with them to get additional information.

20           THE COURT:  We are going to set --

21           MS. CHARMANI:  Your Honor?

22           THE COURT:  Yes.

23           MS. CHARMANI:  Excuse me.  I didn't mean to interrupt.

24           I just want to address an issue specific to BAM

25   relating to the point I made on the SEC production.  I have

P7entroc

 1    confirmed now twice that there were no specific DOJ terms that

 2    were ever agreed upon and run on the documents.

 3            I will make sure that there were no additional

 4    requests with the DOJ that were produced pursuant to specific

 5    search terms, but I simply don't have search terms that were

 6    run.

 7            THE COURT:  If that is the case, then I understand

 8    that.  Then it didn't happen.  Then there's nothing to turn

 9    over.

10            If there were no DOJ-specific search terms that

11    generated that universe of collection, then that is the answer.

12    They may have asked for specific documents and just the

13    performance reviews, in which case you could probably isolate

14    those very quickly.  I can imagine that process not being

15    search-term driven.

16            So certainly you can't create what doesn't exist, and

17    I am not expecting you to do so.

18            MS. CHARMANI:  Thank you, your Honor.

19            MR. MILLER:  Your Honor, just on that, my

20    understanding is that -- totally feel free to correct me -- is

21    that the SEC and BAM agreed on search terms.

22            MS. CHARMANI:  For unrelated enforcement action that

23    is not subject to the definition that you have in your document

24    requests.

25            MR. MILLER:  Understood.

P7entroc

1          MS. CHARMANI:  So are we know expanding the definition

2     of the enforcement actions to go into the SEC action?

3          MR. MILLER:  So my understands is that the SEC and BAM

4     agreed on search terms and that that production was then

5     provided wholesale to the DOJ for its investigation.

6          THE COURT:  I understood Ms. Charmani say to say it

7     wasn't provided to wholesale to the DOJ.

8          MS. CHARMANI:  There were parallel productions both to

9     the SEC and the DOJ, and the same documents were being produced

10    to both regulators.

11         MR. MILLER:  So the DOJ used the same search terms to

12    find the universe of what the DOJ had.  So I can look at the

13    search terms and think --

14         THE COURT:  DOJ didn't use the search terms.  DOJ just

15    got the production.  They didn't generate search terms.  There

16    was a production, and they basically me too-ed it.

17         MS. CHARMANI:  There wasn't any discussion of search

18    terms with the DOJ.  So, no, they did not use search terms to

19    identify any type of relevant documents.

20         MR. MILLER:  I mean, the DOJ asked for what we are

21    asking for here, which is all the documents, because they

22    thought it was relevant to their investigation.  And to the

23    extent there were irrelevant documents, they didn't parse them

24    out.

25         But the search terms would still be helpful to know,

P7entroc

1    okay, are there search terms with hit counts for certain things

2    that we determine are irrelevant.  We can exclude those.

3            And if there are search terms that are still relevant,

4    then we could parse nem.  Because without search terms I am

5    very worried that we are going to come before your Honor and

6    say there's no way to parse the BAM production.

7            The way to do that would still be looking at the

8    search terms and hit reports, and then say these search terms

9    are relevant that they ran, and therefore that's the material

10   that the DOJ used.  And we'll copy those same search terms.

11           You could apply the search terms to BAM's production

12   and immediately produce them without a relevance or

13   responsiveness review, because you determined that those search

14   terms polled out relevant documents.  You could say this is a

15   subset of X hundred thousand documents, and we are excluding

16   things that we determined are irrelevant search terms.

17           Otherwise I don't know how we'll parse BAM's

18   production any further.

19           THE COURT:  So, again, I am not going to rule on this

20   issue today.

21           What I am going to say, as I've said several times

22   now, is that I want the parties to approach this from an

23   efficiency standpoint.

24           Again, I think Mr. Miller makes a fair point, which is

25   if the goal is to determine which subset of materials from the

P7entroc

1    BAM production are going to be turned over to plaintiffs and

2    are particularly relevant, would it not be helpful for him to

3    know what the search term universe is, even if it was the

4    search terms negotiated with the SEC?

5         If the point of this is to narrow the universe so that

6    we are not turning over the entire BAM production simply

7    because it went to DOJ, then I would think that it would be in

8    your client's best interest to approach it from that point of

9    view as to what can we do, what information can we offer to

10   narrow the scope and to make clear what is relevant and what is

11   not relevant.

12        I'm not going to tell you how to go about doing that

13   right now.  Again, it does seem as if BAM raises specific

14   issues that are separate from the Binance Holding issues.

15        But you should have those discussions, and you should

16   find way forward.  Otherwise I will just issue an order at the

17   next conference and we'll cut through this all.

18        Is that understood?

19        MR. MILLER:  Understood.

20        MS. CHARMANI:  Thank you, your Honor.  We'll come up

21   with a practical approach with the plaintiffs, and I am sure we

22   can figure it out.

23        THE COURT:  Practical approach is what I am looking

24   for.

25        MS. CHARMANI:  Thank you.

P7entroc

1          THE COURT:  Ms. Molinelli, can we have a date for a

2   follow-up conference in approximately five weeks' time.

3          THE DEPUTY CLERK:  That takes us to the week of

4   August 18.

5          THE COURT:  What day are we available there?

6          THE DEPUTY CLERK:  We are available every day.

7          THE COURT:  Our afternoons are pretty free.

8          How about the afternoon of the 20th, Wednesday, the

9   20th?

10          THE DEPUTY CLERK:  We can do 2:30.

11          THE COURT:  Would that be acceptable for the parties?

12          Are you available?

13          MR. MILLER:  Yes, your Honor.

14          MR. BANSAL:  Works for the defense.

15          Thank you, Judge.

16          THE COURT:  All right.  2:30.  August 20.

17          We're still holding entry of a case management plan in

18   abeyance until that conference.

19          I'm also holding the motion to compel productions in

20   abeyance until we resume our discussion.

21          I would like a status letter, joint status letter on

22   the progress of any negotiations and agreements that have been

23   reached by COB Monday, the 18th.

24          I urge the parties to approach this practically and

25   with the goal of expedition.

P7entroc

1           Thank you.

2           Court is adjourned.

3           (Adjourned)