**VIA ECF**                                                                                    August 21, 2025

Hon. Jeannette A. Vargas, U.S.D.J.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 703
New York, NY 10007

                RE:    *Troell et al.* v. *Binance Holdings Ltd., et al.*, No. 1:24-cv-07136 (S.D.N.Y.)

Dear Judge Vargas:

The Parties respectfully submit this joint letter to update the Court on the status of their meet and confers regarding (i) a bellwether process and (ii) the Government Productions.

      **Plaintiffs' Bellwether Proposal**

Only Plaintiffs have an actionable bellwether proposal, which the Court should so-order and then set a date certain for the close of discovery. Ex. 1.

On July 14, this Court tasked the parties with narrowing this case to "four, five, maybe six" attacks that could serve as the basis for selecting a "representative" set of bellwether plaintiffs," to save the parties and Court from getting "bog[ged] down in discovery on 500-plus plaintiffs." July 14 Hearing Tr. ("Tr."), at 41:23-42:11. The Court explained that attacks should include "different types of attacks" and "different terrorist groups" and that representative Plaintiffs should include both a "victim of an attack versus a family member." *Id.* at 42:6-9.

On July 18, Plaintiffs provided a detailed proposal implementing exactly those principles, suggesting a handful of attacks, committed by various terrorist groups, in different geographies, from which Bellwether Plaintiffs could be selected. Ex. 2. Plaintiffs' updated August proposal primarily added a Plaintiff selection protocol to ensure a mix of victim types. *See* Ex. 1.

Over five meet and confers, Defendants have never meaningfully engaged with the merits of Plaintiffs' proposal, much less presented an actionable counterproposal. Instead, they claim they need documents and detailed information about *all 533 Plaintiffs* before they can determine bellwether *structure*. Not so. Bellwether attacks, as the Court noted, should be selected as a mix of terrorist groups, geographies, and time periods. Defendants already have that information. The Court can thus order a bellwether structure, and a date certain for close of discovery. After the Court so-orders Plaintiffs' structure, Plaintiffs will continue producing materials—focusing on the Plaintiffs affected by the bellwether attacks—and the parties can select bellwether plaintiffs from those attacks. *See* Ex. 1.[1]

Far from expedient, Defendants' approach would require the Court to resolve briefing on the liability strength of each attack. The parties would have to "do discovery in order to streamline discovery"—an approach the Court rejected as "backwards." Tr. 46:16-17. And of course, were the Court to evaluate the liability case of each attack just to determine structure, Plaintiffs would also first need full discovery from Defendants.

---

[1] Plaintiffs have already produced over 850 pages of documents, along with a detailed spreadsheet containing information responsive to Defendants' requests to learn about all Plaintiffs (*i.e.*, even those who may not be bellwether plaintiffs).

Therefore, Plaintiffs respectfully ask the Court to so-order Plaintiffs' bellwether proposal and order a case schedule. The parties' previously proposed deadlines (148 days for fact discovery—which Plaintiffs propose rounding to 150—and 45 further days for expert discovery) should be ordered as firm dates, running from the August 26 conference. Thus, fact discovery would close on January 23, 2026, and expert discovery would close on March 9, 2026.

Accordingly, the Court need not reach exactly what information is necessary to select specific Plaintiffs. But should the Court reach that issue, there Defendants have reverted to demanding *even more information* about *each* Plaintiff, including certified copies of vital records, medical records, and a host of other documents. *See* Ex. 3; *see also* Ex. 4. Their requests disregard this Court's instruction that broad discovery—including "seek[ing] all of these people's medical information at the outset"—is impractical, burdensome, and unnecessary for deciding a bellwether process. *See* Tr. 46:11:17.

