P8QVTROC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JOCELYN TROELL, et al,

 4              Plaintiffs,

 5         v.                              24 Civ. 7136 (JAV)

 6   BINANCE HOLDINGS LIMITED d/b/a
     BINANCE, et al,
 7
                Defendants.                Conference
 8   ------------------------------x
 9                                         New York, N.Y.
                                           August 26, 2025
10                                         11:10 a.m.
     Before:
11
                    HON. JEANNETTE A. VARGAS,
12
                                           District Judge
13
                          APPEARANCES
14
     SPARACINO PLLC
15        Attorneys for Plaintiffs
     BY:  ADAM GOLDSTEIN
16        -and-
     HOLWELL SHUSTER & GOLDBERG LLP
17   BY:  IAN MILLER
          CHRISTOPHER KIM
18
     CAHILL GORDON & REINDEL LLP
19        Attorneys for Defendant Binance
     BY:  ANIRUDH BANSAL
20        -and-
     WITHERS BERGMAN LLP
21   BY:  CHRISTOPHER N. LAVIGNE

22   BAKER & HOSTETLER LLP
          Attorneys for Defendant Zhao
23   BY:  JOANNA F. WASICK

24   WINSTON & STRAWN LLP
          Attorneys for Defendant BAM
25   BY:  ATHANASIA CHARMANI
```

P8QVTROC

1          (Case called)

2          THE DEPUTY CLERK:  Will parties please make their

3    appearance, beginning with the plaintiff.

4          MR. MILLER:  Ian Miller of Holwell, Shuster &

5    Goldberg, for the plaintiffs, along with my colleague sitting

6    next to me, Adam Goldstein from Sparacino PLLC, and my

7    colleague Christopher Kim, also of Holwell, Shuster & Goldberg.

8          THE COURT:  Good morning.

9          MR. BANSAL:  Good morning, your Honor.

10          Anirudh Bansal from Cahill Gordon & Reindel, for

11    defendant Binance Holdings Limited.

12          THE COURT:  Good morning.

13          MR. LAVIGNE:  Good morning, your Honor.

14          Christopher LaVigne from Withers LLP, also on behalf

15    of defendant Binance Holdings Limited.

16          THE COURT:  Good morning.

17          MS. CHARMANI:  Good morning, your Honor.

18          Thania Charmani, on behalf of BAM Trading Services,

19    from Winston & Strawn.

20          THE COURT:  Good morning.

21          MS. WASICK:  Good morning, your Honor.

22          Joanna Wasick of Baker Hostetler, for defendant

23    Changpeng Zhao.

24          THE COURT:  Good morning, everyone.

25          I am in receipt of the 136-page joint submission from

P8QVTROC

1    the parties; so I see much progress has been made on resolving

2    the issues that I sent you off at the last conference to make

3    progress on, not what I was anticipating when we last spoke.  I

4    did say that I was hoping that I would have some concrete

5    proposals to so-order that the parties could come to an

6    agreement upon.  It does not seem that there's been much

7    agreement, unless I did see on the discovery issue with respect

8    to the government productions that there were continued

9    discussions.  So can the parties report whether there was any

10   significant progress made on that front?

11            MR. MILLER:  Your Honor, the parties met and conferred

12   yesterday.  And the update from that meet-and-confer is that we

13   now know that Binance and Zhao's total de-dupe number of

14   documents is 180,000 documents.  For every CFTC, FinCEN, DOJ,

15   OFAC, both provided by search terms and provided without search

16   terms, 750,000 pages, 180,000 documents.

17            THE COURT:  So that's a very different universe than

18   the two-million-plus documents that the Court was under the

19   impression that we were talking about then that I had

20   referenced and that I believe you had referenced at the last

21   conference.

22            Mr. Bansal?

23            MR. BANSAL:  Judge, it was two million pages, and that

24   was inclusive of BAM's production.  I believe what the Court

25   was referring to -- after seeing Mr. Miller's description of

P8QVTROC

1    what happened at the conference, I went back and looked at it.

2    In our letter, we wrote that the page counts were -- and the

3    document counts were inclusive of documents that had been

4    produced to other agencies so that they overlapped.  And I

5    think the Court was doing rough math, which was as much

6    information obviously as I had.  But the de-duped amount is, as

7    Mr. Miller says for Binance Holdings Limited, 750,000 pages.

8                THE COURT:  750,000 pages.

9                MR. BANSAL:  There's the two million pages --

10               THE COURT:  So that's the apples-to-apples comparison;

11   that's not 2.1 million pages, that's 750,000 pages, which

12   comprises 180,000 documents.

13               MR. BANSAL:  But, Judge, also the two-million page

14   count that the Court was referencing could only have included

15   the BAM production as well.  Because if you add up all the

16   numbers in our letter, it was only 1.4 million pages.  Again,

17   I'm doing this kind of trying to reverse engineer it.  But that

18   would then mean that it's 1.5 million pages.

19               THE COURT:  So what you're saying is the

20   apples-to-apples comparison is actually 1.4 million pages to

21   750,000 pages.

22               MR. BANSAL:  It would be 1.5, because it's 746,000

23   pages, plus 800 -- that's for Binance Holdings Limited, plus

24   816,000 pages for BAM.

25               THE COURT:  All right.  Thank you.  That is a helpful

P8QVTROC

1    data point for comparison.  I appreciate that.

2            MR. MILLER:  So the other two updates from yesterday,

3    so Binance and Zhao, as my colleague just described, 1.5

4    million pages, OFAC is 67,000 pages.

5            Now, there's a subset of OFAC, which is emails and

6    attachments, which is 32,500 pages.  As to those 32,500 pages,

7    we have an agreement.  But Binance's new counsel explained that

8    we have a fundamental philosophical disagreement about the Tai

9    Chi strategy, where Binance affirmatively misled U.S.

10   regulators that the Tai Chi document where they explained the

11   strategy, which was to deceive U.S. regulators using Binance

12   U.S., to create Binance U.S., to draw regulatory attention

13   away.  And that document specifically talks about how it will

14   defer attention from regulators on anti-money laundering

15   issues.

16           And this is at the core of the Binance U.S. alter ego

17   theory; it's at the core of our willful evasion argument; and

18   it's also our argument -- one of our arguments as to why

19   there's personal jurisdiction as to Zhao.  Because Judge Furman

20   recently, after *Fuld*, issued a decision where he said, Even if

21   you don't look to the outer limits of *Fuld*, a scheme aimed at

22   the U.S. is enough.  And this is a scheme aimed at the U.S.,

23   because it was a scheme aimed at U.S. regulators.

24           So that philosophical difference cuts out dozens of

25   search terms from our proposal and is ripe for the Court to

P8QVTROC

1    decide.  And I can go into more details as to why it's relevant

2    when we get there, but that's -- we have a fundamental impasse.

3            THE COURT:  I think I'm not understanding what the

4    various proposals are though.  There was a lot of paper.  I saw

5    charts of search terms.  Cut through it for me, because I'm not

6    going to sit here in the weeds and go through 100 pages of

7    submissions to dictate search terms.  That's not my role.  So I

8    need you to tell me what it is that -- what is the proposal

9    that you are making right now.

10            MR. MILLER:  Yes.  The only information we have to

11   narrow it is the search terms from Binance and Zhao.  So for

12   that reason, we had to go search-term-by-search-term.

13            The way the Court can decide it is to so-order

14   plaintiffs' proposal.  And the issue that we can debate at this

15   conference and the Court can then decide is whether the Tai Chi

16   strategy is relevant, because that's the core of the disputed

17   issue as to why plaintiffs' proposal doesn't work under

18   Binance's theory of the case.  So you can resolve that

19   dispute --

20            THE COURT:  Why is this a point of contention?  You're

21   in the weeds.  I'm up here.  You need to come back up here and

22   tell me what is the point of contention between the two parties

23   as to which documents should be turned over from the government

24   production.  Because as I've said, there's a set of documents

25   out there in the world that we just need to leverage and turn

P8QVTROC

1    over, right.  I've not been a fan of the whole search term

2    process, but that seems to be where the parties have circled

3    back to again, so here we are with search terms again.

4        My view was we have this universe of documents; some

5    percentage of them should just be turned over.  They exist.

6    They have been gathered.  They are sitting there.  Like, they

7    don't need to be reviewed; they don't need to go through

8    another relevance review.

9        Mr. Bansal, I know your position on this.  I'm telling

10   you what I said at the last conference and the marching orders

11   that I thought I gave to the parties, which is, cut through all

12   this.  I don't want it to be the entire production, but you're

13   going to get a significant amount of these government

14   documents.  What is the practical solution?

15       That was the marching order.

16       Now we're back to running search terms on these

17   documents as if we're back at the beginning of discovery again.

18   And that was not what I thought we were doing; that's not what

19   I thought the exercise was.

20       MR. MILLER:  Let me explain why.  Everything you're

21   saying is exactly what plaintiffs have argued at every

22   meet-and-confer.  Defendants had only given us the search

23   terms; so there's no other mechanism to narrow it.

24       So if you look at the search terms, you'll see it's

25   all relevant, your Honor.  And the reason we cut it down and

P8QVTROC

1    provided a compromised proposal was because we wanted to comply

2    with the Court's order.  Now that you look at the search terms,

3    when I look at the search terms, it's a roadmap to plaintiffs'

4    case; it's all relevant, but we've narrowed it down.  But

5    there's no other mechanism to narrow it because they have

6    refused to give us the government requests and narrow their

7    broad form.  They've refused to give us the government

8    production letters; they've refused to go

9    production-by-production and say what the subject matter is.

10          So there's just no way to limit it except what they

11   provided.  I don't want to do the search terms, but that is the

12   only thing we have.  And we need to emerge from this conference

13   with an order.  As your Honor noted, you know, I've got it

14   written down six times, if we don't have a way to narrow it,

15   the Court's going to issue an order and cut through it.

16          THE COURT:  No.  At the end of today, we're going to

17   have a decision on this.  This is done.  You've had two

18   opportunities to meet and confer; so an order will issue at the

19   end of this conference one way or the other.

20          I always prefer for the parties to resolve this

21   themselves, that's why I asked twice for the parties to meet

22   and confer on this issue.

23          Let me hear from Mr. Bansal.  Why are we back at

24   search terms?  Why are we at search terms?

25          MR. BANSAL:  Judge, this is a way that the plaintiffs,

P8QVTROC

1    I thought, until today, agreed was an effective way to put into

2    action what the Court had required us to do when we were last

3    before you, which was to take the low-hanging fruit, the things

4    that are not going to be difficult and are the less

5    challenging, present less challenging issues, and get them out

6    the door right away.

7              THE COURT:  Exactly.

8              MR. BANSAL:  So we have the OFAC production.  And I do

9    understand the plaintiffs' point that sanctions violations,

10   reading the complaint, are much closer to the middle of the

11   fairway of what their allegations are.  So we focused on the

12   communications — and there are a lot of them, right.

13             In any other context, 32,000 pages would be

14   significant; it's just in the context of the millions of pages

15   that are in the government production that they are lower.  But

16   we did try to get that done as quickly as possible.  We are

17   proposing to produce them by the 16th of September, which is

18   very quick -- very quickly.

19             And then with respect to the rest of that production,

20   the Court, I believe -- when I addressed the issue of data

21   protection over the KYB and KYC files, the Court was somewhat

22   understanding of that.  And so we have retained data privacy

23   counsel.  We're going through those materials.  We are not

24   looking to wholesale withhold documents.  There are ways to

25   minimize data protection risks in foreign jurisdictions, while

P8QVTROC

 1    still giving the plaintiffs what they need; so those things can

 2    include redactions and anonymizations.  We have retained expert

 3    data protection counsel to do that.

