**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

JOCELYN TROELL, individually, and for the estate of STEPHEN TROELL, ABIGAIL TROELL, A.T. by and through her next friend Jocelyn Troell, K.T. by and through her next friend Jocelyn Troell, S.T. by and through his next friend Jocelyn Troell, SUSAN TROELL, RICHARD TROELL, SARAH SELLEW, CHRISTINA TROELL, JOANNA WINN, CARVIN JOHNSON, BOBBY RORLS III, AYAD HATTAB, OISHAEL TAYLOR, WYKITA RILEY, GARREN LORIO, MARQUIS SOREL, DEVIN CARAMANIAN, SHAY DUBIS, JAMES BUCKMAN, DOMA SHERPA, FERNANDO SANTIAGO, VINCENT GRAMIGNA, JOLSTON STREET, BRITTANY STREET, JERRELL LOGAN, BRANDON HORNE, DAVID CREASY, ARTHUR VANTINE, DERALD BOWMAN, EAZY NASIR, REZA DOE, FARNAZ DOE, AMIR DOE, SHIWA NAHADI, individually, and for the estate of OMER MAHMOUDZADEH, TARA MAHMOUDZADEH, HADASSAH PRZEWOZMAN, individually, and for the estate of PINCHAS PRZEWOZMAN, P.P. by and through his next friend Hadassah Przewozman, Y.P. by and through his next friend Hadassah Przewozman, CHAYA PRZEWOZMAN, CHAIM PRZEWOZMAN, AVRAOHOM PRZEWOZMAN, F.P. by and through her next friend Chaim Przewozman, ZVI PRZEWOZMAN, SARA ROZENBAUM, YAFA SHECHTER, BURECH GLUCK, GITTY GLUCK, HERMAN GLUCK, RACHEL GLUCK, BRUCHY GLUCK, ABRAHAM GLUCK, A.G. by and through his next friend Herman Gluck, D.G. by and through his next friend Herman Gluck, JACOB GLUCK, SOLOMON GLUCK, V.G. by and through his next friend Herman Gluck, SHAHAR BAUSI, individually, and as co-representative for the estate of ITAI BAUSI, JULIANA FARRON, individually, and as co-representative for the estate of ITAI BAUSI, A.B. by and through his next friends Juliana Farron and Shahar Bausi, NOA BAUSI, YOAV BAUSI, BERNADETTE BRAUNER, NIR BRAUNER, SHEEREL GABAY, LIRON GABAY, GIL GABAY, OREL GABAY, ETHAN HALLEY, WENDY HALLEY, ADAM HALLEY, BOAZ HALLEY, SADIE HALLEY,

Case No.: 1:24-cv-7136 (JAV)

JURY TRIAL DEMANDED

TAMAR MAUDI, SHIMON MAUDI, individually, and for the estate of NOI MAUDI, SIVAN ELKABETZ, SAPIR KITAYEVICH, SHANI ROSENBERG, DIKLA MIZRACHI, individually, and as co-representative for the estate of BEN MIZRACHI, ETSIK MIZRACHI, individually, and as co-representative for the estate of BEN MIZRACHI, DAN MIZRACHI, MAYA MIZRACHI, NEEV MIZRACHI, LIMOR ROM, individually, and as co-representative for the estate of JONATHAN ROM, TOMER ROM, individually, and as co-representative for the estate of JONATHAN ROM, ALONA ROM, NOAM ROM, DVORA SAADON, individually, and as co-representative for the estate of HALLEL SAADON, ELAD SAADON, individually, and as co-representative for the estate of HALLEL SAADON, N.S. by and through his next friends Dvora Saadon and Elad Saadon, O.S. by and through his next friends Dvora Saadon and Elad Saadon, S.S. by and through his next friends Dvora Saadon and Elad Saadon, TAMIR SAADON, YINON SHARABI, LIAT WACHS, individually, and for the estate of IGAL WACHS, J.W. by and through his next friend Liat Wachs, HAL LUBIN, individually, and as co-representative for the estate of ROSE LUBIN, ROBIN LUBIN, individually, and as co-representative for the estate of ROSE LUBIN, ALEC LUBIN, I.L. by and through his next friend Hal Lubin, J.L. by and through his next friends Hal Lubin and Robin Lubin, L.L. by and through her next friends Hal Lubin and Robin Lubin, ISAAC MARGULIES, ELLYN MARGULIES, JACOB MARGULIES, ASHER MARGULIES, SIMON MARGULIES, YONAH LANDAU ZENILMAN, individually, and for the estate of ARI ZENILMAN, A.Z. by and through his next friend Yonah Landau Zenilman, M.Z. by and through her next friend Yonah Landau Zenilman, T.Z. by and through her next friend Yonah Landau Zenilman, LISA WEINSOFF, ROBERT ZENILMAN, SHIRA WEINSOFF ZENILMAN, EITAN ZENILMAN, ELI ZENILMAN, YONATAN ZENILMAN, JOSHUA HEXTER, individually, and for the estate of YAKIR HEXTER, CHAYA HEXTER, EZRA HEXTER, RAPHAEL HEXTER, S.B. by and through his next friend David Bollag, DAVID BOLLAG, E.B. by and through her next friend David Bollag, MADELEINE BOLLAG, N.K. by and through his next friend Allen

Kamer, ALLEN KAMER, STACY RUBTCHINSKY KAMER, ELIANA KAMER, MAYA KAMER, Y.K. by and through his next friend Allen Kamer, I.M. by and through his next friends Nicholas Merkin and Sharon Stein, NICHOLAS MERKIN, SHARON STEIN, EYTAN MERKIN, JONATHAN MERKIN, TALIA FRIEDMAN, individually, and for the estate of ZACHARY HABER, J.H. by and through his next friend Talia Friedman, N.H. by and through his next friend Talia Friedman, S.H. by and through her next friend Talia Friedman, MIRIAM HABER, AHARON HABER, NATHANIEL HABER, NOAM HABER, MARCY TATELBAUM, individually, and as co-representative for the estate of YAKIR TATELBAUM, YEHUDAH TATELBAUM, individually, and as co-representative for the estate of YAKIR TATELBAUM, MEIR TATELBAUM, and TECHELET TATELBAUM,

Plaintiffs,

v.

BINANCE HOLDINGS LIMITED d/b/a BINANCE and BINANCE.COM, CHANGPENG ZHAO, and BAM TRADING SERVICES INC. d/b/a Binance.US,

Defendants.

**SECOND AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE ANTI-TERRORISM ACT**

# TABLE OF CONTENTS

INTRODUCTION ........ 1

THE PARTIES ........ 9

JURISDICTION AND VENUE ........ 13

PROCEDURAL HISTORY ........ 14

A. The Action, the First Amended Complaint, and the Dismissal Order ........ 14

B. This Complaint Is Targeted and Supplies the Details the Court Identified ........ 16

C. After the First Amended Complaint Was Filed, Additional Public Revelations Have Bolstered and Confirmed Plaintiffs' Allegations ........ 18

FACTUAL ALLEGATIONS ........ 22

I. Defendants' Unregistered Cryptocurrency-Based Money Services Business Was a Dangerous Product Uniquely Suited to Terrorist Finance, and Defendants' Unusual Practices Made Terrorist Violence a Substantial Certainty ........ 29

A. Cryptocurrency-Based Financial Services Are Uniquely Suited to Terrorist Finance and Are Heavily Regulated to Prevent It ........ 30

1. How Cryptocurrency Works ........ 30

2. Cryptocurrency Is Uniquely Valuable to Terrorist Organizations ........ 33

3. Cryptocurrency Exchanges Are Restricted Commodities Whose Operators Must Detect and Prevent Terrorism Financing ........ 37

B. Defendants Operated the Binance Exchange in a Manner That Made a Dangerous Product Even More Susceptible to Terrorist Use ........ 40

1. The Binance Platform's Core Features Created Acute Terrorist-Financing Risk ........ 40

2. Defendants Took Affirmative Steps to Stimulate Illicit Usage ........ 43

3. Defendants Deviated Egregiously From Accepted Business Practices and Broke Critically Important Anti-Terrorism Laws ........ 46

4. Defendants Had a Stake in Concealing the Platform's Unlawful Uses ........ 49

II. Defendants Knew That the Binance Platform Enabled Hamas, PIJ, IRGC, and Hizballah Financing .......... 50

A. Public Reports Show How the Key FTOs Used Cryptocurrency to Raise, Move, and Access Funds Unlawfully—Including Through Binance .......... 51

1. Hamas and PIJ .......... 51

2. The IRGC, Hizballah, and Kataib Hizballah .......... 54

B. Binance's Compliance Tools and Data Alerted it to FTO-Affiliated Customers in Real Time During the Relevant Period .......... 69

1. Binance's Compliance Tools .......... 69

2. Information Identifying Key FTO Activity on Binance .......... 71

C. The Full Scale of Binance's FTO-Affiliated Transactions Is Unknown .......... 76

III. Defendants Provided Knowing and Substantial Assistance to Hamas's, PIJ's, the IRGC's, Hizballah's, and Kataib Hizballah's Terrorist Attacks .......... 78

A. Defendants Actively Assisted the FTOs That Attacked Plaintiffs .......... 78

1. Defendants Protected Identified Terrorist-Affiliated Accounts Rather Than Reporting Them as Required by Law .......... 78

2. Defendants Selectively Enforced Compliance Rules to Favor Terrorists .......... 87

3. Defendants Took Affirmative Steps to Conceal the Transactions from Regulators and Law Enforcement .......... 88

4. Defendants Fostered a Sustained Relationship with IRGC-Controlled Cryptocurrency Exchanges .......... 99

B. There Was a Clear Nexus Between Defendants' Assistance and the Terrorist Attacks That Injured Plaintiffs .......... 101

1. Defendants' Assistance to Hamas and PIJ Substantially Assisted Their Attacks .......... 106

2. Defendants' Assistance to the IRGC, Hizballah, and Kataib Hizballah Substantially Assisted Their Attacks .......... 133

3. The Wallet Identifications Are Reliable—and Were Equally Available to Defendants .......... 147

IV. Defendants' Unlawful Conduct Had a Substantial Nexus to New York and the United States ........ 152

A. Binance Used New York Customers, Partners, and Banks in Carrying Out the Scheme ........ 152

B. Binance Illegally Served a Substantial Number of U.S. Users and Used U.S. Service Providers ........ 154

C. Zhao's Unlawful Conduct Had a Substantial Nexus to New York and the United States ........ 156

D. Binance US's Conduct Had a Substantial Nexus to New York and the United States ........ 157

V. The Attacks That Injured Plaintiffs ........ 157

A. The Hamas and PIJ Attacks in Israel ........ 158

1. The May 5, 2019 Rocket Attack in Israel (Przewozman Family) ........ 159

2. The August 14, 2022 Mass-Shooting Attack in Israel (Gluck Family) ........ 159

3. The October 7, 2023 Attack in Israel ........ 160

4. The November 6, 2023 Stabbing Attack in Israel (Lubin Family) ........ 163

5. The November 8, 2023 Complex Attack in Israel (Margulies Family) ........ 164

6. The December 10, 2023 Complex Attack in Israel (Zenilman Family) ........ 164

7. The January 8, 2024 Complex Attack in Israel (Hexter Family) ........ 164

8. The January 15, 2024 Vehicle Attack in Israel (Bollag, Kamer, and Merkin Families) ........ 165

9. The January 16, 2024 Complex Attack in Israel (Haber Family) ........ 166

10. The June 28, 2024 Sniper Attack in Israel (Tatelbaum Family) ........ 166

B. The Hizballah and Kataib Hizballah Attacks in Iraq and Syria ........ 167

1. The November 7, 2022 Assassination Attack in Iraq (Troell Family) ........ 168

2. The February 15, 2021 Rocket Attack in Iraq (Carvin Johnson and Bobby Rorls III) ........ 169

3. The March 13, 2021 Rocket Attack in Iraq (Ayad Hattab) ........ 169

4. The May 1, 2021 Mortar Attack in Iraq (Oishael Taylor) ........ 169

5. The July 3, 2021 Rocket Attack in Iraq (Wykita Riley) .............................. 170

6. The July 7, 2021 Mortar Attack in Iraq (Garren Lorio)............................... 170

7. The July 4, 2022 Rocket Attack in Iraq (Marquis Sorel)............................. 170

8. The August 29, 2022 Small-Arms Attack in Iraq (Devin Caramanian) ....... 170

9. The March 23, 2023 UAV Attack in Syria (Dubis Family and James Buckman)...................................................................................... 170

10. The October 17, 2023 UAV Attack in Iraq (Doma Sherpa) ......................... 171

11. The October 18, 2023 UAV Attack in Iraq (Fernando Santiago)................. 171

12. The October 26, 2023 UAV Attack in Iraq (Vincent Gramigna, Jolston Street, and Brittany Street)............................................................ 171

13. The November 21, 2023 Missile Attack in Iraq (Jerrell Logan).................. 172

14. The December 12, 2023 Rocket Attack in Syria (Brandon Horne)............. 172

15. The January 20, 2024 UAV Attack in Iraq (David Creasy) ........................ 172

16. The July 15, 2024 UAV Attack in Iraq (Arthur Vantine)............................ 173

17. The July 16, 2024 UAV Attack in Iraq (Derald Bowman).......................... 173

C. The IRGC Attacks.............................................................................. 173

1. The March 13, 2022 Ballistic-Missile Strike in Iraq (Eazy Nasir).............. 174

2. The 2022 Hostage-Taking Attack in Iran (Doe Family)............................... 174

3. The September 28, 2022 Missile and UAV Attack in Iraq (Mahmoudzadeh Family).......................................................................... 175

CLAIM FOR RELIEF ........................................................................................ 175

VIOLATION OF THE ANTI-TERRORISM ACT 18 U.S.C. § 2333(d)(2)............................. 175

JURY DEMAND .............................................................................................. 179

PRAYER FOR RELIEF ...................................................................................... 179

Appendix A: Summary of Binance's Hamas and PIJ Transactions ...........................................A1

Appendix B: Summary of Binance's IRGC, Hizballah, and Kataib Hizballah Transactions.......B1

# INTRODUCTION

1. This civil action arises under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 851 (2016), which created a cause of action against those who aid and abet acts of international terrorism committed, planned, or authorized by designated foreign terrorist organizations ("FTOs").

2. Congress created this remedy precisely to reach conduct like Defendants'. As Congress found, it is the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). JASTA accordingly seeks to provide civil litigants with "the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

3. Defendants Binance—the world's largest cryptocurrency exchange—and its founder and former Chief Executive Officer ("CEO") Changpeng Zhao knowingly provided substantial assistance to terrorist attacks committed or authorized by: (1) Hamas and Palestinian Islamic Jihad ("PIJ"), (2) Iran's Islamic Revolutionary Guard Corps ("IRGC"); (3) Hizballah; and (4) the IRGC-Quds Force's ("IRGC-QF") Iraqi proxy Kataib Hizballah. The United States has designated each of these entities as an FTO.

4. Hamas and PIJ committed, planned, or authorized ten of the attacks in this case, which occurred between May 2019 and June 2024. These attacks, which included the events of October 7, 2023, injured 124 direct and indirect victims who are among the Plaintiffs here.

5. Binance knowingly violated laws and regulations to facilitate cryptocurrency transfers to and from a discrete, identified set of Hamas and PIJ financial actors: an identified PIJ network catalogued in Binance's own records, the fundraising wallets for Hamas's terrorist operations wing (the al-Qassam Brigades), and Gaza-based money-transmission intermediaries—including BuyCash, Gaza Now, and the Dubai Company for Exchange—whose ties to Hamas and PIJ were publicly identifiable. Through this conscious, voluntary, and culpable conduct, Defendants enabled Hamas and PIJ to commit the attacks that injured Plaintiffs.

6. Plaintiffs' blockchain expert, the global consulting firm J.S. Held, analyzing publicly available blockchain data, terrorist designations, and other public sources, have documented these transactions and tied them to Hamas and PIJ—identifying the holders, their connections to the two groups, and the specific dated transfers and amounts. The analysis shows that the assistance accumulated steadily in the years before each attack. Thus, by the eve of the October 7, 2023 attack, Binance had processed at least 117,431 transactions worth approximately $428 million with five identified Hamas and PIJ channels. In all, it processed at least 126,404 transactions worth approximately $505 million with them across the period analyzed. *See* App. A, Tables A-1 to A-3.

7. Among those documented transactions were transfers Binance processed through a cryptocurrency wallet—TRON address ***7GWE—that Israel's National Bureau for Counter Terror Financing ("NBCTF") designated, on July 4, 2023, as property of the PIJ, one of the groups that carried out the October 7 attack. Binance continued to process transfers to and from

wallets designated as PIJ property after that designation, the last on September 30, 2023—one week before the October 7 attack.

8. These transactions are representative of a far larger set, and a conservative one: they capture only publicly traceable on-chain activity, while the full volume of transactions through Binance accounts was and remains visible to Binance alone, as Binance processed those only on its internal ledgers to which Plaintiffs lack access. Most of the publicly identified Binance transactions with the identified PIJ network were funds Binance paid out to PIJ-attributed wallets.

9. Publicly traceable activity shows that Binance dealt the same way with the other identified actors after they, too, were publicly identified as terrorists: It processed tens of millions of dollars with Dubai Company for Exchange wallets after Israel designated it a terrorist organization in March 2022, and continued paying six-figure sums to BuyCash-attributed wallets after the U.S. Department of the Treasury's ("Treasury") Office of Foreign Assets Control ("OFAC") designated BuyCash in October 2023—including a $318,248 disbursement on November 4, 2023, two days before the next attack.

10. Binance knew that these specific actors were tied to Hamas and PIJ, because it held and used every tool Plaintiffs' experts used to identify them—and more. Plaintiffs' experts worked only from public blockchain data and standard transaction-graph analysis; Binance had those tools, contracted with the firms that built them, and added what no outsider could match: each account holder's verified identity, device and login data, and the off-chain record of activity on its own books. That combination let Binance identify these actors in real time, from the transactions and patterns themselves rather than from any government list—and the record shows it did, or deliberately chose not to, well before most of these actors were ever designated.

11. Binance's own records bear that out: as the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") determined, and as Binance admitted, Binance's internal records described dozens of its users as "an identified PIJ network," and, "prior to OFAC's designation of BuyCash," Binance "was aware of extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file a [Suspicious Activity Report] with FinCEN." Israeli authorities reinforced what Binance already saw, naming specific Binance accounts in seizure orders beginning in December 2021. And Hamas had, since 2019, openly recommended its supporters use Binance to send money to the organization's terrorist operations wing.

12. When Binance identified these actors, it protected them rather than report them. In April 2019, after a vendor's report identified transactions associated with Hamas, Binance's chief compliance officer ("CCO") moved to influence how the vendor characterized Binance's conduct instead of freezing the accounts. In July 2020, when a compliance tool flagged a customer as Hamas-affiliated, the same Binance executive instructed staff to "let him take his funds and leave. Tell him that third party compliance tools flagged him." That approach reflected policy set at the top of the company: in July 2020, Binance's then-Chief Financial Officer wrote that Binance's compliance and investigation teams should check a user's VIP level before offboarding, and that Binance could then "give them a new account (if they are important/VIP)" with the instructions "not to go through XXX channel again." Many such users immediately came back to Binance with new accounts.

13. Across the entire period from July 2017 through November 2023, on the direction of senior management, Binance refused to file any suspicious activity reports ("SARs") on Hamas- or PIJ-affiliated transactions—even as its own systems flagged specific accounts. As

FinCEN stated in the Binance consent order, "Binance failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist organizations by the United States and United Nations." For six years, law enforcement was denied the account and transaction data needed to disrupt the terrorist financing running through Binance's platform. That decision was intentional—and came from the very top. Zhao acknowledged that "there are a bunch of laws in the US that prevent Americans from having any kind of transaction with any terrorist," requiring financial institutions to "submit all relevant documents for review"—but told his colleagues "we don't want to do that."

14. Binance and Zhao have admitted much of this. To resolve multiple federal investigations, they entered guilty pleas in November 2023 and agreed to pay over $4 billion—among the largest corporate penalties in U.S. history; Zhao was sentenced to federal prison and stepped down as Binance's CEO. The Department of Justice ("DOJ"), OFAC, and FinCEN determined that Binance and Zhao willfully refused to establish an effective anti-money laundering and counterterrorist-financing ("AML/CFT") program, refused to monitor and report required suspicious transactions, and violated anti-terrorism sanctions—all to gain a business advantage. As Treasury Secretary Janet Yellen explained, Binance's "willful failures allowed money to flow to terrorists."

15. Binance provided similar assistance to a second set of attacks. Those attacks were committed, planned, or authorized by the IRGC, Hizballah, and/or the IRGC-QF's and Hizballah's Iraqi proxy Kataib Hizballah. They include a series of hostage-taking, rocket, drone, and missile attacks on U.S. military personnel and civilian contractors in Iraq and Syria between February 2021 and July 2024, carried out by Kataib Hizballah and by joint Hizballah/Kataib Hizballah cells under IRGC-QF direction; the IRGC's March 13, 2022 ballistic-missile strike on

Erbil, Iraq; the IRGC's 2022 hostage-taking of a U.S. national in Iran; and the IRGC's September 28, 2022 missile and UAV attack on Koya, Iraq. Those attacks killed and injured 38 additional Plaintiffs.

16. Binance substantially assisted those attacks in the same way it assisted the Hamas and PIJ attacks. Beginning January 2022, it processed more than $130 million in cryptocurrency transactions with a discrete, identified set of wallets attributed to the IRGC and to Hizballah. Plaintiffs' expert J.S. Held identified approximately $79.6 million in transactions with IRGC-attributed wallets and approximately $54.6 million with Hizballah-attributed wallets, much of it predating the attacks for which Plaintiffs seek recovery, and all of it processed while these organizations carried active U.S. terrorist designations and Binance filed no SARs.

17. Binance assisted the IRGC through a second channel as well. For years it maintained a multi-billion-dollar commercial relationship with numerous cryptocurrency exchanges in Iran, many of which have been sanctioned for supporting the IRGC. The largest of these was Nobitex, an IRGC front that, in its own promotional materials, touted itself as a way to transact around sanctions. According to Chainalysis, some $7.8 billion flowed between Binance and Nobitex before November 2022. A significant portion of this volume (approximately half) was for the benefit of the IRGC, and a majority of that money, in turn, flowed to attacks committed and sponsored by the IRGC.

18. Subsequent events have only confirmed how critical Nobitex was to the IRGC's cryptocurrency efforts. In 2025, Nobitex's source code and internal documents became public, showing that Nobitex had adopted a strategy to evade detection by FinCEN and U.S. blockchain-intelligence firms, had implemented dedicated anti-surveillance software modules, and used a dual-track design that permitted unrestricted access for politically sensitive, state-aligned, and

sanctioned users while bypassing the compliance and fraud checks applied to ordinary customers. These features allowed the IRGC to use Nobitex to move money around sanctions at scale. On June 2, 2026, OFAC designated Nobitex as a terrorist-financing entity providing support to the IRGC. OFAC also designated Iranian cryptocurrency exchanges Wallex and Ramzinex. According to Plaintiffs' analysis, Binance processed over $540 million in volume with these smaller exchanges during the relevant period.

19. Binance also enabled a third channel of support to IRGC-sponsored attacks. Starting in 2022, Binance's blockchain technology enabled a known IRGC sanctions-evasion expert, Babak Zanjani, to create his own cryptocurrency tokens, which were used prolifically by the IRGC to defeat U.S. counterterrorism sanctions. Binance profited from each and every transaction involving these coins, which relied exclusively on technological infrastructure created, promoted, and maintained by Binance. Most jarringly, Binance participated in this misconduct even after pleading guilty—and reacted to its exposure by firing the investigators who discovered it and suing the newspapers that reported it.

20. In sum, Defendants provided a uniquely dangerous service tailor-made to finance terrorist attacks. Specifically, Defendants gave the terrorists access to the international financial system—from which they were otherwise barred by their FTO designations—by operating an illegal, unregistered, cryptocurrency-based money services business. Cryptocurrency is globally accessible, easily transferred across borders, convertible to U.S. dollars, and readily paired with anonymity-enhancing technologies like virtual asset mixing. When accessed through a massively liquid unregistered exchange that deliberately evades AML/CFT and Know Your Customer ("KYC") obligations, it allows terrorists to move money without triggering the safeguards that responsible financial institutions are legally required to maintain—and, because Binance's

exchange is accessible by mobile phone, to do so from geographies with limited financial and technical infrastructure. Binance's decisions to allow anonymity-enhanced coins and to host darknet-market actors further compounded the risk. The exchange's value to terrorists extended well beyond the simple receipt of funds from Binance accounts: their ability to transfer sums into the Binance system allowed them to use it as a terrorist bank, storing and moving value across accounts and geographies in precisely the ways that sanctions prevented them from doing with regular banks. And the proof is in the pudding: Binance rejected 86% of requests from the Israel Defense Forces to freeze cryptocurrency wallets, and of all Israeli seizure orders of cryptocurrency exchange accounts between December 2021 and September 2025, a staggering 99% were on Binance.

21. The attacks that Binance's knowing financial assistance facilitated took many forms. In Israel, they included rocket fire, a mass shooting, a stabbing, a vehicular attack, a sniper attack, and the coordinated October 7, 2023 assault on southern Israel. In Iraq, Syria, and Iran, they included hostage-takings and rocket, drone, missile, and ballistic-missile attacks on Americans. Many are dead; many are scarred; and all have been changed forever by Binance's deliberate malfeasance. Plaintiffs seek justice here for all that they have lost.

22. The penalties Binance and Zhao have paid on account of their criminal pleas constitute partial remuneration to the U.S. government. But they have done nothing to help Plaintiffs. Binance and Zhao are worth tens of billions of dollars—wealth they accumulated by willfully prioritizing business growth over compliance with the law and over the safety of Americans whose protection those laws were designed to ensure. They should be held accountable not only to governments and regulators, but to the flesh-and-blood victims of the attacks they aided.

## THE PARTIES

23. Plaintiffs are 162 direct and indirect victims of terrorist attacks committed from 2019 to 2024. In this terminology, direct attack victims are those who were physically injured or killed in the attack. Indirect attack victims are the direct attack victims' close family members who suffered emotionally as a result of the attacks. Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[1]

24. Defendant **Binance Holdings Limited** d/b/a Binance and Binance.com ("Binance") is an entity incorporated in the Cayman Islands that held, among other things, intellectual property, including trademarks and domain names, and employment contracts for certain employees operating Binance.com, and has employed at least certain individuals who perform work on behalf of the Binance platform. Since at least July 2017, Binance has operated a web-based virtual currency exchange under the name Binance.com. That exchange offered and still offers trading in virtual currencies, digital asset commodities and related derivatives, among other financial products and services, to over 100 million customers throughout the world, in volumes equivalent to trillions of U.S. dollars.

25. On November 21, 2023, Binance pleaded guilty to federal charges of deliberately failing to maintain an effective anti-money laundering program and entered into settlements with three U.S. regulators in connection with charges of violations of the Bank Secrecy Act ("BSA")

---

[1] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

and U.S. sanctions. These violations included knowingly processing and refusing to report transactions involving cryptocurrency wallets held by or affiliated with terrorist groups.

26. Defendant **Changpeng Zhao** is the primary founder, majority owner, and former CEO of Binance. Zhao launched Binance in 2017 and from that time until he was removed from the role as part of his criminal guilty plea with the United States, he had ultimate control over all of Binance's business activities. Zhao is a dual citizen of Canada and the United Arab Emirates. Zhao has directly or indirectly owned and controlled the scores of entities that collectively operate the Binance platform.

27. Together with a core senior management group, as Binance's CEO, Zhao made strategic decisions for Binance and supervised and exercised day-to-day control over its operations and finances. Zhao was responsible for all major strategic decisions, business development, and management of the Binance enterprise. Zhao was responsible for directing and overseeing the creation and operation of Binance's trade matching engines, website, application programming interface ("API") functionalities, and order entry system. And Zhao was ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities. Zhao has admitted that at all relevant times he "prioritized Binance's growth, market share, and profits over compliance with U.S. law, telling Binance employees that it was 'better to ask for forgiveness than permission.'"

28. On November 21, 2023, Zhao pleaded guilty to willful violations of the BSA. He agreed to personally pay a $150 million fine, was sentenced to four months in prison on April 30, 2024, and then served that prison sentence. Zhao was also a named party with "control person" liability in regulatory settlements with Binance.

29. Zhao's guilty plea establishes his personal responsibility for Binance's core misconduct. In his plea agreement, Zhao admitted that "[s]tarting at least as early as August 2017 and continuing to at least October 2022, [he] violated the Bank Secrecy Act … by willfully causing [Binance] to fail to implement and maintain an effective [anti-money laundering] program." As DOJ explained: "Zhao's willful violation of U.S. law was no accident or oversight. He made a business decision that violating U.S. law was the best way to attract users, build his company, and line his pockets. Despite knowing Binance was required to comply with U.S. law, Zhao chose not to register the company with U.S. regulators; he chose not to comply with fundamental U.S. anti-money-laundering (AML) requirements; he chose not to implement and maintain an effective know-your-customer (KYC) system, which prevented effective transaction monitoring and allowed suspicious and criminal users to transact through Binance; and even when Binance employees detected suspicious transactions, Zhao's choices meant those transactions were not reported to U.S. authorities. And when it became clear that Binance had a critical mass of lucrative U.S. customers, Zhao directed Binance employees in a sophisticated scheme to disguise their customers' locations in an effort to deceive regulators about Binance's client base. Critically, Zhao knew that his decision not to implement an effective AML program would result in Binance facilitating transactions between U.S. users and users in Iran and other sanctioned countries and regions in violation of U.S. law."

30. Defendant **BAM Trading Services Inc.** d/b/a Binance.US ("Binance US") is a Delaware corporation that nominally operated the Binance.US cryptocurrency exchange (the "U.S. Exchange") beginning in or around September 2019. Binance and Zhao established the U.S. Exchange as part of a cynical and deceptive plan that would, in theory, allow Binance to surreptitiously (and illegally) retain its substantial base of U.S. users (particularly those with the

greatest transaction volumes and trading frequency) while avoiding the obligation to bring its operations into compliance with U.S. laws and regulations applicable to money service businesses with U.S. operations—including AML/CFT and KYC requirements, other FinCEN regulations, sanctions laws, and the BSA, to name a few.

31. Binance US is majority-owned by Zhao through a convoluted chain of shell companies set up in a variety of jurisdictions. Binance US's direct parent is BAM Management US Holdings Inc. ("BAM Management"), which is also a Delaware corporation. When the U.S. Exchange launched in September 2019, BAM Management was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn is wholly owned by CPZ Holdings Limited, a BVI company that was (and still is) wholly owned by Zhao. Although Zhao's indirect ownership stake in Binance US has since shrunk by 19%, he controlled all material aspects of Binance US's business—either directly or acting through Binance—until (at least) November 2023.

32. Zhao has publicly claimed that he and the broader Binance enterprise are alter egos of one another: "Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office." According to Zhao, the concept of a formal corporate entity with a headquarters and its own bank account is unnecessary: "All of those things doesn't [sic] have to exist for blockchain companies."

33. The District Court for the Northern District of Illinois found as fact that Zhao "directly or indirectly owned and controlled dozens of corporate entities incorporated in numerous jurisdictions around the world" that collectively "operate the Binance platform as a common enterprise." The court further determined that "Binance's reliance on [this] maze of

corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform."

34. Zhao and Binance have admitted that "Zhao made the strategic decisions for" the entire Binance enterprise and "exercised day-to-day control over its operations and finances," and the U.S. government has alleged that they are "publicly dismissive of 'traditional mentalities' about corporate formalities and their attendant regulatory requirements."

35. Because of Zhao's domination of the various entities operating Binance, and Zhao and Binance's domination of the other entities within the corporate "maze" of the Binance enterprise, including Binance US, actions purportedly performed by those entities are legally attributable to Zhao and Binance and vice versa, as they were at all relevant times alter egos of each other.

## JURISDICTION AND VENUE

36. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2338, which provides for jurisdiction over civil actions brought by citizens of the United States, their estates, and family members who have been killed or injured by reason of acts of international terrorism.

37. Personal jurisdiction exists over Defendants under Federal Rule of Civil Procedure 4(k)(1)(A) and New York Civil Practice Law and Rules § 302(a)(1) based on their substantial suit-related contacts with New York, as detailed herein.

38. Personal jurisdiction also exists over Defendants under Federal Rule of Civil Procedure 4(k)(1)(C) and 18 U.S.C. § 2334(a) because one or more Plaintiffs reside in this District and all Defendants have substantial suit-related contacts with the United States, as detailed herein.

39. Personal jurisdiction independently exists over Binance because Plaintiffs served a summons (ECF 5) and a copy of the original complaint (ECF 1) on an officer of Binance within the Southern District of New York on October 11, 2024, and because Binance filed a motion to dismiss under Rule 12(b)(6) without seeking to dismiss the case on the ground of personal jurisdiction, thus waiving the defense, *see* Fed. R. Civ. P. 12(h).

40. Alternatively, personal jurisdiction exists over Zhao under Federal Rule of Civil Procedure 4(k)(2). If the Court were to find jurisdiction over Zhao lacking under New York's long-arm statute, Plaintiffs certify based on reasonably available information that Zhao would not then be subject to suit in the courts of general jurisdiction of any other state, which would make Rule 4(k)(2) jurisdiction appropriate.

41. Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) because one or more Plaintiffs reside in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), based on Defendants' use of at least one bank in this District in carrying out their scheme. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(c)(3) and/or § 1391(d).

## PROCEDURAL HISTORY

### A. The Action, the First Amended Complaint, and the Dismissal Order

42. Plaintiffs commenced this action against Binance and Zhao on September 20, 2024 (ECF 1). On November 22, 2024, Plaintiffs filed the First Amended Complaint (ECF 27) ("FAC"), adding BAM Trading Services (Binance US) as a defendant.

43. The FAC spanned 891 pages and asserted claims on behalf of 535 plaintiffs arising out of 64 terrorist attacks committed between 2016 and July 2024 by nine different terrorist organizations. The FAC also pleaded five counts: aiding and abetting under JASTA, 18 U.S.C. § 2333(d)(2); three counts of conspiracy under the same provision; and primary liability under 18 U.S.C. § 2333(a).

44. Defendants moved to dismiss (ECF 34, 61, 111), Plaintiffs opposed (ECF 69), and the Court heard argument. On March 6, 2026, the Court granted the motions without prejudice under Rule 12(b)(6) and granted Plaintiffs leave to amend. ECF 206 (the "Opinion" or "Op.").

45. The Opinion resolved several issues in Plaintiffs' favor, applying the framework from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), that Congress codified into JASTA. The Court held it "undisputed" that the first element of the *Halberstam* framework—the commission of acts of international terrorism by the relevant FTOs—was satisfied, and it held that Plaintiffs "adequately alleged that Defendants were 'generally aware of [their] role in some illegal activity from which the terrorist attack was foreseeable,'" the second *Halberstam* element. Op. 37. The Court likewise rejected Defendants' attempt to cast their conduct as the passive provision of routine services akin to the social-media platforms in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023): because Binance and Zhao "deliberately violated regulatory requirements designed to prevent illicit activity," provided deficient geofencing and encouraged VPN use to flout sanctions, obstructed law enforcement, and warned FTO-associated accountholders that they had been flagged, their conduct was "a far cry from passive nonfeasance." Op. 40.

46. The Court nonetheless granted the motions to dismiss because the FAC did not plead a "definable nexus between Defendants' conduct and support for specific terrorist attacks." Op. 39. The Court identified the details it found missing: who owned or controlled the FTO-affiliated wallets that transacted on Binance; "what was publicly known about such individuals, or such wallets, at the time the transactions took place"; whether the holders or wallets "were sanctioned or designated"; "to what extent substantial transactions took place prior to, or after, the terrorist attacks at issue"; and "the nature of these transactions, *i.e.*, were these wallets used to transmit funds to the [FTO], for currency trades, or for some other purpose?" Op. 42–43.

47. In granting leave to amend, the Court was "mindful that the Amended Complaint and the motion to dismiss papers were prepared before the Second Circuit's decision in *Ashley* [*v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025),] and without the benefit of this Court's analysis," and observed that "there are details that Plaintiffs could potentially provide to correct the deficiencies identified regarding the wallet transactions … as well as Binance's alleged knowledge of their associations with FTOs, that could establish the requisite nexus between Binance's conduct and the terrorist attacks at issue." Op. 61–62.

**B. This Complaint Is Targeted and Supplies the Details the Court Identified**

48. This Second Amended Complaint is approximately 700 pages shorter and significantly narrower than the FAC: It pleads a single count of aiding and abetting 30 attacks committed, planned, or authorized by five designated FTOs—Hamas, PIJ, the IRGC, Hizballah, and Kataib Hizballah—and all of the attacks pleaded are supported by extensive transaction-level evidence. Thus, the complaint no longer asserts other theories, nor claims arising out of attacks committed by ISIS, al-Qaeda, the Houthis, or Wizard Spider. This complaint also focuses on a shorter time period than the FAC: the first attack now occurred in 2019, as opposed to 2017.

49. The volume of culpable transactions identified here is a different order of magnitude from the FAC. Where the FAC alleged $1.3 million in transactions through four IRGC-affiliated wallets, Op. 42, this complaint pleads, conservatively and based only on public transactions, approximately $79.6 million in transactions with IRGC-attributed wallets, and approximately $54.6 million with Hizballah-attributed wallets (including approximately $11.9 million through the al-Law network)—together with approximately $428 million across 117,431 transactions with the identified Hamas and PIJ actors before October 7, 2023 alone.

50. Drawing on public records and expert blockchain analysis, this complaint supplies specifics regarding the financial actors behind these transactions and their ties to the FTOs. For

each financial actor for whom Binance processed FTO-affiliated transactions, the complaint now identifies the holder and (when possible) its principals by name—the Buy Cash Money and Money Transfer Company and its owner Ahmed M.M. Alaqad; the Dubai Company for Exchange and its owner Khader Dan (also known as Khader Elden), including his Binance account number; Gaza Now and its founder Mustafa Ayyash, including his Binance account number; multiple smaller Gaza-based exchanges; the al-Qassam Brigades' fundraising wallets; the "identified PIJ network" described in Binance's own records; Hizballah's conduit Tawfiq Muhammad Sa'id al-Law; IRGC-controlled cryptocurrency exchanges including Nobitex, Wallex, Ramzinex, and Babak Zanjani's Zedcex and Zedxion exchanges; IRGC ransomware operators; and the Central Bank of Iran. For each actor, the complaint pleads the nature of the actor's connection to the relevant FTO; what was publicly known about that connection at the time of the transactions, including designations, seizure orders, and public reporting; whether and when each actor or wallet was sanctioned or designated; the volume Binance processed before—and after—each attack; and the nature and direction of the transactions.

51. The transaction-level record based on public transactions, which understates the true volume, is documented. This Complaint has two appendices. Appendix A provides transaction-level detail about Binance's Hamas and PIJ transactions including summary statistics about the entire analyzed dataset and representative examples of the underlying transactions. Appendix B does the same for Binance's IRGC / Hizballah / Kataib Hizballah transactions. Attack-by-attack tables state the volume Binance had already processed with the relevant FTO's financial apparatus by the eve of every attack at issue.

### C. After the First Amended Complaint Was Filed, Additional Public Revelations Have Bolstered and Confirmed Plaintiffs' Allegations

52. Events post-dating the FAC have further confirmed the terrorist character of the intermediaries at the center of this case. These facts were unavailable to Plaintiffs when the FAC was filed, but discernable by Defendants throughout the relevant period.

53. The U.S. and Israeli governments have continued to designate additional people, entities, and cryptocurrency wallets that Binance transacted with for their terrorist ties. For example, the United States confirmed the Binance-BuyCash nexus at the heart of the Hamas/PIJ allegations: a civil forfeiture action by DOJ, unsealed on July 16, 2025, traced BuyCash-controlled wallets and identified BuyCash-registered Binance accounts. The evidence shows that even after OFAC designated BuyCash a Specially Designated Global Terrorist ("SDGT") for its support of Hamas, Binance processed 672 transactions with BuyCash-attributed addresses totaling $15.89 million.

54. On January 30, 2026, OFAC designated Zedxion Exchange Ltd. under Executive Order 13224, the counterterrorism authority—the first designation of an IRGC-linked digital-asset exchange—and re-designated Babak Zanjani, finding that he "provided financial backing for major projects that support the Islamic Revolutionary Guard Corps" and that his exchange infrastructure processed nearly $1 billion in IRGC-linked transactions. Zanjani has long been identified as an IRGC member, and in May 2026 FinCEN issued an alert flagging Zanjani's stablecoin, Zedxion USDZ, as a tool for terrorist finance. Binance not only facilitated transactions for Zanjani; it provided the underlying technological architecture for Zanjani's cryptocurrency tokens (including USDZ) and promoted those tokens on its own website—and, as of this filing, still does.

55. Intervening revelations have materially strengthened Plaintiffs' allegations based on Binance's relationships with Iranian cryptocurrency exchanges, including Nobitex. On June 2, 2026, OFAC designated Nobitex—Iran's largest exchange, with which Binance did billions of dollars of business—under Executive Order 13224 for materially supporting the IRGC. OFAC found that Nobitex facilitated "payments tied to Iran's terrorist activities, sanctions evasion efforts, and Islamic Revolutionary Guard Corps (IRGC)-linked transactions," as well as "enabling regime insiders to access international digital asset exchanges and evade sanctions across multiple jurisdictions." OFAC contemporaneously designated the Iranian cryptocurrency exchanges Wallex, Ramzinex, and BitPin under Executive Order 13902 (targeting Iran's financial sector) in what Treasury described as its largest enforcement action to date against Iran's digital-asset economy.

56. Nobitex's inner workings became public in the interim as well. Following a June 2025 data breach, Nobitex's source code and internal documents were published, revealing dedicated anti-surveillance software modules expressly designed to evade FinCEN and U.S. blockchain-intelligence firms. According to crypto analysis firm TRM Labs, these privacy features "were deeply integrated into the wallet architecture, suggesting they could be activated selectively" for favored users. The breach also revealed that select users could be "routed through privileged logic that bypassed standard compliance checks, potentially insulating politically sensitive or sanctioned users from scrutiny"—in other words, for the IRGC to use Nobitex to evade sanctions. In May 2026, *Reuters* reported, based on blockchain analytics and corporate records, that Nobitex's founding family is closely tied to the Supreme Leader's circle and Iran's political establishment—further confirming that Nobitex is an IRGC front.

57. News reporting has also established that Binance's wrongdoing persisted even after its guilty plea and while under court-ordered monitorship. As the *New York Times* and *Wall Street Journal* reported in 2025 and 2026, Binance's own investigators concluded that approximately $1.7 billion flowed from Binance accounts associated with its vendor Blessed Trust and with Hexa Whale to cryptocurrency wallets tied to Iran—including $439 million in the first quarter of 2025 alone—through accounts Binance's compliance systems had marked "Don't block. Internal accounts." When those findings reached Binance's senior executives, Binance suspended or fired four of the investigators. Binance's promises of reform, made to resolve one of the largest corporate criminal penalties in U.S. history, did not survive contact with its business model. Although these transactions post-date the attacks in this case, they illustrate Binance's highly culpable mental state and conduct, further bolstering Plaintiffs' allegations that Binance intentionally aided the IRGC and other FTOs.

58. Indeed, only two days before the filing of this complaint, on July 4, 2026, the *Wall Street Journal* published an investigative report entitled "How Rogue Nations Are Using Cryptocurrencies to Evade Sanctions." The *Journal*'s reporting confirms that Iran continues to use cryptocurrency to evade sanctions, and specifically flags that rogue states are "becoming more sophisticated in how they navigate the market, creating their own digital tokens and crypto exchanges to help process transactions." Thus, "Iran's Islamic Revolutionary Guard Corps has used crypto exchanges—both at home and abroad—to get paid for oil sales, particularly from China, its biggest customer." In that process, "billions of dollars have moved through Binance, the world's largest crypto exchange, to networks financing the Revolutionary Guard." The report also confirms that Iran uses "virtual cash to buy drones and weapon parts." And it relates a 2025 incident where Hamas "asked for donations in crypto" via "a money transfer office that converts

traditional currencies into crypto" and then sends the virtual currency to Hamas; this led to eight Hamas wallets receiving $70,000 during a two-week period. This hot-off-the-press reporting shows that terrorist demand for the risky cryptocurrency services Binance provides is rampant, and that by providing such services to terrorists, Binance directly fueled their violence.

59. Other victims of these same terrorist organizations have sued Binance on overlapping facts. In *Balva v. Binance*, No. 3:25-cv-00266-PDW-ARS (D.N.D.), a separate group of American victims of the October 7 attack at issue here sued Binance, and on June 10, 2026 filed a 396-page amended complaint (ECF 56) pleading account-level transactional detail drawn from Binance's own records concerning the same intermediaries at issue here—including the al-Law network's Binance accounts, Nobitex, Zanjani's Zedcex accounts, and the Gaza-based exchange houses that served Hamas and PIJ. Because the *Balva* complaint appears to be based in part on Binance's internal records (which Binance never handed over in discovery in this case), Plaintiffs' blockchain analysis firm has been able to reproduce some, but not all, of the analysis in the *Balva* complaint—which shows that Plaintiffs' own analysis necessarily and significantly understates the scope of Binance's catering to terrorists. The *Balva* complaint independently corroborates the core of what Plaintiffs allege: that Defendants knowingly permitted the specific terrorist financiers who funded the organizations that committed these attacks to move their money through the Binance exchange.

60. The designations, disclosures, enforcement actions, and reporting described above all press in the same direction: toward confirmation that Binance knowingly and culpably assisted terrorist customers for years; and that Binance's misconduct substantially assisted the attacks in this case.

## FACTUAL ALLEGATIONS

61. Plaintiffs bring an aiding-and-abetting claim under JASTA to hold Defendants liable for substantially assisting the commission of attacks constituting international terrorism. Part I provides background on cryptocurrency and cryptocurrency exchanges, and explains how Defendants were not providing just ordinary financial services, but rather services that rose to the level of being "dangerous wares," such as to render Defendants responsible for all the attacks of the terrorist organizations they were assisting, or alternatively to lessen the showing needed under *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Part II alleges facts showing that Defendants were aware of the role of the Binance exchange in terrorism and terrorist financing, including as to Hamas, PIJ, the IRGC, Hizballah, and Kataib Hizballah. Part III alleges that Defendants knowingly and substantially abetted the commission of the terrorist attacks in this case, including because of the pervasive nature of Defendants' assistance and the dangerous nature of the wares they provided. Part IV describes Defendants' connections to the United States and New York. Finally, Part V details the attacks and the victims.

62. Before detailing the basis for Defendants' liability, this section grounds the allegations in a clear showing of the nexus between Defendants' misconduct and the attacks that injured Plaintiffs, grouped by primary FTO perpetrator—Hamas and PIJ; and then the IRGC, Hizballah, and Kataib Hizballah. The following tables and charts are based on Plaintiffs' blockchain analysis, and show the clear relationship between increased Binance's cryptocurrency transfers for terrorist groups and their agents, on the one hand, and terrorist violence, on the other. Part III.B, *infra*, more fully details the nexus between Binance's assistance to the FTOs and the attacks.

63. **Hamas and PIJ.** Ten of the attacks against Plaintiffs were perpetrated by Hamas and/or PIJ. Table 1 shows the cumulative dollar volume Binance processed with accounts and

wallets affiliated with Hamas, PIJ, and their known cryptocurrency affiliates before the attack date.

| Table 1: Binance Volume for Hamas and PIJ Channels | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **#** | **Attack date** | **Attack** | **Hamas** | **PIJ** | **BuyCash** | **Gaza Now** | **Gaza-based exchanges** | **Total** |
| 1 | 2019-05-05 | Rocket attack, Ashdod (Przewozman) | $50,745 | $0 | $469,464 | $0 | $0 | **$520,209** |
| 2 | 2022-08-14 | Mass shooting, Jerusalem (Gluck) | $23,664,930 | $38,483,180 | $121,519,170 | $909,315 | $817,868 | **$185,394,463** |
| 3 | 2023-10-07 | Coordinated attack, southern Israel | $24,455,369 | $59,456,060 | $336,773,276 | $4,312,161 | $2,690,427 | **$427,687,293** |
| 4 | 2023-11-06 | Stabbing, Jerusalem (Lubin) | $24,455,369 | $59,456,060 | $350,686,297 | $4,319,181 | $2,690,427 | **$441,607,334** |
| 5 | 2023-11-08 | Complex attack (Margulies) | $24,455,369 | $59,456,060 | $352,680,390 | $4,319,181 | $2,690,427 | **$443,601,427** |
| 6 | 2023-12-10 | Complex attack (Zenilman) | $24,455,369 | $59,456,060 | $358,318,018 | $4,319,181 | $2,690,427 | **$449,239,055** |
| 7 | 2024-01-08 | Complex attack, Khan Younis (Hexter) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $4,128,991 | **$450,682,221** |
| 8 | 2024-01-15 | Vehicle attack (Bollag/Kamer/Merkin) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $5,824,345 | **$452,377,575** |
| 9 | 2024-01-16 | Complex attack, N. Gaza (Haber) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $5,946,683 | **$452,499,913** |
| 10 | 2024-06-28 | Sniper attack (Tatelbaum) | $26,174,594 | $59,456,060 | $358,320,618 | $4,320,021 | $49,894,071 | **$498,165,364** |

64. Table 1 shows that before even the first attack (in 2019), Binance facilitated over $520,000 in volume for Hamas and its affiliated money transmitter BuyCash. By the second attack, in 2022, the cumulative volume had exploded to over $185 million, including transactions for Hamas, PIJ, BuyCash, Gaza Now, and several exchanges in Gaza. And by the October 7 attack—the deadliest attack—the volume exceeded $427 million. *See* App. A, Table A-4. A flurry of attacks followed, accompanied by a steady increase in cryptocurrency transaction volume through Binance. The relationship can also be shown graphically:




65. The graph plots the cumulative volume of Binance's Hamas- and PIJ-affiliated transactions over time. The "Total" top line includes triangles to signify the date of each attack and to show how much volume Binance had processed before that attack. It shows a steady upward trend in total cryptocurrency transactions through Binance, precipitating more and more attacks over time.

66. **IRGC, Hizballah, and Kataib Hizballah.** A similar illustration shows the same correlation for the 20 attacks committed by the IRGC, Hizballah, and Kataib Hizballah. Table 2 shows how much volume Binance processed for the IRGC- and Hizballah-affiliated channels prior to each attack.

| Table 2: Binance Volume for IRGC and Hizballah Channels | | | | | | | |
|---|---|---|---|---|---|---|---|
| **#** | **Attack date** | **Attack** | **IRGC** | **Other IRGC** | **IRGC Exchanges (50% Discount)** | **Hizballah** | **Combined** |
| 1 | 2021-02-15 | Rocket attack, Erbil Air Base (Johnson/Rorls) | $0 | $394,153 | $289,588,408 | $0 | $289,982,561 |
| 2 | 2021-03-13 | Rocket attack, Union III Base, Baghdad (Hattab) | $0 | $394,153 | $391,899,679 | $0 | $392,293,832 |
| 3 | 2021-05-01 | Mortar attack, Baghdad (Taylor) | $0 | $394,153 | $709,934,870 | $0 | $710,329,023 |
| 4 | 2021-07-03 | Rocket attack, Al Asad Air Base (Riley) | $0 | $564,189 | $1,080,602,994 | $0 | $1,081,167,183 |
| 5 | 2021-07-07 | Mortar attack, Al Asad Air Base (Lorio) | $0 | $564,189 | $1,091,097,853 | $0 | $1,091,662,042 |
| 6 | 2022-03-13 | Ballistic-missile strike, Erbil (Nasir) | $25,251 | $1,814,470 | $2,178,204,019 | $2,794,099 | $2,182,837,839 |
| 7 | 2022-05-15 | Hostage-taking, Mashhad (Doe) | $30,949 | $1,814,470 | $2,457,531,939 | $9,113,621 | $2,468,490,979 |
| 8 | 2022-07-04 | Rocket attack, Erbil Air Base (Sorel) | $30,999 | $1,814,470 | $2,595,369,913 | $12,687,284 | $2,609,902,666 |
| 9 | 2022-08-29 | Small arms attack, U.S. Embassy, Baghdad (Caramanian) | $30,999 | $1,814,470 | $2,761,062,844 | $14,606,588 | $2,777,514,901 |
| 10 | 2022-09-28 | Rocket and UAV attack, Kurdistan (Mahmoudzadeh) | $30,999 | $1,814,470 | $2,857,046,106 | $15,753,392 | $2,874,644,967 |
| 11 | 2022-11-07 | Assassination attack, Iraq (Troell) | $30,999 | $1,814,470 | $2,923,847,706 | $16,086,815 | $2,941,779,990 |
| 12 | 2023-03-23 | UAV attack, Hasakah, Syria (Dubis/Buckman) | $156,627 | $1,814,470 | $3,001,247,567 | $34,935,765 | $3,038,154,429 |
| 13 | 2023-10-17 | UAV attack, Iraq (Sherpa) | $299,511 | $1,814,484 | $3,009,105,333 | $54,516,828 | $3,065,736,156 |
| 14 | 2023-10-18 | UAV attack, Iraq (Santiago) | $299,511 | $1,814,484 | $3,009,115,312 | $54,518,472 | $3,065,747,779 |
| 15 | 2023-10-26 | UAV attack, Iraq (Gramigna/Streets) | $299,511 | $1,814,484 | $3,009,216,541 | $54,593,617 | $3,065,924,153 |
| 16 | 2023-11-21 | Missile attack, Iraq (Logan) | $299,511 | $1,814,484 | $3,009,627,734 | $54,593,618 | $3,066,335,347 |
| 17 | 2023-12-12 | Rocket attack, Syria (Horne) | $299,511 | $1,814,484 | $3,009,937,895 | $54,593,618 | $3,066,645,508 |
| 18 | 2024-01-20 | UAV attack, Iraq (Creasy) | $529,167 | $2,910,459 | $3,010,418,511 | $54,593,618 | $3,068,451,755 |
| 19 | 2024-07-15 | UAV attack, Iraq (Vantine) | $17,192,494 | $2,934,073 | $3,012,671,417 | $54,593,618 | $3,087,391,602 |
| 20 | 2024-07-16 | UAV attack, Iraq (Bowman) | $17,192,494 | $2,934,073 | $3,012,677,732 | $54,593,618 | $3,087,397,917 |

67. Table 2 includes columns for Binance transactions with wallets owned by the IRGC, by IRGC-controlled operatives including ransomware attackers and the Central Bank of Iran ("Other IRGC"), by Hizballah, and by IRGC cryptocurrency exchanges, *e.g.*, Nobitex. For the exchanges, Plaintiffs acknowledge that not all of the volume was IRGC-related, and so the volume Binance processed is discounted by 50%. *See infra* ¶¶ 164-166 (explaining estimate).

68. Table 2 shows that Binance processed almost $400,000 in volume for the IRGC (ransomware attackers) prior to the first 2021 attack—even if one does not consider volume from

the exchanges. Including exchange volume (discounted by 50%), Binance processed closer to $290 million in IRGC transactions before the first attack. From there, the volume only rises. By the first 2022 attack, Binance had processed over $4.6 million in volume for IRGC wallets, exclusive of exchanges. Including exchanges, the volume was $2.1 *billion*. The volume continues to rise until Binance's 2023 guilty plea—at which point it slows considerably until the end of the period, when it jumps again due primarily to Binance facilitating millions of dollars in transactions for IRGC-owned wallets in the first half of 2024.

69. Graphically, the relationship is best represented on two charts. The first shows activity between Binance and wallets owned by the IRGC, Hizballah, and other IRGC operatives. That volume collectively reached into the tens of millions during the relevant period (and almost doubled thereafter). The second graph shows activity between Binance and the IRGC-controlled exchanges, including Nobitex, Wallex, and Ramzinex, among others—discounted by 50% to account for the fact that not all of the activity on the exchanges is IRGC-related. That activity exceeded $1 billion by the middle of 2021, and ultimately exceeded $3 billion on its own.

**Cumulative Binance Transaction Volume — Attributed Terrorist Actor Wallets (IRGC, IRGC Operatives, and Hizballah)**

Identified transactions, December 2017 – December 31, 2024 (flows continued thereafter)




*Attribution basis: Appendix B and the Complaint. Attack dates as alleged in the Complaint. Per-attack cumulative figures and full data: Appendix B.*

**Cumulative Binance Transaction Volume — IRGC Exchanges (Estimated)**

Identified transactions, December 2017 – December 31, 2024 (flows continued thereafter)




*Shaded band: one-half of the documented volume between Binance and the four exchanges through December 31, 2024 (undiscounted data: Appendix B).*

70. Again, the charts show a steady increase in volume processed through Binance, precipitating more and more attacks over time. This relationship, coupled with the substantive

factual allegations *infra*, establishes a clear nexus between Binance's misconduct and the attacks against Plaintiffs.

71. The foregoing graphs and charts—and this complaint generally—use volume flows between terrorist wallets and Binance in both directions. That makes sense because terrorists used Binance to move money in both directions. Sometimes, terrorists sought to receive money—for example to recover ransomware proceeds, receive donations, or otherwise claim income that they could use for various expenses. Other times, terrorists sought to send money—for example to fund a proxy attack, pay a salary or bounty, or purchase weapons or intelligence. And other times, terrorists may have sought to convert their currency to a different form for the purpose of laundering it or otherwise rendering it more usable. All of those transactions are immensely valuable to terrorist groups, all of them fuel terrorist attacks, and Binance provided unique access to all of them. Accordingly, all transaction volume, regardless of direction, is relevant to Binance's liability. However, even if that were not true, Binance's volumes in each direction are substantial. *See* App. A, Table A-2; App. B, Table B-2. Accordingly, even if the Court only considers transfers in one direction (*e.g.*, from Binance to the FTOs), it should still conclude that Binance's assistance was substantial.

72. It bears stressing that the figures represented in these tables and graphs are conservative estimates. They are derived from Plaintiffs' blockchain analysis, which has limitations. First, it only includes on-chain activity—and therefore does not include the off-chain transactions that occurred inside the Binance exchange. Second, it only includes transactions where Plaintiffs located a designation showing that a particular wallet or account was affiliated with a covered terrorist organization. Not all wallets involved in culpable transactions with Binance have yet been designated, and it is also possible that Plaintiffs have not discovered every

designated wallet. Third, dollar amounts use the value of currency on the day of the transaction. Due to inflation, those same transactions are worth significantly more in today's dollars. Finally, the tables and charts stop at the end of 2024 to focus on the period surrounding the attacks that injured Plaintiffs—but Binance's misconduct did not stop then. Plaintiffs' full dataset includes many millions more in illicit transactions after the attack window.

## I. Defendants' Unregistered Cryptocurrency-Based Money Services Business Was a Dangerous Product Uniquely Suited to Terrorist Finance, and Defendants' Unusual Practices Made Terrorist Violence a Substantial Certainty

73. From the very start of its operation, Binance was an illegal, unregistered, and unregulated money services business ("MSB"), which foreseeably attracted terrorists seeking to evade the traditional highly regulated financial system. Binance's status as an illegal unregistered MSB already put Binance in a uniquely high category of danger, but Binance's other design features added even more risk. Binance chose to use cryptocurrency, which is uniquely prone to terrorist use, and allowed and promoted especially risky coins. And, unlike a bank, Binance's structure as an exchange linked to the public blockchain made it unable to block the deposit of illicit funds, making it even more susceptible to illegal and harmful use. Combined, those design choices created the ultimate terrorist financing machine.

74. Defendants then took an exceptionally dangerous ware—an illegal unregulated cryptocurrency exchange almost perfectly designed for terrorist financing—and operated it in a risky way that predictably led to terrorist use. Among other steps, Defendants promoted virtual private networks ("VPNs") to evade sanctions, undermined internal compliance and KYC efforts, permitted large withdrawals without any KYC, and engaged in an astonishing deception campaign to create a U.S. exchange to obstruct regulators. Defendants' interests in avoiding detection were aligned with the terrorists using the Binance platform, because Defendants knew that exposing terrorist use—by either registering as an MSB and providing Binance's data to

regulators or filing SARs—would expose Defendants to criminal liability and reduce their profits by incurring a regulatory crackdown.

75. There are at least six factors that, taken together, show that Binance's combination of inherent risk and intentional design and operational choices resulted in a uniquely dangerous service that foreseeably could have assisted any of the attacks that injured Plaintiffs. First, Binance's platform was highly susceptible to harmful and illegal use because of cryptocurrency's inherent characteristics (Parts I.A.1–A.2). Second, Binance provided a restricted commodity (Part I.A.3). Third, Binance operated its platform in a risky manner that heightened the terrorist finance risk (Part I.B.1). Fourth, Binance took affirmative steps to stimulate illicit use (Part I.B.2). Fifth, Binance engaged in unusual business practices, including ignoring warnings and preventing compliance, indicating that Binance knew of and intended to facilitate unlawful activity (Part I.B.3). And finally, Binance had a stake in concealing the nature and unlawful uses of its platform, from both a profit-motive perspective and due to the risk of criminal liability (Part I.B.4). These circumstances render Defendants responsible for all the attacks of the terrorist organizations they were assisting, or at least lessen the showing needed under *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023).

## A. Cryptocurrency-Based Financial Services Are Uniquely Suited to Terrorist Finance and Are Heavily Regulated to Prevent It

### 1. How Cryptocurrency Works

76. Cryptocurrencies are digital assets (often called "coins" or "tokens") that serve as a medium of exchange or store of value, secured and transferred using distributed ledger technology known as a "blockchain." A blockchain is a database spread across multiple computer servers that verifies and permanently records every cryptocurrency transaction. Users and institutions provide the computational power required to validate blockchain transactions,

and in return receive fees for each transaction. Different blockchains use different mechanisms to validate transactions. Some, like Bitcoin, rely on "proof of work," which means that transactions are validated by computers solving relatively difficult encryption puzzles. Others, like Ethereum and TRON, rely on "proof of stake," which means that transactions are validated by the votes of holders of a specific token. Blockchains are public to prevent tampering: the creation of a public record fixes a transaction in history. Once recorded, transactions on a public blockchain are viewable by any individual—including law enforcement agencies and blockchain analysis firms.

77. Different cryptocurrencies perform different functions. Some cryptocurrencies, like Bitcoin, fluctuate in value and are frequently bought and sold by investors seeking to make returns from the volatility. Other cryptocurrencies are "stablecoins" whose value has a fixed relationship to fiat currency. For example, USDT, also known as Tether, is a stablecoin whose value tracks very closely to the U.S. dollar. Stablecoins act as obvious digital alternatives to the fiat currencies or other assets to which their value is pegged.

78. Different currencies are traded on different blockchains. For example, Bitcoin is traded on the Bitcoin blockchain. USDT is traded on Ethereum, TRON, and other blockchains. Once a blockchain establishes a protocol for transactions, it is possible for new issuers to create new coins to trade on that chain. This has allowed a proliferation of different cryptocurrencies. The issuers of such currencies, and the managers of the blockchains underlying them, make money when people transact in the currency.

79. Cryptocurrency users store and transact their digital assets through software programs called "crypto wallets." Each wallet has a unique public address—expressed as a string of numbers and letters—that can be shared with others to send or receive funds, and a private key that functions as the wallet owner's secure passcode. Because wallet addresses are permanent

and publicly associated with every transaction recorded on a blockchain, blockchain analysis tools can trace the flow of funds between wallets, identify wallets associated with designated individuals or organizations, and reconstruct transaction histories spanning years.

80. Cryptocurrency exchanges like Binance offer brokerage, trading, settlement, and storage services that allow customers to buy and sell cryptocurrencies using other cryptocurrencies or fiat currency, without needing to locate counterparties directly. Customers can keep wallets on the exchange (these are called "hosted" wallets), which operate similarly to bank accounts, allowing customers to receive money and to order the exchange to send money to other exchange users or to wallets outside the exchange.

81. Also like banks, exchanges operate as centralized depositories: customers deposit their assets with the exchange, which maintains those holdings in pooled wallets and tracks individual customer entitlements on internal ledgers. Exchanges make money from fees on transactions, listings, margin trading, and futures trades. As a rule, the more volume moves through an exchange, the more money the exchange makes.

82. Because exchanges must actively enable customers to establish accounts with them, and then to trade, they necessarily know—or have the means to know—the identities and transaction histories of those customers, and are required by law to act on that knowledge.

83. Transactions conducted between users of the same centralized exchange platform (like Binance) are processed "off-chain"—that is, they are recorded only on the exchange's internal ledgers rather than on a public blockchain. This off-chain feature means that a significant volume of cryptocurrency transactions is not publicly visible. It also means that the exchange itself is the sole repository of information about those transactions—and the only entity positioned to detect, report, or block illicit activity occurring on its platform.

### 2. Cryptocurrency Is Uniquely Valuable to Terrorist Organizations

84. The entire point of cryptocurrency is to provide a decentralized alternative to traditional fiat currency, *i.e.*, money issued by governments. Cryptocurrency advocates believe that governments and banks impose too many restrictions on fiat money, which make transactions less private and efficient than cryptocurrency advocates would prefer. Seeking to avoid such restrictions, cryptocurrencies operate only according to rules set by the users or issuers of the currency. That also means people and entities who want to evade controls on money transfers—including antiterrorism sanctions and other restrictions on terrorist finance—are naturally drawn to cryptocurrency.

85. After the September 11, 2001 attacks, the United States turned its focus to financial institutions that enabled the transactions that fueled terrorist violence. Thus, the USA PATRIOT Act amended the BSA to include additional reporting requirements for financial institutions. President George W. Bush visited FinCEN on November 7, 2001, giving a speech to "put the world's financial institutions on notice." He explained that the War on Terror was "not a war just of soldiers and aircraft. It's a war fought with diplomacy, by the investigations of law enforcement, by gathering intelligence and by cutting off the terrorists' money." He explained how certain terrorist financiers "present[ed] themselves as legitimate businesses. But they skim money from every transaction, for the benefit of terrorist organizations. They enable the proceeds of crime in one country to be transferred to pay for terrorist acts in another." President Bush did not mince words in delivering his "clear message to global financial institutions": "you are with us or you are with the terrorists. And if you're with the terrorists, you will face the consequences."

86. The immediate post-September 11 push continued in the ensuing years, such that by the time Binance launched in 2017, the global banking system had become utterly

inhospitable to terrorist financing. Comprehensive sanctions regimes, correspondent banking restrictions, SWIFT exclusion, and mandatory AML/CFT controls had substantially curtailed terrorist organizations' ability to move money across borders through traditional banks.

87. By the time Binance launched, it was also widely known that cryptocurrency had become a primary tool of terrorist finance—and the obligations that cryptocurrency exchanges were required to fulfill in response were well established. Cryptocurrency exchanges function as centralized financial intermediaries: they hold customer assets, enable transactions, and maintain detailed records of customer activity, and are legally required under the BSA to know their customers, monitor transactions, and report suspicious activity to federal authorities. They are also, of course, subject to anti-terrorism sanctions designed to stop money from flowing to Hamas, PIJ, the IRGC, and Hizballah. Those obligations existed precisely because cryptocurrency's properties—global accessibility, pseudonymity, border-free transferability, and convertibility to hard currency—made it uniquely attractive to terrorist organizations that were barred from the international financial system precisely because they use the money they obtain to attack Americans. As DOJ found in the 2020 Cryptocurrency Enforcement Framework, cryptocurrency gave terrorists "a tool to circumvent traditional financial institutions in order to obtain, transfer, and use funds to advance their missions."

88. Cryptocurrency's operational advantages for terrorist organizations are specific and well-documented. First, speed: cryptocurrency transactions settle across international borders in minutes (or even seconds, depending on the blockchain), without the clearing delays and correspondent bank scrutiny that make traditional wire transfers vulnerable to interdiction. Second, pseudonymity: users can transact through wallet addresses without submitting to identity verification, allowing terrorist financiers to move funds without exposing themselves to KYC

controls. Third, sanctions evasion: because cryptocurrency transactions do not pass through the U.S. dollar clearing system, they are not subject to OFAC screening—the primary mechanism by which the U.S. government blocks sanctioned entities from accessing the global financial system. Fourth, fundraising reach: terrorist organizations have exploited social media platforms to solicit cryptocurrency donations from supporters worldwide, directing them to exchange accounts that can receive funds from any jurisdiction. Fifth, convertibility: cryptocurrency deposited on an exchange can be readily converted to fiat currency, including U.S. dollars, allowing terrorist organizations to translate fundraising proceeds into spendable resources for weapons, logistics, and personnel.

89. The risks inherent to cryptocurrency are especially visible with respect to stablecoins, such as USDT (Tether), which are pegged to the value of the U.S. dollar, and track that value extremely closely. The U.S. dollar is the most usable currency in the world—but its use is regulated and restricted by U.S. anti-terrorism sanctions, which are enforced by governments and banks. Dollar-pegged stablecoins, by contrast, are designed to bypass the U.S. government's efforts to protect the international financial system from terrorist actors. Indeed, there is a cogent argument that the *primary* reason stablecoins like USDT exist is to facilitate illicit transactions that could not be carried out using real U.S. dollars. Otherwise, it would typically be safer, easier, and more convenient to use U.S. dollars themselves. Accordingly, the fact that most of the transactional volume in this case involved transfers of stablecoins is itself support for the conclusion that the transfers were likely illicit.

90. Cryptocurrency's advantages for terrorist finance were not theoretical. As early as 2008, DOJ recognized the risk that "[d]igital currencies … are vulnerable to money laundering and terrorist financing." By 2018, senior U.S. government counterterrorism officials were

announcing that they had "seen terrorist groups … use digital and virtual currencies to … finance their illicit activities." In 2019, the Director of FinCEN himself explained to cryptocurrency providers that the reporting and compliance rules Defendants broke "protect people and save lives; this is a national security issue. … It is important to the person who lost a loved one to an act of terror," and "[c]ompliance—by financial institutions in particular—plays a critical role in preventing these tragedies from occurring." And by 2020, DOJ had documented terrorist organizations conducting "fundraising operations through Internet-based crowdsource platforms," purchasing "tools of the trade" including "raw materials to manufacture drugs or explosives," and transferring funds "often in large amounts" across international borders—all using cryptocurrency. DOJ warned that terrorist use of cryptocurrency threatened "not just public safety, but national security, as well," and that "[c]urrent terrorist use of cryptocurrency may represent the first raindrops of an oncoming storm of expanded use."

91. Similar warnings came steadily from the most senior levels of the United States government. As early as 2013, the Director of FinCEN testified to Congress that virtual currency "has been exploited by some pretty serious criminal organizations," and committed FinCEN to "protect[ing] the U.S. financial system" from "illicit actors" who were "laundering or moving money for the purposes of terrorism." In July 2019, Treasury Secretary Steven Mnuchin publicly warned of the "growing misuse of virtual currencies by money launderers, terrorist financiers, and other bad players," described it as "a national security issue," and cautioned that "[c]ryptocurrencies, such as Bitcoin, have been exploited to support billions of dollars of illicit activity." In February 2021, Treasury Secretary Janet Yellen warned that the "misuse of cryptocurrencies and virtual assets is a growing problem," including as "a tool to finance terrorism." And in June 2023, Treasury Under Secretary for Terrorism and Financial Intelligence

Brian Nelson confirmed that "we have seen both domestic and foreign terrorist actors utilize virtual assets to fund their operations," *i.e.*, attacks.

### 3. Cryptocurrency Exchanges Are Restricted Commodities Whose Operators Must Detect and Prevent Terrorism Financing

92. Cryptocurrency exchanges like Binance occupy the critical chokepoint in this ecosystem. Because exchanges function as centralized depositories with full visibility into their customers' identities and transaction histories, they are uniquely positioned to detect and block terrorist financing—and uniquely culpable when they choose not to, in violation of the law.

93. Cryptocurrency exchanges are subject to the same federal anti-money laundering framework that governs traditional financial institutions. Under the BSA, exchanges operating as MSBs in the United States must register with FinCEN, 31 U.S.C. § 5330; 31 C.F.R. § 1022.380, and implement an effective AML/CFT program—defined as one "reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities." 31 C.F.R. § 1022.210(a). An effective AML/CFT program necessarily includes procedures for verifying customer identity (KYC requirements) and ongoing transaction monitoring, as FinCEN has consistently recognized that such controls are indispensable to preventing illicit actors from accessing the financial system through MSBs.

94. Exchanges acting as MSBs must also file SARs identifying transactions that may involve illicit conduct. 31 U.S.C. § 5318(g); 31 C.F.R. § 1022.320. U.S. government officials have repeatedly described these requirements as the "first line of defense" against terrorist financing, and have specifically warned the digital asset industry that failure to implement robust KYC and AML/CFT controls enables terrorist organizations to access the U.S. financial system through cryptocurrency exchanges.

95. Binance provided an MSB, which is a restricted commodity that was subject to registration and other requirements. The restricted nature of MSBs reflects the inherent risk that they can be utilized unlawfully, and is the reason why they are required by the BSA and regulations to register, and to monitor and report suspicious transactions.

96. These restrictions specifically focus on the risk of terrorism. As Treasury's 2026 National Terrorist Financing Risk Assessment explains, MSBs are uniquely prone to terrorist use because they "allow rapid, efficient movement of funds to underbanked areas." Treasury data backs up the conclusion that even registered MSBs are more dangerous than banks: "MSBs regularly file more than half of all TF [terrorist financing] SARs [suspicious activity reports]." Here, Binance was a uniquely dangerous unregistered MSB, which allowed rapid, efficient movement of funds to the greater Middle East, an underbanked region subject to stricter regulation and scrutiny of transfers due to terrorist misuse.

97. U.S. government authorities repeatedly delivered these warnings directly to the cryptocurrency industry. In 2013, FinCEN issued guidance identifying convertible virtual currency exchangers as MSBs subject to BSA obligations, including transaction monitoring for terrorism financing. In 2019, FinCEN Director Kenneth Blanco, speaking directly to the industry at a blockchain symposium, warned that compliance with AML/CFT requirements "is a national security issue," and "plays a critical role in preventing these tragedies from occurring."

98. The Financial Action Task Force ("FATF")—the principal international AML/CFT standard-setting body—published a June 2019 report on virtual asset service providers that specifically identified unregulated exchanges operating without adequate KYC controls as high-risk channels for terrorist financing, and called on exchanges to implement risk-based controls to detect and report suspicious activity, including activity associated with

designated terrorist organizations. That same year, Treasury's Under Secretary for Terrorism and Financial Intelligence warned that "it is vital that virtual currency exchanges, peer-to-peer exchangers and other providers of digital currency services harden their networks against … illicit schemes."

99. United States authorities did not merely warn in generalities; they told cryptocurrency exchanges precisely what was expected of them. In a May 2019 Advisory on Illicit Activity Involving Convertible Virtual Currency directed at exchanges like Binance, FinCEN instructed that businesses dealing in digital currency should "block IP addresses associated with a sanctioned country or region," "disable the accounts of all holders identified from a sanctioned country or region," "install a dedicated Compliance Officer with authority to ensure compliance with all OFAC-administered sanctions programs," "screen all prospective users to ensure they are not from geographic regions subject to U.S. sanctions," and "ensure OFAC compliance training for all relevant personnel." That same month, Treasury Under Secretary Sigal Mandelker told the digital-currency industry that "AML/CFT and sanctions expectations for the digital currency industry … [s]hould be viewed as a duty serving our national security," and warned that the very "features of emerging technologies that appeal most to users and businesses—like speed of transfers, rapid settlement, global reach, and increased anonymity—can also create opportunities for rogue regimes and terrorists." She admonished that effective compliance could not be reduced to "run[ning] a check of names against OFAC's [sanctions] lists," but had to "incorporate red flags and typologies."

100. The international community warned to the same effect. The FATF warned in 2018 that "[v]irtual currencies/crypto-assets facilitate easy online access and global reach which make them attractive to move and store funds for money laundering and terrorist financing."

United Nations Security Council Resolution 2462 (2019) expressed "grave concern" that "terrorist groups may move and transfer funds … through the use of emerging payment methods, such as … virtual-assets," which "present a risk of being misused, including for terrorist financing," and the United Nations separately reported that the number of Bitcoin transactions in wallets used by ISIL "increased notably before the [2019 Sri Lankan] bombings, leading to the belief that these Bitcoins played a role in financing the attacks." Such warnings only escalated over time as more and more terrorists openly used cryptocurrencies to finance their attacks.

### B. Defendants Operated the Binance Exchange in a Manner That Made a Dangerous Product Even More Susceptible to Terrorist Use

101. Binance and Zhao operated an illegal, unregistered exchange from the very start of Binance's operation, making it categorically different from a law-abiding bank that was registered and had an AML/CFT program but had certain compliance failures. From its very inception, Binance was purpose-built to exacerbate all the worst risks of cryptocurrency and cryptocurrency exchanges—and particularly those most valuable to terrorist finance.

#### 1. The Binance Platform's Core Features Created Acute Terrorist-Financing Risk

102. Binance's compliance team recognized that it provided a service that was especially susceptible to harmful and illegal use. As Binance's own CCO Samuel Lim bluntly explained in 2020, Binance's customers "are here for crime." Cryptocurrency could serve terrorists at scale, however, only if exchanges were willing to facilitate their transactions. Binance provided that service—in the process taking on, creating, and exacerbating known significant terrorism risks.

103. Risk A: Binance chose to operate without meaningful KYC controls. From its launch, Binance allowed users to open accounts and move funds with little or no identity verification. At its lowest tier, a customer could open an account with nothing more than an

email address and—without submitting any identifying information—deposit cryptocurrency and withdraw the equivalent of up to two Bitcoin per day, worth tens of thousands of dollars, and could open multiple such accounts to multiply that ceiling. For an exchange that functioned as its customers' bank, the absence of the one control designed to defeat anonymity is precisely what made it uniquely suited to terrorist financiers who needed exactly that.

104. Risk B: The Binance exchange could not (and still cannot) control deposits to user accounts. As Binance's lawyers explained: "By design, public blockchains allow users to send assets to exchange deposit addresses without prior approval from the receiving exchange. As a result, risk exposure cannot be reduced to absolute zero on any blockchain platform. Exchanges therefore rely on robust on-chain monitoring, screening, and post-receipt controls to detect, investigate, and mitigate exposure after funds are received."

105. As a 2022 Chainalysis review found, these risks are backed up by the data: "As is usually the case, mainstream centralized exchanges were the biggest recipient of illicit cryptocurrency, taking in just under half of all funds sent from illicit addresses." "[T]hose exchanges are fiat off-ramps, where the illicit cryptocurrency can be converted into cash." Fiat off-ramps are "the most important part of the money laundering process, as the funds can no longer be traced via blockchain analysis" at that point. Binance is the single largest mainstream centralized exchange.

106. Binance has previously admitted this risk created unique duties. In response to a *Reuters* investigation, Binance, through a spokesperson, compared its exchange risk to the risk that "a drug dealer walks up to your house and slips a bag of illicit material into your mailbox. You obviously couldn't have prevented them from depositing the illicit materials, but it's incumbent on you to do the right thing by contacting law enforcement and providing them the

info they need to catch the perpetrator." Binance asserted that this is "why Binance has spent tens of millions of dollars hiring and resourcing the most sophisticated cyber forensics team on the planet." Binance also asserted that "CZ has stated publicly, and Binance company policy has been published confirming, that know-your-customer rules (KYC) are both mandatory and welcome, as they are essential to fostering a safe environment."

107. However, the robust controls, KYC, and compliance infrastructure touted by Binance did not actually exist, which predictably and foreseeably led to terrorist use.

108. Risk C: Binance also provided especially risky products, including anonymity-enhanced coins ("AECs"). As FinCEN found, "[m]ost significantly, [risks from Binance] includes risks associated with AECs. AECs use various approaches to hide the sender and/or recipient addresses … and therefore pose heightened money laundering and terrorist finance risks, particularly when [virtual asset service platforms] that offer AECs to their customers fail to implement mitigating controls specifically tailored to these products."

109. These risks were realized. As FinCEN found, "Binance offered at least six of the most popular AECs by market share, including the most popular one, monero. To date, Binance processes almost double the volume of transactions in monero relative to the next closest [convertible virtual currency] exchange that transacts in it—without policies, procedures, or controls designed to mitigate the inherent AML/CFT risk associated with AECs. Binance's failure to implement controls around the specific risks associated with its products and services left it unable to comply with its AML program obligations or its obligation to identify and report suspicious activity occurring on its platform. This, coupled with Binance's 'No-KYC' policy hamstrung reporting critical to law enforcement efforts."

110. Risk D: Binance magnified these dangers by knowingly hosting "nested exchanges" and darknet-market actors on its platform—third-party services that used their own Binance accounts to give their customers, many of them sanctioned or located in sanctioned jurisdictions, backdoor access to the exchange. As FinCEN found and Binance admitted, "numerous nested exchanges operated without any controls on the Binance.com platform until at least 2021," including exchanges later "designated" by OFAC and "shut down by law enforcement." The Russian exchange Garantex operated as a nested exchange on Binance from its March 2019 inception, generating "close to 100,000 transfers between Garantex and Binance between March 2019 and 2022," including "over $100 million in potentially suspicious transactions"; TRM Labs estimated that Binance processed roughly $6.6 billion in transactions for Garantex-associated wallets between November 2019 and July 2024.

111. That conduit reached the FTOs here. On July 4, 2023, Israel's NBCTF, through a seizure order issued by Israeli Defense Minister Yoav Gallant, targeted cryptocurrency wallets belonging to PIJ. Analyzing that seizure, the blockchain-analytics firm Elliptic found that the listed PIJ wallets had transacted with entities affiliated with Hamas and Hizballah, and had processed "funds through Garantex—a sanctioned Russian exchange," which Elliptic identified as terrorist-financing strategies "also observed by other Palestinian groups such as Hamas." Binance thus gave platform access to an exchange through which a designated terrorist organization moved its funds.

**2. Defendants Took Affirmative Steps to Stimulate Illicit Usage**

112. Binance and Zhao stimulated illegal use through their marketing, design, and product decisions. Binance and Zhao promoted the use of Binance for those interested in the "Freedom of Money"—openly touting the ability of Binance to evade the strict regulations preventing the free flow of money in the traditional financial system. Binance and Zhao also

promoted Binance's unique structure—not subject to any country's regulation—which stimulated illicit use by terrorists. Binance and Zhao also stimulated illegal use by not only accepting, but promoting, coins prone to misuse, including AECs.

113. Binance and Zhao also stimulated illegal use by promoting VPNs as a mechanism for customers to hide their location and thwart Binance's own geographic restrictions (which were its primary mechanism to enforce sanctions). Then-CCO Lim admitted that Binance's customer service employees were "teaching ppl how to circumvent sanctions," and openly worried about "land[ing] in jail." As the CFTC alleged, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide." That guide—"A Beginner's Guide to VPNs," published on Binance's own website and amplified publicly by Zhao—is detailed in Part III.A.3.c, *infra*.

114. Defendants also stimulated illegal use by protecting their terrorist users through a brazen campaign of regulator deceit. As detailed in Part III.A.3, Defendants created the U.S. Exchange to shift U.S. regulators' and enforcers' attention away from Binance and onto the U.S. Exchange to "insulate Binance from legacy and future liabilities" and "retard and resolve built-up enforcement tensions" by making Binance US "the target" of U.S. authorities.

115. Binance and Zhao's willful undermining of KYC requirements also stimulated illicit use through discounts and bulk transactions. First, Binance grew to be the largest crypto exchange in the world by undercutting rivals, in part by saving on compliance functions and passing on those discounts in the form of cheaper transaction fees, and in the process gaining volume from terrorist use. These low fees allowed terrorists to engage in cheap and easy terrorist financing. Second, Binance allowed bulk transfers while simultaneously allowing users to open "Level 1" (or "Tier 1") accounts without submitting any KYC information whatsoever. A Level

1 account holder could deposit virtual currency into its account and then transact in an unlimited amount of virtual currency. Level 1 accounts were permitted a large virtual currency withdrawal limit of up to the value of two Bitcoins per day, which for most of the relevant period was a value of tens of thousands of dollars. Binance also allowed users to open multiple Level 1 accounts with different email addresses, which effectively circumvented the withdrawal limit.

116. Binance stimulated illicit use not only through its centralized exchange but by building and promoting decentralized infrastructure engineered to operate without the controls that law and regulation require. Binance created and funded PancakeSwap, a decentralized exchange running on Binance's own BNB blockchain that demands no identity verification, imposes no limits on the volume or value of trading, maintains no listing or delisting gate, and is reached through non-custodial wallets, such as TrustWallet, that Binance likewise promoted. A venue of this kind embodies the very money-laundering and terrorist-financing red flags that FATF and blockchain-intelligence firms had catalogued and warned exchanges like Binance to guard against: no KYC or customer-due-diligence checks, no legal entity or identifiable operator in any jurisdiction, pseudonymous developers, and tolerance of funds arriving directly from mixers.

117. Elliptic's 2023 typologies report—citing 2020 FATF guidance—described precisely how terrorists exploit non-KYC decentralized exchanges of this kind to launder value and convert it across blockchains, and directed legitimate market participants like Binance to "be alert to the risks."

118. Binance was more than alert to those risks: it had contracted for the blockchain-screening tools (from Chainalysis and CipherTrace) capable of detecting such activity, yet declined to build any equivalent screening into the decentralized exchange it created. Binance

made the affirmative decision to design PancakeSwap the way it did. Binance also profited at every layer of the resulting flows—on each PancakeSwap swap, on each transfer through the non-custodial wallets it promoted, and again when the cleaned funds re-entered its centralized exchange. Having built and promoted a trading venue purpose-built to evade the safeguards it was legally obligated to maintain, Binance affirmatively stimulated the illicit use of cryptocurrency.

### 3. Defendants Deviated Egregiously From Accepted Business Practices and Broke Critically Important Anti-Terrorism Laws

119. Binance and Zhao employed unusual business practices, including ignoring warnings and preventing compliance, that show they knew of and intended to further the FTOs' conduct.

120. At Zhao's direction, top Binance executives ignored warnings and even directed employees to undermine compliance efforts. As the CFTC alleged, Binance's CCO Lim "acknowledged in February 2020 that Binance had a financial incentive to avoid subjecting customers to meaningful KYC procedures, as Zhao believed that if Binance's compliance controls were 'too stringent' then '[n]o users will come.'" The same mentality applied when Binance discovered wrongdoing: As Lim told a colleague: "Don't need to be so strict. Offboarding = bad in cz's eyes." Executives even signed off on fake money laundering reports. When Binance's Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a fake annual MLRO report," the CCO assured her "yea its fine I can get mgmt... to sign" off on the fake report.

121. Binance's senior executives undermined internal compliance efforts. CCO Samuel Lim explained that "10/10 cleanup will shake up [Binance].com, take more than 3 months and 7 digits in cost and almost never get buy in from SH." According to the Statement of

Facts in Binance's Plea Agreement, by "SH," Lim was "referring to Binance's inner circle of leaders based in Shanghai at the time, including Individual 4, who, as operations director, would oversee implementation of any controls restricting or removing users—though his performance was evaluated based on his ability to achieve user growth." When a business partner requested a compliance audit specifically, Binance deliberately engaged an auditor it described internally as one that would "just do a half assed individual sub audit on geo[fencing]" to "buy us more time."

122. Binance's own personnel also acknowledged, in their own words, that the Binance enterprise was neither clean nor lawful. As early as 2018, Binance's then-CCO Samuel Lim stated in an internal chat that "there is no fking way we are clean"; "i have seen NOTHING to prove we are"; "i have zero visibility on our VIP clients … ZERO"; and "there is no fking way in hell I am signing off as the cco for the ofac shit." When the same officer observed in early 2019 that terrorists "usually send 'small sums' as 'large sums constitute money laundering,'" a colleague replied: "can barely buy an AK47 with 600 bucks." Binance's Money Laundering Reporting Officer (perhaps an ironic title) responded by describing the company's posture: "we see the bad, but we close 2 eyes."

123. These admissions reflected policy, not idle talk. In September 2018, a senior employee observed that Binance had "[n]othing … in place" to review high-volume accounts for suspicious activity—even as, in that same exchange, the employee could list the categories of transactions that, "in [the] aml world," would be flagged for money-laundering risk, transactions Binance had no protocols to flag or report—and that it was "challenging to use the aml standards to impose on [Binance].com especially when Cz [Zhao] doesn't see a need to," while Binance's Deputy Head of Compliance explained that "[the CEO] keeps saying that compliance is here to make Binance APPEAR compliant." OFAC later reached the same conclusion, finding that

"Binance's failure to implement effective controls was the product of deliberate choices by senior management that effectively ensured Binance's sanctions compliance program would primarily remain only a 'paper program.'"

124. Binance not only ignored independent experts, it attempted to influence them to hide terrorism-related misconduct. As FinCEN found, "Binance received reports from its third-party service provider in April 2019 identifying Hamas-associated transactions and filed no SARs with FinCEN. Instead, Binance's former Chief Compliance Officer attempted to influence how its third-party service provider reported on Binance's conduct." And after a third party flagged accounts associated with Hamas and ISIS in July 2020, the former CCO described it as "[e]xtremely dangerous for our company" and instructed compliance personnel to "[c]heck if he is a VIP account, if yes, to … [o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him."

125. Binance's top executives knew about Binance's sanctions evasion. Binance knew that, as of 2018, it was under investigation by U.S. authorities for violations of Iran sanctions—and yet it continued brazenly to violate them. Binance's then-CCO directed in an internal chat that Binance's position was "not to openly do business with Iran due to sanctions.... we still support Iranian customers but that has to be done non-openly." When asked whether Binance was servicing Iranian users, the CCO confirmed: "we are servicing [them] but non-public"; "[w]e have [I]ranian customers; [the CEO] knows also. And allows it." The CCO went on to explain that the "ceo doesn't want to enforce" sanctions restrictions, and, in the same chat, Binance's then-Deputy Head of Compliance stated that Binance's Operations Director had said that Binance "can service sanctioned countries" on Binance.com.

126. Ultimately, the proof was in the pudding. Israel's NBCTF seizure orders confirm that scores of terrorist operatives or affiliated entities had Binance accounts during the relevant period. From December 2021 to September 2025, NBCTF listed 949 Binance accounts for seizure because they were used by terrorist organizations, including Hamas, PIJ, IRGC-QF, and Hizballah. Of the listed Binance accounts held by terrorist operatives, at least 760 were held by, or otherwise affiliated with, Hamas; at least 67 were held by, or otherwise affiliated with, PIJ; and at least 24 were held by, or otherwise affiliated with, IRGC-QF and Hizballah.

127. These numbers stand out because they represent nearly 99% of all cryptocurrency exchange accounts designated by NBCTF for supporting terrorism during that period. Only eleven non-Binance accounts, on three different exchanges (Nobitex, OKX, and Gate.io), were designated during the same period. This is hard evidence that Binance's conduct was highly irregular—even in the high-risk world of cryptocurrency exchanges. It caused Binance to shine like a beacon to terrorist financiers worldwide.

**4. Defendants Had a Stake in Concealing the Platform's Unlawful Uses**

128. Defendants had a stake in maintaining the dangerous aspects of Binance's service that enabled terrorist financing. Zhao and Binance's interests were aligned with terrorists because of the mutual interests in preventing regulators from learning of terrorist use—which would lead to a crackdown on terrorist use, hurt Binance's profits, and expose Binance and Zhao to prosecution for their crimes (as indeed eventually happened).

129. If Binance had registered as an MSB and submitted all relevant documents for review, regulators would have stopped terrorist use—and Binance's profits. As then-Attorney General Merrick Garland observed in 2023 in announcing Binance and Zhao's guilty pleas: "Binance became the world's largest cryptocurrency exchange in part because of the crimes it committed – now it is paying one of the largest corporate penalties in U.S. history." As then-

Treasury Secretary Janet Yellen explained, "Binance turned a blind eye to its legal obligations in the pursuit of profit." And as then-Acting U.S. Attorney Tessa M. Gorman for the Western District of Washington noted: "From the beginning of its existence, Binance and founder Changpeng Zhao chose growth and personal wealth over following financial regulations aimed at stopping the laundering of criminal cash." "Because Changpeng Zhao knowingly operated a financial platform without basic anti-money laundering safeguards, the company caused illegal transactions … transactions for which Binance profited with significant fees."

## II. Defendants Knew That the Binance Platform Enabled Hamas, PIJ, IRGC, and Hizballah Financing

130. By 2017, each of the FTOs responsible for the attacks against Plaintiffs had recognized the advantages of cryptocurrency and incorporated cryptocurrency into its financing operations, including through the use of Binance's platform. Hamas and PIJ raised funds from global supporters and paid operatives. The IRGC and its proxy network evaded sanctions and moved funds across the Middle East. And Hizballah and Kataib Hizballah received and depended upon IRGC transfers and operational financing.

131. Defendants had specific and detailed knowledge that these key FTOs were using the Binance platform to raise and move massive quantities of money. As explained herein, it was widely reported that these FTOs relied upon cryptocurrency exchanges, including Binance, to evade sanctions, gain access to the global economy, and conduct transactions in aid of their violent agendas (Part II.A). Defendants also had data and compliance tools showing that accounts associated with these FTOs were transacting on the exchange before the relevant attacks (Part II.B). Binance thus operated in a regulatory and informational environment that made terrorist financing a known, documented, and widely publicized risk of the business it had chosen to enter. And this was just the tip of the iceberg: the full scale of the FTO-affiliated

transactions is unknown to Plaintiffs, given the high volume of off-chain transactions visible solely to Binance (Part II.C).

### A. Public Reports Show How the Key FTOs Used Cryptocurrency to Raise, Move, and Access Funds Unlawfully—Including Through Binance

#### 1. Hamas and PIJ

132. Hamas and PIJ have each been designated FTOs since October 1997. Both are primary IRGC and Hizballah proxies, funded, trained, and directed by the IRGC and Hizballah through the same networks and operatives. Iran has historically provided Hamas with roughly $100 million per year; PIJ's operational budget is even more dependent on Iranian support, as the Iranian regime is its sole major donor. Because their financial lifelines run through the IRGC's sanctions-evasion infrastructure, both organizations were early adopters of cryptocurrency as an alternative to the traditional financial system from which Iran had been progressively excluded.

##### a. Hamas

133. Hamas's use of cryptocurrency to raise funds is among the best-documented of any FTO. Beginning in early 2019, the al-Qassam Brigades—Hamas's terrorist operations wing[2]—publicly launched a cryptocurrency fundraising campaign, posting calls for bitcoin donations on social media and official websites, providing video instructions for how to make anonymous donations, and generating unique bitcoin addresses for each donor. The video specifically identified Binance as a channel for donations. That campaign was widely covered in

---

[2] Hamas nominally conducts political and social-welfare activities alongside its terrorist operations, but those activities are not separate from its terrorism. Hamas's political, charitable, and terrorist components answer to a common leadership and operate as an integrated whole, and its social-welfare and fundraising apparatus raises, holds, and moves the funds that sustain its violence. Thus, although Hamas nominally maintains distinct "wings," the notion that these wings are truly separate, such that support given to its political or charitable activities does not support its terrorism, is contradicted by how Hamas operates and has long been rejected by scholars. *See* Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad* (Yale Univ. Press 2006). Funds reaching any part of Hamas sustain its terrorism.

real time. In April 2019, blockchain analytics firm Elliptic warned that "[t]errorist organizations are increasingly experimenting with raising funds in cryptocurrencies," specifically naming Hamas's al-Qassam Brigades campaign as a leading example.

134. In the same year, Hamas openly recommended that its supporters use Binance. Hamas's al-Qassam Brigades published a widely circulated video instructing supporters to create a Binance account—displaying Binance's logo alongside the instruction to "create a new account"—for the purpose of making cryptocurrency donations to the group.

135. In summer 2020, DOJ announced the dismantling of the Hamas cryptocurrency-financing campaign, disclosing that U.S. authorities had tracked and seized all 150 cryptocurrency accounts that laundered funds to and from al-Qassam's accounts.

136. In July 2021, TRM Labs reported that Israel's NBCTF had moved to seize bitcoin, Dogecoin, Tron, and other cryptocurrency wallets controlled by Hamas, with Elliptic estimating the seized wallets had received over $7.7 million in total.

137. Chainalysis's Chief of Government Affairs testified before Congress the same year that Hamas had "seen an increase in cryptocurrency donations" and was "able to use cryptocurrency to circumvent international sanctions to fund its military operations."

138. In September 2021, Coinbase—a direct Binance competitor—published a report finding that "Hamas has raised the most funds" of any terrorist organization using cryptocurrency, with fundraising efforts that "appear to correlate to the time frames of the most intense geopolitical conflict." By October 2023, the *Wall Street Journal* reported that wallets connected to Hamas had received approximately $41 million in cryptocurrency over the preceding two years, while PIJ-linked wallets had received as much as $93 million between August 2021 and June 2023, based on analysis by Elliptic and Israeli government seizure orders.

**b. Palestinian Islamic Jihad**

139. PIJ is, and at all relevant times has been, a purely terrorist organization. It does not govern territory, hold elected office, or take part in any political process, and it administers no social-welfare, charitable, or educational programs. Its only enterprise is armed terrorism in service of its founding objective of destroying Israel; funds reaching PIJ are funds for terrorism.

140. PIJ's documented crypto use parallels Hamas's. In July 2023, Elliptic warned that Israeli seizure orders targeting PIJ wallets made PIJ the eighth known proscribed terrorist group to have engaged with crypto assets, alongside Hamas, Hizballah, the IRGC, and others.

141. In addition to Hamas and PIJ's own cryptocurrency fundraising, the IRGC transferred cryptocurrency to these groups to fund their proxy terrorism. For instance, in May 2024, Treasury stated that the IRGC-QF transfers cryptocurrency to Hamas and PIJ in Gaza, and that the IRGC funds Hamas with tens of millions of dollars annually, including through cryptocurrency. Public reporting ties that funding to cryptocurrency in the period leading up to the October 7 attack: the *Wall Street Journal*, citing former Israeli and U.S. officials, reported that "[a]round 2020, crypto became a method of large-scale transfers between Iran and the group [Hamas] within the hawala networks," becoming "'an essential part for their operational [*i.e.*, attack] activity,'" and enabling "Hamas and affiliates such as Palestinian Islamic Jihad to receive large sums from Iran during the two years that preceded the attacks on Israel" in October 2023.

142. In addition to these channels, Hamas and PIJ raised money through at least three other major intermediaries: BuyCash, a money transmitter added to OFAC's SDN list in October 2023 for its involvement in Hamas fundraising; Gaza Now, a U.S.- and U.K.-designated Hamas/PIJ fundraising network; and Dubai Company for Exchange (DCE / el-Kahira)—a designated Hamas/PIJ exchange. *See* Part III.B.1, *infra*.

143. As detailed in Part III.B, the scale of Hamas and PIJ activity on Binance is confirmed by Plaintiffs' blockchain analysis and by Israeli government enforcement actions taken directly against Binance accounts. Plaintiffs' analysis, limited to publicly traceable on-chain transactions, confirms that from 2017 to 2024 Binance processed at least $29.5 million through identified Hamas wallet addresses and at least $59 million through identified PIJ wallet addresses—and vastly more through intermediaries. Specific Hamas and PIJ wallet addresses, transaction dates, and amounts are set forth in Appendix A and below.

### 2. The IRGC, Hizballah, and Kataib Hizballah

#### a. The IRGC

144. The IRGC is the primary instrument through which Iran sponsors proxy terrorist attacks against the United States and its allies. The IRGC is the principal state sponsor of Hamas, PIJ, Hizballah, and Kataib Hizballah, and is itself a perpetrator or sponsor of all the attacks against Plaintiffs. The United States designated the IRGC-QF as an SDGT in 2007 and designated the entire IRGC as an SDGT in 2017, and an FTO in 2019.

145. Treasury in 2018 explained that its "sanctions on the Iranian regime" were "designed to greatly reduce Iran's capacity to continue … its support for terrorism" and that Treasury used those "financial tools" to disrupt the funding and arms for Hizballah and Hamas.

146. Former U.S. Department of State ("State") employee Gabriel Noronha explained in 2023 that U.S. sanctions on Iran directly reduce the regime's ability to fund terrorist attacks by its proxies, including Hamas: "In 2018, the State Department disclosed that Iran was providing Palestinian terror groups, including Hamas, with $100 million per year," but "[i]n 2019, after the United States reimposed sanctions on Iran, the regime's available funds for terrorism declined and Hamas was forced to institute an 'austerity plan.'"

147. In response to these pressures, the IRGC turned to cryptocurrency to move value across borders outside the reach of the U.S. government and its allies. This pivot was not concealed; the IRGC's own officials proclaimed it. In or around early 2020, IRGC commander Saeed Muhammad said in a speech that Iran "should look to cryptocurrencies to bolster international investment despite heavy sanctions on the nation." These IRGC statements were republished in crypto industry publications, including CoinDesk. Terrorist media arms made the same point: on January 19, 2019, the IRGC-controlled *Fars News Agency* reported that "[u]sing block chain and crypto-currencies can be a way to bypass the sanctions because transactions in crypto-currencies are carried out without SWIFT," and that "these transactions cannot be tracked."

148. The cryptocurrency community took immediate notice. In May 2021, for example, leading blockchain analysis firm CipherTrace warned that a "trend detected by CipherTrace analysts is the substantial use of cryptocurrency in sanctioned geographies—most notably, Iran." In June 2021, Chainalysis's Global Head of Policy and Regulatory Affairs issued a detailed warning and explanation of Iran's comprehensive effort to embrace cryptocurrencies to evade sanctions during testimony before Congress, noting that the "two main ways Iran can use cryptocurrency to evade sanctions, or weaken the impact of sanctions, is to acquire wealth by mining or theft of cryptocurrencies, or to use cryptocurrencies to conduct economic business to bypass traditional screening." In February 2022, Chainalysis publicly warned that "[s]ome in the Iranian government have called for the country to use cryptocurrency to circumvent [U.S.] sanctions," "Iranian Bitcoin mining is well underway at a surprisingly large scale," and "Iranian state actors are well aware of the opportunity." In November 2022, moreover, Jonathan Levin, Chief Strategy Officer at Chainalysis, submitted formal comments to Treasury where he

explained that "Iran stands out for its embrace of cryptocurrency …. Several generals in the Islamic Revolutionary Guard Corps (IRGC)—which plays an outsize role in Iran's politics and economy and is designated as a Foreign Terrorist Organization—have publicly endorsed the use of cryptocurrency, including the launch of a central bank digital currency, to circumvent sanctions."

149. United States officials similarly confirmed that the IRGC uses digital assets to finance its operations and those of its proxies, and have issued warnings specifically connecting Iran's cryptocurrency activity to terrorist financing. For example, in October 2018, FinCEN warned financial institutions—including cryptocurrency exchanges—that Iran "may seek to use virtual currencies" to "fund the regime's nefarious activities, including providing funds to the Islamic Revolutionary Guard Corps (IRGC) and its Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF), as well [as] to Lebanese Hizballah, Hamas, and other terrorist groups." In that same advisory, FinCEN directed that "[i]nstitutions should consider reviewing blockchain ledgers for activity that may originate or terminate in Iran," and underscored that "a non-U.S.-based exchanger or virtual currency provider doing substantial business in the United States is subject to AML/CFT obligations and OFAC jurisdiction."

150. Senior U.S. officials had warned, in vivid terms and well before the attacks against Plaintiffs, that the IRGC's first use of any funds is terrorism that threatens Americans. On February 17, 2018, then-National Security Advisor H.R. McMaster warned hundreds of senior executives at the Munich Security Conference that "When you invest in Iran, you're investing in the IRGC. You might as well cut the Islamic Revolutionary Guards Corps a check and say, 'please use this to commit more murder across the Middle East.'" Treasury Under Secretary Stuart Levey had earlier told the private sector that, given Iran's use of financial

deception, "the operating presumption should be that virtually all transactions or financial services involving Iran could contribute to its … programs," and that "companies around the world have begun to shun all business with the IRGC." And in January 2018 congressional testimony, Treasury Under Secretary Sigal Mandelker warned that "companies doing business in Iran face substantial risks of transacting with the IRGC or IRGC-linked entities."

151. That the IRGC would devote such funds to terrorism, rather than to any civilian purpose, reflects the U.S. government's repeated, bipartisan findings that the Iranian regime prioritizes terrorism above all else. In November 2018, State's Coordinator for Counterterrorism, Ambassador Nathan Sales, explained that "[w]hat the regime prioritizes, despite the country's increasing economic distress, is buying guns and bombs for foreign terrorists," and that "[t]he regime robs its own citizens to pay its proxies abroad." In April 2024, Deputy Treasury Secretary Wally Adeyemo testified that "[a]ny dollar they have will go towards their violent activity before they deal with the people. … [A]ny dollar they get, that they have direct access to in the country[,] will be used for the IRGC before it's ever used for their people." The pandemic confirmed the point: as the United States found in an October 9, 2020 counterterrorism action, "while the Health Ministry was pleading for resources to protect the Iranian people from the [COVID-19] outbreak, Khamenei instead increased funding for the Islamic Revolutionary Guard Corps … by a third." And the IRGC's use of cryptocurrency to attack Americans is concrete: in 2022, the United States charged IRGC operative Shahram Poursafi, who promised to pay $300,000 in cryptocurrency to have former National Security Advisor John Bolton killed on U.S. soil.

152. As is relevant here, the IRGC funded its own attacks and terrorist proxies through cryptocurrency mining, by using stablecoins to evade restrictions on fiat currency, and by transferring bulk volume through Iranian cryptocurrency exchanges that acted as its fronts.

153. The IRGC's cryptocurrency operation started with Bitcoin mining. Bitcoin mining is the energy-intensive activity of using computers to solve encryption puzzles to win the right to validate transactions on the Bitcoin blockchain. Those who solve the puzzles are rewarded with Bitcoin—and the more computing power a person or entity dedicates to mining, the more revenue the mining generates. In 2021, Iran was estimated to mine "as much as seven percent of the global Bitcoin market," and one estimate indicates that Iran's Bitcoin mining "produced as much as $1 billion in revenue in 2021." In a May 2023 hearing, Senator Elizabeth Warren explained that "[t]he biggest crypto mine in [Iran] is run by the Islamic Revolutionary Guard Corps." As Senators Elizabeth Warren and Angus King explained, that revenue enabled the IRGC "to purchase imports, move funds domestically and internationally, and fund Hamas and other terrorist organizations."

154. To monetize its cryptomining efforts, the IRGC needed a way to exchange its mined coins for U.S. dollars or other spendable assets. Binance provided an essential bridge to the global crypto ecosystem. No other exchange had a similar amount of liquidity, and no other exchange was willing to do business with the IRGC. Binance thus played an essential role in helping the IRGC realize the benefits of its mining activities.

155. Mining was only one way the IRGC used cryptocurrency. Another was to convert its local currency, the rial, into viable assets, *e.g.*, stablecoins like USDT, which could be spent instantly worldwide or converted into other fiat currencies, including the U.S. dollar. This allowed the IRGC to evade sanctions preventing it from earning U.S. dollars on its oil sales. It

could instead earn in any currency, change the currency to stablecoins domestically, and then change those stablecoins to U.S. dollars (or instead spend the stablecoins on terrorism or transfer them to proxies). In a 2024 letter, Senators Warren and Angus King explained that "Iran's use of crypto to evade sanctions poses a direct threat to our national security," including because it has "used crypto to fund known terrorist groups like Hezbollah," and also "Hamas, which receives about $100 million a year from its benefactor in Iran." The letter specifically called out Binance, which "processed $8 billion worth of Iranian crypto transactions in a four-year period."

156. The IRGC used cryptocurrency to evade sanctions on an industrial scale through captured cryptocurrency exchanges. The primary such exchange was Nobitex, Iran's largest cryptocurrency exchange, established in 2017. Nobitex serves an estimated 11 million Iranian users and handles a majority of the country's cryptocurrency transactions. It does so principally for the benefit of the IRGC. As explained by former associate OFAC director Miad Maleki, who "helped design America's Iran sanctions policy"—speaking about Nobitex specifically—"[y]ou can't have a successful business in Iran without it being controlled by the regime."

157. The allegation that Nobitex is an IRGC front—and that Binance knew this—is more than plausible. The IRGC has long exercised a monopoly over Iran's sanctions-evasion efforts: State reported to Congress in 2011 that "[t]he IRGC is … widely considered to control the vast majority of [Iran's] underground and black market economy," and the RAND Corporation has reported that the IRGC controls "Iran's shadow economy" including "the illicit smuggling networks." Nobitex openly advertised itself as a vehicle for sanctions evasion—its mission, as stated on its own LinkedIn page, was to let Iranians invest despite the "shadow of sanctions"—and it directed its users to Binance by name as the preferred foreign exchange. Nobitex was candid about the dependency: its own website stated in 2020 that Binance was "the

best option" for Iranians to buy cryptocurrency because it "causes less problems for Iranian users." Senators Warren and King have observed that Iran's use of cryptocurrency "to launder funds is well known" and that Nobitex "provides guidance on its website on avoiding sanctions."

158. Additionally, Nobitex's principals have strong IRGC ties. A May 2026 *Reuters* investigation, drawing on Chainalysis and other blockchain analytics, reported that Nobitex was founded in 2018 by brothers Ali and Mohammad Kharrazi (who used the surname Aghamir) of a politically connected Iranian family tied to the Supreme Leader—who always served as the Supreme Commander of the IRGC, Hizballah, and Kataib Hizballah. That investigation reported that the brothers' father is Ayatollah Bagher Kharrazi, founder of the Iranian political movement known as "Hezbollah in Iran," who helped staff the IRGC after the 1979 revolution, and that the family is related by marriage to all three of Iran's Supreme Leaders—including the current Supreme Leader, Mojtaba Khamenei, to whose brother one of the founders' aunts is married. The family's patriarch held his stake through his son and was a documented business partner of Mohsen Rezai, the founding commander of the IRGC. TRM Labs has identified Aghamir—based on open-source reporting, Treasury designations, and analysis of Nobitex's internal source code—as likely exercising a senior leadership role over Nobitex's blockchain and transaction infrastructure.

159. A principal early Nobitex backer, Mohammad Bagher Nahvi, served as vice chairman of Safiran Airport Services—a company OFAC sanctioned in September 2022 for coordinating flights tied to Iranian drone shipments to Russia. Nobitex's technical infrastructure was provided by Arvan Cloud, which Treasury designated on June 2, 2023, for its close relationship with Iran's intelligence services. These ownership and infrastructure connections

placed Nobitex's governance and operational systems within the IRGC's institutional network from the exchange's founding.

160. Nobitex's IRGC character was further confirmed when, on June 18, 2025, the pro-Israel group Predatory Sparrow (Gonjeshke Darande) hacked Nobitex and removed approximately $90 million in cryptocurrency, deliberately sending the funds to unrecoverable "vanity" addresses bearing anti-IRGC slogans—an act the group framed as targeting Nobitex's role in IRGC and regime finance. Blockchain analysts examining Nobitex in the same period documented its entanglement with sanctioned Iranian infrastructure: Elliptic identified roughly $366 million in suspicious transactions, and reported that wallets associated with Iran's Central Bank purchased over $500 million in cryptocurrency between November 2024 and June 2025, of which approximately $347 million was sent to Nobitex in the first half of 2025 alone.

161. On June 2, 2026, OFAC designated Nobitex under Executive Order 13224 (the counterterrorism authority, for material support to the IRGC) and Executive Order 13902 (Iran's financial sector), in what Treasury described as its largest enforcement action to date against Iran's digital-asset economy. OFAC found that Nobitex handled over half of all Iranian digital-asset inflows during 2025, enabled payments associated with Iran's terrorist operations, and supplied payment pathways for IRGC-sponsored ransomware. OFAC simultaneously blocked four Nobitex principals: chairman and co-founder Amir Hossein Rad, chief executive Seyed Ali Khoee, and co-founders Seyed Mohammad Ali Aghamir Mohammad Ali and Seyed Mohammad Aghamir Mohammad Ali (the brothers publicly known as Ali and Mohammad Kharrazi), the latter of whom OFAC identified as Nobitex's blockchain lead. The designation confirms, by the U.S. government's own findings, the IRGC-control and terrorist-financing character of the very exchange through which billions of dollars in Binance transactions flowed.

162. Although Nobitex was the largest Iranian cryptocurrency exchange, it was not the only suspicious one. In particular, Binance processed significant volume for the exchanges Wallex and Ramzinex during the relevant period. As Treasury explained when it designated these two exchanges (alongside Nobitex) in June 2026, "Wallex is Iran's second-largest digital asset exchange by volume and received 12 percent of all Iranian digital asset inflows in 2025. It additionally has facilitated numerous transactions linked to the IRGC." As Treasury found, "Ramzinex is a digital asset exchange based in Tehran. Founded in 2018, Ramzinex has processed over $2.45 billion in transactions, including for transactions linked to the IRGC and a financial institution backed by the Iranian government, and has been used for sanctions evasion."

163. Still more IRGC exchanges were established offshore by IRGC operative Babak Zanjani. Zanjani was an IRGC member and its sanctions-evasion mastermind, previously sanctioned by U.S. and E.U. authorities for laundering billions of dollars of Iranian oil revenue. In 2021 and 2022, Zanjani established two cryptocurrency exchanges registered in the United Kingdom (Zedxion and Zedcex), which according to TRM Labs, "have processed approximately USD 1 billion in funds linked to the IRGC, accounting for roughly 56% of their total transaction volume, with that share peaking at 87% in 2024." This was "not opportunistic crypto abuse, but the continuation of a well-established state-aligned financial network adapting to new rails." Thus, "Zedcex functioned less like the retail exchange it purports to be and more like a stablecoin clearing hub embedded in a sanctions evasion network." Many users on Zedcex used a token called Zedxion (USDZ), a dollar-pegged asset, which was frequently swapped for USDT and other more established cryptocurrencies. And Zedcex was integrated with domestic Iranian exchanges (including Nobitex), as well as payment processors in Turkey and elsewhere, thus allowing the IRGC to transform its cryptocurrency into fiat currency outside of Iran.

164. Based on the foregoing allegations, Plaintiffs allege that the IRGC benefited from all of the volume moving through IRGC-controlled exchanges (*e.g.*, through a portion of the transaction fees collected on exchanges it owned or controlled), and that the IRGC itself controlled a large percentage of that volume, estimated at 50%. Indeed, in January 2026, Chainalysis noted "the IRGC's growing dominance within Iran's cryptocurrency landscape," which "mirror[s] the IRGC's expanding control over Iran's broader economy and political institutions." Chainalysis determined that in 2025, IRGC-affiliated addresses "represented approximately 50 percent of Iran's total crypto ecosystem, receiving more than $3 billion in funds over the course of the year"—but "even these extraordinary figures are a lower-bound estimate" because they were based on a subset of sanctions designations, which are necessarily incomplete.

165. Plaintiffs' 50% estimate is based on the foregoing cryptocurrency-specific facts, and also on the IRGC's documented role in the relevant sectors of the Iranian economy during the relevant time period. Specifically, the IRGC had monopolies or near-monopolies over the following relevant sectors: (1) sanctions evasion (for which cryptocurrency was an essential tool); (2) oil and gas (often paid for in cryptocurrency); (3) finance, including specifically currency flows; and (4) information and communications technology (which underlies cryptocurrency exchanges). Cryptocurrency exchanges fall at the intersection of all of these. Thus, as *Reuters* reported, "[t]he IRGC is involved in every significant facet of Iran's economy and would take a keen interest in a company as critical to the economy as Nobitex." The same is true for the other IRGC-controlled cryptocurrency exchanges, which also processed billions of dollars in transactions. As former OFAC associate director Maleki explained while commenting

on Nobitex, "As soon as a business [in Iran] becomes meaningfully profitable you will see the government coming in and taking its slice."

166. Importantly, the amount of money that Binance processed for the IRGC-controlled exchanges was so large—exceeding $6 billion during the period of the attacks—that any realistic estimate of the IRGC share still includes more than enough money to fund every attack against Plaintiffs many times over. Thus, even if only 5% or 10% of Binance's illegal transactions for the IRGC exchanges benefited the IRGC, the hundreds of millions of dollars of volume that benefited the terrorists are still substantial by any measure. Accordingly, no matter the precise estimate of the benefit that flowed to the IRGC from these exchanges, any realistic answer to the question places Binance squarely on the culpable side of the line. And Binance knew this because public sources called out the IRGC's role in sanctions evasion and the use of cryptocurrency to evade sanctions during the relevant period. *See supra* ¶¶ 147-150.

**b. Hizballah**

167. Hizballah—a designated FTO since October 8, 1997—likewise relied on cryptocurrency, principally through intermediaries rather than publicly branded fundraising wallets, a pattern reflecting its operational tradecraft.

168. The IRGC established Hizballah in 1982. At all relevant times, every Hizballah operative swears an oath of allegiance to the Supreme Leader, who served as the Supreme Commander of the IRGC and Hizballah.

169. Hizballah always functioned as an IRGC division such that there was never any meaningful firewall between the IRGC and Hizballah. Secretary General Hassan Nasrallah led Hizballah until he died in 2024, and he coordinated attacks with the IRGC. As State reported to Congress in 2015, the IRGC has integrated Hizballah into these operations to such an extent that an IRGC Commander proclaimed that "[t]he IRGC and Hizballah are a single apparatus jointed

together." Senior IRGC leaders also publicly confirmed that Hizballah was part of the IRGC since the latter created the former. In 2016, IRGC founder and Hizballah co-founder Mohsen Rafiqdoost stated that Ayatollah Khomeini "created Hizbullah" as one of the "Iranian security forces" responsible for "Islamizing other countries" in the Middle East. Hizballah leaders confirmed the same. In 2015, for example, Hizballah co-founder Ali Akbar Mohtashemi explained, "[Hizballah] is part of the Iranian rulership; [Hizballah] is a central component of the Iranian … security establishment [*i.e.*, the IRGC]." Hizballah leader Nasrallah also admitted in 2015 that "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran."

170. Hizballah operates as the IRGC's most heavily funded proxy, receiving the bulk of its roughly $1 billion annual budget from Iran. Hizballah shares the IRGC's cryptocurrency financing infrastructure—the same IRGC-QF money-transmission and exchange network that moves value to Iran's Palestinian proxies, Hamas and PIJ. In a May 2024 report, Treasury confirmed that Hizballah "utilizes networks of front companies and legitimate businesses, as well as cryptocurrencies, to raise, launder, and transfer funds"—the same crypto-based IRGC financing channels through which value reached Hamas and PIJ.

171. One major cryptocurrency financial facilitator for Hizballah is Tawfiq Muhammad Sa'id al-Law, who was sanctioned by the United States (on March 26, 2024) and Israel (in May 2023) for his role in routing funds from the IRGC to Hizballah and other proxies. As Treasury explained, al-Law "provided Hizballah with digital wallets to receive funds from IRGC-QF commodity sales," and "conducted cryptocurrency transfers for sanctioned Hizballah officials, including Muhammad Ja'far Qasir and Muhammad Qasim al-Bazzal." Chainalysis reported that "Qasir in particular is a critical conduit for financial disbursements from Iran's

Quds Force used to fund Hezbollah's activities." In sanctioning al-Law, Treasury reaffirmed its "commitment to deploy our tools against those who seek to fund the illicit activities of the IRGC-QF and its destabilizing proxy groups."[3]

172. Israel's NBCTF seizure of cryptocurrency accounts between 2021 and 2023 included accounts associated with Hizballah and al-Law. In June 2023, Israel seized al-Law's wallets on the grounds that his "terrorist infrastructure belonging to Hezbollah and the Iranian Quds Force … operated to transfer funds through digital currencies for Quds Force and Hezbollah." Ultimately, in 2023, Israel seized cryptocurrency wallets linked to the IRGC-QF and Hizballah holding "millions of dollars in cryptocurrency" to be "used by terror elements," and the Defense Minister reported that "since the beginning of [2023], members of Hezbollah" and "the IRGC's Quds Force" have "used cryptocurrency to fund their daily activities."

173. A recent Israeli sanctions order confirms Hizballah's ongoing use of cryptocurrency, and its receipt of cryptocurrency from the IRGC. Israel's NBCTF, in a press release on July 1, 2026, announced that it had issued sanctions orders against 37 cryptocurrency wallets "used by Iran's Islamic Revolutionary Guard Corps to transfer funds to terrorist operatives in the region, including the Hezbollah terrorist organization." The release elaborated that "the wallets were used to transfer funds to Iranian-backed terrorist organizations, foremost among them Hezbollah," and that "tens of millions of dollars were transferred through this

[3] The plaintiffs in *Balva* have made extensive and detailed allegations about al-Law and the scope of his network, which, if true, reveal substantially broader ties to Binance covering at least seventeen accounts and multiple customers. *See Balva* Complaint ¶¶ 499-704. All together, the *Balva* plaintiffs allege that "Cryptocurrency addresses controlled by al-Law and/or Hezbollah transferred the equivalent of over $400 million to Binance accounts between 2021 and 2023 and received over $190 million during the same period." *Id.* ¶ 76. Plaintiffs have not had sufficient time to independently confirm the details of these allegations—but believe them to be true based on the level of detail presented and the quality of the counsel presenting them.

system over the years to terrorist organizations." The Israeli Defense Minister explained that "Every dollar denied to the Revolutionary Guards is a dollar that will not reach Hezbollah, Hamas, the Houthis, and Iran's terrorist proxies."

174. Binance's relationship with the IRGC and Hizballah's cryptocurrency operations is set forth in more detail in Part III.B.2.

**c. Kataib Hizballah**

175. Kataib Hizballah—an Iraqi IRGC-QF and Hizballah proxy and designated FTO since 2009—receives its weapons, training, and operational funding from the IRGC-QF through the same financial infrastructure described *supra*. Kataib Hizballah is a subgroup of Iraqi Shia terrorist group Jaysh al-Mahdi ("JAM"), and interfaced directly with Hizballah to intensify terrorist attacks targeting the United States in Iraq. Hizballah recruited, trained, armed, and directed JAM terrorists, who carried out terrorist attacks against Americans on Hizballah's behalf as Hizballah's agent in Iraq. Indeed, JAM terrorists publicly swore fealty to Hizballah in two marches in Baghdad in 2006, during both of which thousands of JAM fighters publicly marched under Hizballah's banners and photos of Hizballah General Secretary Nasrallah while loudly chanting "we are Hezbollah" and "Mahdi Army [*i.e.*, JAM] and Hezbollah are one."

176. Like Hizballah, every Kataib Hizballah terrorist swears an oath of loyalty to the Supreme Leader, which throughout the relevant period was Ayatollah Ali Khamenei.

177. From the start, JAM and Kataib Hizballah were always sponsored and funded by Iran, and intended to attack Americans in Iraq. On July 9, 2009, Treasury designated Kataib Hizballah an FTO; the accompanying release found that "[t]he IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition … Forces," and that "Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided

training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran." On March 26, 2020, Treasury sanctioned agents for, *inter alia*, "Kata'ib Hizballah" upon finding that "KH" was "an Iranian-backed terrorist militia group" that "receives lethal support from the IRGC-QF, and has been responsible for numerous terrorist acts against" "U.S. … forces in Iraq for over a decade, including bombings, rocket attacks, and sniper operations."

178. Other agencies reached the same conclusion. In 2009, DOD reported to Congress regarding "Iranian-sponsored Shi'a militant groups," including "Ketaib Hezbollah (KH)," that "Iran continues to host, train, fund, arm, and guide militant groups that seek to bleed the U.S. in Iraq." The DIA similarly reported to Congress in 2019 that "One of Tehran's strongest levers of influence in Iraq is through the many Iran-backed Shia militias. Iran has provided financial backing for some of these groups for decades. The Badr Organization, Asaib Ahl al-Haq, and Kataib Hizballah have long served as reliable partners for Tehran, including conducting attacks on U.S. military personnel … using Iranian-provided munitions."

179. The IRGC (and Iran's broader terrorist support infrastructure) provided about half of JAM's budget, including about half of Kataib Hizballah's budget, and directly financed attacks through a range of vehicles, including payments to JAM leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead JAM terrorists.

180. Under these support arrangements, Kataib Hizballah receives cryptocurrency (or funds derived from cryptocurrency transactions) from Hizballah and the IRGC-QF. It also uses cryptocurrency in its attacks. For example, in a recent criminal complaint against Kataib Hizballah commander Mohammad Baqer Saad Dawood al-Saadi, the United States accused al-Saadi of paying someone $3,000 in cryptocurrency to bomb a synagogue in New York.

### B. Binance's Compliance Tools and Data Alerted it to FTO-Affiliated Customers in Real Time During the Relevant Period

#### 1. Binance's Compliance Tools

181. As a virtual asset service provider, Binance was required to operate a risk-based anti-money-laundering and counter-terrorist-financing program that identified suspicious activity through transaction patterns, behavioral indicators, geographic risk, and source-of-funds analysis. These indicators are designed to detect terrorist financing *before* any government has completed the formal process of designating a particular wallet or individual, as explained in the FATF's September 2020 red-flag guidance for virtual assets, as well as in FinCEN's October 2023 alert on the financing of Hamas. A formal sanctions designation is the product of an investigative and intelligence process that typically follows, rather than precedes, observable suspicious activity.

182. Binance could not credibly wait for a wallet or person to be formally designated before identifying terrorist-financing risk, and the law did not permit it to do so. Accordingly, Binance had access to transaction data and compliance tools that alerted it to terrorist finance in real time, and well before official, formal designations of wallets as terrorist related.

183. Binance saw more than just isolated wallet addresses—it saw the users, networks, devices, and the timing and flow of funds behind them. Binance maintained integrated datasets linking each customer's verified identity and KYC records to that customer's account activity: deposits, withdrawals, transfers, and trades; linked accounts and wallets; and the technical metadata generated each time the customer used the platform, including device fingerprints, IP addresses, geolocation, and login and session histories. That body of information—far broader than any public blockchain record or sanctions list—gave Binance precisely the visibility that AML/CFT frameworks require an exchange to use to identify suspicious activity, allowing it to

see not just a wallet address but the user, the network, the access patterns, and the flow of funds behind it.

184. The terrorist-financing patterns at issue in this case are well-established red flags that mapped directly onto data Binance already collected and monitored. Repeated inbound transfers into a wallet followed by rapid consolidation and onward transfers; the use of multiple, rapidly rotating wallets to receive funds and route them through exchange accounts; the rapid conversion and withdrawal of newly received assets; the use of mixing or tumbling services and other anonymity-enhancing techniques; and transactional exposure to jurisdictions associated with terrorist financing, such as Iran, Gaza, and Lebanon—each is a recognized indicator of terrorist financing, and each appeared in the FTO-affiliated activity transiting Binance.

185. Public enforcement materials describe precisely these patterns in Hamas fundraising, including a scheme that used a rotating set of at least seventeen cryptocurrency addresses and laundered the proceeds through virtual-currency exchanges, suspected financiers, and over-the-counter brokers. These behaviors were inherently detectable within Binance's environment, where Binance observed the frequency, timing, and size of transfers, the speed of conversion and withdrawal, the relationships among accounts sharing devices or IP addresses, and deviations from expected customer profiles.

186. Binance had the means to act on these signals: it had purchased the best tools available and had independent reasons to know the terrorist character of the actors it served. In October 2018, Binance contracted with Chainalysis, whose "Know Your Transaction" software is a real-time monitoring solution that uses pattern recognition and proprietary algorithms to raise live alerts on transactions involved in suspicious activity—not merely to screen names against designation lists. That same tool could "automatically monitor for transactional exposure

to Iranian entities with Chainalysis KYT"—which, according to Chainalysis, helped exchanges like Binance "avoid the risk of sanctions violations."

187. Binance retained additional state-of-the-art analytics and screening vendors as well. By November 2018, Binance contracted with Refinitiv for automated KYC screening. By March 2019, it contracted with IdentityMind for additional KYC and AML monitoring. By April 2019, it contracted with CipherTrace specifically to "assess and monitor" threats and "raise Binance's compliance standards." And by May 2019, it contracted with Elliptic for blockchain-based transaction screening. Such tools cluster the many wallets that make up a single network, so that once any one address in a terrorist-financing network was identified—frequently through the actors' own public conduct—the remainder of the network became visible.

188. Each of these firms incorporated designation lists—including OFAC's Specially Designated Nationals list and Israel's NBCTF designation lists—into their monitoring software. When a wallet on those lists sought to transact on the Binance exchange, the software generated a live alert to Binance. Beyond official designations, these firms independently attributed wallets to specific terrorist organizations based on their own blockchain analysis and flagged those wallets when they appeared on the platform, providing Binance a continuous stream of specific, organization-attributed warnings about FTO-affiliated activity.

189. As a matter of standard business practice, Chainalysis, CipherTrace, and the other vendors that Binance contracted with communicated alert data and compliance findings about FTOs—including Hamas, PIJ, the IRGC, Hizballah, and Kataib Hizballah—directly to Binance's senior leadership, including Zhao.

**2. Information Identifying Key FTO Activity on Binance**

190. On identified occasions, Binance's compliance infrastructure flagged specific customers by name and affiliation with the FTOs at issue in this complaint, and those reports

reached Binance's most senior compliance officials. The documented instances below are supported in part by Binance's admissions in the 2023 resolutions from the series of parallel enforcement actions against Binance and Zhao,[4] and by internal communications documented in the FinCEN consent order. Plaintiffs believe and allege that these are merely illustrative examples, and that discovery will show many more instances where Binance privately was alerted to suspicious terrorist activity, but refused to act on it. These refusals are detailed in Part III.A, *infra*.

191. **Hamas.** By no later than February 2019, Binance had been told repeatedly that Hamas terrorists were using the exchange. An internal record from that month documents that upon receiving information "regarding HAMAS transactions" on Binance, Binance's then-CCO explained to a colleague that "terrorists usually send 'small sums' as 'large sums constitute money laundering.'" That response reflects operational familiarity with Hamas's financial practices, not first encounter with the information. In April 2019, Binance received reports from its third-party blockchain analytics vendor specifically identifying transactions associated with Hamas on the platform.

[4] The principal resolutions were: (1) a consent order between Binance and FinCEN, entered pursuant to FinCEN's authority under the BSA, assessing a civil monetary penalty of $3.4 billion—the largest in FinCEN's institutional history; (2) a settlement agreement between Binance and OFAC assessing a penalty of $968 million—the largest in OFAC's institutional history; (3) a consent order with the CFTC resolving allegations of willful AML failures and unlicensed derivatives trading; (4) a criminal guilty plea by Binance in the U.S. District Court for the Western District of Washington to charges of conspiracy to violate the BSA, failure to register as a money transmitting business, and willful violation of the International Emergency Economic Powers Act; and (5) a criminal guilty plea by Zhao in the same court to willful violation of the BSA. Across these resolutions, Binance paid over $4.3 billion in aggregate penalties—one of the largest corporate penalty packages in U.S. history. Zhao was sentenced to four months in federal prison.

192. Zhao's own statements confirm awareness at the CEO level. In June 2019—shortly after the Hamas reports—he told colleagues that "[t]here are a bunch of laws in the US that prevent Americans from having any kind of transaction with any terrorist," requiring financial institutions to "submit all relevant documents for review…. So, we don't want to do that." He added that "it is not reasonable for the US to do this." Zhao was not describing an abstract legal landscape. He was articulating, in real time, a deliberate decision to avoid the anti-terrorism compliance obligations that required Binance to act on what its own tools were reporting.

193. A year later, in July 2020, Binance's compliance tools flagged a customer account as affiliated with Hamas. That identification was specific—by organization and by account—and it was received by Binance's CCO. The CCO's instruction was not to freeze and report the account, as required by U.S. law, but instead to "[c]heck if he is a VIP account, if yes, to … [o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him." The Hamas-affiliated user was then allowed to keep an account for several years in withdrawal-only status.

194. **PIJ.** FinCEN's investigation identified dozens of Binance users transacting tens of millions of dollars with an identified PIJ network. FinCEN Consent Order No. 2023-04, at 47–48 (Nov. 21, 2023). The PIJ character of those users and wallets was identifiable to Binance from the identity-linked customer, device, and transaction data Binance held and was obligated by law to monitor—the same data from which FinCEN's investigators identified the network.

195. **IRGC and Hizballah**. As noted above, Binance's own compliance tools incorporated OFAC and Israeli NBCTF designation lists in real time—lists that identified the IRGC, Hizballah, and the sanctioned al-Law network. As such, even name-and-list screening

flagged those who transacted with these actors. Binance cannot disclaim awareness of the terrorist character of these customers and counterparties merely because a particular formal designation post-dated a particular transaction.

196. As explained *supra*, Binance's major counterparty Nobitex openly advertised itself as a vehicle for sanctions evasion, and was owned and controlled by people with prominent ties to the IRGC. Despite that, Binance's relationship with Nobitex was a named, mutual commercial relationship, and Binance continued processing billions of dollars in Nobitex flows even after announcing know-your-customer controls in 2021. Moreover, given Binance's obvious interest in knowing an institutional customer that was responsible for almost $8 billion in transactional volume, Binance was aware of all public, and considerable non-public, information about Nobitex well before Nobitex was designated for supporting the IRGC in 2026.

197. Although not as large as Nobitex, the Wallex, Ramzinex, Zedxion and Zedcex Exchanges also processed significant volume with Binance, and similarly carried strong red flags for association with the IRGC given their size, location, and principals. Moreover, Binance maintained live purchase guides for tokens controlled by IRGC financial facilitator Babak Zanjani. This remains true to this day, even though Zanjani, Zedxion, and Zedcex have all been designated by U.S. authorities (and Zanjani was a notorious IRGC sanctions-evasion expert first designated in 2013).

198. Binance had access to sufficient information to discern the terrorist nature of the al-Law wallets (based on their counterparties and other transaction activity) before they were identified by law enforcement, but hosted them anyway. Indeed, the al-Law network provides a particularly stark illustration of Binance's pre-designation awareness. When Israel designated al-Law's wallets in 2023, Binance's compliance vendor, Chainalysis, boasted that it was "proud

to say that Chainalysis tools played a role in this landmark national security achievement." In other words, the designation of the al-Law network was based on intelligence gathered by Binance's own vendors—and so Binance necessarily had access to that information before the designation was formalized. And the same is true of many such designations: governments rely on the same vendors that Binance hires to identify and investigate suspicious activity.

199. Notwithstanding this awareness, even after Israel's NBCTF designated al-Law and 28 intermediary wallets in May 2023, Binance continued to facilitate transactions for listed wallets. Indeed, Binance continued to allow 19 wallets that had transacted with al-Law's wallet to transact on its exchange to the tune of more than $53 million—and nearly half of these transfers occurred three weeks or more after al-Law's wallet was listed.

200. Binance thus knew—through public reporting and its own compliance infrastructure—that it was moving funds for the IRGC, Hizballah, and their proxies.

201. **Israeli NBCTF Seizures.** As noted above, Israel's NBCTF seized approximately 895 cryptocurrency accounts at Binance between 2021 and 2024, including accounts belonging to Palestinian firms connected to Hamas's al-Qassam Brigades, and accounts associated with Hizballah and IRGC financier al-Law. Binance monitored such sanctions and seizure orders regularly and was aware of their contents. It also had sufficient information to identify the counterparties transacting with sanctioned and seized wallets or accounts, and to determine whether their activity was likewise suspicious.

202. Israeli enforcement confirms how concentrated this activity was on Binance in particular. For example, of the approximately 660 cryptocurrency-exchange accounts named in Israeli Ministry of Defense seizure warrants issued in November 2023, approximately 98% were Binance accounts. Blockchain analysis of those seizures revealed significant transactions. For

example, it traced a single Binance-associated wallet that received approximately $14 million—across 126 transfers—from a Hamas-linked wallet on Israel's terrorism seizure list.

203. Zhao and other Binance senior leadership were aware that FTOs repeatedly used Binance, including those FTOs that conducted the attacks described in Part V. As CEO of a global cryptocurrency exchange under active government investigation, Zhao regularly monitored warnings from U.S. regulators, international oversight bodies, and the blockchain analytics firms whose services Binance had contracted. His active social-media presence on platforms including Twitter and Reddit reflected ongoing attention to major cryptocurrency-industry developments, including public reporting from those same firms.

### C. The Full Scale of Binance's FTO-Affiliated Transactions Is Unknown

204. The specific FTO identifications documented above and below represent the floor of what Binance's compliance infrastructure detected, not its ceiling.

205. Notwithstanding Binance's monitoring infrastructure, for years Binance actively sought to prevent detection of illicit activity: through May 2022, Binance permitted the vast majority of users to move substantial sums of cryptocurrency without providing their names or any other identifying information. This was not a mere "failure to do more"; it was a deliberate choice to facilitate anonymous transactions despite U.S. laws requiring otherwise. FTO-affiliated transactions that occurred outside the relatively narrow set of identified wallet addresses were therefore invisible to the analytics tools Binance retained—not because the tools failed, but because Binance ensured that the underlying user population remained unidentifiable.

206. Additionally, a substantial volume of activity on centralized exchanges like Binance is not recorded on public blockchain ledgers. Transactions on Binance occur either "on-chain" (recorded on a public blockchain ledger) or "off-chain" (recorded only on Binance's internal private ledger). When a transaction is processed on a public blockchain like the Bitcoin

blockchain, it is possible to trace the flow of funds from one wallet to another. However, when a Binance customer transfers assets internally to another Binance customer, that transfer occurs entirely "off-chain." To process off-chain transactions, Binance transfers value between customer accounts by debiting and crediting its internal ledger, leaving no public trace of the transactions.

207. Binance's off-chain transfer capability provided the key FTOs with a means of moving funds that are visible only to Binance and the users—but entirely invisible to law enforcement and blockchain analytics tools.

208. Accordingly, the true volume of FTO-affiliated transactions on the Binance exchange, visible in full only to Binance, is substantially higher than that set forth herein.

209. In the alternative: to the extent Defendants lacked actual knowledge of any particular FTO-affiliated customer or transaction, Defendants only secured such lack of awareness through willful blindness. Binance and Zhao easily could have obtained the relevant data—as their third-party service providers, and even unrelated third parties, often did—by implementing an effective KYC program and effectively screening transactions for sanctions compliance, steps the law required Binance to take as a prerequisite to doing business with U.S. customers. Had Binance taken those basic steps to inform itself of the nature of its customers and their transactions, it would have quickly learned (to the extent it did not already know) that it was systematically enabling terrorist finance for designated FTOs. Binance's own Money Laundering Reporting Officer supplied a textbook admission of willful blindness: "we see the bad, but we close 2 eyes." And Zhao was personally responsible for Binance's deliberate indifference, admitting in his plea agreement that he "violated the Bank Secrecy Act … by willfully causing [Binance] to fail to implement and maintain an effective [anti-money laundering] program."

## III. Defendants Provided Knowing and Substantial Assistance to Hamas's, PIJ's, the IRGC's, Hizballah's, and Kataib Hizballah's Terrorist Attacks

210. Defendants were no passive bystanders: armed with the knowledge that Hamas, PIJ, the IRGC, and Hizballah were using Binance to further their terrorist activities, Defendants engaged in affirmative acts in support of those FTOs, often in violation of U.S. laws and regulations, which enabled the attacks against Plaintiffs. Part III.A below describes how Defendants knowingly and substantially assisted and provided special treatment to the above FTOs. Part III.B describes the nexus between Binance's knowing assistance and the attacks against Plaintiffs.

### A. Defendants Actively Assisted the FTOs That Attacked Plaintiffs

211. In response to the identified FTO customers and their agents, Defendants did not report or sever the relationships, but rather assisted them, including by: protecting the identities of terrorist-affiliated accounts (Part III.A.1); selectively enforcing compliance rules to favor terrorist-affiliated actors (Part III.A.2); concealing transactions from regulators and law enforcement (Part III.A.3); and developing a sustained relationship with IRGC-controlled cryptocurrency exchanges (Part III.A.4).

#### 1. Defendants Protected Identified Terrorist-Affiliated Accounts Rather Than Reporting Them as Required by Law

##### a. April 2019: Defendants Suppressed an Internal Compliance Report Specifically Identifying Hamas Transactions

212. In April 2019, Binance received a report from its third-party blockchain analytics vendor specifically identifying transactions associated with Hamas on the Binance exchange. As Binance admitted in its FinCEN settlement, the response of Binance's then-CCO was not to freeze the relevant accounts or remove the transactors. Instead, as FinCEN found, the CCO "attempted to influence how its third-party service provider reported on Binance's conduct,"

intervening to shape the vendor's characterization of Binance's compliance posture to third parties, rather than to address the underlying Hamas activity.

213. The significance of this incident lies in what it rules out. Binance's compliance infrastructure had already detected the Hamas activity and reported it to Binance's most senior compliance official—so this is not a case of detection failure. The transactions had been specifically identified as Hamas-associated—so this is not a case of ambiguous risk that could plausibly have been misread. The response was handled by the CCO—and not some low-level employee gone rogue. And the CCO's response was directed specifically at the Hamas characterization, not at any generalized compliance concern. What Binance did in April 2019, on the admitted record, is respond to a specific report of Hamas-associated transactions by working to suppress its external characterization rather than address the underlying conduct.

**b. July 2020: Defendants Warned a Hamas-Affiliated Customer**

214. In July 2020, a third-party service provider flagged a customer account on the Binance exchange as associated with Hamas. As Binance admitted in its FinCEN settlement, Binance's former CCO's response was to instruct compliance personnel to "[c]heck if he is a VIP account, if yes, to … [o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him." The instruction had three components: verify VIP status, facilitate fund withdrawal, and warn the customer that he had been flagged. In the same FinCEN paragraph, Binance admitted that it chose not to file a SAR on transactions related to an individual designated by OFAC for supporting a terrorist group, and that the individual was permitted to maintain a withdrawal-only account for several years after designation and to withdraw his remaining balance.

215. The July 2020 incident was not an improvised response. Per the CFTC, Binance maintained a written policy specifying that if law enforcement requested the freezing of an

account, the VIP team was to contact the customer "through all available means (text, phone)" as soon as the account was unfrozen and inform them it had been investigated. The policy stated: "Do not directly tell the user to run, just tell them their account has been unfrozen and it was investigated by XXX. If the user is a big trader, or a smart one, he/she will get the hint." FinCEN documented a similar exchange, "Giving a strong hint[,] such as your account is unlocked/your account has been investigated by XXX is usually a good enough hint of severity."

216. This policy constituted special treatment for terrorist users, who were the most likely to have their accounts frozen by law enforcement because many authorities, worldwide, were attempting to stop them. Moreover, the evident purpose of the policy was to thwart law enforcement efforts by signaling to dangerous customers that they are being investigated and should run. The fact that Binance had such a policy catering to such users is strong evidence of its own alignment.

217. The foregoing are examples that have surfaced in the public record, but they are indicative of broader policies and patterns. Based on the charges against Binance and the volume of terrorist traffic flowing through Binance, Binance knowingly protected other FTO-affiliated accounts (including those FTOs who carried out the attacks discussed in Part V), including by failing to file required reports with regulators and law enforcement.

#### c. 2024–2025: Even After its Guilty Plea, Binance Continued to Serve and Protect a Massive IRGC-Linked Crypto Network

218. Even after its guilty plea, Binance acted to protect FTOs rather than report them. For instance, while under post-plea court-ordered monitorship, Binance continued to permit IRGC-linked financial flows through accounts that its own internal compliance system had deliberately exempted from scrutiny.

219. On February 24, 2026, Senator Richard Blumenthal, Ranking Member of the U.S. Senate Permanent Subcommittee on Investigations, opened an inquiry into Binance, writing that Binance "appears to have ignored clear warning signs, knowingly allowed illicit accounts to operate, and even provided hands-on support to entities engaged in money laundering," and that Binance compliance had identified 2,000 accounts associated with Iranian entities despite Binance's claim that it bans Iranian users. The inquiry followed reporting by the *Wall Street Journal*, *New York Times*, and *Fortune* that Binance had processed approximately $1.7 billion in transfers connected to Iran, a substantial portion of which was routed to Nobitex and onward to digital wallets linked to U.S.-designated terrorist groups, including the IRGC.

220. The money largely came through two channels, both known to Binance. The first was Blessed Trust, a company that not only held a Binance account but also served as a vendor making payments on Binance's behalf in the United States. Blessed Trust was operationally intertwined with Binance: its chief executive's trading account and an account controlled by a group of Binance employees were both accessed from the same electronic device; and in a Telegram exchange, when a Blessed Trust representative identified himself as a "friend of Rock"—a reference to Rock He, an early Binance employee and member of its board—a Binance employee replied, "Boss Rock has mentioned you before." Binance marked Blessed Trust's account "Don't block. Internal accounts"—a classification that exempted it from the monitoring and screening applied to external accounts, even though Blessed Trust was an outside vendor. Binance's own investigators later concluded that approximately $1.2 billion flowed from Blessed Trust's account, through intermediaries, to wallets tied to Iran and the IRGC. Binance's detection systems did register the network: when an affiliated company applied for its own Binance account—after the U.S. Commerce Department had blacklisted the Hong Kong address

it used, which a former official called "the brightest of the bright red flags"—Binance's KYC process flagged the Iran-sanctions connection and denied the application. But Binance never traced that network to the related account through which the funds flowed uninterrupted; instead, it looked the other way, allowing $1.2 billion to flow to Iran- and IRGC-linked recipients.

221. A second Binance account, registered to the company Hexa Whale, sent approximately $500 million to Iran- and IRGC-affiliated entities. According to the *New York Times*, "an Israeli official told the investigators that Hexa Whale was financing terrorist organizations." The *New York Times* further reported that Hexa Whale "was allowed to open its Binance account and move hundreds of millions of dollars, even after providing the exchange with a fraudulent bank statement that was flagged at the time."

222. When Binance's investigators' findings reached Binance's top executives last fall, the company suspended or fired four of the investigators involved within weeks, citing "unauthorized disclosure" of client data. On March 11, 2026, the *Wall Street Journal* reported, and the *New York Times* independently confirmed, that the Department of Justice had opened a criminal investigation into transfers from Binance accounts to Iran—more than two years after Binance's guilty plea and during the monitorship period. This confirms that the institutional misconduct documented here was not cured by the 2023 resolutions.

223. This continuity of conduct through and beyond the monitorship period underscores the pattern established by the incidents discussed in Part III.A.1.a-b above: each represents a moment at which Binance's compliance infrastructure identified an illicit FTO-affiliated actor, network, or flow, and Binance's response was to preserve rather than sever the relationship, evidencing clear special treatment of these actors.

224. This post-guilty plea misconduct strongly supports an inference that Defendants engaged in similar misconduct before their pleas, too. After their plea, Defendants knew that they were under scrutiny, had promised to step up their compliance efforts, and knew that if they were caught catering to terrorists, they would suffer dire financial and reputational consequences. Because Defendants were nevertheless willing to engage in such brazen misconduct, it follows that prior to their pleas, when Defendants believed that they might not be caught, they were even more likely to have done so.

#### d. 2022-2026: Binance Transacted With Exchanges and Actively Promoted Cryptocurrencies Designed by an IRGC Sanctions-Evasion Expert

225. Binance conducted multifaceted business with Babak Zanjani—a documented IRGC financial facilitator whose exchange infrastructure TRM Labs found processed nearly $1 billion in IRGC-linked transactions.

226. Zanjani has served as one of the IRGC's primary financial facilitators for well over a decade. Treasury designated him in 2013 for moving billions of dollars on behalf of the Iranian regime, including to an IRGC company; he was delisted in 2016 as part of the nuclear deal with Iran. By December 2024, following release from an Iranian prison, Zanjani had re-emerged and reassumed control of his cryptocurrency-exchange infrastructure. On January 30, 2026, Treasury re-designated Zanjani and two of his UK-registered exchanges—Zedcex Exchange Ltd. and Zedxion Exchange Ltd.—under Executive Order 13224, the counterterrorism authority, in OFAC's first designation of an IRGC-linked digital-asset exchange registered outside Iran. Treasury described Zanjani as having been "freed from imprisonment in order to launder money for the regime" and as having "provided financial backing for major projects that support the [IRGC]."

227. Zedcex and Zedxion operated as active IRGC financial channels. TRM Labs found that together they processed approximately $1 billion in IRGC-linked funds—roughly 56% of their total volume, rising to 87% in late 2024—and identified direct transfers of over $10 million from IRGC wallets through the Zanjani network to a sanctioned Houthi/IRGC financier. TRM Labs further documented that Zedcex and Zedxion wallets routed funds to Nobitex, placing Zanjani's exchange infrastructure within the same IRGC-aligned financial ecosystem.

228. Reporting by the *Wall Street Journal* has separately quantified the IRGC's use of Binance through the Zanjani network. According to that reporting, Zanjani's network conducted approximately $850 million in transactions over two years (2024-2025) on Binance, of which experts assessed that roughly $425 million moved to finance the IRGC. This volume largely moved through a single trading account that remained open into 2026. That account, in the name of a Zedcex subsidiary, took in Iranian oil proceeds and relayed them to IRGC-linked wallets, continuing well after Binance's 2023 guilty plea. Per the *Journal*, "[t]he crypto funds could then move to Iranian exchanges such as Nobitex, where the money could be converted into local rials. Or the crypto could be transferred to pay suppliers and buy weapons out of view of authorities." The *Journal* further reported that Binance flagged the Zedcex account internally as being accessed from Tehran in late 2024 yet left it open for more than another year—generating roughly a dozen additional internal alerts through November 2025—and that Binance's top executives restricted compliance employees' ability to review certain sensitive accounts and processed a large volume of these flows through an account it had labeled "internal."

229. These accounts were neither anonymous nor isolated: related accounts opened in the names of Zanjani's sister, his romantic partner, and a company director were all accessed from the same devices, so that Binance could see they formed a single network. Binance's own

investigators recognized the danger and acted on it—an internal Binance report recommended removing the users because of "the high-risk nature of these associations and the potential for sanctions evasion and terrorist financing," and Binance's investigators urged that the accounts be closed and reported. Binance did neither. The accounts remained open for more than fifteen months after they were flagged; and rather than act on its own investigators' warnings, Binance forced out several of the investigators who raised concerns about the Iranian network. Binance thus did not fail to detect Zanjani's IRGC-linked network—it detected the network, was warned by its own personnel that the accounts presented a terrorist-financing risk, and chose to keep the accounts open and remove the people who had sounded the alarm.

230. Zanjani's activity was not limited to exchanges. He also issued and developed cryptocurrencies of his own—including IRR (TOMAN), Zedxion (ZEDX), Zedxion USDZ (USDZ), and Wrapped Zedxion (WZEDX). Binance began promoting at least two of these tokens no later than November 2022, one month after the close of the period covered by OFAC's consent order documenting Binance's IRGC-related sanctions violations. In fact, Binance maintained step-by-step guides on its own website directing users to acquire those tokens. Each guide directed users first to purchase BNB—Binance's proprietary cryptocurrency—then to use BNB to acquire the relevant Zanjani token through PancakeSwap, a decentralized exchange that Binance employees created in-house in 2020 and that has remained under Binance's supervision—generating transaction-fee revenue for Binance at each step. Moreover, Binance's own technology supplied the rails on which Zanjani's tokens operated. The USDZ stablecoin and Zanjani's other tokens were issued and run on the BNB Chain (formerly the Binance Smart Chain)—the blockchain network that Binance created, controls, and promotes—in Binance's standard "BEP-20" token format, and Zedcex steered its customers to move USDZ onto Binance.

Binance therefore did not merely process transactions in these IRGC-linked tokens; its proprietary blockchain was the operating substrate on which a designated IRGC financial facilitator's tokens were created, held, and circulated, making Binance a participant in the scheme rather than a bystander to it.

231. PancakeSwap is not the independent, third-party venue it publicly presents itself to be; it is decentralized infrastructure that Binance built, seeded, and administers. Binance selected PancakeSwap as one of the first projects funded by its $100 million BNB Chain Accelerator Fund in 2020, and PancakeSwap runs on the BNB Chain that Binance created, controls, and promotes. The *Wall Street Journal* has reported, based on the accounts of former Binance employees, that Binance staff created PancakeSwap in-house and that it has remained under Binance's supervision—even as it is marketed to the public as an anonymous protocol run by pseudonymous developers with "a penchant for breakfast foods." The dependence of Zanjani's tokens on this Binance-operated infrastructure is stark. The IRR (TOMAN) token has no independent market: its entire liquidity and pricing run through a single PancakeSwap liquidity pool that pairs it exclusively with USDZ, the stablecoin issued by Zanjani's Zedxion exchange, and that pool draws 100% of its funds from a single liquidity provider. A token whose only market is one captive pool—supplied in full by a single wallet, on a decentralized exchange Binance created, and on a blockchain Binance controls—is not a freely traded asset but a conversion rail operating on Binance's own machinery. Binance thus did not merely process transactions in a designated IRGC facilitator's tokens; it built and administered the underlying technology allowing those tokens to be created and traded.

232. In May 2026, Treasury issued a warning specifically identifying Zanjani's USDZ stablecoin as an Iranian sanctions-evasion tool. Nevertheless, Binance's guides for all four

Zanjani tokens remained live as of the filing of this complaint, well after OFAC's January 30, 2026 counterterrorism designation of Zanjani and his exchanges.

**2. Defendants Selectively Enforced Compliance Rules to Favor Terrorists**

233. Binance's ongoing promotion of Zanjani's tokens despite his designation constitutes special treatment for a terrorist customer. That Binance continued promoting these specific tokens was an intentional choice, not an oversight. This is evidenced by the fact that Binance was simultaneously removing other tokens on compliance grounds.

234. For example, in February 2024—fourteen months after Binance began promoting the Zanjani tokens, and during the monitorship—Binance delisted Monero (XMR), one of the most widely traded privacy coins in the market, stating that it "no longer meets [Binance's] standards." Although Binance did not expressly say which standards, the industry understanding was that Binance delisted Monero because its privacy architecture made it impossible to monitor deposits, a capability Binance was required to maintain after its guilty plea. Binance had earlier delisted Monero in certain European jurisdictions on regulatory grounds, and the February 2024 global delisting was understood as reflecting Binance's post-settlement compliance obligations.

235. Yet at the time it removed Monero, Binance maintained guides for all four Zanjani-connected tokens—guides that stated on their face that Binance was "constantly reviewing" the cryptocurrencies it promoted. Zanjani's 2013 designation was public record throughout this period, as was his link to Zedxion Exchange through UK Companies House filings, and the tokens had been live on the platform for over fourteen months. The same compliance review that flagged Monero's monitoring characteristics would have surfaced Zanjani's documented IRGC history if applied to ZEDXION and USDZ. TRM Labs identified USDZ across the Zedcex and Zedxion wallet infrastructure when mapping the IRGC-linked exchange network.

236. The Zanjani facts are but one example of Binance's special treatment of terrorist customers. When Binance's systems or vendors identified a counterparty as connected to Hamas, PIJ, the IRGC, or Hizballah, Binance did not sever or report the relationship; it preserved it—continuing to process transactions for BuyCash and the Dubai Company for Exchange after the United States and Israel designated them as terrorist financiers, paying funds outward to PIJ- and Hamas-attributed wallets, and warning flagged accountholders so they could withdraw their balances ahead of enforcement. That protective response was the opposite of how Binance treated compliance risks unconnected to these organizations. Binance thus reserved for these FTO-connected actors a course of conduct—identification followed by protection rather than reporting—that it did not extend to users generally.

### 3. Defendants Took Affirmative Steps to Conceal the Transactions from Regulators and Law Enforcement

237. Beyond protecting the identities of, and giving preferential treatment to, key customers affiliated with Hamas, PIJ, the IRGC, and Hizballah, Defendants simultaneously took affirmative steps to ensure that regulators and law enforcement could not see what it was doing—measures that were not incidental to its compliance failures but rather intentional choices that enabled those failures to continue for years without detection. The below sections describe Binance's resistance to enforcement requests targeting FTO-affiliated accounts; its refusal to file any required SARs on those transactions; the systemic steps it took to disable and falsify its compliance infrastructure; and how Binance created and used Binance US to divert regulators from the Binance.com platform where the transactions at issue occurred.

#### a. Zhao and Binance Refused and Delayed Compliance With Law Enforcement Requests Targeting FTO-Affiliated Accounts

238. Binance's resistance to law enforcement requests targeting FTO-affiliated accounts on its platform was systematic and documented across multiple enforcement channels.

The NBCTF seizures discussed *supra* ¶ 126—nearly 1,000 Binance accounts seized between 2021 and 2025 connected to Hamas, ISIS, Hizballah, and al-Law—succeeded through direct governmental enforcement action, not voluntary cooperation by Binance. The scale of Binance's non-cooperation with enforcement requests is captured in a figure Binance offered publicly as a point in its favor: that it had rejected 86% of requests from the Israel Defense Forces to freeze cryptocurrency wallets. In context—following years of documented Hamas, PIJ, and Hizballah transactions on the Binance exchange and the NBCTF's seizure of hundreds of Binance-hosted accounts tied to those same organizations—that figure establishes that Binance's response to voluntary enforcement requests directed at FTO-affiliated accounts was categorical resistance, not cooperation.

239. Binance exhibited the same posture with respect to actively thwarting law enforcement. As established below, Binance refused to file a single SAR on FTO-affiliated transactions across the entire period covered by its regulatory settlements. FinCEN determined that Binance's willful refusal to report hundreds of thousands of suspicious transactions "inhibited law enforcement's ability to disrupt the illicit actors" and that its conduct "extensively harmed FinCEN's mission to safeguard our financial system from illicit use" and exposed the U.S. financial system to a significant volume of illicit financial activity—including transactions related to individuals listed on OFAC's SDN List and terrorist financing.

240. The 2023 resolutions likewise establish that this willful refusal was directed by senior management, not the product of oversight.

241. As established in Part III.A.1.b, when Binance's compliance tools specifically flagged a customer account as affiliated with Hamas, the institutional response was to warn the

customer that he had been flagged and facilitate fund withdrawal rather than report to law enforcement.

242. In the same vein, Binance's Tai Chi strategy, addressed in Part III.A.3.d, was explicitly designed to "retard and resolve built-up enforcement tensions" by redirecting U.S. regulatory attention to Binance US while preserving the Binance.com platform—where FTO-affiliated transactions were occurring—beyond effective regulatory reach.

243. That posture persisted through and beyond the 2023 guilty pleas: as established in Part III.A.1.c, when Binance's investigators eventually surfaced $1.7 billion in IRGC-linked flows through the Blessed Trust network, they did so only after receiving alerts from law enforcement, not through any voluntary compliance initiative.

244. Resistance to law enforcement was not incidental to Binance's institutional conduct across the relevant period. It was a designed feature of it.

#### b. Binance Filed No Suspicious Activity Reports on FTO-Affiliated Transactions

245. As discussed at ¶ 94, exchanges acting as MSBs are required under the BSA to file SARs with FinCEN identifying transactions that may involve illicit conduct. A SAR filing therefore serves two functions: it creates a record of the suspicious transaction, and it alerts law enforcement to the potential illicit activity, enabling investigation and potential interdiction. Binance's conduct deliberately defeated both functions.

246. Binance filed zero SARs on FTO-affiliated transactions across the entire period covered by its regulatory settlements, thus inhibiting FinCEN's ability to disrupt illicit actors and safeguard our financial system from illicit use. That refusal was deliberate. The 2023 resolutions establish it as a matter of institutional policy: Binance's senior management directed personnel not to file SARs on FTO-affiliated transactions even after its own compliance infrastructure had

identified the relevant accounts. The specific instances of SAR non-filing are catalogued across Parts II and III: the February and April 2019 Hamas transaction reports received by the CCO (¶¶ 191, 212); the July 2020 Hamas-affiliated VIP account (¶ 214); the identified PIJ network accounting for tens of millions of dollars in transactions (¶ 194). Each instance involved a specific, documented identification of FTO-affiliated activity. None produced a SAR.

247. United States officials and FinCEN have specifically described SAR filing obligations as "the first line of defense" against acts of terror. By systematically suppressing that first line of defense across the full period of the FTO-affiliated transactions at issue in this complaint, Binance ensured that U.S. law enforcement and intelligence agencies responsible for disrupting attacks by interdicting terrorist financing had no real-time notice of the accounts, transaction volumes, and counterparty identities that its own compliance infrastructure was identifying. The nexus between that suppression and the attacks that injured Plaintiffs is addressed in Part III.B, *infra*.

**c. Zhao and Binance Deliberately Disabled the Compliance Systems That Would Have Flagged FTO Transactions**

248. Binance's public position was that it blocked users from sanctioned jurisdictions by restricting access based on IP address. In practice, Binance simultaneously published a guide on its own website—"A Beginner's Guide to VPNs"—explaining to customers how to conceal their locations using VPNs, going so far as to advise users that they "might want to use a VPN to unlock sites that are restricted in your country." Zhao amplified this guidance publicly, tweeting in 2019 that VPNs were "a necessity, not optional." CFTC transcripts of internal communications confirm that advising customers to use VPNs to circumvent Binance's own IP address blocks was a high-level business decision approved by Zhao and other senior executives.

249. Binance's promotion of VPNs was not a passive failure to police evasion; it was affirmative assistance in defeating Binance's own controls. Binance publicly represented that it blocked prohibited users by screening IP addresses, and then taught those same users how to beat that screen. In 2018, Binance's own CCO admitted that its customer-service employees were "teaching ppl how to circumvent sanctions." OFAC found that Binance's "senior management … encouraged the use of VPNs and surreptitiously allowed U.S. users and sanctioned jurisdiction users to trade even after ostensibly blocking them," explaining that "Binance continued to allow trades by users who were logged in from an IP address in a comprehensively sanctioned jurisdiction so long as that user had submitted KYC documents from a non-sanctioned jurisdiction." As alleged above, Binance's published VPN guide was designed to teach customers "how to easily skirt Binance's compliance controls."

250. When the Binance US platform launched in 2019, Binance announced that it was implementing controls to block U.S. customers from the Binance.com platform. In reality, Binance did the opposite. As explained below and in Part III.A.3.d, behind the scenes, Binance was making efforts to retain its most valuable U.S. customers on Binance.com, shielded from oversight by U.S. regulators.

251. Zhao directed Binance to assist high-value U.S. customers, referred to internally as "VIP" users, in circumventing those controls and to do so surreptitiously because—as Zhao himself acknowledged—Binance did not want to "be held accountable" for these actions. As the SEC found, Binance's CCO explained, "[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means."

252. On a June 25, 2019 call, Binance employees and executives told Zhao that they were implementing the plan by contacting U.S. VIP users "offline," through direct phone calls,

"leav[ing] no trace." If a U.S. VIP user owned or controlled an offshore entity outside of the United States, Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred its holdings to the new account. On the same call, an employee described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was "misidentified" in Binance's records as a U.S. customer. Zhao authorized and directed this strategy, explaining on the call, "[w]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not."

253. Also, during the call on or around June 25, 2019, a senior employee provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law." The senior employee provided an alternative route to the same end: "But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which makes us believe it is a US account ... if you think we made a wrong judgment, please do the following, you know, and we have a dedicated customer service VIP service officer." The senior employee described Binance's plan as "international circumvention of KYC."

254. Consequently, even as Binance represented that it was blocking U.S. customers, as of June 2020, approximately 17.8% of Binance's customers remained located in the United States.

255. Binance engaged in the same pattern of public-presenting compliance with contradictory private practice with respect to Iran. As alleged in Part I.B.3, *supra*, Binance's CCO directed that Iranian customers be serviced "non-openly"—with Zhao's knowledge and

approval. A year after Binance publicly claimed to have blocked all Iranian accounts, it identified approximately 600 verified KYC-cleared Iranian users still active on the platform. That figure represents only the subset of Iranian users who had completed full KYC verification. Binance's own records identified more than 12,500 additional users who had provided Iranian phone numbers—a population Binance knowingly maintained on the platform while publicly claiming it had blocked all Iranian access.

256. Binance's internal compliance reporting was fabricated to match its false external representations, as the fake MLRO report alleged in Part I.B.3, *supra*, confirms. In August 2019, the CCO falsely assured a U.S. state regulator that Binance performed AML/CFT controls, screened customers against OFAC sanctions lists, and conducted customer due diligence for suspected terrorism financing. By December 2019, that same CCO acknowledged internally that Binance "doesn't even do AML namescreening/sanctions screening."

257. The magnitude of what Binance's concealment shielded is fixed by Binance's own admissions. OFAC found that Binance processed at least 1,667,153 virtual-currency transactions, totaling approximately $706,068,127, that violated U.S. sanctions programs—including 1,205,784 trades worth $599,515,938 between U.S. persons and Iranian counterparties. DOJ found, and Binance admitted, that Binance "willfully caused" "at least 1.1 million transactions" between U.S. users and users in Iran "with an aggregate transaction value of at least $898,618,825." And by Binance's "own estimates, between June 2017 and September 2021, Binance processed over 1,000,000 transactions with an aggregate value in excess of $500 million between U.S. users and users accessing the platform via an Iranian IP address."

258. Binance paired that concealment with affirmative public deception. In a widely promoted March 4, 2022 message, Zhao asserted that "Binance follows international sanction

rules strictly" and that Binance "implements mandatory KYC as part of its onboarding process"—statements that, as Binance's guilty pleas and regulatory settlements confirm, were false when made. Internally, Binance's senior employees "knew of, and joked about, the exchange's growing ranks of Iranian users"; "'IRAN BOYS,' one of them wrote in response to data showing the popularity of Binance … in Iran." Binance and Zhao also "destroyed documents related to illegal conduct." Binance's posture stood in stark contrast to the rest of the industry: by no later than 2019, Apple, GitHub, Amazon Web Services, Google, Slack, and cryptocurrency competitors such as Coinbase had all blocked or exited Iranian users, even against attempted VPN circumvention.

259. These public misrepresentations were Zhao's own. Zhao controlled Binance's social media channels—as he controlled every other important aspect of how Binance operated—and, on information and belief, dictated or otherwise approved the content of Binance's public messaging about compliance. At a minimum, Zhao approved Binance's broader public relations campaign to willfully misrepresent Binance's compliance practices and policies, and Binance and Zhao collaborated to maximize the reach of that messaging: Binance's official social media accounts often directed users to messages that Zhao posted on his own account.

#### d. Zhao and Binance Created and Controlled Binance US to Divert Regulatory Attention From Binance's FTO-Facilitation Activities

260. Binance's active solicitation and onboarding of users in the U.S.—where Binance had no license to do business—began to receive regulatory scrutiny in 2018, when New York opened an investigation into Binance's catering to that state's residents.

261. This prompted Zhao to focus on how Binance could have its cake and eat it by continuing to access and profit from the U.S. market while avoiding the need to comply with U.S. laws, sanctions, and regulations (as well as any associated enforcement actions).

262. One person who Zhao and Binance consulted on this question came up with a possible solution in late 2018 that has been referred to in media sources as the "Tai Chi" strategy, named after a defense-focused martial art. Under this strategy, Binance and Zhao would create a U.S.-based entity—the "Tai Chi" entity, which ultimately became Binance US—that would purport to launch a separate crypto exchange that is operated independently from Binance, fully compliant with all U.S. laws, regulations, and other obligations, and would hold itself out as the sole manner by which any U.S.-based user could transact in the Binance ecosystem.

263. This approach was designed to allow Binance to signal to regulators and otherwise publicly claim that it was completely restricting access by U.S.-based users to its larger non-U.S. platform—who would instead use the U.S. Exchange operated by Binance US—while secretly retaining its largest and most active (*i.e.*, most profitable) U.S. customers on the non-U.S. platform. In the process, the Tai Chi strategy would shift U.S. regulators' attention away from Binance and onto Binance US, as the sole Binance-related entity they were led to believe would be serving U.S. customers (and thus obligated to comply with U.S. laws). This structure aimed to "insulate Binance from legacy and future liabilities" and "retard and resolve built-up enforcement tensions" by making Binance US "the target" of U.S. authorities.

264. Accordingly, the Tai Chi strategy was not principally designed to create an independent and successful U.S.-based exchange platform. Instead, Binance US was conceived from the outset to serve as a tool of deception and misdirection—*i.e.*, a fraud. As Zhao himself framed it, the "goal" was "to reduce the losses to ourselves [*i.e.*, Zhao and Binance]" in terms of retaining valuable U.S. users on the non-U.S. platform, "and at the same time to make the U.S. regulatory authorities not trouble us [*i.e.*, Zhao and Binance]."

265. Despite claiming to have rejected the "Tai Chi" strategy as presented, Zhao and Binance took concrete steps to implement it just a few months later in early 2019.

266. The strategy largely worked as intended until late 2023. Despite U.S. authorities beginning to investigate Binance in 2018 for illegal activity, including the activity described herein, the investigations progressed rather haltingly. Meanwhile, Binance continued growing at breakneck speed while deliberately flouting applicable sanctions and other U.S. laws and regulatory requirements. More importantly, Binance's deliberate evasion of its obligations during that time—including to file SARs and maintain proper AML/CFT practices and controls—allowed terrorists and their financers to use the Binance ecosystem to horrific ends.

267. Not surprisingly, Zhao's and Binance's public proclamations that Binance US was independent were lies. In reality, nearly every material aspect of Binance US's operations was tightly controlled by Zhao and Binance, often in ways that made a mockery of the corporate form.

268. Zhao and Binance abused the corporate form to defraud U.S. regulators and the public, and to perpetuate their scheme for providing financial services to international terrorists and criminals. Indeed, the very formation of Binance US and the launch of the U.S. Exchange was spearheaded by Zhao and Binance to aid their efforts to continue profiting through illegal behavior by deceiving U.S. authorities about Binance's compliance efforts and diverting U.S. authorities' focus from Binance's law-breaking. And the ruse worked for several years, during which time terrorists transacted on Binance's platform and Binance maintained its dominant market position over law-abiding competitors. Binance US was not built to be a successful standalone cryptocurrency exchange business; it was meant to obscure Zhao's and Binance's lawlessness.

269. The fraud perpetrated by Zhao and Binance using Binance US did not end there. As several U.S. regulators determined, Binance and Zhao used entities that Zhao owned to serve as market makers for the U.S. Exchange because Zhao directed Binance US to onboard those entities specifically. One such entity, Sigma Chain AG, deliberately engaged in excessive wash trading to artificially increase the transaction volume reported on the U.S. Exchange to attract new users and raise outside venture capital in Binance US based on deception. Merit Peak Limited, another entity owned by Zhao, regularly moved large sums of money from Binance US's accounts (including customer funds) at Zhao's and Binance's direction and without Binance US's knowledge or permission. Merit Peak often commingled those Binance US customer funds with Binance funds in its own accounts *en route* to transferring the funds to another third party.

270. Binance and Zhao controlled Binance US's bank accounts (and thus Binance US customers' funds) until at least May 2023.

271. Through at least the end of 2022, Binance (at Zhao's direction) maintained custody and control over the U.S. Exchange's crypto assets, including those deposited, held, and traded by Binance US's customers.

272. Through much of 2021, Binance had exclusive control over Binance US's data, and Binance US was not permitted to access any data about the U.S. Exchange without Zhao's personal approval.

273. Binance and Zhao exercised control over even Binance US's routine business expenditures and decisions, such as rent, legal expenses, and even an $11,000 purchase of sweatshirts bearing the Binance logo. Zhao also personally overruled the more consequential

decision made by Binance US's first CEO, Catherine Coley, to not offer trading in Binance's native token (BNB) on the U.S. Exchange.

274. Binance US employees referred to Zhao's and Binance's control of its operations as "shackles" that impeded Binance US employees' ability to run the U.S. exchange. Just over a year into Binance US's existence, Ms. Coley told Binance's CFO that the degree of control exercised by Binance and Zhao over Binance US's operations made her entire team feel "duped into being a puppet." That sentiment persisted for years. Brian Brooks, Binance US's second "CEO"— handpicked by Zhao—resigned just a few months into the job after being overruled on a variety of basic operational decisions. As Brooks later testified: "[W]hat became clear to me at a certain point was [Zhao] was the CEO of [Binance US], not me … All of the things that we had previously agreed and had worked on for 80 days were suddenly repudiated with no further discussion, and on that day, I realized, huh, I'm not actually the one running this company[.]"

#### 4. Defendants Fostered a Sustained Relationship with IRGC-Controlled Cryptocurrency Exchanges

275. Nobitex—Iran's largest cryptocurrency exchange and an IRGC front—was not an arm's-length counterparty but a close, long-term Binance partner. According to Chainalysis, between 2018 and November 2022 Binance "processed Iranian transactions with a value of $8 billion," "some $7.8 billion" of which "flowed between Binance and Iran's largest crypto exchange, Nobitex." *Reuters* reported in 2022 that even after announcing mandatory KYC controls in 2021, Binance processed nearly $1.05 billion in trades directly from Nobitex.

276. Plaintiffs' own analysis of the on-chain record confirms the staggering scale of this channel. A transaction-level dataset of the on-chain transfers between Binance and Nobitex comprises 2,147,606 transactions representing approximately $5.48 billion in value moved between the two exchanges between April 2018 and December 2024, divided nearly evenly by

direction and concentrated overwhelmingly in 2021 and 2022. *See* App. B, Tables B-2, B-3, B-10. At the peak of the Binance-Nobitex relationship (in April of 2021), the analysis shows that Binance processed 223,005 transactions for Nobitex with a combined value exceeding $480 million. Although large, that month was not an outlier: With two exceptions, in every month from the start of 2021 to the end of 2022, Binance processed nine-figure volumes for Nobitex over at least tens (and often hundreds) of thousands of transactions.

277. Such massive volume does not happen by accident. Rather, it bespeaks close coordination and a deep business relationship that required deliberate effort from Binance to sustain. Against that backdrop, any suggestion that Binance did not know Nobitex's character is implausible: Binance publicly represented that its monitoring would "keep an eye on every transaction" and, "in real-time, discover and halt any illicit transactions and transfers," and that it had built "the most sophisticated cyber forensics team on the planet"—yet it processed billions of dollars with a single Iranian exchange that publicly named Binance as its preferred foreign partner and that OFAC has found served the IRGC.

278. In light of Chainalysis's recent public report that the IRGC "has extensively leveraged digital assets to finance its malign activities both domestically and through its network of proxy networks across the Middle East," Binance's multi-year, multi-billion-dollar history of transacting with Nobitex reflects a massive flow of funds from Binance accounts not just to the IRGC but to its regional proxies—including Hizballah, Hamas, PIJ, and Kataib Hizballah. Chainalysis has separately reported that "on-chain analysis has linked Nobitex to a range of illicit actors," including "IRGC-affiliated ransomware operators," "entities tied to … Hamas-affiliated networks," and "sanctioned pro-Hamas media outlet[] Gaza Now," among others.

279. In sum, Binance's relationship with Nobitex was not the passive hosting of transactions that happened to touch an Iranian exchange; it was a knowing, mutual, and sustained commercial partnership that Binance chose to maintain with an exchange it understood to serve the IRGC—a course of dealing that reflected a conscious decision to keep the IRGC's largest cryptocurrency conduit connected, through Binance, to the global financial system from which the IRGC's designations were meant to exclude it. Given the IRGC's control of roughly half of Iran's cryptocurrency market, its monopoly over Iran's sanctions-evasion economy, and the United States' repeated findings that the Iranian regime channels its revenues to the IRGC and to terrorism before any other national priority, Binance's knowing maintenance of the Nobitex channel supplied the IRGC—and, through the IRGC-QF, the proxies that carried out the attacks against Plaintiffs—with a sustained reservoir of funds in the periods preceding those attacks.

280. As noted *supra*, although Nobitex was the largest and most clearly IRGC-linked exchange in Binance's stable of institutional counterparties, it was not the only one. Binance also had significant business relationships with Wallex and Ramzinex, both of which have now been sanctioned by the United States.

**B. There Was a Clear Nexus Between Defendants' Assistance and the Terrorist Attacks That Injured Plaintiffs**

281. Given Defendants' pervasive and systematic course of conduct, the uniquely dangerous nature of the service they were providing, and their knowing and willful acts as detailed above, the law does not require a significant or indeed any nexus between Defendants' assistance and the conduct causing Plaintiffs' injuries. *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 501-02 (2023). Nevertheless, there is a close nexus between Defendants' affirmative and illegal misconduct assisting terrorist organizations and the specific attacks against Plaintiffs.

282. Enabling the IRGC, Hizballah, Hamas, and PIJ to access cryptocurrency and related technology mattered because funding is the operational lifeblood of terrorism. As DOJ has explained, one of the core tenets of American counterterrorism policy is the empirical recognition that "[b]usinesses" like Binance that "provide material support to foreign terrorist organizations place the lives and safety of U.S. citizens at risk" because FTOs that "target U.S. nationals living at home and abroad for terror attacks … often cannot carry out their operations [*i.e.*, attacks] without assistance from foreign companies and financial networks." Accordingly, as senior Treasury official Daniel Glaser testified to Congress in June 2016, "[d]isrupting the flow of funds to terrorists and terrorist organizations has become an integral part of our broader strategy to combat terrorism," because "by employing financial tools, we can degrade the functioning of terrorist organizations and make it harder for them to accomplish their destructive goals." The cryptocurrency Binance moved was no exception. As DIA Director Lieutenant General Scott Berrier confirmed, "[c]ryptocurrency … is one method of how [the IRGC] finance[s] their [] operations," and that activity "certainly threatens our US forces in the region."

283. Aiding and abetting an act of international terrorism through funding can occur either before or after the fact. Before attacks, helping terrorists pay for salaries, weapons, and key equipment aids and abets those attacks by enabling them. Terrorist attacks need recruitment, training, procurement, intelligence-gathering, planning, and logistical and communications resources for execution. All those inputs cost money; at scale—*e.g.*, to carry off a complex mass attack like the October 7 attack, or a series of attacks over time—they cost substantial amounts of money. Accordingly, funds provided to FTOs in the months and even years before attacks are essential to FTOs' ability to plan, authorize, and commit those attacks. The assistance is even

more important when, as here, the funds take the form of money that can move undetected by counterterrorism authorities and be made instantly available anywhere in the world.

284. Government agencies and experts have determined that cryptocurrency was particularly helpful to the IRGC and its proxies, including Hamas, Hizballah, and Kataib Hizballah. In particular, Treasury has found that the IRGC launders its oil proceeds, increasingly through stablecoins, in shadow-banking networks used to "procure weapons and other materiel on the international market" and to fund "domestic weapons development." One such network—the al-Law network—moved more than $100 million in digital assets from Iranian oil sales for the benefit of the IRGC-QF and Iran's Ministry of Defense and Armed Forces Logistics. Those proceeds armed the proxies directly: they fed the IRGC-QF pipeline through which Hizballah and Kataib Hizballah obtained their weapons.

285. Iran and its proxies also used cryptocurrency to pay the operatives who carry out attacks and missions. As alleged above, Kataib Hizballah commander al-Saadi was charged with paying $3,000 in cryptocurrency to a purported cartel operative—in fact an undercover officer—to bomb a synagogue in New York. Iranian intelligence has likewise recruited and paid operatives inside Israel in cryptocurrency to carry out sabotage and intimidation missions, in one 2024 case paying roughly $12,000, which was seized. Cryptocurrency also funded the salaries of terrorist fighters: Hamas pays its fighters monthly stipends of roughly $200 to $300, financed in part by money men who move funds through cryptocurrency.

286. There is a particularly strong connection between cryptocurrency and the IRGC's funding, procurement, and fielding of unmanned aerial vehicles (UAVs), commonly known as drones. These UAVs are at the center of the IRGC's and its proxies' attacks, including those that harmed Plaintiffs. The IRGC-QF maintains a dedicated UAV directorate—Department 8000—

that develops UAVs and supplies them, along with training, to Iranian-aligned militias in Iraq and Syria. Iran increasingly finances that drone enterprise with cryptocurrency. Iran's Ministry of Defense export arm has publicly advertised Shahed attack drones (along with ballistic missiles and warships) for sale to foreign governments with cryptocurrency accepted as payment, expressly assuring buyers that sanctions would not prevent the contracts from being executed. Blockchain analysis has separately traced payments for drone components from a wallet funded, directly and indirectly, by Nobitex, by IRGC-controlled wallets, and by a U.S.-designated Iranian cryptocurrency facilitator. The cryptocurrency that funded this drone apparatus moved through the very Iranian exchanges and facilitators whose transactions Binance processed. Those Iranian UAVs were the weapons used in the attacks on U.S. forces in Iraq and Syria that injured Plaintiffs. Seven of the attacks pleaded here were committed by Kataib Hizballah and by joint Hizballah/Kataib Hizballah cells operating under IRGC-QF direction, using drones supplied by the IRGC's drone apparatus.

287. Assistance after attacks includes martyr payments made to the perpetrators' families, disability payments made to wounded terrorists, bounty payments paid as rewards for successful attacks, and propaganda to spread word of the attack and increase its impact politically and with potential donors. The IRGC and its proxies likewise used cryptocurrency to pay operatives and to make the bounty, martyr, and disability payments that reward and incentivize attacks. These post-attack expenses provided critical incentives to conduct the attacks in the first instance, and are as important and culpable as pre-attack support. The IRGC's proxies also used cryptocurrency to reap financial rewards from attacks in the form of increased donations. For example, as terrorism scholar Martin Gallagher documented in his 2024 book

*Terror For Profit*, IRGC-trained Hamas "saw a spike in [crypto]currency flow after every successful attack it mounted."

288. In this Part, for each attack at issue, the complaint identifies the most important wallet holders through which Binance processed the relevant FTO-affiliated transactions, the nature of those holders' connections to the FTO, what was publicly known about those links at the time of each transaction and how Binance's own compliance infrastructure would have surfaced that knowledge, the designation status of each holder, the specific transaction dates and amounts, and the relationship between those transactions and the attacks at issue.

289. A note on methodology applies throughout. Plaintiffs' blockchain analysis, conducted by independent experts, is limited to publicly traceable on-chain transactions recorded on a public blockchain, and is preliminary, ongoing, and subject to revision at the time expert disclosures will be due in this case. But a substantial volume of activity on centralized exchanges like Binance is processed off-chain, recorded only on the exchange's internal ledgers and invisible to outside analysis. The transaction figures in this section are therefore a conservative floor; the true volume of FTO-affiliated transactions on the Binance exchange, visible only to Binance, is substantially higher.

290. Plaintiffs allege that Binance knowingly processed a significant number of additional Hamas-, PIJ-, IRGC-, and Hizballah-affiliated transactions with a close nexus to the attacks discussed in Part V, beyond those transactions described below, given the pervasive nature of Binance's assistance and the fact that so many transactions were processed off-chain (and thus cannot be identifiable until discovery).

### 1. Defendants' Assistance to Hamas and PIJ Substantially Assisted Their Attacks

291. The first set of ten attacks that injured Plaintiffs, described below in Part V.A, were committed, planned, or authorized by Hamas and/or PIJ. Throughout the period in which those attacks were planned and carried out, Binance knowingly processed transactions with a discrete, identified set of Hamas and PIJ financial actors—organizational fundraising wallets, an identified PIJ network, and three Hamas/PIJ money-transmission intermediaries since designated as terrorist or terrorist-financing entities by the United States or Israel (BuyCash, Gaza Now, and the Dubai Company for Exchange). Binance did so with knowledge of those actors' terrorist character and after repeated, specific notice, while suppressing the legally required reporting that would have disrupted them.

#### a. Binance Processed Transactions Through a Discrete, Identified Set of Hamas and PIJ Financial Actors

292. The Hamas and PIJ wallets discussed below were not anonymous wallets indistinguishable from ordinary customer traffic. Each actor identified below was in fact a component of the Hamas or PIJ financial apparatus—a fact since confirmed by U.S. or Israeli terrorist designations and enforcement actions. The Hamas or PIJ character of each was knowable, and in several instances specifically known, to Binance at the time it processed the transactions, through contemporaneous public reporting, Israeli counter-terror-financing seizures, and Binance's own customer, transaction, and compliance records. Binance's culpable knowledge did not depend on any government designation; each actor's Hamas or PIJ character was identifiable before it appeared on any public list. Where a designation did precede Binance's dealing, Binance transacted after it anyway: it processed transactions with Dubai Company for Exchange wallets after that entity's 2022 Israeli terrorist-organization designation, and with

BuyCash wallets after that entity's 2023 OFAC designation. Each actor transacted across identified Binance accounts and deposit addresses.

293. The complete transaction-level record—wallet addresses, dates, amounts, and direction for every transaction—was compiled from public blockchain data; illustrative transactions are set forth, by actor, in Appendix A. Each of these actors is described below.

**(1) The al-Qassam Brigades and Hamas fundraising wallets**

294. Beginning in early 2019, Hamas's terrorist operations wing, the Izz al-Din al-Qassam Brigades, launched a public cryptocurrency fundraising campaign, declaring on social media and its official websites that the funds were for its terrorist operations and itself generating and publishing the donor wallet addresses. The campaign's Hamas character was publicly declared by Hamas itself; and the United States confirmed it through enforcement action, seizing 150 cryptocurrency accounts associated with the campaign in 2020.

295. Hamas's use of cryptocurrency did not end with that campaign. Plaintiffs' blockchain analysis identifies at least $29.5 million in transactions between Binance and identified Hamas wallets across 9,300 transactions from 2018 through 2025. Of those transactions, 2,886 occurred after the counterparty wallet had been placed on an Israeli or U.S. sanctions list. More transactions on those wallets moved out from Binance to the Hamas wallets (5,412) than into Binance from them (3,888).

**(2) The PIJ network**

296. FinCEN's investigation identified dozens of Binance users transacting tens of millions of dollars with an identified PIJ network, on which Binance filed no SARs. FinCEN Consent Order No. 2023-04, at 47–48 (Nov. 21, 2023). These were PIJ's own users and wallets. Their PIJ character did not depend on any government designation: it was identifiable to Binance throughout from the identity-linked customer and transaction data Binance held and was legally

obligated to monitor—the same on-chain and account data from which FinCEN's investigators and Plaintiffs' expert identified the network, *see infra* Part III.B.3—supporting the inference that Binance either identified these users as PIJ or deliberately avoided doing so.

297. Plaintiffs' blockchain analysis confirms and quantifies the network: at least $59.5 million across 89,054 transactions between Binance and PIJ-attributed wallets, including recurring transfers of approximately $200,000 in 2022 (for example, $201,937 on November 22, 2022 and $200,214 on December 20, 2022; *see* App. A, Table A-6). Israel's NBCTF later confirmed the wallets' PIJ character, listing them as PIJ property on July 4, 2023. Binance continued to process transfers to and from those listed wallets even after that designation—the last on September 30, 2023, one week before the October 7 attack.

**(3) BuyCash—a U.S.-designated Hamas and PIJ money transmitter**

298. The Buy Cash Money and Money Transfer Company is a Gaza-based money-transmission and cryptocurrency business owned by and operated by Ahmed Alaqad. OFAC designated BuyCash and Alaqad as SDGTs on October 18, 2023, stating that BuyCash was "Linked To: HAMAS." Then, in 2025, a civil forfeiture complaint (first filed April 26, 2024) was unsealed in *United States v. Nine Cryptocurrency Wallets Held by Tether Limited and Seven Cryptocurrency Wallets Held by Binance Holdings Ltd.*, No. 24-cv-01251-RDM (D.D.C.), confirming that "BuyCash and Alaqad have had strong links to Hamas and other FTOs for years prior to their OFAC designations, and received the equivalent of millions of dollars in crypto-currency transfers in support of these organization's illicit activities." The complaint sought forfeiture of seven Binance accounts "as foreign assets of Hamas."[5]

[5] The Binance account-level detail in this section is drawn from the United States' forfeiture complaint.

299. BuyCash is the largest single Hamas/PIJ financial actor on the Binance exchange: Plaintiffs' analysis identifies at least $358.3 million in transactions between Binance and BuyCash-attributed wallets across 20,352 transactions from December 2017 through October 2025, including recurring six-figure transfers in both directions—for example, a $699,704 deposit to Binance on August 3, 2023. *See* App. A, Tables A-1, A-7. Nominis, a cutting-edge blockchain intelligence firm, summarized this succinctly: "The evidence paints a clear and unmistakable picture: **Buy Cash = Hamas = Terror Financing**." *Crypto Terror Financing Misconceptions: Understanding the True Scale,* Nominis Insights, Nov. 27, 2025, https://www.nominis.io/insights/crypto-terror-financing-misconceptions.

300. Alaqad—who, like his company, is based in Gaza—had been known as a Hamas financial operative long before he and BuyCash were officially designated in the wake of the October 7, 2023 attack.[6] In 2019, Alaqad personally conducted at least five cryptocurrency transactions on behalf of Hamas—which the research underlying this complaint has independently located and verified. Binance's records include a transaction attributed to this fundraising activity: a BuyCash deposit of $14,425 on March 24, 2019 (App. A, Table A-7). An OFAC-sanctioned address in the BuyCash network ("Address-6WW") had been identified as early as September 2019 as a conduit for funds from Al-Qaeda-affiliated sources; that same address appears in the blockchain record underlying the BuyCash transaction analysis, showing that this wallet address was used to transfer money to and from BuyCash's Binance accounts.

301. An even clearer pre-designation marker of BuyCash's terrorist character came in June 2021, when the NBCTF issued an administrative seizure order freezing BuyCash's Binance

[6] BuyCash was also linked to Islamic State financial activity in 2017, and in 2019, sanctioned Bitcoin wallets connected to the BuyCash network received funds from al-Qaeda operatives.

accounts as Hamas-affiliated property. Binance was required to—and did—halt those accounts in response. Because Binance itself executed the freeze, there is no question that Binance and Zhao, its highly engaged founder and CEO, were aware of BuyCash's and Alaqad's involvement with Hamas and its financial apparatus. Nominis concluded based on a review of Alaqad's and BuyCash's observable activity that Alaqad's "actions link Buy Cash to the financial infrastructure of Hamas with clarity that leaves no plausible alternative explanation."

302. As blockchain intelligence firm Nominis concluded: "The cumulative evidence establishes that Buy Cash is not a passive vector exploited by terrorists … Buy Cash is an integrated component of the financial architecture that supports Hamas. Its systems, personnel, and wallets form a deliberate network created to move money covertly in support of designated terrorist organizations. The line between Buy Cash and terror financing is not blurred. It is direct, explicit, and repeatedly demonstrated in transactional behavior and representative action."

303. BuyCash operated on Binance through at least seven interlinked accounts. BuyCash's own website, buy-cash.com, listed *buycash0@gmail.com* as the company's official contact address. Binance's records show this same address was used to register Binance Account ***1098, held in the name of Ahmed Y.A. Abughali, who was involved in BuyCash's highest terrorist-finance-risk transactions while simultaneously operating a public Telegram channel advertising BuyCash's cryptocurrency exchange services. Account ***0091 was associated with the telephone number BuyCash publicly advertised as its business contact; Accounts ***1098 and ***0091 shared device fingerprints, establishing their common control. Account ***6631, registered to Suha Alaqad, was linked through email-chain analysis to the foregoing accounts and accessed from the Gaza Strip. Account ***0638 was also accessed from the Gaza Strip by the same device as Account ***6631. Two additional accounts—***9222 and ***6855—were

accessed from locations consistent with a coordinated network, including the West Bank and Turkey (where other accounts in the network were accessed). Account ***0256 was accessed from Cairo. The United States' forfeiture complaint identifies additional BuyCash Binance accounts that transacted in smaller amounts.

304. Account No. ***1098 was BuyCash's earliest and longest-running Binance account. Registered to Abughali with the *buycash0@gmail.com* address, it was active from at least April 2018 through January 2022, during which BuyCash used U.S. correspondent banks to convert USDT to dollars. This account transacted with Address-6WW, which was designated by OFAC in 2019. The United States' forfeiture complaint alleged that between April 14, 2018 and January 10, 2022, this Binance account received approximately $145,680 from Address-6WW.

305. Account No. ***0091 succeeded Account ***1098 as the primary operating account, active from at least January 2022 through June 2023. It received funds via Address-nVF—a Tron-network address that executed approximately 28,751 transactions totaling approximately $396 million from November 2021 onward, controlled using the *buycash0@gmail.com* credentials. Account ***0091 also received funds via Address-WGy through at least September 2023; proceeds were converted to U.S. dollars through U.S. correspondent banks. Shared device fingerprints link Accounts ***0091 and ***1098, establishing common control.

306. Account No. ***6631, registered to Suha Alaqad, a member of Alaqad's family, formed a third node in the BuyCash network. Its registration email, sahaomer1980@gmail.com, was forensically linked by shared device and IP data to both *buycash.com@gmail.com* and *buycash0@gmail.com*, the BuyCash public business address. This account was accessed from

the Gaza Strip as recently as August 29, 2023, which placed its operator in Gaza shortly before the October 7, 2023 attack.

307. Address-nVF served as BuyCash's primary high-volume on-chain conduit. From November 5, 2021 onward, the address executed approximately 28,751 transactions totaling approximately $396 million—a volume wholly inconsistent with any legitimate retail money-transmission business profile, and a profile that Binance's own transaction monitoring was capable of detecting in real time.

308. Two additional accounts served as staging and disbursement nodes. Account ***4744 received approximately $23 million collectively from Address-nVF (November 2022 through June 2023) and Address-WGy (July through October 2023), functioning as an intermediate consolidation point. Account ***7294 was active in the period immediately surrounding October 7, 2023, having received multiple large disbursements from Binance in the days before and after the attack, as detailed below.

309. BuyCash's Binance relationship supported PIJ as well as Hamas. Address-t5t, a BuyCash-attributed address, sent $529,300 to a PIJ-affiliated wallet (Address-foQF) in transactions between March 5, 2022 and April 18, 2023—and received $350,500 from the same address. This bidirectional flow between BuyCash and a PIJ-attributed wallet establishes BuyCash as a financing node serving both Hamas and PIJ simultaneously, and implicates Binance in facilitating fund flows to both organizations through the same counterparty relationship.

310. BuyCash's Binance accounts displayed, in combination, the full constellation of red flags that Binance's own compliance manuals, FinCEN guidance, and FATF recommendations identified as markers of terrorist financing through a virtual asset service

provider: (a) a Gaza-based operator conducting high-frequency, high-volume cryptocurrency transactions through a retail-branded money transmitter; (b) explicit use of Binance's platform by an entity publicly marketing itself as a cryptocurrency exchanger under its own brand name; (c) transaction volumes and counterparty structures inconsistent with legitimate retail remittance; (d) receipt of funds from sanctioned counterparties; and (e) coordinated multi-account control through shared device fingerprints and email chains traceable to a single operator.

311. Binance's records establish that BuyCash accounts were accessed from the Gaza Strip on multiple occasions: Account ***0638 on December 30, 2022; Account ***6631 on August 29, 2023. Other accounts in the BuyCash network were accessed from the West Bank and Turkey (Accounts ***9222 and ***6855) and from Cairo (Account ***0256, November 16, 2023—the same date a post-designation disbursement was recorded). Gaza-origin cryptocurrency transactions are, on their face, among the highest-risk indicators in FinCEN's published guidance on Hamas cryptocurrency financing. This makes good sense given Hamas's monopoly over administrative and economic functions in the territory.

312. The shared-device and coordinated-access patterns across BuyCash's accounts provided independent confirmation that these were not unrelated retail customers. A compliance program exercising reasonable diligence would have identified these patterns and linked the accounts to a single controlled network.

313. The receipt (to Address-WGy) of 110,000 USDT from Russian cryptocurrency exchange Garantex on July 3, 2023—more than a year after Garantex was designated by OFAC on April 5, 2022 for facilitating ransomware and darknet market transactions—constituted an independent sanctions-exposure red flag. A deposit from Garantex to a Gaza-based cryptocurrency operator's account is the kind of transaction for which SARs are required and

account freezes are mandated under applicable BSA/AML rules. Binance did neither. Instead, Binance continued to process multiple transactions from Address-WGy to other BuyCash-linked accounts.

314. Finally, the sheer volume of Address-nVF's activity, described above, is inconsistent with any legitimate remittance use case. FATF's guidance for virtual asset service providers, applicable throughout this period, expressly identifies volume-inconsistency as a primary indicator requiring enhanced due diligence.

315. Binance refused to file a single SAR in connection with any of its transactions with BuyCash. That refusal was willful. FinCEN's 2023 Consent Order specifically identifies BuyCash as an entity for which Binance did not file required SARs—despite its status as a high-volume Gaza-based cryptocurrency business transacting in amounts far exceeding any plausible retail remittance profile. The Consent Order states that Binance was aware of BuyCash's connection to terrorism financing before the October 2023 designation.

316. In the 10 weeks leading up to the attack on October 7, 2023, Binance processed over $21 million in transactions for BuyCash—a flurry of suspicious activity that has a clear and unmistakable link to the subsequent massacre. In the wake of that attack, on October 18, 2023, OFAC designated BuyCash for its role in supporting Hamas.

317. The OFAC designation of BuyCash as an SDGT on October 18, 2023 easily should have ended Binance's willingness to transact with BuyCash on its exchange. But it did not. In the period following the designation, Binance processed 672 transactions with BuyCash-attributed addresses totaling $15.89 million.

318. Several of these post-designation transfers were significant. Binance disbursed $318,248 to BuyCash on November 4, 2023—two days before the November 6 stabbing attack

that killed and/or injured the Plaintiff members of the Lubin family—followed by $240,242 on the date of that attack. Binance then disbursed $298,704 to BuyCash on November 16, 2023—eight days after the November 8 complex attack that killed and/or injured the Plaintiff members of the Margulies family, and less than a month before the December 10 attack that killed and/or injured the Plaintiff members of the Zenilman family. Binance also disbursed $242,522 to BuyCash on November 14, 2023. *See* App. A, Table A-7.

319. Binance's continued processing of BuyCash transactions after designation is not explained by settlement lag or automated processing delays. Account ***7294—the designated-period disbursement node—received the above transfers through a deliberate series of individual transactions on successive dates in October and November 2023. Address-Zwm2, used to move funds in this period, was not frozen until November 16, 2023. Binance therefore processed disbursements to BuyCash for nearly a month after the OFAC designation and 10 days after the attack on Rose Lubin. Binance's assistance did not stop at designation, or even at its own guilty plea.

320. In sum, Binance's relationship with BuyCash represents the precise conduct that FinCEN, OFAC, and FATF warned against throughout the relevant period: sustained, high-volume provision of cryptocurrency processing services to a Gaza-based entity that was publicly identified, forensically linkable, and ultimately government-designated as a mission-critical financial vehicle of Hamas. Binance processed hundreds of millions of dollars in BuyCash transactions, filed zero SARs, and continued dealing with BuyCash after both the June 2021 NBCTF seizure and the October 2023 OFAC designation—including specific six-figure disbursements made in the days of and surrounding Hamas attacks during an active terrorist campaign in Israel. This is not a case of a terrorist evading detection; it is a case of a rogue

financial institution that actively evaded its regulatory obligations after "see[ing] the bad but [] clos[ing] 2 eyes."

#### (4) Dubai Company for Exchange and Other Gaza-Based Exchanges

321. **Dubai Company for Exchange.** Binance also facilitated transactions for multiple currency exchange businesses in Gaza. The largest of these was the Dubai Company for Exchange ("DCE"). In the words of NBCTF's March 7, 2022 designation of DCE as a terrorist organization, the company had "for years constituted a significant part of Hamas' economic infrastructure for laundering and transferring capital" from overseas sources into Hamas and PIJ operating accounts in Gaza and the West Bank to the tune of tens of millions of dollars.

322. Israel designated DCE a terrorist organization on March 7, 2022; DCE thereafter renamed itself "el-Kahira" to evade the designation. NBCTF listed the same Binance account across successive seizure orders (first on December 29, 2021, then in mid-2022, on April 21, 2023, and in January 2025), and DCE-attributed wallets transacted directly into identified Binance deposit addresses ("Binance Hot 7" and "Binance 14"). Those orders put Binance on specific notice as early as December 2021 of that account's involvement with Hamas terrorist finance; the seizures were later confirmed in public reporting, when *Reuters* reported in May 2023 that Israel had seized roughly 190 Binance accounts owned by three Gaza-based currency-exchange firms—including DCE—that it had designated as terrorist organizations for transferring funds for Hamas. Binance's continued dealing with DCE after its designation was vast: Plaintiffs' analysis identifies 6,719 transactions worth $50.89 million between Binance and DCE-attributed wallets after the March 7, 2022 Israeli terrorist-organization designation—essentially the entire DCE relationship (6,719 of 6,818 transactions)—continuing through June 2025, with $48.97 million of that volume occurring after October 7, 2023, including a $259,854 transfer to Binance on April 25, 2024. *See* App. A, Tables A-1, A-9.

323. Notwithstanding its name, DCE has no relationship with Dubai or with the United Arab Emirates; rather, it has at all times been based in the Gaza Strip, where it has operated a currency exchange and money service business for the benefit of Hamas. In addition to its currency conversion and remittance services, DCE also provided Hamas and PIJ with cryptocurrency services, including the ability to convert various crypto tokens into fiat currency and vice versa. To provide those services, DCE maintained a large number of cryptocurrency accounts on the Binance exchange, which it used to "transfer[] funds intended for terrorism."

324. Indeed, DCE was so instrumental to Hamas's terrorist ground game that IDF targeted it in counterterrorist operations and struck it in May 2025 as part of ongoing efforts to dismantle Hamas's financial infrastructure. IDF had previously targeted and killed one of DCE's employees, Tahseen Al-Nadiyya, in August 2024 for the key role he allegedly played in funding Hamas's terrorist operations.

325. On December 29, 2021, the NBCTF issued Administrative Seizure Order ("ASO") 79/21 targeting cryptocurrency accounts held by Al Mutahadun for Exchange—one of three Gaza-based currency firms that Israeli authorities treated as an interconnected Hamas financial network. Binance account ***1443—the same account that would later be identified as belonging to Khader Dan in the DCE-specific seizure order—was among the 47 accounts listed and targeted in ASO 79/21. The presence of a single Binance account number across two Israeli seizure orders (the 2021 Al Mutahadun order and the 2022 DCE order) confirms the integrated nature of the Hamas Gaza exchange network and establishes that Binance account ***1443 had been government-identified as a terrorism-finance vehicle at least two months before DCE's formal designation as a terrorist organization in its own right.

326. On March 7, 2022, Israel's Ministry of Defense issued Designation of Terrorist Organization #377, formally designating DCE as a terrorist organization. The NBCTF simultaneously issued Administrative Seizure Order 15/22, which listed Binance user account ***1443 (identified as held by Khader Dan a/k/a Elden) and 47 associated cryptocurrency wallet addresses—including one Ethereum address and 46 Tron network addresses—for immediate seizure. Binance was specified as the account-holding institution.

327. Shortly after the March 2022 Israeli designation, DCE renamed itself "el-Kahira" (also styled "al-Cairo" and "al-Cairo for General Trading")—a transparent and amateur sanctions-evasion technique. The *Jerusalem Post* reported in May 2025 that "originally operating under the name 'Dubai,' the office was renamed 'Al-Cairo' in 2022 after being designated by the Israeli Defense Ministry as aiding terrorist organizations." The rename changed the corporate identity while preserving the same Gaza location, the same ownership (Khader Dan), the same Binance account (***1443), and the same operational purpose: channeling funds to Hamas and PIJ. Despite this transparent rename, wallet addresses associated with DCE/el-Kahira continued transacting with Binance, including multiple Tron network addresses that last transacted directly into the "Binance Hot 7" Binance deposit address (***hSCf) as recently as October 2025, well after the January 2025 seizure order that explicitly named el-Kahira.

328. Israeli enforcement actions against DCE Binance accounts continued into 2023 and 2025. On April 21, 2023, the NBCTF issued Administrative Seizure Order 19/23, targeting over 70 Binance accounts tied to Al Mutahadun, DCE, and Al Wefaq—the same three firms *Reuters* had reported on in the same month. On January 26, 2025, more than a year after Binance had pleaded guilty and paid over $4 billion in criminal and regulatory penalties, the NBCTF issued Administrative Seizure Order 1/25, again targeting dozens of Binance accounts connected

to DCE, this time listing the entity explicitly by its renamed identity, "el-Kahira for General Trading." The 2025 seizure order confirms that DCE/el-Kahira accounts remained operational on Binance more than two years after the designation and more than a year after Binance's guilty plea.

329. Even apart from the government seizure orders and the hastily executed renaming of DCE's business, Binance had undeniable public notice of DCE's inextricable connection to Hamas by May 2023. On May 5, 2023, *Reuters* published an exclusive report stating that Israel had seized approximately 190 Binance accounts from three Hamas-designated Gaza currency firms, explicitly identifying DCE among them. The *Reuters* report further noted that Binance had received information about Hamas's cryptocurrency activity as early as 2019. A compliance program exercising reasonable diligence would have identified DCE as a designated counterparty from the combination of: (a) ASO 79/21 and ASO 15/22, each of which named Binance account ***1443 specifically; (b) the March 2022 public Israeli designation; and (c) the May 2023 *Reuters* reporting that explicitly named Binance and DCE together.

330. Because Israeli authorities named Binance account ***1443 by its specific account number—not merely by a wallet address—in successive seizure orders, Binance had individualized, account-specific notice of DCE's terrorist character. But there were multiple other factors known to Binance requiring the filing of a SAR: (a) a Gaza-based currency exchange conducting high-frequency, high-volume USDT transactions on the Tron network; (b) post-designation continuation of the relationship through a corporate rename; (c) receipt from and transfers to sanctioned Russian cryptocurrency exchange Garantex worth millions of dollars in USDT; and (d) direct wallet-to-deposit-address routing that established Binance's own transaction records as the primary evidence of the DCE relationship. Under applicable

BSA/AML rules, any one of these indicators required enhanced due diligence; in combination, they required SAR filings, account suspension, and compliance escalation. Binance did none of these things.

331. The defining structural characteristic of Binance's DCE relationship is that it was overwhelmingly a post-designation relationship. Of the 6,818 total transactions Plaintiffs' analysis identifies between Binance and DCE-attributed wallets, 6,719—98.5%—occurred after the March 7, 2022 Israeli designation. The total post-designation value is $50.89 million. Binance disbursed outward—to DCE's own wallets—in 4,985 of those 6,818 transactions, making Binance not merely a passive recipient but an active outbound transferor to DCE and by extension Hamas. Of the $50.89 million in post-designation volume, $48.97 million occurred after October 7, 2023—meaning Binance's assistance to a government-designated Hamas financier not only persisted through the October 7 massacre but accelerated in its aftermath. *See* App. A, Tables A-1, A-9.

332. Independent blockchain forensic analysis confirms the scale of Binance's continued DCE exposure after its own criminal guilty plea. A February 2025 report by blockchain intelligence firm Global Ledger—distributed by crypto.news—found that between January 1, 2024 and February 13, 2025 alone, Binance received approximately $46.9 million in USDT on the Tron network from DCE/el-Kahira-attributed wallets. This figure represents the largest share of a total approximately $78 million flow from DCE/el-Kahira to four major cryptocurrency exchanges in that period. The Global Ledger report also found that DCE/el-Kahira had processed over $155 million in USDT before Israeli enforcement actions took effect. The 2024 figure—$46.9 million flowing to Binance after Binance's November 2023

criminal guilty plea—lays bare Binance's culpability in connection with the substantial assistance it provided to a designated terrorist organization/financier.

333. The blockchain-level evidence of DCE's Binance routing is direct and specific. The Ethereum wallet associated with DCE under ASO 15/22 (***ffd3) last transacted on August 15, 2023—into "Binance 14" (***1d60), a publicly identified Binance deposit address. Multiple Tron network wallets listed in ASO 15/22 transacted directly into "Binance Hot 7" (***hSCf), a publicly identified Binance deposit address, through (at least) late 2025. These direct wallet-to-Binance-deposit-address flows establish that Binance's transaction records would have shown the DCE-attributed wallets as the funding source. Unlike activity routed through intermediaries, these are direct transfers: DCE wallets named in Israeli government orders sending funds directly into Binance's own deposit infrastructure (and vice versa).

334. Binance's provision of financial services to DCE/el-Kahira represents conscious and culpable assistance to Hamas's attacks at issue in this case. The Israeli government expressly identified DCE's specific account number with Binance in a formal seizure order in December 2021, named it again in a formal terrorist organization designation and seizure order in March 2022, named it yet again in a supplemental seizure order in April 2023, and named the same entity (by its new name) in a further seizure order in January 2025. *Reuters* publicly reported the Binance/DCE connection in May 2023. Through all of it, Binance processed at least 6,719 "on-chain" transactions worth $50.89 million with DCE-attributed wallets—almost certainly involving a substantial additional number of "off-chain" transactions recorded only on Binance's internal ledger—including $48.97 million after the October 7 attack and $46.9 million after Binance's own criminal guilty plea. This is a relationship Binance knew about, was told about by

governments and press multiple times, and did nothing to slow or stop DCE's transactions—even while Hamas was engaged in a public and brutal terrorist campaign throughout Israel.

335. In addition to its robust relationship with DCE, Binance facilitated transactions for smaller Hamas-dominated cryptocurrency exchanges based in Gaza. As a baseline, as FinCEN has recognized, any substantial transaction involving a Gaza-based cryptocurrency exchange raises red flags for being controlled by or otherwise involving Hamas. Hamas dominates local economic activity, while innocent Gazans lack the means to use cryptocurrency freely to conduct substantial economic transactions. "Israeli intelligence … beyond blockchain analysis" has thus confirmed that during the relevant period "a significant portion of the funds received by the Gazan exchanges were for Hamas," according to the *Wall Street Journal*.

336. **Al Mutahadun for Exchange and the Shamlakh Network.** Al Mutahadun for Exchange (n/k/a Al Markaziya) was a Gaza-based money exchange that was part of a broader Hamas funding network operated by the Shamlakh family. In recent years, Shamlakh network entities have been "the main end point for funds transferred from the IRGC-QF to Hamas and PIJ in Gaza," which OFAC emphasized in its January 2024 designation of several Shamlakh network members. Even before that designation, the Israeli government had repeatedly identified Al Mutahadun and Shamlakh family members as responsible for "facilitating the transfer of tens of millions of dollars to Hamas annually, specifically to the military wing of the organization." The Israeli government also explained those funds "originate from Iran and are given as part of the framework of assistance granted by the Iranian Revolutionary Guards – Quds Force to terrorist[s]." Israel formally designated Al Mutahadun in May 2021.

337. Binance empowered the Shamlakh network. As confirmed and reiterated across several NBCTF seizure orders over 2021 to 2024, the Shamlakh network—including individuals

and entities like Al Mutahadun—controlled and operated nearly 200 Binance user accounts. In connection with a February 2022 seizure order, for example, the Israeli Ministry of Defense announced, "[t]he Shamlach family, through the currency exchange companies it owns"—including "the Al'matchadun currency exchange company"—"assists the Hamas terror organization, particularly its military arm, by transferring funds in scopes of dozens of million dollars annually."

338. Certain Shamlakh-held Binance accounts bore obvious red flags of the holder's identity, guaranteeing that Binance knew or should have known about these accounts' connection to the Hamas-supporting Shamlakh network. For example, Binance account ***3593 was held in the name of "Ahmad Shamallakh." Ahmad is a confirmed member of the Shamlakh family; was an "owner[] or director[]" of Al Mutahadun; and was a "key player[] in the financial flow from Iran to Hamas and PIJ using" that exchange, according to Treasury's January 2024 announcement in which he and other Shamlakh family members were designated (OFAC transliterated his name to "Ahmed"). Further, Binance account ***5910 was held in the name of "Mohammed Shamalach," using the email address "shamalakhmohammed@gmail.com," and it was seized by NBCTF in January 2023. And Binance user account ***9428 was held in the name of "Mohammed Shamalakh," using the email address "shamalakhhany@gmail.com"; it was seized by NBCTF in April 2023.

339. This sequence of events is highly revealing. The Shamlakh family, whose network had been designated by Israel for supporting Hamas, was signing up for Binance accounts using their real names and gmail addresses containing their last name. Most strikingly, when Mohammad Shamlakh's Binance account was seized in 2023, he came back and used the

same name, spelled slightly differently, for a different Binance account. The Shamlakhs were not even *trying* to hide from Binance.

340. Despite these designations and red flags, between January 2022 and March 2023, Binance enabled the Shamlakh network—via the Al Mutahadun cryptocurrency exchange—to conduct at least 177 cryptocurrency transactions valued at $690,394. Notably, these figures reflect only on-chain interactions between identified Al Mutahadun cryptocurrency wallets and Binance. These figures do not reflect internal, off-chain Binance activity of the nearly 200 identified Al Mutahadun and Shamlakh network Binance user accounts—which discovery will likely reveal to be substantial.[7]

341. **Herzallah Exchange and General Trading Company.** Herzallah is a Gaza-based money exchange company. The United States sanctioned Herzallah on January 22, 2024 as a money exchange that Hamas had "directly co-opted and utilized" to facilitate transactions—including "through the use of cryptocurrencies"—that enabled Hamas's attacks. Herzallah was "a primary money launderer for Hamas," according to Treasury. Herzallah was also designated for helping PIJ launder money. Israel similarly designated Herzallah on April 15, 2024, for

[7] Plaintiffs' analysis of these Al Mutahadun transactions relies on an NBCTF order that involved the seizure of a cluster of wallets held by Al Mutahadun, DCE, and Al Wefaq Company for Exchange—each of which are Hamas-controlled Gaza cryptocurrency exchanges. NBCTF attributed most seized wallets to the three exchanges and attributed one of the remaining two wallets specifically to Mohammed Shamlakh. Based on Plaintiffs' research, and to avoid double-counting in their transaction analysis, Plaintiffs have attributed wallets in this NBCTF order exclusively to Al Mutahadun. This is appropriate for two reasons. First, Al Mutahadun has held itself out as the "Central Exchange" or "United Exchange" Company of Gaza, consistent with the Shamlakh network's role managing Hamas's global currency flows. Second, Al Mutahadun dominated the cluster's identified Binance presence. Regardless, even if a given wallet were technically attributed to another Gaza cryptocurrency exchange (either DCE or Al Wefaq), the ultimate analysis is the same: each of these three exchanges has been designated by OFAC, NBCTF, or both for pervasively supporting Hamas's and PIJ's terrorism—including via providing transfers of cryptocurrency from the IRGC—and Binance knowingly enabled their ability to move vast sums of cryptocurrency for Hamas and PIJ.

"assist[ing] the terrorist organizations Hamas and PIJ in transferring funds to finance their activities," including by "transferr[ing] tens of millions of dollars" to these groups. Despite this designation and other red flags, between April 2025 and June 2025, Binance enabled Herzallah to conduct at least 168 cryptocurrency transactions valued at approximately $1,059,280.

342. **Hamasat Company for Exchange and Money Transfers.** Hamasat (also transliterated as "Hamsat") is a Gaza-based money exchange company. Israel designated Hamasat on September 9, 2024, for operating on an "ongoing basis" to "assist the designated terrorist organization HAMAS in a manner that makes a substantial contribution to its operations." Israel's IDF confirmed in 2023 that Hamasat was used to transfer "funds to Hamas' military wing," and Hamas used those funds to pay terrorists' salaries and finance Hamas's terrorism. Despite this designation and other red flags, between May 2025 and June 2025, Binance enabled Hamasat to conduct at least 45 cryptocurrency transactions valued at approximately $522,022.

343. Hamas and the IRGC used the same techniques to finance attacks in the West Bank. Israeli security officials have documented a terrorism-financing route by which Iranian money reaches West Bank operatives through money changers and cryptocurrency—"digital means, almost without control from regulators"—and is used to purchase weapons and to fund attacks. As a senior Israeli security official explained, that money "allowed the Palestinians to move from knife terrorism to pistol and rifle terrorism" and "enabled the large-scale trade in weapons in the West Bank," including smuggled "ammunition, pistols, rifles, explosive devices and military equipment." In August 2023, Israel's Ministry of Defense issued administrative seizure orders—including ASO 38/23—freezing approximately 1.2 million shekels held by

money changers who moved these funds, and Hamas's West Bank branch has claimed responsibility for shooting attacks financed through this route.

344. Binance's transactions for Herzallah and Hamasat occurred after the attacks in this case, and Plaintiffs do not rely on them to establish substantial assistance. However, these transactions are highly relevant to Binance's scienter. The fact that Binance facilitated these transfers after the sanctions and designations, during the long-running terrorist campaign that commenced on October 7, and after Binance's historic guilty plea, permits the reasonable inference that Binance facilitated the transactions—and similar Hamas and PIJ terrorist-supporting transactions that preceded them—knowingly.

**(5) Gaza Now—a U.S.- and U.K.-designated Hamas/PIJ fundraising network**

345. Gaza Now, a Gaza-based Hamas and PIJ fundraising network founded and directed by Mustafa Ayyash, solicited cryptocurrency donations that were siloed to flow specifically to enable attacks by Hamas and PIJ. Its support for Hamas and PIJ was overt and long-running. On June 9, 2021, Gaza Now posted a message on its Telegram channel soliciting donations for Hamas's terrorist operations wing, the al-Qassam Brigades, and provided the same contact email that the Brigades themselves used to solicit Bitcoin donations. On May 10, 2023, its Twitter account posted video footage of PIJ's al-Quds Brigades firing rocket barrages at Israel. And public blockchain reporting documents that a Gaza Now donation address received a $12,000 transfer directly from a PIJ-attributed wallet between August 2021 and July 2022.

346. Consistent with that conduct, OFAC and the United Kingdom designated Gaza Now and Ayyash on March 27, 2024. OFAC listed Gaza Now as "Linked To: HAMAS," and the United Kingdom described it as a network that "promotes the Hamas and Palestinian Islamic Jihad terrorist groups." A sworn federal criminal complaint filed in June 2026 alleges the same:

it describes the operator OFAC designated alongside Gaza Now as using the outlet to "promote Hamas's terrorist agenda and solicit funds for Hamas," and—based on Gaza Now-branded 2022 events staged with masked, armed members of PIJ's al-Quds Brigade—finds a "close relationship between Gaza Now and PIJ." Compl. ¶¶ 29–30, *United States v. Sabassi*, No. 26 Mag. 2344 (S.D.N.Y. June 16, 2026).

347. Gaza Now's terrorist character was identifiable—and identified—well before that designation. The blockchain-analytics firm TRM Labs publicly traced Gaza Now's Hamas fundraising to a donation campaign active as early as 2021, tying Gaza Now's cryptocurrency solicitations to Hamas years before any government designation.

348. The specific wallets and account through which that activity ran were identifiable as Gaza Now's. Gaza Now posted its donation-wallet addresses openly on its Telegram channel, where anyone, Binance included, could see and attribute them. By October 2023 the blockchain-forensics firm Whitestream had publicly identified what it called the "Gaza Now Binance wallet," a cryptocurrency address OFAC would later designate. Binance's ability to make that connection did not depend on public reporting, however, because Binance hosted Ayyash himself as a customer. In February 2024, Israel's NBCTF seized the contents of cryptocurrency-exchange accounts associated with Gaza Now and Ayyash and hosted by Binance and Gate.io, and its seizure materials identified the Binance account—***1732—as Ayyash's. The know-your-customer records for that account listed the account holder as "Mustafa Ayash," his Austrian resident number, and the email address gazalnps@gmail.com—the same email address that had appeared in Gaza Now's own online fundraising solicitations as early as 2021. The OFAC-designated USDT (TRON) address ending in -aVNU—one of the account's deposit addresses—first became active in August 2021, so that Binance held Ayyash's identifying

information—including an email publicly tied to Gaza Now's Hamas fundraising—from the time the account was opened, years before Gaza Now was designated. The individual behind that account was, moreover, publicly identified with Hamas. Austrian authorities had arrested Ayyash in 2017 for his affiliation with Hamas, and he publicly championed the group, at one point tweeting "#Hamas_is_not_a_terrorist." A sworn federal criminal complaint alleges that, that same year, as foreign law enforcement investigated him and Gaza Now "on charges of being affiliated with Hamas," Ayyash secretly emailed a Hamas media account asking Hamas to publicly "deny any relationship" with him or Gaza Now. Compl. ¶ 32(a), *United States v. Sabassi*, No. 26 Mag. 2344 (S.D.N.Y. June 16, 2026). The source-of-funds and identity diligence Binance was obligated to perform would have connected that account directly to Gaza Now.

349. Plaintiffs' expert identified at least $4.3 million in transactions between Binance and Gaza Now-attributed wallets across 494 transactions. The transactional record precisely establishes Binance's role because Gaza Now's flows ran through the very account identified above—Binance account ***1732. The two OFAC-designated Gaza Now deposit addresses ending in -aVNU and -DaPw fed that account: the -aVNU address was active from August 2021, more than two years before the October 7 attack, and the -DaPw address routed Gaza Now's largest recorded Binance flows into it in August 2023, in the weeks before October 7—$201,899 on August 9, $115,475 on August 5, and $99,154 on August 3, 2023. Binance thus received Gaza Now's peak fundraising into an account its own records had identified as belonging to Mustafa Ayyash.

350. As with BuyCash and the Gaza exchanges, Binance continued serving Gaza Now (although in smaller quantities) after Gaza Now was designated by OFAC and the United

Kingdom on March 27, 2024. Blockchain analysis shows 19 transactions with a value of $1,036 after that date.

* * *

351. During the relevant period, Plaintiffs' analysis found that Binance processed 126,404 transactions, with a total volume of $504,795,714, for these five channels of support to operations by Hamas and PIJ. *See* App. A, Table A-1. This is a staggering volume of terrorist finance that was critical to Hamas's and PIJ's ability to carry out attacks. And crucially, because it only represents on-chain activity connected to wallets readily identifiable as associated with terrorism, it presents a floor—and not a ceiling—on the volume Binance processed for Hamas and PIJ.

**Table 3: Binance Transaction Volume for Hamas & PIJ Channels**

| # | Actor | Transactions | Total USD | Wallets | Earliest | Latest |
|---|---|---|---|---|---|---|
| 1 | Hamas | 9,296 | $29,459,772 | 78 | 2018-03-02 | 2025-06-30 |
| 2 | Palestinian Islamic Jihad (PIJ) | 89,054 | $59,456,060 | 26 | 2020-10-29 | 2023-09-30 |
| 3 | BuyCash | 20,352 | $358,320,698 | 18 | 2017-12-13 | 2025-10-19 |
| 4 | Gaza Now | 494 | $4,320,331 | 15 | 2021-08-24 | 2024-07-04 |
| 5 | Dubai Company for Exchange (Khader Elden) | 6,818 | $50,967,157 | 69 | 2022-01-02 | 2025-06-07 |
| 6 | Herzallah Exchange | 168 | $1,059,280 | 9 | 2024-05-26 | 2025-06-30 |
| 7 | Hamasat (exchange) | 45 | $522,022 | 1 | 2025-05-10 | 2025-06-28 |
| 8 | Al Mutahadun | 177 | $690,394 | 1 | 2022-01-15 | 2023-03-02 |
| | **Gaza-based exchanges (subtotal, rows 5–8)** | **7,208** | **$53,238,853** | **80** | | |
| | **TOTAL (all actors)** | **126,404** | **$504,795,714** | **217** | **2017-12-13** | **2025-10-19** |

352. Binance did not deal with these actors at arm's length or in ignorance. Instead, Binance's own compliance infrastructure and contracted vendors identified Hamas and PIJ activity on the exchange—including the February and April 2019 reports specifically identifying Hamas transactions, the July 2020 account flagged as Hamas-affiliated, and the identified PIJ network—and Binance's senior compliance personnel received those reports. Israel's counter-

terror-financing authority seized hundreds of Binance accounts between 2021 and 2024 and named specific Binance accounts in its public designation orders, giving Binance direct notice of the terrorist character of those accounts. As set forth in Part III.B.3, Binance possessed the same wallet-attribution data and analytical tools Plaintiffs' expert used—from a materially superior data vantage—and could identify these actors independent of any government designation. Binance thus did not merely fail to detect Hamas and PIJ on its platform; it identified them as such and chose how to respond.

353. What Binance did for these actors went beyond the latitude it extended to high-volume users generally. Repeatedly, when Binance's own systems or vendors specifically identified a Hamas or PIJ counterparty, Binance acted to shield that identification. When a third-party compliance vendor's April 2019 report identified Hamas transactions on the exchange by name, Binance intervened to influence how the vendor reported them and filed no report of its own with FinCEN (Part III.A.1.a). When its tools flagged an account as Hamas-affiliated in July 2020, Binance's CCO had the accountholder warned and permitted it to withdraw its balance before enforcement could reach it (Part III.A.1.b). Binance filed no SAR on any transaction it had identified as Hamas- or PIJ-affiliated, and it continued to process transactions for BuyCash and DCE after the United States and Israel designated them as Hamas and PIJ financiers. These were affirmative interventions—triggered by Binance's own identification of these counterparties as Hamas and PIJ, and directed at keeping that identification from the government. Because Binance acted on the specific knowledge that these were Hamas and PIJ, its protective servicing of them reflects a knowing association with those organizations and a conscious assumption of a role in their financial operations. Plaintiffs are aware of no instance in which Binance voluntarily severed, froze, or reported a counterparty it had identified as

connected to Hamas or PIJ—even though, as set forth in Part III.A.2, Binance acted on the compliance risks it identified when the counterparty or product was not connected to those organizations.

**b. Binance's Assistance to These Actors Preceded Each of the Ten Hamas and PIJ Attacks**

354. Binance provided assistance to Hamas and PIJ before each relevant attack, and in most cases provided further assistance after the fact.

355. The Hamas and PIJ financing apparatus exists to convert money into violence. Funds are used to purchase weapons and munitions, to build and sustain domestic rocket-production capability, to train operatives, and to meet the operational costs of attacks; and the resulting capability is accumulated over time rather than consumed when the funds arrive. As Dr. Matthew Levitt testified before Congress, the resources Hamas raised enabled it to "collect weapons, develop its own domestic rocket production capability, train, and ultimately carry out the October 7 massacre." Because the value Binance moved to that apparatus sustained the capability Hamas and PIJ drew upon to attack, Binance's provision of financial services to the apparatus before each attack contributed to the operational capacity that attack required.

356. The threat Binance's transfers posed did not turn on their size. In 2019, Treasury Under Secretary Mandelker warned that "without the appropriate strong safeguards cryptocurrencies could become the next frontier" for terrorist attacks, and emphasized that "the cost of carrying out a terrorist attack can be low"—noting that a FinCEN analysis found remittances linked to terrorism "averaged less than $600 per transaction."

357. The amounts Binance allowed Hamas and PIJ to obtain were significant before each attack. The pre-attack record set out below (the same as appears beneath ¶ 63, *supra*) measures that assistance, attack by attack. Across the 10 attacks, the same identified actors—the

al-Qassam fundraising wallets, the identified PIJ network, BuyCash, the Gaza exchanges, and Gaza Now—were components of Hamas's and PIJ's dedicated terrorism-financing apparatus, such that Binance's knowing, culpable provision of financial services to them in each pre-attack period supports the inference that Binance consciously assisted each attack that apparatus funded.

**Table 4: Binance's Pre-Attack Assistance to Hamas & PIJ**

| # | Attack date | Attack | Hamas | PIJ | BuyCash | Gaza Now | Gaza-based exchanges | Total |
|---|---|---|---|---|---|---|---|---|
| 1 | 2019-05-05 | Rocket attack, Ashdod (Przewozman) | $50,745 | $0 | $469,464 | $0 | $0 | $520,209 |
| 2 | 2022-08-14 | Mass shooting, Jerusalem (Gluck) | $23,664,930 | $38,483,180 | $121,519,170 | $909,315 | $817,868 | $185,394,463 |
| 3 | 2023-10-07 | Coordinated attack, southern Israel | $24,455,369 | $59,456,060 | $336,773,276 | $4,312,161 | $2,690,427 | $427,687,293 |
| 4 | 2023-11-06 | Stabbing, Jerusalem (Lubin) | $24,455,369 | $59,456,060 | $350,686,297 | $4,319,181 | $2,690,427 | $441,607,334 |
| 5 | 2023-11-08 | Complex attack (Margulies) | $24,455,369 | $59,456,060 | $352,680,390 | $4,319,181 | $2,690,427 | $443,601,427 |
| 6 | 2023-12-10 | Complex attack (Zenilman) | $24,455,369 | $59,456,060 | $358,318,018 | $4,319,181 | $2,690,427 | $449,239,055 |
| 7 | 2024-01-08 | Complex attack, Khan Younis (Hexter) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $4,128,991 | $450,682,221 |
| 8 | 2024-01-15 | Vehicle attack (Bollag/Kamer/Merkin) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $5,824,345 | $452,377,575 |
| 9 | 2024-01-16 | Complex attack, N. Gaza (Haber) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $5,946,683 | $452,499,913 |
| 10 | 2024-06-28 | Sniper attack (Tatelbaum) | $26,174,594 | $59,456,060 | $358,320,618 | $4,320,021 | $49,894,071 | $498,165,364 |

358. The October 7 attack required years of preparatory funding. As described in Part V, *infra*, Hamas and PIJ jointly planned and prepared it over a multi-year period—from origins before 2014 through the intensive preparation they resumed in 2021—and every transaction documented above with these five actors before October 7, 2023 was within that window.

359. By the eve of the October 7 attack, Binance had processed at least 117,431 transactions worth approximately $428 million with these five identified Hamas and PIJ channels—including $21.97 million with BuyCash-attributed wallets in the final ten weeks—and

the Gaza Now wallet OFAC later designated had been receiving funds from Binance's own hot wallet since August 2021. *See* App. A, Tables A-3, A-4. Binance's knowing provision of services to this apparatus throughout the multi-year preparatory period supports the inference that it consciously assisted the October 7 attack.

360. Binance's assistance did not stop with its customers' designations, or even its own guilty plea. It continued transacting with BuyCash-attributed wallets after BuyCash's 2023 OFAC designation—disbursing $318,248 to BuyCash on November 4, 2023, two days before the November 6 attack—and with DCE wallets after Israel designated that entity a terrorist group, including 5,577 transactions worth approximately $49.2 million with the rebranded el-Kahira in the period preceding the June 28, 2024 attack, all after Binance pleaded guilty in November 2023. *See* App. A, Table A-7.

**2. Defendants' Assistance to the IRGC, Hizballah, and Kataib Hizballah Substantially Assisted Their Attacks**

361. The twenty attacks that injured Plaintiffs described below in Parts V.B and C were committed, planned, or authorized by the IRGC, Hizballah, and Kataib Hizballah. Throughout the period in which those attacks were planned and carried out, Binance knowingly processed transactions with a discrete, identified set of IRGC and Hizballah financial actors: the IRGC's own financial wallets; the wallets of other IRGC operatives and support channels (the Central Bank of the Islamic Republic of Iran, the SamSam/Ghorbaniyan ransomware cash-out network, and the Pay2Key ransomware operation); and Hizballah's own fundraising and financial wallets, including the network of Tawfiq Muhammad Sa'id al-Law. That wallet-level record totals approximately $137 million—all of it processed while those organizations carried active U.S. terrorist designations, and none of it reported in a SAR. Separately and independently, Binance moved over $6 billion in identified on-chain transactions with four

IRGC-controlled Iranian cryptocurrency exchanges; that institutional stream is pleaded on its own terms below.

362. These funds aided and abetted IRGC, Hizballah, and Kataib Hizballah attacks. Both before and after attacks, the FTOs used the funds they obtained from Binance transactions to finance salaries, recruitment, procurement of weapons and communications technologies, intelligence, planning, logistics, martyr payments, disability payments, and bounty payments. The IRGC and Hizballah are also major supporters of Hamas and PIJ, and so the transactions here reinforce Binance's liability for the Hamas and PIJ attacks, too.

**a. Binance Processed Transactions Through a Discrete, Identified Set of IRGC, Hizballah, and Kataib Hizballah Financial Actors**

363. Each actor identified below was in fact a component of the IRGC or Hizballah financial apparatus—a fact confirmed by United States and Israeli designations, seizure orders, and enforcement actions—and the IRGC or Hizballah character of each was knowable, and in several instances specifically known, to Binance at the time it processed the transactions, through contemporaneous public reporting, government designations, and Binance's own customer, transaction, and compliance records. Unlike several of the Hamas and PIJ actors described above, whose official designations came only after Binance's dealing, the principals here were designated before the first identified transaction in any channel: the IRGC, Hizballah, and Kataib Hizballah carried active U.S. terrorist designations throughout. The intermediaries were designated in turn—the Ghorbaniyan/SamSam bitcoin addresses in November 2018, the Central Bank of Iran under OFAC's counterterrorism authority on September 20, 2019, and the Hizballah wallets listed by Israel's NBCTF on October 20, 2023. And where a designation preceded or interrupted Binance's dealing, Binance continued transacting anyway: it processed transactions with IRGC-attributed wallets through June 28, 2025, with Hizballah-attributed

wallets for months after the NBCTF's October 2023 listing, and within the Other IRGC Operatives channel through January 28, 2026.

364. As above, the complete transaction-level record—dates, direction, approximate USD amounts, and counterparty wallet addresses—was compiled from public blockchain data; the identified transactions on which Plaintiffs rely are set forth, by channel, in Appendix B. The channels are mutually exclusive: no transaction is counted more than once. And because the analysis captures only publicly traceable on-chain activity—omitting off-chain transactions internal to Binance's own ledger and on-chain wallets that could not be attributed—the figures below are a conservative floor that understates actual volume. Each channel is described below.

**(1) The IRGC's own wallets**

365. Plaintiffs' blockchain analyst identified 666 transactions worth approximately $79.6 million between Binance and the IRGC's own financial wallets—52 distinct counterparty wallets—between January 6, 2022 and June 28, 2025. App. B, Tables B-1, B-8. That figure reflects a two-way servicing relationship: Binance both received value from IRGC-attributed wallets and disbursed value out to them. Every one of these transactions post-dated the IRGC's FTO designation by more than two years. This wallet-level record dwarfs the $1.3 million in IRGC wallet transactions pleaded in Plaintiffs' prior complaint.

366. The individual transactions were large, recurring, and strikingly recent. Each of the 50 largest identified IRGC transactions—ranging up to nearly $6 million each—was processed after Binance's 2023 guilty plea. App. B, Table B-8. They include a $4,000,971 transfer into Binance on January 7, 2025 and a $5,997,817 transfer into Binance on January 12, 2025—part of nearly $30 million in identified IRGC-wallet transactions in January 2025 alone—and, between May 21 and May 28, 2025, approximately $13.5 million that Binance disbursed to a single IRGC-attributed wallet across six transfers. On the identified record, a financial

institution that had just pleaded guilty to federal BSA and sanctions offenses was servicing the IRGC's own wallets in seven-figure increments.

**(2) Other IRGC operatives and support channels**

367. Binance also processed 90 identified transactions worth approximately $2.9 million for other IRGC operatives and support channels between December 17, 2017 and January 28, 2026. App. B, Tables B-1, B-9. This channel aggregates wallets attributed to the Central Bank of the Islamic Republic of Iran (approximately $1.4 million, almost all in 2021, but continuing to January 2026)—which OFAC designated under its counterterrorism authority on September 20, 2019 for providing financial support to the IRGC-QF and Hizballah; the SamSam/Ghorbaniyan ransomware cash-out network (approximately $394,000 in 2017–2018), whose bitcoin addresses OFAC publicly identified in November 2018; and the IRGC-linked Pay2Key ransomware operation (approximately $1.1 million in 2023–2024).

368. The United States has authoritatively described the Central Bank's terrorist-financing role: in designating it on September 20, 2019, OFAC found that "Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah," and Treasury reaffirmed on February 14, 2024 that the Central Bank "played a critical role in providing financial support to the IRGC-QF and Hizballah." The most recent identified transaction in this channel was processed on January 28, 2026—more than two years after Binance pleaded guilty.

369. Ransomware operations were a key source of revenue for the IRGC. Victims of cyberattacks (which were themselves acts of international terrorism) were coerced into paying ransoms in the form of cryptocurrency to regain access to their data. That currency flowed through Binance back to the IRGC, where it was used to promote more terrorism. The SamSam, Ghorbaniyan, and Pay2Key ransomware operations were all examples of the IRGC's unlawfully

generated funds. In other words, Binance played an essential role in accomplishing these acts of terrorism—and in the process helped finance further terrorism.

**(3) Hizballah**

370. Plaintiffs identified 7,819 transactions worth approximately $54.6 million between Binance and Hizballah-attributed wallets between January 1, 2022 and April 17, 2024—all of it moved through just 14 distinct counterparty wallets, reflecting sustained, repeated servicing of the same identified Hizballah financial infrastructure rather than diffuse retail activity. App. B, Tables B-1, B-14.

371. The channel comprises three components. First, Hizballah's own fundraising and financial wallets account for approximately $29.6 million across 357 transactions between January 11, 2022 and June 27, 2023, of which 268 were disbursements from Binance to Hizballah-controlled wallets—including a sustained series of six-figure disbursements in early 2023, among them $370,984 on January 19, 2023; $500,165 on February 7, 2023; and $519,058 on March 14, 2023.

372. Second, the network of Tawfiq Muhammad Sa'id al-Law—the money exchanger through whom the IRGC-QF moved commodity-sale proceeds to Hizballah, as set forth below—accounts for approximately $11.9 million across 130 transfers between February 9 and June 2, 2023, 105 of them disbursements from Binance. Further, based on the allegations in the *Balva* complaint, this number is likely very conservative.

373. Third, the Hizballah wallets listed by Israel's NBCTF on October 20, 2023 account for approximately $13.0 million across 7,332 transactions between January 1, 2022 and April 17, 2024. Binance kept processing transactions with those listed wallets after the October 7 attack, after the NBCTF's listing, and after its own guilty plea—through April 17, 2024.

* * *

374. During the relevant period, Plaintiffs' analysis found that Binance processed 8,575 identified transactions, with a total volume of $137,162,374, for these three channels of wallet-level support to the IRGC, its operatives, and Hizballah—every dollar of it moved while those organizations carried active U.S. terrorist designations, and none of it reported in a SAR.

| Table 5: Binance Transaction Volume for IRGC & Hizballah Channels | | | | | | |
|---|---|---|---|---|---|---|
| # | Channel | Transactions | Total USD | Wallets | Earliest | Latest |
| 1 | Islamic Revolutionary Guard Corps (IRGC) | 666 | $79,634,646 | 52 | 2022-01-06 | 2025-06-28 |
| 2 | Other IRGC Operatives and Support Channels | 90 | $2,934,110 | 6 | 2017-12-17 | 2026-01-28 |
| 3 | Hizballah | 7,819 | $54,593,618 | 14 | 2022-01-01 | 2024-04-17 |
| | **TOTAL (all channels)** | **8,575** | **$137,162,374** | **72** | **2017-12-17** | **2026-01-28** |

375. This wallet-level record alone—without regard to the exchange volume described below—is two orders of magnitude larger than the $1.3 million pleaded in the prior complaint, and it is a floor, not a ceiling: it captures only publicly traceable on-chain activity connected to wallets readily identifiable as associated with the IRGC and Hizballah. Others—*e.g.*, the plaintiffs in *Balva*—allege that addresses controlled by Hizballah and al-Law transacted $590 million in volume on Binance between 2021 and 2023. *Balva* Complaint ¶ 76.

376. Binance did not deal with these actors at arm's length or in ignorance. The IRGC, Hizballah, and Kataib Hizballah carried active U.S. terrorist designations throughout the entire period of the transactions summarized above; the Central Bank of Iran was designated years before its identified flows; and U.S. and Israeli authorities publicly attributed the relevant wallets in designations, seizure orders, and enforcement actions throughout the period. As set forth in Part III.B.3, Binance possessed the same wallet-attribution data and analytical tools Plaintiffs' expert used—from a materially superior data vantage—and could identify these actors independent of any government action. Binance nonetheless filed no SARs on any of these transactions, and Plaintiffs are aware of no instance in which Binance voluntarily severed, froze,

or reported a counterparty it had identified as connected to the IRGC or Hizballah. Instead, Binance fired its own compliance people when they brought transactions like these to the attention of their superiors.

**b. Binance Processed Billions of Dollars in Transactions with IRGC-Controlled Cryptocurrency Exchanges**

377. Separately and independently from the wallet-level record above, Binance maintained significant institutional relationships with at least four IRGC-controlled cryptocurrency exchanges—Nobitex, Wallex.ir, Ramzinex, and Zedcex. The on-chain record of those relationships is enormous: between April 9, 2018 and September 23, 2025, Binance processed 2,356,713 identified transactions with wallets attributed to the four exchanges, moving approximately $6.05 billion across 132,449 distinct counterparty wallets. App. B, Tables B-1, B-2. The institutional relationships behind these flows—Binance's knowing, mutual commercial partnership with Nobitex, and its creation and promotion of the token infrastructure behind Zedcex—are pleaded in Parts III.A.4 and III.A.1.d, *supra*. No transaction in this stream is counted in the wallet-level channels above.

| Table 6: Binance Transaction Volume for IRGC Exchanges | | | | | | |
|---|---|---|---|---|---|---|
| # | Exchange | Transactions | Total USD | Wallets | Earliest | Latest |
| 1 | Nobitex | 2,147,606 | $5,481,533,952 | 124,558 | 2018-04-09 | 2024-12-15 |
| 2 | Wallex.ir | 86,352 | $298,746,667 | 7,917 | 2019-03-03 | 2024-05-22 |
| 3 | Ramzinex | 121,602 | $242,239,438 | 58 | 2019-07-06 | 2024-09-20 |
| 4 | Zedcex | 1,153 | $26,103,877 | 54 | 2021-06-01 | 2025-09-23 |
| | **TOTAL (all exchanges)** | **2,356,713** | **$6,048,623,934** | **132,449**[8] | **2018-04-09** | **2025-09-23** |

378. Nobitex—Iran's largest cryptocurrency exchange and an IRGC front—accounts for the great bulk of the stream: 2,147,606 transactions worth approximately $5.48 billion between April 9, 2018 and December 15, 2024, concentrated overwhelmingly in 2021 and 2022,

[8] This figure is less than the sum of the column because 138 wallets transacted with more than one IRGC exchange. The Total figure counts only unique wallets, and so subtracts 138.

the very period in which the Iraq and Syria attack campaign was funded, planned, and launched. *See* Part V.B & C, *infra*. The single largest identified transfers each exceeded $1 million, including a $2,212,618 disbursement from Binance on October 29, 2021 and repeated seven-figure deposits into Binance throughout 2021 and 2022. App. B, Tables B-3, B-10.

379. Wallex.ir—designated by OFAC alongside Nobitex on June 2, 2026—transacted 86,352 times with Binance, moving approximately $298.7 million across 7,917 counterparty wallets between March 2019 and May 2024, including repeated six-figure transfers in both directions from mid-2020 onward. App. B, Tables B-3, B-11.

380. Ramzinex—also designated by OFAC on June 2, 2026—transacted 121,602 times with Binance, moving approximately $242.2 million between July 2019 and September 2024 through just 58 distinct counterparty wallets. App. B, Tables B-3, B-12. More than 120,000 transactions running through a few dozen wallets is the signature of an institutional settlement pipeline between two exchanges, not retail customer traffic—and is precisely the volume-and-concentration profile that Binance's own transaction monitoring was capable of detecting in real time.

381. Zedcex—the exchange operated by designated IRGC sanctions-evasion facilitator Babak Zanjani's network on token infrastructure Binance created and promoted, *see* Part III.A.1.d, *supra*—transacted 1,153 times with Binance, moving approximately $26.1 million across 54 counterparty wallets between June 1, 2021 and September 23, 2025. App. B, Tables B-3, B-13. Those flows continued until weeks before OFAC designated Zedcex in January 2026—and for nearly two years after Binance's own guilty plea.

382. Again, these numbers are conservative. As *Reuters* reported in November 2022, Chainalysis determined that Nobitex alone transacted $7.8 billion with Binance from 2018 until

the date of the report. And the *Wall Street Journal*'s reporting on Zedcex indicates that its subsidiary moved hundreds of millions through a single Binance account to the IRGC. It is accordingly highly likely that a full inquiry after discovery will reveal volumes *much* higher than even the eye-popping numbers alleged here.

383. That said, Plaintiffs do not allege that every dollar of this exchange volume constituted money for terrorism; the Iranian exchanges served ordinary Iranian users as well. But as alleged in Part III.A.4, a substantial fraction of the Iranian exchange volume—on the order of one-half, or approximately $3 billion—was IRGC-related. Even if that estimate is off by a factor of 10, the IRGC still has realized $300 million in benefit over the time period surrounding the attacks in this case—which is more than enough to have funded all of them many times over.

384. Independent of the amount of transaction value attributable to the IRGC, the IRGC's control of the exchanges themselves is not a matter of degree: Nobitex and Zedcex in particular are clear IRGC fronts in light of the identities of their principals, and both were designated under counterterrorism authorities. Accordingly, independent of the IRGC-controlled dollars that moved through these exchanges, Binance's relationship with these exchanges provided tremendous value to the IRGC in the form of channels to a global financial system that was otherwise closed to terrorists. That relationship also provided the IRGC with a means to receive ransomware proceeds, convert IRGC revenues to fiat currencies worldwide, and instantaneously move money to terrorist proxies anywhere it was desired.

#### c. The IRGC-Quds Force external-financing apparatus that funds Kataib Hizballah ran through Binance

385. The Iraq and Syria attacks were carried out by Hizballah and Kataib Hizballah, an Iraqi IRGC and Hizballah proxy that is a related but organizationally distinct entity from Lebanese Hizballah. Plaintiffs do not rest the connection on a generalized theory that IRGC

commercial revenues eventually reached Kataib Hizballah. They plead a specific, documented funding apparatus—the IRGC-QF's external-financing network—that both demonstrably ran through Binance and is the mechanism through which the IRGC-QF funds Kataib Hizballah.

386. The IRGC-QF is the common paymaster of both Lebanese Hizballah and Kataib Hizballah. State found that the "IRGC continues to provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq," and others. In 2022 specifically, State reported that Iran supported Kata'ib Hizballah "with sophisticated weapons—including increasingly accurate and lethal unmanned aerial systems (UAS)—support, funding, and training," and that those groups "conducted multiple rocket and UAS attacks on U.S. and coalition facilities across Iraq, as well as attacks in Syria." Kataib Hizballah is not self-financing: as State's Foreign Terrorist Organization profile states, "KH depends heavily on support from Iran." Treasury's enforcement record is to the same effect: on March 26, 2020, OFAC sanctioned a network of twenty individuals and entities for providing financial support that enables the IRGC-QF to "transfer[ ] lethal aid to Iranian-backed terrorist militias in Iraq such as Kata'ib Hizballah."

387. As explained *supra*, the international community has long warned that the IRGC uses cryptocurrency to fund its proxies, including Hizballah. The al-Law network is documented evidence that this IRGC-QF external-financing apparatus operated on Binance. The United States sanctioned al-Law, finding that he "provided Hizballah with digital wallets to receive funds from IRGC-QF commodity sales" and "conducted cryptocurrency transfers for sanctioned Hizballah officials, including Muhammad Ja'far Qasir and Muhammad Qasim al-Bazzal."

Treasury had previously designated Qasir as an SDGT, identifying him as "a critical link between Hizballah and its primary funder, Iran," and "a critical conduit for financial disbursements from the IRGC-QF to Hizballah."

388. Because al-Law's Binance transfers were IRGC-QF commodity-sale proceeds—funds the IRGC-QF controls and disburses—and because the IRGC-QF is the entity that finances Kataib Hizballah, the al-Law record establishes that the same external-financing apparatus that pays for Kataib Hizballah's operations in Iraq and Syria was moving tens of millions of dollars through Binance during the period in which the attacks at issue were planned and executed. That is a documented IRGC-QF disbursement operation transiting identified Binance accounts, not the attenuated commercial-enrichment inference. The directly-attributed IRGC wallets (approximately $79.6 million, beginning January 2022) independently evidence funds of the IRGC—the IRGC-QF's parent—transiting Binance during the same period.

389. The same network supplies the end-use bridge from these cryptocurrency receipts to the weapons used in attacks. Muhammad Ja'far Qasir—the very Hizballah official for whom al-Law conducted the cryptocurrency transfers described above—is not only the IRGC-QF's principal financial conduit to Hizballah but also the leader of Hizballah's Unit 108, which coordinates the transfer of weapons and military technology from Syria to Lebanon. The cryptocurrency-financing node and the weapons-transfer pipeline thus run through the same designated individual and network, directly connecting the funds moving through Binance to the materiel that Hizballah and its IRGC-QF paymaster use in attacks. Hizballah's own leadership has confirmed the import of these funds: Secretary-General Hassan Nasrallah stated that Hizballah's "budget, its salaries, its expenses, its food and drink, its weapons and rockets, are all from the Islamic Republic of Iran." Because Iranian support funds Hizballah's general budget,

value entering Hizballah's accounts—including the cryptocurrency routed through Binance—underwrites its attack capability rather than any segregated, non-violent account.

#### d. Binance's Assistance to These Actors Preceded Each of the Twenty IRGC, Hizballah, and Kataib Hizballah Attacks

390. Binance provided assistance to the IRGC, Hizballah, and Kataib Hizballah before each of the twenty attacks for which Plaintiffs seek recovery, and in most cases provided further assistance after the fact. Wallet-level activity in the IRGC and Hizballah channels dates to the first two weeks of January 2022, and in the Other IRGC Operatives channel to December 2017; the separate institutional exchange stream dates to April 2018 and peaked in 2021 and 2022, before and during the attack campaign at issue.

391. The pre-attack record set out below measures that assistance, attack by attack, in both streams. For each of the twenty attacks, Appendix B sets forth the number of identified transactions Binance had already processed as of the attack date, and their approximate USD value, by channel and combined. App. B, Tables B-6, B-7. The table below (also reproduced *supra* beneath ¶ 66) states the cumulative pre-attack figures for the wallet-level channels (IRGC, Other IRGC Operatives, and Hizballah combined), and separately states the cumulative pre-attack value of the institutional exchange stream:

**Table 7: Binance's Pre-Attack Assistance to the IRGC & Hizballah**

| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges (50% Discount) | Hizballah | Combined |
|---|---|---|---|---|---|---|---|
| 1 | 2021-02-15 | Rocket attack, Erbil Air Base (Johnson/Rorls) | $0 | $394,153 | $289,588,408 | $0 | **$289,982,561** |
| 2 | 2021-03-13 | Rocket attack, Union III Base, Baghdad (Hattab) | $0 | $394,153 | $391,899,679 | $0 | **$392,293,832** |
| 3 | 2021-05-01 | Mortar attack, Baghdad (Taylor) | $0 | $394,153 | $709,934,870 | $0 | **$710,329,023** |
| 4 | 2021-07-03 | Rocket attack, Al Asad Air Base (Riley) | $0 | $564,189 | $1,080,602,994 | $0 | **$1,081,167,183** |
| 5 | 2021-07-07 | Mortar attack, Al Asad Air Base (Lorio) | $0 | $564,189 | $1,091,097,853 | $0 | **$1,091,662,042** |
| 6 | 2022-03-13 | Ballistic-missile strike, Erbil (Nasir) | $25,251 | $1,814,470 | $2,178,204,019 | $2,794,099 | **$2,182,837,839** |

| Table 7: Binance's Pre-Attack Assistance to the IRGC & Hizballah | | | | | | | |
|---|---|---|---|---|---|---|---|
| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges (50% Discount) | Hizballah | Combined |
| 7 | 2022-05-15 | Hostage-taking, Mashhad (Doe) | $30,949 | $1,814,470 | $2,457,531,939 | $9,113,621 | **$2,468,490,979** |
| 8 | 2022-07-04 | Rocket attack, Erbil Air Base (Sorel) | $30,999 | $1,814,470 | $2,595,369,913 | $12,687,284 | **$2,609,902,666** |
| 9 | 2022-08-29 | Small arms attack, U.S. Embassy, Baghdad (Caramanian) | $30,999 | $1,814,470 | $2,761,062,844 | $14,606,588 | **$2,777,514,901** |
| 10 | 2022-09-28 | Rocket and UAV attack, Kurdistan (Mahmoudzadeh) | $30,999 | $1,814,470 | $2,857,046,106 | $15,753,392 | **$2,874,644,967** |
| 11 | 2022-11-07 | Assassination attack, Iraq (Troell) | $30,999 | $1,814,470 | $2,923,847,706 | $16,086,815 | **$2,941,779,990** |
| 12 | 2023-03-23 | UAV attack, Hasakah, Syria (Dubis/Buckman) | $156,627 | $1,814,470 | $3,001,247,567 | $34,935,765 | **$3,038,154,429** |
| 13 | 2023-10-17 | UAV attack, Iraq (Sherpa) | $299,511 | $1,814,484 | $3,009,105,333 | $54,516,828 | **$3,065,736,156** |
| 14 | 2023-10-18 | UAV attack, Iraq (Santiago) | $299,511 | $1,814,484 | $3,009,115,312 | $54,518,472 | **$3,065,747,779** |
| 15 | 2023-10-26 | UAV attack, Iraq (Gramigna/Streets) | $299,511 | $1,814,484 | $3,009,216,541 | $54,593,617 | **$3,065,924,153** |
| 16 | 2023-11-21 | Missile attack, Iraq (Logan) | $299,511 | $1,814,484 | $3,009,627,734 | $54,593,618 | **$3,066,335,347** |
| 17 | 2023-12-12 | Rocket attack, Syria (Horne) | $299,511 | $1,814,484 | $3,009,937,895 | $54,593,618 | **$3,066,645,508** |
| 18 | 2024-01-20 | UAV attack, Iraq (Creasy) | $529,167 | $2,910,459 | $3,010,418,511 | $54,593,618 | **$3,068,451,755** |
| 19 | 2024-07-15 | UAV attack, Iraq (Vantine) | $17,192,494 | $2,934,073 | $3,012,671,417 | $54,593,618 | **$3,087,391,602** |
| 20 | 2024-07-16 | UAV attack, Iraq (Bowman) | $17,192,494 | $2,934,073 | $3,012,677,732 | $54,593,618 | **$3,087,397,917** |

392. **The 2021 Joint Hizballah/Kataib Hizballah attacks.** By the time the first joint Hizballah/Kataib Hizballah attack occurred in February 2021, Binance had helped the IRGC obtain significant revenue from its ransomware operations, generating $394,153 through the "Other IRGC" channel. By the time the fourth attack occurred, Binance had also begun transacting in earnest with the Central Bank of Iran, and so the wallet-level volume as of the fourth and fifth attack jumped to $564,189.

393. Those funds, alone, were sufficient to carry out the first five rocket and mortar attacks. But they were dramatically augmented by the funds flowing through the IRGC exchange channel, which had grown explosively in early 2021: by the February 15, 2021 Erbil Air Base attack, approximately $579 million had already moved between Binance and the IRGC-controlled exchanges, and by the July 7, 2021 Al Asad Air Base attack, approximately $2.18 billion—alongside the Other IRGC Operatives channel's earliest flows, which date to December

2017. App. B, Tables B-6, B-7. In the table above, all exchange values are discounted by 50% to reflect the IRGC's partial share of the volume.

394. **The IRGC attacks.** The March 13, 2022 Erbil ballistic-missile strike (Nasir), the May 15, 2022 Doe hostage-taking, and September 28, 2022 missile and UAV attack (Mahmoudzadeh) were committed by the IRGC itself, so the identified flows funded the actual perpetrator. By March 13, 2022, IRGC-attributed wallets had been transacting with Binance for more than two months, Hizballah-attributed wallets for ten weeks (128 transactions worth approximately $2.8 million), and the wallet-level record stood at 214 transactions worth approximately $4.6 million—while the separate exchange stream (discounted) had already moved over $2 billion. By the May 15, 2022 hostage-taking attack, the wallet-level record had grown to 972 transactions worth approximately $11.0 million, and the exchange stream to over $2.4 billion. Then, by the September 28, 2022 missile and UAV attack, the wallet-level record had grown to 3,249 transactions worth approximately $17.5 million, and the discounted exchange stream to approximately $2.85 billion. App. B, Tables B-6, B-7.

395. **The November 7, 2022 Troell assassination attack.** By November 7, 2022, Hizballah-attributed wallets had been transacting with Binance for more than ten months—3,732 identified transactions worth approximately $16.1 million—and the wallet-level record stood at 3,832 transactions worth approximately $17.9 million, with the separate exchange stream at approximately $5.85 billion. App. B, Tables B-6, B-7.

396. **The 2023 and 2024 Joint Hizballah/Kataib Hizballah attacks.** By the March 23, 2023 joint Hizballah/Kataib Hizballah Hasakah UAV attack (Dubis/Buckman), the wallet-level record stood at approximately $36.9 million—including approximately $34.9 million in Hizballah-attributed transactions, among them approximately $2.5 million moved through the

al-Law network in the six weeks immediately preceding the attack. By the October and November 2023 attacks (Sherpa, Santiago, Gramigna/Streets, Logan), the wallet-level record exceeded $56.6 million, and essentially the entire Hizballah channel—approximately $54.6 million—had accrued. And the record kept growing through the final attacks: by the July 15 and 16, 2024 UAV attacks (Vantine, Bowman), the wallet-level record stood at approximately $74.7 million—including approximately $17.2 million in the IRGC's own-wallet channel, the majority of it accrued after Binance's 2023 guilty plea—while the exchange stream exceeded $6.02 billion. App. B, Tables B-6, B-7.

397. Again, Binance's assistance did not stop at designation, or even at its own guilty plea. Every one of the 50 largest identified IRGC-wallet transactions post-dates Binance's 2023 guilty plea; the IRGC channel ran through June 28, 2025; the Other IRGC Operatives channel ran through January 28, 2026; and the separate exchange stream ran through September 23, 2025, until weeks before OFAC designated Zedcex—all of it processed while the IRGC, Hizballah, and Kataib Hizballah remained designated, and none of it reported in a single SAR.

### 3. The Wallet Identifications Are Reliable—and Were Equally Available to Defendants

398. Plaintiffs' identification of the Hamas-, PIJ-, IRGC-, and Hizballah-affiliated wallets and transactions is the work of Plaintiffs' blockchain-analysis expert, J.S. Held. Working only from publicly available, on-chain data, J.S. Held identified those transactions using industry-standard techniques: it anchored its analysis to wallet addresses that U.S. and Israeli authorities had publicly attributed to Hamas, PIJ, IRGC, and Hizballah and their financiers—addresses appearing on OFAC's Specially Designated Nationals List, on the designation and seizure lists published by Israel's NBCTF, and in U.S. forfeiture filings—and then applied clustering and transaction-graph analysis to trace the flow of funds to and from those addresses

and to identify additional wallets under the same actors' control, corroborated by open-source intelligence. Clustering analysis of this kind is a standard method for extending a set of known addresses: where a wallet controlled by a terrorist actor repeatedly transfers smaller amounts to the same group of wallets shortly after receiving larger transfers over an extended period, those receiving wallets can be identified—through their transaction proximity, frequency, and patterns—as likely under common ownership or affiliation and subjected to further analysis. These are the same techniques used by the AML/CFT and compliance functions of cryptocurrency exchanges and blockchain-analytics firms.

399. Binance has publicly represented that it performs precisely this analysis, in real time. In its own words, Binance "invest[s] heavily in KYC … and transaction monitoring technology," running "transaction monitoring" that "utilizes the latest technology to keep an eye on every transaction to ensure that we can, in real-time, discover and halt any illicit transactions and transfers"—and, to do so, "work[s] with partners such as Chainalysis, TRM Labs, CipherTrace by Mastercard and Elliptic, as well as a robust suite of internal tools."

400. Those tools were built for the precise task of identifying terrorist-affiliated wallets. As established in Part III, Binance contracted Chainalysis, Refinitiv, IdentityMind, CipherTrace, and Elliptic no later than 2018–2019, and their software ingested the same OFAC and NBCTF designation data on which J.S. Held relied. Chainalysis's "Know Your Transaction" tool used "pattern recognition, proprietary algorithms and millions of open source references to … raise live alerts on transactions involved in suspicious activity," and Elliptic's software enabled Binance "to identify whether transactions are linked to illicit actors such as terrorist organizations" and to "proactively check future transactions for links to … terrorist fundraising

wallets." The public reports these firms issued were, as Binance itself stressed, only a fraction of the private, transaction-specific information they furnished to Binance.

401. The data and methodology underlying J.S. Held's identifications were therefore neither unique to Plaintiffs nor available only in hindsight. The same wallet attributions—the OFAC and NBCTF designations and the U.S. forfeiture filings—were fed into Binance's own monitoring tools in real time, and Binance closely monitored those attributions throughout the relevant period. Everything J.S. Held was able to identify from public data alone, Binance's contracted tools were designed to identify, and did identify, as the transactions occurred.

402. Centralized exchanges such as Binance do not maintain a separate on-chain wallet for each customer. They custody customer assets in pooled "omnibus" wallets—some kept online as "hot" wallets to fund customer withdrawals, the majority held offline in "cold" wallets for security—and credit or debit each customer's balance on the exchange's internal ledger. On the public blockchain, an outside analyst can see cryptocurrency moving into and out of Binance's omnibus and hot wallets, including transfers between those Binance wallets and the Hamas-, PIJ-, IRGC-, and Hizballah-affiliated wallets identified above; the transfers J.S. Held catalogued are these on-chain-visible movements between Binance's own wallets and the designated counterparties—as reflected in the funds sent directly from Binance's hot wallet to the Gaza Now wallet described above. What an outside analyst cannot see are the customer-to-customer transfers that occur inside the exchange and are recorded only on Binance's private internal ledger—activity visible to Binance alone.

403. Binance's vantage was not merely equal to that of Plaintiffs' expert but materially superior. Plaintiffs only had the ability to access the public blockchain. Binance alone held the off-chain record of transactions internal to its platform—visible to no outside analyst—together

with the verified identity, device-fingerprint, IP, geolocation, and login data it collected on every account holder. Any wallet, counterparty, or pattern that Plaintiffs and their expert could surface from public data, Binance could see in greater detail, and with the customer's true identity attached.

404. The transaction patterns that J.S. Held documented, set forth in the Appendices, are not ambiguous. They are textbook indicators of terrorist financing—the very indicators that FATF's guidance for virtual-asset service providers, FinCEN's October 20, 2023 advisory on Hamas financing, and Binance's own contracted monitoring tools were built to detect, and that Binance's risk-based monitoring obligations required it to detect, without regard to whether any government had yet designated a particular wallet. The activity on Binance's own books displayed at least the following such indicators, each independent of any designation:

405. **Transactions with designated and listed counterparties, continued after designation.** The clearest indicator in counter-terrorist-financing compliance is transacting with a wallet that already appears on a sanctions or terrorist-designation list. Binance processed at least 2,886 transactions with Hamas-attributed wallets after those wallets were placed on a U.S. or Israeli list; at least 672 transactions worth approximately $15.89 million with BuyCash-attributed wallets after BuyCash's October 18, 2023 OFAC designation; and at least 6,719 transactions worth approximately $50.89 million with DCE-attributed wallets after that entity's March 7, 2022 designation as a terrorist organization.

406. On the IRGC and Hizballah side, after Israel designated al-Law's wallet along with 28 of his counterparties in May 2023, Binance allowed 19 of those wallets to transact tens of millions of dollars for weeks thereafter. Binance also facilitated transactions for Zanjani's exchanges and coins even though he was a notorious IRGC sanctions-evasion specialist who had

been designated in 2013. And Binance processed at least $1.4 million in transactions for the Central Bank of Iran years after Treasury designated it for providing "billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah."

407. **A high volume of transactions with users in comprehensively sanctioned jurisdictions.** Binance processed millions of transactions for users in Iran—and it knew this. Binance's senior employees "knew of, and joked about, the exchange's growing ranks of Iranian users"; "'IRAN BOYS,' one of them wrote in response to data showing the popularity of Binance … in Iran." Binance also knew that doing business with Iranian customers was inherently risky due to the well-documented warnings from the United States government, other world governments, and international organizations explaining that doing business with Iranian users was tantamount to funding the IRGC's terrorism.

408. **Sustained, high-volume, repeated transfers with single high-risk counterparties.** Binance processed 20,352 transactions (approximately $358 million) with BuyCash-attributed wallets and 89,054 transactions (approximately $59.5 million) with the identified PIJ network, much of it recurring transfers into the same counterparty addresses over months and years—a volume and regularity that no risk-based monitoring system could miss. *See* App. A, Table A-1. The same point is even more obviously true with respect to the Iranian cryptocurrency exchanges, which accounted for billions of dollars in volume over millions of transactions.

409. **Large transfers lacking any legitimate business rationale, to Gaza-based money transmitters in a high-risk jurisdiction.** FATF identifies both transfers lacking a logical business explanation and concentrated exposure to higher-risk jurisdictions as red flags.

Binance repeatedly moved six-figure sums—for example, a single $699,704 transfer on August 3, 2023 and a $318,248 disbursement on November 4, 2023, *See* App. A, Table A-7—to and from BuyCash, Gaza Now, and DCE, Gaza-based money transmitters operating in a jurisdiction governed by Hamas and synonymous with terrorist-financing risk, with no lawful commercial explanation for transfers of that magnitude.

410. Each of these indicators was present in Binance's own transaction records, detectable by the very tools Binance had contracted, and required to be identified under the risk-based program Binance was obligated to maintain. Binance's failure to act on them was a matter of choice, not capacity.

## IV. Defendants' Unlawful Conduct Had a Substantial Nexus to New York and the United States

411. A key component of Defendants' strategy was to leverage New York's unrivaled financial infrastructure—its banks, markets, enterprises, and customer base—and Binance's access to U.S. customers to generate tens of billions of dollars in profits, while deliberately defying the New York and federal laws, including mandatory AML/CFT obligations, that are designed to prevent abuse of the U.S. financial system for funding terrorist attacks. Defendants' suit-related contacts with New York and the United States, summarized below and detailed throughout this Complaint, support personal jurisdiction over each Defendant.

### A. Binance Used New York Customers, Partners, and Banks in Carrying Out the Scheme

412. Binance purposefully used New York customers in carrying out the scheme alleged herein. As set forth in prosecution and settlement documents involving DOJ, the CFTC, and the SEC, several of Binance's key "VIP market makers" and largest customers were quantitative hedge funds that were headquartered in, and directed trading from, New York. Binance deliberately reached out to these New York-based firms to cultivate their business and

was aware of their location in New York. These market makers provided critical liquidity to Binance.com—liquidity that helped make Binance the world's largest cryptocurrency exchange and the preferred exchange of terrorist groups seeking to trade and transfer cryptocurrency. From 2017 to 2024, Binance also conducted massive amounts of business with New York-based counterparties, including the crypto exchanges Gemini (total transaction value of approximately $25 billion) and Paxful (approximately $3.7 billion), and financial flows between Binance and New York-based Coinbase totaled approximately $240 billion during the same period.

413. Binance also purposefully availed itself of the New York commercial system, relying on New York-based partners to imbue its conduct with the legitimacy of that system. In or about October 2018, Binance reached into New York to partner with Chainalysis, the New York-based cryptocurrency compliance and investigation firm, and in late 2018 Binance partnered with New York-based Refinitiv to implement automated KYC screening. As alleged above, those compliance partnerships were a smokescreen: Binance publicly touted them as proof of compliance while routinely ignoring the terrorist-financing alerts the vendors' tools generated.

414. In or about 2019, Binance reached into New York to solicit an ongoing business relationship with Paxos Trust Company ("Paxos"), a New York-based and New York-regulated limited purpose trust company. Together, Binance and Paxos issued a U.S. dollar-backed stablecoin, BUSD, the U.S. dollar reserves for which were maintained by Paxos in New York, and Binance and Paxos shared the profits from investing those reserves. Binance deliberately sought and touted the imprimatur of the New York Department of Financial Services ("NYDFS"), which authorized BUSD in 2019: as Binance's then-CFO explained, "[l]aunching a stablecoin approved by the New York State Department of Financial Services (NYDFS) is a

strategic step for Binance to provide on-chain financial services for users across the world." As of November 2022, Binance held nearly $24 billion in New York-issued Paxos BUSD—about one-third of the company's total crypto assets—and financial flows between Binance and Paxos from 2019 to 2024 were approximately $40 billion. In 2023, NYDFS ordered Paxos to cease minting Paxos-issued BUSD as a result of unresolved issues related to Paxos's oversight of its relationship with Binance, including Paxos's violation of its obligation to conduct diligence "to prevent bad actors from using the platform." Analysis of public blockchains showed that wallets owned by, or affiliated with, FTOs, including Hamas, were involved in transactions in BUSD.

415. Binance likewise purposefully availed itself of the New York banking system, relying on New York-based banks, including Signature Bank, to clear and settle billions of U.S. dollars in payments in the course of providing substantial assistance to the terrorist groups that attacked and injured Plaintiffs or their family members. Binance held numerous accounts at Signature Bank and extensively utilized the bank's Signet platform to settle cryptocurrency transactions in U.S. dollars. Between 2019 and 2023, Binance deposited more than $5.5 billion into its Signature Bank accounts.

### B. Binance Illegally Served a Substantial Number of U.S. Users and Used U.S. Service Providers

416. Binance's unlawful conduct also had a substantial nexus to the United States as a whole. Binance admitted that, starting at least as early as August 2017 and continuing until at least October 2022, it operated its exchange wholly or in substantial part in the United States by serving a substantial number of U.S. users, without registering with FinCEN or complying with U.S. law. As Binance admitted: "From the beginning, [Binance] tracked and monitored the status and growth of both its U.S.-registered users and its U.S.-based website visitors." In or around August 2017, Binance created a graphic touting the exchange's "[r]apid user growth" in its first

forty-five days, showing that more than 23% of Binance's 122,729 users were from the United States—a greater share than from any other country. According to periodic revenue reports prepared by Binance personnel, as of January 2020 approximately 19.9% of Binance's customers were located in the United States, and by September 2020 Binance had approximately 2.5 million users in the United States—more than it had in any other country. According to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022—transactions that generated over $1.6 billion in profit for Binance.

417. Those U.S. contacts were suit-related. According to Binance's November 2023 settlement with OFAC, "[f]rom approximately August 2017 to October 2022," Binance "matched and executed virtual currency trades on its online exchange platform between U.S. person users and users in sanctioned jurisdictions or blocked persons"—conduct that "resulted in at least 1,667,153 virtual currency transactions – totaling approximately $706,068,127." The settlement specified that at least one transaction involved "blocked persons" under 31 C.F.R. § 594.201(a)—the Global Terrorism Sanctions Regulations, which bar transactions with persons listed in the Annex to Executive Order 13224, the terrorism-financing executive order, and with foreign persons determined to have committed, or to pose a significant risk of committing, acts of terrorism against the United States. Binance's settlement with OFAC thus includes direct evidence that Binance's U.S. users interacted with terrorists on the Binance exchange.

418. Binance has admitted to conspiring to operate as a virtual currency exchange that would gain market share and profit by attracting "a substantial number of U.S. users," and "particularly U.S. VIP users, who accounted for a significant percentage of the overall trading volume on Binance.com." In carrying out that scheme, Binance contracted with U.S.-based

Amazon Web Services to host the Binance.com website through which the illegal transactions occurred; leased office space in the United States for its employees; procured legal and business advice from U.S. law firms and consultants; and hosted and attended networking and social events in the United States.

### C. Zhao's Unlawful Conduct Had a Substantial Nexus to New York and the United States

419. Zhao conceived and founded Binance, "made the strategic decisions for" it, and "exercised day-to-day control over its operations and finances." Zhao personally played a substantial role in directing Binance's efforts to exploit the U.S. market, retain key U.S. "VIP" users, and circumvent the U.S. regulatory regime, including by "encouraging [U.S.] users to conceal and obfuscate their U.S. connections … by creating new accounts and [falsely] submitting non-U.S. KYC information in connection with those accounts." As alleged herein, Zhao personally participated in the decisions to advise customers to use VPNs to circumvent Binance's own IP-address blocks and to implement the Tai Chi strategy—both aimed at retaining U.S. users—and he pleaded guilty to BSA violations premised on Binance's U.S. operations.

420. By virtue of Zhao's dominant role in Binance, including its strategies to exploit and leverage the New York and United States markets while circumventing governing financial regulations, Binance's purposeful availment of New York and the United States as detailed above is equally attributable to Zhao.

421. After his guilty plea, Zhao sought and obtained a Presidential pardon for his offenses related to the allegations in this case. To obtain that pardon, Zhao and Binance reportedly retained a cadre of lawyers, lobbyists, and public relations professionals in the United States to seek relief from the White House directly and through persons close to the White House. And the pardon itself is yet another implicit admission of guilt, made in the United

States. *Cf. Burdick v. United States*, 236 U.S. 79, 94 (1915) (a pardon "carries an imputation of guilt; acceptance a confession of it").

### D. Binance US's Conduct Had a Substantial Nexus to New York and the United States

422. Binance US is a U.S. company created and intended to serve the U.S. market, to deceive U.S. authorities about the true scope of Binance's business, and to develop high-value U.S. users for migration onto the Binance.com platform. The company is at home in the United States, and all of its suit-related conduct occurred here.

423. As part of a common enterprise with Zhao and Binance—and indeed an alter ego of both—Binance US had, at a minimum, the same purposeful contacts with New York and the United States that are alleged as to Zhao and Binance above (just as they shared Binance US's contacts). In addition, all of Binance US's conduct was intentionally aimed at the United States. Its stated purpose was to provide licensed cryptocurrency services and an exchange platform to U.S. residents; its actual raison d'être was to serve as an instrument that Binance and Zhao could use—and did use—to influence the conduct of United States officials and to deflect the attention of U.S. lawmakers and regulators away from Binance and its illegal activities.

424. In addition to the deception inherent in Zhao's suggestion that Binance US was the sole platform for U.S. customers, Binance US set up a registered political action committee to lobby U.S. authorities, which utilized New York banks (Signature Bank) and sought contributions from New York investors (Skybridge Capital) and made donations in New York congressional races.

## V. The Attacks That Injured Plaintiffs

425. The connection between Defendants' conduct and each attack described below is established in the preceding Parts and incorporated herein.

426. Unless otherwise stated, all Plaintiffs named in this section were U.S. nationals at the time of the relevant attack and, where a Plaintiff was killed, at the time of death. Any exception is noted.

427. Each attack was an act of international terrorism as defined by 18 U.S.C. § 2331.

### A. The Hamas and PIJ Attacks in Israel

428. Each act of international terrorism described in this section occurred during the period of Binance's assistance to Hamas and PIJ. Binance's assistance made it possible for Hamas and PIJ to finance and carry out such attacks. Each attack was planned, authorized, and/or committed by these designated FTOs, often with assistance from the IRGC and/or Hizballah.

429. Each attack described in this section was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Iranian regime and its instrumentalities—including the IRGC and Hizballah—and supplied to operatives from Hamas and PIJ. All such payments were designed to, and did, incentivize Hamas's and PIJ's successful attacks, including each attack described in this section.

430. Each attack described in this section also would have violated the laws of war if the terrorists who committed it had been subject to them. Most of the victims were civilians not taking part in hostilities. And in every attack, the attackers neither wore uniforms nor otherwise identified themselves as enemy combatants; they deliberately operated from, and hid among, civilian populations; and they employed means, including indiscriminate rocket fire and perfidious ambushes launched from civilian cover, that indiscriminately placed civilians at risk. None of these attacks was committed by the "military forces" of any state: Hamas and PIJ are designated FTOs, not the armed forces of a state, and their attacks formed part of a campaign of terrorism rather than lawful armed conflict. Each attack described in this section accordingly

constitutes an act of "international terrorism" under 18 U.S.C. § 2331(1) and falls outside the exclusion in 18 U.S.C. § 2336(a).

**1. The May 5, 2019 Rocket Attack in Israel (Przewozman Family)**

431. On May 5, 2019, Hamas and PIJ committed a rocket attack in Ashdod, Israel. Pinchas Przewozman died of injuries sustained in the attack, which was planned and authorized by Hamas and PIJ.

432. Plaintiff Hadassah Przewozman is the widow of Pinchas Przewozman and an Israeli national. She brings claims in both her personal capacity and representative capacity on behalf of Pinchas Przewozman's estate. Plaintiff P.P., by and through next friend Hadassah Przewozman, is the minor son of Pinchas Przewozman. Plaintiff Y.P., by and through next friend Hadassah Przewozman, is the minor son of Pinchas Przewozman. Plaintiff Chaya Przewozman is the mother of Pinchas Przewozman and an Israeli national. Plaintiff Chaim Przewozman is the father of Pinchas Przewozman. Plaintiff Avraohom Przewozman is the brother of Pinchas Przewozman. Plaintiff F.P., by and through next friend Chaim Przewozman, is the minor sister of Pinchas Przewozman. Plaintiff Zvi Przewozman is the brother of Pinchas Przewozman. Plaintiff Sara Rozenbaum is the sister of Pinchas Przewozman. Plaintiff Yafa Shechter is the sister of Pinchas Przewozman.

**2. The August 14, 2022 Mass-Shooting Attack in Israel (Gluck Family)**

433. On August 14, 2022, Hamas committed a mass-shooting attack in Jerusalem, Israel. Burech Gluck, Gitty Gluck, Herman Gluck, and Rachel Gluck were each injured in the attack, which was planned and authorized by Hamas. Burech Gluck suffered injuries after being shot in the neck. The bullet's exit wound was in his spinal cord near the C4 and C5 vertebrae. A second bullet struck Burech Gluck in his left thumb. Gitty Gluck suffered from severe psychological and emotional trauma. Herman Gluck suffered injuries from being shot in his left

cheek, and an exit wound from on the right side of the back of his neck. Rachel Gluck suffered psychological and emotional harm.

434. Plaintiff Bruchy Gluck is the sister of Burech and Rachel Gluck and the daughter of Gitty and Herman Gluck. Plaintiff Abraham Gluck is the brother of Burech and Rachel Gluck and the son of Gitty and Herman Gluck. Plaintiff A.G., by and through next friend Herman Gluck, is the minor brother of Burech and Rachel Gluck and the minor son of Gitty and Herman Gluck. Plaintiff D.G., by and through next friend Herman Gluck, is the minor brother of Burech and Rachel Gluck and the minor son of Gitty and Herman Gluck. Plaintiff Jacob Gluck is the brother of Burech and Rachel Gluck and the son of Gitty and Herman Gluck. Plaintiff Solomon Gluck is the brother of Burech and Rachel Gluck and the son of Gitty and Herman Gluck. Plaintiff V.G., by and through next friend Herman Gluck, is the minor brother of Burech and Rachel Gluck and the minor son of Gitty and Herman Gluck.

**3. The October 7, 2023 Attack in Israel**

435. On October 7, 2023, Hamas and PIJ jointly committed a coordinated attack across southern Israel in which approximately 1,200 people were killed and approximately 250 taken hostage. The attack was planned and authorized by Hamas and PIJ.

436. The October 7 attack was years in the making. Plans for an assault on the Israeli communities bordering Gaza took shape before 2014, were suspended during the 2014 Gaza war, and resumed as intensive preparation and training in 2021. A six-page handwritten directive dated August 24, 2022—attributed by Israeli intelligence to Hamas's Gaza leader Yahya Sinwar and recovered by Israeli forces in 2025—set out instructions for the assault, including the targeting of civilian communities, that Hamas commanders echoed in real time as they carried out the attack. The final decision to launch was made on October 6, 2023.

437. **(a) The Bausi Family.** Itai Bausi was attending the Supernova music festival during the October 7 attack. He was injured in the attack and died on October 11, 2023 of injuries sustained during it.

438. Plaintiffs Juliana Farron and Shahar Bausi are the mother and father of Itai Bausi; Shahar Bausi is an Israeli national. They bring claims in both their personal capacities and as co-representatives of Itai Bausi's estate. Plaintiff A.B., by and through his next friends Juliana Farron and Shahar Bausi, is the minor brother of Itai Bausi. Plaintiff Noa Bausi is the sister of Itai Bausi. Plaintiff Yoav Bausi is the brother of Itai Bausi.

439. **(b) The Brauner Family.** Plaintiffs Bernadette Brauner and Nir Brauner, who are married to each other, were each severely wounded in the October 7 attack, suffering severe post-traumatic stress disorder ("PTSD") after sheltering for more than twenty hours.

440. **(c) The Gabay Family.** Plaintiff Sheerel Gabay was attending the Supernova music festival during the October 7 attack, where she was severely wounded, suffering a gunshot wound to the knee, two open fractures, and a ruptured eardrum.

441. Plaintiff Liron Gabay is the mother of Sheerel Gabay. Plaintiff Gil Gabay is the father of Sheerel Gabay. Plaintiff Orel Gabay is the sister of Sheerel Gabay.

442. **(d) The Halley Family.** Plaintiff Ethan Halley was attending the Supernova music festival during the October 7 attack, where he was severely wounded by shrapnel, including shrapnel lodged in his lungs.

443. Plaintiff Wendy Halley is the mother of Ethan Halley. Plaintiff Adam Halley is the father of Ethan Halley. Plaintiff Boaz Halley is the brother of Ethan Halley. Plaintiff Sadie Halley is the sister of Ethan Halley.

444. **(e) The Maudi Family.** Noi Maudi, a civilian, was attending a music festival during the October 7 attack. He was injured in the attack and died on October 7, 2023 of injuries sustained during it.

445. Plaintiff Shimon Maudi is the father of Noi Maudi and an Israeli national. He brings claims in both his personal capacity and representative capacity on behalf of Noi Maudi's estate. Plaintiff Tamar Maudi is the mother of Noi Maudi and an Israeli national. Plaintiffs Sivan Elkabetz, Sapir Kitayevich, and Shani Rosenberg are the sisters of Noi Maudi and Israeli nationals.

446. **(f) The Mizrachi Family.** Ben Mizrachi, a civilian, was attending the Supernova music festival during the October 7 attack. He was injured in the attack and died on October 7, 2023 of injuries sustained during it.

447. Plaintiffs Dikla Mizrachi and Etsik Mizrachi are the mother and father of Ben Mizrachi; Etsik Mizrachi is a Canadian and Israeli national. They bring claims in both their personal capacities and as co-representatives of Ben Mizrachi's estate. Plaintiffs Dan Mizrachi and Maya Mizrachi are the brother and sister of Ben Mizrachi and are Canadian and Israeli nationals. Plaintiff Neev Mizrachi is the sister of Ben Mizrachi.

448. **(g) The Rom Family.** Jonathan Rom was attending the Supernova music festival during the October 7 attack. He was injured in the attack and died on October 7, 2023 of injuries sustained during it.

449. Plaintiffs Limor Rom and Tomer Rom are the mother and father of Jonathan Rom and Israeli nationals. They bring claims in both their personal capacities and as co-representatives of Jonathan Rom's estate. Plaintiffs Alona Rom and Noam Rom are the sister and brother of Jonathan Rom and Israeli nationals.

450. **(h) The Saadon Family.** Hallel Saadon was serving in the Israel Defense Forces during the October 7 attack. He was injured in the attack and died on October 7, 2023 of injuries sustained during it.

451. Plaintiffs Dvora Saadon and Elad Saadon are the mother and father of Hallel Saadon; Elad Saadon is an Israeli national. They bring claims in both their personal capacities and as co-representatives of Hallel Saadon's estate. Plaintiffs N.S., O.S., and S.S., each by and through his next friends Dvora Saadon and Elad Saadon, are the minor brothers of Hallel Saadon. Plaintiff Tamir Saadon is the brother of Hallel Saadon.

452. **(i) The Sharabi Family.** Plaintiff Yinon Sharabi was at home with his wife and children during the October 7 attack, where he was severely wounded and suffered psychological injuries.

453. **(j) The Wachs Family.** Igal Wachs was volunteering with a community-watch security team to defend his village during the October 7 attack. He was injured in the attack and died on October 7, 2023 of injuries sustained during it.

454. Plaintiff Liat Wachs is the widow of Igal Wachs. She brings claims in both her personal capacity and representative capacity on behalf of Igal Wachs's estate. Plaintiff J.W., by and through his next friend Liat Wachs, is the minor son of Igal Wachs.

**4. The November 6, 2023 Stabbing Attack in Israel (Lubin Family)**

455. On November 6, 2023, Hamas committed a stabbing attack in Jerusalem, Israel. Rose Lubin, a sergeant in the Israeli Border Police, was killed in the attack, which was planned and authorized by Hamas.

456. Plaintiffs Hal and Robin Lubin are Rose Lubin's father and mother. They bring claims in both their personal capacities and as co-representatives of Rose Lubin's estate. Plaintiff Alec Lubin is Rose Lubin's brother. Plaintiff I.L., by and through his next friend Hal Lubin, is

the minor brother of Rose Lubin. Plaintiffs J.L. and L.L., by and through their next friends Hal Lubin and Robin Lubin, are Rose Lubin's minor brother and stepsister, respectively. L.L. lived in the same household as Rose Lubin for a substantial period and considered Rose Lubin the functional equivalent of a biological sister.

**5. The November 8, 2023 Complex Attack in Israel (Margulies Family)**

457. On November 8, 2023, Hamas committed a complex attack in Gaza, Israel. Isaac Margulies of the Israel Defense Forces suffered burns, broken bones, and shrapnel injuries in the attack, which was planned and authorized by Hamas.

458. Plaintiffs Ellyn and Jacob Margulies are Isaac Margulies' mother and father. Plaintiffs Simon and Asher Margulies are Isaac Margulies' brothers.

**6. The December 10, 2023 Complex Attack in Israel (Zenilman Family)**

459. On December 10, 2023, Hamas committed a complex attack involving an explosive device and coordinated small-arms fire in Gaza, Israel. Ari Zenilman, a U.S. national serving in the Israel Defense Forces, was killed in the attack, which was planned and authorized by Hamas.

460. Plaintiff Yonah Landau Zenilman is Ari Zenilman's widow. She brings claims in both her personal capacity and representative capacity on behalf of Ari Zenilman's estate. Plaintiffs A.Z., M.Z. (an Israeli national), and T.Z., by and through their next friend Yonah Landau Zenilman, are Ari Zenilman's minor children. Plaintiffs Lisa Weinsoff and Robert Zenilman are Ari Zenilman's mother and father. Plaintiffs Shira Weinsoff Zenilman, Eitan Zenilman, Eli Zenilman, and Yonatan Zenilman are Ari Zenilman's siblings.

**7. The January 8, 2024 Complex Attack in Israel (Hexter Family)**

461. On January 8, 2024, Hamas and PIJ committed a complex attack involving rocket-propelled grenades against Israeli forces in Khan Younis, in the southern Gaza Strip.

Yakir Hexter of the Israel Defense Forces was killed in the attack, which was committed, planned, or authorized by Hamas and PIJ, which fought Israeli forces in Khan Younis jointly and in coordination through the Palestinian factions' Joint Operations Room.[9]

462. Plaintiff Joshua Hexter is Yakir Hexter's father. He brings claims in both his personal capacity and representative capacity on behalf of Yakir Hexter's estate. Plaintiff Chaya Hexter is Yakir Hexter's mother. Plaintiffs Ezra and Raphael Hexter are Yakir Hexter's brothers.

**8. The January 15, 2024 Vehicle Attack in Israel (Bollag, Kamer, and Merkin Families)**

463. On January 15, 2024, Hamas committed a vehicle attack at a bus stop in Israel. Plaintiffs S.B., N.K., and I.M. were each injured in the attack, which was planned and authorized by Hamas.

464. Plaintiff S.B., by and through next friend David Bollag, suffered a severe foot injury requiring physical therapy, as well as emotional injuries. Plaintiff David Bollag is the father of S.B. and a Swiss and Israeli national. Plaintiff E.B., by and through next friend David Bollag, is the minor sister of S.B. Plaintiff Madeleine Bollag is the sister of S.B. and a Swiss and Israeli national.

465. Plaintiff N.K., by and through next friend Allen Kamer, suffered injuries to his head and spinal cord; he initially could not breathe independently, speak, or walk, and endured more than five months of rehabilitation and numerous surgeries. Plaintiff Allen Kamer is the father of N.K. Plaintiff Stacy Rubtchinsky Kamer is the mother of N.K. Plaintiffs Eliana and Maya Kamer are the sisters of N.K. Plaintiff Y.K., by and through next friend Allen Kamer, is the minor twin brother of N.K.

---

[9] PIJ's terrorist operations arm, the al-Quds Brigades, attacked Israeli forces in Khan Younis in the days surrounding this attack. See Institute for the Study of War & Critical Threats Project, Iran Update, January 6, 2024.

466. Plaintiff I.M., by and through next friends Nicholas Merkin and Sharon Stein, suffered loss of consciousness and severe injuries preventing return to usual physical activities. Plaintiffs Nicholas Merkin and Sharon Stein are Plaintiff I.M.'s parents. Plaintiffs Eytan and Jonathan Merkin are Plaintiff I.M.'s brothers.

**9. The January 16, 2024 Complex Attack in Israel (Haber Family)**

467. On January 16, 2024, Hamas and PIJ committed a complex attack against Israeli forces in the northern Gaza Strip. Zachary Haber of the Israel Defense Forces was killed in the attack, which was committed, planned, or authorized by Hamas and PIJ, which fought Israeli forces in the northern Gaza Strip jointly and in coordination through the Palestinian factions' Joint Operations Room.[10]

468. Plaintiff Talia Friedman is Zachary Haber's widow. She brings claims in both her personal capacity and as representative of Zachary Haber's estate. Plaintiffs J.H., N.H., and S.H., by and through their next friend Talia Friedman, are Zachary Haber's minor children. Plaintiffs Miriam and Aharon Haber are Zachary Haber's parents. Plaintiffs Nathaniel and Noam Haber are Zachary Haber's brothers.

**10. The June 28, 2024 Sniper Attack in Israel (Tatelbaum Family)**

469. On June 28, 2024, Hamas committed a sniper attack in Israel. Yakir Tatelbaum of the Israel Defense Forces died of injuries sustained in the attack, which was planned and authorized by Hamas.

470. Plaintiffs Marcy and Yehudah Tatelbaum are Yakir Tatelbaum's mother and father. They bring claims in both their personal capacities and as co-representatives of Yakir

[10] PIJ's terrorist operations arm, the al-Quds Brigades, conducted anti-armor attacks on Israeli forces in the northern Gaza Strip in the period surrounding this attack.

Tatelbaum's estate. Plaintiffs Meir and Techelet Tatelbaum are Yakir Tatelbaum's brother and sister.

**B. The Hizballah and Kataib Hizballah Attacks in Iraq and Syria**

471. Each attack described in this section occurred during the period of Binance's assistance to Hizballah, Kataib Hizballah, and the IRGC. The connection between Defendants' conduct and each such attack is established *supra* and incorporated here by reference.

472. Each attack described in this section was committed by Kataib Hizballah, or by a joint cell of Hizballah and Kataib Hizballah operatives under IRGC-QF direction, and was planned and authorized by Hizballah—a designated FTO.

473. Each cell that committed an attack described in this section was funded, armed, and logistically supported by the Iranian regime—including Ayatollah Ali Khamenei and the IRGC—and by Hizballah. Each attack was also aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Iranian regime, the IRGC, and Hizballah and supplied to operatives from the IRGC, Hizballah, and Kataib Hizballah; all such payments were designed to, and did, incentivize Hizballah's and Kataib Hizballah's successful attacks, including each attack described in this section.

474. The IRGC's role extended beyond funding, arming, and directing the cells. For each attack described in this section other than the November 7, 2022 assassination attack, the IRGC—including the IRGC-QF and the IRGC Intelligence Organization ("IRGC-IO")—provided direct operational support to the attack teams, including intelligence used to plan and execute the attacks. And beginning with the September 28, 2022 attack, the attack cells themselves operated as joint cells of the IRGC, Hizballah, and Kataib Hizballah, with IRGC operatives in Iran acting in coordination with Hizballah and Kataib Hizballah operatives in Iraq and Syria.

475. Each attack described in this section also would have violated the laws of war if the terrorists who committed it had been subject to them. Many of the victims were civilians—including civilian contractors and aid workers—not taking part in hostilities. In every attack, the attackers neither wore uniforms nor otherwise identified themselves as enemy combatants, and they launched rockets, mortars, missiles, and one-way attack drones from positions in and among civilian areas, using weapons that indiscriminately placed civilians at risk. None of these attacks was committed by the "military forces" of any state: Hizballah and Kataib Hizballah are designated FTOs, not the armed forces of a state. Each attack described in this section accordingly constitutes an act of "international terrorism" under 18 U.S.C. § 2331(1) and falls outside the exclusion in 18 U.S.C. § 2336(a).

**1. The November 7, 2022 Assassination Attack in Iraq (Troell Family)**

476. On November 7, 2022, a joint cell comprising Hizballah and Kataib Hizballah operatives and IRGC-QF members committed an ambush attack in Iraq in which the terrorists forced Stephen Troell to stop his car and shot him with an assault rifle while his wife watched—and then fled to Iran for refuge arranged by IRGC officials. The attack was planned and authorized by the IRGC-QF, which also provided extensive intelligence and weapons to the terrorists that committed the attack. *See* Criminal Compl., *United States v. Mohammad Reza Nouri,* No. 23 MAG 5824, at ¶¶ 9, 13-17, 19-20, 26, 30 (S.D.N.Y. Aug. 1, 2023), https://www.justice.gov/usao-sdny/media/1381856/dl. Stephen Troell was killed in the attack.

477. Plaintiff Jocelyn Troell is the widow of Stephen Troell and brings claims in both her personal capacity and representative capacity on behalf of Stephen Troell's estate. Plaintiff Abigail Troell is the daughter of Stephen Troell. Plaintiffs A.T. and K.T., by and through next friend Jocelyn Troell, are the minor daughters of Stephen Troell. Plaintiff S.T., by and through next friend Jocelyn Troell, is the minor son of Stephen Troell. Plaintiff Susan Troell is the

mother of Stephen Troell. Plaintiff Richard Troell is the father of Stephen Troell. Plaintiffs Sarah Sellew, Christina Troell, and Joanna Winn are Stephen Troell's sisters.

**2. The February 15, 2021 Rocket Attack in Iraq (Carvin Johnson and Bobby Rorls III)**

478. On February 15, 2021, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a rocket attack on Erbil Air Base in Iraq.

479. Carvin Johnson was severely wounded by the attack; he suffered from injuries to his abdomen (including a liver laceration) and bowel, a blast-related brain injury and hemorrhagic shock, as well as psychological injuries, including severe depression, PTSD, and general anxiety.

480. Bobby Rorls III was also severely wounded; he suffered from psychological and emotional injuries such as PTSD, anxiety, depression, hypervigilance, sleep disturbances, and difficulties concentrating.

**3. The March 13, 2021 Rocket Attack in Iraq (Ayad Hattab)**

481. On March 13, 2021, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a rocket attack on the Union III Base in Baghdad, Iraq.

482. Ayad Hattab was severely wounded in the attack; he suffered from lumbar spine injuries as well as psychological and emotional distress.

**4. The May 1, 2021 Mortar Attack in Iraq (Oishael Taylor)**

483. On May 1, 2021, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a mortar attack on the Baghdad Diplomat Support Center near the U.S. Embassy in Baghdad, Iraq.

484. Oishael Taylor sustained psychological and emotional injuries in the attack such as anxiety and PTSD.

**5. The July 3, 2021 Rocket Attack in Iraq (Wykita Riley)**

485. On July 3, 2021, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a rocket attack on Al Asad Air Base, Iraq.

486. Wykita Riley sustained injuries in the attack, including psychological and emotional injuries such as PTSD.

**6. The July 7, 2021 Mortar Attack in Iraq (Garren Lorio)**

487. On July 7, 2021, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a mortar attack on Al Asad Air Base, Iraq.

488. Garren Lorio sustained injuries in the attack, including psychological and emotional injuries such as PTSD and extreme anxiety.

**7. The July 4, 2022 Rocket Attack in Iraq (Marquis Sorel)**

489. On July 4, 2022, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a rocket attack on Erbil Air Base in Iraq.

490. Marquis Sorel sustained injuries in the attack, including psychological and emotional injuries such as PTSD.

**8. The August 29, 2022 Small-Arms Attack in Iraq (Devin Caramanian)**

491. On August 29, 2022, a joint cell comprising Hizballah and Kataib Hizballah operatives committed a small-arms attack on the U.S. Embassy compound in Baghdad, Iraq.

492. Devin Caramanian, a civilian working for Triple Canopy, sustained injuries in the attack, including psychological and emotional injuries such as PTSD.

**9. The March 23, 2023 UAV Attack in Syria (Dubis Family and James Buckman)**

493. On March 23, 2023, an IRGC-Quds Force-directed proxy cell committed a one-way attack-drone (UAV) strike on a coalition base near Hasakah in northeastern Syria. The strike

was claimed by Liwa al-Ghaliboun, a group assessed to be an IRGC-QF front closely linked to Kataib Hizballah—its insignia nearly identical to Kataib Hizballah's—and the attack drone was tied to Iran by U.S. investigators. Scott Dubis was killed in the attack. Plaintiff Shay Dubis is the widow of Scott Dubis.

494. James Buckman sustained injuries in the attack, including emotional and psychological injuries such as PTSD and anxiety.

**10. The October 17, 2023 UAV Attack in Iraq (Doma Sherpa)**

495. On October 17, 2023, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a UAV attack in Iraq.

496. Doma Sherpa sustained injuries in the attack, including physical and psychological injuries such as PTSD.

**11. The October 18, 2023 UAV Attack in Iraq (Fernando Santiago)**

497. On October 18, 2023, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a UAV attack in Iraq.

498. Fernando Santiago sustained physical and psychological injuries in the attack, including but not limited to PTSD, as well as hearing loss, headaches, blurry vision, and other neurological symptoms.

**12. The October 26, 2023 UAV Attack in Iraq (Vincent Gramigna, Jolston Street, and Brittany Street)**

499. On October 26, 2023, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a UAV attack in Iraq.

500. Vincent Gramigna and Jolston Street each sustained emotional and psychological injuries in the attack, including PTSD and trouble sleeping.

501. Brittany Street sustained physical and psychological injuries in the attack, including injuries to her feet, knees, and back as well as psychological and emotional injuries such as PTSD, anxiety, depression, insomnia, and recurring headaches.

**13. The November 21, 2023 Missile Attack in Iraq (Jerrell Logan)**

502. On November 21, 2023, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a missile attack in Iraq. The attack featured IRGC missiles, and the attack cell included IRGC personnel drawn from the IRGC-QF, the IRGC-IO, and the IRGC's missile command.

503. Jerrell Logan sustained injuries in the attack, including a concussion, smoke inhalation, hearing loss, and psychological and emotional conditions, such as PTSD, insomnia, anxiety, and depression.

**14. The December 12, 2023 Rocket Attack in Syria (Brandon Horne)**

504. On December 12, 2023, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a rocket attack in Syria.

505. Brandon Horne sustained physical and psychological injuries in the attack, including dissociation and sleep disorders.

**15. The January 20, 2024 UAV Attack in Iraq (David Creasy)**

506. On January 20, 2024, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a UAV attack in Iraq.

507. David Creasy sustained injuries in the attack, including psychological injuries such as PTSD.

**16. The July 15, 2024 UAV Attack in Iraq (Arthur Vantine)**

508. On July 15, 2024, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a UAV attack in Iraq.

509. Arthur Vantine sustained injuries in the attack, psychological and emotional injuries such as PTSD, anxiety, and trouble sleeping.

**17. The July 16, 2024 UAV Attack in Iraq (Derald Bowman)**

510. On July 16, 2024, a joint cell comprising Hizballah and Kataib Hizballah operatives in Iraq, acting in coordination with the IRGC in Iran, committed a UAV attack in Iraq.

511. Derald Bowman, a civilian working for TCOM, suffered injuries in the attack, including a TBI, PTSD, anxiety, stress disorders, headaches, and tinnitus in his left ear.

**C. The IRGC Attacks**

512. Each attack described in this section was committed, planned, and authorized by the IRGC—a designated FTO. The connection between Defendants' conduct and each such attack is established above and incorporated here by reference.

513. Each attack described in this section was aided by, *inter alia*, bounty, salary, disability, and martyr payments funded by the Iranian regime and supplied to IRGC operatives; all such payments were designed to, and did, incentivize the IRGC's successful attacks, including each attack described in this section.

514. Each attack described in this section also would have violated the laws of war if the terrorists who committed it had been subject to them. The victims were civilians not taking part in hostilities; the attackers neither wore uniforms nor otherwise identified themselves as enemy combatants; and the attacks indiscriminately placed civilians at risk. Nor did these attacks occur in the course of any declared war or armed conflict between the military forces of two or more states: they were terrorist attacks directed at civilians, committed by an organization the

United States has designated as an FTO. Each attack described in this section accordingly constitutes an act of "international terrorism" under 18 U.S.C. § 2331(1) and falls outside the exclusion in 18 U.S.C. § 2336(a).

**1. The March 13, 2022 Ballistic-Missile Strike in Iraq (Eazy Nasir)**

515. On March 13, 2022, the IRGC launched a ballistic-missile strike on Erbil, Iraq. The IRGC publicly claimed the attack, stating that "the strategic center for conspiracy and evil of the Zionists was targeted by powerful and pinpoint missiles of the Islamic Revolution Guards Corps."

516. Eazy Nasir, a civilian contractor for Vectrus, was injured in the strike, suffering a head injury and concussion and continuing psychological and emotional injuries including PTSD.

**2. The 2022 Hostage-Taking Attack in Iran (Doe Family)**

517. On May 15, 2022, the IRGC, including the IRGC-QF and IRGC Intelligence Organization, planned, authorized, and committed a hostage-taking attack in Mashhad, Iran, which also involved extensive activity, including intelligence gathering, in the United States.

518. Plaintiff Reza Doe was abducted, held hostage, and brutally beaten and tortured during captivity. Reza Doe sustained severe blunt force trauma to the head resulting in a concussion and a coma, and he now suffers from continued memory issues and residual brain damage as a result.

519. Plaintiff Farnaz Doe is the wife of Reza Doe. Plaintiff Amir Doe is the son of Reza Doe.

### 3. The September 28, 2022 Missile and UAV Attack in Iraq (Mahmoudzadeh Family)

520. On September 28, 2022, a joint cell comprised of Hizballah and Kataib Hizballah in Iraq and the IRGC in Iran launched dozens of Fateh-class missiles from IRGC sites in Iran and dozens of UAVs, at Kurdish refugee camps in Koya, Iraq. The IRGC planned and authorized the attack, which also relied on IRGC-supplied weapons and intelligence. Omer Mahmoudzadeh, a civilian helping refugees in camps near the Democratic Party of Iranian Kurdistan headquarters, was killed in the attack.

521. Plaintiff Shiwa Nahadi is the widow of Omer Mahmoudzadeh and brings claims in both her personal capacity and representative capacity on behalf of Omer Mahmoudzadeh's estate. Plaintiff Tara Mahmoudzadeh is the daughter of Omer Mahmoudzadeh.

## CLAIM FOR RELIEF

## VIOLATION OF THE ANTI-TERRORISM ACT 18 U.S.C. § 2333(d)(2)

522. Plaintiffs incorporate their factual allegations above.

523. To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that Defendants were generally aware that they were playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that Defendants knowingly provided substantial assistance.

524. Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

525. The attacks that injured Plaintiffs were acts of "international terrorism" because:

a. The attacks involved violent and dangerous acts that violated the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of property by fire or explosive, conspiracy to murder in a foreign country, hostage taking, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1203, 2332, 2332a, 2332b, and 2332f, respectively.

b. The attacks, carried out by terrorists seeking to terrorize Israel and the United States and their allies, appear to have been intended (i) to intimidate or coerce the civilian populations of Israel, the United States, and other nations, (ii) to influence the policy of the Israeli, U.S., and other governments by intimidation and coercion, and (iii) to affect the conduct of the Israeli, U.S., and other governments by mass destruction, assassination, and kidnapping. And

c. The attacks occurred primarily outside the territorial jurisdiction of the United States.

526. Each attack that injured Plaintiffs was committed by Hamas, PIJ, the IRGC, Hizballah, or Kataib Hizballah, or by joint cells of those organizations acting under IRGC-QF direction.

527. Each such attack was committed, planned, or authorized by a designated FTO. Hamas and PIJ have each been designated an FTO at all relevant times. The IRGC has been a designated FTO since April 15, 2019, and an SDGT since October 13, 2017. Hizballah has been

a designated FTO since October 8, 1997. Kataib Hizballah has been a designated FTO since 2009.

528. Defendants were generally aware that they were playing a role in illegal activity, and that the terrorist attacks that injured Plaintiffs were a natural and foreseeable consequence of that activity.

529. Defendants provided substantial assistance knowingly and culpably, and not innocently or inadvertently. Defendants did so with knowledge that they were aiding terrorist organizations carrying out attacks on Americans:

a. Defendants knowingly provided uniquely dangerous services to FTOs despite it being foreseeable—and indeed inevitable—that this service would assist in the FTO attacks, including the attacks discussed above. Indeed, Binance's services have at least five factors that render them "dangerous wares" under *Twitter*, 598 U.S. at 502. First, Binance provided a restricted commodity. Second, Binance's platform was susceptible to harmful and illegal use. Third, Binance operated its platform in a way that stimulates illicit use. Fourth, Binance engaged in unusual business practices, including ignoring warnings and preventing compliance, indicating that Binance knew of and intended to facilitate unlawful activity. And fifth, Binance had a stake in concealing the nature and unlawful uses of its platform, from both a profit-motive perspective and due to the risk of criminal liability. Moreover, even though FTOs repeatedly used Binance's services to carry out terrorist attacks and Binance was aware of these issues, Binance continued to knowingly provide its services to FTOs.

b. Defendants also provided pervasive and systemic assistance to the FTOs that carried out the attacks discussed in Part V. The assistance involved years of willful

misconduct and tremendous sums of money that provided critically important assistance to the FTOs that killed or injured Plaintiffs and their family members. For instance, Defendants "consciously and selectively" assisted "a particular terrorist group" and thus "culpably assisted the terrorist group," *Twitter*, 598 U.S. at 502, by developing a sustained relationship with IRGC-controlled exchanges (including Nobitex) and promoting cryptocurrencies that FTO actors controlled.

c. In addition, setting aside the above, Defendants also knowingly provided substantial assistance for each of the attacks discussed in Part V. *See* Part III. They provided a type of assistance—illegal, covert access to funds—that was critically important to terrorist violence, including these specific attacks; in amounts that reached at least into the tens of millions, and likely into the billions; willfully and intentionally; over an extended period of years before and after each attack. Such assistance is substantial by any measure.

530. At all times, Defendants knew that they were aiding violent terrorist organizations that would use Defendants' services to gain access to funds that were necessary to enable attacks.

531. In the alternative, Defendants at a minimum willfully blinded themselves to the FTO affiliations of their customers and to the terrorist uses of their platform, as alleged in Part III. That willful blindness satisfies the knowledge component of knowing and substantial assistance.

532. Each Defendant is liable for the conduct alleged herein. Zhao personally directed, approved, and controlled that conduct—including Binance's refusal to implement effective AML/CFT and KYC controls, its retention and protection of U.S. VIP and FTO-affiliated customers, and its deception of U.S. regulators—and admitted in his guilty plea that he willfully

caused Binance's BSA violations. Binance US operated as part of a single enterprise with, and as the alter ego and instrumentality of, Binance and Zhao, and the conduct alleged herein is therefore legally attributable to all Defendants, as alleged in The Parties section above.

533. As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

534. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

535. Wherefore, Plaintiffs pray this Court:

a. Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b. Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the ATA pursuant to 18 U.S.C. § 2333(a);

c. Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d. Award Plaintiffs prejudgment interest; and

e. Award Plaintiffs any such further relief the Court deems just and proper.

Dated: July 6, 2026

Respectfully submitted,

SPARACINO PLLC

<u>*/s/ Tejinder Singh*</u>

Tejinder Singh
Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice*)
Geoffrey P. Eaton (*pro hac vice*)
Matthew J. Fisher (*pro hac vice*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: (202) 629-3530
tejinder.singh@sparacinopllc.com
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
matt.fisher@sparacinopllc.com
stacey.wilson@sparacinopllc.com

Vincent Levy
Jack Millman
Madison Gardiner
Kathryn Arnett
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, NY 10017
Tel: (646) 837-5120
vlevy@hsgllp.com
jmillman@hsgllp.com
mgardiner@hsgllp.com
karnett@hsgllp.com

*Counsel for Plaintiffs*

# APPENDIX A

# APPENDIX A

## Schedule of Identified Hamas and PIJ Transactions on the Binance Exchange

### Contents of This Appendix

**Table A-1.** Summary of identified transactions, by actor—transactions, total USD, counterparty wallets, and period for the eight identified actors, with a subtotal for the Gaza-based exchanges and an all-actor total.

**Table A-2.** Directional flow, by actor—transactions and approximate USD value moving to Binance and from Binance, for each actor, with a subtotal for the Gaza-based exchanges and an all-actor total.

**Table A-3.** Cumulative pre-attack transactions, by actor group—for each of the ten Hamas and PIJ attacks alleged in the Second Amended Complaint, the number of identified transactions Binance had already processed, by actor group and in total.

**Table A-4.** Cumulative pre-attack USD volume, by actor group, for the same attacks.

**Table A-5.** Hamas—the 50 largest identified transactions, chronological.

**Table A-6.** Palestinian Islamic Jihad (PIJ)—the 50 largest identified transactions, chronological.

**Table A-7.** BuyCash—the 50 largest identified transactions and three additional transactions identified in the Complaint, chronological.

**Table A-8.** Gaza Now—the 50 largest identified transactions, chronological.

**Table A-9.** Gaza-based exchanges (consolidated)—the 50 largest identified transactions across the group, chronological, with the transacting entity identified.

### Source and Scope

This Appendix sets out transactions identified by Plaintiffs' blockchain-analysis expert, J.S. Held, from public blockchain records, between the Binance.com exchange and cryptocurrency wallets attributed to Hamas, Palestinian Islamic Jihad (PIJ), and the Hamas- and PIJ-affiliated money service businesses described in the complaint. The schedule includes all identified transactions through the end of data collection; the earliest identified transaction occurred on December 13, 2017, and the latest on October 19, 2025. The transactions are aggregated into five mutually exclusive actor groups—Hamas, PIJ, BuyCash, Gaza Now, and the Gaza-based exchanges; no transaction is counted in more than one actor or group.

### Actor and Group Definitions

**"Hamas"** comprises the fundraising wallets of Hamas and its military wing (the al-Qassam Brigades), including wallets of the Khader Elden operation that the attribution data assigns to Hamas; Hamas has been a designated Foreign Terrorist Organization since 1997 and a Specially Designated Global Terrorist since 2001. This actor is distinct from, and shares no wallets or transactions with, the Dubai Company for Exchange actor below.

**"Palestinian Islamic Jihad (PIJ)"** is the identified PIJ fundraising network; PIJ has been a designated Foreign Terrorist Organization since 1997.

**"BuyCash"** is Buy Cash Money and Money Transfer Company, a Gaza-based money-transfer business designated by the U.S. Treasury's Office of Foreign Assets Control (OFAC) on October 18, 2023 for material support to Hamas.

**"Gaza Now"** is a Hamas-affiliated fundraising network designated by OFAC and the United Kingdom's Office of Financial Sanctions Implementation on March 27, 2024.

**"Gaza-based exchanges"** aggregates four designated Gaza money-exchange businesses: (i) the **Dubai Company for Exchange (Khader Elden)**, designated by Israel (Designation No. 377) and the subject of National Bureau for Counter Terror Financing (NBCTF) administrative seizure orders in 2022, 2023 (ASO 19/23), and 2025 (ASO 1/25, under its renamed identity "el-Kahira for General Trading"); (ii) the **Herzallah Exchange and General Trading Company**, designated by OFAC on January 22, 2024 for material support to Hamas and listed by the NBCTF; (iii) **Hamasat**, a Gaza money-exchange company operated by Hamas financier Subhi Ferwana and listed by the NBCTF; and (iv) **Al Mutahadun**, a money-exchange house owned by Mohammed Shamlakh, Hamas's senior officer for managing global currency flows (attribution detailed in the following paragraph). These are money-exchange houses that U.S. and Israeli authorities have identified as channels through which funds, including funds originating with Iran's Islamic Revolutionary Guard Corps–Qods Force, reached Hamas and PIJ in Gaza.

**"Al Mutahadun"** comprises the wallets designated in Israel's multi-party NBCTF seizure order naming Al Mutahadun for Exchange, the Dubai Company for Exchange, and Al Wefaq Company for Exchange, which the attribution data labels as a single parent entity ("Al Mutahadun for exchange or Dubai Company for exchange or Al Wefaq Co for exchange"). The order attributes most of the seized wallets to the cluster rather than to any one firm; one of the two name-attributed wallets belongs to Mohammed Shamlakh. Based on Plaintiffs' research, and to avoid double-counting, these wallets are attributed exclusively to Al Mutahadun; wallets attributable to the Dubai Company for exchange are, wherever possible, categorized under that actor (Table A-1, row 5). Separate Israeli designations targeting Al Mutahadun and the Shamlakhs between December 2021 and January 2023 identify 104 Binance accounts by account number only, without public blockchain addresses. This number is far greater than Al Wefaq's attributed Binance wallets. Al Mutahadun Binance account activity occurred on Binance's internal ledger and therefore does not appear in these tables, which accordingly understate Al Mutahadun's Binance transactions. Even if a given wallet were attributed instead to Dubai Company or Al Wefaq, each of the three exchanges has been designated by OFAC, NBCTF, or both for supporting Hamas and/or PIJ terrorism, and the analysis is unchanged.

**Basis for Attribution**

Each wallet is attributed to the identified actor on the basis of U.S. and Israeli government action—designations by the U.S. Treasury's Office of Foreign Assets Control and administrative seizure and forfeiture orders issued by Israel's National Bureau for Counter Terror Financing—together with commercial blockchain-attribution data (TRM Labs), which identify the wallet as controlled by or affiliated with the actor.

**Reading the Tables**

"From Binance" denotes value Binance transferred to the actor-controlled wallet, and "To Binance" the reverse. All amounts are approximate USD values at the time of the transaction. "Wallets" counts the unique non-Binance counterparty wallet addresses across the actor's transactions (the sending address for transactions to Binance; the receiving address for transactions from Binance); where a single transaction involves multiple counterparty addresses, each address is counted. No wallet is shared between actors, and the all-actor total counts each wallet once. Rows without an ascertainable USD value are excluded from all counts and totals.

"Cumulative pre-attack" figures include all identified transactions occurring before the date of the attack. Transactions specifically identified in the body of the Complaint are marked ‡ in Tables A-6 and A-7. Because this analysis captures only publicly traceable on-chain activity—and omits transactions internal to Binance's own ledger and wallets that could not be singly attributed—these figures are a conservative floor that understates actual volume.

**Table A-1. Summary of identified transactions, by actor**

| # | Actor | Transactions | Total USD | Wallets | Earliest | Latest |
|---|---|---|---|---|---|---|
| 1 | Hamas | 9,296 | $29,459,772 | 78 | 2018-03-02 | 2025-06-30 |
| 2 | Palestinian Islamic Jihad (PIJ) | 89,054 | $59,456,060 | 26 | 2020-10-29 | 2023-09-30 |
| 3 | BuyCash | 20,352 | $358,320,698 | 18 | 2017-12-13 | 2025-10-19 |
| 4 | Gaza Now | 494 | $4,320,331 | 15 | 2021-08-24 | 2024-07-04 |
| 5 | Dubai Company for Exchange (Khader Elden) | 6,818 | $50,967,157 | 69 | 2022-01-02 | 2025-06-07 |
| 6 | Herzallah Exchange | 168 | $1,059,280 | 9 | 2024-05-26 | 2025-06-30 |
| 7 | Hamasat (exchange) | 45 | $522,022 | 1 | 2025-05-10 | 2025-06-28 |
| 8 | Al Mutahadun† | 177 | $690,394 | 1 | 2022-01-15 | 2023-03-02 |
| | **Gaza-based exchanges (subtotal, rows 5–8)** | **7,208** | **$53,238,853** | **80** | | |
| | **TOTAL (all actors)** | **126,404** | **$504,795,714** | **217** | **2017-12-13** | **2025-10-19** |

*† Wallets designated in a multi-party NBCTF seizure order also naming the Dubai Company for Exchange and Al Wefaq Company for Exchange; attribution basis in the Al Mutahadun definition above. This line is distinct from, and shares no wallets or transactions with, the Dubai Company for Exchange (Khader Elden) in row 5.*

**Table A-2. Directional flow, by actor**

| # | Actor | Transactions to Binance | USD to Binance | Transactions from Binance | USD from Binance |
|---|---|---|---|---|---|
| 1 | Hamas | 3,887 | $14,748,602 | 5,409 | $14,711,170 |
| 2 | Palestinian Islamic Jihad (PIJ) | 30,716 | $30,187,356 | 58,338 | $29,268,704 |
| 3 | BuyCash | 13,327 | $254,092,494 | 7,025 | $104,228,204 |
| 4 | Gaza Now | 118 | $2,109,142 | 376 | $2,211,189 |
| 5 | Dubai Company for Exchange (Khader Elden) | 1,833 | $18,091,757 | 4,985 | $32,875,400 |
| 6 | Herzallah Exchange | 46 | $403,249 | 122 | $656,031 |
| 7 | Hamasat (exchange) | 44 | $521,523 | 1 | $499 |
| 8 | Al Mutahadun | 171 | $690,386 | 6 | $8 |
| | **Gaza-based exchanges (subtotal, rows 5–8)** | **2,094** | **$19,706,915** | **5,114** | **$33,531,938** |
| | **TOTAL (all actors)** | **50,142** | **$320,844,509** | **76,262** | **$183,951,205** |

*Directional split of the transactions in Table A-1; each actor's two directions sum to its Table A-1 totals. "To Binance" and "From Binance" are defined in "Reading the Tables" above.*

**Table A-3. Cumulative pre-attack transactions, by actor group**

| # | Attack date | Attack | Hamas | PIJ | BuyCash | Gaza Now | Gaza-based exchanges | Total |
|---|---|---|---|---|---|---|---|---|
| 1 | 2019-05-05 | Rocket attack, Ashdod (Przewozman) | 93 | 0 | 252 | 0 | 0 | 345 |
| 2 | 2022-08-14 | Mass shooting, Jerusalem (Gluck) | 5,994 | 76,943 | 7,182 | 153 | 446 | 90,718 |
| 3 | 2023-10-07 | Coordinated attack, southern Israel | 7,531 | 89,054 | 19,434 | 436 | 976 | 117,431 |
| 4 | 2023-11-06 | Stabbing, Jerusalem (Lubin) | 7,531 | 89,054 | 20,042 | 473 | 976 | 118,076 |
| 5 | 2023-11-08 | Complex attack (Margulies) | 7,531 | 89,054 | 20,093 | 473 | 976 | 118,127 |
| 6 | 2023-12-10 | Complex attack (Zenilman) | 7,531 | 89,054 | 20,342 | 473 | 976 | 118,376 |
| 7 | 2024-01-08 | Complex attack, Khan Younis (Hexter) | 7,532 | 89,054 | 20,348 | 473 | 1,074 | 118,481 |
| 8 | 2024-01-15 | Vehicle attack (Bollag/Kamer/Merkin) | 7,532 | 89,054 | 20,348 | 473 | 1,172 | 118,579 |
| 9 | 2024-01-16 | Complex attack, N. Gaza (Haber) | 7,532 | 89,054 | 20,348 | 473 | 1,194 | 118,601 |
| 10 | 2024-06-28 | Sniper attack (Tatelbaum) | 7,821 | 89,054 | 20,349 | 489 | 5,761 | 123,474 |

*Attacks are numbered 1–10 in date order, matching the Complaint's per-attack table for the Hamas and PIJ attacks.*

**Table A-4. Cumulative pre-attack USD volume, by actor group**

| # | Attack date | Attack | Hamas | PIJ | BuyCash | Gaza Now | Gaza-based exchanges | Total |
|---|---|---|---|---|---|---|---|---|
| 1 | 2019-05-05 | Rocket attack, Ashdod (Przewozman) | $50,745 | $0 | $469,464 | $0 | $0 | $520,209 |
| 2 | 2022-08-14 | Mass shooting, Jerusalem (Gluck) | $23,664,930 | $38,483,180 | $121,519,170 | $909,315 | $817,868 | $185,394,463 |
| 3 | 2023-10-07 | Coordinated attack, southern Israel | $24,455,369 | $59,456,060 | $336,773,276 | $4,312,161 | $2,690,427 | $427,687,293 |
| 4 | 2023-11-06 | Stabbing, Jerusalem (Lubin) | $24,455,369 | $59,456,060 | $350,686,297 | $4,319,181 | $2,690,427 | $441,607,334 |
| 5 | 2023-11-08 | Complex attack (Margulies) | $24,455,369 | $59,456,060 | $352,680,390 | $4,319,181 | $2,690,427 | $443,601,427 |
| 6 | 2023-12-10 | Complex attack (Zenilman) | $24,455,369 | $59,456,060 | $358,318,018 | $4,319,181 | $2,690,427 | $449,239,055 |
| 7 | 2024-01-08 | Complex attack, Khan Younis (Hexter) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $4,128,991 | $450,682,221 |
| 8 | 2024-01-15 | Vehicle attack (Bollag/Kamer/Merkin) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $5,824,345 | $452,377,575 |
| 9 | 2024-01-16 | Complex attack, N. Gaza (Haber) | $24,457,371 | $59,456,060 | $358,320,618 | $4,319,181 | $5,946,683 | $452,499,913 |
| 10 | 2024-06-28 | Sniper attack (Tatelbaum) | $26,174,594 | $59,456,060 | $358,320,618 | $4,320,021 | $49,894,071 | $498,165,364 |

**Table A-5. Hamas**

*Fundraising wallets of Hamas and its military wing (the al-Qassam Brigades). The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 9,296; $4,798,555 of $29,459,772 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---:|---|
| 1 | 2021-03-10 | To Binance | $65,331 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 2 | 2021-03-31 | To Binance | $111,149 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 3 | 2021-04-01 | To Binance | $137,640 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 4 | 2021-04-06 | To Binance | $80,048 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 5 | 2021-05-05 | To Binance | $127,195 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 6 | 2021-05-08 | From Binance | $70,113 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 7 | 2021-05-10 | From Binance | $70,069 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 8 | 2021-05-11 | From Binance | $70,300 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 9 | 2021-05-23 | From Binance | $100,220 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 10 | 2021-05-24 | To Binance | $118,044 | THB6eY4f85GUab3hdXHhNb53AX1vRzJ83s |
| 11 | 2021-06-07 | From Binance | $80,115 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 12 | 2021-06-09 | From Binance | $75,111 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 13 | 2021-06-10 | To Binance | $150,161 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 14 | 2021-06-11 | From Binance | $105,734 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 15 | 2021-06-12 | From Binance | $70,030 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 16 | 2021-06-15 | From Binance | $72,414 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 17 | 2021-07-07 | To Binance | $100,139 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 18 | 2021-07-26 | From Binance | $65,103 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 19 | 2021-08-03 | To Binance | $82,586 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 20 | 2021-08-03 | From Binance | $76,080 | TGfH7imvH9h6yxusNNPkkwrDzKCg7kFDTf |
| 21 | 2021-08-06 | To Binance | $197,532 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 22 | 2021-08-22 | To Binance | $68,832 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 23 | 2021-08-28 | From Binance | $74,959 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 24 | 2021-08-29 | To Binance | $128,567 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 25 | 2021-08-30 | To Binance | $100,140 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 26 | 2021-08-30 | From Binance | $90,125 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 27 | 2021-09-03 | From Binance | $76,905 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 28 | 2021-09-04 | From Binance | $100,358 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 29 | 2021-09-06 | To Binance | $300,129 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 30 | 2021-09-06 | From Binance | $100,042 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 31 | 2021-09-06 | From Binance | $100,042 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 32 | 2021-09-06 | From Binance | $70,030 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 33 | 2021-09-07 | From Binance | $99,997 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 34 | 2021-09-07 | To Binance | $76,680 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 35 | 2021-09-08 | From Binance | $80,315 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 36 | 2021-09-08 | To Binance | $70,276 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 37 | 2021-09-09 | From Binance | $100,196 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 38 | 2021-09-18 | From Binance | $60,275 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 39 | 2021-10-24 | From Binance | $84,569 | TXPggkiHzYZofVqpzMDS19ePG6qmcnu3gq |
| 40 | 2021-11-16 | From Binance | $78,361 | TXRBsytHfJDoAKRdcedgLsoHudh1xJGUdC |
| 41 | 2021-11-17 | From Binance | $101,250 | TXRBsytHfJDoAKRdcedgLsoHudh1xJGUdC |
| 42 | 2021-11-30 | To Binance | $107,909 | TJnYxvBHyoZT9GsGGaHzeQxvrGz743k1gq |
| 43 | 2021-11-30 | To Binance | $93,005 | TR2nTb64cQMx6tqFwisoC6o7barFWHhPiw |
| 44 | 2021-11-30 | To Binance | $75,508 | TPCQLRv6Bepnd5oPhXtrs1iHpSLchuHAso |
| 45 | 2021-11-30 | To Binance | $65,757 | TXdNFmv2wngkc9WT4sT9HdFgVWbYyfX21L |
| 46 | 2021-12-05 | To Binance | $67,506 | TM8PjCzv71EakELjVHoqsZY2aRHoPU8nr5 |
| 47 | 2021-12-20 | To Binance | $74,185 | TR2nTb64cQMx6tqFwisoC6o7barFWHhPiw |
| 48 | 2021-12-26 | To Binance | $92,585 | TR2nTb64cQMx6tqFwisoC6o7barFWHhPiw |
| 49 | 2024-05-10 | From Binance | $149,927 | TYy8cFhadMXY6K9Bt5NBewZnQrZ6UpiZrA |
| 50 | 2025-06-30 | From Binance | $85,011 | TP834zaucGKtAVjJPc9QQQkz5ses87KEf8 |

### Table A-6. Palestinian Islamic Jihad (PIJ)

*The identified PIJ fundraising network's wallets. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 89,054; $7,207,589 of $59,456,060 total). Transactions identified in the body of the Complaint are marked ‡.*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2022-04-09 | To Binance | $105,664 | TQ4HeWsnzXexz2UKY3Ef94xg3rnWkawirR |
| 2 | 2022-04-19 | To Binance | $168,598 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 3 | 2022-05-31 | To Binance | $100,087 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 4 | 2022-06-13 | From Binance | $125,760 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 5 | 2022-06-13 | To Binance | $125,257 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 6 | 2022-06-14 | From Binance | $100,722 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 7 | 2022-06-16 | From Binance | $173,373 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 8 | 2022-06-17 | To Binance | $100,129 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 9 | 2022-07-03 | To Binance | $150,190 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 10 | 2022-07-03 | From Binance | $144,260 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 11 | 2022-07-04 | To Binance | $120,034 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 12 | 2022-07-04 | From Binance | $111,059 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 13 | 2022-07-19 | To Binance | $122,067 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 14 | 2022-07-24 | To Binance | $100,098 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 15 | 2022-07-25 | To Binance | $100,098 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 16 | 2022-07-25 | From Binance | $100,097 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 17 | 2022-07-26 | To Binance | $130,238 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 18 | 2022-07-26 | From Binance | $120,254 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 19 | 2022-07-26 | To Binance | $100,183 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 20 | 2022-08-01 | From Binance | $110,351 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 21 | 2022-08-01 | To Binance | $110,112 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 22 | 2022-08-11 | To Binance | $150,114 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 23 | 2022-08-11 | To Binance | $139,986 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 24 | 2022-08-12 | From Binance | $150,950 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 25 | 2022-08-13 | To Binance | $130,129 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 26 | 2022-09-11 | To Binance | $100,134 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 27 | 2022-09-16 | From Binance | $150,073 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 28 | 2022-10-02 | To Binance | $200,056 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 29 | 2022-10-04 | From Binance | $100,400 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 30 | 2022-10-06 | To Binance | $200,023 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 31 | 2022-10-11 | To Binance | $199,786 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |
| 32 | 2022-10-11 | From Binance | $197,377 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 33 | 2022-10-13 | From Binance | $185,069 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 34 | 2022-10-27 | To Binance | $199,774 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 35 | 2022-10-29 | From Binance | $197,014 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 36 | 2022-10-31 | To Binance | $199,844 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 37 | 2022-11-08 | From Binance | $119,963 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 38 | 2022-11-22 | To Binance | $201,937 ‡ | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 39 | 2022-11-22 | From Binance | $200,126 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 40 | 2022-11-23 | From Binance | $149,856 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 41 | 2022-11-27 | From Binance | $200,011 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 42 | 2022-12-07 | From Binance | $130,105 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 43 | 2022-12-20 | To Binance | $200,214 ‡ | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 44 | 2022-12-21 | From Binance | $149,287 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 45 | 2022-12-22 | From Binance | $159,975 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 46 | 2023-01-15 | From Binance | $110,019 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 47 | 2023-01-24 | From Binance | $100,085 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 48 | 2023-01-25 | From Binance | $139,625 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 49 | 2023-02-21 | From Binance | $137,622 | TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE |
| 50 | 2023-03-23 | From Binance | $189,404 | TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF |

**Table A-7. BuyCash**

*Buy Cash Money and Money Transfer Company's wallets. The below chart reflects the largest 50 identified transactions by USD value, together with 3 additional transactions identified in the body of the Complaint (marked ‡), listed chronologically (53 of 20,352; $19,584,450 of $358,320,698 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2019-03-24 | To Binance | $14,425 ‡ | 19D1iGzDr7FyAdiy3ZZdxMd6ttHj1kj6WW |
| 2 | 2021-10-04 | From Binance | $398,278 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 3 | 2021-11-12 | To Binance | $300,603 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 4 | 2021-11-12 | From Binance | $300,502 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 5 | 2021-11-17 | From Binance | $566,514 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 6 | 2022-03-06 | To Binance | $299,407 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 7 | 2022-04-06 | To Binance | $399,147 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 8 | 2022-04-20 | From Binance | $299,987 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 9 | 2022-04-21 | From Binance | $299,998 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 10 | 2022-04-26 | To Binance | $300,270 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 11 | 2022-05-06 | To Binance | $480,120 ‡ | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 12 | 2022-06-07 | From Binance | $350,148 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 13 | 2022-06-11 | From Binance | $430,220 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 14 | 2022-09-18 | To Binance | $300,722 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 15 | 2022-09-26 | From Binance | $459,943 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 16 | 2022-09-29 | From Binance | $571,005 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 17 | 2022-10-03 | From Binance | $564,055 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 18 | 2022-10-03 | To Binance | $299,598 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 19 | 2022-10-04 | From Binance | $330,687 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 20 | 2022-10-06 | From Binance | $322,731 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 21 | 2022-10-19 | From Binance | $597,164 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 22 | 2022-10-26 | From Binance | $517,998 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 23 | 2022-10-28 | From Binance | $536,855 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 24 | 2022-11-02 | From Binance | $669,148 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 25 | 2022-11-03 | From Binance | $389,745 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 26 | 2022-12-08 | From Binance | $348,313 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 27 | 2023-01-09 | From Binance | $300,937 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 28 | 2023-01-23 | From Binance | $346,855 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 29 | 2023-02-09 | From Binance | $300,296 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 30 | 2023-02-17 | From Binance | $303,750 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 31 | 2023-02-22 | From Binance | $373,409 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 32 | 2023-02-22 | To Binance | $328,146 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 33 | 2023-03-01 | To Binance | $400,495 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 34 | 2023-03-03 | From Binance | $460,030 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 35 | 2023-03-03 | To Binance | $300,297 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 36 | 2023-03-11 | From Binance | $319,348 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 37 | 2023-03-28 | To Binance | $321,134 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 38 | 2023-03-30 | To Binance | $320,289 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 39 | 2023-04-04 | To Binance | $330,182 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 40 | 2023-04-06 | To Binance | $300,375 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 41 | 2023-04-14 | To Binance | $300,362 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 42 | 2023-04-18 | To Binance | $318,141 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 43 | 2023-06-14 | From Binance | $304,548 | TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc |
| 44 | 2023-06-16 | From Binance | $397,589 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 45 | 2023-06-28 | From Binance | $319,823 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 46 | 2023-07-05 | From Binance | $410,017 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 47 | 2023-07-13 | To Binance | $300,334 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 48 | 2023-08-03 | To Binance | $699,704 ‡ | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 49 | 2023-08-18 | To Binance | $323,657 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 50 | 2023-09-04 | To Binance | $299,955 | TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t |
| 51 | 2023-11-04 | From Binance | $318,248 ‡ | TGVA2jrm7ZzJXFUFAfmwbEWtWsyry9zFFj |
| 52 | 2023-11-06 | From Binance | $240,242 ‡ | TGVA2jrm7ZzJXFUFAfmwbEWtWsyry9zFFj |
| 53 | 2023-11-16 | From Binance | $298,704 ‡ | TUvRgYTczesQQho4cL8myZm5qJ3PxwZwm2 |

### Table A-8. Gaza Now

*Wallets of the Gaza Now fundraising network. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 494; $2,714,140 of $4,320,331 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2022-02-18 | From Binance | $45,446 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 2 | 2022-07-07 | To Binance | $27,521 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 3 | 2022-07-08 | To Binance | $28,630 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 4 | 2022-07-11 | To Binance | $30,320 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 5 | 2022-08-12 | To Binance | $36,932 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 6 | 2022-08-12 | From Binance | $24,704 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 7 | 2022-08-13 | To Binance | $39,512 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 8 | 2023-07-03 | To Binance | $28,207 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 9 | 2023-07-08 | To Binance | $43,027 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 10 | 2023-07-09 | To Binance | $51,459 | TGJVc32ig2u8tQsYMLE7KXHT5NDQroaVNU |
| 11 | 2023-07-09 | From Binance | $25,762 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 12 | 2023-07-26 | From Binance | $59,806 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 13 | 2023-07-26 | To Binance | $40,356 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 14 | 2023-07-27 | To Binance | $69,728 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 15 | 2023-07-29 | From Binance | $58,296 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 16 | 2023-07-29 | To Binance | $58,188 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 17 | 2023-07-29 | To Binance | $24,758 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 18 | 2023-08-02 | From Binance | $77,018 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 19 | 2023-08-02 | To Binance | $77,017 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 20 | 2023-08-03 | From Binance | $99,493 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 21 | 2023-08-03 | To Binance | $99,154 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 22 | 2023-08-04 | From Binance | $64,283 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 23 | 2023-08-05 | To Binance | $115,475 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 24 | 2023-08-05 | To Binance | $64,313 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 25 | 2023-08-05 | From Binance | $57,474 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 26 | 2023-08-05 | From Binance | $55,423 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 27 | 2023-08-05 | From Binance | $30,881 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 28 | 2023-08-05 | From Binance | $25,498 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 29 | 2023-08-06 | From Binance | $38,330 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 30 | 2023-08-07 | From Binance | $45,249 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 31 | 2023-08-07 | From Binance | $36,061 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 32 | 2023-08-09 | To Binance | $201,899 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 33 | 2023-08-09 | To Binance | $25,693 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 34 | 2023-08-09 | From Binance | $25,530 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 35 | 2023-08-11 | To Binance | $54,731 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 36 | 2023-08-11 | From Binance | $33,908 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 37 | 2023-08-12 | From Binance | $71,713 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 38 | 2023-08-12 | To Binance | $49,967 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 39 | 2023-08-12 | From Binance | $48,908 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 40 | 2023-08-13 | From Binance | $92,069 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 41 | 2023-08-13 | From Binance | $80,087 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 42 | 2023-08-13 | To Binance | $80,006 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 43 | 2023-08-13 | To Binance | $46,616 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 44 | 2023-08-13 | From Binance | $39,051 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 45 | 2023-08-13 | To Binance | $38,835 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 46 | 2023-08-13 | To Binance | $36,519 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 47 | 2023-08-13 | From Binance | $25,486 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 48 | 2023-08-14 | To Binance | $92,863 | TTgcTTNbNuFdbrhvbjMZVrdU5KALyzDaPw |
| 49 | 2023-08-15 | From Binance | $51,757 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |
| 50 | 2023-08-15 | From Binance | $40,181 | TXEsK1sEsKjZ1xtHitnyAAoqw3WLdYdRNW |

### Table A-9. Gaza-based exchanges (consolidated)

*Consolidated table for the Gaza-based exchanges group—Dubai Company for Exchange (Khader Elden), Herzallah Exchange, Hamasat, and Al Mutahadun—with the transacting entity identified in each row. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 7,208; $10,531,199 of $53,238,853 total).*

| # | Date | Entity | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---:|---|
| 1 | 2023-01-25 | Dubai Co. | To Binance | $152,824 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 2 | 2023-02-13 | Dubai Co. | To Binance | $199,797 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 3 | 2023-04-10 | Dubai Co. | From Binance | $124,136 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 4 | 2023-04-12 | Dubai Co. | From Binance | $110,175 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 5 | 2023-04-16 | Dubai Co. | To Binance | $110,135 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 6 | 2023-05-08 | Dubai Co. | From Binance | $140,492 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 7 | 2024-01-02 | Dubai Co. | From Binance | $163,543 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 8 | 2024-01-04 | Dubai Co. | From Binance | $174,916 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 9 | 2024-01-08 | Dubai Co. | From Binance | $124,968 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 10 | 2024-01-13 | Dubai Co. | From Binance | $149,990 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 11 | 2024-02-06 | Dubai Co. | To Binance | $199,698 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 12 | 2024-02-07 | Dubai Co. | To Binance | $129,711 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 13 | 2024-02-12 | Dubai Co. | To Binance | $620,242 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 14 | 2024-02-12 | Dubai Co. | To Binance | $500,195 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 15 | 2024-02-12 | Dubai Co. | To Binance | $500,195 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 16 | 2024-02-12 | Dubai Co. | From Binance | $500,194 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 17 | 2024-02-12 | Dubai Co. | To Binance | $330,129 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 18 | 2024-02-12 | Dubai Co. | To Binance | $300,117 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 19 | 2024-02-12 | Dubai Co. | From Binance | $250,097 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 20 | 2024-02-12 | Dubai Co. | From Binance | $241,256 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 21 | 2024-02-12 | Dubai Co. | To Binance | $200,078 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 22 | 2024-02-12 | Dubai Co. | To Binance | $199,078 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 23 | 2024-02-12 | Dubai Co. | To Binance | $140,055 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 24 | 2024-02-12 | Dubai Co. | To Binance | $125,049 | TKFmsWwzDk8vqnKx3BQ9DJxa4dQqbpPQg6 |
| 25 | 2024-02-13 | Dubai Co. | To Binance | $300,185 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 26 | 2024-02-13 | Dubai Co. | To Binance | $148,238 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 27 | 2024-02-14 | Dubai Co. | To Binance | $350,304 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 28 | 2024-02-15 | Dubai Co. | To Binance | $380,403 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 29 | 2024-02-16 | Dubai Co. | To Binance | $200,207 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 30 | 2024-02-16 | Dubai Co. | From Binance | $126,456 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 31 | 2024-02-19 | Dubai Co. | To Binance | $199,796 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 32 | 2024-02-29 | Dubai Co. | To Binance | $119,212 | TT4FNjuwJfZN956V4nxKRkWZirG96gWGj2 |
| 33 | 2024-02-29 | Dubai Co. | From Binance | $111,064 | TTj4MGQTuYQTEpiJ7BmkjNMciDTStMK69a |
| 34 | 2024-03-08 | Dubai Co. | To Binance | $129,189 | TT4FNjuwJfZN956V4nxKRkWZirG96gWGj2 |
| 35 | 2024-03-11 | Dubai Co. | From Binance | $249,846 | TTj4MGQTuYQTEpiJ7BmkjNMciDTStMK69a |
| 36 | 2024-03-14 | Dubai Co. | To Binance | $116,787 | TT4FNjuwJfZN956V4nxKRkWZirG96gWGj2 |
| 37 | 2024-03-28 | Dubai Co. | From Binance | $205,213 | TTj4MGQTuYQTEpiJ7BmkjNMciDTStMK69a |

| # | Date | Entity | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|---|
| 38 | 2024-04-12 | Dubai Co. | From Binance | $120,025 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 39 | 2024-04-13 | Dubai Co. | To Binance | $134,977 | TPKFo86STad1Eg1MhDeoyhf5g7wivLqonF |
| 40 | 2024-04-18 | Dubai Co. | To Binance | $199,895 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 41 | 2024-04-24 | Dubai Co. | To Binance | $199,972 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 42 | 2024-04-25 | Dubai Co. | To Binance | $259,854 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 43 | 2024-04-26 | Dubai Co. | To Binance | $199,859 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 44 | 2024-04-27 | Dubai Co. | To Binance | $199,772 | TJdTWNG8YdADcXHZg9ea1hnruNdMN5i4p8 |
| 45 | 2024-05-16 | Dubai Co. | To Binance | $130,087 | TU2TsDYZSVgeferWm7qgdKYgohgFn9CB9s |
| 46 | 2024-05-28 | Dubai Co. | From Binance | $149,915 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 47 | 2024-05-29 | Dubai Co. | From Binance | $124,253 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 48 | 2024-05-30 | Dubai Co. | From Binance | $136,666 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 49 | 2024-05-31 | Dubai Co. | From Binance | $200,074 | TEJHvTzJ3JqFYxvoq8LCeHFob4ELEjB9YX |
| 50 | 2024-06-10 | Dubai Co. | To Binance | $151,880 | TLjzbmnkxiUFdp5caQfATdD6JBoXpHTqJx |

# APPENDIX B

# APPENDIX B

## Schedule of Identified IRGC and Hizballah Transactions on the Binance Exchange

### Contents of This Appendix

**Table B-1.** Summary of identified transactions, by Channel—transactions, total USD, counterparty wallets, and period for the four Channels and in total.

**Table B-2.** Directional flow, by Channel—transactions and approximate USD value moving to Binance and from Binance, for each Channel and in total.

**Table B-3.** IRGC Exchanges, by total USD transaction volume—the same measures for Nobitex, Wallex.ir, Ramzinex, and Zedcex individually.

**Table B-4.** Cumulative pre-attack transactions, by Channel—for each of the 30 attacks alleged in the Second Amended Complaint, the number of identified transactions Binance had already processed, by Channel and combined.

**Table B-5.** Cumulative pre-attack USD volume, by Channel—the same, in approximate USD value.

**Table B-6.** Cumulative pre-attack transactions—the same measures as Table B-4, limited to the 20 attacks attributed to the IRGC, Hizballah, or Kataib Hizballah.

**Table B-7.** Cumulative pre-attack USD volume—the same 20 attacks, in approximate USD value.

**Table B-8.** Islamic Revolutionary Guard Corps (IRGC)—the 50 largest identified transactions, chronological.

**Table B-9.** Other IRGC Operatives and Support Channels—the 50 largest identified transactions, chronological.

**Table B-10.** Nobitex (IRGC Exchange)—the 50 largest identified transactions, chronological.

**Table B-11.** Wallex.ir (IRGC Exchange)—the 50 largest identified transactions, chronological.

**Table B-12.** Ramzinex (IRGC Exchange)—the 50 largest identified transactions, chronological.

**Table B-13.** Zedcex (IRGC Exchange)—the 50 largest identified transactions, chronological.

**Table B-14.** Hizballah—the 50 largest identified transactions, chronological.

### Source and Scope

This Appendix sets out transactions identified by Plaintiffs' blockchain-analysis expert, J.S. Held, from public blockchain records and attributed to the Iranian Islamic Revolutionary Guard Corps (IRGC), other IRGC operatives and support channels, IRGC cryptocurrency exchanges—including Nobitex, Iran's largest cryptocurrency exchange—and Hizballah. The transactions are aggregated into four mutually exclusive Channels; no transaction is counted in more than one Channel.

### Channel Definitions

**"Islamic Revolutionary Guard Corps (IRGC)"** aggregates three identified parent entities: "Islamic Revolutionary Guard Corps (IRGC)"; "Islamic Revolutionary Guard Corps (IRGC),Zedcex"; and "Zedcex,Islamic Revolutionary Guard Corps (IRGC)."

**"Other IRGC Operatives and Support Channels"** aggregates four identified parent entities: the Central Bank of the Islamic Republic of Iran; Ghorbaniyan, Mohammad; Pay2Key; and SamSam.

**"IRGC Exchanges"** aggregates four Iranian cryptocurrency exchanges, listed by total USD transaction volume: Nobitex, Wallex.ir, Ramzinex, and Zedcex.

**"Hizballah"** aggregates three identified sub-entities, as labeled in the attribution data: "Hezbollah"; "Hezbollah (Tawfiq al-Law)"; and the wallets listed by Israel's National Bureau for Counter Terror Financing on October 20, 2023.

### Basis for Attribution

Each wallet is attributed to the identified actor on the basis of U.S. and Israeli government action—designations by the U.S. Treasury's Office of Foreign Assets Control and administrative seizure and forfeiture orders issued by Israel's National Bureau for Counter Terror Financing—together with commercial blockchain-attribution data (TRM Labs), which identify the wallet as controlled by or affiliated with the actor.

### Reading the Tables

"From Binance" denotes value Binance transferred to the actor-controlled wallet, and "To Binance" the reverse. All amounts are approximate USD values at the time of the transaction. "Wallets" counts the unique non-Binance counterparty wallet addresses across the Channel's transactions (the sending address for transactions to Binance; the receiving address for transactions from Binance); where a single transaction involves multiple counterparty addresses, each address is counted. "Cumulative pre-attack" figures include all identified transactions occurring before the date of the attack, including Nobitex transactions within the IRGC Exchanges Channel. Attacks attributed in the Complaint to the IRGC, Hizballah, or Kataib Hizballah are shown in bold in Tables B-4 and B-5. Because this analysis captures only publicly traceable on-chain activity—and omits transactions internal to Binance's own ledger and wallets that could not be singly attributed—these figures are a conservative floor that understates actual volume.

**Table B-1. Summary of identified transactions, by Channel**

| # | Channel | Transactions | Total USD | Wallets | Earliest | Latest |
|---|---|---|---|---|---|---|
| 1 | Islamic Revolutionary Guard Corps (IRGC) | 666 | $79,634,646 | 52 | 2022-01-06 | 2025-06-28 |
| 2 | Other IRGC Operatives and Support Channels | 90 | $2,934,110 | 6 | 2017-12-17 | 2026-01-28 |
| 3 | IRGC Exchanges | 2,356,713 | $6,048,623,934 | 132,449 | 2018-04-09 | 2025-09-23 |
| 4 | Hizballah | 7,819 | $54,593,618 | 14 | 2022-01-01 | 2024-04-17 |
| | **TOTAL (all Channels)** | **2,365,288** | **$6,185,786,308** | **132,496** | **2017-12-17** | **2026-01-28** |

*Each wallet is counted once within each Channel and, in Table B-3, once within each exchange. 25 wallets transacted with more than one Channel, and 138 with more than one exchange; the IRGC Exchanges row and the TOTAL row each count every wallet once. The figure in the TOTAL row represents the total number of unique wallets (132,521 minus the 25 wallets that would otherwise be double-counted).*

**Table B-2. Directional flow, by Channel**

| # | Channel | Transactions to Binance | USD to Binance | Transactions from Binance | USD from Binance |
|---|---|---|---|---|---|
| 1 | Islamic Revolutionary Guard Corps (IRGC) | 334 | $37,090,794 | 332 | $42,543,852 |
| 2 | Other IRGC Operatives and Support Channels | 45 | $559,671 | 45 | $2,374,439 |
| 3 | IRGC Exchanges | 1,296,765 | $2,988,808,531 | 1,059,948 | $3,059,815,403 |
| 4 | Hizballah | 3,389 | $11,871,347 | 4,430 | $42,722,271 |
| | **TOTAL (all Channels)** | **1,300,533** | **$3,038,330,343** | **1,064,755** | **$3,147,455,965** |

*Directional split of the transactions in Table B-1; each Channel's two directions sum to its Table B-1 totals. "To Binance" and "From Binance" are defined in "Reading the Tables" above.*

**Table B-3. IRGC Exchanges, by total USD transaction volume**

| # | Exchange | Transactions | Total USD | Wallets | Earliest | Latest |
|---|---|---|---|---|---|---|
| 1 | Nobitex | 2,147,606 | $5,481,533,952 | 124,558 | 2018-04-09 | 2024-12-15 |
| 2 | Wallex.ir | 86,352 | $298,746,667 | 7,917 | 2019-03-03 | 2024-05-22 |
| 3 | Ramzinex | 121,602 | $242,239,438 | 58 | 2019-07-06 | 2024-09-20 |
| 4 | Zedcex | 1,153 | $26,103,877 | 54 | 2021-06-01 | 2025-09-23 |

*Wallets are counted once within each exchange; because 138 wallets transacted with more than one exchange, the four rows sum to more than the Channel's 132,449 unique wallets in Table B-1.*

**Table B-4. Cumulative pre-attack transactions, by Channel**

| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges | Hizballah | Combined |
|---|---|---|---|---|---|---|---|
| 1 | 2019-05-05 | Rocket attack, Ashdod (Przewozman) | 0 | 44 | 342 | 0 | 386 |
| 2 | **2021-02-15** | **Rocket attack, Erbil Air Base (Johnson/Rorls)** | 0 | 44 | 252,671 | 0 | 252,715 |
| 3 | **2021-03-13** | **Rocket attack, Union III Base, Baghdad (Hattab)** | 0 | 44 | 365,088 | 0 | 365,132 |
| 4 | **2021-05-01** | **Mortar attack, Baghdad (Taylor)** | 0 | 44 | 690,594 | 0 | 690,638 |
| 5 | **2021-07-03** | **Rocket attack, Al Asad Air Base (Riley)** | 0 | 46 | 1,056,015 | 0 | 1,056,061 |
| 6 | **2021-07-07** | **Rocket attack, Al Asad Air Base (Lorio)** | 0 | 46 | 1,070,620 | 0 | 1,070,666 |
| 7 | **2022-03-13** | **Ballistic-missile strike, Erbil (Nasir)** | 29 | 57 | 1,662,832 | 128 | 1,663,046 |
| 8 | **2022-05-15** | **Hostage-taking, Mashhad (Doe)** | 42 | 57 | 1,857,787 | 873 | 1,858,759 |
| 9 | **2022-07-04** | **Rocket attack, Erbil Air Base (Sorel)** | 43 | 57 | 1,972,871 | 1,521 | 1,974,492 |
| 10 | 2022-08-14 | Mass shooting, Jerusalem (Gluck) | 43 | 57 | 2,063,003 | 2,270 | 2,065,373 |
| 11 | **2022-08-29** | **Small arms attack, U.S. Embassy, Baghdad (Caramanian)** | 43 | 57 | 2,100,741 | 2,590 | 2,103,431 |
| 12 | **2022-09-28** | **Rocket and UAV attack, Kurdistan (Mahmoudzadeh)** | 43 | 57 | 2,157,427 | 3,149 | 2,160,676 |
| 13 | **2022-11-07** | **Hostage-taking attack, Iraq (Troell)** | 43 | 57 | 2,202,015 | 3,732 | 2,205,847 |
| 14 | **2023-03-23** | **UAV attack, Hasakah, Syria (Dubis/Buckman)** | 65 | 57 | 2,308,676 | 5,348 | 2,314,146 |
| 15 | 2023-10-07 | October 7 attack, southern Israel | 93 | 58 | 2,332,207 | 7,652 | 2,340,010 |
| 16 | **2023-10-17** | **UAV attack, Iraq (Sherpa)** | 93 | 58 | 2,332,970 | 7,736 | 2,340,857 |
| 17 | **2023-10-18** | **UAV attack, Iraq (Santiago)** | 93 | 58 | 2,333,046 | 7,741 | 2,340,938 |
| 18 | **2023-10-26** | **UAV attack, Iraq (Gramigna/Streets)** | 93 | 58 | 2,333,657 | 7,817 | 2,341,625 |
| 19 | 2023-11-06 | Stabbing attack, Jerusalem (Lubin) | 93 | 58 | 2,334,555 | 7,817 | 2,342,523 |
| 20 | 2023-11-08 | Complex attack, Gaza (Margulies) | 93 | 58 | 2,334,715 | 7,818 | 2,342,684 |
| 21 | **2023-11-21** | **Missile attack, Iraq (Logan)** | 93 | 58 | 2,335,807 | 7,818 | 2,343,776 |
| 22 | 2023-12-10 | Complex attack, Gaza (Zenilman) | 93 | 58 | 2,337,173 | 7,818 | 2,345,142 |
| 23 | **2023-12-12** | **Rocket attack, Syria (Horne)** | 93 | 58 | 2,337,337 | 7,818 | 2,345,306 |
| 24 | 2024-01-08 | Complex attack, Khan Younis (Hexter) | 100 | 83 | 2,339,493 | 7,818 | 2,347,494 |
| 25 | 2024-01-15 | Vehicle attack, Israel (Bollag/Kamer/Merkin) | 115 | 83 | 2,340,062 | 7,818 | 2,348,078 |
| 26 | 2024-01-16 | Complex attack, northern Gaza (Haber) | 115 | 83 | 2,340,143 | 7,818 | 2,348,159 |
| 27 | **2024-01-20** | **UAV attack, Iraq (Creasy)** | 116 | 83 | 2,340,414 | 7,818 | 2,348,431 |
| 28 | 2024-06-28 | Sniper attack, Israel (Tatelbaum) | 384 | 86 | 2,350,309 | 7,819 | 2,358,598 |
| 29 | **2024-07-15** | **UAV attack, Iraq (Vantine)** | 391 | 86 | 2,351,196 | 7,819 | 2,359,492 |
| 30 | **2024-07-16** | **UAV attack, Iraq (Bowman)** | 391 | 86 | 2,351,248 | 7,819 | 2,359,544 |

*Attacks are numbered 1–30 in date order across both attack sets. The Complaint numbers the Hamas and PIJ attacks (1–10; see Appendix A) and the IRGC, Hizballah, and Kataib Hizballah attacks (1–20; see Tables B-6 and B-7) separately, in the same date order.*

## Table B-5. Cumulative pre-attack USD volume, by Channel

| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges | Hizballah | Combined |
|---|---|---|---|---|---|---|---|
| 1 | 2019-05-05 | Rocket attack, Ashdod (Przewozman) | $0 | $394,153 | $1,395,341 | $0 | $1,789,494 |
| 2 | **2021-02-15** | **Rocket attack, Erbil Air Base (Johnson/Rorls)** | $0 | $394,153 | $579,176,816 | $0 | $579,570,969 |
| 3 | **2021-03-13** | **Rocket attack, Union III Base, Baghdad (Hattab)** | $0 | $394,153 | $783,799,357 | $0 | $784,193,510 |
| 4 | **2021-05-01** | **Mortar attack, Baghdad (Taylor)** | $0 | $394,153 | $1,419,869,739 | $0 | $1,420,263,892 |
| 5 | **2021-07-03** | **Rocket attack, Al Asad Air Base (Riley)** | $0 | $564,189 | $2,161,205,987 | $0 | $2,161,770,176 |
| 6 | **2021-07-07** | **Rocket attack, Al Asad Air Base (Lorio)** | $0 | $564,189 | $2,182,195,706 | $0 | $2,182,759,895 |
| 7 | **2022-03-13** | **Ballistic-missile strike, Erbil (Nasir)** | $25,251 | $1,814,470 | $4,356,408,038 | $2,794,099 | $4,361,041,858 |
| 8 | **2022-05-15** | **Hostage-taking, Mashhad (Doe)** | $30,949 | $1,814,470 | $4,915,063,878 | $9,113,621 | $4,926,022,918 |
| 9 | **2022-07-04** | **Rocket attack, Erbil Air Base (Sorel)** | $30,999 | $1,814,470 | $5,190,739,826 | $12,687,284 | $5,205,272,579 |
| 10 | 2022-08-14 | Mass shooting, Jerusalem (Gluck) | $30,999 | $1,814,470 | $5,419,845,901 | $13,945,308 | $5,435,636,678 |
| 11 | **2022-08-29** | **Small arms attack, U.S. Embassy, Baghdad (Caramanian)** | $30,999 | $1,814,470 | $5,522,125,688 | $14,606,588 | $5,538,577,745 |
| 12 | **2022-09-28** | **Rocket and UAV attack, Kurdistan (Mahmoudzadeh)** | $30,999 | $1,814,470 | $5,714,092,212 | $15,753,392 | $5,731,691,073 |
| 13 | **2022-11-07** | **Hostage-taking attack, Iraq (Troell)** | $30,999 | $1,814,470 | $5,847,695,411 | $16,086,815 | $5,865,627,695 |
| 14 | **2023-03-23** | **UAV attack, Hasakah, Syria (Dubis/Buckman)** | $156,627 | $1,814,470 | $6,002,495,133 | $34,935,765 | $6,039,401,995 |
| 15 | 2023-10-07 | October 7 attack, southern Israel | $299,511 | $1,814,484 | $6,017,963,623 | $54,438,664 | $6,074,516,282 |
| 16 | **2023-10-17** | **UAV attack, Iraq (Sherpa)** | $299,511 | $1,814,484 | $6,018,210,666 | $54,516,828 | $6,074,841,489 |
| 17 | **2023-10-18** | **UAV attack, Iraq (Santiago)** | $299,511 | $1,814,484 | $6,018,230,623 | $54,518,472 | $6,074,863,090 |
| 18 | **2023-10-26** | **UAV attack, Iraq (Gramigna/Streets)** | $299,511 | $1,814,484 | $6,018,433,082 | $54,593,617 | $6,075,140,694 |
| 19 | 2023-11-06 | Stabbing attack, Jerusalem (Lubin) | $299,511 | $1,814,484 | $6,018,786,008 | $54,593,617 | $6,075,493,620 |
| 20 | 2023-11-08 | Complex attack, Gaza (Margulies) | $299,511 | $1,814,484 | $6,018,873,737 | $54,593,618 | $6,075,581,350 |
| 21 | **2023-11-21** | **Missile attack, Iraq (Logan)** | $299,511 | $1,814,484 | $6,019,255,467 | $54,593,618 | $6,075,963,080 |
| 22 | 2023-12-10 | Complex attack, Gaza (Zenilman) | $299,511 | $1,814,484 | $6,019,829,797 | $54,593,618 | $6,076,537,410 |
| 23 | **2023-12-12** | **Rocket attack, Syria (Horne)** | $299,511 | $1,814,484 | $6,019,875,789 | $54,593,618 | $6,076,583,402 |
| 24 | 2024-01-08 | Complex attack, Khan Younis (Hexter) | $311,394 | $2,910,459 | $6,020,591,059 | $54,593,618 | $6,078,406,530 |
| 25 | 2024-01-15 | Vehicle attack, Israel (Bollag/Kamer/Merkin) | $528,172 | $2,910,459 | $6,020,743,615 | $54,593,618 | $6,078,775,864 |
| 26 | 2024-01-16 | Complex attack, northern Gaza (Haber) | $528,172 | $2,910,459 | $6,020,761,538 | $54,593,618 | $6,078,793,787 |
| 27 | **2024-01-20** | **UAV attack, Iraq (Creasy)** | $529,167 | $2,910,459 | $6,020,837,022 | $54,593,618 | $6,078,870,266 |

| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges | Hizballah | Combined |
|---|---|---|---|---|---|---|---|
| 28 | 2024-06-28 | Sniper attack, Israel (Tatelbaum) | $16,874,879 | $2,934,073 | $6,024,523,601 | $54,593,618 | $6,098,926,171 |
| 29 | **2024-07-15** | **UAV attack, Iraq (Vantine)** | $17,192,494 | $2,934,073 | $6,025,342,833 | $54,593,618 | $6,100,063,018 |
| 30 | **2024-07-16** | **UAV attack, Iraq (Bowman)** | $17,192,494 | $2,934,073 | $6,025,355,463 | $54,593,618 | $6,100,075,648 |

**Table B-6. Cumulative pre-attack transactions—IRGC, Hizballah, and Kataib Hizballah attacks only**

| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges | Hizballah | Combined |
|---|---|---|---|---|---|---|---|
| 1 | 2021-02-15 | Rocket attack, Erbil Air Base (Johnson/Rorls) | 0 | 44 | 252,671 | 0 | 252,715 |
| 2 | 2021-03-13 | Rocket attack, Union III Base, Baghdad (Hattab) | 0 | 44 | 365,088 | 0 | 365,132 |
| 3 | 2021-05-01 | Mortar attack, Baghdad (Taylor) | 0 | 44 | 690,594 | 0 | 690,638 |
| 4 | 2021-07-03 | Rocket attack, Al Asad Air Base (Riley) | 0 | 46 | 1,056,015 | 0 | 1,056,061 |
| 5 | 2021-07-07 | Rocket attack, Al Asad Air Base (Lorio) | 0 | 46 | 1,070,620 | 0 | 1,070,666 |
| 6 | 2022-03-13 | Ballistic-missile strike, Erbil (Nasir) | 29 | 57 | 1,662,832 | 128 | 1,663,046 |
| 7 | 2022-05-15 | Hostage-taking, Mashhad (Doe) | 42 | 57 | 1,857,787 | 873 | 1,858,759 |
| 8 | 2022-07-04 | Rocket attack, Erbil Air Base (Sorel) | 43 | 57 | 1,972,871 | 1,521 | 1,974,492 |
| 9 | 2022-08-29 | Small arms attack, U.S. Embassy, Baghdad (Caramanian) | 43 | 57 | 2,100,741 | 2,590 | 2,103,431 |
| 10 | 2022-09-28 | Rocket and UAV attack, Kurdistan (Mahmoudzadeh) | 43 | 57 | 2,157,427 | 3,149 | 2,160,676 |
| 11 | 2022-11-07 | Hostage-taking attack, Iraq (Troell) | 43 | 57 | 2,202,015 | 3,732 | 2,205,847 |
| 12 | 2023-03-23 | UAV attack, Hasakah, Syria (Dubis/Buckman) | 65 | 57 | 2,308,676 | 5,348 | 2,314,146 |
| 13 | 2023-10-17 | UAV attack, Iraq (Sherpa) | 93 | 58 | 2,332,970 | 7,736 | 2,340,857 |
| 14 | 2023-10-18 | UAV attack, Iraq (Santiago) | 93 | 58 | 2,333,046 | 7,741 | 2,340,938 |
| 15 | 2023-10-26 | UAV attack, Iraq (Gramigna/Streets) | 93 | 58 | 2,333,657 | 7,817 | 2,341,625 |
| 16 | 2023-11-21 | Missile attack, Iraq (Logan) | 93 | 58 | 2,335,807 | 7,818 | 2,343,776 |
| 17 | 2023-12-12 | Rocket attack, Syria (Horne) | 93 | 58 | 2,337,337 | 7,818 | 2,345,306 |
| 18 | 2024-01-20 | UAV attack, Iraq (Creasy) | 116 | 83 | 2,340,414 | 7,818 | 2,348,431 |
| 19 | 2024-07-15 | UAV attack, Iraq (Vantine) | 391 | 86 | 2,351,196 | 7,819 | 2,359,492 |
| 20 | 2024-07-16 | UAV attack, Iraq (Bowman) | 391 | 86 | 2,351,248 | 7,819 | 2,359,544 |

*The 20 attacks attributed in the Complaint to the IRGC, Hizballah, or Kataib Hizballah—the rows shown in bold in Tables B-4 and B-5—numbered 1–20 in date order, matching the Complaint's per-attack table for these attacks. Cumulative figures correspond to Tables B-4 and B-5.*

**Table B-7. Cumulative pre-attack USD volume—IRGC, Hizballah, and Kataib Hizballah attacks only**

| # | Attack date | Attack | IRGC | Other IRGC | IRGC Exchanges | Hizballah | Combined |
|---|---|---|---|---|---|---|---|
| 1 | 2021-02-15 | Rocket attack, Erbil Air Base (Johnson/Rorls) | $0 | $394,153 | $579,176,816 | $0 | $579,570,969 |
| 2 | 2021-03-13 | Rocket attack, Union III Base, Baghdad (Hattab) | $0 | $394,153 | $783,799,357 | $0 | $784,193,510 |
| 3 | 2021-05-01 | Mortar attack, Baghdad (Taylor) | $0 | $394,153 | $1,419,869,739 | $0 | $1,420,263,892 |
| 4 | 2021-07-03 | Rocket attack, Al Asad Air Base (Riley) | $0 | $564,189 | $2,161,205,987 | $0 | $2,161,770,176 |
| 5 | 2021-07-07 | Rocket attack, Al Asad Air Base (Lorio) | $0 | $564,189 | $2,182,195,706 | $0 | $2,182,759,895 |
| 6 | 2022-03-13 | Ballistic-missile strike, Erbil (Nasir) | $25,251 | $1,814,470 | $4,356,408,038 | $2,794,099 | $4,361,041,858 |
| 7 | 2022-05-15 | Hostage-taking, Mashhad (Doe) | $30,949 | $1,814,470 | $4,915,063,878 | $9,113,621 | $4,926,022,918 |
| 8 | 2022-07-04 | Rocket attack, Erbil Air Base (Sorel) | $30,999 | $1,814,470 | $5,190,739,826 | $12,687,284 | $5,205,272,579 |
| 9 | 2022-08-29 | Small arms attack, U.S. Embassy, Baghdad (Caramanian) | $30,999 | $1,814,470 | $5,522,125,688 | $14,606,588 | $5,538,577,745 |
| 10 | 2022-09-28 | Rocket and UAV attack, Kurdistan (Mahmoudzadeh) | $30,999 | $1,814,470 | $5,714,092,212 | $15,753,392 | $5,731,691,073 |
| 11 | 2022-11-07 | Hostage-taking attack, Iraq (Troell) | $30,999 | $1,814,470 | $5,847,695,411 | $16,086,815 | $5,865,627,695 |
| 12 | 2023-03-23 | UAV attack, Hasakah, Syria (Dubis/Buckman) | $156,627 | $1,814,470 | $6,002,495,133 | $34,935,765 | $6,039,401,995 |
| 13 | 2023-10-17 | UAV attack, Iraq (Sherpa) | $299,511 | $1,814,484 | $6,018,210,666 | $54,516,828 | $6,074,841,489 |
| 14 | 2023-10-18 | UAV attack, Iraq (Santiago) | $299,511 | $1,814,484 | $6,018,230,623 | $54,518,472 | $6,074,863,090 |
| 15 | 2023-10-26 | UAV attack, Iraq (Gramigna/Streets) | $299,511 | $1,814,484 | $6,018,433,082 | $54,593,617 | $6,075,140,694 |
| 16 | 2023-11-21 | Missile attack, Iraq (Logan) | $299,511 | $1,814,484 | $6,019,255,467 | $54,593,618 | $6,075,963,080 |
| 17 | 2023-12-12 | Rocket attack, Syria (Horne) | $299,511 | $1,814,484 | $6,019,875,789 | $54,593,618 | $6,076,583,402 |
| 18 | 2024-01-20 | UAV attack, Iraq (Creasy) | $529,167 | $2,910,459 | $6,020,837,022 | $54,593,618 | $6,078,870,266 |
| 19 | 2024-07-15 | UAV attack, Iraq (Vantine) | $17,192,494 | $2,934,073 | $6,025,342,833 | $54,593,618 | $6,100,063,018 |
| 20 | 2024-07-16 | UAV attack, Iraq (Bowman) | $17,192,494 | $2,934,073 | $6,025,355,463 | $54,593,618 | $6,100,075,648 |

*The same 20 attacks as Table B-6, in approximate USD value.*

### Table B-8. Islamic Revolutionary Guard Corps (IRGC)

*The IRGC's own financial wallets. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 666; $67,634,669 of $79,634,646 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---:|---|
| 1 | 2024-02-01 | To Binance | $499,485 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 2 | 2024-03-22 | To Binance | $1,000,382 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 3 | 2024-03-23 | From Binance | $1,000,811 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 4 | 2024-03-26 | To Binance | $1,000,426 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 5 | 2024-03-28 | To Binance | $1,996,729 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 6 | 2024-04-01 | To Binance | $998,563 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 7 | 2024-04-02 | From Binance | $549,458 | TU5N1PAd9bmRNyJdTBgDVpn489wZGzHKQU |
| 8 | 2024-04-07 | To Binance | $321,956 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 9 | 2024-04-19 | To Binance | $500,143 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 10 | 2024-05-01 | To Binance | $499,599 | TNutMPVfo5mVCC2j81ZWkXXzdRJrMUeKuU |
| 11 | 2024-05-03 | To Binance | $3,867,580 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 12 | 2024-06-03 | From Binance | $499,718 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 13 | 2025-01-03 | To Binance | $1,998,116 | TNutMPVfo5mVCC2j81ZWkXXzdRJrMUeKuU |
| 14 | 2025-01-06 | From Binance | $1,999,448 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 15 | 2025-01-06 | From Binance | $1,999,448 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 16 | 2025-01-07 | To Binance | $4,000,971 | TNutMPVfo5mVCC2j81ZWkXXzdRJrMUeKuU |
| 17 | 2025-01-08 | From Binance | $1,998,191 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 18 | 2025-01-08 | To Binance | $1,348,780 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 19 | 2025-01-09 | From Binance | $306,954 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 20 | 2025-01-12 | To Binance | $5,997,817 | TNutMPVfo5mVCC2j81ZWkXXzdRJrMUeKuU |
| 21 | 2025-01-16 | From Binance | $2,000,050 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 22 | 2025-01-17 | From Binance | $1,999,758 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 23 | 2025-01-18 | From Binance | $733,833 | TCrvaaFooU3tamGeESNQP1AseBJpeahrn5 |
| 24 | 2025-01-20 | From Binance | $1,997,381 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 25 | 2025-01-20 | To Binance | $1,353,873 | TEXsD49JGEaM8qgBX77Xuq3wxMKiAyWHNX |
| 26 | 2025-01-21 | To Binance | $549,341 | TCrvaaFooU3tamGeESNQP1AseBJpeahrn5 |
| 27 | 2025-01-30 | From Binance | $1,364,979 | TCrvaaFooU3tamGeESNQP1AseBJpeahrn5 |
| 28 | 2025-02-04 | To Binance | $361,365 | TRpDQ4v7vFHXxEGunsm6JXHztYMA4baQUu |
| 29 | 2025-02-20 | From Binance | $589,941 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 30 | 2025-02-25 | To Binance | $469,805 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 31 | 2025-02-25 | From Binance | $469,904 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 32 | 2025-02-27 | To Binance | $791,814 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 33 | 2025-03-03 | From Binance | $821,242 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 34 | 2025-03-07 | To Binance | $999,965 | TTmw3qzMsHC8628v4pcJG798377pZrLm8f |
| 35 | 2025-03-07 | To Binance | $272,485 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 36 | 2025-03-24 | From Binance | $279,622 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 37 | 2025-03-28 | To Binance | $2,314,420 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 38 | 2025-03-29 | From Binance | $1,799,142 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 39 | 2025-04-17 | To Binance | $274,896 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 40 | 2025-04-27 | To Binance | $540,153 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 41 | 2025-04-27 | From Binance | $540,152 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 42 | 2025-04-27 | To Binance | $540,153 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 43 | 2025-05-08 | From Binance | $248,045 | TUjufcYJkmaQVN7a7KrycKRXVw2voXYsAu |
| 44 | 2025-05-21 | From Binance | $1,179,842 | THCVcSevbe2XmhfSfeDAHEE7UUoZTQAD9a |
| 45 | 2025-05-23 | From Binance | $1,175,262 | THCVcSevbe2XmhfSfeDAHEE7UUoZTQAD9a |
| 46 | 2025-05-27 | From Binance | $3,283,974 | THCVcSevbe2XmhfSfeDAHEE7UUoZTQAD9a |
| 47 | 2025-05-28 | From Binance | $2,393,312 | THCVcSevbe2XmhfSfeDAHEE7UUoZTQAD9a |
| 48 | 2025-05-28 | From Binance | $2,283,666 | THCVcSevbe2XmhfSfeDAHEE7UUoZTQAD9a |
| 49 | 2025-05-28 | From Binance | $400,141 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 50 | 2025-05-28 | From Binance | $3,221,578 | THCVcSevbe2XmhfSfeDAHEE7UUoZTQAD9a |

### Table B-9. Other IRGC Operatives and Support Channels

*Other channels of support for the IRGC, including the Central Bank of the Islamic Republic of Iran; Mohammad Ghorbaniyan; Pay2Key; and SamSam. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 90; $2,743,525 of $2,934,110 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2017-12-17 | To Binance | $14,900 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 2 | 2017-12-17 | To Binance | $15,508 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 3 | 2018-04-07 | To Binance | $19,099 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 4 | 2018-04-07 | To Binance | $18,891 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 5 | 2018-04-08 | From Binance | $14,220 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 6 | 2018-05-08 | To Binance | $18,608 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 7 | 2018-05-08 | To Binance | $18,927 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 8 | 2018-08-13 | To Binance | $15,309 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 9 | 2018-08-13 | To Binance | $15,214 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 10 | 2018-10-01 | To Binance | $26,605 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 11 | 2018-10-01 | To Binance | $26,350 | 1AjZPMsnmpdK2Rv9KQNfMurTXinscVro9V |
| 12 | 2021-05-13 | To Binance | $100,013 | TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81 |
| 13 | 2021-05-28 | To Binance | $70,022 | TNiq9AXBp9EjUqhDhrwrfvAA8U3GUQZH81 |
| 14 | 2021-09-27 | From Binance | $110,269 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 15 | 2021-09-27 | From Binance | $70,171 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 16 | 2021-09-27 | From Binance | $90,120 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 17 | 2021-10-09 | From Binance | $75,039 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 18 | 2021-10-10 | From Binance | $125,076 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 19 | 2021-10-10 | From Binance | $85,051 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 20 | 2021-10-10 | From Binance | $80,048 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 21 | 2021-10-11 | From Binance | $210,706 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 22 | 2021-10-12 | From Binance | $189,902 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 23 | 2021-10-20 | From Binance | $113,396 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 24 | 2021-10-22 | From Binance | $100,501 | TTiDLWE6fZK8okMJv6ijg42yrH6W2pjSr9 |
| 25 | 2023-12-17 | From Binance | $41,323 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 26 | 2023-12-17 | From Binance | $41,323 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 27 | 2023-12-17 | From Binance | $41,323 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 28 | 2023-12-17 | From Binance | $41,323 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 29 | 2023-12-17 | From Binance | $41,323 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 30 | 2023-12-17 | From Binance | $41,323 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 31 | 2023-12-20 | From Binance | $41,493 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 32 | 2023-12-20 | From Binance | $41,493 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 33 | 2023-12-20 | From Binance | $41,493 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 34 | 2023-12-20 | From Binance | $41,493 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 35 | 2023-12-20 | From Binance | $41,493 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 36 | 2023-12-20 | From Binance | $41,493 | bc1qlwd94gf5uhdpu4gynk6znc5j3rwk9s53c0dhjs |
| 37 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 38 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 39 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 40 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 41 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 42 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 43 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 44 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 45 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 46 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 47 | 2023-12-21 | From Binance | $85,583 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 48 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 49 | 2023-12-21 | From Binance | $42,792 | bc1q2egjjzmchtm3q3h3een37zsvpph86hwgq4xskh |
| 50 | 2024-03-18 | To Binance | $23,597 | bc1q6w2an66vrje747scecrgzucw9ksha66x9zt980 |

**Table B-10. Nobitex (IRGC Exchange)**

*IRGC cryptocurrency exchange Nobitex. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 2,147,606; $70,748,949 of $5,481,533,952 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2021-01-31 | To Binance | $1,385,744 | rnm3AqXHTAkAPqfHhkVD1mfUnLAV4u9Sbn |
| 2 | 2021-02-06 | To Binance | $1,177,336 | bc1q78mzg4zfkz9mmm988vapk3rsfyz692jd4demvp |
| 3 | 2021-02-06 | To Binance | $1,177,151 | 1NTo1vpqqm1YiH1vfnKepVG9A92iAjQT6m |
| 4 | 2021-02-07 | To Binance | $1,652,990 | bc1q78mzg4zfkz9mmm988vapk3rsfyz692jd4demvp<br>bc1qx0t65ysgf23qptmkmkkuj7x7zchdesss54hles |
| 5 | 2021-02-07 | To Binance | $1,653,504 | 1NTo1vpqqm1YiH1vfnKepVG9A92iAjQT6m |
| 6 | 2021-02-08 | To Binance | $1,344,304 | bc1qx0t65ysgf23qptmkmkkuj7x7zchdesss54hles |
| 7 | 2021-02-08 | To Binance | $1,325,013 | 1NTo1vpqqm1YiH1vfnKepVG9A92iAjQT6m |
| 8 | 2021-02-13 | To Binance | $1,411,682 | bc1qgtxgqpqdxdn0tkenyaksxufam9ppm6gn6rlqlr |
| 9 | 2021-02-13 | To Binance | $1,409,468 | 1NTo1vpqqm1YiH1vfnKepVG9A92iAjQT6m |
| 10 | 2021-05-01 | To Binance | $1,735,950 | bc1qmerlyegcvyzyepfvthwmsulref3tnw54k7uxf8 |
| 11 | 2021-05-03 | To Binance | $1,172,735 | bc1qjzw8mqy9k5gldpfaqqcpl5fz0jzytmxk89cxnm |
| 12 | 2021-05-06 | To Binance | $1,394,843 | bc1qxwk4mlcmea67jx8g8vllnsmnaek849mgcxdu0v |
| 13 | 2021-05-08 | To Binance | $1,172,172 | bc1qxwk4mlcmea67jx8g8vllnsmnaek849mgcxdu0v |
| 14 | 2021-05-10 | To Binance | $1,291,507 | bc1qtvccggjkcj92la3jwdtt04es8q5kvfnptwe828<br>bc1qsxl9cmnsl8c3rxsrt32hcdmsd8c00svxlypmr9<br>bc1qg6r9ctwanxr5vh2awwgpq58ejr3gktk2vmfel0<br>bc1qn9f83u64hzhszaaxpmq9upvc0gcycfec5nucty |
| 15 | 2021-10-14 | From Binance | $1,168,072 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 16 | 2021-10-16 | From Binance | $1,157,969 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 17 | 2021-10-17 | To Binance | $1,171,134 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 18 | 2021-10-17 | To Binance | $1,524,793 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 19 | 2021-10-18 | From Binance | $1,518,485 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 20 | 2021-10-28 | From Binance | $1,502,300 | TC2YdnWQJRmJzy7tD7C7e3S29SiMKuS95G |
| 21 | 2021-10-29 | To Binance | $2,180,449 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 22 | 2021-10-29 | From Binance | $2,212,618 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 23 | 2021-10-29 | To Binance | $2,206,937 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 24 | 2021-10-30 | From Binance | $1,721,153 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 25 | 2021-11-12 | To Binance | $1,155,385 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 26 | 2021-11-12 | From Binance | $1,185,135 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 27 | 2021-11-13 | To Binance | $1,156,440 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 28 | 2021-11-13 | From Binance | $1,164,595 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 29 | 2021-11-21 | To Binance | $1,182,244 | bc1qs9fjw6kg3sfk0mwdcp4spa3e64f9kecyk09w9s |
| 30 | 2021-11-30 | To Binance | $1,337,610 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 31 | 2021-11-30 | To Binance | $1,398,111 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 32 | 2021-11-30 | From Binance | $1,385,447 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 33 | 2021-12-06 | To Binance | $1,949,546 | bc1qgcvcnez7p0q5ctaaf70tkfkje4cgzh5d9suuua |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 34 | 2021-12-08 | To Binance | $1,309,248 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 35 | 2021-12-08 | From Binance | $1,330,986 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 36 | 2021-12-10 | To Binance | $1,495,702 | bc1q37mn9nl7655tffa8ku8x5s28dcesg6cwy4ljlx<br>bc1qtsra7fcqxc3m0nwa666vtd5ukvvmw5lp2pcttl |
| 37 | 2021-12-15 | To Binance | $1,477,366 | bc1qh6xl8gf3m863ypxtd3vlycngdsd3rgd759ewyz |
| 38 | 2021-12-21 | To Binance | $1,469,816 | bc1qlm57uj6l2q842rpt7tr4sjusxp8lv0afuq532q |
| 39 | 2021-12-25 | To Binance | $1,534,757 | bc1q45rkynzg89un5gj5hty392qwa200kyd5mhsd0e |
| 40 | 2022-02-05 | To Binance | $1,252,838 | bc1qquqv2dy6afpnpmaceje4923v9ul3zku3vet8kl |
| 41 | 2022-02-16 | To Binance | $1,315,388 | bc1q2h6u5r96535sgaaem6wn2h4y4h5a5zpjy0qk0t |
| 42 | 2022-02-16 | From Binance | $1,428,453 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 43 | 2022-02-24 | To Binance | $1,175,473 | bc1q0l46tpt4mr8zvyp85f4kkjl233tre5agq2dn54 |
| 44 | 2022-02-28 | To Binance | $1,240,142 | bc1qdppnz3ez78ps82rlxp0y6upyyurhwrnfthk0se |
| 45 | 2022-03-19 | From Binance | $1,293,487 | 0x1798ab24cb55cf833751deb7b257e5b36942db74 |
| 46 | 2022-03-24 | To Binance | $1,323,624 | bc1qda2jwahvmwuws0nxzanuu2etp28dkjthz7aqhx |
| 47 | 2022-03-27 | To Binance | $1,316,773 | bc1quydzhx0gchqg5fagm4q4dg3sxu6zfq3y2adaea |
| 48 | 2022-04-10 | From Binance | $1,617,104 | TC2YdnWQJRmJzy7tD7C7e3S29SiMKuS95G |
| 49 | 2022-10-29 | To Binance | $1,337,310 | 0x67d7ffff21e7d8916df2c1cbefa28d54d6701eaf |
| 50 | 2022-10-31 | To Binance | $1,247,660 | 0x67d7ffff21e7d8916df2c1cbefa28d54d6701eaf |

### Table B-11. Wallex.ir (IRGC Exchange)

*IRGC cryptocurrency exchange Wallex.ir. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 86,352; $14,832,262 of $298,746,667 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2020-06-19 | From Binance | $302,034 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 2 | 2020-07-06 | From Binance | $230,721 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC<br>3Da2kZznhhVoAHPGvXnuZPrhscxrxT663y |
| 3 | 2020-07-16 | From Binance | $310,668 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 4 | 2020-08-05 | From Binance | $280,935 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 5 | 2020-08-18 | From Binance | $208,004 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 6 | 2020-08-20 | From Binance | $291,554 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 7 | 2020-09-04 | From Binance | $317,548 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 8 | 2020-09-10 | To Binance | $300,029 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 9 | 2020-10-16 | From Binance | $231,399 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 10 | 2020-11-03 | From Binance | $219,397 | 3KiXFrwDszJ9TtU4tPbMsPrHHvjfBp6kXC |
| 11 | 2021-01-16 | To Binance | $250,069 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 12 | 2021-01-21 | To Binance | $299,535 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 13 | 2021-02-07 | To Binance | $300,141 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 14 | 2021-04-04 | From Binance | $250,105 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 15 | 2021-04-17 | To Binance | $520,939 | Xk1CohCVByJ7emyMXwRJjKXkZ7V1U3E7wE XoURfgY9oiEQtngVTEyqZ1fcXWfSyrGsoY Xmcv2jbBADyUyTKMaegk4bpLkEPFY1PwdV XvhQ62v4VyGNuNmuTfKCEpsrcfEStZskHM Xo1f53JW2LjBW5QpvGSN216DXT4bqxXdnM XrTodqZazhfcU5FWeyQLmVZaFevSt4326R XkGFzTqGHAHCPUgUAWDt3fFsoNhs6efAkM XipsLJzRxayGnwg1aMB7ZvSVKbFiXytEr9 Xhp6xCwdS1jka2aVsP7E3vA39VsWDDD8HS XgdFHxKfhRL2y3Qk6SrggJ6728Btogxrha Xt3JwYm7Ef7b8VhbFvfmENUE1dXPYkx1N1 XohFDWj1f8HkjWjvctiTQhoKcLRz9AYF6p XftMbzBVEAJfkq7BB4NHDEKamEqZnrdMTt XwnwDRKtZnwAmfsqdEDMvscCGnvjmYFzuZ Xn885f2f9qaZcUcCHxMz7Xsbi23WYdbtBa XhAw7MfME4UjpzvApCe3C3JB2uijy3FY8b XtppQsoDdKcEQjdzDUAD8cGvvqYfgwgCfJ XhN2WE3NG8RuDUpD7tx2H838dzfqSnjNz7 XyPDGX2Jti1atZp4FQi5Kur69ZvfsUzzRW XnT2YqhgSCr4iThqPu2FspRxU29Fxo2qfg XjWzNhv8qF1XWVyFdPi8GLLNphf7c9UzBs |
| 16 | 2021-04-17 | To Binance | $360,010 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 17 | 2021-04-20 | To Binance | $207,415 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 18 | 2021-05-13 | To Binance | $500,831 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 19 | 2021-05-14 | To Binance | $299,084 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 20 | 2021-05-22 | From Binance | $300,199 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 21 | 2021-06-18 | To Binance | $311,645 | rrhXWEwk7wpsdV77Wcb7S3VFRSt7EGGHU4 |
| 22 | 2021-08-14 | To Binance | $305,387 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 23 | 2021-08-21 | From Binance | $222,479 | TKBvPiwyfTamQ9ECKx9QavDJR927YZC96f |
| 24 | 2021-08-28 | From Binance | $203,222 | TKBvPiwyfTamQ9ECKx9QavDJR927YZC96f |
| 25 | 2021-09-02 | From Binance | $283,819 | TKBvPiwyfTamQ9ECKx9QavDJR927YZC96f |
| 26 | 2021-10-01 | From Binance | $292,113 | TKBvPiwyfTamQ9ECKx9QavDJR927YZC96f |
| 27 | 2021-10-17 | To Binance | $210,693 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 28 | 2021-10-23 | To Binance | $204,192 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 29 | 2021-10-31 | To Binance | $209,716 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 30 | 2021-12-02 | From Binance | $231,574 | TKBvPiwyfTamQ9ECKx9QavDJR927YZC96f |
| 31 | 2021-12-03 | To Binance | $210,380 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 32 | 2021-12-05 | From Binance | $250,036 | TM35DLYEq4nFMq1L5vjrxgXEo1AbpaJgZF |
| 33 | 2021-12-10 | To Binance | $216,565 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 34 | 2021-12-22 | From Binance | $215,921 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 35 | 2022-01-04 | From Binance | $419,296 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 36 | 2022-01-15 | From Binance | $260,461 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 37 | 2022-01-17 | To Binance | $410,424 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 38 | 2022-01-18 | From Binance | $250,526 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 39 | 2022-02-06 | From Binance | $501,073 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---:|---|
| 40 | 2022-02-10 | From Binance | $300,406 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 41 | 2022-03-05 | From Binance | $380,364 | TJYBaGueMRMBr3a4GHFke9j51y8ZHWAQSJ |
| 42 | 2022-03-05 | From Binance | $440,853 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 43 | 2022-03-14 | From Binance | $250,174 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 44 | 2022-04-07 | From Binance | $259,671 | TXinbPbwzGbSpg5MyQCFns5f8FdtgwR7Ep |
| 45 | 2022-04-11 | From Binance | $336,793 | TPL3pkDAsjWoS1W3wNwg5STJDVgs2BeHPf |
| 46 | 2022-05-28 | From Binance | $568,866 | TXZX3xTYg7KubDaRDrv8zBsGkGukPCB8jb |
| 47 | 2022-07-14 | From Binance | $206,222 | TG6eozti1c5Ep2YwnqE14ZYgHSCUvrcqw9 |
| 48 | 2022-07-20 | From Binance | $455,740 | TXZX3xTYg7KubDaRDrv8zBsGkGukPCB8jb |
| 49 | 2022-07-23 | From Binance | $230,123 | TXZX3xTYg7KubDaRDrv8zBsGkGukPCB8jb |
| 50 | 2022-08-22 | From Binance | $212,911 | TQCgv55Ur4Z6FaCzkaDGZLPHzMaH2WovCY |

### Table B-12. Ramzinex (IRGC Exchange)

*IRGC cryptocurrency exchange Ramzinex. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 121,602; $10,136,143 of $242,239,438 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---:|---|
| 1 | 2021-11-18 | To Binance | $200,463 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 2 | 2021-11-20 | To Binance | $201,024 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 3 | 2021-11-22 | To Binance | $200,152 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 4 | 2021-12-02 | To Binance | $179,602 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 5 | 2021-12-06 | To Binance | $179,973 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 6 | 2021-12-08 | From Binance | $164,143 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 7 | 2021-12-10 | To Binance | $236,924 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 8 | 2021-12-10 | To Binance | $180,224 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 9 | 2021-12-11 | To Binance | $199,809 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 10 | 2021-12-22 | From Binance | $206,238 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 11 | 2021-12-23 | From Binance | $179,207 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 12 | 2022-01-16 | From Binance | $166,347 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 13 | 2022-01-24 | From Binance | $213,526 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 14 | 2022-01-29 | From Binance | $264,900 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 15 | 2022-02-04 | From Binance | $225,962 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 16 | 2022-02-05 | From Binance | $225,111 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 17 | 2022-02-07 | From Binance | $214,140 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 18 | 2022-02-07 | From Binance | $221,941 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 19 | 2022-02-08 | To Binance | $234,343 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 20 | 2022-02-11 | To Binance | $215,121 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 21 | 2022-02-14 | To Binance | $192,073 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 22 | 2022-02-15 | From Binance | $185,302 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 23 | 2022-02-18 | To Binance | $179,726 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 24 | 2022-02-18 | To Binance | $197,439 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 25 | 2022-02-21 | To Binance | $256,966 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 26 | 2022-02-22 | To Binance | $181,868 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 27 | 2022-02-22 | To Binance | $202,081 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 28 | 2022-02-23 | From Binance | $188,132 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 29 | 2022-02-24 | To Binance | $176,749 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 30 | 2022-02-24 | To Binance | $176,749 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 31 | 2022-02-25 | From Binance | $160,465 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 32 | 2022-02-28 | To Binance | $176,752 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 33 | 2022-02-28 | From Binance | $172,380 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 34 | 2022-03-01 | From Binance | $181,976 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 35 | 2022-03-03 | To Binance | $176,664 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 36 | 2022-03-04 | To Binance | $160,961 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 37 | 2022-03-10 | To Binance | $176,316 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 38 | 2022-03-11 | To Binance | $176,562 | TQkW5odVs63YmAomSVPmLSJQBXRaJSUMuA |
| 39 | 2022-03-15 | From Binance | $211,955 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 40 | 2022-03-17 | From Binance | $206,587 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 41 | 2022-03-19 | From Binance | $216,380 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 42 | 2022-03-19 | From Binance | $194,306 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 43 | 2022-03-24 | From Binance | $183,404 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 44 | 2022-03-25 | From Binance | $180,192 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 45 | 2022-03-27 | From Binance | $215,751 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 46 | 2022-03-27 | From Binance | $210,516 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 47 | 2022-03-27 | From Binance | $242,170 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 48 | 2022-03-28 | From Binance | $186,372 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 49 | 2022-03-29 | From Binance | $205,943 | TKtaeydNG8figJjhL12ViEMfiwM5xAodeJ |
| 50 | 2022-11-30 | To Binance | $454,256 | THEkNHowkCeGQNAsJ4VnT3wcyeo13Zr9T3 |

### Table B-13. Zedcex (IRGC Exchange)

*IRGC cryptocurrency exchange Zedcex. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 1,153; $23,037,988 of $26,103,877 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2022-03-05 | From Binance | $442,454 | TXL4dU1g7cLVpQEGohHvmtXyeAJCvgQxmW |
| 2 | 2022-04-12 | From Binance | $90,098 | TXL4dU1g7cLVpQEGohHvmtXyeAJCvgQxmW |
| 3 | 2022-09-13 | From Binance | $188,088 | TXL4dU1g7cLVpQEGohHvmtXyeAJCvgQxmW |
| 4 | 2023-03-16 | From Binance | $461,048 | TXL4dU1g7cLVpQEGohHvmtXyeAJCvgQxmW |
| 5 | 2023-12-25 | To Binance | $100,050 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 6 | 2024-04-06 | From Binance | $100,304 | 0xd0f78c002463966693d3555a740edb4359d0b7b1 |
| 7 | 2024-04-19 | From Binance | $100,347 | 0xd0f78c002463966693d3555a740edb4359d0b7b1 |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 8 | 2024-04-19 | From Binance | $401,389 | 0xd0f78c002463966693d3555a740edb4359d0b7b1 |
| 9 | 2024-05-28 | To Binance | $251,523 | 0xd0f78c002463966693d3555a740edb4359d0b7b1 |
| 10 | 2024-07-01 | From Binance | $99,850 | TRynBAMA5Uzs3ryTk7EZZuoDZNdJrv6FmM |
| 11 | 2024-07-02 | From Binance | $499,522 | TWd1UQYbgtNaW9PxDAE3rrRVgWG1XRAcaK |
| 12 | 2024-07-28 | From Binance | $100,004 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 13 | 2024-07-29 | To Binance | $100,065 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 14 | 2024-07-29 | From Binance | $200,120 | TBbakY3qANmXVRaY1GHF5KJMfEJCsw3gTD |
| 15 | 2024-08-01 | From Binance | $100,199 | TBbakY3qANmXVRaY1GHF5KJMfEJCsw3gTD |
| 16 | 2024-08-03 | From Binance | $226,892 | TG4YsqEynLqov2AR5gsL6MwnP6H4cs2YNM |
| 17 | 2024-08-12 | From Binance | $300,479 | TBbakY3qANmXVRaY1GHF5KJMfEJCsw3gTD |
| 18 | 2024-08-16 | To Binance | $115,965 | TBbakY3qANmXVRaY1GHF5KJMfEJCsw3gTD |
| 19 | 2024-08-16 | To Binance | $80,045 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 20 | 2024-10-14 | To Binance | $119,950 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 21 | 2024-10-25 | From Binance | $299,934 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 22 | 2024-10-28 | From Binance | $500,285 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 23 | 2024-10-28 | From Binance | $200,113 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 24 | 2024-10-29 | From Binance | $999,647 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 25 | 2024-10-31 | To Binance | $81,456 | TBugfvTSnKyfy1sgyrwvZLmub8iVUKCFp7 |
| 26 | 2024-11-03 | From Binance | $199,981 | TTS9o5KkpGgH8cK9LofLmMAPYb5zfQvSNa |
| 27 | 2024-11-04 | From Binance | $649,157 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 28 | 2024-11-05 | To Binance | $62,454 | TBugfvTSnKyfy1sgyrwvZLmub8iVUKCFp7 |
| 29 | 2024-11-05 | To Binance | $59,255 | TBugfvTSnKyfy1sgyrwvZLmub8iVUKCFp7 |
| 30 | 2024-11-11 | To Binance | $350,554 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 31 | 2024-11-20 | To Binance | $60,073 | TGPpUijtVSBBq9e1yKKkx2N84YKmZEAjsc |
| 32 | 2024-11-20 | To Binance | $300,364 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 33 | 2024-11-21 | From Binance | $300,705 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 34 | 2024-11-26 | From Binance | $350,054 | TGPpUijtVSBBq9e1yKKkx2N84YKmZEAjsc |
| 35 | 2024-12-02 | To Binance | $70,003 | TGPpUijtVSBBq9e1yKKkx2N84YKmZEAjsc |
| 36 | 2024-12-09 | From Binance | $994,906 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 37 | 2024-12-11 | From Binance | $2,002,908 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 38 | 2024-12-12 | From Binance | $2,000,974 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 39 | 2024-12-13 | From Binance | $1,500,232 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 40 | 2024-12-18 | From Binance | $229,735 | TLvuvpfBKdxddxSsJefeiGCe9eVY8HUroE |
| 41 | 2024-12-19 | To Binance | $415,038 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 42 | 2024-12-20 | From Binance | $1,550,229 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 43 | 2024-12-20 | To Binance | $1,000,049 | TEXsD49JGEaM8qgBX77Xuq3wxMKiAyWHNX |
| 44 | 2024-12-23 | From Binance | $500,027 | TGsNFrgWfbGN2gX25Wcf8oTejtxtQkvmEx |
| 45 | 2024-12-24 | To Binance | $81,000 | TGPpUijtVSBBq9e1yKKkx2N84YKmZEAjsc |
| 46 | 2024-12-25 | To Binance | $99,978 | TGPpUijtVSBBq9e1yKKkx2N84YKmZEAjsc |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 47 | 2025-02-02 | From Binance | $1,999,415 | TQqcbNioXb1qQ6Ngo6Yimf7vUfpxyGfRov |
| 48 | 2025-06-23 | To Binance | $1,000,671 | TCA9vmjsYw9MtPKEwRBtGhKFRfr4CLxJAv |
| 49 | 2025-06-24 | To Binance | $1,000,380 | TCA9vmjsYw9MtPKEwRBtGhKFRfr4CLxJAv |
| 50 | 2025-06-30 | From Binance | $100,019 | TUcT6hZ5cVkeFNZnaNDrLkTmT5z1TcnDAo |

### Table B-14. Hizballah

*Hizballah's own fundraising and financial wallets, including wallets that are part of the al-Law network. The below chart reflects the largest 50 identified transactions by USD value, listed chronologically (50 of 7,819; $13,245,943 of $54,593,618 total).*

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 1 | 2022-03-19 | From Binance | $212,933 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 2 | 2022-03-31 | To Binance | $199,992 | TYh5oEYa8hJhXtbkpqXDpfSYUg7udNJ8DY |
| 3 | 2022-04-19 | To Binance | $200,069 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 4 | 2022-04-25 | From Binance | $200,072 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 5 | 2022-05-11 | From Binance | $249,814 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 6 | 2022-05-31 | From Binance | $285,248 | TKiBsUqd5ixPTqVWVp5BdDCHvoR7nwfMn3 |
| 7 | 2023-01-04 | From Binance | $222,365 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 8 | 2023-01-12 | From Binance | $262,862 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 9 | 2023-01-12 | From Binance | $199,895 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 10 | 2023-01-13 | From Binance | $207,355 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 11 | 2023-01-19 | From Binance | $370,984 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 12 | 2023-01-25 | From Binance | $199,465 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 13 | 2023-01-28 | From Binance | $248,947 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 14 | 2023-01-30 | From Binance | $203,587 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 15 | 2023-01-30 | From Binance | $205,801 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 16 | 2023-01-30 | From Binance | $325,085 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 17 | 2023-01-31 | From Binance | $200,250 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 18 | 2023-02-01 | From Binance | $253,930 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 19 | 2023-02-04 | From Binance | $254,969 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 20 | 2023-02-06 | From Binance | $460,113 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 21 | 2023-02-07 | From Binance | $500,165 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 22 | 2023-02-07 | From Binance | $335,110 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 23 | 2023-02-07 | From Binance | $400,132 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 24 | 2023-02-08 | From Binance | $276,319 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 25 | 2023-02-13 | From Binance | $321,012 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 26 | 2023-02-15 | From Binance | $200,140 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 27 | 2023-02-16 | From Binance | $443,292 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 28 | 2023-02-21 | From Binance | $211,297 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 29 | 2023-02-24 | From Binance | $413,275 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |

| # | Date | Direction | Amount (USD) | Counterparty wallet |
|---|---|---|---|---|
| 30 | 2023-02-24 | From Binance | $250,237 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 31 | 2023-03-06 | From Binance | $210,151 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 32 | 2023-03-13 | From Binance | $231,205 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 33 | 2023-03-13 | From Binance | $236,232 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 34 | 2023-03-14 | From Binance | $519,058 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 35 | 2023-03-15 | From Binance | $201,574 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 36 | 2023-03-20 | From Binance | $301,937 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 37 | 2023-03-24 | From Binance | $202,582 | TWBAPzpPiZarfVsY2BLXeaLhNHurn4wkWG |
| 38 | 2023-03-27 | From Binance | $272,982 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 39 | 2023-03-30 | From Binance | $226,003 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 40 | 2023-03-31 | From Binance | $236,247 | TWBAPzpPiZarfVsY2BLXeaLhNHurn4wkWG |
| 41 | 2023-04-09 | From Binance | $215,776 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 42 | 2023-04-11 | From Binance | $276,105 | TWBAPzpPiZarfVsY2BLXeaLhNHurn4wkWG |
| 43 | 2023-04-14 | From Binance | $200,240 | TWBAPzpPiZarfVsY2BLXeaLhNHurn4wkWG |
| 44 | 2023-04-15 | From Binance | $229,585 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 45 | 2023-04-15 | From Binance | $212,185 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 46 | 2023-04-18 | From Binance | $252,402 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 47 | 2023-04-18 | From Binance | $214,094 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 48 | 2023-04-27 | To Binance | $200,347 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |
| 49 | 2023-05-09 | From Binance | $200,164 | TWBAPzpPiZarfVsY2BLXeaLhNHurn4wkWG |
| 50 | 2023-05-19 | From Binance | $292,359 | TMWkK1qx5KR6cJ1jjSqQsNUik3bfPDmhpf |