**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOCELYN TROELL, individually and for the estate of STEPHEN TROLL, et al.,<br>*Plaintiffs,*<br>v.<br>BINANCE HOLDINGS LIMITED, et al.,<br>*Defendants.* | Case No. 1:24-cv-07136 (JAV)<br><br>**ORAL ARGUMENT REQUESTED** |

# MEMORANDUM OF LAW IN SUPPORT OF MR. CHANGPENG ZHAO'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT


**BAKER & HOSTETLER LLP**

Joanna F. Wasick
Marco Molina
45 Rockefeller Plaza
New York, NY 10111
212-589-4200
jwasick@bakerlaw.com
mmolina@bakerlaw.com

Richard B. Raile (*pro hac vice*)
Washington Square, Suite 1100
1050 Connecticut Ave., N.W. Washington, D.C. 20036
(202) 861-1711
rraile@bakerlaw.com

*Counsel for Defendant Changpeng Zhao*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 2

ARGUMENT .......... 5

I. The SAC Does Not Plead Knowing Substantial Assistance. .......... 5

A. The SAC Does Not Allege Scienter. .......... 7

B. The SAC Does Not Allege Direct and Extraordinary Assistance. .......... 15

C. The SAC Does Not Allege Pervasive and Systematic Assistance to FTOs. .......... 21

D. The SAC's Willful Blindness Theory Contravenes Precedent. .......... 22

II. The SAC Does Not Plead General Awareness. .......... 23

III. The Court Lacks Personal Jurisdiction Over Mr. Zhao. .......... 24

A. Proper Service Neither Occurred Nor Is Authorized. .......... 24

B. The SAC Does Not Plead a Basis for Personal Jurisdiction. .......... 25

CONCLUSION .......... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*,
480 U.S. 102 (1987)....................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................13

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025).................... *passim*

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026)....................19, 20

*Atzili v. Islamic Republic of Iran*,
2026 WL 1500823 (D.D.C. May 29, 2026).................... *passim*

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022)....................19, 25

*Brill v. Chevron Corp.*,
2018 WL 3861659 (N.D. Cal. Aug. 14, 2018)....................22

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012)....................24

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)....................25

*In re Diisocyanates Antitrust Litig.*,
2026 WL 522845 (W.D. Pa. Feb. 25, 2026)....................28

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943)....................22

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022)....................27

*Fisk v. Letterman*,
401 F. Supp. 2d 362 (S.D.N.Y. 2005)....................12

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)....................25

*Fraenkel v. Standard Chartered Bank*,
2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025) ............ 7, 17, 23

*Freeman v. HSBC Holdings PLC*,
2026 WL 880107 (E.D.N.Y. Mar. 31, 2026) ............ 7

*Freeman v. HSBC Holdings PLC*,
465 F. Supp. 3d 220 (E.D.N.Y. 2020) ............ 22

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025) ............ 26, 27, 28

*Glob. Gaming Phil., LLC v. Razon*,
2022 WL 836716 (S.D.N.Y. Mar. 21, 2022) ............ 14

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ............ 6, 21

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ............ 22, 23

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
8 F.3d 130 (2d Cir. 1993) ............ 14

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ............ 17

*Lelchook v. Lebanese Canadian Bank*,
2024 WL 967078 (S.D.N.Y. Mar. 6, 2024) ............ 16

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012) ............ 25

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ............ 2

*Long Side Ventures LLC v. Hempacco Co.*,
2023 WL 6386888 (S.D.N.Y. Sept. 29, 2023) ............ 14

*Matsumura v. Benihana Nat. Corp.*,
542 F. Supp. 2d 245 (S.D.N.Y. 2008) ............ 11

*Morris v. N.Y. State Dep't of Tax'n & Fin.*,
623 N.E.2d 1157 (N.Y. 1993) ............ 14

*Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*,
2011 WL 381612 (E.D.N.Y. Feb. 2, 2011) ............ 12

*Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*,
484 U.S. 97 (1987) ........................................................................................................24

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) .............................................................................................14

*Provencher v. Bimbo Foods Bakeries Distrib. LLC*,
175 F.4th 180 (2d Cir. 2026) ...........................................................................................26

*Rodriguez v. Imperial Brands, PLC.*,
182 F.4th 1333 (11th Cir. 2026) .......................................................................................28

*Santos v. State Farm Fire & Cas. Co.*,
902 F.2d 1092 (2d Cir. 1990).......................................................................................24, 25

*Schrier v. Qatar Islamic Bank*,
632 F. Supp. 3d 1335 (S.D. Fla. 2022) ..............................................................................25

*Siegel v. HSBC Holdings, PLC*,
2018 WL 501610 (S.D.N.Y. Jan. 19, 2018) .......................................................................25

*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019)........................................................................................17, 23

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021) ..........................................................15

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025)..................................................................................10, 13, 19, 20

*Spetner v. Palestinian Inv. Bank*,
2026 WL 2350124 (E.D.N.Y. 2026)........................................................................ *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
2026 WL 2432174 (S.D.N.Y. Aug. 19, 2026) .....................................................................25

*In re Terrorist Attacks on Sept. 11, 2001*,
538 F.3d 71 (2d Cir. 2008)................................................................................................25

*Troell v. Binance Holdings Ltd.*,
2026 WL 636849 (S.D.N.Y. Mar. 6, 2026) ........................................................... *passim*

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)....................................................................................... *passim*

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016)................................................................................................24

*Wallace v. Wood*,
752 A.2d 1175 (Del. Ch. 1999)....................14

*Weiss v. Nat'l Westminster Bank, PLC.*,
993 F.3d 144 (2d Cir. 2021)....................17, 23

*Williams v. Richardson*,
425 F. Supp. 3d 190 (S.D.N.Y. 2019)....................13

*Xin Wang v. Essence Int'l Fin. Holdings Ltd.*,
2026 WL 2272785 (S.D.N.Y. May 19, 2026) ....................15

**Statutes**

18 U.S.C. § 2333....................3, 5

18 U.S.C. § 2334....................25, 26

18 U.S.C. § 2339B ....................2

**Rules**

Fed. R. Civ. P. 4....................24, 26, 27

Fed. R. Civ. P. 12....................24

N.Y. C.P.L.R. § 302(a) ....................26

**Other Authorities**

Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment....................27

## PRELIMINARY STATEMENT

In March, this Court dismissed claims under the Justice Against Sponsors of Terrorism Act ("JASTA") against Defendants Changpeng Zhao, Binance Holdings Limited ("Binance") and BAM Trading Services Inc. ("BAM") (together, "Defendants") because the First Amended Complaint ("FAC") did not plead they "were intentionally seeking to associate themselves with terrorist organizations or to form a common enterprise with them." *Troell v. Binance Holdings Ltd.*, 2026 WL 636849, at *21 (S.D.N.Y. Mar. 6, 2026). The Second Amended Complaint ("SAC") suffers from the same deficiency and confirms that Plaintiffs cannot plead facts sufficient for a JASTA claim.

The SAC alleges nothing new regarding Mr. Zhao that this Court has not already rejected as insufficient. Plaintiffs do not plead that Mr. Zhao funded, supported, or had any relationship with a foreign terrorist organization ("FTO"). Like the FAC, the SAC bases its theory of liability on his former position as Binance's CEO and the one Bank Secrecy Act ("BSA") charge the government made against him. But the court that handled that case made clear there was no evidence Mr. Zhao knew of any wrongdoing by anyone who interacted with the Binance exchange. And, like the FAC, the SAC cedes that Mr. Zhao's business decisions were motivated solely by Binance's financial success and its retention of high-volume, lucrative "VIP" customers.

