**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

JOCELYN TROELL, *et al.*,

Plaintiffs,

v.

BINANCE HOLDINGS LIMITED, *et al.*,

Defendants.

No. 1:24-cv-7136-JAV

# MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

**[ORAL ARGUMENT REQUESTED]**


**WITHERS BERGMAN LLP**

Christopher N. LaVigne
Joseph Gallo Alexander Haden
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone: (212) 848-9800
christopher.lavigne@withersworldwide.com
joseph.gallo@withersworldwide.com
alex.haden@withersworldwide.com

**MILBANK LLP**

Neal Kumar Katyal (*pro hac vice*)
Colleen E. Roh Sinzdak (*pro hac vice*)
Kristina Alekseyeva
Samantha Ilagan (*pro hac vice* forthcoming)
Zois Manaris (*pro hac vice* forthcoming)
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com
crohsinzdak@milbank.com
kalekseyeva@milbank.com
silagan@milbank.com
zmanaris@milbank.com

Nola B. Heller
Matthew J. Laroche
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5108
nheller@milbank.com
mlaroche@milbank.com

**TABLE OF CONTENTS**

Page

INTRODUCTION ....................1

BACKGROUND ....................5

I. FACTS AND PROCEDURAL HISTORY ....................5

A. The Court's Prior Dismissal Order ....................5

1. *The FAC And Binance's Motion To Dismiss The FAC*....................5

2. *This Court's Order Dismissing The FAC* ....................6

B. Subsequent Decisions From The D.C. District Court And The Southern District Of New York....................7

II. THE ALLEGATIONS IN THE SECOND AMENDED COMPLAINT....................8

A. The SAC Adds Allegations Regarding Transactions Involving FTO-Affiliated Wallets *On Other Exchanges*....................9

B. The SAC Adds Conclusory And Self-Contradictory Allegations About Special Treatment ....................11

C. Plaintiffs Add Implausible Allegations Asserting That Financial Services Are Dangerous Wares ....................11

D. Plaintiffs Improperly Rely On Prior U.S. Agency Filings....................12

LEGAL STANDARD....................13

ARGUMENT ....................13

I. PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING-AND-ABETTING LIABILITY UNDER JASTA....................13

A. Plaintiffs Cannot Establish A Concrete Nexus Between Binance's Conduct And Any Specific Attack ....................14

1. *Plaintiffs Have Failed To Allege That Binance Provided Any Direct Assistance To The FTOs That Perpetrated The Attacks* ....................14

2. *Plaintiffs Have Failed To Allege That Binance Provided Special Treatment To The Attacks' Perpetrators* ....................20

**TABLE OF CONTENTS—Continued**

Page

3. *Plaintiffs' Allegations Look Nothing Like Those That Have Been Held To State A Claim For Aiding And Abetting* .....22

B. Plaintiffs Cannot Establish That Binance Provided "Pervasive, Systemic, And Culpable" Assistance .....23

1. *Neither Financial Services Nor Cryptocurrency Is A "Dangerous Ware"* .....24

2. *In Any Event, Plaintiffs Do Not Allege That Binance Provided Financial Services Or Cryptocurrency To The FTOs That Perpetrated The Attacks* .....26

C. Plaintiffs' Factual Allegations Suffer From Two Additional Flaws .....27

II. CERTAIN PLAINTIFFS MUST BE DISMISSED BECAUSE JASTA PROVIDES A CAUSE OF ACTION ONLY FOR U.S. NATIONALS .....28

CONCLUSION .....30

CERTIFICATE OF WORD COUNT

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 13

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) .......... 2, 3, 6, 16, 18, 20, 23, 24, 25, 26

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026) .......... 15, 22

*Atzili v. Islamic Republic of Iran*,
No. 1:24-cv-3365, 2026 WL 1500823
(D.D.C. May 29, 2026) .......... 4, 7, 8, 15, 21, 23

*Averbach ex rel. Est. of Averbach v. Cairo Amman Bank*,
No. 1:19-cv-4, 2020 WL 1130733
(S.D.N.Y. Mar. 9, 2020) .......... 28

*Cruz v. Loc. 32BJ*,
No. 22-cv-03068, 2026 WL 878597
(S.D.N.Y. Mar. 31, 2026) .......... 13, 19

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943) .......... 24, 26

*Freeman v. HSBC Holdings PLC*,
No. 18-cv-7359, 2026 WL 880107
(E.D.N.Y. Mar. 31, 2026) .......... 27

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011) .......... 27, 28

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) .......... 3, 22, 23

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) .......... 27, 28

*Siegel v. HSBC N. Am. Holdings*,
933 F.3d 217 (2d Cir. 2019) .......... 18

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025) .......... 1, 4, 20, 26

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Troell v. Binance Holdings Ltd.*,
No. 24-cv-7136, 2026 WL 636849
(S.D.N.Y. Mar. 6, 2026) ....................1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 23, 24, 27

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)....................1, 2, 3, 4, 8, 20, 21, 23

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*,
No. 10-cv-864, 2014 WL 3569338
(E.D.N.Y. July 18, 2014) ....................27, 28

*Weslowski v. Zugibe*,
626 F. App'x 20 (2d Cir. 2015) ....................13

*Weslowski v. Zugibe*,
96 F. Supp. 3d 308 (S.D.N.Y. 2015)....................13

*Zobay v. MTN Grp. Ltd.*,
695 F. Supp. 3d 301 (E.D.N.Y. 2023) ....................27

**STATUTES:**

18 U.S.C. § 2333(a) ....................28

18 U.S.C. § 2333(d)(2) ....................28, 29

Justice Against Sponsors of Terrorism Act,
Pub. L. No. 114-222, 130 Stat. 852 (2016)....................1

**OTHER AUTHORITIES:**

Azraa Muthy, *With Bank Infrastructure in Ruins, Gaza Gets a Lifeline from Cryptocurrencies*, The New Arab (July 16, 2024), https://www.newarab.com/features/bank-infrastructure-ruins-gaza-gets-crypto-lifeline....................18, 19

Nicholas Anthony, *Money Across Borders: How Cryptocurrency Has Opened Global Exchange*, Cato Inst. (Nov. 7, 2023), https://www.cato.org/publications/money-across-borders-how-cryptocurrency-has-opened-global-exchange ....................25

## INTRODUCTION

In March, this Court dismissed Plaintiffs' allegations that Defendant Binance Holdings Limited ("Binance") aided and abetted a series of terrorist attacks committed by five Foreign Terrorist Organizations ("FTOs") between May 2017 and July 2024, holding Plaintiffs failed to state a claim under the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). *Troell v. Binance Holdings Ltd.*, No. 24-cv-7136, 2026 WL 636849, at *16-17 (S.D.N.Y. Mar. 6, 2026). In reaching that conclusion, the Court identified fundamental defects in Plaintiffs' prior complaint that made it impossible for them to plausibly allege Binance provided the kind of "knowing and substantial" assistance JASTA requires. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 491 (2023).

Plaintiffs' Second Amended Complaint ("SAC"), Dkt. No. 236, fails to remedy these defects. Instead, it is full of conclusory and self-contradictory allegations, accompanied by charts and descriptions of transactions involving wallets held by alleged terrorist affiliates *on other crypto exchanges*—all designed to camouflage that Plaintiffs' allegations do not even point to a single Binance wallet that was owned or controlled by the FTOs that perpetrated the Attacks, nor even a single transaction with a *non-Binance wallet* that was used for financing the Attacks.

