**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOCELYN TROELL, individually, and for the estate of STEPHEN TROELL, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BINANCE HOLDINGS LIMITED d/b/a BINANCE and BINANCE.COM, CHANGPENG ZHAO, and BAM TRADING SERVICES INC. d/b/a Binance.US,<br><br>Defendants. | No. 1:24-cv-07136 (JAV)<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT BAM TRADING SERVICES INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1
JURISDICTIONAL FACTS ..... 3
ARGUMENT ..... 4
I. The SAC Should Be Dismissed Under Rule 12(b)(2) Because the Court Lacks Personal Jurisdiction Over BAM. ..... 4
A. Specific Jurisdiction Under Rule 4(k)(1)(A) and New York's Long-Arm Statute is Improper. ..... 5
B. Jurisdiction is Improper Under Rule 4(k)(1)(C). ..... 9
II. Plaintiffs Fail to State a Claim for Aiding and Abetting Under JASTA. ..... 11
A. The Governing Standard Requires Far More Than Plaintiffs Allege Here. ..... 12
III. Plaintiffs Fail to Establish that BAM Is an "Alter Ego" for Jurisdictional or Liability Purposes. ..... 18
A. Plaintiffs Cannot Satisfy the Demanding Standards Governing Alter-Ego Liability. ..... 18
B. The SAC Does Not Plausibly Allege That BAM Lacked an Independent Corporate Existence ..... 20
CONCLUSION ..... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016) .....5, 7

*In re All Year Holdings Ltd.*,
648 B.R. 434 (S.D.N.Y. 2022).....27

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
122 F.3d 130 (2d Cir. 1997).....19, 26

*Am. Protein Corp. v. AB Volvo*,
844 F.2d 56 (2d Cir. 1988).....22

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) .....13, 17

*Atchley v. AstraZeneca UK Ltd.*,
165 F.4th 592 (D.C. Cir. 2026).....13, 17, 18

*Atzili v. Islamic Republic of Iran*,
2026 WL 1500823 (D.D.C. May 29, 2026).....14, 17

*Bank of Am. v. Apollo Enter. Sols., LLC*,
2010 WL 4323273 (S.D.N.Y. Nov. 1, 2010).....19

*Bernhardt v. Islamic Republic of Iran*,
47 F.4th 856 (D.C. Cir. 2022).....15, 16

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
582 U.S. 255 (2017).....8, 9

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
491 B.R. 335 (S.D.N.Y. 2013).....23

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*,
2012 WL 12932049 (S.D.N.Y. July 17, 2012) .....19

*CesFin Ventures LLC v. Al Ghaith Holding Co. PJSC*,
2022 WL 18859076 (S.D.N.Y. Dec. 10, 2022) .....19

*CFTC v. Zhao*,
2023 U.S. Dist. LEXIS 236484 (N.D. Ill. Dec. 14, 2023).....25

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
2025 WL 289499 (2d Cir. Jan. 24, 2025) ....................26

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
851 F. Supp. 2d 504 (S.D.N.Y. 2012)....................21

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)....................5

*De Jesus v. Sears, Roebuck & Co.*,
87 F.3d 65 (2d Cir. 1996)....................20

*Doheny v. IBM*,
714 F. Supp. 3d 342 (S.D.N.Y. 2024)....................19

*Finan v. Lafarge S.A.*,
2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025)....................12

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 ....................22

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)....................8

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025)....................9, 10, 11

*Gadsden v. Home Pres. Co.*,
2004 WL 485468 (Del. Ch. Feb. 20, 2004) ....................26

*Gartner v. Snyder*,
607 F.2d 582 (2d Cir. 1979)....................20

*Gligorov v. Nation of Brunei*,
2026 WL 2276372 (D.C. Cir. Aug. 7, 2026) ....................10, 11

*Gracey v. Albawardi*,
2024 WL 5116368 (Del. Ch. Dec. 13, 2024)....................20

*Greene v. Long Island R.R.*,
280 F.3d 224 (2d Cir. 2002)....................23

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983)....................15

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ....................14

*Landgarten v. York Rsch. Corp.*,
1988 WL 7392 (Del. Ch. Feb. 3, 1988) ....................23

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012)....................5, 7, 8

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018)....................14, 15

*In re Lyondell Chem. Co.*,
543 B.R. 127 (Bankr. S.D.N.Y. 2016) ....................21

*Manichaean Cap., LLC v. Exela Techs., Inc.*,
251 A.3d 694 (Del. Ch. 2021)....................20

*In re Maxus Energy Corp.*,
641 B.R. 467 (Bankr. D. Del. 2022) ....................20, 27

*Nat'l Gear & Piston, Inc v. Cummins Power Sys., LLC*,
975 F. Supp. 2d 392 (S.D.N.Y. 2013)....................20

*In re Nordlicht*,
115 F.4th 90 (2d Cir. 2024) ....................27

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ....................21

*Przewozman v. Charity*,
2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023) ....................7

*Rodriguez v. Imperial Brands*, *PLC*,
182 F.4th 1333 (11th Cir. 2026) ....................10, 11

*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019)....................17

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025)....................13, 16

*SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n*,
18 N.Y.3d 400 (2012) ....................7

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)....................7

*In re Terrorist Attacks on September 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005)....................9

*Trs. of Arden v. Unity Constr. Co.*,
2000 WL 130627 (Del. Ch. Jan. 26, 2000) ....................23

*Twitter v. Taamneh*,
598 U.S. 471 (2023) .................... *passim*

*United States v. Bestfoods*,
524 U.S. 51 (1998) ....................23

*Walden v. Fiore*,
571 U.S. 277 (2014) ....................8

*Wallace v. Wood*,
752 A.2d 1175 (Del. Ch. 1999) ....................20, 21

*Weiss v. Nat'l Westminster Bank PLC*,
176 F. Supp. 3d 264 (E.D.N.Y. 2016) ....................7

*Wenske v. Blue Bell Creameries, Inc.*,
2018 WL 5994971 (Del. Ch. Nov. 13, 2018) ....................23

*Wildman v. Deutsche Bank Aktiengesellschaft*,
2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) ....................16

*X Corp. v. World Federation of Advertisers*,
826 F. Supp. 3d 772 (N.D. Tex. 2026) ....................10

*Zobay v. MTN Grp. Ltd.*,
695 F. Supp. 3d 301 (E.D.N.Y. 2023) ....................6, 9, 10

**Statutes**

18 U.S.C. § 2334(a) ....................9

Anti-Terrorism Act .................... *passim*

Justice Against Sponsors of Terrorism Act .................... *passim*

**Other Authorities**

CPLR § 302(a)(1) ....................5, 7

Fed. R. Civ. P. 4(k)(1)(A) ....................5

Fed. R. Civ. P. 4(k)(1)(C) ....................5, 9, 10, 11

Fed. R. Civ. P. 12(b)(2) ....................1, 4, 28

Fed. R. Civ. P. 12(b)(6) ....................1, 28

U.S. Const. amend. V....................................................................................................9

U.S. Const. amend. XIV .................................................................................................9

On March 6, 2026, this Court dismissed Plaintiffs' First Amended Complaint (the "FAC") in full, concluding that Plaintiffs failed to state aiding-and-abetting and other claims under the Anti-Terrorism Act ("ATA") and Justice Against Sponsors of Terrorism Act ("JASTA"). Op. and Order ("Op."), ECF No. 206. Plaintiffs filed a Second Amended Complaint to address the identified deficiencies. Second Am. Compl. ("SAC"), ECF No. 236. The deficiencies remain. Defendant BAM Trading Services Inc., d/b/a Binance.US ("BAM"), therefore moves to dismiss all claims against it with prejudice under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim.