Less than four hours before the parties' final meet and confer, Defendants sent a mini-brief, addressed to Plaintiffs but aimed at the Court. Ex. 5. Defendants again demanded a laundry list of documents from all Plaintiffs for the purpose of creating "discrete categories" based on unspecified "prominent variables." *See id.* at 3. That is pointless. The Court and Plaintiffs have *already identified* variables that bear on representativeness; that is enough. *See* Eldon E. Fallon, et. al., *Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev. 2323, 2345-46 (2008) (encouraging "variables [that] could be easily identified, appeared to be substantively important, and provided a clear line of demarcation" as opposed to attempting to "account[] for every variable in an individual case," in light of the "[t]ime" constraints and "realities of modern mass tort litigation"). And Defendants' hypothetical about Plaintiffs cherry-picking "one gravely injured victim" in an attack where everyone else walked away with "minor injuries," Ex. 5 at 3, is unfounded (and does not fairly describe any attack, much less those in Plaintiffs' proposal).

Finally, under no circumstances should Plaintiffs have to produce any blockchain analysis now. *See* Ex. 5 at 3. Here, too, Defendants seek to flip the normal order of operations, and inject a needless expert discovery/summary judgment phase. Ex. 6 at 4-5. These privileged materials are independently protected from disclosure, anyway. *See id.*

**Plaintiffs' Proposals for the Government Productions**

***Binance and Zhao***: Only Plaintiffs have a detailed compromise proposal for Binance and Zhao's joint productions, which the Court can and should so-order. *See* Ex. 7.

After Binance shared the search terms used to create the government production, on August 6 Plaintiffs proposed—term by term—a narrowed set of terms Plaintiffs wanted run, explaining each term's relevance. Binance did not engage, except to ask Plaintiffs to further substantiate the CFTC production's relevance. Plaintiffs responded with an updated proposal that further substantiated that production's clear relevance, while narrowing which terms would be run against certain custodians in the CFTC production. *See* Ex. 7 at 32-33.

On August 20, Plaintiffs met the latest additions to Binance's defense team. Binance's new counsel implausibly claimed that the entire CFTC production is irrelevant, stated that some search terms for the DOJ production are irrelevant (without naming any particular terms), and then suggested a set of compromises could be made—*after* the conference. In the interest of expediency, Plaintiffs have offered to meet every day leading to the conference to create an agreement. If that fails, however, the Court should so-order Plaintiffs' proposal. As the Court held: "**If you are not prepared to come up with proposals . . . then as I said at the outset, I will just issue an order**." Tr. 30:20-22. Only Plaintiffs have a full ready proposal.

2

Moreover, the potential universe of documents for both Binance and Binance.US is much smaller than previously understood; accordingly, any burden of production has correspondingly shrunk. Binance recently disclosed that the actual number of de-duped documents and pages is *dramatically smaller* than Plaintiffs and the Court previously understood, although the total number remains a mystery. While Binance's counsel expressed surprise at Plaintiffs' apparent misunderstanding, the Court appears to have held the same understanding, *e.g.*, Tr. 4:15-16 ("It's 2 million pages of documents at a minimum, just counting up from what I saw in the papers")—and repeatedly relied upon that number, *see* Tr. 5:19, 18:13, 19:6, 28:16-21, 40:20. Binance never stated that the de-duped number it would have to actually produce is far smaller. Binance.US similarly disclosed that its previously stated document count was also heavily inflated, there due to a counting quirk whereby *each message* in text and instant message chains was separately counted.

**Binance.US**: Binance.US has refused to provide *any* information that could narrow its production, betting that the Court will not enforce its order. At the July conference, the Court held: "The point. . . is to find ways to limit what is otherwise going to be a wholesale production. . . . [I]f there is no limiting principle on the large-scale government production, then they are going to get the government production." Tr. 48:5-10. Regarding the SEC search terms and other information from Binance.US, the Court explained: "If the point of this is to narrow the universe so that we are not turning over the entire BAM production simply because it went to DOJ, then I would think that it would be in your client's best interest to approach it from that point of view as to . . . what information can we offer to narrow the scope . . . Otherwise I will just issue an order at the next conference and we'll cut through this all." Tr. 54:5-17.