 4            So with respect to the OFAC production, I think we

 5    have taken what the Court said to heart and tried to chunk out

 6    those parts of this that are going to be the most helpful to

 7    the plaintiffs, most relevant to their claims, and the easiest

 8    and the least challenging for the defendants to get through.

 9            Now, with respect to the DOJ and FinCEN productions,

10    which are much larger, Mr. Miller has asked for the --

11            THE COURT:  I'm looking at the letters now.  So it's

12    about 30 -- 67,000 was OFAC?

13            MR. BANSAL:  Sixty-seven thousand documents -- excuse

14    me, is it -- I'm just going to --

15            MR. MILLER:  It's pages --

16            THE COURT:  I've got 67,000 pages.

17            MR. BANSAL:  Yes.  And that's inclusive of the KYB.

18    And then there might be some other cats and dogs, but the bulk

19    of what remains after the communications production is going to

20    be that KYB and KYC; it's about 31,000 pages worth of material.

21            THE COURT:  And I have in the joint letter that you

22    are expecting to produce about 550,000 pages from DOJ/FinCEN by

23    November.

24            MR. BANSAL:  Judge, that is the total number of

25    documents in the government's -- in the DOJ and FinCEN

P8QVTROC

1    productions that consist of communications.  So it's just the

2    easiest thing was to use search terms on to get through.  And

3    yes, Judge, we are proposing that once we agree upon search

4    terms, the large majority of those documents are going to be

5    responsive.

6          If you look at -- you might have color coding, if you

7    don't want to get into this, Judge, any more than I do.

8          THE COURT:  I certainly don't want to get into the

9    color coding of the search terms.  That is way too far in the

10   weeds for my purposes.

11         But what I understand you to -- and I think, again,

12   this is very practical, separating out the communications from

13   documents that raise the data privacy concerns so that one

14   group of documents could get processed quickly and the other

15   documents which need to be reviewed go through a separate

16   process, completely understand that.  Very consistent with the

17   directions I provided last time.

18         I guess what I'm struggling to understand is what is

19   the holdup in figuring out what is going to be produced overall

20   and what is not going to be produced.  Where is the breaking

21   point between the plaintiffs and the defendants?

22         MR. BANSAL:  So, Judge, I don't believe that there is

23   as fundamental a disagreement as Mr. Miller characterized.  I

24   mean, we have a disagreement over the CFTC productions, because

25   that's an agency that has a different agreement, and we can

P8QVTROC

1    talk about that.  But I think that we're not that far apart on

2    the search terms that we would agree would be run against the

3    DOJ and FinCEN productions to create the universe of documents

4    that would then be produced.  And I do think that's going to be

5    a very, very substantial portion of that 550,000-page count

6    that the Court just referenced.

7            THE COURT:  And what is going to be withheld and why?

8            MR. BANSAL:  Judge --

9            THE COURT:  Leaving aside the data privacy issues, why

10   can't we just not turn over the 550,000 pages of documents?

11   Why are we cutting -- why are we parsing and dicing and slicing

12   this thing?

13           MR. BANSAL:  So, Judge, I have to confess that there

14   are others who have been more involved.  I'm not going to not

15   answer your question, Judge, I'm just telling you why I need a

16   moment to confer.

17           THE COURT:  Sure.

18           MR. BANSAL:  But there are -- and maybe it's too much

19   detail for your Honor to get into here, but there are aspects

20   of those productions that do go away from what the plaintiffs

21   are interested in include -- or that it's relevant to their

22   case, including like registration as a money service business.

23           But let me just have a moment, if I could.

24           THE COURT:  Okay.

25           (Counsel conferred)

P8QVTROC

1          MR. BANSAL:  We're not going to do this tag team, but

2     on this particular issue, I would just request that

3     Mr. LaVigne --

4          THE COURT:  If he's the more knowledgeable and can

5     answer my question, then I would prefer that.

6          MR. BANSAL:  Thank you, Judge.

7          THE COURT:  Just make sure you speak -- I was going to

8     say, make sure you bring the microphone close to you so that

9     the court reporter is able to hear you.

10          MR. LAVIGNE:  Sure.

11          So being new to this party, we did review the last

12     transcripts and took your Honor seriously on this.  And we did

13     try to divvy this up, which is the three dates that we provided

14     in our letter.

15          Now, I just want to start with the September 16th

16     date.  I don't actually think there's a dispute between the

17     parties about that; we agree on that based on our

18     meet-and-confer yesterday.  And part of the reason that that's

19     not being handed over just tomorrow, right, that's 9,000

20     roughly coms and attachments from the OFAC production, which

21     are the easiest to sort of get a grasp on.

22          Unfortunately, some of those, based on a review, do

23     have transaction and customer ID data in them, so that's why we

24     asked for the 21 days plus the conference, just to make sure

25     that we cover our bases on that front.  Again, we're not

P8QVTROC

1    planning on withholding anything based on the KYC -- excuse me,

2    the data privacy issue in that production, nor are we

3    generally; but it obviously takes some time to get through

4    that, to advise our client on what are sort of low, midlevel,

5    and high risks for production of some of this information,

6    depending on what country it comes from, for example.

7              Now, the same is true, which is why we've asked for --

8    we've split up the DOJ and FinCEN ecoms, which is not only

9    emails, but it's also chat communications in various

10   attachments to those, which are voluminous.  That, too, the

11   reason we asked for 90 days is, frankly, it's proportional -- I

12   wouldn't say -- it's probably not for the people doing the

13   review, but asking for 21 days for around 9,000 documents to do

14   this sort of data privacy review, and then three months

15   essentially to do it for 140,000 documents seems pretty

16   proportional to us.

17             And those would go out -- and this issue about search

18   terms, you know, we put those dates in understanding that all

19   of this stuff would happen sort of simultaneously, right; that

20   you want an order about this is going to be produced on this

21   date.  So those dates are happening simultaneously.

22             There's a third bucket of information which includes,

23   you know, know your customer, know your business, and

24   transaction data.  They are voluminous, sort of line-by-line.

25   That implicates much more of this issue of data privacy.

P8QVTROC

1    We just have not been able to get our heads around how
2  to deal with that, sort of, efficiently.  As Mr. Bansal said,
3  we've consulted outside experts on this.  And the proposal that
4  we put forth is that we work with plaintiffs to try to figure
5  out a proposal based on, sort of, a menu of options that we've
6  been given, which are, go through, identify low, midlevel,
7  high-risk sort of jurisdictions and approach it from that
8  perspective.  Because there may be options to sort of not
9  redact anything, just produce a whole bunch of stuff wholesale,
10  depending on the jurisdiction they are coming from, meet and
11  confer about potential redactions or, in the other instances,
12  sort of like France and other categories, to the extent those
13  exist, talking -- at least going to the foreign regulator and
14  telling them affirmatively, We need to produce this type of
15  information; it's under compulsion of a court, right, and just
16  check our box that way to cover our clients from the risk of
17  prosecution for violation of those foreign laws.

18    And so what we're trying to do with that September
19  25th date is to work with plaintiffs to report back on a
20  workable solution for that.  Again, this isn't under the guise
21  of we're going to withhold wholesale, you know, productions on
22  this, it's just to avoid, you know, there is a test for this
23  stuff, the courts do apply, you know, whether foreign data
24  privacy trumps U.S. discovery laws.  We're just trying to avoid
25  that whole thing, and I think we can.  And so that's the

P8QVTROC

1    interim September 25 date.

2            THE COURT:  So I understand the tranches, and those

3    timings sound very reasonable to me.  And I appreciate that you

4    took to heart what I said last time about what can get out

5    quickly, what implicates data privacy concerns and needs to be

6    looked at more closely, and the buckets sound reasonable to me

7    as well.  All of that sounds fine.

8            What I think I am still stuck on is where is the

9    disconnect here?  So what is it that you're disagreeing on?

10    What is it that they want to be produced that you are not going

11    to be producing, leaving aside data privacy.

12            MR. LAVIGNE:  In thinking about this, you know, and I

13    voiced this yesterday during our meet-and-confer call, I just

14    think a lot of this disagreement is hypothetical.  I think once

15    they get the documents, they are going to see what they are

16    going to see, and a lot of these, sort of, you know, arguments

17    around the edges are going to be obviated.

18            Totally get there's a disagreement maybe on the theory

19    of the case that, you know, they have a view of violations of

20    U.S. laws and U.S. users is something that's relevant and maybe

21    we don't.  The search term narrowing process, frankly, doesn't

22    even really touch on that issue.  The only fundamental part

23    that I think we disagree on in terms of what is actually going

24    to be produced in this scheme that we propose is the CFTC

25    bucket.

P8QVTROC

1          THE COURT:  So other than the CFTC bucket, you are

2    going to produce the things that they have asked for in

3    production.

4          MR. LAVIGNE:  Well, so the one caveat on top of that

5    is where we are asking to meet and confer, and we have been

6    about these sort of search terms, honestly, many of those

7    search terms are around the edges.  And I think what you're

8    going to see and what they are going to see is this issue that

9    they are trying to tee up today without briefing is not ripe.

10   You know, they are going to see a whole bunch of documents

11   that, one way or another, get out a whole bunch of stuff that

12   they are talking about.

13         And if there is an issue — and this is what I was

14   trying to raise yesterday during the meet-and-confer — once you

15   get the documents, then we can have an actual targeted dispute

16   that the judge can, like, decide or not decide.  Today we're

17   sort of just waving our hands around saying this.  I think the

18   only thing right now, the disconnect that could be decided by

19   the Court and would be helpful to the parties is this bucket of

20   CFTC documents.

21         THE COURT:  I am still confused though as to what is

22   the meet-and-confer going to be about.  You're saying it's at

23   the margins, but I need to understand what is the issue.

24         MR. LAVIGNE:  So we presented to plaintiffs the search

25   terms that were provided -- used by the government.

P8QVTROC

1          THE COURT:  Yes.

2          MR. LAVIGNE:  -- to --

3          THE COURT:  I have the long chart of that.

4          MR. LAVIGNE:  Yeah, yeah, exactly.

5          In mid August, I guess, finally, the parties got

6   around to talking about what of those we could get rid of to

7   sort of narrow the burden on us to try to do this review and

8   production.  They proposed some, and we came back to them last

9   week with ones that we also further wanted to trim.

10          In this first bucket, for example, of this OFAC ecoms

11  and attachments, we agreed to further limit those search terms

12  by removing Cuba, for example, as a search term.  And with

13  that, we agreed that we would run the search terms and produce

14  that tranche of documents by September 16th.  So that's sort of

15  the nature of the meet and confer.  The DOJ and FinCEN search

16  terms were much broader than the OFAC search terms, and so

17  there's a little more daylight between the parties.

18          THE COURT:  So there's a disagreement about the search

19  terms to be run.  That's the period on it.

20          MR. LAVIGNE:  Yup.

21          THE COURT:  And the search terms that you want run

22  amount to how many documents at the end of the day?  And how

23  many do the search terms that they want to run, what's the gap?

24  What is the actual numerical gap?

25          MR. LAVIGNE:  Yeah.  So we --

P8QVTROC

1                 (Counsel conferred)

2                 MR. LAVIGNE:  I don't have the exact specific number,

3      so please let me caveat that.  But we're talking about 80 to 85

4      percent of this 558,000 pages, somewhere in the range of 10,000

5      or less documents that would be potentially withheld even based

6      on our, sort of, best-case trimming.