As for the SAC's new allegations, they overwhelmingly describe events that occurred *after* Mr. Zhao resigned as Binance's CEO and no longer had any role at the company. Aside from that, Plaintiffs do not identify *any* Binance account owned or controlled by an FTO that perpetrated the attacks. They allege only that Binance account owners who were *not* FTOs may have transacted, at indeterminate times, with other wallets vaguely "associated with" FTOs. Critically, the SAC does not plead that Mr. Zhao helped process—or even knew about—these alleged transactions.

The "multiple degrees of separation" between Mr. Zhao and any FTO attack, bridged only by unsupported assumptions and disregard of the pleaded timeline, do not plead the scienter, culpable assistance, or nexus that JASTA requires. *Atzili v. Islamic Republic of Iran*, 2026 WL 1500823, at *9 (D.D.C. May 29, 2026).

Because the SAC fails to state a JASTA claim, and because the Court in any event lacks personal jurisdiction over Mr. Zhao, it should dismiss this case with prejudice.

**BACKGROUND**

Mr. Zhao is among the founders of Binance, a Cayman Islands entity formed in 2017 that operates Binance.com, a cryptocurrency exchange that serves "over 100 million customers throughout the world, in volumes equivalent to trillions of U.S. dollars." ¶¶24, 26.[1] Mr. Zhao also served as Binance's CEO from 2017 until November 21, 2023. ¶¶26, 28.

In 2023, the government charged Mr. Zhao with a single count under the BSA for failing to maintain an effective anti-money laundering ("AML") program at Binance.[2] Although the government may charge a defendant with furnishing "material support or resources to a foreign terrorist organization," 18 U.S.C. §2339B(a)(1), if it can show mere "knowledge of [an] organization's connection to terrorism," *Linde v. Arab Bank, PLC*, 882 F.3d 314, 330 (2d Cir. 2018), the government brought no such claim against Mr. Zhao. On November 21, 2023, Mr. Zhao pleaded guilty to the one count, resigned as Binance's CEO, and ceased all involvement in operating or managing Binance.[3]

---

[1] Paragraph citations are to the SAC, unless otherwise indicated.

[2] Plea Agreement ¶2, *United States v. Zhao*, No. 2:23-cr-00179 (W.D. Wash. Nov. 21, 2023), ECF No. 31.

[3] *Id.*; Plea Agreement ¶8.f.xiii, *United States v. Binance*, No. 2:23-cr-00178 (W.D. Wash. Nov. 21, 2023), ECF No. 23 ("Binance Plea Agreement").

At the sentencing hearing, the presiding judge explained that there was "no evidence that the defendant explicitly was informed of any specific transaction, or a specific user transacted on Binance with criminal proceeds" and "no evidence that the defendant was aware of suspicious circumstances, making it reasonable to believe such funds were processed, or proceeds of unlawful activities."[4] The court was impressed by Mr. Zhao's "extraordinary commitments and dedication to philanthropic opportunities across the planet, not just in his country," and found that his "history and characteristics[] are of a mitigating nature and a positive nature."[5] The court also lauded Mr. Zhao's "extraordinary steps and significant steps, in terms of [his] level of cooperation with law enforcement, in their investigation."[6] On October 21, 2025, Mr. Zhao received a full and unconditional presidential pardon.[7] The White House emphasized that the case against Mr. Zhao included "no allegations of fraud or identifiable victims,"[8] and that "even the judge in his case said that the sentencing that the Biden administration was asking for was egregious and went too far."[9]

Nevertheless, Plaintiffs' FAC attempted to transform assertions that the government has abandoned into liability for various claims under the Anti-Terrorism Act, 18 U.S.C. §2333

---

[4] Sent'g Hr'g Tr. 6:16-23, *United States v. Zhao*, No. 2:23-cr-00179 (W.D. Wash. May 3, 2024), ECF No. 93 ("Sentencing Tr."), attached to the Decl. of Joanna F. Wasick (Sept. 4, 2026) as Ex. 1.

[5] *Id.* 29:9-15, 74:2-5.

[6] *Id.* 74:19-22.

[7] *See* President Donald J. Trump, Executive Grant of Clemency to Changpeng Zhao (Oct. 21, 2025), https://www.justice.gov/pardon/media/1416576/dl?inline.

[8] Aaron Navarro & Kathryn Watson, *Trump pardons billionaire crypto exchange founder who pleaded guilty to money laundering-related charge*, CBS News (Oct. 23, 2025), https://www.cbsnews.com/news/changpeng-zhao-trump-pardons-binance-crypto-exchange-founder-money-laundering/.

[9] The White House, *Press Secretary Karoline Leavitt Briefs Members of the Media, Nov. 4, 2025*, at 26:23-56 (YouTube, Nov. 4, 2025), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-nov-4-2025/.

("ATA"), including aiding and abetting under JASTA. This Court found the FAC pleaded no basis for liability and dismissed it.

Plaintiffs then filed the SAC, with a single JASTA claim. The SAC contains only one new allegation about Mr. Zhao specifically—that he received a pardon. ¶421. The SAC's "new" material consists primarily of tables most notable for failing to reflect a single Binance customer account owned by an FTO or a single transaction used for financing a terrorist attack. The SAC reflects only that some Binance customers transacted with some wallets that allegedly were associated with an FTO. Most often this non-Binance counterparty is an unidentified customer of another foreign exchange allegedly linked to a FTO in indeterminate ways. The SAC cites news articles and designations by the United States or Israel (predominantly the latter) to allege Defendants were aware of the counterparty's FTO connection.

But large swaths of this information postdate Mr. Zhao's tenure at Binance—sometimes by years. *See infra* §I.A.1. And the SAC admits that nearly all of the designations occurred after the relevant transfer was made. *Id*. Allegations suggesting that certain designations predate a transfer are contradicted elsewhere in the SAC. For example, Table A-7 lists a March 2019 transfer from Address-6WW, which the SAC alleges "was designated by OFAC in 2019." ¶304. However, the complaint in one of the civil forfeiture proceedings referenced in the SAC states that "Address-6WW was referenced in OFAC's October 18, 2023[] designation."[10]

[10] *See* United States' Am. Verified Compl. for Forfeiture ¶40, *In Rem United States v. All Digital Assets*, No. 1:24-cv-01251 (D.D.C. Sept. 4, 2025), ECF No. 15; *see also* OFAC Counter Terrorism Designations Update (Oct. 18, 2023), https://ofac.treasury.gov/recent-actions/20231018 (referencing Address-6WW).

## ARGUMENT

A JASTA claim for aiding and abetting requires well-pleaded allegations that (1) an FTO committed an act of international terrorism, (2) the defendant was generally aware of his role in the act of terrorism, and (3) the defendant knowingly and substantially assisted the terrorist act. *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 435 (2d Cir. 2025). This Court dismissed the FAC under the third element—knowing, substantial assistance, *Troell*, 2026 WL 636849, at *16—and it provides the most straightforward route to resolving the single JASTA claim here. Moreover, the general awareness element is unmet, and Mr. Zhao is not amenable to personal jurisdiction and, indeed, was not properly served.

Mr. Zhao also joins the arguments in Binance's Motion to Dismiss ("Binance Br.") and BAM's Motion ("BAM Br."), filed concurrently with this one, including arguments concerning nexus (Binance Br. §I.A), non-U.S. national plaintiffs (*id.* §II), and alter ego (BAM Br. §III.C).