The SAC should therefore be dismissed with prejudice. In *Twitter*, the Supreme Court held that plaintiffs cannot state a claim for aiding and abetting unless their allegations demonstrate that defendants "gave such knowing and substantial assistance" to a terrorist organization that they "culpably participated in the … attack" itself. 598 U.S. at 497. That means that, to avoid dismissal, Plaintiffs' allegations must establish that Binance "intend[ed] to facilitate the [terrorist attacks'] commission." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291 (2025) (citation modified). Plaintiffs have not come close.

In dismissing the prior complaint, this Court explained that Plaintiffs' allegations failed to satisfy *Twitter*'s demanding standard in multiple ways. First, Plaintiffs could not show any direct nexus between Binance and the terrorist attacks because the allegations failed to provide key information about the Binance transactions that allegedly helped finance the Attacks—including, most fundamentally, who "owned and controlled" the terrorist-affiliated wallets that were alleged to have "operated on the Binance exchange." *Troell*, 2026 WL 636849, at *17. Second, Plaintiffs failed to allege that the FTO-affiliated "owners of the wallets" had been given any special treatment *because* of their FTO affiliations. *Id.* at *18. And third, Plaintiffs had not met the "high bar" for establishing knowing-and-substantial assistance in the absence of a direct nexus because they had not "plausibly alleged that Defendants sought to engage in a common enterprise with any of the FTOs" or otherwise demonstrated that "Defendants took action with the intent to specifically encourage or aid terrorist attacks against Americans." *Id.* at *22 (citation modified).

All three deficiencies persist—indeed, are exacerbated—in the SAC.

*First*, while the SAC provides new details about the alleged FTO-related transactions on Binance, those details only expose insurmountable defects in Plaintiffs' claims: Their allegations do not describe *any* transactions involving a Binance account that was owned or controlled by the FTOs that perpetrated the terrorist attacks. Rather, the SAC's numerous tables detail transactions between unspecified Binance accounts and wallets *on other crypto exchanges* that were allegedly affiliated with the FTOs' networks.

These allegations are plainly insufficient to show that Binance "consciously and culpably assisted the attack[s]." *Twitter*, 598 U.S. at 503. If anything, they suggest that the Attacks' perpetrators obtained their financial services from crypto exchanges other than Binance. SAC ¶ 301. And the Second Circuit already rejected similar allegations in *Ashley v. Deutsche Bank*

*Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025). As this Court has explained, *Ashley* held that plaintiffs could not state an aiding-and-abetting claim against a bank based on the financial services it provided to the terrorists' money launderers. *Troell*, 2026 WL 636849, at *20. There, plaintiffs alleged that the bank was providing financial services directly to an " 'internationally infamous money launderer for the [terrorist syndicate],' who used his accounts 'to execute USD-denominated transactions and repatriate [funds] back to' " the terrorist network. *Id.* (citation omitted). But even those allegations were not enough, because the bank's customer "was not himself a member of the terrorist syndicate." *Id.* Plaintiffs' allegations with respect to Binance are even less "robust," *id.*—and miles away from the kinds of allegations the Second Circuit has found to successfully allege aiding and abetting in cases like *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842 (2d Cir. 2021), where the banks provided services *directly to the terrorists*.

*Second*, Plaintiffs have not and cannot show that Binance "uniquely flouted" anti-money-laundering and know-your-customer regulations for the benefit of the FTOs that perpetrated the Attacks, which independently requires dismissal. *Troell*, 2026 WL 636849, at *21. Again, Plaintiffs do not even offer *any* allegations establishing the Attacks' perpetrators were Binance's customers, and while Plaintiffs offer conclusory allegations that Binance gave special treatment to "terrorist users," SAC ¶ 216, the SAC itself demonstrates that treatment was afforded to all "VIP" customers, *id.* ¶¶ 214-215. As this Court already found, that necessarily means that Plaintiffs cannot show these transactions were allowed to occur because they were affiliated with the Attacks or their perpetrators, or that the transactions otherwise establish "conscious[ ] and culpabl[e]" assistance. *Troell*, 2026 WL 636849, at *17 (quoting *Twitter*, 598 U.S. at 503).

*Third*, Plaintiffs have not come close to showing that Binance "took action with the intent to specifically encourage or aid terrorist attacks against Americans." *Id.* at *22. Plaintiffs try to

evade this problem by introducing novel allegations that Binance's financial services—or perhaps cryptocurrency in general—constitute "a dangerous product uniquely suited to terrorist finance." SAC at 29 (capitalization altered). That fails twice over: Financial services and cryptocurrency are nothing like the drugs and guns that the Supreme Court has previously deemed "dangerous wares." *Twitter*, 598 U.S. at 502. Were it otherwise, every bank whose customer transacts with a known criminal might be guilty of aiding and abetting. And in any event, the Supreme Court just rejected aiding-and-abetting allegations against gun manufacturers who make military-grade machine guns used by violent cartels, on the ground that manufacturing those weapons for suppliers who in turn sell them to the cartels creates too attenuated a chain to justify aiding-and-abetting liability. *Smith & Wesson*, 605 U.S. at 291. If those allegations regarding the manufacturers of genuinely dangerous wares are insufficient, then Plaintiffs' financial-services-based allegations certainly cannot be enough.

In short, Plaintiffs' Second Amended Complaint is as deficient as its first, and there is no reason to think a third could remedy these deficiencies. Plaintiffs had the benefit of a detailed dismissal opinion identifying precisely what was missing, and they filed a substantially revised complaint with expert-generated transaction tables and appendices expressly designed to cure those defects. And still, the SAC cannot identify an Attack-financing transaction, an FTO-controlled Binance account, terrorist-specific preferential treatment, or any intent to facilitate an Attack. Further amendment would be futile. Indeed, another federal district court recently dismissed analogous claims against Binance with prejudice. *Atzili v. Islamic Republic of Iran*, No. 1:24-cv-3365, 2026 WL 1500823 (D.D.C. May 29, 2026). This Court should follow suit.

## BACKGROUND

### I. Facts And Procedural History

Binance is the world's largest cryptocurrency exchange. Cryptocurrency exchanges provide critical financial infrastructure worldwide, allowing retail and institutional users to buy, sell, and hold digital assets like Bitcoin. Customers can use a cryptocurrency exchange like a bank, storing their cryptocurrencies in a digital "wallet" and transferring those digital assets as needed. That feature aids the billions of people worldwide who lack access to traditional banks—including those living in developing economies and political dissidents in countries where the banking system is controlled by the government. It also aids those who prefer to store and transfer their assets in digital currencies that traditional banks may not accommodate.

Plaintiffs are a group of individuals who allege they were injured by acts of international terrorism perpetrated between May 2019 and July 2024. Plaintiffs do not allege Binance played any role in planning or perpetrating these Attacks. Instead, they allege that individuals with Binance accounts transferred funds to and from wallets associated with FTOs, and that some of those funds *could have been* used to finance the Attacks.

#### A. The Court's Prior Dismissal Order

##### *1. The FAC And Binance's Motion To Dismiss The FAC*

Plaintiffs filed an 891-page First Amended Complaint ("FAC"), Dkt. No. 27, on December 2, 2024, alleging that Binance aided and abetted the commission of acts of international terrorism in violation of JASTA. The FAC sought to satisfy *Twitter*'s demanding standard for pleading an aiding-and-abetting claim primarily through conclusory allegations that Binance "deliberately" built and operated the "world's largest cryptocurrency exchange" as a money-laundering vehicle, "enabling terrorists to use the Binance exchange to raise and move hundreds of millions of dollars." FAC ¶¶ 12-16. Plaintiffs further alleged that several FTOs, including IRGC, PIJ, Hizballah, and

Hamas, were able to conduct transactions on Binance.com because Binance failed to comply with anti-money-laundering and know-your-customer obligations, even though Binance was aware from public reporting that persons affiliated with FTOs were using its platform. *Troell*, 2026 WL 636849, at *5-8, *21.