## INTRODUCTION

BAM unequivocally condemns terrorism in all forms and deeply sympathizes with the victims of the attacks underlying Plaintiffs' pleadings. But BAM has no connection to those attacks and is not responsible for them under any theory of liability, which the SAC's own allegations make clear.

Plaintiffs amended their Complaint, but their allegations remain insufficient under JASTA's demanding standard as interpreted by the Supreme Court. That deficiency is especially pronounced as to BAM. Even after amendment, the SAC barely mentions BAM, and none of its new allegations identifies an affirmative act by BAM. Instead, the SAC repeats the theory that BAM's existence served as a regulatory diversion. In a 220-page complaint spanning 535 paragraphs, only 23 mention BAM, largely repackaging that theory.

That theory cannot establish that BAM knowingly and substantially assisted or culpably participated in any of the thirty terrorist attacks. The SAC identifies no BAM customer who allegedly transacted with terrorists, alleges no terrorist organization accessed or used BAM's platform, and alleges no BAM employee interacted with a terrorist-linked individual or account. Those omissions echo the regulatory filings on which Plaintiffs rely. Those filings confirm that

BAM is a federally- and state-regulated entity that operates a digital-asset exchange, Binance.US, exclusively for U.S. customers. They do not allege that BAM violated any KYC or AML obligations or had any association with a terrorist actor. Tellingly, none of Plaintiffs' new allegations purporting to trace particular Binance.com transactions to FTOs involve BAM or Binance.US. They therefore do nothing to cure the pleading deficiencies as to BAM.

Plaintiffs also fail to establish personal jurisdiction over BAM. BAM bars New York residents from using its platform, and the SAC identifies no BAM conduct in New York connected to Plaintiffs' claims. Its only BAM-specific New York allegation concerns a political action committee unrelated to the attacks or transactions alleged in the SAC. Nor can Plaintiffs establish jurisdiction based on BAM's contacts with the United States as a whole: due process requires a meaningful relationship between BAM's conduct and the claims, but the SAC alleges none. Every transaction Plaintiffs identify involving an alleged terrorist-linked actor is alleged to have occurred on Binance.com, not BAM's separate Binance.US platform.

Unable to allege jurisdictionally relevant conduct or actionable assistance, Plaintiffs resort to an alter-ego theory that would attribute the contacts and conduct of separate actors to BAM. But whatever motive Plaintiffs ascribe to BAM's formation, their theory encounters a dispositive obstacle. BAM is a functioning business with independent corporate significance, not "merely a shell" or "a sham," as would be required to pierce the corporate veil. BAM operates a major U.S. digital-asset exchange with its own customers, employees, bank accounts, assets, and substantial revenue. The SAC incorporates materials alleging that BAM generated more than $265 million in revenue in 2021 alone and operated one of the largest digital-asset trading platforms in the United States. An enterprise of that scale cannot plausibly be characterized as existing solely as a vehicle for BHL or Mr. Zhao. No amount of common ownership, managerial involvement, or alleged

influence changes the fact that BAM operates a substantial, revenue-generating business with independent corporate significance. That reality forecloses Plaintiffs' alter-ego theory. No court has found that BAM and BHL are alter egos, and this Court should not be the first.

The SAC's lack of allegations concerning BAM is not an oversight. It reflects the fundamental flaw in Plaintiffs' case: BAM has no connection to the conduct, transactions, or attacks on which their claims depend. Having failed to cure that deficiency after multiple opportunities to amend, Plaintiffs' claims against BAM should be dismissed with prejudice.

## JURISDICTIONAL FACTS

BAM operates Binance.US, a trading platform that eligible individuals in the United States can use to purchase or sell digital assets; BHL operates a separate international exchange, Binance.com. (Ex. A, Kellogg Decl. ¶¶ 9, 12; *see* SAC ¶¶ 24, 30.) BAM is organized under Delaware law and headquartered in Florida. (Kellogg Decl. ¶ 4; *see* SAC ¶ 30.) It is registered as a "money services business" (MSB) with the U.S. Department of Treasury's Financial Crimes Enforcement Network (FinCEN) and maintains 31 state-issued money transmitter licenses. (Kellogg Decl. ¶¶ 40-41.) BAM is subject to applicable federal and state oversight. (*Id.* ¶¶ 40-41; *see* SAC ¶ 262.) Since its inception in 2019, BAM has restricted non-U.S. individuals from accessing and using its Binance.US exchange. (Kellogg Decl. ¶ 10; *see* SAC ¶ 262 (BAM was held out "as the sole manner by which any U.S.-based user could transact").)

Additionally, BAM prohibits access to its platform in certain states, including New York. New York residents are not eligible to use BAM's platform under its terms of use, and BAM has never held a money transmitter license in New York. (Kellogg Decl. ¶¶ 13-14.)

Plaintiffs continue to conflate two distinct platforms to obscure the absence of any substantive allegations against BAM. Their pleading depends on treating BAM and BHL as "part of a single enterprise" (*See* SAC ¶¶ 31-35, 532). Without that premise, they cannot attribute to

BAM any conduct relevant to their claims. But BAM and BHL operate separate platforms and maintain distinct operations. They serve individuals in different geographic markets. (Kellogg Decl. ¶¶ 9-18.) BAM has its own Board of Directors, makes its own employment decisions, and maintains its own policies and procedures. (*Id.* ¶¶ 19-25.) BAM and BHL have never shared officers, employees, office space, or physical facilities. (*Id.*) Their financial operations are likewise separate. BAM has never received capital contributions from BHL, has consistently maintained sufficient capital to satisfy its anticipated obligations, pays its own operating expenses and employee compensation, services its own debt, and prepares and files its own tax returns. (*Id.* ¶¶ 28-32.) The companies do not share bank accounts, and neither has access to or authority over the other's accounts. (*Id.* ¶¶ 33-36.) No person affiliated with BHL has signatory authority over BAM's accounts, and BHL's finance team cannot initiate or execute transfers from them. (*Id.*) BAM also prepares its own financial reports, including quarterly reports and profit-and-loss statements, without BHL's involvement. (*Id.* ¶ 37.) BAM separately controls the wallets holding its customers' digital assets, and BHL cannot access those assets or information about BAM's customers, accounts, or holdings. (*Id.* ¶¶ 38-39.) The companies instead maintain an arm's-length commercial relationship governed by service-level agreements. Under those agreements, BHL licenses certain software and trademarks that BAM uses to operate Binance.US, and BHL's authority, if any, is limited to specified contractual services and does not include authority to bind BAM or act on BAM's behalf in matters relevant to Plaintiffs' claims. (*Id.* ¶¶ 26-27.)

## ARGUMENT

### I. The SAC Should Be Dismissed Under Rule 12(b)(2) Because the Court Lacks Personal Jurisdiction Over BAM.

This Court lacks personal jurisdiction over BAM because the SAC identifies no suit-related BAM conduct connecting it to New York or the claims, and instead attributes other defendants'

contacts to BAM (SAC ¶¶ 411, 423), despite the rule that jurisdiction must be established separately as to each defendant.