Since July 18, Plaintiffs have repeatedly requested Binance.US provide the SEC search terms, the government requests, the government production letters, or any other information that could narrow its production. Those requests have largely been rebuffed. Binance.US only offered information about previously undisclosed separate productions to the DOJ—productions, not part of the core production to SEC/DOJ, that concerns a volume *less than 5%* of the main Binance.US production. Instead of providing useful information about the productions to the SEC Binance.US provided wholesale to the DOJ, Binance.US has doubled-down on directing Plaintiffs to blindly propose their own search terms—the exact approach the Court rejected, Tr. 30, and which will cause further disputes and delay.

Binance.US's approach distracts from the central issue: Its full re-production to the DOJ is relevant. Binance.US's letter, *see* ECF No. 120-1, makes that clear. Even if the SEC's *claims* concerned securities issues, the *actual documents* concern issues squarely relevant to this case. The disclosed subject-matter categories confirm that the production related to relevant topics, such as: Zhao's control; whether Binance.US is an alter ego of Zhao or Binance; whether Binance.US helped Binance hide U.S. users; and knowledge of, and compliance with, AML, SAR, and money-transmitting-business regulations. *See* ECF No. 120-1. The only facially doubtful category—the performance reviews—was revealed to be relevant, because Binance.US previously admitted that they were limited to twenty performance reviews produced as responsive "to the roles, responsibility, and structure of Binance U.S." Tr. 16:22-23.

The Court should order that Binance.US produce the full production. Binance.US had plenty of opportunities to narrow what should be produced; it squandered those chances. Binance.US knew the risks of its intransigence: being forced to "an order at the next conference" to "turn[] over the entire BAM production." Tr. 54:5-17. Permitting Binance.US to go back to the drawing board would reward and encourage delay.

**<u>Defendants' Position: Bellwether</u>**

Defendants propose a preliminary discovery period for both Parties to ascertain the issues and facts needed to make a reasoned decision on how a bellwether process could best work in this case. *See* Ex. 8, Defs Aug. 20, 2025 letter (detailing deficiencies in Plaintiffs' bellwether proposal).

Bellwether selection "**cannot be made in a vacuum**." *Meranus v. Gangel*, 1991 WL 120484, at *1-2 (S.D.N.Y. June 26, 1991)[2] (ordering limited interrogatory discovery and document productions to determine whether a bellwether was appropriate). Selection should only occur after verifiable information is available to identify common issues and representative plaintiffs. *Adams v. Deva Concepts, LLC*, 2023 WL 6518771, at *1-6 (S.D.N.Y. Oct. 4, 2023) (deferring decision on bellwether and ordering further discovery where there was only "unverified or dubiously verified" information); *Zito v. Leasecomm Corp.*, 233 F.R.D. 395, 400 (S.D.N.Y. 2006) ("Whether there is some rational basis for deciding how to group the cases for trial is a matter best deferred until the close of discovery."). *See also In re Repetitive Stress Inj. Litig.*, 11 F.3d 368, 373-74 (2d Cir. 1993) (a consolidated process must not veer "too far in the interest of expediency and sacrifice basic fairness in the process").

Bellwether selection "requires sufficient information on variables such as the plaintiffs' characteristics, the type of injury, the claims brought, the time when claims arose or a case was filed, or the availability of certain defenses." *Adams*, 2023 WL 6518771, at *4-5. Unverified information, including sworn questionnaires, **does not suffice**. *Id.* After the necessary information is gathered, courts should: **first**, catalogue all claims and cases into categories based on prominent variables; **second**, pool representative cases and determine test cases that, (a) reflect the individual categories of the overall cases, (b) illustrate their likelihood of success and measure of damages, and (c) illuminate challenges of presenting certain types of cases; **third**, establish a method for selecting a predetermined number of individual cases for trial. *Id.* 2023 WL 6518771, at *3.

Here, none of these steps has been taken, nor can they, as Defendants—and the Court—lack the information needed to begin. Deferring a decision on a bellwether until after an initial discovery phase enables the Parties and the Court to proceed responsibly,[3] without delaying progress. Plaintiffs can make their limited production while Defendants make theirs. Defendants' proposal also streamlines the case by identifying Plaintiffs who lack standing. The Court should not have

---

[2] Unless noted, emphases are added and citations are omitted.