7                 THE COURT:  Okay.  So you have agreement on the vast

8      bulk, and there's this marginal dispute about approximately

9      10,000 documents, the 180,000; is that right?  What is the

10     universe --

11                MR. LAVIGNE:  A hundred and forty thousand --

12                THE COURT:  -- 10,000 out of what?

13                MR. LAVIGNE:  A hundred and forty thousand, sort of,

14     communications and attachments.

15                THE COURT:  All right.  So we're really talking now --

16     we're at a very small area of dispute.  That really is what I

17     was trying to get at.  What is the gap between the two parties'

18     positions?  It sounds as if it's pretty narrow at this point.

19                MR. LAVIGNE:  And that, your Honor, is why we asked

20     for the November 24th date, because sort of no matter what this

21     process entails, that data privacy issue on that is just going

22     to take a little bit of time.

23                THE COURT:  All right.

24                Mr. Miller, let me hear from you why these particular

25     10,000 documents that seem to be the crux of the issue are

P8QVTROC

1    particularly critical, and why we need to -- why you need them,

2    why we need to resolve it today.

3            MR. MILLER:  Yes.

4            There's a laundry list of search terms in the DOJ and

5    FinCEN productions that are about the Tai Chi strategy.

6            So in 2020, to back up, Forbes comes out with this

7    article, and it says Binance is deceiving U.S. regulators.  We

8    have a leaked document.  And it lays out in this leaked

9    document that Binance was using Binance U.S.  It created it to

10   deceive U.S. regulators --

11           THE COURT:  This is the document you were referring to

12   earlier.

13           MR. MILLER:  Exactly.  So this is the --

14           THE COURT:  I think you kind of jumped into the

15   argument without giving me a context for what you were talking

16   about.

17           MR. MILLER:  Understood, your Honor.

18           So this Forbes article, this October 2020 Forbes

19   article, and it's like the theory of the case that gets the

20   government going, so it's the one that says it's from --

21   created by the specific people.  And then the government has

22   search terms which are about those people that they want to

23   exclude.  They say the creators of the document are irrelevant.

24           The government says the document says they are trying

25   to mislead New York regulators, the CFTC, OFAC, the SEC.

P8QVTROC

         THE COURT:  Well, presumably, I assume you've asked

for the document.  Are you saying that these 10,000 documents

all pertain to this Tai Chi strategy that you're referring to?

         MR. MILLER:  They're search terms exactly like Tai

Chi.  I would call it -- slide 1 of the opening is things like

the Tai Chi document itself.  And the other is slide 2, which

are things, so slide 1 is the Tai Chi document says if you have

U.S. users, this is a huge problem, because regulators are

going to demand all your information.  And there's a

contemporaneous quote from Zhao that explains it.  He says,

There's a bunch of laws in the U.S. that prevent Americans from

having any kind of transaction with any terrorist.

         And then in order to achieve that, if you serve U.S.,

you would need to submit all relevant documents for review.  We

don't want to do that.  It's very simple if you don't want to

do that.  You can't have American users.  And that's been the

CFTC complaint and our complaint.

         So that's on slide 1, along with the Tai Chi document.

         And so that's why in the Forbes article it says the

Tai Chi document, a slide show believed to be seen by senior

Binance executives, is a strategic plan to execute a

bait-and-switch.  Explicitly mentions the need to undermine the

ability of anti-money laundering and U.S. sanctions enforcement

to detect illicit activity.  More specifically it describes a

detailed strategy for distracting FinCEN, OFAC, the SEC, the

P8QVTROC

1    CFTC, and the New York Department of Financial Services.

2         And then the CFTC's enforcement division principal

3    deputy director says, Defendants' alleged willful evasion of

4    U.S. laws at the core of the commission's complaint against

5    Binance, the defendants' own emails and chats reflect that

6    Binance's efforts have been a sham, and Binance deliberately

7    chose over and over again to place profits over following law.

8         And then --

9         THE COURT:  You don't need to give me the entire

10   speech about relevance of this document.  I'm focused on a very

11   narrow discovery dispute, which is, to what extent do these

12   search terms — which are 10,000 documents, apparently — you're

13   talking about one document, to what extent do you need all of

14   these search terms in order to obtain relevant evidence from

15   this production, and why now?  Why can't you wait for the

16   production and see what you get?  And then if there are gaps,

17   go back to them.  Because we've talked about the gap-filling

18   exercise before.

19        But I'm not quite clear on why now?  Why this set of

20   documents?  Why can't we just turn over quickly what has been

21   agreed to be turned over, and you can see what you have.  And

22   then come November, if there are these gaps and specific

23   information about this document and the creators of the

24   document and discovery you want related to the document, we

25   could pursue it.

P8QVTROC

1          But to me, that's more relevant.  I don't need to hear

2     like the entire history of this one specific document.

3          MR. MILLER:  Let me step back and explain why for DOJ

4     and FinCEN, but then also for the CFTC.

5          THE COURT:  Well, let's leave the CFTC, because I

6     think that's going to raise a separate issue.  I want to know

7     about the 10,000-document gap that we're talking about here.

8     Let's resolve that issue and then move on.

9          MR. MILLER:  Yes.

10          The reason why we should resolve it now is because it

11     relates to that core concept of the creation of Binance U.S.

12     Binance U.S. is an alter ego.  It's ripe for resolution.  It's

13     a core of our complaint.  There's no need for us to file

14     another meet-and-confer in a few months that raises what we

15     just discussed.  We've been discussing it for three months;

16     we've had three conferences.  We've explained the theory of it;

17     we can go in further detail.

18          But I think defendants are trying to say, Don't get in

19     the weeds, your Honor.  It's so in the weeds.  You'd have to

20     really look at the search terms.  Don't go there.

21          When the reality is, you can just say, Why are we

22     parsing this for relevance?  Why are we going to push off this

23     relevance issue and splice and dice it in November?  Just give

24     them the 10,000 documents.  What's the worst case?  You have

25     10,000 documents that you have a dispute about relevance.  Why

P8QVTROC

1    make the parties spend time and resources briefing for the

2    umpth time this issue.

3            And the same is true -- the reason why the CFTC is

4    relevant is because I have to clear up what it's about.  It is

5    not about --

6            THE COURT:  I want to punt the CFTC.

7            MR. MILLER:  Yes.

8            THE COURT:  So let me hear from whoever wants to speak

9    on behalf of Binance with respect to these documents.  Because

10   I think Mr. Miller has a point, in that we've been going back

11   and forth on this a while.  What is the burden to Binance of

12   just running these search terms and providing the 10,000?  It's

13   pretty at the margin.  Why is this the holdup?  Why can't we

14   just produce these documents?

15           MR. BANSAL:  Judge, we understood that this exercise

16   was something that Mr. Miller wanted to do.  We have engaged,

17   right, and we've done -- we've put a lot of work into it.  The

18   only reason I held up this document, Judge, I wasn't going to

19   withhold any part of it, but you would be able to see just how

20   much we have dove into the explanations that Mr. Miller has.

21           I think that what the Court raised earlier is exactly

22   what Mr. Miller should do.  And he loses nothing from it,

23   right.  He gets hundreds of thousands of pages of documents

24   over the next -- between now and Thanksgiving.  And he looks at

25   them.  And as your Honor recognized, he's not prejudiced in any

P8QVTROC

1    way because he can always come back to us and say, Hey, the

2    stuff that I wanted that is relevant is not in there.

3        THE COURT:  But why can't we just do it now?  It's

4    10,000 more documents, essentially.  What is the burden of

5    producing these documents now?  Why do we need to wait?

6        MR. BANSAL:  Judge --

7        THE COURT:  What is the issue?

8        MR. BANSAL:  These are 10,000 more documents that

9    would have to be reviewed.  I know that's not — relative to the

10   number of documents that we're planning to produce — that

11   significant, but it is 10,000 documents.

12       Also, I sort of feel like under Mr. Miller's theory,

13   we're damned if we do and we're damned if we don't.  If we

14   withhold a huge bulk of documents, then they'll say, Oh, you

15   know, they're cutting the discovery too much.  And then if we

16   say, Oh, it's only a little bit, he'll say, Oh, why not just

17   give us everything.

18       THE COURT:  Fair enough, Mr. Bansal.  Fair enough.

19       All right.  Let's put in a period to this DOJ/FinCEN.

20   It sounds as if OFAC, the parties are in agreement.

21       Do you agree, Mr. Miller?

22       MR. MILLER:  So as to emails and attachments, yes.

23   But I will just note, for this foreign data privacy issue,

24   they're supposed to, in the opposition to the motion to compel

25   — and this is *Wultz v. Bank of China Limited* — the party

P8QVTROC

1    resisting discovery must provide the Court with information of

2    sufficient particularity and specificity to allow the Court to

3    determine whether the discovery sought is indeed prohibited by

4    foreign law.  The party must describe, among other things --

5            THE COURT:  Until they review the documents, how can

6    they do that?  That's the whole process that we're doing now.

7    They've hired a data privacy attorney, they are going to review

8    the documents.  Presumably, if there's a privilege, they are

9    going to timely raise it.  They hadn't even reviewed the

10   documents yet.  It's a million pages of documents.

11           They are not going to have someone go through a

12   million pages of documents and articulate every country and

13   which data privacy laws are implicated and how they are

14   implicated two months ago, when we're still discussing what

15   needed to be looked at.  I mean, that's not a reasonable

16   position.

17           MR. MILLER:  Understood, your Honor.

18           And if that's the Court's position, we'll skip that

19   argument.  So they'll review it for data privacy and we'll

20   resolve it when it gets there as to whether it's --

21           THE COURT:  They raised data privacy at the first

22   conference and the possibility of foreign law, and they are

23   putting in process a place to do the review that seems

24   reasonable to me that front-loads documents that you want that

25   don't need to go through this review so that they can quickly

P8QVTROC

1    produce to you.  But then they shouldn't be penalized because

2    they are delaying review of the data privacy document so that

3    you can get documents that don't implicate this on a quicker

4    time frame.  That doesn't seem fair.

5            MR. MILLER:  So I think what is left for the Court to

6    decide today on this issue for Binance specifically is why

7    require -- because the motion to compel is going to be exactly

8    what I said, it's going to say exactly what I just said.  It's

9    going to be what I can tell you today in a letter motion about

10   the relevance of the Tai Chi strategy and because we know

11   there's going to be 10,000 documents about that withheld, and

12   that's right at the core of the willful evasion.  So it just

13   seems deeply inefficient to say, File this motion to compel in

14   November.  I can file it tomorrow.  It's ripe now.

15           At the May conference, we talked about the CFTC

16   production.  And the CFTC production is not about --

17           THE COURT:  I'm not talking about the CFTC.

18           MR. MILLER:  I understand.

19           The reason why I'm relating the two is because --

20           THE COURT:  I want to resolve this issue, and then

21   we're going to move on to the other issue.

22           So this is my ruling on the DOJ/FinCEN issue:  I'm

23   going to adopt the defendants' timeline for production.

24   However, in November, we are going to come back to these final

25   10,000.  I'm not saying that you're not going to get them.  I

P8QVTROC

just want to front-load the documents that there's agreement on
that we have a schedule proposed for, because that way you get
the bulk of the documents quickly.

Ten thousand additional documents, it is a burden in
rolling them out and reviewing them, not saying you're not
going to get them, but they'll be at the back of the line and
we can revisit the discussion.  I'm not saying you have to
bring a motion to compel about them either.  We can simply have
a discussion here at a conference as to whether or not, in
light of the productions that have been made, these documents
are still being sought, whether you might receive a bulk of
them, given that you're already getting a large percentage of
the documents at issue.  And so perhaps the gap is not going to
be as large as perceived today.  And we'll revisit it.