### I. The SAC Does Not Plead Knowing Substantial Assistance.

JASTA requires well-pleaded allegations that Mr. Zhao "knowingly provid[ed] substantial assistance" to "an act of international terrorism." 18 U.S.C. §2333(d)(2). In *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), the Supreme Court held that this text requires well-pleaded allegations "that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Id.* at 493 (citation omitted). JASTA demands "intentional participation," i.e., "some 'affirmative act' 'with the intent of facilitating the offense's commission.'" *Id.* at 490 (citation omitted).

The "twin requirements" of the statute—"knowing" and "substantial" assistance—"work[] in tandem" to inform the ultimate question of whether any conduct was "'culpable.'" *Id.* at 491-92. Where "less substantial assistance" is alleged, the plaintiff must allege "more scienter." *Id.* at

492. On the other hand, direct allegations of intent are less necessary "if the assistance w[as] direct and extraordinary." *Id.* But that is *not* because alleged assistance can establish aiding-and-abetting apart from a culpable state of mind. It is rather because "a court might more readily infer conscious participation in the underlying tort" from direct, exceptional assistance. *Id.* Such assistance can "evidence[] a deliberate long-term intention to participate in an ongoing illicit enterprise." *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983). But alleged assistance—even if it is valuable to the principal—does not support an aiding-and-abetting claim if it does not reveal the defendant's intent to aid the principal in the underlying offense. *See Twitter*, 598 U.S. at 504 (criticizing the Ninth Circuit for "focusing…primarily on the value of defendants' platforms *to ISIS*, rather than whether defendants culpably associated themselves with ISIS' actions"). Intent remains the "core inquiry." *Spetner v. Palestinian Inv. Bank*, 2026 WL 2350124, at *13 (E.D.N.Y. 2026). Accordingly, in *Ashley*, the Second Circuit found no claim stated against banks that allegedly "engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists" because no allegations "support[ed] the inference that the Banks' money laundering operations were designed or performed with the intent to aid" terrorist attacks. 144 F.4th at 444-45.

Applying this doctrine, this Court held that the FAC failed to state an aiding-and-abetting claim because, at best, it showed "that Defendants have indiscriminately permitted illicit activity on the Binance platform," not that "they were intentionally seeking to associate themselves with terrorist organizations or to form a common enterprise with them." *Troell*, 2026 WL 636849, at *21. Subsequently, another federal court dismissed JASTA claims against Defendants Binance and BAM because the complaint merely showed that these entities "were aware" of Hamas-

associated transactions, not intent to aid terrorist acts.[11] *Atzili*, 2026 WL 1500823, at *8-9. A chorus of similar decisions has found it insufficient for plaintiffs to allege "systematic aid in the form of financial services" to FTOs, even in "substantial sums" and even with the defendant's "intimate knowledge of its customers' illegal schemes" and choice "to transact with them anyway." *Spetner*, 2026 WL 2350124, at *14; *see also, e.g.*, *Freeman v. HSBC Holdings PLC*, 2026 WL 880107, at *16 (E.D.N.Y. Mar. 31, 2026) ("Defendants' provision of financial services is too widespread to impart the requisite intent to aid the specific terrorist acts at issue."); *Fraenkel v. Standard Chartered Bank*, 2025 WL 2773251, at *9-10 (S.D.N.Y. Sept. 26, 2025) (similar).

The SAC likewise fails to allege any "scienter" against Mr. Zhao that might limit Plaintiffs' need to show direct and extraordinary assistance, and it alleges no direct and extraordinary assistance by which culpable intent might be inferred. *Twitter*, 598 U.S. at 491. As with the FAC, what is alleged is "a far cry from the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." *Id.* at 502. Because the SAC strikes out at each of the three ways to show culpability, it should be dismissed.

### A. The SAC Does Not Allege Scienter.

The SAC falls far short of pleading the requisite state of mind, i.e., "'intent to further [a terrorist organization's] terrorist activities.'" *Ashley*, 144 F.4th at 444 (citation omitted).

#### 1. Prominent Allegations Concern the Time Frame After Mr. Zhao Left Binance and Cannot Show Scienter.

The SAC is most obviously inadequate in its extensive reliance on facts occurring *after* Mr. Zhao left Binance. The SAC admits that Mr. Zhao "stepped down as Binance's CEO" as of "November 2023," ¶14, and that he had no ongoing influence after "he was removed from th[at]

[11] Sufficient service was never accomplished on Mr. Zhao in that litigation.

role," ¶26; *see also* Binance Plea Agreement ¶8.f.xiii. The only SAC allegation specifically attributed to Mr. Zhao that postdates his resignation is that he received a pardon. ¶421. And the SAC is clear in seeking to hold Mr. Zhao liable for activities of Binance, not for anything he did separately. *See, e.g.*, ¶¶27-29.

But Section III of the SAC—where Plaintiffs purport to allege knowing substantial assistance, *see* SAC p.78-147—prominently features occurrences *after* November 2023. The SAC asserts that, "[e]ven after its guilty plea, Binance acted to protect FTOs rather than report them." ¶218. Labeled "**2024-2025**," this segment of the SAC—which features congressional testimony and news reports extending well into 2026—cannot apply to Mr. Zhao, or show anything about his intent. ¶¶218-24 (§III.A.1.c). The next section (§III.A.1.d) attempts to link "Binance…with Babak Zanjani—a documented IRGC financial facilitator." ¶225. But the SAC admits "he was *delisted*" from the Treasury Department's sanctions list in 2016 "as part of the nuclear deal with Iran" and was not listed again until "January 30, 2026." ¶226 (emphasis added). The time periods of publication of purportedly relevant information alleged in this section likewise postdate Mr. Zhao's exit from Binance. *See* ¶¶228 ("2024-2025," "November 2025"), 232 ("May 2026").

The same is true of the attempt in the next section (§III.A.2) to show "special treatment." ¶233. It claims that Binance's delisting of one currency (unassociated with an FTO) while maintaining others established "special treatment of terrorist customers." ¶236. But this occurred "in February 2024." ¶234. Meanwhile, the SAC's extensive discussion of Binance's supposed relationship with Nobitex, "Iran's largest cryptocurrency exchange," ¶¶275-79, does not support a claim against Mr. Zhao because OFAC did not designate it until June 2, 2026, ¶55.

In attempting to show "nexus between Defendants' assistance and the conduct causing Plaintiffs' injuries," ¶281, the SAC likewise leans heavily into post-November 2023 allegations.

In making allegations about BuyCash, the SAC admits it was designated by OFAC "on October 18, 2023," ¶298, the eve of Mr. Zhao's exit from Binance, ¶¶26, 28 (and *after* the October 7 attacks). Other warnings about BuyCash were published as late as "Nov. 27, 2025." ¶299. The forfeiture complaint that allegedly publicized these facts was "filed April 26, 2024," and unsealed "in 2025." ¶298. Allegations about Al Mutahadun for Exchange and Herzallah, Gaza-based money exchanges, could likewise not relate to Mr. Zhao because their OFAC designations came in "January 2024." ¶336; *see also* ¶341 ("January 22, 2024"). Another exchange the SAC emphasizes, Hamasat, was designated (by Israel, not the U.S.) "on September 9, 2024," ¶342, and Gaza Now—yet another featured actor—was designated "on March 27, 2024," ¶346.