Binance moved to dismiss the FAC on December 20, 2024. Mem. in Supp. of Mot. to Dismiss, Dkt. No. 35. As Binance explained, despite filing a nearly 900-page complaint, Plaintiffs failed to allege "a single transaction by a [Binance] exchange user" that "directly funded or caused the Attacks" in any way. *Id.* at 5.

2. *This Court's Order Dismissing The FAC*

This Court agreed with Binance, dismissing the FAC's aiding-and-abetting claims in full on March 6, 2026. *Troell*, 2026 WL 636849, at *22. The Court explained this result was required by *Ashley*, 144 F.4th 420, which applied *Twitter* to reject allegations that a bank could be held liable under JASTA for providing financial services to money launderers associated with FTOs on the theory that the bank failed to employ robust anti-money-laundering and counter-terrorism-financing policies and operated in high-risk terrorist financing jurisdictions.

This Court held that, like the complaint in *Ashley*, the FAC failed to include "plausible factual allegations sufficiently linking Defendants' actions to the [Attacks] that injured Plaintiffs" and instead relied heavily on "money's fungibility." *Troell*, 2026 WL 636849, at *15 (quoting *Ashley*, 144 F.4th at 444). For one thing, Plaintiffs did "not identify the persons or entities who held the wallets at issue" and did "not explain the nature of their connection to the" FTOs or the specific Attacks. *Id.* at *18. Further, Plaintiffs' theory of "liability [wa]s predominantly premised on the allegation that individuals and entities with terrorist affiliations were permitted to transact on the Binance exchange"—an allegation that is insufficient as a matter of law after *Ashley* and *Twitter* to establish "knowing and substantial assistance." *Id.* at *16-17 (capitalization altered).

That was particularly so because Plaintiffs failed to allege that Binance "uniquely flouted [anti-money-laundering and related] regulations and reporting requirements for the benefit of" the FTOs. *Id.* at *21. Plaintiffs instead alleged the opposite—that Binance had "given special accommodations" to *all* "VIP customer[s] on the platform," permitting "all sorts of illicit actors to engage in transactions unchecked." *Id.* Those generalized allegations fatally "undermine[d]" Plaintiffs' theory of aiding-and-abetting liability because they disproved any claim that Binance "sought to form a common enterprise with Hamas or the PIJ, or any FTO for that matter." *Id.*

The Court also rejected Plaintiffs' arguments that Binance's assistance was "so pervasive, systemic, and culpable that it can be said the defendant aided their every wrongful act." *Id.* at *22. This Court observed there was "no allegation" in the FAC that Binance "took any step to encourage or solicit any FTO to commit a terrorist attack," the allegations of any communications between Binance and alleged FTO members were "sparse" and concerned only "their accounts," and—most importantly—no allegations "plausibly suggest[ed] that [Binance] took action with the intent to specifically encourage or aid terrorist attacks against Americans." *Id.* The Court therefore dismissed, with leave to amend.

### B. Subsequent Decisions From The D.C. District Court And The Southern District Of New York

Shortly thereafter, the D.C. District Court dismissed nearly identical JASTA claims arising out of the October 7 Hamas attacks on Israel *with prejudice*, holding that "[p]laintiffs' allegations fail[ed] to establish that the assistance" Binance "provided to Hamas was substantial or connected enough to the October 7 attacks to merit liability." *Atzili*, 2026 WL 1500823, at *1; *see* Order, *Atzili* (D.D.C. May 29, 2026), Dkt. No. 113.

*Atzili* explained that plaintiffs "fail[ed] to adequately link any alleged assistance from … [Binance]" to their injuries because they "d[id] not allege that any particular Binance transaction

supported the October 7 attacks." 2026 WL 1500823, at *10. At most, Binance "allegedly did not stop others from transferring money to Hamas-associated accounts on [its] platform[ ]," and even treating platform access as financial assistance, "there is not much 'closeness between defendants' assistance and the act of international terrorism that injured plaintiffs.' " *Id.* (citation modified). Nor did the *Atzili* plaintiffs allege that Binance " 'treated Hamas-linked users any differently from anyone else' "; rather—just like Plaintiffs here—plaintiffs there alleged Binance provided help evading sanctions to "VIP users generally." *Id.* at *9 (brackets omitted) (quoting *Twitter*, 598 U.S. at 504). Those allegations, the court held, were a "far cry" from the "bespoke dealings" and "voluntary, tailored relationship" with an FTO that precedent demands. *Id.* (citation modified).

One month after this Court dismissed the FAC, another court in this District agreed to reconsider its prior denial of a motion to dismiss analogous claims against Binance. Order, *Raanan v. Binance Holdings Ltd.*, No. 1:24-cv-697 (S.D.N.Y. Apr. 28, 2026), Dkt. No. 109. That decision was issued before *Ashley*, and the court recognized that it would be "folly" to deny reconsideration after *Ashley* and this Court's application of *Twitter*. Letter Mot. to Stay Discovery at 2, *Raanan* (S.D.N.Y. May 8, 2026), Dkt. No. 117 (citation omitted). That motion is fully briefed and awaiting decision.

## II. THE ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

Plaintiffs filed the SAC on July 7, 2026, purporting "to correct the deficiencies" this Court identified in *Troell*, 2026 WL 636849, at *25. *See* SAC ¶¶ 47-51. But the SAC does no such thing. While it cuts approximately 600 pages and drops any allegations with respect to *30* attacks included in the FAC, it does not meaningfully address the defects this Court identified. Plaintiffs do not, for example, allege that Binance directly funded or supported the Attacks, had advance knowledge of the Attacks, or otherwise intentionally associated itself with the Attacks in any way.

Instead, Plaintiffs attempt to overcome the flaws in the FAC in three main ways, none of which succeeds.

### A. The SAC Adds Allegations Regarding Transactions Involving FTO-Affiliated Wallets *On Other Exchanges*.

The crux of Plaintiffs' allegations remains that Binance failed to comply with certain anti-money-laundering and know-your-customer safeguards and otherwise created a hospitable environment for malfeasance. SAC ¶¶ 74, 107-109. The SAC again alleges, for example, that "Binance was purpose-built to exacerbate all the worst risks of cryptocurrency and cryptocurrency exchanges—and particularly those most valuable to terrorist finance." *Id.* ¶ 101.

The SAC attempts to link these generalized allegations to the Attacks by adding several tables and two appendices summarizing transactions between 2018 and 2025 that allegedly involved transfers of funds to and from "wallets attributed to" FTOs and FTO-controlled cryptocurrency exchanges. SAC at A1, B1. But those allegations cannot establish the requisite link because Plaintiffs do not allege that any of those transactions involved *Binance* wallets owned or controlled by the FTOs responsible for the Attacks. Rather, when Plaintiffs discuss "wallets attributed to" FTOs, they mean wallets *on other crypto exchanges* that were allegedly associated with those groups. And most of the transactions enumerated in the tables do not even involve transactions with *non-Binance* wallets attributed *to the FTOs*. They involve transactions with non-Binance wallets attributed to currency exchanges that allegedly provided services to the FTOs—even though this Court has already rejected analogous efforts to rely on wallets held by currency exchanges. *See Troell*, 2026 WL 636849, at *19-20.