Plaintiffs invoke (1) specific jurisdiction under Rule 4(k)(1)(A) and New York's long-arm statute, CPLR § 302(a)(1); and (2) statutory jurisdiction under Rule 4(k)(1)(C) through the ATA's nationwide service provision. (SAC ¶¶ 37-38.) Neither works: the SAC alleges no BAM conduct connected to the terrorism claims under either framework.[1]

### A. Specific Jurisdiction Under Rule 4(k)(1)(A) and New York's Long-Arm Statute is Improper.

Rule 4(k)(1)(A) authorizes personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). Under CPLR § 302(a)(1), a court may exercise jurisdiction over a nondomiciliary who "transacts any business within the state," provided the plaintiff's cause of action "aris[es] from" that transaction. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012). The analysis has two prongs: whether (1) the defendant "transacted business" in New York through purposeful activity, and (2) the claim bears an "articulable nexus" or "substantial relationship" to that transaction. *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323, 329 (2016). Neither is satisfied here.

#### 1. BAM Did Not "Transact Business" in New York.

Plaintiffs' jurisdictional allegations as to BAM begin and end with alter ego. Although the SAC has a section titled "Binance US's Conduct Had a Substantial Nexus to New York and the United States," it identifies almost no BAM-specific conduct. (SAC ¶¶ 422-24.) Plaintiffs instead

[1] Plaintiffs do not contend that BAM is subject to general jurisdiction in New York. Nor could they. BAM is incorporated in Delaware and headquartered in Florida, and the SAC alleges no facts that would make this the "exceptional case" in which a corporation is deemed at home outside those paradigmatic forums. *See Daimler AG v. Bauman*, 571 U.S. 117, 137-39 & n.19 (2014).

claim BAM was part of a "common enterprise" and alter ego of BHL and Mr. Zhao, so it shared their contacts with New York and the United States. (SAC ¶ 423.) But "[a] plaintiff is required to establish personal jurisdiction separately over each defendant." *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 324 (E.D.N.Y. 2023). Without the conclusory alter-ego allegations, the SAC identifies no BAM conduct in New York sufficient to confer jurisdiction.

The allegations Plaintiffs seek to attribute to BAM underscore the absence of an independent jurisdictional basis. Plaintiffs' New York jurisdictional theory rests on allegations that BHL cultivated New York customers, transacted with New York counterparties, relied on New York-based business partners and compliance vendors, obtained regulatory approval for a stablecoin through a New York trust company, and used New York banks. (SAC ¶¶ 412-15.) But those allegations concern Binance.com and Mr. Zhao, not BAM. Plaintiffs do not allege that BAM participated in any of that conduct. Instead, the SAC makes clear that Plaintiffs' jurisdictional theory depends on treating BAM as part of a "common enterprise" and attributing BHL's and Mr. Zhao's contacts to BAM. (*Id.* ¶ 423.)

That approach resembles *Zobay*, which dismissed claims against an affiliate where the complaint attributed no specific conduct to it and relied on conclusory intra-corporate affiliations. 695 F. Supp. 3d at 329. The court explained that such allegations were merely a "barebones recitation of the veil-piercing standard." *Id.* So too here: Plaintiffs' claim that BAM shares BHL's and Mr. Zhao's contacts depends entirely on their defective alter-ego theory. Without that, Plaintiffs' own allegations confirm that BAM was not involved in the alleged New York conduct. And as discussed below, BAM is not the alter ego of BHL or Mr. Zhao. *See infra* Section III.

The only BAM-specific New York contact alleged is a political action committee ("PAC"). (SAC ¶ 424.) Plaintiffs allege that BAM established the PAC to make political contributions. (*Id.*)

Section 302(a)(1) turns on the nature and quality of contacts, not their mere existence. *See Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 280 (E.D.N.Y. 2016). It covers a defendant that "transacts any business within the state." CPLR § 302(a)(1). The alleged contact here is political activity, not commercial activity. That is a far cry from the kind of purposeful business activity contemplated by the statute. *Cf. SPCA of Upstate N.Y., Inc. v. Am. Working Collie Ass'n*, 18 N.Y.3d 400, 404-05 (2012) (donations to New York entity insufficient). At most, Paragraph 424 alleges a New York connection, not that BAM transacted business there.

**2. Plaintiffs' Claims Do Not Arise from BAM's Alleged New York Activity.**

Even if the PAC allegation constituted "transacting business," Plaintiffs cannot satisfy § 302(a)(1)'s nexus requirement. The New York transaction must have an "articulable nexus" or "substantial relationship" to the claims. *Licci*, 673 F.3d at 66-67. Jurisdiction is improper where the relationship is too attenuated or "merely coincidental." *Id.*; *Al Rushaid*, 28 N.Y.3d at 330.

Courts applying § 302(a)(1) likewise require a meaningful connection between forum conduct and the specific wrongdoing. *See, e.g.*, *Przewozman v. Charity*, 2023 WL 2562537, at *13 (E.D.N.Y. Mar. 17, 2023); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 726-30 (S.D.N.Y. 2010). In *Przewozman*, the court dismissed for lack of jurisdiction where plaintiffs "failed to allege a causal link between the use of the correspondent account" and the attacks, because there was "no basis from which the court can conclude that 'the correspondent account at issue' was 'used as an instrument to achieve the very wrong alleged.'" 2023 WL 2562537, at *15. In *Tamam*, the court refused to exercise jurisdiction based on the defendant's maintenance of New York correspondent bank accounts where the complaint "[did] not set forth a substantial relationship between the correspondent bank accounts and . . . terrorist activity." 677 F. Supp. 2d at 727.

The disconnect here is even more pronounced. Plaintiffs do not allege that BAM's PAC

transferred funds to any terrorist organization, facilitated any transaction at issue in the SAC, or had any involvement whatsoever in the attacks giving rise to Plaintiffs' claims. The alleged PAC activity and the injuries alleged in this case occupy entirely separate spheres. Whatever relevance Plaintiffs believe the PAC has to New York, any connection between that activity and the claims asserted here is, at most, "merely coincidental." *Licci*, 673 F.3d at 66-67.

### 3. Exercising Specific Jurisdiction Over BAM Would Violate Due Process.

Asserting specific jurisdiction would also violate due process. A defendant's "suit-related conduct must create a substantial connection with the forum State," and specific jurisdiction is unavailable without an "affiliation between the forum and the underlying controversy," regardless of unrelated forum activities. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017). The inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 284. Although the requirement that a claim "arise out of or relate to" a defendant's forum contacts does not demand strict causation, the Supreme Court has emphasized that the phrase "relate to" has "real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).

Those limits are absent. The only BAM-specific New York contact alleged in the SAC concerns a PAC. (SAC ¶ 424.) That allegation bears no relationship to the terrorist attacks, alleged terrorist financing, or other conduct underlying Plaintiffs' claims. Plaintiffs therefore cannot establish the required relationship among "the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 284.

Plaintiffs' theory ultimately reduces to the proposition that because BAM allegedly engaged in one activity in New York, it may be sued there for claims having nothing to do with

that activity. But due process does not permit jurisdiction based on unrelated forum contacts. *See Bristol-Myers Squibb*, 582 U.S. at 264-65. Because the SAC identifies no suit-related New York conduct by BAM, the exercise of specific jurisdiction would violate the Fourteenth Amendment.