[3] Indeed, multiple district courts handling mass-plaintiff-mass-attack ATA cases have declined to rush into a bellwether process before discovery has begun or while preliminary discovery is going. *See, e.g.*, *Moses et al v. BNP Paribas, S.A.*, No. 1:24-cv-04938 (S.D.N.Y.) (operative complaint filed November 2024, motion to dismiss pending, and no bellwether process initiated in 250-plus plaintiff, 63-attack ATA case); *Cabrera v. Black and Veatch et al.*, 1:19-cv-03833-EGS (DDC) (operative complaint filed March 2024, no bellwether process initiated in 700-plus plaintiff, 197-attack ATA case); *Schmitz, et al. v. Ericsson Inc., et al.*, No. 1:22-cv-02317 (D.D.C. 2022) (operative complaint filed December 2022, no bellwether process initiated in 1300-plus plaintiff, 250-plus-attack ATA case); *Bartlett et al v. Societe Generale de Banque au Liban SAL et al*, Docket No. 1:19-cv-00007 (E.D.N.Y. Jan 01, 2019) (operative complaint filed August 2024, motion to dismiss denied, discovery ongoing, no bellwether process initiated in 1100-plus, 267-attack ATA case); *Zobay, et al., v. MTN Group Ltd., et al.*, No. 1:21-cv-03503 (E.D.N.Y.) (operative complaint filed November 2023, discovery commenced as of March 2024, no bellwether process initiated in 300-plus plaintiff, 12-attack ATA case).

to wait until after a bellwether trial to dismiss ineligible Plaintiffs. And because approximately **47 of the 64 attacks in the FAC involve only one direct Plaintiff**, if only one lacks standing, related derivative claims may also be dismissed.

Plaintiffs bear the burden of showing that a bellwether process is appropriate, but have not done so. *In re Repetitive Stress Inj. Litig.*, 11 F.3d at 374. As detailed in Ex. 8, Plaintiffs' proposal does not streamline discovery, identify common issues, or otherwise identify a representative plaintiff. Instead, it seeks to bypass Plaintiffs' discovery obligations and undermines Defendants' due process rights, including the right to be heard and present their case. *See Chevron*, 109 F.3d at 1023 (*Jones, J.* concurring).

**Defendants' Position: Document Production & Interrogatories:**

**OFAC/FinCEN/DOJ Production:** The Parties have made substantial progress toward agreement on producing communications from the Government Productions.[4] The Parties have broadly agreed to use a slightly truncated set of search terms from those originally used to identify and produce documents from productions to OFAC, FinCEN and the DOJ. The Parties expect to finalize these terms soon and BHL anticipates producing a substantial portion of the approximately 9,000 OFAC communications and attachments (approximately 32,500 pages) produced to OFAC **before September 16, 2025**. The DOJ and FinCEN productions are under review for compliance with data privacy regulations, privilege, and for counsel to otherwise fulfill counsel's ethical professional obligations in the context of discovery. BHL expects to produce a substantial portion of the 140,000 communications and attachments (approximately 550,000 pages) produced to the DOJ and FinCEN by **November 24, 2025**. Other documents in the OFAC production, such as transaction data and KYC/KYB information containing BHL customer financial and identification information, raise additional concerns, including foreign data privacy issues. BHL proposes continuing to meet and confer with Plaintiffs regarding a protocol and schedule for these other categories of documents, and update the Court by **September 25, 2025**.

**CFTC Production**: The CFTC production contains documents and custodians reflecting its unique regulatory purview—which is materially different from OFAC, DOJ, and FinCEN, and unrelated to Plaintiffs' claims regarding terrorism and sanctions compliance. For this reason, these documents are not relevant and their production should not be ordered. Most CFTC documents overlap with OFAC, DOJ, or FinCEN productions and will be included in those productions to Plaintiffs as set forth above. Any documents concerning U.S. commodities regulations are irrelevant to Plaintiffs' claims.