But this is the schedule.  It's a reasonable schedule.
It means that between now and November, you are getting
hundreds and thousands of pages of expedited discovery, which
is what the Court's goal was through this exercise.

So you're going to get a large part of it.  We'll
revisit it in November.  And very happy to hear your arguments
about whether or not there are significant gaps in the
production on the specific issue.  And, as you say, we have the
search terms.  We know what the documents -- the universe of
documents are.  If need be, we can quickly roll those out as
well.

P8QVTROC

1          MR. MILLER:  Understood, your Honor.

2          THE COURT:  So I want to turn now to the CFTC.  I know

3    you've been eager to talk about it.

4          What is the dispute regarding the CFTC production?

5          MR. MILLER:  The reason I was trying to link the two,

6    your Honor, is because the CFTC -- slide 1 is the Tai Chi

7    document saying you created Binance to deceive U.S. regulators,

8    you knew you had U.S. users, and you knew if you had U.S.

9    users, you have to hand over your data to U.S. regulators.

10   Regulators find out, they are going to crack down because they

11   know that you have terrorists on the website, as they

12   eventually did.  So that's slide 1 of the opening.  Binance and

13   Zhao knew from the very beginning, and that's why they

14   willfully misled U.S. regulators.

15         Slide 2 is they had U.S. users.  They got a document

16   that said, for example, the CFTC details that Zhao got a

17   document detailing that 23 percent of their users were U.S.

18   users.  There are documents about the use of VPNs and avoiding

19   geofencing, about how they directed U.S. users to evade the law

20   and to hide the fact that Binance was using U.S. users.

21         Because otherwise the regulators would come in, they'd

22   install compliance controls, and a profitable business serving

23   the same terrorists in sanctioned countries would disappear.

24   So that is the theory of the case, and that is what the CFTC's

25   production is about.  And it's the same thing -- and the reason

P8QVTROC

1    I'm mixing them is because it's the same thing.  It doesn't

2    have terms about contracts, options, futures, money services

3    business.  Those aren't the terms.  They're just simply not

4    there.

5           So I know the CFTC regulates a lot of things, but in

6    this context, the search terms, the documents, they are unique

7    custodians.

8           So, for example, one of the custodians is the

9    co-founder.  That co-founder is not a custodian anywhere else

10   in the DOJ and FinCEN productions.  So that custodian has a

11   document that says, We know we have U.S. users and we've got a

12   huge problem; because regulators are going to come in and crack

13   down on us.  So we have to use VPNs and geofencing to hide that

14   fact.  That is what slide 2 of the opening is.  And slide 1 is

15   the Tai Chi document, the quote from Zhao.  So that's what the

16   CFTC production is really about.

17          Dodd-Frank had this anti-evasion rule.  And it says if

18   you evade the CFTC's laws, the CFTC has a new power, and was

19   the first ever time they used it.  And that's why the

20   enforcement director said:  The willful evasion is at the core

21   — that's the quote — at the core of the CFTC's complaint.  And

22   if you look through the search terms, that's what it says.  It

23   has nothing about any other general -- they weren't trying to

24   say, Were you misclassifying partial options contracts and

25   changing the tax treatment, that is not what they were doing.

P8QVTROC

 1    They were looking at this willful evasion of U.S. law.

 2            So that's why we want those DOJ and FinCEN documents.

 3    And I understand your Honor's ruling and we'll reach those in

 4    November.  But the CFTC production is critical.  It's going to

 5    be used at trial, used in depositions.  We need to prove that

 6    Zhao and Binance knew from an early stage that they had

 7    compliance obligations.

 8            The way you have compliance obligations is you're

 9    servicing U.S. users and knowingly doing it.  And that's the

10    willfulness, that's the knowledge that shows that when they

11    embarked upon this scheme, it was knowing.  It goes to the

12    point about personal jurisdiction, because it's a scheme aimed

13    at the U.S.  It's so many elements of the case that it's

14    critical, and that's why the same will be true when we get back

15    to the Tai Chi issue.

16            THE COURT:  So let me hear from defendants, Binance,

17    on this.

18            One thing that I'm unclear about your position on the

19    CFTC production is that you claim it's irrelevant, but at the

20    same time you say that the documents largely overlap what's

21    already being produced.

22            So what is the gap?  Again, what is the gap?  How many

23    CFTC documents are we talking about?  And how many are already

24    being produced through these other productions?

25            MR. BANSAL:  The documents that are exclusively

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P8QVTROC

1  produced, that were exclusively produced to the CFTC, were only

2  2200, Judge.

3          THE COURT:  You're talking about 2200 documents.

4          MR. BANSAL:  Documents, comprising 6500 pages, Judge.

5          And so I do think — and I'm happy to address

6  Mr. Miller's other points, unless the Court has other questions

7  on that issue.  But I do think that perhaps, look, at worst,

8  they could fall into the same bucket as the 10,000 documents

9  that your Honor has just referenced.  And Mr. Miller could take

10  a look at the hundreds of thousands of pages from the other

11  productions that he's going to get and decide whether he still

12  thinks this is an issue.  And I think there are decent reasons

13  to do at least that, Judge.

14          One is that in addition to the fact that the CFTC has

15  a vastly different agreement than the other regulators, there

16  is some sensitivity that we have tried to observe with respect

17  to the CFTC.  Because they did say in the letter to the

18  plaintiffs earlier this year, right, so the investigation that

19  resulted, this was after the settlement.

20          But in a letter to the plaintiffs earlier this year,

21  the CFTC said that the plaintiffs' request under *Touhy* for

22  these -- two regulations for these documents — I'm quoting now

23  — improperly demands documents that could reveal law

24  enforcement sources or methods, and may interfere with ongoing

25  investigations and, therefore, are protected by law enforcement

P8QVTROC

1    privilege.  I realize that's not our privilege to assert, but

2    that is the source of some degree of sensitivity that the

3    company is trying to treat these documents with.

4              Judge, as far as Mr. Miller's point on his need for

5    these documents, he's proffered that the CFTC production is

6    relevant because it would include documents related to

7    Binance's efforts to having U.S. users, while at the same time

8    avoiding U.S. regulation.

9              Apart from the fact, Judge, that there was no U.S.

10   involvement alleged in the attacks, if Mr. Miller's point is

11   that there were efforts to evade U.S. regulations, I don't

12   think that it's going to be in his opening that the company's

13   efforts to evade U.S. commodities regulation were relevant and

14   helpful to his case.

15             I think the points that he would try to make in his

16   opening, as I understand them, are that the company was trying

17   to avoid — and obviously we dispute this — sanctions and

18   anti-money laundering regulations.  And again, those are within

19   the agreement of other regulators and based on how much overlap

20   there is between the CFTC documents and the documents given to

21   the other regulators.  Again, I think Mr. Miller is going to

22   get everything he needs for that opening from those other -- to

23   support this theory, to the extent it has any validity, from

24   those other productions.

25             THE COURT:  What about the one unique custodian?  How

P8QVTROC

1    many of the 2200 documents — 6500 pages — are documents that

2    come from that particular custodian?

3             MR. BANSAL:  If I could have a moment, Judge.

4             (Counsel conferred)

5             MR. MILLER:  Just to clarify, seven unique custodians.

6             THE COURT:  Seven unique.

7             MR. MILLER:  The co-founder was an example, but

8    there's seven unique custodians.  And our proposal limits

9    overlapping search terms to the extent that they are not the

10   unique custodians.

11            THE COURT:  But we're talking about a very limited

12   universe right now; we're talking about 2200 documents.

13            MR. MILLER:  Every hit count I've heard today, and

14   we've asked for it, so the 10,000 number you asked about, I

15   asked repeatedly for the difference between the two, this

16   number, everything is news to me.  Everything we are learning

17   about hit counts, new as of this conference, and the number of

18   total pages and documents is new as of yesterday.

19            So I hear everything your Honor is saying.  It just

20   seems like unnecessary to -- we've got it teed up now, it's

21   fresh in our minds, we know the issue.  It's a small number of

22   documents.  This crew behind us is just a small fraction of the

23   power behind this massive joint defense group.  And we're

24   quibbling over 10,000 documents or 2,000 documents, and I don't

25   understand why.

P8QVTROC

1          MR. BANSAL:  Judge, in any call that I was ever on —

2     and I said this to Mr. Miller — the question about total number

3     of documents and the delta, he asked me last week.  I told him

4     that, okay.  And we worked on that and we got him the answers

5     as quickly as we got them.

6          THE COURT:  The delta is very important.  So, again, I

7     have encouraged from the beginning prompt sharing of

8     information as it is asked.  So I'm going to leave it at that.

9          This process will go much more smoothly if there's

10    transparency with respect to things such as what is the

11    universe of documents that we're talking about.  Of course, if

12    Mr. Miller doesn't know if this is a large or small group of

13    documents, it definitely, I'm sure, changes the calculation for

14    him quite a bit.

15         On the 2200 documents from CFTC, I'm going to rule the

16    same as I did with respect to the Tai Chi documents.  I'm

17    certainly not saying that they are out; we are just going to

18    defer them.  We are going to focus on the documents for which

19    there's agreement; we're going to get them out the door; we're

20    getting them out the door quickly.  And then we're going to

21    revisit these kinds of dribs and drabs at the end to see

22    what -- is there any reason that these are still relevant given

23    the productions that will then be in the plaintiffs' hands.

24    And then they can renew their application.  It doesn't have to

25    be -- as I said, it doesn't have to be a motion to compel;

P8QVTROC

1    we're not going to need briefing on this.  We've had

2    discussions.  We're fully apprised of the issues.  But we can

3    revisit it at a future conference.

4         So I'm not ruling that these documents are out; I'm

5    simply deferring them so that we can fast-track the documents

6    for which there is agreement and then revisit these other

7    issues later, when we have more information about what has been

8    produced and what are the gaps in production.

9         And I think that takes care of the Binance government

10    production issues.  Now do we have to turn to BAM, I which I

11    know raises its own set of issues.

12         So, Ms. Charmani, let me hear you about BAM.

13         MS. CHARMANI:  Your Honor, since the last conference,

14    we worked very hard to find a practical solution.

15         What happened with BAM is that we are in a tougher

16    universe than BHL, in that we only have redactions that were

17    driven by the SEC, means that if agreeing on search terms with

18    the DOJ, which would help us identify relevant documents.

19         Plaintiffs have taken the position that they want the

20    SEC search terms.  We said these aren't relevant.  Why don't we

21    work together to find relevant documents when it comes to the

22    claims in this case.

23         They said, No, we want the SEC search terms.

24         After the conference in July, we went back to counsel

25    for the investigations, and I said, Give me some context,

P8QVTROC

1    anything that would help me narrow the production.

2              They said, In the beginning of the productions, we

3    identified this categories of documents — they call them

4    handover documents — that we only gave to the DOJ.

5              I promptly produced to plaintiffs details on the

6    categories of documents, dates of productions, volumes of

7    productions, and number of documents.  They asked me for the

8    custodians.  I also provided the custodians.

9              And then during every meet-and-confer since the first

10   meet-and-confer after the conference, I suggested that they

11   give me search terms relevant to their allegations to run

12   across the SEC/DOJ productions so we could identify relevant

13   documents.

14             Mr. Miller's position has been that this is too

15   burdensome to craft search terms to their own complaint.

16             I would posit that this is something they will have to

17   do at some point anyway, and it can be that burdensome.