The SAC also seeks to hold Mr. Zhao liable for attacks ranging from December 2023 through July 2024. ¶¶461-70, 504-11. In aggregating funds supposedly flowing to and from Binance from various actors, the SAC does not differentiate between amounts from before and after Mr. Zhao left Binance. *See* SAC B2-B8 (Tables B-1 through B-7). When it does break amounts out, the SAC shows that "the largest 50 identified transactions by USD value" involving "[t]he IRGC's own financial wallets" all occurred in 2024 and 2025. SAC B9-B10 (Table B-8).

The effort to pursue an aiding-and-abetting claim against Mr. Zhao cannot succeed where so much of the SAC's content cannot be tied to him simply by virtue of timing.

#### 2. Allegations Concerning the Time When Mr. Zhao Held an Executive Role at Binance Do Not Show Scienter.

The SAC's pre-November 2023 allegations add no material content absent from the FAC and say nothing about Mr. Zhao's intent. The SAC remains devoid of allegations showing that he "somehow consciously and culpably assisted the attack[s]," and—at most—vaguely suggest (possibly) that Mr. Zhao "indiscriminately permitted illicit activity," which is insufficient. *Troell*, 2026 WL 636849, at *21 (quotation marks omitted).

**Alleged BSA Violations**. Like the FAC, the SAC presents only one set of allegations directly about Mr. Zhao—that he caused Binance to operate as "an illegal, unregistered exchange" without "an AML/CFT program." ¶101; *see also* ¶¶112, 115, 120, 123, 128-29. Setting aside that the presidential pardon repudiated these assertions, the Court was already presented with them, *Troell*, 2026 WL 636849, at *5-7, and found them wanting because Plaintiffs did not "allege[] that Defendants uniquely flouted AML/CFT regulations and reporting requirements for the benefit of Hamas or the PIJ," *id.* at *21; *see Spetner*, 2026 WL 2350124, at *15 (dismissing JASTA claim despite defendant's violations of U.S. law where the "better inference" was a desire to profit economically, not to support terrorism). Because the BSA imposes affirmative obligations, and Mr. Zhao is alleged to have erred by omission, Plaintiffs' assertion is merely that Mr. Zhao "could have adopted measures to reduce its users' downstream crime." *Id.* at *14 (cleaned up); *see Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 293 (2025). That is why another court recently agreed with this one that scienter cannot be inferred from the legal violations alleged here. *Atzili*, 2026 WL 1500823, at *9; *see also* ECF No. 112 at 20-23 (demonstrating that Plaintiffs' theory erroneously reads a private right of action into the BSA).

The SAC's minor variations on this basic theme also fail. The alleged failure to file suspicious activity reports ("SARs") is another way of describing omissions under the BSA. ¶¶239, 245-47. And as this Court has already determined, Binance's alleged failure to file SARs was not specific to any FTO (Plaintiffs do not plead that Binance filed any SARs at all) and fails to suggest any attempt to aid and abet an act of terrorism. *Troell*, 2026 WL 636849, at *21; *see also* Binance Plea Agreement ¶5 ("Binance has never filed a SAR"). Similarly, no intent to aid attacks can be inferred from the allegation that Mr. Zhao promoted VPNs "as a mechanism for customers to hide their location and thwart Binance's own geographic restrictions." ¶113. The Court also knew of

this allegation, *Troell*, 2026 WL 636849, at *6, 17, and it reflects at most intent to obtain access to the lucrative *U.S.* market, *see id.* at *21; *see* ¶¶112-13. In fact, the SAC's allegations that Mr. Zhao's policies indiscriminately permitted "'illegal transactions,'" ¶129, prove that he provided no special treatment to terrorists. *See also* ¶192 (allegation about intent to evade laws writ large). Like the FAC, the SAC pleads that Mr. Zhao's motivation was not terrorism, but increasing profits. ¶¶27, 29, 120, 129. Likewise, alleged special treatment for "VIP" users, ¶¶12, 122, 124, 193, 214-15, 246, 251-53, confirms the intent was *not* to aid terrorism. Because VIP users were "high-value U.S. customers," ¶251, not terrorists, the policy supports only the inference of intent to make profits regardless of the source. *See Atzili*, 2026 WL 1500823, at *9 (debunking the VIP argument). The same inference follows from Plaintiffs' allegations that Mr. Zhao and Binance established BAM to draw U.S. regulators' attention away from Binance. ¶¶260-74. Efforts to tap U.S. markets are not special treatment for terrorists suggesting the requisite scienter. *Ashley*, 144 F.4th at 443.

**Third-Party Reports**. The SAC alleges two reports to "Binance" from third-party vendors identifying "transactions associated with Hamas on the Binance exchange," ¶¶212, 191 and "a customer account…associated with Hamas," ¶¶214, 193. Neither report is alleged to have reached Mr. Zhao; both incidents were addressed by "Binance's then-CCO." ¶¶212, 214; *see also Matsumura v. Benihana Nat. Corp.*, 542 F. Supp. 2d 245, 255-56 (S.D.N.Y. 2008) (recognizing "the persuasive authority rejecting the imputation of knowledge from a corporation to its officers and directors"). That aside, the CCO's conduct refutes Plaintiffs' intent-to-aid-terrorists narrative: the CCO directed staff to "'*[o]ffboard* the user'"—i.e., kick the user off the exchange—and "let him take his funds" but *only if* "he is a VIP" user. ¶214 (emphasis added). As noted above, VIP users were defined by trading volume, not FTO relation. ¶251. As this Court already held, this only shows "accommodations…made available to any VIP customer on the platform," not any act

"for the benefit of Hamas or the PIJ." *Troell*, 2026 WL 636849, at *21; *see also Atzili*, 2026 WL 1500823, at *9 (same allegations, same analysis, same conclusion).

The SAC also makes open-ended allegations about the "compliance tools" that supposedly enabled Binance to see "the users, networks, devices, and the timing and flow of funds," as well as "state-of-the-art analytics and screening vendors." ¶¶182-83, 187. These allegations are, in the first place, incompatible with the SAC's predominant thrust elsewhere that Binance and Mr. Zhao *rejected* internal-compliance measures to blind themselves to suspicious activity on the exchange. *Compare* ¶¶181-89 (reasoning from legal KYC requirements that Binance employed sophisticated KYC measures), *with* ¶¶29, 74 (alleging Defendants ignored KYC requirements), 103 (Binance customers opened accounts "without submitting…identifying information"), 107 (KYC "controls" at Binance "did not actually exist"), 256 (Binance "'doesn't even do AML namescreening/sanctions screening'"). "Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*, 2011 WL 381612, at *6 (E.D.N.Y. Feb. 2, 2011) (citation omitted); *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005) ("The Court…is not obliged to reconcile plaintiff's own pleadings"). The SAC cannot allege both near-omniscience, ¶¶181-89, and "willful blindness" about who interacted with the exchange, ¶209; *see also* ¶122 (alleging "'zero visibility'"). Nor is it plausible that these vendors had better intelligence than both the U.S. and Israeli governments such that the vendors could identify non-customer wallets connected to FTOs before these countries designated them, ¶¶183, 186-87—especially when the SAC pleads that the vendors relied on those governments' designation lists. ¶¶188, 195.

All this aside, no report of terrorist-related activity is plausibly alleged to have reached Mr. Zhao. The SAC's one contrary suggestion, ¶189, is a "conclusory allegation[]" because it "do[es] not adequately 'plead factual content,' but instead provide[s] mere 'labels and conclusions.'" *Williams v. Richardson*, 425 F. Supp. 3d 190, 202 (S.D.N.Y. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). It also contradicts conclusions by the judge who presided over Mr. Zhao's sentencing, who found no evidence that Mr. Zhao knew of any specific wrongful use on the exchange.[12] Any assumption of knowledge that might be drawn as to Mr. Zhao would show, at most, "knowledge of…customers' illegal schemes" and choice "to transact with them anyway," which is not knowing and substantial assistance. *Spetner*, 2026 WL 2350124, at *14. It is not aiding and abetting merely to "sell a product to a known lawbreaker." *Smith & Wesson*, 605 U.S. at 295.