The allegations in the body of the SAC are more of the same. They do not describe Binance wallets held by the Attacks' perpetrators; the only "Binance accounts" mentioned belong to crypto exchanges like BuyCash that indisputably did not perpetrate the Attacks. *Compare* SAC ¶¶ 303-

308 (listing specific "Binance accounts" belonging to BuyCash), *with id.* ¶¶ 296-297 (broadly referencing transactions "between Binance and PIJ-attributed wallets" without listing a single Binance account); *see also id.* ¶¶ 294-295 (similarly failing to identify any "Hamas wallets" on Binance); *id.* ¶¶ 365-366 (same for "IRGC-wallet transactions"); *id.* ¶¶ 367-369 ("wallets attributed to the Central Bank of the Islamic Republic of Iran"); *id.* ¶¶ 370-374 ("Hizballah-attributed wallets").

Nor do Plaintiffs connect any transactions involving Binance wallets to any particular Attack. The *only* specific allegation about a transaction with a non-Binance wallet attributed to an FTO that Plaintiffs purport to temporally link to an Attack is an alleged September 30, 2023, transaction with a PIJ-affiliated TRON wallet. SAC ¶¶ 7, 297. Plaintiffs, however, do not allege whether that transaction was to or *from* the TRON wallet, nor do they allege anything about the size of the alleged transfer. *Id.* Moreover, Plaintiffs do not allege that Binance knew that the TRON wallet—or, for that matter, any other wallet involved in the transactions the SAC describes—belonged to the FTOs responsible for the Attacks. Indeed, Plaintiffs generally avoid asserting that these non-Binance wallets were actually owned by the FTOs responsible for the Attacks, instead using indeterminate terms like "associated with," "connected to," "linked," or "attributed to" the FTOs without providing any specific details as to their owners. *E.g.*, *id.* ¶¶ 12, 45, 98, 110, 124, 131, 201, 219, 236, 238, 243, 280, 298, 328, 351, 367, 375-376, 398. As this Court recognized, Plaintiffs cannot rely on such allegations to show a concrete nexus without specifying the nature of the affiliation. *Troell*, 2026 WL 636849, at *19-20.

Thus, Plaintiffs *still* have not alleged that *any* Binance wallet or account was owned or controlled by the perpetrators of the Attacks or otherwise concretely linked to those Attacks.

### B. The SAC Adds Conclusory And Self-Contradictory Allegations About Special Treatment.

Plaintiffs also add several conclusory and implausible allegations that Binance provided "special treatment for terrorist users." *E.g.*, SAC ¶ 216. But these allegations are directly contradicted by other parts of the SAC where Plaintiffs continue to concede, as they must, that any special treatment Binance provided was based on "VIP" status, not terrorist affiliation. *Id.* ¶¶ 214-215. Plaintiffs do not identify a single rule or reporting criterion that Binance applied differently to accounts or transactions associated with FTOs, as compared to other VIP accounts or transactions. On the contrary, Plaintiffs concede that Binance froze VIP accounts like those owned by BuyCash when requested to do so by law enforcement officials. *E.g.*, *id.* ¶ 301.

Plaintiffs' theory that Binance "selectively enforced compliance rules to favor terrorists" is based almost entirely on allegations about Binance's treatment of private cryptocurrencies produced by a single individual, Babak Zanjani. *Id.* at 87 (capitalization altered). Plaintiffs claim that Binance bent the rules to allow Zanjani to market his cryptocurrencies on Binance despite his designation as a terrorist, even though it delisted another private coin associated with a different entity. *Id.* ¶ 233. But as Plaintiffs elsewhere acknowledge, during the time of this alleged favoritism, Zanjani was *not* designated as a terrorist—having been formally delisted by the U.S. Department of Treasury in 2016. *Id.* ¶ 226. And regardless, Plaintiffs offer no reason to infer that Binance's associations with Zanjani were predicated on his alleged terrorist affiliations, rather than the high volume of trade and business he gave the platform.

### C. Plaintiffs Add Implausible Allegations Asserting That Financial Services Are Dangerous Wares.

Plaintiffs also add allegations that Binance's financial services, or perhaps cryptocurrency generally, constitute "dangerous wares." SAC ¶¶ 61, 73-129, 529(a) (citation omitted). This is a transparent effort to circumvent this Court's prior holding that Plaintiffs had not met the "high"

bar to show that Binance's "role with respect to the FTOs is so pervasive, systemic, and culpable that it can be said the defendant aided their every wrongful act." *Troell*, 2026 WL 636849, at *22 (citation modified). Plaintiffs therefore spend over 20 pages attempting to accomplish the impossible task of wedging Binance's provision of financial services to entities that allegedly transacted with FTOs into a doctrine designed for those who sell machine guns to gangsters and morphine to drug addicts.

**D. Plaintiffs Improperly Rely On Prior U.S. Agency Filings.**

Unable to allege conduct that satisfies *Twitter*'s demanding aiding-and-abetting liability standard, Plaintiffs rely on Binance's consent orders with the Financial Crimes Enforcement Network (the "FinCEN Consent Order") and the Commodity Futures Trading Commission, a settlement agreement with the Office of Foreign Assets Control ("OFAC"), and a U.S. Department of Justice civil forfeiture complaint that was not even lodged against Binance, but instead targeted certain wallets that Binance froze at the government's request. *See* SAC ¶ 301; *see also, e.g.*, *id.* ¶¶ 14, 55, 123, 161, 190 n.4, 214, 239-240, 249, 257, 296, 417; Declaration of Colleen E. Roh Sinzdak ("Sinzdak Decl."), Exs. 1-4, filed contemporaneously herewith. These citations cannot help Plaintiffs.

As discussed *infra* at pp. 27-28, Plaintiffs cannot rely on these filings for substantive allegations, because, at most, the filings are akin to settlement agreements that do not admit fault. *Contra* SAC ¶ 14.

Even setting that aside, the filings do not suggest Binance's liability because—at most—they merely discuss Binance's historical anti-money-laundering, know-your-customer, and sanctions policies; they do not even hint that Binance purposefully structured its compliance program to allow terrorists to use its platform to fund any terrorist activities, let alone the specific Attacks here. *Contra id.* ¶¶ 13-14, 190, 214, 296, 315. None of the agencies ever concluded that.

Regardless, the filings *undercut* Plaintiffs' conclusions in many ways. For example, the filings show there were multiple degrees of separation between Binance and any FTO. *See* Sinzdak Decl. Ex. 1 at 45-46 (explaining that Binance "failed to file" Suspicious Activity Reports, or SARs, after "Binance [1] user addresses were found to [2] interact with bitcoin wallets [3] associated with [FTOs]"). And far from concluding that Binance facilitated terrorist attacks, the FinCEN Consent Order acknowledges that, despite any failure to file SARs, Binance "proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing." *Id.* at 46.

**LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim, a plaintiff's "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must accept as true a plaintiff's factual allegations in the complaint, but "naked assertions devoid of further factual enhancement" and "legal conclusions" will not satisfy the plaintiff's burden. *Id.* (citation modified).

Where a court has already dismissed a previous complaint for failure to state a claim, the amended complaint must "correct the deficiencies identified" in the prior order. *Troell*, 2026 WL 636849, at *25. Amended complaints that fail to do so are dismissed under the law-of-the-case doctrine. *E.g.*, *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 315-317 (S.D.N.Y. 2015), *aff'd*, 626 F. App'x 20 (2d Cir. 2015); *Cruz v. Loc. 32BJ*, No. 22-cv-03068, 2026 WL 878597, at *4 (S.D.N.Y. Mar. 31, 2026).

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING-AND-ABETTING LIABILITY UNDER JASTA.

The SAC fails to "correct the deficiencies" this Court identified in the FAC. *Troell*, 2026 WL 636849, at *25. While Plaintiffs have tried hard to conceal it with a blizzard of tables and details about wallets held on cryptocurrency exchanges *other than Binance*, the SAC does not allege that Binance provided financial services to any of the Attacks' perpetrators, nor does it even point to transactions between Binance accounts and wallets held on other exchanges that can be tied to the Attacks. The SAC likewise fails to allege that Binance provided any special treatment to the Attacks' perpetrators or otherwise indicated an intent to "culpably and consciously" associate itself with the Attacks. *Id.* at *17. Finally, Plaintiffs' misguided effort to shoehorn this case into the Supreme Court's "dangerous wares" precedents is unavailing. The Court should dismiss the SAC with prejudice.