**B. Jurisdiction is Improper Under Rule 4(k)(1)(C).**

Plaintiffs fare no better under Rule 4(k)(1)(C) and the ATA's nationwide service provision. They contend that jurisdiction exists because BAM has contacts with the United States as a whole. (SAC ¶ 38.) But nationwide service is only the beginning of the jurisdictional analysis, not the end. Although Rule 4(k)(1)(C) permits personal jurisdiction when authorized by federal statute, and 18 U.S.C. § 2334(a) authorizes nationwide service of process in ATA actions, courts must still determine whether exercising jurisdiction comports with due process. *See Zobay*, 695 F. Supp. 3d at 322-23; *see also In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 806-07 (S.D.N.Y. 2005). For cases implicating Rule 4(k)(1)(C), the jurisdictional analysis proceeds under the Fifth rather than Fourteenth Amendment. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025). And while *Fuld* confirmed that this inquiry proceeds under the Fifth Amendment, it did not dispense with the requirement that the defendant's conduct bear a meaningful relationship to the United States and the claims asserted. *See id.* at 17-24.

In *Fuld*, the Supreme Court declined to endorse an "unbounded jurisdictional theory" under Rule 4(k)(1)(C). *Id.* at 18. Although the Fifth Amendment permits a more flexible inquiry, jurisdiction there rested on the PSJVTA's narrowly defined U.S.-related conduct and significant foreign-policy interests. *Id*. at 18-22. The Court stressed that the statute applied only to two identified entities with decades of "meaningful contacts, ties, and relations" with the United States and cautioned against extending its reasoning to more attenuated assertions. *Id*. It also preserved a case-specific reasonableness inquiry considering the defendant's burden and the controversy's relationship to the United States. *Id*. at 23-24.

Post-*Fuld* decisions have confirmed that the requisite connection remains essential. In *Gligorov v. Nation of Brunei*, the D.C. Circuit held that jurisdiction was lacking because the alleged conduct did not create the type of "meaningful relationship" with the United States necessary to justify the exercise of federal-court jurisdiction. 2026 WL 2276372, at *5, *9 (D.C. Cir. Aug. 7, 2026). Likewise, in *Rodriguez v. Imperial Brands*, *PLC*, the Eleventh Circuit held that jurisdiction was unreasonable absent "predicate conduct bearing a meaningful relationship to the United States," notwithstanding the plaintiffs' status as U.S. nationals. 182 F.4th 1333, 1347-50 (11th Cir. 2026). Unlike the PSJVTA in *Fuld*, the governing statute contained no jurisdictional predicates narrowly tying the litigation to U.S.-connected conduct. *Id.*

*Fuld* also did not alter that jurisdiction must be established separately as to each defendant. In *X Corp. v. World Federation of Advertisers*, the court described the post-*Fuld* inquiry as whether "the conduct giving rise to this case or controversy" is sufficiently connected to the United States and rejected efforts to establish jurisdiction through collective allegations about affiliated entities. 826 F. Supp. 3d 772, 795, 797-98 (N.D. Tex. 2026); *see also Zobay*, 695 F. Supp. 3d at 324-26 (dismissing ATA claims against domestic subsidiaries because plaintiffs failed to plead those entities' own involvement in alleged wrongdoing).

Rule 4(k)(1)(C) therefore provides no basis for jurisdiction over BAM. The SAC does not allege that BAM processed a transaction for an FTO, that an FTO accessed Binance.US, or that BAM interacted with Hamas, PIJ, the IRGC, Hizballah, or any attacker. And none of the terrorist-financing allegations concern BAM. Instead, those allegations are directed at "Binance," meaning BHL and Binance.com. (*See* SAC ¶¶ 412-18.)

The SAC alleges only that BAM operates a U.S.-based exchange and established a PAC. (*Id.* ¶¶ 422-24.) Neither relates to the alleged terrorist financing, the attacks at issue, or the conduct

underlying Plaintiffs' claims. If those allegations alone were sufficient to establish the requisite connection under Rule 4(k)(1)(C), the due-process inquiry would collapse into a rule that any domestic corporation may be sued under the ATA regardless of whether it engaged in conduct related to the alleged wrongdoing. Neither *Fuld* nor its progeny endorses such a result.

Even if BAM's domestic status supplied the necessary U.S. contacts, exercising jurisdiction remains unreasonable. *Fuld* preserved a case-specific inquiry considering the defendant's relationship to the controversy and the United States. 606 U.S. at 23-24. Here, Plaintiffs attempt to attribute the alleged financing to a separate foreign entity, BHL, and allege no connection to BAM's domestic operations. *See Gligorov*, 2026 WL 2276372, at *9; *Rodriguez*, 182 F.4th at 1348. Plaintiffs do not demonstrate the required meaningful connection between a defendant's conduct and the claim.

Plaintiffs identify no BAM conduct connected to the alleged financing or attacks. Their Rule 4(k)(1)(C) theory therefore depends on attributing other defendants' conduct to BAM and fails for the reasons below. The claims against BAM should be dismissed for lack of personal jurisdiction.

## II. Plaintiffs Fail to State a Claim for Aiding and Abetting Under JASTA.[2]

To plead aiding-and-abetting, Plaintiffs must plausibly allege that BAM (1) aided a party who "perform[ed] a wrongful act that cause[d] an injury"; (2) was "generally aware of [its] role as part of an overall illegal or tortious activity at the time [it] provide[d] the assistance"; and (3) "knowingly and substantially assist[ed] the principal violation." *Twitter v. Taamneh*, 598 U.S. 471,

---

[2] BAM joins and incorporates by reference Sections I and II of BHL's memorandum of law in support of its motion to dismiss. BAM separately addresses the deficiencies specific to the claims against it, but the arguments in Sections I and II of BHL's memorandum provide additional grounds for dismissing the SAC against BAM.

486 (2023). Further, this liability must be "cabin[ed]" to "conscious, voluntary, and culpable participation" in terrorist acts. *Id.* at 489, 493.

Plaintiffs' sole remaining claim alleges that "Defendants" aided and abetted thirty terrorist attacks by five organizations. (SAC ¶¶ 526, 529.) But as to BAM, the SAC alleges neither misconduct nor meaningful involvement in the conduct alleged. BAM and Binance.US are mentioned in only twenty-three of the SAC's 535 paragraphs. (*See id.* ¶¶ 30-31, 35, 42, 114, 237, 242, 250, 262-64, 267-74, 422-24, 532.) Plaintiffs do not identify any transaction listed in the SAC's appendices that allegedly occurred on Binance.US. (*See id.* at A1, B1-2.) Plaintiffs devote nearly eighty paragraphs to JASTA's "general awareness" requirement yet never mention BAM. (*See id.* ¶¶ 130-209.) Plaintiffs' BAM-specific assistance allegations reduce to three assertions: Binance.US launched in 2019; BAM was created as a regulatory diversion; and BHL and Mr. Zhao influenced BAM's operations. (*Id.* ¶¶ 30, 114, 237, 250, 262-64, 267-74.) Those allegations cannot establish general awareness, knowing or substantial assistance, or the nexus required by JASTA.

### A. The Governing Standard Requires Far More Than Plaintiffs Allege Here.

To state an aiding-and-abetting claim under JASTA, Plaintiffs must plausibly allege that BAM consciously and culpably participated in the attacks that injured them. *Twitter*, 598 U.S. at 498. Liability is limited to defendants who "culpably associated themselves with" the underlying misconduct and "participated in it as something that they wished to bring about." *Id*. Plaintiffs must also establish a concrete nexus between the defendant's conduct and the attacks at issue because a broader rule "would necessarily hold defendants liable as having aided and abetted each and every" terrorist act committed by the organization. *Finan v. Lafarge S.A.*, 2025 WL 2504317, at *20 (E.D.N.Y. Aug. 29, 2025).