**Interrogatories**: Plaintiffs have asked BHL to identify its low-level compliance employees. BHL is continuing to consider this request, but consistent with FRCP 33(d) anticipates that most if not all of those employees will be identified through the documents produced from the Government Productions above.

**Communications with the Government:** Plaintiffs separately request cover letters, documents requests, and meeting materials shared with the government, but they provide no valid reason why such documents are relevant or necessary, especially in light of the production of the Government Production documents. Defendants are especially cautious in light of our recent discovery of *Touhy* request denials **that were not disclosed by the Plaintiffs to Defendants or this Court.**

---

[4] As defined in the Court's May 21, 2025 Order (ECF No. 100).

**Transactional Data:** Plaintiffs request "transactional data" for 15,000 wallets identified through the same blockchain analysis they relied on in their complaint and briefing. Defendants have already requested this analysis as part of Defendants' proposed initial, pre-bellwether discovery phase. And Plaintiffs' argument that this information is protected from disclosure, is meritless in light of prevailing law on waiver, at-issue, and fairness doctrines. *In re Commodity Exch., Inc. Gold Futures and Options Trading Litig.*, 2019 WL 13046984 (S.D.N.Y. Feb. 25, 2019) (work product protections waived for expert analysis cited in complaint).

**BAM-Specific Issues:** Since the last status hearing, pursuant to the Court's directive, BAM has continued to make good faith efforts to find "a practical solution" regarding the Government Productions. BAM was not a party to the Enforcement Actions. In response to a DOJ subpoena, BAM did not negotiate specific search terms with the DOJ but instead agreed to produce copies of its SEC productions. These productions were made in a separate action—now voluntarily dismissed—that focused on securities violations unrelated to Plaintiffs' allegations. To identify relevant documents here, BAM disclosed to Plaintiffs categories of materials produced solely to the DOJ and is prepared to promptly produce those deemed relevant. Additionally, BAM has repeatedly requested that Plaintiffs provide search terms tailored to their claims to identify further responsive documents. Plaintiffs have refused, claiming the process of drafting search terms responsive to their allegations would be too burdensome, instead insisting on receiving the SEC search terms, government requests and production cover letters—materials that include sensitive and irrelevant information—some designated as "Confidential Grand Jury Materials Subject to Fed. R. Crim. P. (6)(e). Plaintiffs' approach amounts to conducting discovery in reverse: demanding access to BAM's information in order to then tailor their requests. This is contrary to the principles of discovery, which "[i]s guided by the allegations in the complaint and the defenses asserted." *Haber v. ASN 50th St.*, LLC, 272 F.R.D. 377, 380 (S.D.N.Y. 2011). BAM even suggested using the BHL search terms already provided to Plaintiffs to start, but Plaintiffs declined. After weeks of requests, Plaintiffs only yesterday proposed that BAM run all 120 search terms agreed upon between BHL and the DOJ, claiming they are all relevant to BAM. That assertion is unfounded given BAM's distinct position. Nonetheless, BAM has agreed to run those terms and expects hit counts shortly. Despite Plaintiffs' refusal to engage in a targeted discovery process, BAM will continue its efforts to cooperate and reach a workable compromise.

Respectfully submitted,

/s/ *Ian Miller*
Holwell Shuster & Goldberg LLP
*Counsel for Plaintiffs*

/s/ *Christopher LaVigne*
Withers Bergman LLP
*Counsel for Defendant Binance Holdings Limited*

/s/ *Matthew J. Fisher*
Sparacino PLLC
*Counsel for Plaintiffs*

/s/ *Anirudh Bansal*
Cahill Gordon & Reindel LLP
*Counsel for Defendant Binance Holdings Limited*

/s/ *Thania Charmani*
Winston & Strawn LLP
*Counsel for Defendant BAM Trading Services Inc.*

cc: All attorneys via ECF

/s/ *Katherine L. McKnight*
BakerHostetler LLP
*Counsel to Defendant Changpeng Zhao*