18             Nonetheless, since they refuse to craft search terms

19   as to their own allegations, I said, You have the DOJ search

20   terms that were agreed upon with the BHL.  Why don't you use

21   those as your basis and narrow them down as to BAM — that

22   wasn't a party to that enforcement action, and the allegations

23   are somewhat different here — and I could run those.

24             He again declined to do so.  He said, No, I want the

25   SEC search terms.

P8QVTROC

1          This is zero steps since July.  We've made several

2   proposals; they've made zero steps, even though I asked them

3   repeatedly.

4          Then last week, almost eight days ago, they said,

5   Fine, run the DOJ search terms that were agreed upon with BHL.

6          I asked if they believed we should narrow them in some

7   way when it comes to BAM.  They said no.  This is an

8   unreasonable position.  One of the search terms is Binance U.S.

9   So we're running a search term with the company's name on the

10  company's documents.  This isn't going to yield targeted

11  results.  Nonetheless, we decided to run them.

12         We are in the process of getting this hit counts back

13  — there are 120 sets of search terms — and reviewing them in

14  order to make our own proposal.

15         I asked Mr. Miller to meet and confer tomorrow on

16  those search terms.  He said he would, and would provide some

17  times.

18         This is where we are.

19         I want to know that over these weeks we've made

20  several proposals and they insist on the SEC search terms.

21         In order to demonstrate in good faith that they are

22  not relevant, during one of our meet-and-confers, Mr. Miller

23  asked me whether this Tai Chi term was included in the SEC

24  search terms.  He's been saying today that this is core to

25  their theory in their complaint.  I responded that it is not;

P8QVTROC

that the majority of the SEC search terms refer to tokens and
unrelated issues.  And why don't we focus on the search terms
or issues that are relevant here.

He could have proposed custodians, search terms,
categories of documents for me to run.  He didn't, up until
eight days ago.  We're running them.  We will be ready with a
proposal tomorrow.  And I think we will make significant
progress.  But this is where we are.

THE COURT:  What is the total universe of the SEC/DOJ
production for BAM?

MS. CHARMANI:  They are 717,327 documents.

And we are in the process of trying to understand this
volume; because counsel for the enforcement actions clarified
that the reason this is so high is because every instant
message from messaging apps was counted for one document.  So,
for example, if I said:  Hi, good morning.  And another
message:  How are you doing today?  Those are two documents.

I don't know why they were produced this way.  I've
been working with the vendor to process these and take these
out in order to provide Mr. Miller with the volume of just
documents, ecoms, and attachments.  I don't have this number
yet.  I followed up multiple times.  I was on the phone again
with them yesterday.  They say it's a time-consuming process
because of the way instant messaging was processed.  I'm hoping
I will have this for him tomorrow.

P8QVTROC

1    THE COURT:  Can I ask you for some more background on
2    the SEC investigation.  What was the nature of the original
3    investigation for which these documents were produced?

4    MS. CHARMANI:  The SEC brought a complaint alleging
5    that Binance U.S. violated registration laws from the
6    Securities Exchange Act in relation with tokens that were
7    listed on its platforms.

8    Allegations also referred to Binance U.S.'s air
9    program, which was a program where users could, at a very high
10   level, provide Binance U.S. with their tokens, and then Binance
11   U.S. would provide back some type of yield.

12   There was also a stablecoin issue in their complaint.

13   None of these issues are present here, and this is
14   evident in the search terms.  The majority -- the vast majority
15   of the search terms refer to specific tokens.  This is
16   sensitive information that we don't want to provide, since they
17   are not relevant.  And it is telling that plaintiffs named in
18   the complaint every enforcement action as a relevant action
19   here except the SEC action.

20   THE COURT:  Mr. Miller, let me hear from you as to why
21   are the BAM documents produced to the SEC relevant at all?  Why
22   should we even be using this as a basis point for production?

23   MR. MILLER:  So let me back up in the timeline.

24   Before the July 14th conference, the Court said
25   provide the subject matter of your productions to the DOJ.  BAM

P8QVTROC

1    only provided details about the big SEC production provided

2    wholesale to the DOJ.  So these new mini productions, which are

3    like four percent of the size of the core thing, are new, newly

4    disclosed productions that would directly -- the handover

5    productions.

6            THE COURT:  The handover productions.

7            MR. MILLER:  But, critically, BAM's letter before the

8    July 14th conference, which is the only information we've ever

9    been given about the subject matter of these productions, show

10   that they are clearly relevant.  They are not about different

11   tokens.  As described by BAM --

12           THE COURT:  It was represented to us that it was about

13   specific tokens, and that the tokens are the search terms.

14           MR. MILLER:  Well, I'd love to see the search terms.

15   We've asked many times.

16           THE COURT:  She just told you most of the search terms

17   are the tokens.

18           MR. MILLER:  I have no --

19           THE COURT:  She just told you that.

20           MR. MILLER:  I understand, your Honor.

21           But I think then we should just get the search terms

22   and we can exclude the tokens and go from there.

23           But if you look at the letter before the July 14th

24   conference, it details the subject matter.  And the subject

25   matter is relevant.  It goes to things like Zhao's control,

P8QVTROC

1    Binance is an alter ago.  That's the key core of what the SEC

2    at least asked for in terms of the documents that were

3    responsive.  So those are the responsive documents described in

4    the June 27th letter that was submitted to the Court at ECF

5    121.  And so we know the subject matter and they are relevant.

6    There was one thing that looks not relevant, and that's that

7    there's performance reviews.  But we talked about that at the

8    last --

9              THE COURT:  Right.

10             But, Ms. Charmani, my understanding is that the SEC

11   search terms are largely token-specific; is that correct?

12             MS. CHARMANI:  Your Honor, I can represent that

13   there's seven pages, and five of them are only tokens.

14             THE COURT:  So the core of what the SEC asked for

15   wasn't about alter ego, it was about this very specific issue

16   that has nothing to do with your case.

17             MR. MILLER:  That information is new to me as of this

18   conference.  The only information we have about the subject

19   matter is what BAM provided in the letter before the July

20   conference.

21             THE COURT:  I think what Ms. Charmani is saying is

22   that what she shared with you is that they are irrelevant

23   search terms that largely have to do with the SEC issues and

24   that are largely token-specific.

25             Did she not share the token-specific aspect of this

P8QVTROC

1   during your meet-and-confer?  What was discussed then?

2          MR. MILLER:  I'm confused as to the disconnect between

3   the letter which describes the subject matter --

4          THE COURT:  Forget the letter.  You've had

5   meet-and-confers with Ms. Charmani; correct?

6          MR. MILLER:  Yes.

7          THE COURT:  Did she tell you they were token-specific?

8          MR. MILLER:  She did not describe that the vast

9   majority were token-specific in what I'm understanding based on

10  the search terms.  And I don't know if the search terms -- I

11  mean, the documents are mostly token-specific.

12         But here's a way to cut through this, your Honor:

13  Have them run SEC search terms, except for the ones that are

14  token-specific, and produce the documents.  And we'll go ahead.

15  They can cut through the issue right now.  I don't want

16  token-specific documents.  Cut out all those search terms and

17  we'll only run the other search terms that aren't about tokens,

18  and we'll go forth.

19         MS. CHARMANI:  Your Honor, I'm not in the habit of

20  spending the Court's time into issues that are not that

21  relevant.  But I want to be accurate in presenting the record.

22         We had the specific call in which we discussed the SEC

23  search terms.  I said that most of them are token-related.

24         You responded to me, Can you tell me if Tai Chi is one

25  of the search terms?

P8QVTROC

1           I said it is not.

2           So this was specifically disclosed and discussed.

3           Apart from that, the SEC search terms are unrelated

4    because the complaint is unrelated here.  I don't understand

5    their resistance as to, A, crafting search terms that are

6    relevant to the allegations, or DOJ-specific search terms that

7    they already have from BHL, and narrowing them appropriately.

8           If Mr. Miller contends that they don't want to run the

9    DOJ search terms, and what they want are only the SEC search

10   terms unrelated to the tokens, and that will be the end of

11   their inquiry, then we should discuss that.  But what they want

12   is to get the unrelated search terms, see they are unrelated,

13   and then ask for further DOJ search terms.

14          It's just I have to find some practical solution.  I

15   keep asking for one, I keep suggesting solutions, and they keep

16   coming back with, No, we want the SEC search terms.  I just

17   don't understand it.

18          THE COURT:  We have the handover documents; correct?

19          MS. CHARMANI:  Yes.

20          THE COURT:  Is there agreement with respect to the

21   handover documents?

22          MS. CHARMANI:  We haven't discussed them.  I think

23   there are only two or three categories that I view as

24   irrelevant.  We will discuss tomorrow.  If they insist on

25   those, I don't believe there's going to be a disagreement.

P8QVTROC

1              THE COURT:  All right.

2              You should continue to meet and confer on the handover

3    documents.

4              On the bulk of the documents, I don't see any

5    relevance or any utility to having BAM turn over or even search

6    the SEC production.

7              This is a wholly unrelated investigation.  You haven't

8    shown that it really is going to advance discovery in a

9    meaningful way.  You'll get discovery from BAM from custodians

10   through their normal process; you will get to craft search

11   terms; you will get to have access to documents on the issues

12   that you have identified as relevant, including alter ego.  It

13   doesn't seem like these SEC documents go to that and they are

14   not going to advance the case.

15             The whole purpose of leveraging the government

16   productions was because of the idea that there had already been

17   gathered a core group of documents from which we could obtain

18   on an expedited basis relevant documents and expedite that

19   discovery to the plaintiffs.  This doesn't seem like it falls

20   into that category.

21             You can seek discovery from BAM in the normal course.

22   The holdover documents that went to DOJ separately, you can

23   continue to meet and confer on that.  But other than that,

24   we're going to cut off this whole BAM/SEC investigation

25   discovery.  This is unproductive.  We're going to move on.

P8QVTROC

1              MS. CHARMANI:  Thank you, your Honor.

2              THE COURT:  Are there any other issues with respect to

3    government productions that we need to discuss today?

4              MS. CHARMANI:  I don't believe so.

5              MR. MILLER:  No.

6              THE COURT:  All right.  Let's move on to bellwether.

7         And I want to start with defendants, because I am a

8    little exasperated by the letter brief that seems to now

9    revisit -- or I think in your terms, want a reset on the

10   bellwether issue, despite the discussion we had at the last

11   conference and despite the guidance provided by the Court as to

12   what the structure that I was anticipating that we would be

13   moving forward could look like.  And instead, there now seems

14   to be this, you know, philosophical discussion of bellwethers

15   that I found wholly unhelpful.  But I want to give you an

16   opportunity to address this issue.

17        But why on earth we're looking at cases on bellwether

18   that are so far afield from ATA-type cases, where what we're

19   looking at are terrorist attacks, we're looking at geographic

20   dispersity, we're looking at time periods.  Those are the

21   pertinent characteristics.

22        Citing to me cases in which there are plaintiff groups

23   in mass torts, where they are trying to build plaintiff classes

24   and, therefore, early discovery as to plaintiff characteristics

25   makes sense, I understand the relevance to those particular

P8QVTROC

1    cases.  I don't understand the relevance to this case.  I don't

2    understand why you'd need to know the medical histories of 535

3    plaintiffs in order to determine whether we should be looking

4    at an ISIS attack or an Al-Qaida attack, and which part of the

5    world we should be looking at.

6            The plaintiffs have proposed bellwethers that cover, I

7    think, half the plaintiff group — 200-plus plaintiffs that will

8    be able to be chosen from as bellwethers.  If that's not

9    representative, I'm not quite sure what this exercise is about.