**Users in Sanctioned Jurisdictions**. Further leveraging tried-and-failed assertions of the FAC, the SAC repeats allegations about the volume of users on the exchange from sanctioned countries such as Iran. ¶¶255-57. The Court already dismissed this point, correctly observing that aiding-and-abetting liability does not arise merely because "financial institutions intentionally and knowingly facilitated transactions by sanctioned entities." *Troell*, 2026 WL 636849, at *18. So too the SAC's allegations about Nobitex, "Iran's largest cryptocurrency exchange." ¶¶275-79. Even if Binance could be credited with "processing transactions for wallets hosted on Nobitex," that "does not suggest that" Mr. Zhao "intended to assist IRGC in committing terrorist attacks." *Troell*, 2026 WL 636849, at *19. As the SAC admits, OFAC did not designate Nobitex until 2026, and its "inner workings" did not "bec[o]me public" until "a June 2025 data breach." ¶¶55-56.

---

[12] Sentencing Tr. 6:16-23.

### 3. The SAC Does Not Plausibly Allege That Binance or BAM Were Mr. Zhao's Alter Egos.

Implicitly admitting that a claim does not lie against Mr. Zhao for his own actions, the SAC drops the words "alter ego" in a few places in an apparent effort to attribute to Mr. Zhao all acts of all agents of Binance. ¶¶32, 35, 423, 532. That fails, first, because the SAC alleges no plausible claim against Binance (or BAM). It fails, second, because the alter ego assertion is nonsensical on its face. *Any* cognizable concept of alter ego doctrine proposes that one entity has no separate existence apart from "transact[ing] the dominator's business rather than its own." *Long Side Ventures LLC v. Hempacco Co.*, 2023 WL 6386888, at *7 (S.D.N.Y. Sept. 29, 2023) (citation omitted); *see also Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (similar). The SAC describes both Binance and BAM as running their own cryptocurrency businesses. ¶30 (Binance); ¶¶24, 263 (BAM); *see also* BAM Br. at 3-4. Further, veil piercing requires "complete domination" of the entity. *Morris v. N.Y. State Dep't of Tax'n & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993) (addressing New York law); *Wallace*, 752 A.2d at 1183-84 (Delaware law); *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 276 (2d Cir. 2023) (federal common law). The SAC acknowledges leadership at both entities apart from Mr. Zhao. *See, e.g.*, ¶¶27 (addressing Binance's "core senior management group," separate from Mr. Zhao), 12 (CFO), 102 (CCO), 123 (Deputy Head of Compliance), 209 (Money Laundering Reporting Officer); ¶¶273-74 (addressing BAM's CEOs and employees); *see also* BAM Br. at 4.

Moreover, Binance is incorporated in the Cayman Islands, ¶24, which applies English veil-piercing law. *Glob. Gaming Phil., LLC v. Razon*, 2022 WL 836716, at *7 (S.D.N.Y. Mar. 21, 2022); *see also Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (applying the law of the state of incorporation to alter ego claim). Under English law, veil-piercing applies only if "a company was somehow 'interposed' to deliberately frustrate a legal liability or

obligation of the person controlling the company that existed independently of the company's involvement." *Xin Wang v. Essence Int'l Fin. Holdings Ltd.*, 2026 WL 2272785, at *8 (S.D.N.Y. May 19, 2026) (citing the U.K. Supreme Court's decision, *Prest v. Petrodel Res. Ltd.* [2013] UKSC 34); *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 2021 WL 4994435, at *9 (Bankr. S.D.N.Y. Oct. 27, 2021) (citing *Prest* and stating that British law requires that the controlling person "deliberately evaded or frustrated a legal obligation by interposing" the entity). The SAC does not—and could not—allege that Mr. Zhao established Binance and BAM only to avoid personal liability to Plaintiffs.

Regardless of what jurisdiction's law applies to the alter ego question, the standard cannot be satisfied (including for personal jurisdiction, *see infra* §III.B). Accordingly, each Defendant must be analyzed separately, and Mr. Zhao cannot be held liable based on acts that are not attributed to him personally.

**B. The SAC Does Not Allege Direct and Extraordinary Assistance.**

The SAC independently attempts to establish "a close nexus between Defendants'" supposed actions "and the specific attacks against Plaintiffs." ¶281; *see* ¶¶282-418. It fails in this effort. It does "not plead that BAM and [Binance]"—let alone Mr. Zhao—"had a direct relationship with Hamas or any other terrorist organization." *Atzili*, 2026 WL 1500823, at *9. Rather, the supposed assistance of Mr. Zhao is, at best, highly attenuated and indirect. Like the FAC and pleadings in other cases, the SAC demonstrates "that there were multiple degrees of separation between" Binance and BAM, on the one hand, and FTOs, on the other. *Id.* Mr. Zhao was even further removed from any act of terrorism.

**Transaction-Processing Theory**. The SAC orients its nexus theory around the allegation that "Binance processed the relevant FTO-affiliated transactions" that allowed cryptocurrency to flow to FTOs. ¶288; *see also, e.g.*, ¶¶292 ("Binance…processed the transactions"), 295

(“transactions between Binance and identified Hamas wallets”), 297 (“transactions between Binance and PIJ-attributed wallets”), 299 (“transactions between Binance and BuyCash-attributed wallets”), 321 (“Binance also facilitated transactions”), 340 (“Binance enabled…transactions”), 341 (“Binance enabled…transactions”), 349 (“transactions between Binance and Gaza Now-attributed wallets”), 351 (“Binance processed…transactions”), 356 (“Binance’s transfers”), 359 (“Binance had processed…transactions”), 365 (“transactions…between Binance and the IRGC’s own financial wallets”), 367 (“Binance also processed…transactions”), 370 (“transactions…between Binance and Hizballah-attributed wallets”), 377 (“Binance processed…transactions with wallets”), 391 (“transactions Binance had already processed”), 392 (“Binance had also begun transacting”).

These allegations have no connection—direct or otherwise—with Mr. Zhao because he is not alleged to have been involved in processing transactions. In the one case unrelated to this one where a JASTA claim was permitted to proceed against an individual defendant (an executive of the co-defendant bank), it was alleged that he “personally initiat[ed] and authoriz[ed] [the] banking relationship with Hizbollah,” “personally processed transactions on this criminal network’s behalf” and “was in frequent, and at times daily, contact with individuals from a Hizbollah-affiliated criminal network.” *Lelchook v. Lebanese Canadian Bank*, 2024 WL 967078, at *2, 8 (S.D.N.Y. Mar. 6, 2024). Nothing close to that is alleged here. In fact, in the SAC’s nexus paragraphs (¶¶281-418), the word “Zhao” appears a single time in a conclusory aside related to BuyCash—which was not designated by OFAC until the very end of Mr. Zhao’s tenure at Binance (October 18, 2023). *See* ¶¶298, 316. Every other allegation of assistance applies to “Binance,” which (as noted) the SAC defines separately from Mr. Zhao. ¶¶24, 26, 30. *See also* Binance Br.

§I.A (explaining why these allegations do not establish a direct connection between Binance and FTOs either).