#### A. Plaintiffs Cannot Establish A Concrete Nexus Between Binance's Conduct And Any Specific Attack.

##### *1. Plaintiffs Have Failed To Allege That Binance Provided Any Direct Assistance To The FTOs That Perpetrated The Attacks.*

In dismissing the prior complaint, this Court directed Plaintiffs to provide "information as to the nature of the association a particular wallet" on Binance had with the FTOs. *Troell*, 2026 WL 636849, at *17. Specifically, the Court instructed Plaintiffs to explain who "owned and controlled" each Binance account at issue—whether it was "an operative of the [FTOs that perpetrated the Attacks], a supporter, or an intermediary such as a money transmitter or financer." *Id.* And the Court further required Plaintiffs to explain "what was publicly known about" the Binance account holders "at the time the transactions took place," so that it could assess whether Plaintiffs had plausibly alleged that Binance was aware of the accounts' FTO affiliations. *Id.*

The SAC fails to cure any of those defects. The SAC does not so much as identify a single Binance account owned by an FTO.[1] Rather, it obfuscates matters by providing over a hundred pages of irrelevant details about *non-Binance wallets and accounts* purportedly connected to the FTOs. Even then, Plaintiffs largely fail to explain the connection between these non-Binance wallets and the FTOs that perpetrated the Attacks, instead using vague terms like "associated," "linked," and "affiliated." *E.g.*, SAC ¶¶ 12, 45, 98, 110, 124, 131, 201, 219, 236, 238, 243, 280, 298, 328, 351, 367, 375-376, 398. And Plaintiffs fail to draw any real connection between the alleged transactions and any specific Attack. These deficiencies reveal exactly what the Court suspected on the first go-around—that Plaintiffs cannot establish "a discernable nexus between the alleged money laundering and the attacks committed against Plaintiffs." *Troell*, 2026 WL 636849, at *21 (citation omitted).

Plaintiffs' allegations regarding Hamas and PIJ illustrate the problem. Plaintiffs boldly proclaim that they identified "$29.5 million in transactions between Binance and identified Hamas wallets across 9,300 transactions" and "$59.5 million across 89,054 transactions between Binance and PIJ-attributed wallets." SAC ¶¶ 295, 297. Again, what Plaintiffs fail to make clear is that *none* of those "Hamas wallets" or "PIJ-attributed wallets" was on Binance. Each of those transactions occurred between an (unidentified) Binance customer and wallets on other cryptocurrency platforms. Further, Plaintiffs do not explain what they mean by "Hamas wallets" or "PIJ-attributed wallets,"[2] and they conspicuously do not allege that Binance knew of any

[1] Even if the SAC had, the SAC would still fail to show the requisite " ' close and distinct tie' to [any FTO's] 'acts of terrorism,' " *Atzili*, 2026 WL 1500823, at *10 (citation modified) (quoting *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 605 (D.C. Cir. 2026)), for all the reasons explained herein.

[2] For example, Plaintiffs' claim that the wallets belonged to PIJ seems to come from the FinCEN Consent Order, *see* SAC ¶¶ 194, 296-297, but the Order says those wallets were part of the "PIJ network," not owned by PIJ itself. *See* Sinzdak Decl. Ex. 1 at 47. Plaintiffs do not explain what

relationship between those wallets and the FTOs. *See id.* ¶¶ 294-297. The SAC does not even plausibly allege that these transactions with non-Binance wallets involved funds that facilitated the Attacks. *See id*. These omissions are striking: Despite the hundred or so pages preceding these paragraphs—where Plaintiffs conclusorily claim again and again that Binance aided and abetted Hamas and PIJ—Plaintiffs cannot identify a single Hamas or PIJ wallet hosted on Binance, nor a single Attack-related transaction.

*Ashley* squarely forecloses this attempt to rely on account services provided not to the terrorists themselves, but rather to "entities with an apparent or possible connection to terrorists" on the theory that "some of the money must have gone to the terrorists' violent activities." 144 F.4th at 444. *Ashley* explained that permitting JASTA claims predicated on such a "theory based on money's fungibility" would impermissibly erase JASTA's "intent" and "awareness" requirements. *Id.* (citation modified). The Second Circuit therefore rejected allegations that a bank had facilitated money laundering transactions that funded terrorist activities because the "complaint fail[ed] to plead with specificity allegations from which th[e] Court could draw adequate inferences" that the bank " 'knew or intended that [the terrorists] would receive the funds.' " *Id.* at 444-445 (citation omitted).

The SAC similarly lacks such allegations, although Plaintiffs try to conceal this defect by highlighting a single September 30, 2023, transaction that allegedly occurred between an unspecified Binance account and a *non-Binance* TRON wallet "listed" or "designated" as PIJ property. SAC ¶ 7. Although Plaintiffs make this their leading allegation—featured prominently in the SAC's introduction, *id.*—it cannot give rise to an inference that Binance knew or intended

being part of the "PIJ network" means, further attenuating the nexus between transactions occurring on Binance and the Attacks.

to facilitate funding for the October 7 attacks, because Plaintiffs leave out numerous essential details, including whether Binance was aware of the transaction, the amount of money involved,[3] and even whether the transaction was to or *from* the allegedly-PIJ-affiliated TRON wallet.

Tables A-5 and A-6 of the Appendix, which Plaintiffs devote to listing alleged transactions between Binance and Hamas or PIJ, further confirm that the transactions Plaintiffs cite cannot establish a direct nexus between Binance and the Attacks perpetrated by those organizations. Again, the tables do not purport to list any Binance accounts owned or controlled by FTOs. And the listed transactions lack a temporal correspondence with the Attacks: The overwhelming majority of the transactions identified in Tables A-5 and A-6 occurred between 2021 and early 2023—but only *one* of the ten Attacks ascribed to Hamas and PIJ occurred during that time. *Compare* SAC at A5-A7, *with id.* ¶¶ 428-470. In fact, the transactions in those Tables are so transparently attenuated from the Attacks that just *two* are discussed in the body of the SAC—and both involve funds flowing *from* the allegedly FTO-affiliated non-Binance wallets into unspecified Binance accounts. *Id.* at A5-A7.

Nor do the Plaintiffs' "[c]umulative pre-attack" tables advance their claims. *See* SAC at A3-A4, B4-B8. Those Tables simply add together "all identified transactions occurring before the date of" a particular Attack, *id.* at A3, B2, without alleging facts to show that those funds remained available to the FTO, reached the perpetrators, funded terrorist operations, or had any connection to that Attack. Thus, the same earlier transactions inflate the totals attributed to multiple later Attacks. At best, that chronology is just the "fungibility" theory this Court already rejected. *Troell*, 2026 WL 636849, at *20.

[3] Notably, the purported transfer is *not* listed in Plaintiffs' Table A-6 describing the 50 largest transactions with PIJ-affiliated wallets—the latest of which occurred in March 2023. *See* SAC at A6-A7.