The Supreme Court reiterated the strict requirements for aiding-and-abetting liability in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025). There, the Court

reiterated the "canonical formulation" that "an aider and abettor must *participate in a crime* as in something that he *wishes to bring about* and seek by his action to make it succeed." *Id*. at 291 (emphasis added). Accordingly, "[t]o aid and abet a crime, a person must take an affirmative act in furtherance of that offense." *Id*. Indeed, "aiding and abetting usually requires misfeasance rather than nonfeasance." *Id*. at 292.

In *Ashley v. Deutsche Bank Aktiengesellschaft*, the Second Circuit rejected allegations that a financial institution provided "knowing and substantial assistance" to terrorist activities by offering routine banking services. 144 F.4th 420, 443 (2d Cir. 2025). The court affirmed dismissal despite allegations that the defendants continued to provide "irreplaceable foreign exchange and export finance services" after being warned by the U.S. military about its customers' ties to terrorist organizations. *Id*. at 429-30. The court held that Plaintiffs did not allege a "willingness to aid the [] terrorist activities," even though they "plausibly demonstrate[d]" that the bank was "generally aware of its indirect role." *Id.* at 439, 443; *see id.* at 440 ("[W]e know from *Twitter* that knowledge of one's role in terrorist activities by itself is insufficient to allege an aiding-and-abetting claim."). The *Ashley* court rejected even allegations of active *malfeasance* against defendants alleged not only to have knowingly *permitted* illegal activity, but to have also actively engaged in terrorist financing, by "custom build[ing]" and "operat[ing]" money laundering schemes known to fund terrorism. *Id*. at 431.

By contrast, the D.C. Circuit's decision in *Atchley v. AstraZeneca UK Ltd.* illustrates the type of allegations that can satisfy JASTA's demanding standard. 165 F.4th 592 (D.C. Cir. 2026). The defendants there engaged in years of direct dealings with the terrorist organization itself, including cash bribes, free products, and formal commercial arrangements negotiated and carried out in the presence of the terrorist group's personnel. *Id.* at 609-13. The court described those facts

as a "voluntary, tailored relationship" demonstrating both culpable participation and awareness of how the assistance would be used. *Id.* at 613.

The allegations against BAM fall far short of *AstraZeneca* and even those in *Ashley*. They are also materially indistinguishable from allegations recently rejected in *Atzili v. Islamic Republic of Iran*, a case arising from some of the same attacks, asserting the same JASTA theories, and brought against the same defendants. 2026 WL 1500823, at *7-13 (D.D.C. May 29, 2026). There, the court held that allegations that BAM and BHL failed to implement adequate controls, failed to remove terrorist-linked users, and permitted Hamas-associated transactions on their platforms did not establish the knowing and substantial assistance, culpability, or nexus required by JASTA, and dismissed the claims with prejudice. The same deficiencies are present here.

**1. Plaintiffs Cannot Establish General Awareness.**

Plaintiffs cannot establish the "general awareness" required for aiding-and-abetting liability. JASTA requires a defendant to be "aware that, by assisting the principal, it is itself assuming a role in terrorist activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (cleaned up). In the financial-services context, that ordinarily requires allegations that the defendant knowingly provided services to an individual or entity it understood had ties to a terrorist organization. *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (holding that plaintiffs could not establish general awareness where they failed to plausibly allege that defendant was aware the customers it transacted with had ties to Hamas).

The SAC contains no such allegation as to BAM. Although Plaintiffs devote nearly eighty paragraphs to "general awareness," they never mention BAM. (SAC ¶¶ 130-209.) Those allegations concern Binance.com, a separate platform operated by a separate entity. (*See, e.g.*, *id.* ¶¶ 190-203.) Plaintiffs do not allege that BAM served a terrorist-linked actor, that a terrorist organization used Binance.US, that BAM knew of a terrorist-linked transaction, or that it

understood it was "assuming a role" in the attacks. *Linde*, 882 F.3d at 329.

That failure alone precludes "knowing and substantial assistance." *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 870 (D.C. Cir. 2022). Of the "126,404 transactions worth approximately $505 million" that Plaintiffs attempt to link to terrorist actors, they do not allege that a single transaction occurred on Binance.US. (SAC ¶ 6.) Nor do they allege that any terrorist-linked actor ever accessed BAM's platform.[3]

**2. Plaintiffs Cannot Establish "Knowing and Substantial Assistance."**

Plaintiffs also fail to plead "knowing and substantial assistance" under the *Halberstam* factors: "(1) the nature of the act assisted, (2) the amount of assistance provided, (3) whether the defendant was present at the time of the principal tort, (4) the defendant's relation to the principal actor, (5) the defendant's state of mind, and (6) the duration of the assistance given." *Twitter*, 598 U.S. at 486 (quoting *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983)). Every factor cuts against liability.

The SAC alleges no BAM assistance to a terrorist organization, whether by kind, amount, or duration. It alleges no relationship between BAM and Hamas, PIJ, Hizballah, the IRGC, or any other terrorist actor. It alleges no interaction between BAM and any terrorist-linked account. And

[3] Critically, not a single regulatory agency overseeing AML or KYC compliance—including the CFTC, FinCEN, and DOJ—has named BAM in any enforcement action related to the violations Plaintiffs allege in their Complaint. *See, e.g.*, Consent Order, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Dec. 14, 2023), ECF No. 80; Plea Agreement, *United States v. Binance Holdings Ltd.*, No. 23-cr-00178 (W.D. Wash. Nov. 21, 2023), ECF No. 23; Plea Agreement, *United States v. Changpeng Zhao*, No. 23-cr-00179 (W.D. Wash. Nov. 21, 2023), ECF No. 31 ("Zhao Plea Agreement"); FinCEN Consent Order, *In re Binance Holdings Ltd.*, No. 2023-04 (Nov. 21, 2023); OFAC Settlement Agreement (Nov. 21, 2023), https://ofac.treasury.gov/system/files/2023-11/20231121binance_settlement.pdf. (*See* SAC ¶ 190 n.4 (citing these regulatory actions).) Plaintiffs also reference the now-dismissed SEC litigation against both BAM and BHL. (*See id.* ¶ 251.) That litigation is irrelevant to this action and did not involve allegations of terrorism; instead, it arose from the SEC's attempt to reclassify cryptocurrencies as "securities."

it pleads no culpable state of mind on BAM's part. *See Bernhardt*, 47 F.4th at 870-72 (finding no substantial assistance alleged no involvement with or relationship to the FTO and no culpable state of mind); *Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 WL 17993076, at *24 (E.D.N.Y. Dec. 29, 2022) (dismissing aiding-and-abetting claim under *Halberstam* framework where complaint "is unclear how much of [the] alleged amount was actually remitted by [defendant]," "does not allege" presence, alleged only an "attenuated" business relationship, and provided "insufficient evidence" of state of mind and duration), *aff'd sub nom.*, *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025).

The SAC's only BAM-specific allegations are that Binance.US launched in 2019, BAM served as a regulatory diversion, and BHL and Mr. Zhao influenced BAM's operations. (SAC ¶¶ 237, 250, 262-64, 267-74.) Even accepted as true, they allege no affirmative assistance to a terrorist organization. At most, Plaintiffs allege that BHL "created and used" BAM as a compliant U.S. exchange while separately operating Binance.com. (*Id.* ¶ 237.) *Twitter* and *Smith & Wesson* hold that such passive conduct is insufficient. *See Twitter*, 598 U.S. at 500; *Smith & Wesson*, 605 U.S. at 291-92.