10           So I didn't appreciate the bellwether briefing that I

11   got from defendants, but I want to give you an opportunity to

12   be heard.

13           MS. WASICK:  Thank you, your Honor.

14           Joanna Wasick, Baker Hostetler.

15           The issue with the bellwether in these other cases, as

16   it is with ATA, is that it's focused on who representative

17   plaintiff is.  The issue is about a representative plaintiff.

18   And to figure out what's representative, you have to identify

19   what the different variables are in the case.  Your Honor

20   mentioned geography.  But there are other issues here.  Wallets

21   that are -- there are allegations, for instance, that there are

22   certain key wallets in this case.  That's going to be an issue

23   for different types of transfers.

24           There's nothing here in these cherry-picked six cases

25   that plaintiff has chosen that shows what the real variables

P8QVTROC

1    are in this case, what the defenses are going to be, what the

2    claims are going to be about, who the plaintiffs are.  So, you

3    know, there's a step, a three-step process that's in this *Adams*

4    case.  I know it's about a hair product case.  Hair product,

5    ATA cases are two different things.

6            THE COURT:  The problem I have with *Adams* as a

7    comparator is that the proposal that was made by the plaintiffs

8    in that case focused on plaintiffs' medical conditions.  So

9    when you're trying to break down into four or five groups based

10   on plaintiffs' medical conditions, and no one has the medical

11   records, well, then of course it's premature to choose

12   groupings based on that because you don't have any information.

13           But we're not trying to pick classes, categories,

14   broad categories, based at least on step one, which is, in my

15   mind, picking the attacks.  Those are not going to be

16   plaintiff-dependent.  There'll be a step two or three, where

17   you want to find representative plaintiffs for the bellwether

18   trials.  Of course, that step has to take place.

19           But we're at step one, where we're trying to identify

20   the categories and the pertinent characteristics that apply to

21   those categories.  And I don't think that's a

22   plaintiff-specific inquiry in this context we're in, in the ATA

23   context.

24           MS. WASICK:  In the ATA context, we want to make sure

25   that we have plaintiffs in these bellwether attacks that

P8QVTROC

1    actually have standing to bring these claims.  That means that

2    they were --

3         THE COURT:  If they don't have standing, that would be

4    informative too.  That would be a representative sample to say,

5    Look, these people don't have standing.  That's also

6    information that can be useful in determining the strengths or

7    weaknesses of the plaintiffs' overall case, which is the entire

8    benefit of doing bellwether, both discovery and trial.

9         MS. WASICK:  But, your Honor, that's what we're asking

10   for.  We took your advice.  We're not asking for a 26-page

11   questionnaire.  We're asking not for full medical records,

12   we're not asking to depose 500 plaintiffs.  We're asking, Do

13   you have evidence that you are a U.S. national?  Do you have

14   support that shows that you are actually present and injured?

15        THE COURT:  But why can't you do that for the 200-plus

16   plaintiffs that are going to be the representatives or the

17   potential representatives from the six terrorist attacks that

18   are proposed?  I mean, that's half the plaintiff class.  You'll

19   get full information about those plaintiffs, as I understand

20   it.

21        Mr. Miller, is that correct?  You're proposing that

22   you will provide full information about the potential

23   individuals in these six chosen terrorist attacks.  And then

24   from there, we'll have -- I know there's various proposals,

25   randomization, each side picking.  But presumably for the

P8QVTROC

people who fall in these categories, you're going to provide

extensive discovery.

        MR. MILLER:  We're going to provide passports to show

U.S. citizenship, V.A. disability status to show injury, we are

going -- we provided a spreadsheet already that details

relationships, which your Honor said was relevant.  We have

already made two productions; we're the first party to make

productions in this case on some of these standing documents.

        We're not going to provide medical documents, because

that's going to be incredibly enormously burdensome.  We hear

from defendants about three clients being difficult.  For

200-something, going to all these doctors and getting extensive

medical records, it will put discovery backwards, as your Honor

said at the last conference about medical records.  So that

type of information, no.

        But we've agreed to provide a whole bevy of

information.  And if the Court so-orders our proposal, we have

the six attacks, we'll keep rolling productions of information

about those 200-something plaintiffs, which was, as your Honor

noted, the majority of the plaintiffs.  We can resolve any

disputes about documents necessary to choose plaintiffs as we

go.

        And I think that by so-ordering our proposal, that

will make the parties a lot more reasonable, because we won't

be asking for -- you know, there's requests about things

P8QVTROC

1    verified for people overseas under The Hague Convention and

2    going to their consulates, like these verification processes

3    that will be deeply complex and slow down the case.  I think

4    those types of requests will fall away; instead, the parties

5    will just focus on what do we really need to pick

6    representative plaintiffs from these attacks.

7         And the Court can say, We have a date certain for fact

8    discovery.  Know what the attacks are.  Plaintiffs, I want you

9    to keep being cooperative and keep providing rolling

10   productions.  The parties keep meet and conferring about

11   information.  At the next conference, the defendants tell me we

12   also want this discrete thing, I can rule on it then.

13        But we know we have the six attacks.  We know we have

14   a date certain for discovery.  That will force cooperation, and

15   that will mean this case will go forward in an expeditious way.

16        THE COURT:  Let me ask Ms. Wasick -- am I pronouncing

17   it correctly?

18        MS. WASICK:  That is, your Honor.

19        THE COURT:  Ms. Wasick, you alluded to earlier the key

20   issue.  And I mean the key, not the core issue.  It does seem

21   to me that that's an issue that goes more toward which attacks

22   should we be choosing.

23        I'm less concerned about the plaintiff information.  I

24   think that's a secondary step.  But when we're choosing the

25   attacks, to the extent that defendants have opposition to the

P8QVTROC

1    attacks that have been chosen or think they need more

2    information, what is the specific information that would be

3    useful to determining whether there are unique defenses with

4    respect to particular attacks or the strength and weaknesses of

5    a liability claim based on a specific attack?  To me, that

6    would be useful information to determining whether we have the

7    right six.

8            MS. WASICK:  Exactly, your Honor.

9            And there is a blockchain analysis that plaintiffs

10   have conducted.  And they reference it numerous times in the

11   complaint; they reference it in briefing for the motion to

12   dismiss; and they've used it as a basis to ask for

13   transactional documents related to 15,000 identified wallets.

14   And we've asked plaintiffs for this analysis.  They have put it

15   into issue.  They are using it to craft their case.

16           And you're right, that is a key piece of information

17   that we need to know about because maybe these six attacks that

18   plaintiffs have chosen with their analysis, maybe these are the

19   six attacks where there actually is a transaction that's close

20   in time to the particular attack; whereas the vast majority of

21   the other attacks don't have that transaction that's close in

22   time.

23           We don't know anything about what they're basing their

24   wallet identification on.  That's going to be a big issue.  We

25   don't know if the wallets are going to the actual group that

P8QVTROC

 1    conducted the attack versus a secondary group that perhaps

 2    funded the terrorist group that actually made the attacks.

 3    There are all these issues with regard to types of

 4    transactions, identifications of wallets.

 5              And so we've asked plaintiffs' counsel to give us this

 6    analysis so we can be on the same playing field, so we have the

 7    information that we need also to see if these different attacks

 8    are representative.

 9              THE COURT:  Mr. Miller, why are they not entitled to

10    that information?  Because that does seem to go to the

11    strengths or weaknesses of the liability claims as they are --

12    as they pertain to particular attacks.  These would go right to

13    their defenses.

14              MR. MILLER:  Understood, your Honor.

15              I want to make the full record on this issue, because

16    this is a third rail for us that we think would blow up the

17    case and waive critically privileged documents and do discovery

18    backwards.  So --

19              THE COURT:  I mean, it's not discovery backwards.

20    We're in discovery.

21              MR. MILLER:  But the reason why is because it would

22    require almost a *Daubert* ruling by the Court, because these --

23    there's no open source -- to start.  There's no open source

24    document that we have that provides one thing.  It is

25    communications between counsel and other counsel, where counsel

P8QVTROC

```
1    have looked at things like the Israeli lists of wallets
2    classified as link to terrorists; looked at OFAC's list of
3    sanctions wallets.  So it would require huge amounts going
4    through extensive communications to try to figure out
5    attorney-client work product communications and hand those
6    over.
7              But the other thing is defendants have the information
8    advantage.  And here's why, and this is critical:  The way that
9    these issues are linked is that there is an internal Binance
10   blockchain ledger.  And everything in that internal ledger is
11   hidden from the public.  So what we have is the bits and pieces
12   which we need to do discovery about by linking it to Binance's
13   internal ledger.
14             And then we need to do discovery on the people who are
15   looking at the account specifically and deciding whether there
16   were SARs issued for those accounts.  So defendants have an
17   asymmetrical information advantage because they can look at the
18   open source things like OFAC lists.  And they can also look at
19   their internal blockchain ledger.
20             So if we were to proceed down this path, which would
21   be to decide the liability strength of each attack, that means
22   we would need to spend hundreds of thousands of dollars on
23   expert analysis of Binance's internal blockchain ledger, our
24   open source analysis, and all the documents that we get from
25   defendants over three months, because we would need to look at
```

P8QVTROC

1    all the warnings that they received related to different

2    wallets, add those in.  Then we'd need to submit a brief to the

3    Court, which is like a summary judgment brief, that links to

4    the expert report, goes attack by attack, and provides

5    different liability strength.

6            It would be so incredibly burdensome and would delay

7    this case by so many months that it would be a huge setback to

8    the expeditious resolution of this case.  And as the Court

9    said, we don't want to do discovery just to do discovery.  And

10   that's what this case would turn into, is a huge push to get

11   this briefing about attack liability.

12           And I just want to note, we didn't choose the attacks

13   based on some secret-sauce information about liability

14   strength.  We mostly did it because the two biggest attacks

15   have the largest number of people.  And then what we did is we

16   went through and we picked other attacks that are different

17   terrorist groups, geographies, time frames, which is exactly

18   what the Court said.  And that's what we should emerge from

19   this conference with an order on.

20           If the Court is saying, Here's how on government

21   productions we'll move forward and cut out the weak from the

22   chaff and move forward expeditiously; on bellwether, we should

23   say we've got these six attacks, they are going to provide more

24   information about these plaintiffs, you're going to select

25   through some of these methods, and then we will march towards a

P8QVTROC

1    fact discovery deadline that the Court can order now.  And the

2    Court can add more time to our proposal.  But, otherwise, we

3    are going to be mired in, I think, at least six months of

4    fights about the bellwether, because we're going to have to do

5    this huge amount of expert work, liability strength analysis,

6    submit these long attacks, about 64 different attacks, where we

7    try to explain why the relative liability strength of each one,

8    and then have -- and we're not going to reach a resolution.  So

9    the Court will have to wade through expert reports and hundreds

10   of pages of briefing to decide what the Court thinks are

11   different levels of liability strength.  And that's just not

12   how this case should proceed, your Honor.

13            THE COURT:  Let me hear from Ms. Wasick.

14            MS. WASICK:  Sure.

15            Your Honor, there is an analysis; it's referenced in

16   the first amended complaint, paragraphs 17, 747, 767 through

17   71, 778, 1153, and 1263.  Those are the ones that we were able

18   to find.  It's a very large complaint.

19            There's an analysis.  It talks about the transactions

20   at issue.  And we're just asking that we can have what they

21   have so we can see which transactions came close to the attack,

22   which wallets are at issue; and if we choose this specific

23   attack, is it going to resolve these issues that could have

24   applicability to the other nonbellwether attacks.