**Degrees of Separation Between FTOs**. The SAC pleads additional "degrees of separation" between Binance and any FTO, *Atzili*, 2026 WL 1500823, at *9, which further emphasizes that even more degrees of separation lie between Mr. Zhao and any FTO.

Second Circuit precedent has expressed that alleging a financial institution's knowing and substantial assistance is especially difficult where its "customer" is *not* an FTO but is alleged to have its own relationship with an FTO. *Compare Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 862 (2d Cir. 2021) (claim stated where customers of defendant were "integral parts of Hizbollah"), *with Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) (no claim stated where defendant's customer did business with al-Qaeda); *see also Ashley*, 144 F.4th at 444 ("it is not enough to say that facilitating the money laundering operations, which are not themselves Syndicate entities, results in substantial support to the Syndicate"). While a defendant with direct contact to an FTO does not necessarily aid and abet, *see, e.g.*, *Twitter*, 598 U.S. at 478, a defendant even farther removed is even less likely to do so, *see Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 166-67 (2d Cir. 2021), because, a plaintiff must allege scienter across the "several steps between any conduct by" the defendant and "the actions of those who directly perpetrated the Attacks." *Fraenkel*, 2025 WL 2773251, at *10.

The SAC neither alleges that FTOs were Binance customers nor bridges the intent gap across the several steps of conduct—from Mr. Zhao, to Binance, to Binance customers, to wallets Binance customers interacted with, to an FTO, to an attack. The SAC explains that, as a "[c]ryptocurrency exchange," Binance "offer[s] brokerage, trading, settlement and storage services" to customers—not that Binance trades on its own behalf with anyone. ¶80. It also

explains that customers of an exchange can use their wallets to trade with wallets "outside the exchange." *Id*. Outside transactions between Binance.com wallets and other wallets are recorded on the public blockchain ("onchain"). ¶¶83, 206. Importantly, the SAC admits that the transactions it alleges are drawn "only from public blockchain data," ¶10, which means one of the counterparties was not a Binance customer. The SAC is clear that the "on-chain interactions" it cites involve non-FTO Binance accounts that are counterparties to the wallets of alleged wrongdoers. ¶340; *see also, e.g.*, SAC B9-B19 (Tables B-8 through B-14 showing exchanges "From" and "To Binance" and "Counterparty wallet[s]" identified as belonging to FTOs or associates).

Simply put, the SAC does not allege that Binance directly hosted FTOs as customers. It claims Defendants failed to "take[] more aggressive action to stop others from financially assisting terrorists." *Atzili*, 2026 WL 1500823, at *10 (citation omitted). It provides no information about the Binance customer involved in the transaction, that person's intent, the purpose of the exchange, or the use to which the monetary value was put. Instead, the SAC improperly treats Binance's customers and the wallets they interact with as interchangeable. *See, e.g.*, ¶6 ("transactions…tied…to Hamas and PIJ"); *see also* ¶¶288-89. They are not.

Moreover, as to the vast majority of transactions, an FTO is not alleged to have participated on *either* side. The SAC predominantly relies on allegations of transactions involving other financial service providers (e.g., exchanges) that indisputably did not commit the relevant act of international terrorism. *See* ¶¶298-320 (BuyCash), 321-35 (Dubai Company for Exchange and "other" exchanges in Gaza), 336-40 (Al Mutahadun for Exchange and the Shamlakh Network), 341 (Herzallah Exchange and General Trading Company), 342-44 (Hamasat Company for Exchange and Money Transfers), 345-50 (Gaza Now), 367-69 ("IRGC operatives and support

channels”), 377-84 (Nobitex, Wallex.ir, Ramzinex, and Zedcex), 385-89 (IRGC-QF). These allegations fare no better than the failed allegations about “transactions connected to Altaf Khanani’s money laundering organization” in *Ashley*, which the Second Circuit found to lack a “discernable nexus” with “the attacks.” 144 F.4th at 443; *see also Troell*, 2026 WL 636849, at *19 (similar holding regarding Tawfiq Muhammad Sa’id al-Law). Yet these allegations account for more than 80% of the supposed assistance the SAC alleges concerning Hamas and the PIJ, *see* SAC A3 (Table A-1: $415mm of $504mm), and more than 97% of the supposed assistance alleged concerning IRGC and Hizballah, SAC B2 (Table B-1) ($6.05bb of $6.19bb).

**Fungibility and Support for Transcendent Enterprise**. At best, the SAC alleges “substantial assistance to a transcendent ‘enterprise’ separate from and floating above all the actionable wrongs that constitute it,” *Twitter*, 598 U.S. at 495, under “a theory based on money’s fungibility,” that controlling precedent forecloses. *Ashley*, 144 F.4th at 444. The SAC merely alleges “financially suspect transactions writ large, not in a manner that actively sought to” support terrorist acts. *Troell*, 2026 WL 636849, at *15. As shown above, the SAC does not plausibly allege that Mr. Zhao knew of any FTO benefiting from the Binance exchange. And even that would fall short. “When a company merely knows that some bad actors are taking advantage of its products for criminal purposes, it does not aid and abet…even if the company could adopt measures to reduce their users’ downstream crimes.” *Smith & Wesson*, 605 U.S. at 293 (cleaned up); *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022) (“a lengthy financial relationship does not terrorism assistance make”).

The D.C. Circuit recently permitted a JASTA claim to proceed on allegations that illustrate what is lacking here. *See Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026). The defendant drug companies there were alleged to have an “active, direct, and particularized”

relationship with the terrorist group Jaysh al-Mahdi, engaging in "bespoke dealings," paying it "cash bribes" directly, and "execut[ing] a formal sales contract by hand inside the Ministry headquarters in Baghdad, surrounded by Jaysh al-Mahdi fighters, propaganda, and weaponry." *Id.* at 612-13. These and other allegations supported an inference that the companies "associated themselves with Jaysh al-Mahdi's violent campaign of terrorism against U.S. nationals in Iraq." *Id.* at 613. The SAC pleads nothing like that. It falls well "short of the kind of 'bespoke dealings' and 'voluntary, tailored relationship' with a terrorist entity" that may satisfy the standard. *Atzili*, 2026 WL 1500823, at *9. Its flimsy efforts to plead "special treatment," ¶¶216, 223, provide no factual content suggesting any Defendant "was treating" an FTO-affiliated person "differently than it treated its other clients," *Ashley*, 144 F.4th at 443. Binance provided "generally available services," and Mr. Zhao allegedly set generally applicable policies related to those services; the *Twitter* standard requires more. *Atzili*, 2026 WL 1500823, at *10.

**Supposedly Dangerous Products**. The SAC is equally infirm in claiming a "uniquely dangerous nature of the service" Binance was "providing." ¶281; *see* ¶¶73-75. Cryptocurrency is not dangerous. As the SAC acknowledges, cryptocurrency is "a medium of exchange or store of value" traded on a "blockchain," which is a "database spread across multiple computer servers that verifies and permanently records every cryptocurrency transaction." ¶76. "Blockchains are public to prevent tampering: the creation of a public record fixes a transaction in history." ¶76. Exchanges like Binance are "like banks." ¶81. That is all a way of describing something not materially different from money—which precedent does not equate with weapons or other dangerous items. It is irrelevant that some cryptocurrency "advocates believe that governments and banks impose too many restrictions on fiat money" or even that some bad actors "are naturally drawn to cryptocurrency." ¶84. Allegations like that fail even as to products that *are* dangerous. *Smith &*

*Wesson*, 605 U.S. at 297-98 ("The manufacturers cannot be charged with assisting in criminal acts just because Mexican cartel members like those guns too.").