To close these obvious gaps, Plaintiffs attempt to rely on Binance accounts allegedly linked to currency exchanges in Gaza that allegedly provided financial services to Hamas and PIJ. *See* SAC ¶¶ 298-353. But *Ashley* held that a complaint cannot establish aiding and abetting based on allegations that a financial institution provided aid to a different financial institution that in turn assisted the terrorists. There, the Second Circuit explained that it had previously declined to find aiding-and-abetting liability where a U.S. bank gave " 'hundreds of millions of dollars' " to a Saudi bank with "known links to terrorist organizations." 144 F.4th at 445 (quoting *Siegel v. HSBC N. Am. Holdings*, 933 F.3d 217, 224-225 (2d Cir. 2019)). Although the U.S. bank also helped the Saudi bank " 'flout' U.S. sanctions laws," those allegations were not sufficient because they did not establish that the U.S. bank provided knowing and intentional assistance to the terrorists themselves. *Id.* (citation omitted). Applying this reasoning, this Court rejected Plaintiffs' effort to rely on allegations in the FAC regarding transactions between Binance wallets and "wallets hosted on the Nobitex exchange," which was allegedly "controlled by" IRGC. *Troell*, 2026 WL 636849, at *19. This Court explained that processing transactions involving wallets on another exchange "d[id] not suggest that Defendants intended to assist IRGC in committing terrorist attacks." *Id.*

The SAC disregards these clear holdings, setting out numerous allegations about Binance wallets held by BuyCash and the other Gaza exchanges. Moreover, rather than alleging transactions between the accounts BuyCash allegedly held on Binance and the FTOs that perpetrated the Attacks, Plaintiffs' tables document transactions between unspecified Binance accounts and *non-Binance wallets held by these other currency exchanges*. *See, e.g.*, SAC at A8-A9. Nor do Plaintiffs allege that the funds transferred to the other exchanges can be traced to subsequent transfers to Hamas or PIJ, a dramatic omission given that Gaza-based exchanges are

also used by scores of civilians residing in Gaza who do not have access to traditional banking services. *See, e.g.*, Azraa Muthy, *With Bank Infrastructure in Ruins, Gaza Gets a Lifeline from Cryptocurrencies*, The New Arab (July 16, 2024), https://www.newarab.com/features/bank-infrastructure-ruins-gaza-gets-crypto-lifeline.

Further, Plaintiffs fail to establish that Binance was even aware that exchanges like BuyCash were associated with terrorism "at the time" of the Attacks. *See Troell*, 2026 WL 636849, at *17. For example, Plaintiffs *concede* that BuyCash was designated "in the wake of the October 7, 2023 attack." SAC ¶¶ 298, 300; *see also id.* ¶¶ 336, 338, 340 (similarly relying on 2024 designation of the Shamlakh family post-dating 2022 and 2023 transactions). Plaintiffs suggest that Binance should have been able to flag pre-Attack transactions even before their designations, *e.g.*, *id.* ¶¶ 339-340, but as Plaintiffs recognize elsewhere, Binance serves hundreds of millions of users globally and processes trades "in volumes equivalent to trillions of U.S. dollars," *id.* ¶ 24. No court has imposed JASTA liability based on such attenuated allegations.

Plaintiffs' allegations with respect to IRGC, Hizballah, and Iranian exchanges are more of the same. Plaintiffs identify *no* Binance accounts held by members of those FTOs and rely largely on the transactions with wallets that belonged to currency exchanges allegedly affiliated with the FTOs, *id.* ¶¶ 365-389—allegations this Court already held insufficient, *Troell*, 2026 WL 636849, at *19, *21 (specifically discussing allegations regarding the Nobitex exchange and the al-Law network). Plaintiffs of course cannot relitigate those determinations. *Cruz*, 2026 WL 878597, at *4 (law of the case doctrine bars a party from "seek[ing] to relitigate … previous rulings"). Nor do Plaintiffs allege that Binance was aware of the connections to the FTOs at the time of the transactions. And a close comparison of Plaintiffs' Table B-7 (listing the Attacks) with Tables B-8, B-9, and B-14 (alleging transactions with IRGC, "Other IRGC," and Hizballah) reveals that the

vast majority of the transactions occurred months apart from any of the Attacks for which Plaintiffs seek to hold Binance liable. SAC at B8-B19.

Accordingly, while Plaintiffs have now supplied more information about the Binance transactions than was in the FAC, that information reveals that Plaintiffs cannot establish a direct nexus between Binance and the Attacks. Instead, they seek to rely on the sort of attenuated connections with the Attacks' perpetrators that the Supreme Court, the Second Circuit, and this Court have found lacking.

*2. Plaintiffs Have Failed To Allege That Binance Provided Special Treatment To The Attacks' Perpetrators.*

In dismissing the nexus allegations in the FAC, this Court also pointed to an additional flaw: Plaintiffs had not alleged that Binance singled out the perpetrators of the Attacks for special treatment, *Troell*, 2026 WL 636849, at *21, or provided any "other very good reason to think that defendants were consciously trying to help or otherwise participate in the … attack," *Twitter*, 598 U.S. at 500 (citation modified); *accord Ashley*, 144 F.4th at 441. That defect persists in the SAC, and it is independently fatal to Plaintiffs' aiding-and-abetting claims. *See, e.g.*, *Smith & Wesson*, 605 U.S. at 291-292 (aiding-and-abetting allegations must establish that the defendant "intend[ed] to facilitate" the commission of the offense so as to "make the offense his own" (citation modified)).

In its prior dismissal order, this Court explained that Plaintiffs did not allege that Binance "uniquely flouted AML/CFT regulations and reporting requirements for the benefit of Hamas or the PIJ" or any other FTO. *Troell*, 2026 WL 636849, at *21. On the contrary, the FAC made clear that those "entities were not given special accommodations, other than those made available to *any* VIP customer on the platform." *Id.* (emphasis added). The Court concluded that those allegations necessarily defeat any "claim of aiding-and-abetting liability" because they dispel any suggestion

that Binance "sought to form a common enterprise with Hamas or the PIJ, or any FTO for that matter." *Id.* The *Atzili* court recently reached the same conclusion about analogous allegations. 2026 WL 1500823, at *9 (citing *Twitter*, 598 U.S. at 500).

The SAC fails to address those concerns. Plaintiffs continue to allege platform-wide compliance failures common to all of Binance's hundreds of millions of users. *See* SAC ¶¶ 101-129, 210-290. And while Plaintiffs have added some conclusory allegations that Binance provided "special treatment for terrorist users," the supporting facts invariably demonstrate that the treatment was provided because of "VIP" status, not terrorist ties. *Id.* ¶¶ 215-216. Plaintiffs also briefly suggest that Binance "selectively enforced compliance rules to favor terrorists." *Id.* at 87 (capitalization altered). But Plaintiffs do not identify a single rule that Binance selectively enforced to favor FTO-associated accounts—let alone connect that enforcement failure with any specific Attack. Instead, as discussed *supra* at p. 11, Plaintiffs' allegations center almost entirely around Binance's failure to ban Babak Zanjani's tokens, even though Zanjani was not designated as a terrorist at the time of these alleged efforts—and even then, Plaintiffs do not attempt to connect Zanjani's tokens to the Attacks. SAC ¶¶ 233-236.

And the converse is also true: While the SAC relies almost exclusively on alleged transactions between unidentified Binance accounts and non-Binance wallets with alleged terrorist affiliations, Plaintiffs have failed to establish that Binance treated those transactions any differently than the billions of other transactions that Binance processes on its platform. Instead, Plaintiffs allege that Binance should have, but did not, stop or flag these transactions—allegations that are plainly insufficient to show that Binance was "consciously trying to help or otherwise participate in the" Attacks. *Twitter*, 598 U.S. at 500 (citation modified).