### 3. Plaintiffs Cannot Establish a Definable Nexus Between BAM and the Attacks.

For the same reason, Plaintiffs fail to establish the "definable nexus" this Court found lacking in the FAC. *See* Op. at 39. The only BAM-specific allegations are that it served as a vehicle of regulatory diversion. (*See* SAC ¶¶ 30, 237, 262-64, 270-74, 424.) That does not create a "concrete" or "definable" nexus to specific terrorist attacks at issue. *See* Op. at 39; *Twitter*, 598 U.S. at 501; *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225-26 (2d Cir. 2019) (dismissing aiding-and-abetting claim when plaintiff failed to show defendant "knowingly assumed a role in

AQI's terrorist activities or substantially assisted AQI in those activities, specifically the November 9 attacks").

Plaintiffs attempt to cure this defect by providing additional detail regarding transactions that allegedly occurred on Binance.com. (*See* SAC App'x A, App'x B.) For the reasons set forth in BHL and Mr. Zhao's motions to dismiss, which BAM joins, those allegations also fall short of JASTA liability. More detail about transactions on a different platform does not create a nexus between BAM and the attacks. Plaintiffs still do not identify a single transaction on Binance.US involving a terrorist organization, a terrorist affiliate, or any of the attacks underlying their claims.

Nor do Plaintiffs solve the nexus problem by identifying transaction volume before particular attacks. Those allegations still attempt to connect Defendants to terrorist organizations "in general," rather than to specific attacks. *Ashley*, 144 F.4th at 444. They allege nothing more than "assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Twitter*, 598 U.S. at 495. Plaintiffs still provide no "localized story" linking particular assistance to defined attacks through temporally and geographically connected conduct. *AstraZeneca*, 165 F.4th at 607. Without a limiting principle, their theory would impose liability for any attack by any of the five organizations, whether or not a transaction relates to that attack—precisely the theory *Twitter* rejected. 598 U.S. at 501. As *Atzili* observed in dismissing similar claims against BAM and BHL arising from October 7, the theory "has no limiting principle because any attack carried out by Hamas could theoretically have been funded with money linked to a Binance transaction." 2026 WL 1500823, at *11.

### 4. Plaintiffs Do Not Plausibly Allege Culpable Participation.

Finally, Plaintiffs do not plausibly allege that BAM "culpably associated" with any terrorist attack or "participated in it as something that [it] wished to bring about." *Twitter*, 598 U.S. at 498.

Plaintiffs' principal theory is that terrorist-linked users received "special treatment" on

BHL's platform because VIP users could withdraw funds and close accounts rather than be immediately reported. (SAC ¶¶ 214-16.) But they do not allege BAM helped formulate the policy and also allege it applied to VIP users generally. (*Id.*) This Court already held that such general treatment is not a special accommodation for terrorist actors and rejected the theory that Binance.com "generally permitted and solicited illicit actors of all ilks to use its platforms." Op. at 52-54. Nor does the conduct resemble the "bespoke dealings" or "voluntary, tailored relationship" in *AstraZeneca*, 165 F.4th at 612-13. Plaintiffs still do not allege that terrorist-linked users received accommodations unavailable to other VIP customers. Op. at 52-53. Even under Plaintiffs' theory, any alleged benefit to terrorist-linked users would be an incidental consequence of generally available platform policies, not targeted assistance to terrorist actors or proof that Defendants "wished to bring about" terrorist attacks. *Twitter*, 598 U.S. at 498.

The SAC does not cure the defects identified in dismissing the FAC: it still alleges no general awareness, knowing and substantial assistance, definable nexus to the attacks, or culpable participation by BAM. The JASTA claim should be dismissed with prejudice.

## III. Plaintiffs Fail to Establish that BAM Is an "Alter Ego" for Jurisdictional or Liability Purposes.

Unable to identify conduct by BAM giving rise to jurisdiction or liability, Plaintiffs seek to attribute the contacts and conduct of separate actors to BAM through an alter-ego theory. (*See, e.g.*, SAC ¶¶ 423, 532.) But alter ego is not a substitute for pleading defendant-specific facts. It is an extraordinary doctrine that permits courts to disregard the corporate form only in exceptional circumstances. Plaintiffs' allegations fall far short of that demanding standard.

### A. Plaintiffs Cannot Satisfy the Demanding Standards Governing Alter-Ego Liability.

For jurisdictional purposes in federal-question cases, Second Circuit courts apply the federal common-law, incorporation-state, or forum-state alter-ego test. *CesFin Ventures LLC v. Al*

*Ghaith Holding Co. PJSC*, 2022 WL 18859076, at *4 (S.D.N.Y. Dec. 10, 2022). For liability, they apply federal common law or incorporation law. *Doheny v. IBM*, 714 F. Supp. 3d 342, 371-72 (S.D.N.Y. 2024). BAM is not BHL's or Mr. Zhao's alter ego under any test.[4]

Federal common law, New York, and Delaware apply similar tests. Under federal common law, "a plaintiff must show that the controlling corporation perpetrated a fraud or so dominated and disregarded the corporate entity's form that the entity primarily transacted the dominat[ing] entity's personal business rather than its own corporate business." *Id.* at 374.[5]

New York law also requires "the controlling entity exercised complete domination over the corporation with respect to the transaction at issue" and further that "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Id.* at 373.

Delaware law does not materially differ from New York law: plaintiffs must show "exclusive domination and control to the point that [the dominated entity] no longer has legal or independent significance of its own" and was "a sham" that "exist[ed] for *no other purpose* than as a vehicle for fraud." *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (emphasis added).[6]

---

[4] The "standard for piercing the corporate veil for purposes of personal jurisdiction . . . is a less stringent one" than the standard for imposing liability. *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 2012 WL 12932049, at *14 (S.D.N.Y. July 17, 2012); *see also Bank of Am. v. Apollo Enter. Sols., LLC*, 2010 WL 4323273, at *4 (S.D.N.Y. Nov. 1, 2010). Even if Plaintiffs could satisfy their burden for jurisdictional purposes, that would not automatically establish liability.

[5] Federal and New York law look to the same factors to assess domination: (1) whether corporate formalities are observed, (2) whether the capitalization is adequate, (3) intermingling of funds, (4) whether there is overlap in ownership, officers, directors, and personnel, (5) whether the corporate entities share common office space, address, and telephone numbers, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the alleged dominator deals with the dominated corporation at arm's length, (8) whether the corporation is treated as an independent profit center, (9) whether others pay or guarantee debts of the dominated corporation, and (10) whether the corporation in question had property that was used by the alleged dominator as if it were the dominator's own. *See id.* at 373-74 (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).

[6] Delaware courts look to multiple factors to determine domination, including "(1) whether the

Additionally, "an overall element of injustice or unfairness" must be present, *Manichaean Cap.*, 251 A.3d at 707, as well as "a causal connection between the damages alleged and the abuse of the corporate form." *In re Maxus Energy Corp.*, 641 B.R. 467, 505 (Bankr. D. Del. 2022).

Under any formulation, alter ego presents a high bar. Related corporations are afforded a "presumption of separateness," *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (applying federal common law), and courts "disregard corporate form reluctantly," *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (applying New York law). *See Gracey v. Albawardi*, 2024 WL 5116368, at *5 (Del. Ch. Dec. 13, 2024) ("Delaware law presumes respect for the corporate form. . . . As such, persuading a Delaware court to disregard the corporate entity is a difficult task."); *Nat'l Gear & Piston, Inc v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 404 (S.D.N.Y. 2013) (Delaware law establishes a "high hurdle"). Plaintiffs therefore must show far more than common ownership, overlapping interests, managerial involvement, or influence over business decisions. They must plausibly allege that BAM lacked a meaningful corporate existence of its own. They cannot.