25            What Mr. Miller just went on and on about

P8QVTROC

1    attorney-client -- it's work product.  It's work product.  And

2    work product is protected in some instances.  But it has been

3    waived here because it's been put at issue.  We've cited

4    this -- you know, the one decision by Judge Caproni, the *In re*

5    *Commodity Exchange Act*.  And that's what these say.  If you are

6    using this to further your case, if you are putting your

7    analysis, even if it's work product, you can't use that

8    analysis as both a sword and a shield, which is exactly what

9    Mr. Miller is trying to do here.

10           THE COURT:  What I'm hearing is Mr. Miller is saying

11   that it's not actually an analysis; it's not like there's an

12   expert report that exists that puts this all together or a

13   spreadsheet.  There's no document.  There's no document that

14   just contains the analysis.

15           Is that correct, Mr. Miller?

16           MR. MILLER:  Yes.

17           We have, from a variety of different sources, the

18   spreadsheet that we provided to defendants which just lists the

19   wallets.  But that's from a whole bunch of different sources in

20   pre-complaint work that is attorney-client privilege, that's

21   work product.  And to do all that --

22           THE COURT:  Why would it be attorney-client privilege?

23           MR. MILLER:  Well, work product.

24           THE COURT:  I'm assuming --

25           MR. MILLER:  Work product privilege, you're right.

P8QVTROC

1          (Indiscernible crosstalk)

2          THE COURT:  -- had access to wallets.

3          MR. MILLER:  You're right.  Work product privilege.

4          Because if they are saying this bears on the attacks,

5    so does the internal Binance data, because the Binance ledger

6    is critical to it.  And so, you know, each time a low-level

7    employee says, There's a wallet.  I just got an alert for it.

8    Should I process this transaction anyway?  And the manager

9    says, Don't worry about it.  Go for it.  That would be relevant

10   to liability.

11         So we'd be doing liability first.  We'd be deciding

12   liability, which is everything in the case to decide

13   bellwether.  And that is absolutely backwards to every approach

14   that is done for bellwether.  It's supposed to be an

15   expeditious case management efficiency approach that would --

16         THE COURT:  It's also supposed to be representative,

17   right?  Because otherwise there's no information gained from

18   bellwether.  But I also do think that what we have proposed is

19   representative.

20         The original approach that I laid out at the last

21   conference was geographic diversity, timing diversity,

22   terrorist attack, type of attack, and also when you get to the

23   point of choosing the plaintiffs, choosing based on different

24   injuries, direct family members, fatalities versus other types

25   of injuries.  That makes a representative sample.

P8QVTROC

1              I think Ms. Wasick makes some good points with respect

2       to information bearing on liability.  But given that we have

3       six attacks that represent more than half of the class, I don't

4       know how we couldn't be representative.  If at the end of the

5       day one or two of these particular attacks turns out to have

6       stronger or weaker liability defenses, that would be

7       informative for both sides, for both sides.  That's how

8       bellwethers work.

9              If you think that they've cherry-picked the six cases,

10      well, then you have an opportunity to propose a few other

11      cases.  You can propose them.  I would leave in place the two

12      that have the largest number of defendants, because I think

13      that's what helps to make this a useful sample size for

14      purposes of bellwether.  But if you want to substitute out one

15      or two other attacks to make sure that they haven't, you know,

16      selectively chosen the very, very best ones from a merits

17      standpoint, engage in that process.

18             But this is the approach that I laid out.  I think

19      this gets us to a representative point, which is the whole

20      reason to have representative categories, so that we can look

21      at pertinent characteristics.  And some will be stronger or

22      weaker, both the plaintiffs and the cases.  That's the point of

23      having a few of these to choose from.  And it's also supposed

24      to be informative from a settlement perspective, from if a

25      merits trial is ultimately had, for purposes of evaluating the

P8QVTROC

strength or weakness of the remaining hundreds of plaintiff
claims, and the 60-ish-plus different terrorist attacks that
are at issue, that's the exercise.  That's why one has a
bellwether.

            They are not going to be perfect.  They are not going
to -- each one of them is not going to be wholly representative
of the set, of course not.  But a set of six that represents
more than half of the plaintiffs claims should be
representative by its nature.

            MS. WASICK:  Your Honor, the selection of a bellwether
is going to have implications for the rest of this case.  And
there has been no discovery.  We have no verified information
to make this decision.

            THE COURT:  Do you think the terrorist attacks didn't
happen?

            MS. WASICK:  We don't know if the plaintiffs were
there at that particular time.

            THE COURT:  But you'll get that discovery.

            For the six terrorist attacks that are at issue,
you're going to get that discovery before a plaintiff is
chosen.  They are not going to have a hypothetical plaintiff
that has no records and no linkage to a terrorist attack.
Because you'll get discovery as to the plaintiffs.  When you
get to the bellwether stage of choosing who specifically will
be a bellwether plaintiff, you will get discovery, of course.

P8QVTROC

1          But we're talking about the structure.  We're talking

2     about the structure that's going to overlay it.  There's no

3     dispute that these attacks happened, right; there's no dispute

4     about that.  You know which attacks are at issue.  They are in

5     the complaint.  They are matters of public record.

6          So the question is which of the attacks are we going

7     forward with?  And if you want to choose different ones and put

8     forward different ones of the 64 that are in the complaint — I

9     think it's 64 — you should be part of that process.  You

10    haven't yet, as I understand it, put forward any attacks that

11    you think should be part of the process.  But, instead, you've

12    just, you know, laid out general principles for bellwether.

13    They are not helpful here.

14          MS. WASICK:  Just to take a step back, we don't have

15    any information.  Mr. Zhao, for example, is facing claims of

16    hundreds of different individuals whom he's never met.  He's

17    facing billions of dollars worth of liability.  And plaintiffs'

18    counsel is saying we can choose these attacks.  We don't have

19    any discovery or information to make a reasoned decision about

20    whether we're going to be able to put forth different defenses

21    tests, different theories of liabilities in these six attacks.

22    We don't have any discovery.

23          And it's not going to slow anything down.  Mr. Miller

24    has said that he expects full discovery from defendants, from

25    start to finish, doesn't matter if an attack ended in 2020,

P8QVTROC

1    say.  He still wants discovery until 2024.

2            THE COURT:  We can revisit that.  Whether discovery

3    should be limited -- reciprocal discovery should be limited

4    based on the bellwether I think is a separate issue.

5            First of all, going forward with a bellwether trial,

6    it doesn't bind you as to the rest of the cases.  I know you

7    cited in one of your letters cases that have to do with the

8    fair process when you're talking about consolidation of cases

9    and the like involving different defendants.  That's not this

10   issue.

11           A bellwether trial resolves claims on a single

12   plaintiff.  That's it.  That's all it does.  It provides you

13   with information.

14           So it's not a due process issue.  Because you can

15   choose to be bound by it, you can choose to not be bound by it,

16   you can choose to litigate the other 500 claims.  You can do it

17   one-by-one, you can do it in a group.  There's all sorts of

18   different ways to go forward.

19           The bellwether provides information.  It provides

20   information that can be useful to the parties in determining

21   the strengths and weaknesses of their claims, in determining

22   whether or not a resolution is possible.

23           You could choose to be bound.  I'm not ordering that

24   though.  I'm not ordering here today, as we sit here talking

25   about discovery, that some ruling on a bellwether is going to

P8QVTROC

1    bind you as to other cases.

2            So I'm not clear as to what this process issue that

3    you're raising is.  We're just trying to streamline discovery

4    to move this along.  You do not need discovery about 500

5    plaintiffs to do that.

6            We're going to choose six terrorist attacks.  That's

7    what I said last time.  That's what the exercise is.  If you

8    want to provide input as to what those attacks are, there's

9    plenty of public information as to those attacks.  You have

10   access to that information.  There are allegations in the

11   complaint.

12           Once the attacks are chosen and it's time to choose

13   bellwether plaintiffs, we can talk about what that discovery

14   should look like.  I'm not going to so-order Mr. Miller's

15   proposal as to steps two and three at this particular point in

16   time as to how we're going to choose the bellwether plaintiffs.

17   I would like defendants to participate in that discussion and

18   have proposals as to how we should move forward with that.

19           But we're choosing attacks, that I have made very

20   clear last time.  That is what we are doing.

21           So this whole reset which goes against the spirit of

22   what I asked you to do, we're just not doing that.  Understood?

23           MS. WASICK:  Yes, your Honor.

24           THE COURT:  Thank you.

25           MR. BANSAL:  If I might, Judge.

P8QVTROC

1          THE COURT:  Yes, Mr. Bansal.

2          MR. BANSAL:  We will do exactly as you say, Judge.

3          I would just like to make another point about the

4   transactional analysis that Mr. Miller is unwilling to share

5   with us, but is used in the complaint and in his motion to

6   dismiss opposition.

7          You've raised a very good question of cherry-picking.

8   How did Mr. Miller choose these six attacks?  I suspect it

9   wasn't random.  He knows what this proof that he intends to

10  offer, this undisclosed blockchain analysis, is going to say

11  about the six attacks he has chosen.  I have no way of knowing

12  whether he chose six attacks that have the best possible proof

13  from this analysis and that we might be able to make an

14  argument to the Court that, Hey, that is cherry-picking, Judge,

15  and we're not learning anything from a cherry-picked set of

16  attacks.

17         So Mr. Miller says -- I don't think he's standing on

18  work product — I don't think he can.  If he does, I can address

19  it.  But he says that there's no report.  Well, the case from

20  Judge Caproni, the CFTC case, there were reports, there were

21  analyses.  Did Mr. Miller telling us that these people only

22  communicated by telephone?  I know that there are -- there is

23  product underlying his analysis that will tell us what it is,

24  what the proof is likely to look like with respect to

25  particular attacks, because that's what he's using.

P8QVTROC

1          THE COURT:  I am open to an application, Mr. Bansal

2    and Ms. Wasick, from the defendants seeking information from

3    the plaintiff as to these six attacks as to what is the

4    specific blockchain analysis, what are the wallets that were

5    associated, what are the transactions.

6          You have that information, Mr. Miller.  You can

7    provide it to them.  You can provide it to them.

8          I think they raise strong points about whether or not

9    these attacks have been cherry-picked.  Certainly I think they

10   have to include the two that have the largest plaintiffs

11   groups.  That makes the most sense to me.  But with respect to

12   the other four, we want it to be representative.  We want it to

13   be representative.  And this analysis exists.  You can provide

14   it to them.  I'm not saying you have to turn over your emails,

15   I'm not saying you have to turn over all of your communications

16   internally.  But there's a way to provide them with the

17   specific information that underlies the communications.

18         What is the evidence linking a specific attack to the

19   defendants, right?  That's the analysis at the end of the day,

20   right?  That is the analysis that you've put forward in the

21   complaint.

22         Now, I understand that you want to be heard on this

23   more.  I think that maybe this needs to be a letter briefed to

24   the Court from both parties, because it is going to be a work

25   product issue that they want to assert.  Work product is a

P8QVTROC

1    qualified privilege.  Even aside from the waiver issue that

2    Ms. Wasick was arguing, it's a qualified privilege.  It can be

3    overcome.  And if there's a need for defendants to have it,

4    they are going to get it.  It sounds like there's a need for

5    them to have it, Mr. Miller.

6         MR. MILLER:  Your Honor, if I may.

7         So putting aside the host of objections and the

8    briefing about work product, here's why I don't think it's

9    relevant to the issue today, which is can we go forward with

10   the six attacks.  And that is, we didn't cherry-pick it,

11   because we don't have a good sense of what defendants' internal

12   blockchain data and documents will show linkages to different

13   attacks.