**The *Halberstam* Factors**. *Halberstam* further supports dismissal. *Halberstam*, 705 F.2d at 483-84 (listing factors). To begin with the obvious, the SAC pleads no relationship between Mr. Zhao and any FTO that comes anywhere near the relationship between the defendant and principal in that case. And, as with the FAC, the *Halberstam* factors weigh in Defendants' favor. *Troell*, 2026 WL 636849, at *22 (holding that "the six *Halberstam* factors reinforce[] th[e] conclusion" that the FAC did not plead aiding and abetting). The SAC does not allege "that Defendants took any step to encourage or solicit any FTO to commit a terrorist attack," they "were not present during any of the terrorist attacks," the "only relationship to the FTOs" was—at most—"an arms' length relationship," and no allegation suggests "the intent to specifically encourage or aid terrorist attacks against Americans." *Id.* at *22. Although the SAC arguably provides more dollar figures than the FAC, it too—in alleging an amount of assistance—depends on a discredited fungibility theory that is several degrees of separation removed from all Defendants—especially Mr. Zhao. In the scheme of a global cryptocurrency exchange with "over 100 million customers throughout the world, in volumes equivalent to trillions of U.S. dollars," ¶24, the dollar figures are in any event "not particularly substantial." *Atzili*, 2026 WL 1500823, at *9.

**C. The SAC Does Not Allege Pervasive and Systematic Assistance to FTOs.**

Because the SAC alleges neither extraordinary, direct assistance nor scienter, it necessarily falls well short of showing that Mr. Zhao "systemically and pervasively assisted" any FTO such that he could be deemed to have aided "each terrorist attack." *Twitter*, 598 U.S. at 501-02. This theory is not pleaded without showing "a near-common enterprise," in which "defendants intentionally associated themselves with [an FTO's] operations or affirmatively gave aid that

would assist each of [its] terrorist acts." *Id.* at 502. The FAC did not plead this because it alleged "at most…that Defendants generally permitted and solicited illicit actors of all ilks to use its platforms," not that they "sought to engage in a common enterprise with…FTOs." *Troell*, 2026 WL 636849, at *22. The SAC falls short even of alleging that any Defendants permitted FTOs to use the platform.

Indeed, Plaintiffs go much of the way to conceding this theory away by abandoning their conspiracy claim after this Court dismissed it. *Id.* at *22-23. The Supreme Court explained that this "systemic" aiding-and-abetting theory "begins to blur with conspiracy liability." *Twitter*, 598 U.S. at 496. Plaintiffs show they cannot allege this.

### D. The SAC's Willful Blindness Theory Contravenes Precedent.

Implicitly acknowledging it does not plead even knowledge of benefits to FTOs—let alone scienter—the SAC alleges "[i]n the alternative" that the lack of "actual knowledge" was "secured…through willful blindness." ¶209; *see also* ¶¶531, 338 ("should have known"). The Second Circuit squarely rejected that argument in *Ashley*, which explained that "a JASTA claim requires 'intent to further [a terrorist organization's] terrorist activities.'" 144 F.4th at 444 (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 500 (2d Cir. 2021)). *Ashley* distinguished between "interested cooperation, stimulation, instigation," which may be actionable, and "knowledge, acquiescence, carelessness, indifference, lack of concern," which is not. *Id.* at 443 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943)). Courts have repeatedly rejected JASTA claims based on allegations that the defendant "should have known that it was contributing to terrorism and chose to ignore the possible consequences." *Brill v. Chevron Corp.*, 2018 WL 3861659, at *3 (N.D. Cal. Aug. 14, 2018); *see Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 233 (E.D.N.Y. 2020) (same). This Court should as well.

## II. The SAC Does Not Plead General Awareness.

Although the SAC's failure to allege knowing substantial assistance is dispositive, it separately fails to plead Mr. Zhao's general awareness. In evaluating the FAC, the Court determined it showed "Defendants' general awareness of the role the Binance exchange played in terrorist financing." *Troell*, 2026 WL 636849, at *16. But the Court did *not* find that Mr. Zhao was generally aware of a role *his* activities played in any terrorist activity. *See Honickman*, 6 F.4th at 496 (this "element requires the defendant to be 'generally aware' of *its* role…" (emphasis added)). As shown (§I.B), the SAC does not plausibly allege that Mr. Zhao had a role in terrorism or that he was aware that any act he took benefited an FTO in any way.

That aside, the SAC's allegations call for another look at this element because they clarify that Binance itself was dealing with customers who are, in turn, alleged to have dealt with FTOs or (more commonly) third parties that had purported relationships with FTOs (or had their own customers with some relationship with FTOs). "In cases involving allegations that a bank indirectly aided the principal via its customers, the Second Circuit has instructed district courts to focus," first, on "'whether the bank was aware of the customers' connections with the terrorist organization before the relevant attacks'" and, second, on whether "the customers were…closely intertwined with the terrorist organization's violent terrorist activities.'" *Spetner*, 2026 WL 2350124, at *11 (quoting *Ashley*, 144 F.4th at 438). But the SAC provides *no* information about Binance's customers that could enable the Court to answer these questions. As explained (§I.A), this case is among those where scienter is especially difficult to show across layers of removal from the defendant to an FTO. *See Siegel*, 933 F.3d at 225; *Ashley*, 144 F.4th at 444-45; *Weiss*, 993 F.3d at 166-67; *Fraenkel*, 2025 WL 2773251, at *10. For similar reasons, because the SAC

does not allege that Binance's customers were closely intertwined with an FTO and that Binance was aware of this relationship, it does not show general awareness.

## III. The Court Lacks Personal Jurisdiction Over Mr. Zhao.

In dismissing the FAC, the Court found it unnecessary to address Mr. Zhao's personal jurisdiction defenses. *Troell*, 2026 WL 636849, at *25 (discussing *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012)). The Court may take the same approach here and adjudicate the merits. Regardless, Plaintiffs' failure to plead a basis for personal jurisdiction over Mr. Zhao independently supports dismissal. *See also* ECF No. 112 at 3-14; ECF No. 128 at 2-5.

### A. Proper Service Neither Occurred Nor Is Authorized.

Service is a "prerequisite[] to…personal jurisdiction," *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 105 (1987), but Mr. Zhao was not lawfully served (and this motion properly contests service). *See* Fed. R. Civ. P. 12(b)(4) and (5). While this Court authorized service by alternative means under Rule 4(f)(3), ECF No. 94, Plaintiffs' summons prominently lists the New York address of Baker & Hostetler as the place of service. ECF No. 97. Rule 4(f) permits service "at a place not within any judicial district of the United States." Fed. R. Civ. P. 4(f). And unlike Rule 4(e), which expressly authorizes service on an authorized "agent" for defendants in the United States, Fed. R. Civ. P. 4(e)(2)(C), Rule 4(f) requires service on the "individual" defendant—not an agent. Fed. R. Civ. P. 4(f). Even if Rule 4(f) did recognize service on agents, "service of process on an attorney not authorized to accept service for his client is ineffective." *Santos v. State Farm Fire & Cas. Co.*, 902 F.2d 1092, 1094 (2d Cir. 1990). Baker & Hostetler was not authorized to accept service for Mr. Zhao.

For the same reason, there is no "statutory basis for personal jurisdiction that renders such service of process effective," as is essential. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317,

327 (2d Cir. 2016). While the ATA authorizes service "in any district where the defendant resides, is found, or has an agent," 18 U.S.C. §2334(a), Mr. Zhao neither resides nor was found nor appointed an agent in a federal district. Because an agent is a person authorized to accept service, *Santos*, 902 F.2d at 1095, service is ineffective under the ATA if the recipient "lacked authority." *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1346 (S.D. Fla. 2022).