### 3. *Plaintiffs' Allegations Look Nothing Like Those That Have Been Held To State A Claim For Aiding And Abetting.*

The insufficiency of Plaintiffs' allegations is even more apparent when they are compared to the kind of aiding-and-abetting claims that have been held to survive a motion to dismiss. In *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592 (D.C. Cir. 2026), for example, plaintiffs alleged that defendants orchestrated "a long-running scheme to provide [an FTO] with cash and in-kind bribes that amounted to at least 20 per cent of the value of each contract, as well as off-the-books shipments of free goods that were not tied to any particular contract." *Id.* at 611 (citation modified). The D.C. Circuit held that those allegations of *direct* assistance sufficiently established knowing and culpable conduct.

Similarly, in its pre-*Twitter* decision in *Kaplan*, the Second Circuit held that plaintiffs stated an aiding-and-abetting claim based on allegations that the bank had "*actual knowledge*" that the accounts in question "belonged to Hizbollah" and had given those Hizbollah officials special treatment "pursuant to [the bank's] long-standing official policy and practice of support for Hizbollah." 999 F.3d at 849, 853 (emphasis first added, then omitted) (citation modified). Among other things, the complaint alleged that the bank had responded to a U.N. report stating that the bank's "service to one of its customers constituted money laundering for Hizbollah … by stating that the report was 'part of the propaganda and war launched by the Jewish state against Lebanon' and by increasing that customer's credit limit." *Id.* at 862 (citation omitted). And the bank there "disregarded its own internal policies in order to grant its known Hizbollah-affiliated Customers special exceptions." *Id.* at 858 (citation modified).

Plaintiffs' allegations look nothing like the unusually direct, tailored, and culpable assistance in *AstraZeneca* or *Kaplan*: Plaintiffs do not allege that Binance provided cash, bribes, or goods to the perpetrators of the Attacks, as in *AstraZeneca*, 165 F.4th at 611, nor do they allege

that Binance hosted any accounts that "belonged to" the FTOs, as in *Kaplan*, 999 F.3d at 866. And they likewise fail to offer statements showing that Binance was sympathetic to the terrorists, or that it offered customers special treatment on account of their terrorist affiliations.

Plaintiffs cannot avoid that defect by tacking on lengthy appendices or artful descriptions of wallets held on *other* currency exchanges. No amount of reframing can get around the fact that Plaintiffs allege absolutely no particularized facts establishing that Binance somehow singled out FTOs for preferential treatment or "culpably and consciously" assisted the Attacks. *Troell*, 2026 WL 636849, at *17. If a financial institution's failure to detect and block its customers' transactions with malefactors constitutes knowing participation in terrorism, then *every* bank, payment processor, and telecommunications company with imperfect compliance controls would face liability whenever its customers misuse its services. That is exactly the kind of boundless standard that courts have warned against: Conflating a regulatory failure with conscious participation in terrorism would "take aiding and abetting far beyond its essential culpability moorings," *Twitter*, 598 U.S. at 503, and effectively impose strict liability on any financial institution that has ever been sanctioned for compliance deficiencies, *Atzili*, 2026 WL 1500823, at *11. As this Court has recognized, that is not the law.

### B. Plaintiffs Cannot Establish That Binance Provided "Pervasive, Systemic, And Culpable" Assistance.

*Twitter* recognized that where plaintiffs fail to establish a "concrete nexus" between the defendant and the attack, they can establish aiding-and-abetting liability only by alleging "pervasive, systemic, and culpable assistance." 598 U.S. at 501-502. As this Court already explained, because finding liability without a direct nexus to the specific attack "would justify holding a secondary defendant liable for *all* of [a] group's actions," *id.* at 502 (emphasis added), there is an extraordinarily "high bar" to establishing liability under this pathway, *Troell*, 2026 WL

636849, at *22 (quoting *Ashley*, 144 F.4th at 445). Plaintiffs' FAC failed to meet that bar because "[n]one" of their "allegations plausibly suggest[ed] that Defendants took action with the intent to specifically encourage or aid terrorist attacks against Americans." *Id.*

The SAC does not remedy this defect. Plaintiffs try to overwhelm the Court with transaction tables to show "pervasive and systemic" assistance, but even setting aside the problems with these tables, *see supra* at pp. 17-20, they do not establish the missing culpability. *Ashley* requires "pervasive and systemic" aid *and* conduct "designed or performed with the intent to aid" the FTOs specifically. 144 F.4th at 445. Plaintiffs do not (and cannot) allege that Binance acted "with the intent to specifically encourage" the Attacks. They do not even try. Instead, Plaintiffs repackage their prior allegations to try to fit into the "dangerous wares" doctrine the Supreme Court referenced in *Twitter*. SAC ¶ 61 (citation omitted). But those efforts fail because (1) neither financial services nor cryptocurrency are "dangerous wares," and (2) Supreme Court and Second Circuit precedent recently clarified that the "dangerous wares" doctrine applies only to the direct supplier of the dangerous ware—not to entities further removed from the immediate sale, as alleged against Binance here.

*1. Neither Financial Services Nor Cryptocurrency Is A "Dangerous Ware."*

This case does not involve the kind of products or services that have been deemed "dangerous wares." In referencing dangerous wares in *Twitter*, the Supreme Court cited its prior decision in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943). That case held that where a business sells an "inherently" dangerous item like morphine or machine guns, it may be easier to show that the seller knew of and intended to "promote and cooperate in" the "illegal use" of those dangerous items. *Id.* at 710-711. In *Ashley*, the Second Circuit likewise "assume[d]" that a specific fertilizer "used to make IEDs" could qualify as a "dangerous ware" given its "deadly potential." 144 F.4th at 442.

Unlike morphine, machine guns, and the fertilizer used in IEDs, however, financial services are not "deadly." The Second Circuit implicitly recognized as much when it considered the "dangerous wares" allegations in *Ashley*: Plaintiffs there had alleged that a bank could be held liable for providing "dangerous wares" to terrorists because the bank provided financial services to companies that sold the terrorists fertilizer for making IEDs. *Id.* at 439-442. The Court rejected those allegations because, while it assumed the fertilizer was a dangerous ware, it likewise assumed the financial services the bank provided were *not*—so much so that the Court did not even mention the possibility that financial services might be "dangerous wares" in and of themselves. Rather, *Ashley* simply held there was too "tenuous" a "connection between the banking services and the terrorist attacks" for the bank's aid to be deemed knowing and substantial. *Id.* at 441.

The Second Circuit's assumption that financial services are not "dangerous wares" makes sense. Unlike with machine guns or morphine, the overwhelming majority of those who use financial services—including cryptocurrency platforms—do so for lawful purposes. Cryptocurrency is a mainstream unit of monetary exchange, used frequently by big businesses in need of a universal currency, and those living under corrupt or weak governments who need a medium of exchange independent of the government. *See, e.g.*, Nicholas Anthony, *Money Across Borders: How Cryptocurrency Has Opened Global Exchange*, Cato Inst. (Nov. 7, 2023), https://www.cato.org/publications/money-across-borders-how-cryptocurrency-has-opened-global-exchange. Money is a neutral medium—exactly why the "fungibility theory" does not work. *Ashley*, 144 F.4th at 444 (citation omitted).

Plaintiffs quibble that cryptocurrency exchanges—like drugs and guns—are subject to regulation. *See* SAC ¶¶ 92-100. But so are all manner of financial services, from insurance to

consumer lending to investment advisory services. There is no legal basis to extend a doctrine that has so far been limited to deadly products to currency or financial services.

2. *In Any Event, Plaintiffs Do Not Allege That Binance Provided Financial Services Or Cryptocurrency To The FTOs That Perpetrated The Attacks.*

Even if financial services or cryptocurrency could somehow be deemed "dangerous wares," Plaintiffs still do not allege that Binance provided those services directly to the FTOs that perpetrated the Attacks, as Supreme Court precedent requires. Rather, as in *Ashley*, Plaintiffs allege only that Binance provided these services to other entities that, in turn, allegedly transacted with the FTOs. That is too "tenuous" a link. 144 F.4th at 440.