### B. The SAC Does Not Plausibly Allege That BAM Lacked an Independent Corporate Existence

The "extraordinary circumstances" required to pierce the corporate veil are not present here. *See Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012). Whatever motive Plaintiffs ascribe to BAM's formation, they cannot plausibly characterize an operating exchange with hundreds of millions of dollars in independent

---

company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021).

revenue as "merely a shell," *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 276 (2d Cir. 2023), or "a sham" that "exist[ed] for no other purpose than as a vehicle for fraud," *Wallace*, 752 A.2d at 1184.

**1. BAM Operates a Substantial, Revenue-Generating Business.**

Plaintiffs cannot plausibly allege that BAM lacked an independent corporate existence. To prevail on an alter-ego theory, Plaintiffs must show that BAM "exist[ed] for no other purpose than as a vehicle for fraud," *Wallace*, 752 A.2d at 1184, or was "actually carrying on [BHL's] business instead of its own," *In re Lyondell Chem. Co.*, 543 B.R. 127, 141 (Bankr. S.D.N.Y. 2016).

Plaintiffs attempt to satisfy that standard by alleging that BAM "was not built to be a successful standalone cryptocurrency exchange business." (SAC ¶ 268; *see also* SAC ¶ 264.) But they still do not plausibly allege that BAM functioned as nothing more than a shell. Plaintiffs' own sources establish that BAM had independent corporate significance. The SAC acknowledges that BAM had its own customers, employees, bank accounts, and assets. (*See* SAC ¶¶ 270-72.) The SEC complaint further alleges that, as of 2023, Binance.US was "one of the top five crypto asset trading platforms in the United States," with average 24-hour volume over $282 million, and that in 2021, "BAM Trading generated over $265 million in revenue." Am. Compl. ¶ 211, *SEC v. BHL*, No. 23-cv-1599 (D.D.C. June 5, 2023), ECF No. 282 ("SEC Am. Compl."); *id.* ¶ 241. Those incorporated allegations contradict the claim that BAM's exchange was not "independent and successful." (SAC ¶ 264.)

The Kellogg Declaration confirms this. BAM maintains its own Board of Directors, employees, bank accounts, financial reports, tax returns, customer assets, and customer information. (Kellogg Decl. ¶¶ 19-24, 32-39.) It pays its own operating expenses and employee compensation, services its own debt, and has never received capital contributions from BHL. (*Id.* ¶¶ 28, 30-31.) BAM and BHL do not share bank accounts, and neither entity has authority over

the other's accounts. (*Id.* ¶¶ 33-36.) BAM also maintains sufficient capital to meet its anticipated obligations and prepares its own quarterly financial reports and profit-and-loss statements without BHL's involvement. (*Id.* ¶¶ 29, 37.) These facts confirm that BAM operated its own business, maintained separate finances, and functioned as an independent profit center.

**2. Plaintiffs' Ownership and Governance Allegations Do Not Establish Complete Domination.**

Plaintiffs rely heavily on allegations concerning ownership and managerial involvement. BAM is a wholly owned subsidiary of BAM Management US Holdings Inc., an entity whose ownership Plaintiffs allege traces indirectly to Mr. Zhao. (Kellogg Decl. ¶ 5; SAC ¶ 31.) Plaintiffs acknowledge, however, that Mr. Zhao's indirect ownership interest has "shrunk" over time. (SAC ¶ 31.) They do not allege that BHL owns BAM, and it does not. (Kellogg Decl. ¶¶ 6-7.)

Allegations that Mr. Zhao or BHL influenced BAM's assets or business decisions describe ordinary incidents of ownership and corporate governance. (*See, e.g.*, SAC ¶¶ 271, 273.) The Second Circuit and Delaware courts have repeatedly held that common ownership or management between corporations does not warrant imposing alter ego liability. *See Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988). Requiring approval for certain business expenditures or decisions is also "conduct [] typical of a majority shareholder." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460; *see Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *6 n.44 (Del. Ch. Nov. 13, 2018) ("It is hornbook law that the exercise of the control which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary."); *cf. Greene v. Long Island R.R.*, 280 F.3d 224, 233-34 (2d Cir. 2002).

Mr. Zhao's involvement with both companies does not change the analysis. "Neither total stock ownership nor the existence of common management, without more, is sufficient to pierce the corporate veil." *Landgarten v. York Rsch. Corp.*, 1988 WL 7392, at *4 (Del. Ch. Feb. 3, 1988);

*see also Trs. of Arden v. Unity Constr. Co.*, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000). Even "substantial overlap in management and control of . . . two entities" ordinarily does not eliminate the "legal significance of corporate form." *Wenske*, 2018 WL 5994971, at *6 n.44.[7] Plaintiffs therefore must allege facts showing that BAM lacked meaningful discretion and operated only as a vehicle for BHL or Mr. Zhao. The SAC does not do so.

### 3. The Statements and Regulatory Materials Cited in the SAC Do Not Establish That BAM Was a Shell.

Plaintiffs rely on selective quotations from BAM's former executives. Read in context, those statements undermine, rather than support, Plaintiffs' position.

For example, Plaintiffs cherry-pick statements by BAM's early CEOs to paint a misleading picture. According to the SEC Complaint, which is the source of the SAC's quoted statement, Catherine Coley's statement that her team felt "duped into being a puppet" was not a description of "the degree of control exercised by Binance and Zhao over BAM's operations." (*See* SAC ¶ 274.) Instead, it was a reaction to a news article describing Mr. Zhao's supposed motives for creating BAM, indicating that this scheme was news to her and BAM's employees. *See* SEC Am. Compl. ¶¶199-200 (alleging that the article caused BAM employees to "los[e] a lot of trust"). The reaction of BAM's employees to previously unknown allegations does not establish that they knowingly operated a sham entity. It suggests the opposite.

Plaintiffs likewise omit critical context from the testimony of former BAM CEO Brian Brooks. Plaintiffs claim Mr. Brooks testified that Mr. Zhao "was the CEO of [BAM], not [him]." (SAC ¶ 274.) In reality, Mr. Brooks testified that his communications with Mr. Zhao were in his

---

[7] *See also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("Control through the common ownership of shares does not fuse the corporations, even when the directors are common to each."); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349-50 (S.D.N.Y. 2013) (similar).

capacity as "board chair [of] BAM Trading." *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599 (D.D.C. June 8, 2023), ECF No. 29-4, at 74:6-11.[8] He further clarified that BAM did not "report" to BHL or Mr. Zhao and that BHL did not control BAM. *Id.* at 65:6-15 (describing his communications with Mr. Zhao as "just corporate communication" and stating, "I don't regard that as reporting"), 74:16-22 ("Binance.com [did not] somehow control[] us.").

Mr. Brooks also qualified his statement that "CZ was the CEO of BAM, not [him]" by explaining:

> That **wasn't because Binance.com somehow controlled us** . . . It was more of an issue of if I'm Steve Ballmer and he's Bill Gates, who's really running this company, right? So it was not that oh, gee CZ's acting in a different capacity, it is more of do I have the delegation and autonomy to carry out the mission of a CEO . . . ?