14        So in order to do what they are doing, which is to

15   decide liability strength, you need the internal Binance

16   blockchain data.  And that is not work product at all.  That is

17   plainly discoverable.  And we've asked for it and they've

18   refused.

19        And you need to know did some compliance person on a

20   specific day say, Hey, we just got a specific activity report

21   about this wallet.  And then a businessperson says, Override

22   it.  That's a VIP customer.  And that's a date that we can link

23   to a specific attack.

24        So this issue will go nowhere productive.  Because

25   what we're going to be at is we'll be here in months, and we'll

1    be saying, We need more discovery from defendants.  We need to

2    have expert reports that look at it.  We need to do huge

3    amounts of work to decide the liability strength.  And that's

4    what we didn't -- we don't have enough information to kind of

5    cherry-pick attacks.  So we did exactly what your Honor says:

6    We picked the two biggest.  Then we said, Well, let's get an

7    attack for a different country, for a different terrorist

8    group, for a different attack modality, from a different time

9    period.  And that's what we did.

10          And so I think your Honor's point, the way courts

11   approach this is you don't have to find every variable, you

12   don't have to do things like liability strength.  There's cases

13   where plaintiffs even choose all the plaintiffs.  And the court

14   says, If you're choosing lead plaintiffs, then it's not going

15   to help you with settlement, because they are going to say,

16   Well, you chose lead plaintiffs; we're not going to settle the

17   rest.

18          So if the Court says we've got the six-attack

19   structure, that gives us ability to move forward in this case,

20   you'll provide discovery about the specific plaintiffs, we can

21   move forward with this case, because these other liability

22   questions are just not going to get resolved within six months

23   because it's going to require expert reports and the liability

24   strength of each --

25          THE COURT:  We're not doing expert reports to pick

P8QVTROC

1    bellwethers.  We're not doing that.

2             But the question is, is there more information that

3    can be shared in order to choose the six attacks?  Is there

4    more information that could be shared from both sides in order

5    to assess the liability?

6             So to the extent that either party thinks that there

7    is information that is necessary to choose the six attacks that

8    we're going to use as bellwether, and it's not going to be

9    plaintiff-specific information, that's a phase two issue, but

10   if there's information specific to the terrorist attacks that

11   Mr. Miller or the defendants think is necessary, if you think

12   that you need the blockchain logs from Binance is what I

13   understand that you think that that would be useful for you to have

14   on one end, they think your blockchain analysis would be useful

15   for them to have on the other end, maybe we just exchange, and

16   then you guys can choose your six attacks based on transparency

17   and common ground information and we can move forward.  Maybe

18   that's the way forward.

19            MR. MILLER:  Your Honor, if I may.

20            I understand your Honor's -- that option.  But the six

21   attacks that we've proposed are sufficiently representative --

22            THE COURT:  I'm not ordering the six attacks today.

23   I'm ordering that we're going forward with the six-attack

24   structure.

25            MR. MILLER:  Understood.

P8QVTROC

 1              THE COURT:  We are doing that.  I'm going to allow the

 2    parties a little bit more time to discuss what the six attacks

 3    are.

 4              We don't need to decide.  We have a lot of discovery

 5    going forward.  We have a lot of discovery that will be going

 6    forward in the next couple of months.  This is not going to bog

 7    down anything.  There is plenty of work to be done while we

 8    resolve this.

 9              But this is sufficiently important that we should make

10    sure that we arrive at six representative attacks.  And if

11    liability is one of the issues that ultimately we think the

12    strength and weaknesses of liability cases specific to each

13    attack turns out to be something that we should take into

14    account, we will.

15              Perhaps there's not going to be enough information and

16    that's one of the things that representative samples we'll just

17    let play out.  Some may be stronger, some may be weaker.  We

18    may not be able to assess that at the outset.  But I'd like to

19    at least see what information can be exchanged in an

20    expeditious fashion to allow this to go forward.

21              I want to hear from both parties as to what discovery

22    they think they would need from the other side that could be

23    obtained quickly, that would aid in the inquiry that we're

24    doing right now, which is can we assess liability strength at

25    the outset.  And if we can't, we can't.  We're certainly not

P8QVTROC

 1    going down the path of months of expert discovery to determine

 2    bellwethers.  That is not what we're doing here.  That's not

 3    going to be a thing.

 4              MR. MILLER:  Understood, your Honor.

 5              THE COURT:  So what can we exchange?  What is it that

 6    you're looking for on the one end; what is it the defendants

 7    are looking for on the other end specific to the six proposed

 8    attacks or other attacks?

 9              MR. MILLER:  So plaintiffs understand that and we'll

10    go forward with that in mind.

11              Just to be clear, we agree that the two biggest

12    attacks are --

13              THE COURT:  I think the two biggest attacks have to

14    stay.

15              MR. MILLER:  Right.  And we'll figure out --

16              THE COURT:  It's half the plaintiff class.  It's half

17    the plaintiff class.  If that's not representative, then like

18    picking six cases that involve 20-something plaintiffs out of

19    300 is not going to get us to a representative place.  That is

20    just unuseful.  That is unuseful.

21              MR. MILLER:  We agree, your Honor.

22              We will approach the remaining four attacks with these

23    guidelines in mind.  We'll see what we can exchange.  We'll see

24    what we can reach from them.  And we can return to it.

25              The other element is that we do ask for a date

P8QVTROC

1    certain.  We now have the structure in place.  We know we're

2    not going to do 530-something depositions.  We have a court

3    order on discovery as to the government productions.  We have a

4    lot of certainty.

5          Now, we said 150 days for fact discovery.  With the

6    schedule on government productions, I think we need to push

7    that out more.

8          THE COURT:  A hundred fifty days is wholly unrealistic

9    given the volume of discovery that we're talking about.

10          MR. MILLER:  I agree.

11          THE COURT:  It took us months just to get through the

12    government productions.  We are not fully there.

13          MR. MILLER:  I agree, your Honor.

14          I think a date certain though will force the parties

15    to be more reasonable and allow us to cut through, because the

16    disputes have a tendency to fill up time available.  So if we

17    have a date certain, then we would be able to move forward with

18    that in mind, make the compromises, the parties would work

19    together to make the compromises necessary.  Because otherwise,

20    it just encourages more bites at the apple where we keep

21    relitigating these issues because there's no deadline in place

22    that forces the parties to work cooperatively.

23          THE COURT:  So I'm going to set a deadline at the next

24    conference.  I said I was going to do it today, but because we

25    don't have a bellwether in place, I do want to wait until the

P8QVTROC

1    next conference to do so, and I want the parties to propose

2    deadlines.

3            Keep in mind, as I said at the initial conference, one

4    of the reasons I've hesitated to set a deadline is I have firm

5    deadlines; so the deadline doesn't move.  Once we set a

6    deadline, that's the deadline.  So it will be what it will be.

7    And I don't want to have to come back and hear, We didn't

8    get -- you know, the productions were voluminous, the review

9    took longer, we're deposing X number of people.

10            Until we have a real handle on what discovery in this

11    case involves, setting a deadline would be arbitrary and

12    potentially lead us to having to move a deadline, and then

13    that's meaningless to me.  Whatever date we pick is going to be

14    fully informed by what discovery remains to be done.  And then

15    we can be comfortable setting a firm deadline and comfortable

16    that the discovery that both parties want and need can be

17    accomplished in that time frame that we're discussing.

18            Obviously, if we're moving forward with bellwether,

19    that's a very different thing.  And that's part of why I want

20    to pause on that; how many bellwether plaintiffs are we going

21    to have, what is the selection method going to be?  That is one

22    of the assignments that I've given to the parties to have

23    further discussions on, now that you know that we are

24    proceeding with the six-attack structure, which I thought we

25    understood last time, but we revisited again, again reaffirming

P8QVTROC

1    we're on the six-attack structure.

2           So I want the parties to come up with common proposals

3    as to how to pick plaintiffs from those terrorist attacks once

4    we have settled on what those are.

5           MR. MILLER:  Understood, your Honor.

6           We'll proceed with that in mind.

7           THE COURT:  Yes.

8           But I agree with you, Mr. Miller, that a deadline for

9    discovery is going to need to be imposed; it will put some

10   structure onto this.  I think we'll be more fully informed at

11   the next conference, which I anticipate should be probably in

12   October.  And I'm hoping that by mid October, the parties will

13   have advanced the ball quite a bit on the bellwether issues.

14          In the interim, again, as I put out, if there's

15   discovery that either side thinks they need in order to be

16   fully informed as to liability strengths and weaknesses, there

17   should be a joint letter submission setting forth both parties'

18   positions with respect to that discovery, probably about two

19   weeks in advance of the conference so that I have fully time to

20   look at it.

21          Does everyone understand?

22          MR. MILLER:  Understood, your Honor.

23          MR. BANSAL:  Yes.

24          So if we have a dispute over, for example, the

25   blockchain analysis, we should put it in that joint letter.

P8QVTROC

1          THE COURT:  Exactly.  That is exactly what I'm

2    contemplating.

3          MR. BANSAL:  That's fine, Judge.

4          In terms of scheduling, I mean, I don't know how

5    Mr. Miller would feel about this, but perhaps it would make

6    some sense for him to review the very voluminous discovery that

7    we intend to produce by November, and then have the conference.

8    But, again --

9          THE COURT:  I want to have a conference that focuses

10   on this bellwether issue, understanding that the discovery will

11   still be rolling at that time.  And I also want to start

12   discussing the final case management plan schedule which, to

13   date, we have not imposed in this case.  So those would be the

14   two agenda items — at least currently — for an October

15   conference.

16         In November, I'm sure we'll be meeting again to

17   discuss the outstanding issues with respect to document

18   productions, including Mr. Miller's renewed request, if any,

19   for some of the categories of documents for which I have

20   deferred decision.

21         So, Ms. Molinelli, what can we do with respect to

22   conferences in mid October?

23         THE DEPUTY CLERK:  We could do Monday, October 20th,

24   or Wednesday, October 22nd.

25         THE COURT:  What is availability on the 22nd?  That's

P8QVTROC

1    looking better between those two dates.

2            THE DEPUTY CLERK:  We can do 2:30 p.m.

3            THE COURT:  Is everyone available on the 22nd at 2:30

4    p.m.?

5            MR. BANSAL:  Defense are available, Judge.

6            MR. MILLER:  Plaintiffs are available, your Honor.

7            THE COURT:  Wonderful.  We will meet again on the

8    22nd.

9            I am going to have the joint letter that I discussed —

10   let's make it due the 10th of October.  So that should be any

11   applications to the Court for discovery that would be in aid of

12   selecting the bellwether terrorist attacks.

13           Any other issues we need to take up today?

14           MR. MILLER:  Just on page length for the joint letter,

15   could we do four each?

16           THE COURT:  I think that's fair, given that there

17   could be significant discovery issues, including work product

18   being raised by these letter motions.

19           MR. BANSAL:  No objection.

20           THE COURT:  All right.

21           Four pages single-spaced each; so it will be an

22   eight-page letter due on October 10th.  And, of course, if you

23   have no applications because you've all worked it out, I would

24   be exceedingly pleased.

25           MR. MILLER:  We'll make that a one-page letter, your

P8QVTROC

1    Honor.

2            THE COURT:  Appreciate it.

3            All right.  If there are no other issues, then court

4    is adjourned.

5                              *    *    *