**B. The SAC Does Not Plead a Basis for Personal Jurisdiction.**

An exercise of jurisdiction over Mr. Zhao would not "comport with constitutional due process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 60 (2d Cir. 2012). "[A] dual citizen of Canada and the United Arab Emirates," ¶26, Mr. Zhao is not amenable to general jurisdiction in New York. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). That leaves specific jurisdiction, which requires "a relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021). The ties the SAC alleges "with New York and the United States," ¶411, lack the requisite relationship to this case. The "scheme" that "Binance" is alleged to have advanced in New York (and the U.S.) is the plan to retain U.S. VIP users, and none of them are alleged to have anything to do with FTOs or the attacks. *See* ¶¶412-18. The SAC does not allege that Mr. Zhao performed any service for an FTO in New York or the United States, or that any alleged assistance would result in injury "felt on American soil." *In re Terrorist Attacks on Sept. 11, 2001*, 2026 WL 2432174, at *13 (S.D.N.Y. Aug. 19, 2026). While the SAC mentions Mr. Zhao's presidential pardon, ¶421, that occurred after the case was filed and is not suit-related conduct. This case is like the many where specific jurisdiction was not established because forum-related ties were attenuated from the claims. *See In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93-94 (2d Cir. 2008); *Bernhardt*, 47 F.4th at 864-65; *Siegel v. HSBC Holdings, PLC*, 2018 WL 501610, at *4 (S.D.N.Y. Jan. 19, 2018).

Plaintiffs have contended that they need not establish minimum contacts because of the Supreme Court's decision in *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025). But *Fuld* made clear that a minimum-contacts test continues to apply to federal cases where state law (not a federal statute) supplies the basis of jurisdiction. *Id.* at 11. Here, where service occurred (if at all) under Rule 4(f), the basis for personal jurisdiction remains the New York long-arm statute, N.Y.C.P.L.R. §302(a), which is governed by a minimum-contacts test, *see Provencher v. Bimbo Foods Bakeries Distrib. LLC*, 175 F.4th 180, 187 (2d Cir. 2026).

Plaintiffs' invocation of Rule 4(k)(2) does not bypass the minimum-contact standard. First, Plaintiffs cannot certify that Mr. Zhao is "not subject to suit in any state court of general jurisdiction," Fed. R. Civ. P. 4(k)(2), when they claim to have asserted it under New York law, ¶¶419-21. In any event, *Fuld* did not hold that a minimum contacts test does not apply in cases invoking Rule 4(k)(2). It addressed the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), which provides that two organizations in particular—the Palestine Liberation Organization ("PLO") and the Palestinian Authority ("PA")—will "be deemed to have consented to personal jurisdiction" in the United States for ATA claims if they engage in specific conduct: making payments to a terrorist (or their family) who killed or injured a U.S. national in or related to the United States; and maintaining an establishment or conducting activities in the United States. *Fuld*, 606 U.S. at 8-9 (quoting 18 U.S.C. §2334(e)). *Fuld* considered only whether that personal jurisdiction provision was constitutional under the Fifth Amendment's Due Process Clause even if it does not satisfy the traditional minimum-contacts standard under the Fourteenth Amendment Due Process Clause. The Court held that "the Fifth Amendment does not incorporate the Fourteenth Amendment minimum contacts standard." *Id.* at 23.

But *Fuld* did not address Rule 4(k)(2); it held only that the Fifth Amendment did not preclude Congress from enacting an entirely separate statute extending personal jurisdiction over "two *sui generis* foreign entities" for a "narrow category of claims." *Id.* at 20-22. The Court explained that the PSJVTA "reflects the political branches' balanced judgment of competing concerns over sensitive and weighty interests of national security and foreign affairs and fairness to these particular defendants—entities with which the Federal Government has complex, long-standing relationships in which concerns over terrorism have long been at the fore." *Id.* at 19. "Congress and the President" therefore could constitutionally make "a considered judgment to subject the PLO and PA to liability in U.S. courts as part of a comprehensive legal response to 'halt, deter, and disrupt' acts of international terrorism that threaten the life and limb of American citizens." *Id.* at 20. But Congress and the President did not make a judgment regarding Rule 4(k)(2) or the assertions made here. The very existence of the PSJVTA proves this: if Plaintiffs were right that Rule 4(k)(2) (or the ATA) subjects everyone in the world to jurisdiction in the U.S., there would have been no need for the PSJVTA.

Indeed, Rule 4(k)(2) *incorporates* a minimum contacts test by requiring that jurisdiction be "consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B). When the rule was promulgated, and for decades after, federal courts "unanimously" understood that standard to refer to the usual Fourteenth Amendment minimum-contacts analysis. *See, e.g.*, *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 232 n.8, 239 (5th Cir. 2022) (collecting authorities). In proposing Rule 4(k)(2), the Advisory Committee explained that Rule 4(k)(2) "requires…affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party." Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment.

*Fuld*'s holding regarding the PSJVTA did not rewrite the basic requirements for personal jurisdiction under Rule 4(k)(2).

That aside, *Fuld* still requires a nexus analysis. The decision rejected a "maximalist theory of federal jurisdiction," which would "impose[] *no* territorial limits on personal jurisdiction" and would allow "any run-of-the-mill private defendant" to be haled into American courts. 606 U.S. at 18, 22. The Court emphasized that the PSJVTA allowed jurisdiction over "*sui generis* foreign entities" with "decades of meaningful contacts, ties, and relations with the United States" and only if they engaged in predicate conduct related to the United States and terrorism, and for ATA claims only. *Id.* at 22 (citation omitted). The Court further indicated that the Fifth Amendment—like the Fourteenth—likely imposes a "reasonableness" requirement that was satisfied in that case. *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987)). Courts applying *Fuld* have recognized that it requires "some showing of minimum contacts and purposeful availment." *In re Diisocyanates Antitrust Litig.*, 2026 WL 522845, at *6 (W.D. Pa. Feb. 25, 2026); *see also Rodriguez v. Imperial Brands, PLC.*, 182 F.4th 1333, 1347-50 (11th Cir. 2026) (finding personal jurisdiction lacking because, unlike *Fuld*, defendants were not alleged to have a longstanding U.S. presence and engage in claim-related conduct here). Here, there is no nexus between Mr. Zhao, the United States, and this case.

## CONCLUSION

The SAC fares no better than the FAC. Indeed, it further underscores that Mr. Zhao had no intent to aid an FTO's attack and that no act of his directly or substantially supported one. The Court should dismiss Plaintiffs' claim against him with prejudice.

Dated: September 4, 2026
New York, New York

Respectfully submitted,

*/s/ Joanna F. Wasick*

**BAKER & HOSTETLER LLP**

Joanna F. Wasick
Marco Molina
45 Rockefeller Plaza
New York, NY 10111
212-589-4200
jwasick@bakerlaw.com
mmolina@bakerlaw.com

Richard B. Raile (*pro hac vice*)
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 861-1711
rraile@bakerlaw.com

*Counsel for Defendant Changpeng Zhao*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1 and Section 5.A. of the Court's Individual Rules and Practices in Civil Cases, I hereby certify that the foregoing memorandum of law complies with the word count limitation as set forth therein. As measured by the word processing system used to prepare it, the foregoing memorandum of law contains 8,749 words.

Dated: September 4, 2026

*/s/ Joanna F. Wasick*
Joanna F. Wasick