The Supreme Court's recent decision in *Smith & Wesson* throws this defect into sharp relief. There, the Supreme Court held that manufacturers of "military style assault weapons" that were "coveted by [Mexican] cartels" could not be held liable for aiding and abetting the cartels' violent acts based on allegations that the manufacturers had designed guns that were favored by the cartels and then knowingly supplied them to dealers who sold them to the cartels. 605 U.S. at 297-298 (citation modified). The Court explained that the manufacturers had not sold the guns to the cartels themselves, and the allegations that they had not done enough to prevent the dealers' "illegal transactions with Mexican traffickers" were insufficient to "show that the manufacturers ha[d] 'join[ed] both mind and hand' with lawbreakers in the way needed to aid and abet." *Id.* at 296, 298 (quoting *Direct Sales*, 319 U.S. at 713).

Because the Supreme Court found the aiding-and-abetting allegations in *Smith & Wesson* too attenuated, even though the military assault weapons were indisputably "dangerous wares," Plaintiffs' even more attenuated allegations regarding the provision of financial services necessarily fail.

* * *

Ultimately, Plaintiffs' "dangerous wares" theory merely reframes their previous argument that Binance provided pervasive-and-systemic assistance when it "generally permitted" bad actors of "all ilks" on its platform. *Troell*, 2026 WL 636849, at *22. The Court already rejected that argument, and rightly so. This case therefore presents nothing like the exceedingly rare circumstances in which a defendant has been found to participate so actively and directly in the terrorist's actions that it can be said to have acted "with the intent to specifically encourage or aid terrorist attacks against Americans." *Id.*; *see Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 348 (E.D.N.Y. 2023) (finding plaintiff adequately alleged pervasive-and-systemic assistance where defendant directly provided "many millions of dollars in funding, embargoed dual-use technologies, and operational or technical support" to IRGC, taking "a leadership role in a procurement scheme"). The complaint should therefore be dismissed in full, *with prejudice*.

**C. Plaintiffs' Factual Allegations Suffer From Two Additional Flaws.**

The SAC suffers from two additional defects. *First*, the SAC relies on allegations about events occurring *after* the Attacks. *E.g.*, SAC ¶¶ 52-58, 160-162, 164, 219, 222-224, 227-228 (discussing conduct from "late 2024" to the present). Those *post*-Attack allegations obviously cannot support a claim for injuries suffered as a result of the Attacks. *See Freeman v. HSBC Holdings PLC*, No. 18-cv-7359, 2026 WL 880107, at *10 (E.D.N.Y. Mar. 31, 2026) (allegations involving FTO that was not designated until "nearly a decade after the attacks that injured Plaintiffs" would "fail to state a JASTA aiding-and-abetting claim"); *Troell*, 2026 WL 636849, at *18 (similar).

*Second*, Plaintiffs repeatedly rely on U.S. agency filings and consent resolutions. But Plaintiffs cannot rely on any allegations in pre-adjudication complaints or settlements to establish liability here, because "preliminary steps in litigations and administrative proceedings that did not

result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial." *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593 (S.D.N.Y. 2011) (citation omitted); *accord Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976) (affirming district court's decision to strike references to prior Securities and Exchange Commission complaint); *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, No. 10-cv-864, 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014) (similar).

Here, the U.S. agency actions Plaintiffs rely on did not involve an adjudication on the merits.[4] For instance, the SAC (at, *e.g.*, ¶¶ 123, 417) points to an OFAC settlement agreement with Binance and OFAC's enforcement release discussing that settlement. But that settlement agreement expressly noted that Binance settled "without any finding of fault." Sinzdak Decl. Ex. 2 at 5 (OFAC Settlement Agreement); *see also* Sinzdak Decl. Ex. 1 (FinCEN Consent Order) at 1 (similar). And the FinCEN Consent Order expressly states that "Binance has proactively cooperated with global law enforcement and blockchain vendors to combat terrorism financing," Sinzdak Decl. Ex. 1 at 46, making Plaintiffs' selective citations from the document even more inappropriate. The Court should strike those allegations.

## II. CERTAIN PLAINTIFFS MUST BE DISMISSED BECAUSE JASTA PROVIDES A CAUSE OF ACTION ONLY FOR U.S. NATIONALS.

The Anti-Terrorism Act ("ATA") and JASTA do not "provide remedies for non-nationals claiming damages for personal injuries." *Averbach ex rel. Est. of Averbach v. Cairo Amman Bank*, No. 1:19-cv-4, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020). The ATA provides a cause of action for "[a]ny national of the United States injured … by reason of an act of international terrorism, or his or her estate, survivors, or heirs." 18 U.S.C. § 2333(a). And JASTA permits

---

[4] Binance's November 21, 2023 plea agreement is an exception. *See* Sinzdak Decl. Ex. 5. But Plaintiffs rely on the plea agreement just once. SAC ¶ 121.

aiding-and-abetting liability only "[i]n an action under subsection (a)." *Id.* § 2333(d)(2). Thus, a non-U.S. national can only state JASTA claims on behalf of a U.S. national's estate, survivors, or heirs.

The SAC includes 19 Plaintiffs who are not U.S. nationals who appear to seek damages on their own behalf. SAC ¶¶ 432, 438, 445, 447, 449, 451, 460, 464 (Israeli, Swiss, and Canadian nationals seeking claims in their personal capacities).[5] The Court should dismiss those claims for this separate reason.

---

[5] Those Plaintiffs are: Hadassah Przewozman, Chaya Przewozman, Shahar Bausi, Shimon Maudi, Tamar Maudi, Sivan Elkabetz, Sapir Kitayevich, Shani Rosenberg, Etsik Mizrachi, Dan Mizrachi, Maya Mizrachi, Limor Rom, Tomer Rom, Alona Rom, Noam Rom, Elad Saadon, M.Z., David Bollag, and Madeleine Bollag.

## CONCLUSION

For these reasons, the Court should dismiss the Second Amended Complaint against Binance with prejudice.

Dated: September 4, 2026

Respectfully submitted,

**MILBANK LLP**

/s/ *Colleen E. Roh Sinzdak*

Neal Kumar Katyal (*pro hac vice*)
Colleen E. Roh Sinzdak (*pro hac vice*)
Kristina Alekseyeva
Samantha Ilagan (*pro hac vice* forthcoming)
Zois Manaris (*pro hac vice* forthcoming)
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7505
nkatyal@milbank.com
crohsinzdak@milbank.com
kalekseyeva@milbank.com
silagan@milbank.com
zmanaris@milbank.com

Nola B. Heller
Matthew J. Laroche
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5108
nheller@milbank.com
mlaroche@milbank.com

**WITHERS BERGMAN LLP**

Christopher N. LaVigne
Joseph Gallo Alexander Haden
430 Park Avenue, 10th Floor
New York, NY 10022
Telephone: (212) 848-9800
christopher.lavigne@withersworldwide.com
joseph.gallo@withersworldwide.com
alex.haden@withersworldwide.com

*Attorneys for Defendant Binance Holdings Limited*

**CERTIFICATE OF WORD COUNT**

Pursuant to the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and Rule 5(A) of the Individual Rules and Practices in Civil Cases of the Honorable Jeannette A. Vargas, United States District Judge for the Southern District of New York, I hereby certify that Defendant's Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint, exclusive of the caption, table of contents, table of authorities, and signature blocks, contains 8,721 words, as measured by the word-processing system used to prepare this brief.

Dated: September 4, 2026

*/s/ Colleen E. Roh Sinzdak*
Colleen E. Roh Sinzdak