*Id.* at 74:19-75:4 (emphasis added). This context defeats Plaintiffs' claim of total dominion. Rather, it reflects his personal frustration with being "overruled" on certain strategic matters such as BAM's tech migration and his perception of being overshadowed by a more prominent figure, analogous to "Steve Ballmer [to] Bill Gates." *Id.* at 74:23-25, 75:16-76:7. Plaintiffs' reliance on this isolated phrase is unsurprising, but Mr. Brooks himself provides ample explanation for his turn of phrase, which fails to support the level of control required to establish an alter ego relationship.

Plaintiffs also rely on regulatory materials that do not implicate BAM. For example, Mr. Zhao's alleged statement that blockchain companies don't require "a formal corporate entity with a headquarters and its own bank account" (SAC ¶ 32), is irrelevant here because BAM indisputably has both. (*See* Kellogg Decl. ¶ 4; SAC ¶ 270 (alleging that BAM has bank accounts).) Plaintiffs' citation to government allegations that Mr. Zhao and Binance have been "publicly dismissive" of

[8] BAM refers the Court to the fuller testimony that the SAC quotes.

traditional corporate structures (*see* SAC ¶ 34) similarly comes from a section of the SEC complaint relating to *BHL*. SEC Am. Compl. ¶ 27.

Next, Plaintiffs claim a federal court has found that Mr. Zhao operated "the Binance platform as a common enterprise." (SAC ¶ 33.) Again, this finding says nothing about BAM—it comes from a consent order in an action BAM was not party to and that made no mention of BAM or its platform. *See CFTC v. Zhao*, 2023 U.S. Dist. LEXIS 236484, at *3, 10-11 (N.D. Ill. Dec. 14, 2023). Plaintiffs' allegation that Mr. Zhao "'made the strategic decisions for' the entire Binance enterprise" (SAC ¶ 34) appears to be a paraphrase of this same order. *See CFTC v. Zhao*, 2023 U.S. Dist. LEXIS 236484, at *11 (similar language). And Plaintiffs' claim that Mr. Zhao "exercised day-to-day control over [the] operations and finances" of "the Binance enterprise" appears to paraphrase Mr. Zhao's plea agreement—which BAM was again not a party to or mentioned in (and for which he has since been pardoned). *See* Zhao Plea Agreement ¶ 9(d).

**4. The SAC Does Not Allege Disregard of BAM's Corporate or Financial Separateness.**

The traditional indicia of domination are largely absent from the SAC. Plaintiffs, for example, do not allege that BAM failed to observe corporate formalities, such as having "no contracts, no employees, [or] no independent office space," or failing to keep corporate records. *Am. Fuel Corp.*, 122 F.3d at 135. Their own theory alleges that BAM was created to conduct U.S. operations through a separate entity represented as "fully compliant" with U.S. law. (SAC ¶ 262.) That theory presupposes an entity with its own operations, personnel, policies, accounts, and regulatory obligations.

Nor do Plaintiffs allege that BAM was undercapitalized or insolvent. The cases permitting veil piercing on those grounds involve entities with no meaningful assets or capital, or entities dependent on their owners for ordinary operating expenses. *See Gadsden v. Home Pres. Co.*, 2004

WL 485468, at *5 (Del. Ch. Feb. 20, 2004) (disregarding corporate status where corporation had "no assets, capital, or tools" and shareholder actively "remov[ed] all funds from the corporate accounts"); *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2025 WL 289499, at *3 (2d Cir. Jan. 24, 2025) (finding undercapitalization where companies had "minimal" bank balances and relied on owner's personal funds for operating expenses). BAM bears no resemblance to those entities. Plaintiffs' incorporated materials describe a platform generating hundreds of millions of dollars in annual revenue (*see supra* Section III.B.1), while the Kellogg Declaration establishes that BAM paid its own expenses, serviced its own debt, filed its own tax returns, and maintained adequate capital. (Kellogg Decl. ¶¶ 28-32.)

The SAC also does not plausibly allege commingling of funds. It alleges neither shared bank accounts, nor funds held in the other's accounts. The SAC alleges only that, after funds left BAM's accounts, a third party held them in an account containing other funds associated with BHL. (SAC ¶ 269.) That does not establish that BAM and BHL disregarded their separate accounts or treated each other's property as their own. The Kellogg Declaration confirms that neither company has access to the other's bank accounts and that BHL personnel cannot initiate or execute transfers from BAM's accounts. (Kellogg Decl. ¶¶ 33-36.)

The SAC also contains no well-pleaded allegation that BAM and BHL failed to deal at arm's length. Their commercial relationship is governed by written service-level agreements under which BHL licenses specified technology and trademarks to BAM. (Kellogg Decl. ¶¶ 26-27.) Reliance on contracted services does not establish that the licensee lacks corporate independence. The relevant question is whether BAM conducted its own business. Its separate customers, platform, employees, finances, regulatory obligations, and substantial revenue establish that it did.

### 5. Plaintiffs Do Not Allege That Any Misuse of BAM's Corporate Form Caused Their Injuries.

Delaware and New York also require that Mr. Zhao and Binance used their alleged control over BAM to harm Plaintiffs. *See In re Nordlicht*, 115 F.4th 90, 107 (2d Cir. 2024) (requiring that "[the] domination was used to commit a fraud or wrong *that injured the party seeking to pierce the veil*" (emphasis added)); *In re Maxus Energy Corp.*, 641 B.R. at 505 (requiring a "causal connection" between "abuse of the corporate form" and plaintiff's damages).

Plaintiffs do not allege that Mr. Zhao or Binance used BAM to harm *them*. BAM is not alleged to have engaged in conduct linked even indirectly or remotely to terrorism (independently or at Mr. Zhao's or BHL's direction). Plaintiffs do not identify any transaction in the SAC that allegedly took place on Binance.US. To the extent that Plaintiffs allege Mr. Zhao created BAM to perpetrate a "fraud," (SAC ¶ 269), its purported target was U.S. regulators, not Plaintiffs. *In re All Year Holdings Ltd.*, 648 B.R. 434, 444-45 (S.D.N.Y. 2022) (dismissal proper where complaint fails to allege alter ego was used "to perpetuate a fraud or some other wrong *against the plaintiff*" (emphasis added)). Even if Plaintiffs' few allegations were sufficient to establish Zhao's "control," they still would not permit holding BAM liable under the ATA.

Plaintiffs' deficient alter-ego theory cannot cure their failure to plead any relevant jurisdictional contacts or substantive conduct by BAM.

## CONCLUSION

For the reasons above, the Court should dismiss the Second Amended Complaint against BAM with prejudice under Rule 12(b)(2) and Rule 12(b)(6).

Dated: September 4, 2026

Respectfully submitted,

By: */s/ Thania Charmani*

Daniel Tramel Stabile
Thania (Athanasia) Charmani
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-4659
Daniel.stabile@winstontaylor.com
Thania.charmani@winstontaylor.com

***Attorneys for Defendant BAM Trading Services Inc. d/b/a Binance.US***

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1 and Section 5(a) of the Court's Individual Rules and Practices in Civil Cases, I hereby certify that the foregoing memorandum of law complies with the word count limitation as set forth therein. As measured by the word processing system used to prepare it, the foregoing memorandum of law contains 8,727 words.

Dated: September 4, 2026

*/s/ Thania Charmani*
Thania Charmani

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2026, a true and correct copy of the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users in this action.

*/s/ Thania Charmani*
Thania Charmani

***Attorney for Defendant BAM Trading Services Inc. d/b/a Binance.US***